IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD M. LISAN, M.D. | ) | Case No. 1:18-CV-0969 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT WILKE, Acting Secretary of Veterans Affairs, | ) | <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u> |
| | ) | |
| | ) | |
| Defendant. | | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................iv

STATEMENT OF THE ISSUES .......................................................................................... 1

SUMMARY OF THE ARGUMENT ................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 1

   I.    LISAN'S REQUEST FOR ACCOMMODATION ............................................. 3

      A.    On-Call Duties at the VA ......................................................................... 3

      B.    Lisan's Reasonable Accommodation Process ............................................. 4

      C.    Lisan's On-Call Obligations in Late 2016 and Early 2017 ......................... 6

   II.    LISAN'S COMPLAINT ................................................................................... 6

   III.    FOUR NURSES MAKE SEXUAL HARASSMENT COMPLAINTS AGAINST
        LISAN, AND LISAN FAILS TO FOLLOW VA DIRECTIVE ...................................... 6

      A.    Lisan Continued to Harass the CRNAS and Touched Bonfili in the Operating Room
          During a Surgery. ...................................................................................... 9

      B.    Letter of Warning and Suspension ............................................................ 10

LAW AND ARGUMENT .................................................................................................. 11

   I.    SUMMARY JUDGMENT STANDARDS ....................................................... 11

   II.    TITLE VII STANDARDS ................................................................................ 12

   III.    REHABILITATION ACT STANDARDS ....................................................... 13

   IV.    LISAN'S GENDER DISCRIMINATION CLAIM FAILS. .......................................... 13

      A.    Lisan Cannot Set Forth A Prima Facie Case of Gender Discrimination. ................... 13

      B.    Lisan Cannot Show That the VA's Explanation for Its Actions is Pretextual. ........... 16

   V.    LISAN'S DISABILITY DISCRIMINATION CLAIMS ARE WITHOUT MERIT...... 18

      A.    Lisan's Failure to Accommodate Claim Fails. .......................................... 18

     1.  Lisan is not Otherwise Qualified Because he Cannot Perform an Essential Function of His Position With or Without Reasonable Accommodation………………………..  18

     2.  On-Call Duties are an Essential Function of Lisan's Position……………………19

    B.    Lisan's Disability Discrimination Claim Also Fails. .................................................. 22

VI.    LISAN FAILS TO STATE A RETALIATION CLAIM. ............................................. 23

    A.    Adverse Actions .................................................................................................. 24

    B.    Lisan Cannot Prove Causation............................................................................. 26

VII.    LISAN CANNOT STATE A HOSTILE WORK ENVIRONMENT CLAIM. ............. 26

CONCLUSION ............................................................................................................. 29

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537 (6th Cir. 2003) .................................................. 23

*Akers v. Alvey*, 338 F.3d 491 (6th Cir.2003).................................................................................... 27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 12

*Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008)......................................................... 14

*Armstrong v. Index Journal Co.*, 647 F.2d 441 (4th Cir. 1981)..................................................... 25

*Austion v. City of Clarksville*, 244 F. App'x 639 (6th Cir. 2007)................................................. 28

*Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653 (W.D. Ky. 2012) .................. 21

*Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338 (6th Cir. 1998)............................................. 29

*Barrett v. Whirlpool Corp.*, 556 F.3d 502 (6th Cir. 2009)............................................................ 24

*Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir. 1997) ......................................................... 27

*Blake v. Potter*, Nos. 1:04CV2112, 1:05CV649, 2006 WL 355321
    (N.D. Ohio Feb. 15, 2006) ....................................................................................................... 28

*Bligh-Glover v. Rizzo*, No 1:08CV2788, 2012 WL 4506029
    (N.D. Ohio Sept. 30, 2012) ...................................................................................................... 28

*Bonfiglio v. Toledo Hosp.*, No. 3:16CV2163, 2018 WL 5761220
    (N.D. Ohio Nov. 1, 2018) ........................................................................................................ 15

*Broska v. Henderson*, 70 F. App'x 262 (6th Cir. 2003)................................................................ 29

*Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006) ................................................. 24, 25

*Campbell v. Hamilton Cty.*, 23 F. App'x 318 (6th Cir. 2001) ...................................................... 15

*Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698 (6th Cir. 2012) ........................ 28

*Combs v. Int'l Ins. Co.*, 354 F.3d 568 (6th Cir. 2004) ................................................................. 12

*Commerce Fed. Sav. Bank v. Fed. Deposit Ins. Corp.*, 872 F.2d 1240 (6th Cir.1989) .................. 2

*E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753 ............................................................................ 21, 26

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998) ...........................14-15

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ..................................................... 27

*Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800 (5th Cir. 1997) ............................. 19

*Freeman v. Potter*, 200 F. App'x 439 (6th Cir. 2006) ................................................... 14

*Fullen v. City of Columbus*, 514 F. App'x 601 (6th Cir. 2013) ................................... 16

*Gaines v. Runyon*, 107 F.3d 1171 (6th Cir. 1997) ........................................................ 18

*Gohl v. Livonia Pub. Sch.*, 134 F. Supp. 3d 1066 (E.D. Mich. 2015) ......................... 13

*Grace v. USCAR*, 521 F.3d 655 (6th Cir. 2008) ........................................................... 26

*Green v. BakeMark USA, LLC*, 683 F. App'x 486 (6th Cir. 2017) ............................. 19

*Gribcheck v. Runyon*, 245 F.3d 547 (6th Cir.2001) ..................................................... 24

*Hammond v. Jacobs Field Servs.*, 499 F. App'x 377 (5th Cir. 2012).....................21-22

*Hardman v. Univ. of Akron*, 40 F. App'x 116 (6th Cir. 2002) .................................... 15

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)................................................... 27, 28

*Hedrick v. W. Res. Care. Sys.*, 355 F.3d 444 (6th Cir. 2004) ...................................... 18

*Henderson v. Walled Lake Consol., Sch.*, 469 F.3d 479 (6th Cir. 2006) ..................... 12

*Hennenfent v. Mid Dakota Clinic, P.C.*, No. CIV A1-96-117, 1998 WL 1780618
(D. N. Dakota March 3, 1998) ...................................................................... 21

*Hersko v. Wilson*, No. 3:15-CV-215, 2018 WL 3456262 (S.D. Ohio July 18, 2018) ................. 18

*Hoskins v. Oakland Cty. Sheriff's Dep't.*, 227 F.3d 719 (6th Cir. 2000).................... 21

*Johnson v. Kroger Co.*, 319 F.3d 858 (6th Cir. 2003) ................................................. 16

*Jones v. Potter*, 488 F.3d 397 (6th Cir. 2007)....................................... 11, 13, 18, 22

*Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925 (8th Cir. 2012) ................. 21

*Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876 (6th Cir.1996)............................ 14, 24

*Laurin v. Providence Hosp.*, 150 F.3d 52 (1st Cir. 1998)........................................... 20

*Lewis v. Humbold Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) ................................... 13

*Loeffler v. Frank*, 486 U.S. 549 (1988)........................................................................... 2

*Lutz v. Donahoe*, No. 13CV11335, 2014 WL 2218042................................................... 24

*Martinez v. Cracker Barrel Old Country Store*, 703 F.3d 911 (6th Cir. 2013) ........................... 16

*Marty Meyer-Gad v. Centra Care Health Sys.*, Civ. No. 05-1086,
    2006 WL 2987668 (D.Minn. Oct. 18, 2006)........................................................... 21

*Mason v. Geithner*, 811 F. Supp. 2d 128 (D.D.C.2011) ................................................... 25

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ............................................ 12, 16, 22

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)................................................... 27

*Miller v. Univ. of Pittsburgh Med. Ctr., McKeesport*, Civ. Act. No. 06-937,
    2008 WL 11450427 (W.D. Pa. July 10, 2008)........................................................ 21

*Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992) .................................................. 15, 29

*Mo. Pac. R.R. v. Ault,* ("Ault"), 256 U.S. 554, 41 S.Ct. 593, 65 L.Ed. 1087 (1921)..................... 2

*Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497 (6th Cir. 2014) ................................ 26

*Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784 (6th Cir. 2000) .................................... 27, 28

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ............................................ 27

*Nelson v. Ball Corp.*, 656 F. App'x 131 (6th Cir. 2016) ................................................... 14

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)........................................... 28

*Peltier v. United States*, 388 F.3d 984 (6th Cir. 2004) .................................................... 13

*Porter v. Tri-Health, Inc.*, Civ. Act. No. 1:16CV00978-WOB,
    2018 WL 5779490 (S.D. Ohio Nov. 2, 2018)......................................................... 20, 21, 22

*Rattigan v. Holder*, 604 F. Supp. 2d 33 (D.D.C. 2009) .................................................... 25

*Russell v. Univ. of Toledo*, 537 F.3d 596 (6th Cir. 2008) ................................................. 16

*Seeger v. Cincinnati Bell Telephone Co.*, LLC, 681 F.3d 274 (6th Cir. 2012)........................... 16

*Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603 (6th Cir. 2003) .......................... 17

*Taylor v. Geithner*, 703 F.3d 328 (6th Cir. 2013) .......................................................... 26

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556 (2d Cir. 2011) .......................... 26

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ................................. 13

*Thompson v. Williamson County*, 219 F.3d 555 (6th Cir. 2000) ................................ 13

*Thorn v. Sebelius*, 766 F. Supp. 2d 585 (D. MD 2011) ................................... 28

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) .................................. 24, 26

*Upshaw v. Ford Motor Co.*, 576 F.3d 576 (6th Cir. 2009) ................................ 12

*Vaughn v. Parkwest Med. Ctr.*, 716 F. App'x 428 (6th Cir. 2017) ................................ 22

*White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 797 (6th Cir. 2004) ................................ 24

*Willey v. Slater*, 20 F. App'x 404 (6th Cir. 2001) ................................ 28

*Williams v. Gen. Motors Corp.*, 187 F.3d 553 (6th Cir. 1999) ................................ 28

*Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359 (6th Cir. 2010) ................................ 15

*Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249 (6th Cir. 2002) ................................ 14

## **STATUTES**

29 U.S.C. § 701 ................................................................................................. 13

29 U.S.C. § 794 ................................................................................................. 13

29 U.S.C. § 794(a) ............................................................................................. 18

42 U.S.C. §§ 2000e-2000e-17 ........................................................................... 12

42 U.S.C. § 2000e-3(a) ...................................................................................... 23

42 U.S.C. §§ 12101-12213 ................................................................................ 13

**FEDERAL REGULATIONS**

29 C.F.R. § 1630.2 ................................................................................................... 20

**LEGISLATIVE MATERIALS**

Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017, Pub. L. No. 115-41, 131 Stat. 862 (2017) ............................................................. 11

## STATEMENT OF THE ISSUES

1. Whether Plaintiff Ronald Lisan (Lisan) has set forth a prima facie of gender discrimination, retaliation, and hostile work environment under Title VII.

2. Whether Lisan has set forth a prima facie case of failure to accommodate, disability discrimination, and retaliation under the Rehabilitation Act.

3. Whether Lisan can show that Defendant's legitimate, non-discriminatory reasons for its actions were pretextual.

## SUMMARY OF THE ARGUMENT

Lisan is not entitled to an accommodation removing the essential functions of his position, particularly where medical documentation does not identify Lisan's functional limitations or the length of his requested accommodation. When, shortly thereafter, a nurse tells the chief of anesthesiology that Lisan made inappropriate sexual comments towards her, and the chief later learns that other nurses have similar allegations, it is not gender discrimination for the chief to initiate a sexual harassment investigation. Nor is it discrimination or retaliation for the VA to issue a ten-day suspension where Lisan deliberately violated orders not to discuss the allegations with the complainants. This Court should grant summary judgment in favor of the VA because Lisan has failed to establish a prima facie case for his claims, was not entitled to the accommodation of his choice, and cannot show that Defendant's legitimate, non-discriminatory reasons for its actions were pretextual.

## FACTUAL BACKGROUND

On April 27, 2018, Lisan filed a Complaint asserting that his "claims in this action include sex discrimination, hostile work environment, disability discrimination, denial of Reasonable Accommodation and reprisal/retaliation." (ECF No. 1, PageID # 2, ¶ 6.) He seeks compensatory damages in excess of $100,000; pre-judgment and post-judgment interest; removal of adverse items

from the Cleveland VA Medical Center's ("VA") records; attorney's fees; and an award of back pay, front pay, and benefits. (ECF No. 1, PageID # 25.)[1]

Lisan is employed at the VA as a staff anesthesiologist. He began working at the VA in January 2006 in part because the hours and on-call responsibilities were less onerous than at his prior position. (Deposition of Ronald Lisan ("Lisan Tr.") 30:9-31:1). Beginning in January 2015, and at all times since, Dr. Susan Raphaely, M.D., has been the Service Chief of Anesthesiology and Lisan's first-line supervisor. (Declaration of Susan Raphaely ("Raphaely Dec."), ¶ 1). Dr. Raphaely reports to Dr. Murray Altose, the Chief of Staff of the VA, who in turn reports to Susan M. Fuehrer, the director of the VA. (*Id.*) In 2014, Dr. Raphaely met with the prior chief of anesthesiology, who sent her information about the department and expected staff departures. (*Id.*, ¶ 2.)

In the summer of 2016, Lisan was diagnosed with obsessive-compulsive disorder ("OCD"), though he was aware of the OCD much earlier and knew he had depression for "decades." (Lisan Tr. 35:25-36:20.) In September 2016, Lisan took a medical leave of absence to seek treatment at Rogers Memorial Hospital. (*Id.* at 74:3-14.) He returned to work on Wednesday, December 7, 2017. (*Id.* at 125:20-22.) When Lisan returned to work, he was capable of "competently performing all of the duties of a full-time anesthesiologist at the VA, for all regularly scheduled full-time weekly work hours." (ECF No. 1, PageID # 18, ¶ 17.) He had a light workload the first week, with two days of no assignments, and three cases, a normal workload, on Friday, December 9th. (Raphaely Dec. ¶ 6h). However, he felt that he could not participate in on-call duties. (Lisan Tr. 124:7-8.)

---

[1]Lisan also seeks punitive damages against the VA. However, punitive damages are not available in this case. The United States and its agencies are immune from suit, unless such immunity has been waived. *See, e.g., Loeffler v. Frank,* 486 U.S. 549, 554 (1988). The Supreme Court has held that, in light of the doctrine of sovereign immunity, courts lack the authority "to impose punitive fines or assessments upon an instrumentality of the United States, absent an express waiver of such immunity by Congress." *Commerce Fed. Sav. Bank v. Fed. Deposit Ins. Corp.,* 872 F.2d 1240, 1248 (6th Cir.1989) (citing *Mo. Pac. R.R. v. Ault,* 256 U.S. 554, 563–65, 41 (1921)).

## I.    LISAN'S REQUEST FOR ACCOMMODATION

When Dr. Raphaely first became aware of Lisan's request for no-call, she did not know the duration of the request, whether it was long-term or short-term. (Deposition of Susan Raphaely ("Raphaely Tr.") 118:16-22). Lisan told her that he needed to gradually work up to being on call, but did not indicate, nor was he aware of, how long was that would take. (*Id.* at 119:2-8). Dr. Raphaely initially felt the request was feasible but did not know the VA's rules. (*Id.* at 120:5-13). She asked for guidance from Dr. Altose and human resources (HR) who told her that it was not her decision, and she needed to refer Lisan to the reasonable accommodation department. (*Id.* at 121:3-122:1; Raphaely Dec. ¶ 6i). Accordingly, Dr. Raphaely reached out to Bruce Kafer, the Local Reasonable Accommodation Coordinator (LRAC), in the VA's EEO office. (Declaration of Bruce Kafer ("Kafer Dec.") ¶ 6a). Kafer asked her whether on-call duties were an essential function of a staff anesthesiologists' position. (Raphaely Dec. ¶ 6j).

### A.    On-Call Duties at the VA

The anesthesiology department at the VA is a 24/7 operation, and an anesthesiologist may be needed at any time for emergency surgeries or consultations. (*Id.* ¶ 5). Because an anesthesiologist needs to be available at all times, nearly all of them participate in an on-call rotation. (*Id.*) Overnight, "on-call," or "first call" duties for a staff anesthesiologist at the VA require a physician to start their shift at 2 p.m., instead of 7 a.m., and to stay at the hospital until the last surgery is complete. (*Id.* ¶ 5c.) At that point, the on-call physician can leave the hospital and go home but must be available by pager or cell phone to answer calls or come back to the VA as needed. (*Id.*) This is distinct from "late duty," where the anesthesiologist starts their day at 9 a.m. and stays until the on-call physician allows them to leave, generally around 5 p.m. (*Id.* ¶ 5b.) The late duty anesthesiologist has no overnight obligations, nor do they need to be available once they leave the hospital. (*Id.* ¶ 5b.) Between late duty and first call, anesthesiologists at the VA generally have "call"

3

5 to 6 times every month. (*Id.* ¶ 5.) The functional statement identifying responsibilities of a staff anesthesiologist states that on-call duties are part of the position. (*Id.* ¶ 5a, Ex. 1C). Indeed, according to the VA Handbook, <u>all</u> full-time physicians are expected to be on-call as part of their normal hours of work. (*Id.* ¶ 5, Ex. 1B.) The exception is one anesthesiologist who works exclusively at the VA's ambulatory surgery center, which is only open during traditional business hours; however, she receives a commensurately lower salary and works pursuant to a unique employee agreement. (*Id.* ¶ 5e.)

In addition, the number of staff in the anesthesiology department fluctuates on a daily basis. (Raphaely Tr. 139:17-23). Dr. Raphaely testified, "we function kind of almost bare minimum so we don't have a lot of flexibility when someone, when people are gone." (*Id.*) Thus, when someone is not in the on-call rotation, the remaining physicians must work additional call shifts. (Raphaely Dec. ¶ 5f.) The percentage of time spent on call is highly variable, and depends on what might occur on any given day. (Raphaely Tr. 133.) In light of the foregoing, Dr. Raphaely told Kafer that call was an essential function of an anesthesiologist's position. (Kafer Dec. ¶ 6a.)

B.    Lisan's Reasonable Accommodation Process

On December 16, 2016 Lisan submitted a reasonable accommodation application with a one-sentence doctor's note to Kevin Roach, the department's administrative officer, which Roach forwarded to Kafer. (Kafer Dec. ¶ 2b, Ex. 2-B.) The note said, "This will verify this patient's need to not be on call as he recovers from a recent hospitalization stay." (*Id.*) At this point, Lisan did not know how long he would need the "no-call" accommodation. (Lisan Tr. 128:21-130:7). Kafer informed Lisan that his medical documentation was insufficient, explained the reasonable accommodation process, including the fact that essential functions cannot be removed via the reasonable accommodation process, and asked for additional documentation. (Kafer Dec. ¶ 2c-2d, Ex.2-B). Kafer also explained that reassignment to another position may be an option if a reasonable

4

accommodation was not available, but that this was a separate process. (*Id.*)

Lisan submitted additional documentation clarifying that the request was for "a temporary accommodation to continue hierarchical exposure therapy without flooding, which would overwhelm." (Kafer Dec. ¶ 6e, Ex. 2-D.) In identifying the activities limited by Lisan's impairment, Carol Marciano, Lisan's healthcare provider, stated that his recovery "is based on his ability to have a regular sleep schedule," and stated, "sleep deprivation deters his healthy recovery," in response to the degree or extent to which the impairment limits an activity. (*Id.*) As to duration, Marciano stated, "to be reviewed in 6 months." (*Id.*) Dr. Kramer, from Roger's Memorial Hospital, stated, "I would strongly recommend that Dr. Lisan have a no-call position for the foreseeable future as he readjusts to his work schedule," "[Lisan] needs to be allowed to slowly acclimate to his work schedule so as to avoid flooding him with work stressors/responsibilities," and "[…] the stress of call including lack of sleep and increased anxiety could likely have delirious [sic] effect on his health." (*Id.*) Dr. Kramer stated that the accommodation was temporary, but he did not identify a time frame. (*Id.*)

Although Kafer planned to meet with Lisan on January 10, 2017, he asked Dr. Raphaely to cancel the meeting due to a conflict. (Kafer Dec. ¶ 6f, Ex. 2-E; Deposition of Bruce ("Kafer Tr.") 151:22-152:3.) On January 17, 2017, Kafer emailed Lisan to explain that the medical documentation provided did not justify the accommodation Lisan requested and that the VA's reasonable accommodation policy prohibits management from removing essential functions of his position. (Kafer Dec. ¶ 6g, Ex. 2-F.) Thus, Kafer closed Lisan's request. (*Id.* at ¶ 5). On January 18, 2017, Kafer reminded Lisan that he could seek a transfer to a no-call position through a separate process. (*Id.* at ¶ 6g, Ex. 2-F.) Lisan responded that Dr. Raphaely had told him that a brief period of no call for a few months would be possible. (*Id.*) In response, on January 19, 2017, Kafer further explained the reasonable accommodation process and reiterated that the medical documentation was insufficient to support the removal of an essential function. (*Id.*)

C.     Lisan's On-Call Obligations in Late 2016 and Early 2017

Lisan was not scheduled on call for two and a half weeks after his return. (Raphaely Dec. ¶ 6l, Ex. 1F). Although Lisan had initially requested Christmas as one of the holidays for which he would be willing to be on-call, Dr. Raphaely scheduled Dr. Moss for the four-day Christmas weekend due to Lisan's medical leave of absence; if Lisan returned, she would allow them to split the weekend. (*Id.* at ¶ 7,7n, Ex. 1J). However, when Dr. Moss was unable to take his entire call, Dr. Raphaely asked Lisan to cover two of the four Christmas on-call days, while Dr. Raphaely covered the overnight portions of those on-call duties. (*Id.* at ¶ 7n-o, Ex. 1J.) In January 2017, Dr. Raphaely scheduled Dr. Lisan for two "first call" shifts, but other anesthesiologists covered the overnight portions of Lisan's January call duties. (*Id.* at ¶ 6l, Ex. 1g). By mid-January, HR and Kafer advised Dr. Raphaely that Lisan could be added to the regular call schedule for February. (*Id.* at 6m, Ex. 1H). From February 2017 onward, Lisan was assigned to the normal call rotation. (*Id.*)

Dr. Raphaely offered Lisan the option of working part time on a temporary basis until he felt able to work at full capacity, which would result in proportionately fewer call obligations. (Raphaely Tr. 127:7-22; Lisan Tr. 170:11-13, 171:15-17.) Lisan did not accept. (*Id.*) Lisan also had the option of using his remaining FMLA leave, which he also declined. (Kafer Dec. ¶ 6d, Ex. 2-C; Lisan Tr. 171:25-172:12).

## II.     LISAN'S COMPLAINT

On January 9, 2017, Dr. Raphaely received an email containing a letter from Lisan's counsel accusing her of sex discrimination, disability discrimination, and harassment. (Raphaely Dec. ¶ 11.)

## III.     FOUR NURSES MAKE SEXUAL HARASSMENT COMPLAINTS AGAINST LISAN, AND LISAN FAILS TO FOLLOW VA DIRECTIVE

On January 9, 2017, Karin Bonfili, a certified registered nurse anesthetist (CRNA) in the anesthesiology department, came to Dr. Raphaely, her second-line supervisor, and reported that the

prior week, Lisan made unwelcome comments with sexual undertones towards her. (Declaration of Karin Bonfili ("Bonfili Dec.") ¶ 2.) Bonfili told Dr. Raphaely to speak with Jessica Foster, another CRNA, because she also had an uncomfortable, unsolicited, and upsetting encounter the prior week, which she felt was sexual harassment. (Raphaely Dec. ¶ 8a-b; see Declaration of Jessica Foster ("Foster Dec.") ¶ 2). Dr. Raphaely reached out to the VA's EEO office for guidance, where she was referred to the VA's Sexual Harassment policy, Medical Center Policy (MCP) 003-003, and advised to administer the checklists attached. (Raphaely Dec. ¶ 8b; Kafer Dec. ¶ 8, Ex. 2-H.)

MCP 003-003 explains, "[t]he key word in defining sexual harassment is unwelcome.  When any unwelcome or unsolicited conduct is imposed on a person who regards it as offensive or undesirable, could be construed as sexual harassment.  When a person communicates that the conduct is unwelcome, it could become illegal." (Kafer Dec. ¶ 8, Ex. 2-H, p. 2.) The policy counsels, "Management Officials, Service Chiefs and Supervisors must take immediate and appropriate action upon receipt of actual or constructive knowledge of sexual harassment affecting any of their employees." (*Id.*) In addition, "management officials, service chiefs, and supervisors who tolerate such behavior by failing to take appropriate action or who retaliate against employees who report incidents or file formal complaints of sexual harassment will be subject to disciplinary action." (Id). Finally, the policy advises service chiefs to be "responsive to any form of improper behavior that could lead to such allegations." (*Id.*, p.3). A supervisor is required to immediately notify the EEO/Affirmative Employment Program Manager, who will report the allegation to the Medical Center Director within 24 hours. (*Id.* p. 4.)

Accordingly, Dr. Raphaely asked Bonfili and Foster to document what happened on a "report of contact" or "ROC" form, and she submitted the completed ROCs to the EEO office. (Raphaely Dec. ¶ 8b; Foster Dec. ¶ 3, Ex. 4-A; Bonfili Dec. ¶ 3, Ex. 3-A.) Raphaely administered checklist A to Bonfili and Foster. (Raphaely Dec. ¶ 8c, Ex. 1K) On January 10 and 12, 2017, Dr. Raphaely

presented Lisan with Bonfili and Foster's ROCs and administered checklist B. (Raphaely Dec. ¶ 8d, Ex. 1L.) As per the checklist, she "ordered the alleged harasser to cease any contact with the alleged victim except that which is absolutely required for official business." (*Id.*) On the recommendation of the EEO office, she did not interview Lisan, because they would do it. (*Id.*)

In mid-January, Dr. Raphaely learned that CRNA Elaine Costanzo, as a new employee two years earlier, had heard Lisan make inappropriately sexual comments, including one where he mentioned his "own male genitalia." (Declaration of Elaine Costanzo ("Costanzo Dec.") ¶ 2.) Dr. Raphaely felt an obligation to report the behavior and asked her to document what happened. (Costanzo Dec. ¶ 4; Raphaely Dec. ¶ 8, 8c). Around January 20, 2017, Costanzo submitted an ROC to Dr. Raphaely, which she forwarded to the EEO office. (Costanzo Dec. ¶ 4, Ex. 5-A.) Following MCP 003-003, Dr. Raphaely administered checklist A to Costanzo and checklist B to Lisan, again ordering him not to have any contact with Costanzo except as required for official business. (Raphaely Dec. ¶ 8c-8d, Ex. 1K, 1L). Also on January 20, 2017, CRNA Rhonda Verb shared with Dr. Raphaely that Lisan had made inappropriate and sexually suggestive comments to her. (Declaration of Rhonda Verb ("Verb Dec."), ¶ 2-3.) Dr. Raphaely asked Verb to document the incident and administered checklist A. (*Id.* at ¶ 4, Ex. 6-A; Raphaely Dec. ¶ 8c, Ex. 1K.) For the fourth time, Dr. Raphaely administered checklist B to Lisan and ordered him not to have contact with Verb except as required for official business. (Raphaely Dec. ¶ 8d, Ex. 1L). On the advice of the EEO office, Dr. Raphaely did not interview Lisan nor investigate Costanzo or Verb's allegations, instead leaving that to the EEO office. (*Id.* at ¶ 8c-d.)

Kafer and his colleague in the EEO office, LeShelle Reese investigated the allegations. (Kafer Dec. ¶ 9, Ex. 2-I). In his deposition, Lisan largely corroborated the encounters with Bonfili and Foster, although he contends that they took his statements out of context and that he did not make any sexual overtures. (See, generally, Lisan Tr. 254:16-270:23).

A.  Lisan Continued to Harass the CRNAS and Touched Bonfili in the Operating Room During a Surgery.

The four complainants continued to feel that Lisan was harassing them. On January 26, 2017, Costanzo emailed Kafer to say that she was "starting to feel threatened and uncomfortable doing my job because Dr. Lisan has been making his rounds to ALL of my CRNA colleagues and some of the operating room nurses to 'tell his side of the story.'" (Costanzo Dec.¶ 5, Ex. 5-B.) She further stated that Lisan went into a room where he was not assigned in order to speak to a CRNA about the sexual harassment allegations. (*Id.*)

On March 7, 2017, Lisan entered an operating room (OR) where Bonfili was administering anesthesia to a patient in surgery and tried to talk to her about their relationship. (Bonfili Dec. ¶ 4.) Bonfili asked Lisan to leave, and he d*Id.* (*Id.*)

The next day, on March 8, 2017, Lisan again went into an OR where Bonfili was administering anesthesia to a patient in surgery, even though he was not the attending physician assigned to that OR. (*Id.* at ¶ 5.) She was behind drapes that separated her from the other OR staff. (*Id.*, Ex. 3-B). Lisan put his hands on Bonfili's back and asked her if it was ok to touch her, but she did not consent. (*Id.*) According to Bonfili, Lisan said that if she talked to his lawyer, "he would promise not 'to sue me'" if I would explain that he was joking about the sexual talk and never meant to hurt me." (*Id.*) He said that if Bonfili "talked to Dr. Raphaely, there would be retaliation." (*Id.*) Another anesthesiologist, Dr. Mannix, entered the room and told Lisan that he was needed in another OR, but Lisan refused to leave. (*Id.*) Dr. Schlesinger, a second anesthesiologist, ultimately told Bonfili to leave while she stayed with the patient. (*Id.*) Bonfili told Dr. Raphaely, who told Bonfili to go to EEO office. (Raphaely Dec. ¶ 9.) Kafer and Reese in the EEO office recommended that Bonfili go to the VA police. (Bonfili Dec. ¶ 5a.) Bonfili made a written statement to VA Police, and they opened an investigation. (*Id.* at ¶ 5a Ex. 3-B; Declaration of David Hohlbaugh ("Hohlbaugh

Dec.") ¶ 3, Ex. 7-A). The police interviewed both Bonfili and Lisan, describing Bonfili as "visibly upset." (Hohlbaugh Dec. ¶ 3, Ex. 7-A.) Lisan disagreed with Bonfili's account, but did not deny that he went into an OR where he was not assigned, during a surgery, in order to discuss Bonfili's allegations with her. (*Id.*)

On March 8, 2017 Costanzo reported to Dr. Raphaely that Lisan called her cell phone, stating that he did not feel they could provide safe patient care together because Costanzo did not say "hello" to him in the hallway, that he asked her to change shifts so they did not have to work together, and that he discussed Costanzo's allegations against him. (Costanzo Dec. ¶ 6, Ex. 5-C). On March 9, 2017, Costanzo documented the incident in a statement to the VA Police and on an ROC, which she submitted to Dr. Raphaely. (*Id.*; Hohlbaugh Dec. Ex. 7-A.)

On March 9, 2017, Foster emailed the director of the medical center to voice her concerns about Lisan's behavior after she and the other CRNAs made their sexual harassment allegations, contending that Lisan created a hostile work environment. (Foster Dec. ¶ 4a, Ex. 4-B.) The next day, she reached out to Kafer, stating that she was concerned for her safety. (*Id.* at ¶ 4b, Ex. 4-C) Lisan continued to talk to her and "hang around areas in the hospital that I am also present – like the CRNA office." (*Id.*) She requested to have no contact with him going forward and stated, "this situation has made me very stressed, both mentally and physically, causing great anxiety, and has negatively impacted my life for over two months." (*Id.*)

 B.  <u>Letter of Warning and Suspension</u>

Following the Bonfili incident, Raphaely asked HR what she could do to prevent further issues. (Raphaely Dec. ¶ 9a.) HR assisted Raphaely in drafting a "Letter of Warning," reminding Lisan not to discuss the sexual harassment allegations with the CRNAs who made the allegations. (*Id.*) On or about March 10, 2017, Raphaely presented Lisan with the written warning. (*Id.*, Ex. 1M). HR also recommended that after an investigation, a suspension might be appropriate. (*Id.* at ¶ 9b.)

Kafer and Reese completed their investigation in March of 2017, concluding that the conduct alleged did not rise to the level of sexual harassment; however, the investigation found, "it is clear sexually inappropriate behavior was occurring." (Kafer Dec. ¶ 9, Ex. 2-I.) The investigation report also noted that Lisan failed to follow direct supervisory orders not to contact the four CRNAs. (*Id.*)

In light of these findings and the Bonfili incident, Dr. Raphaely felt that Lisan's conduct was egregious and that a 10-day suspension was appropriate. (Raphaely Dec. ¶ 9a.) HR assisted her in drafting a notice of proposed suspension. (*Id.* at ¶ 10). On March 20, 2017, Lisan was issued a proposed suspension for failure to follow orders and inappropriate conduct. (Exhibit 8, March 20, 2017 Proposed Suspension). Lisan was given the opportunity to reply, and on May 11, 2017, he and his counsel met with Dr. Altose, who heard Lisan's oral reply. (Raphaely Dec. ¶ 10.) Based on Lisan's statements during the oral reply, his lack of remorse, and the inappropriateness of Lisan's behavior, Fuehrer upheld the suspension in late June of 2017.[2] (*Id.*, ¶ 10; Deposition of Susan Fuehrer, Vol. II ("Fuehrer II Tr."), 188:13-189:17, 193:13-194:1).

## LAW AND ARGUMENT

## I.     SUMMARY JUDGMENT STANDARDS

Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, a court must construe the evidence and make all reasonable inferences from it in favor of the non-moving party. *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (citations omitted). The court should grant summary judgment when the evidence raises no

---

[2] At the time the suspension was issued, there was no specified time period in which the VA was required to make a decision regarding suspension. Cf., Compl. ¶ 13(3)(xiii) (alleging that "by VA rule, Lisan was mandated to receive suspension decision within 30 days after the Proposed Suspension […].") The President signed the Department of Veterans Affairs Accountability and Whistleblower Protection Act of 2017, Pub. L. No. 115-41, 131 Stat. 862, the law imposing time limits on discipline, on Friday, June 23, 2017.

genuine issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a *genuine* issue of *material* fact . . . . A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the nonmoving party. . . . A factual dispute concerns "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law.

*Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006) (citations omitted). If the defendant "successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case. . . ." the court should grant summary judgment. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004).

## II.    TITLE VII STANDARDS

In this case, Lisan asserts claims of gender discrimination, and retaliation based on individual adverse actions and on a hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17. In each of these claims, absent direct evidence of discrimination, courts apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Under the *McDonnell Douglas* analysis, a Title VII plaintiff must establish a prima facie case through circumstantial evidence. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009).

If a plaintiff succeeds in establishing a prima facie case, the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. Once the defendant has done so, the burden of production then returns to the plaintiff to show by a preponderance of the evidence that the defendant's explanation is pretextual. *Id.* at 804-05. "The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citations omitted).

## III.     REHABILITATION ACT STANDARDS

Lisan also has brought claims pursuant to the Rehabilitation Act. The Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et. seq*, provides the exclusive remedy for federal employees alleging disability discrimination. *Peltier v. United States,* 388 F.3d 984, 989 (6th Cir. 2004). In the Sixth Circuit, the Rehabilitation Act and the Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. §§ 12101-12213, use the same substantive standard. *Jones,* 488 F.3d at 403. "[C]ourts often treat the two in the same manner and analyze ADA and RA claims together." *Gohl v. Livonia Pub. Sch.*, 134 F. Supp.3d 1066, 1074 (E.D. Mich. 2015), *aff'd*, 836 F.3d 672 (6th Cir. 2016); *Thompson v. Williamson Cty.,Tenn.*, 219 F.3d 555, 557 n.3 (6th Cir. 2000). Rehabilitation Act claims do have a stricter causation standard than ADA claims. *See, e.g.*, 29 U.S.C. § 794 and *Lewis v. Humbold Acquisition Corp., Inc.*, 681 F.3d 312, 315 (6th Cir. 2012) (Rehabilitation Act bars discrimination that occurs "solely by reason of" an individual's disability).

## IV.     LISAN'S GENDER DISCRIMINATION CLAIM FAILS.

Lisan claims that the VA discriminated against him on the basis of his gender, male, in violation of Title VII. Lisan's claims are "reverse discrimination" claims, in which he asserts discrimination because he is a member of the majority, rather than the minority.

### A.     Lisan Cannot Set Forth A Prima Facie Case of Gender Discrimination.

To state a prima facie case of reverse discrimination, a plaintiff must show:

1. Background circumstances to support the suspicion that the defendant is that unusual employer who discriminated against the majority;
2. That he suffered an adverse employment action;
3. He was qualified for the position; and
4. That he was treated differently than similarly situated employees of a different gender.

*Nelson v. Ball Corp.*, 656 F. App'x 131, 134-35 (6th Cir. 2016); *Arendale v. City of Memphis*, 519 F.3d 587, 603-04 (6th Cir. 2008). Because two of the decision makers in this case, Dr. Raphaely and Director Fuehrer, are female, Lisan can demonstrate a prima facie case on the first element. The Sixth Circuit has held that when deciding officials are minorities, a non-minority plaintiff has satisfied the "background circumstances" requirement. *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002); *Arendale*, 519 F.3d at 603. *But see Snyder v. Ohio Dep't of Rehab. & Corr.*, No. 2:14, 2016 WL 7852524, *3 (S.D. Ohio July 19, 2016) (finding that *Zambetti* did not apply to reverse sex discrimination claims).

To prove the second element of his prima facie case, Lisan must allege that he suffered an adverse employment action. An adverse employment action in the discrimination context is a materially adverse change in the terms and conditions of employment. *Freeman v. Potter*, 200 F. App'x 439, 442 (6th Cir. 2006). Examples of adverse employment actions include hiring, firing, failing to promote, reassignment with significantly different responsibilities, or decisions causing a significant change in benefits, which normally inflict direct economic harm. *Id.*

Lisan alleges one adverse action, his ten-day suspension. The suspension is the only action taken against him that had any economic effect or could be considered a change in hours or salary. *See Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (an employment action generally requires changes in hours or salary in order to qualify as adverse). Lisan was qualified to be an anesthesiologist since he was board-certified. Therefore, he can produce sufficient evidence to prove the second and third prongs of the prima facie test with respect to his suspension. Lisan nonetheless cannot prove a prima facie case of gender discrimination because he fails to identify any similarly situated employees.

To prove the fourth prong of the prima facie case, Lisan must produce evidence of similarly situated female employees who were treated more favorably. *See Ercegovich v. Goodyear Tire &*

*Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) ("[T]the plaintiff [must] demonstrate that he or she is similarly-situated to [a] non-protected employee in all *relevant* respects."); *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010). "The individuals with whom plaintiff seeks to compare his treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

"Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated." *Campbell v. Hamilton Cty.*, 23 F. App'x 318, 325 (6th Cir. 2001) (internal citations omitted). Thus, a comparator with no disciplinary history is not similarly situated to a plaintiff who has a disciplinary record. *See, e.g., Hardman v. Univ. of Akron*, 40 F. App'x 116, 119 (6th Cir. 2002) (reverse discrimination plaintiff with disciplinary record not similarly situated to employee with no disciplinary history); *Bonfiglio v. Toledo Hosp.*, No. 3:16CV2163, 2018 WL 5761220 at *7 (N.D. Ohio Nov. 1, 2018) (Carr, J.) (male plaintiff who was insubordinate was not similarly situated to female employees with no record of behavioral or disciplinary issues).

In this case, Lisan complains generally that Dr. Raphaely did not discipline female doctors who came in late, did not have peer reviews for female physicians, and assigned female doctors to work with stronger CRNAs. (Lisan Tr. 198:23-199:20.) However, Lisan was suspended because he disobeyed a direct order not to discuss non-business topics with CRNAs who had filed sexual harassment complaints against him. (Raphaely Dec. ¶ 9d.) Lisan identifies no female anesthesiologists who were the subjects of harassment complaints from their co-workers, or who had disobeyed a similar direct order. (Lisan Tr. 202:4-12.) Because Lisan has not identified a similarly situated woman, he cannot state a prima facie case of gender discrimination.

B.    Lisan Cannot Show That the VA's Explanation for Its Actions is Pretextual.

Even if Lisan could set forth a prima facie case of gender discrimination, the VA would still be entitled to summary judgment on his gender discrimination claim because he cannot show that the VA's actions were pretextual. If Lisan had stated a prima facie case, the burden of production would have shifted to the VA to articulate a "legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas*, 411 U.S. at 802. The VA has articulated a legitimate, non-discriminatory reason for suspending Lisan—he disobeyed a direct order not to have contact with co-workers who had filed complaints against him. In addition, he threatened a co-worker by telling her that he would not sue her if she cooperated with his attorney. (Raphaely Dec. ¶ 9d.) An employer has a legitimate cause to discipline or terminate an employee who refuses to follow through on an employer's expressed directions. *Fullen v. City of Columbus*, 514 F. App'x 601, 606 (6th Cir. 2013); *Russell v. Univ. of Toledo*, 537 F. 3d 596, 604 (6th Cir. 2008).

Since the VA has articulated a legitimate reason for its actions, the burden of production would have returned to Lisan to show by a preponderance of the evidence that the VA's explanation is pretextual. *McDonnell Douglas*, 411 U.S. at 803-04. A plaintiff can prove pretext by showing that the stated reason: (1) has no basis in fact; (2) was not the defendant's actual motivation; or (3) was insufficient to explain the defendant's actions. *Martinez v. Cracker Barrel Old Country Store*, 703 F.3d 911, 915 (6th Cir. 2013). At all times "the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (citation and internal quotation marks omitted). In order to show pretext, the plaintiff must show both that the defendant's reason is false *and* that discrimination was the real reason. *Seeger v. Cincinnati Bell Telephone Co.*, LLC, 681 F.3d 274, 285 (6th Cir. 2012).

Lisan cannot show that the VA's explanation has no basis in fact. Bonfili, who previously

had filed a sexual harassment complaint against Lisan, complained to her supervisor and EEO, and filed a police report alleging that Lisan not only had come into an operating room for non-business purposes, but had touched her and threatened to sue her if she did not cooperate with his attorney. (Bonfili Dec. ¶ 5, Ex.3-B.) While Lisan may quibble with certain details of the incident, he admits that he entered an operating room to which he was not assigned to discuss Bonfili's complaint against him. (Lisan Tr., 215:21-25; 219:22-221:1.) He also admits that he touched Bonfili, although he claims she gave him permission. (Lisan Tr., 225:6-228:4.) Therefore, Lisan cannot show that the VA's explanation of its actions had no basis in fact.

Lisan also cannot show that the VA's explanation was not its true motivation. He cannot point to any female anesthesiologists who committed similar offenses and were not disciplined. Lisan speculates that his gender caused his suspension because "Dr. Raphaely clearly did not like men," female doctors were not disciplined if they were late, and female doctors were scheduled with stronger CRNAs. (Lisan Tr., 197:15-200:4.) Such unsupported speculation, especially when unrelated to the alleged discriminatory action, is not sufficient to create a triable issue on pretext. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 623 (6th Cir. 2003).

Finally, Lisan cannot show that his actions were insufficient to explain the VA's actions. Lisan had been told several times not to have any non-business related contact with the four CRNAs who had filed sexual harassment allegations against him. (Raphaely Dec. ¶¶ 8d, 9.) Despite those instructions, Lisan not only entered an operating room to discuss the allegations with one of the CRNAs and touched her, but also threatened to sue her if she did not cooperate with his attorney. (Raphaely Dec. ¶ 9d; Bonfili Decl, ¶ 5 and Ex. 3-B.) Lisan's egregious conduct was more than sufficient to support the VA's suspension.

Because Lisan cannot state a prima facie case of gender discrimination and cannot show that the VA's legitimate, non-discriminatory reasons for its action was pretextual, this Court should grant

17

summary judgment to the VA on his gender discrimination claim.

## V.  LISAN'S DISABILITY DISCRIMINATION CLAIMS ARE WITHOUT MERIT.

The Rehabilitation Act forbids agencies of the United States, from discriminating against an "otherwise qualified individual with a disability…"solely by reason of her or his disability." 29 U.S.C. § 794(a).

### A.  Lisan's Failure to Accommodate Claim Fails.

In order to prove a *prima facie* case for a failure to accommodate claim under the Rehabilitation Act, a plaintiff must show that:

1. he is disabled;
2. he is otherwise qualified for his position;
3. the agency was aware of his disability;
4. an accommodation was needed; and
5. the agency failed to provide the necessary accommodation.

*Gaines v. Runyon*, 107 F.3d 1171, 1175-76 (6th Cir. 1997).

"A disabled employee who claims that he is 'otherwise qualified with a reasonable accommodation' bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Hersko v. Wilson*, No. 3:15-CV-215, 2018 WL 3456262, at *13 (S.D. Ohio July 18, 2018) (quoting *Hedrick v. W. Res. Care Sys.*, 355 F.3d 444, 457 (6th Cir. 1997)). If the plaintiff does this, "the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated because the accommodation would impose an undue hardship of the operation of its programs." *Id.* (quoting *Gaines*, 107 F.3d at 1175-76).

### 1.  Lisan is not Otherwise Qualified Because he Cannot Perform an Essential Function of His Position With or Without Reasonable Accommodation.

In order to prove a prima facie case for a failure to accommodate claim, Lisan must show that he is "otherwise qualified to perform the job requirements, with or without a reasonable accommodation." *Jones*, 488 F.3d at 403. Lisan must show that he meets the necessary prerequisites

for the job, such as education, experience and skill; and that he can perform the essential job functions, with or without a reasonable accommodation. *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 n. 14 (5th Cir. 1997).

In this case, Lisan meets the job prerequisites, as he is an experienced, board-certified anesthesiologist. However, he has not shown that he could perform the essential functions of a staff anesthesiologist at the VA, with or without a reasonable accommodation.

### 2.    On-Call Duties are an Essential Function of Lisan's Position.

In order to determine whether a job function is essential, courts may consider several non-exclusive factors, including the employer's judgment as to which functions are essential; written job descriptions; the amount of time spent on the job performing the function; the terms of a collective bargaining agreement; the consequences of not requiring the incumbent to perform the function; the work experience of past incumbents in the job; and the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2 (n)(3); *Green v. BakeMark USA, LLC*, 683 F. App'x 486, 492 (6th Cir. 2017).

With regard to the first factor, the VA considered on-call duty to be an essential function of an anesthesiologist position. (Raphaely Dec. ¶ 6j). The anesthesiology department is "a 24/7 operation," because an anesthesiologist could be needed at any time for emergency surgeries. (*Id.* at ¶ 5.) Therefore, an anesthesiologist is required to be available at all times. (*Id.*) The functional statement for staff anesthesiologists states that on-call duties are part of the position. (*Id.*, ¶ 5a, Ex. 1B.) Also, the VA Handbook states that "[f]ull time physicians, dentists, podiatrists, chiropractors, and optometrists . . . shall be continuously subject to call unless officially excused by proper authority. This requirement as to availability exists 24 hours per day, 7 days per week." (*Id.* at ¶ 5a, Ex. 1C.)

An employer's judgment is probative on the issue of whether a particular job duty is an

"essential function." *Porter v. Tri-Health, Inc.*, Civ. Act. No. 1:16CV00978-WOB, 2018 WL 5779490, *6 (S.D. Ohio Nov. 2, 2018) ("Although not determinative, courts generally find the employer's judgment highly probative of the essential function inquiry.") (citations omitted). "The unique requirements of a hospital, including emergencies that can occur at any time warrants deference to such staffing decisions." *Id.*, at *7. *See also Laurin v. Providence Hosp.*, 150 F.3d 52, 59 (1st Cir. 1998) (a hospital unit that is open 24 hours per day is a "particularly compelling context in which to defer to rational staffing judgments by hospital employers based on the genuine necessities of the hospital business").

The amount of time spent on the function factor also weighs in favor of the VA's position. "Because the function is the responsibility of being on-call, not actually being called in, the inquiry must be the length of the on-call responsibility as compared to [an employee's] other hours." *Porter*, 2018 WL 5779490 at * 8. In this case, anesthesiologists at the VA generally have call 5-6 times per month, including dates when they are on "late duty." (Raphaely Dec. ¶ 5.) Indeed, Dr. Raphaely testified that, time spent working while on first call is, on average, 20 percent of an anesthesiologist's work week, though it is wildly variable. (Raphaely Tr. 132:23-135:17). Thus, physicians are on call the equivalent of more than one day per week, a significant portion of their work time.

The work experiences of incumbents also supports the VA's position that on-call duty is an essential function. All VA Medical Center staff anesthesiologists are required to take call. (Raphaely Dec. ¶ 5d.) Lisan, who has worked at the VA as an anesthesiologist for more than a decade, knew that all of the anesthesiologists at the hospital were required to be in the call rotation. The consequences of not requiring the incumbent to perform the function in this case are clear— if Lisan were removed from the call rotation, other anesthesiologists would be required to take more call in order to provide 24-hour coverage. (Raphaely Dec. ¶ 5f.)

After consideration of all of the factors, it is clear that on-call duties are essential functions

of a VA staff anesthesiologist.  Indeed, many courts have found that on-call duty is an essential function for health care providers and hospital personnel.  *See, e.g.*, *Porter*, 2018 WL 5779490 at *7-*9 (overnight on-call duty was essential function of hospital sonographer position); *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F.Supp.2d 653, 661-662 (W.D. Ky. 2012) (on-call duty an essential function of surgical nurse position); *Miller v. Univ. of Pittsburgh Med. Ctr., McKeesport*, Civ. Act. No. 06-937, 2008 WL 11450427, *8 (W.D. Pa. July 10, 2008) (availability to take call and work shifts as required an essential function of surgical technician); *Marty Meyer-Gad v. Centra Care Health Sys.*, Civ. No. 05-1086, 2006 WL 2987668, *5 (D.Minn. Oct. 18, 2006) (all-night call an essential function of hospital chaplain position); *Hennenfent v. Mid Dakota Clinic, P.C.*, No. CIV A1-96-117, 1998 WL 1780618, *3 (D. N.Dakota March 3, 1998) (on-call duty an essential function for clinic internist).

### 2.    Lisan's Requested Accommodation is not Reasonable.

Lisan's requested accommodation is not a reasonable one because it would require the VA to indefinitely remove on-call duty, an essential function of his job.  An accommodation is *per se* unreasonable if it removes an essential function of a job. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (*en banc*). Lisan's proposed accommodation also would require the VA to reallocate essential functions to other employees, which is not required by law. *Porter*, 2018 WL 5779490 at *10 (proposed schedule that shifts the burden of overnight on-call responsibility to someone else is *per se* unreasonable); *Hoskins v. Oakland Cty. Sheriff's Dep't.*, 227 F.3d 719, 729 (6th Cir. 2000) (employer not required to shift an essential job function onto others). *See also Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 932 (8th Cir. 2012) (job restructuring can be a reasonable accommodation, but an employer is not required to reallocate or eliminate essential functions of a job). Employers are not obligated to implement accommodations that would "result in other employees having to work harder or longer." *Hammond v. Jacobs Field Servs.*, 499 F.App'x

377, 382 (5th Cir. 2012) (citations omitted).

While Lisan testified that his request for no call was temporary, Lisan's physicians indicated that he would need to not have call for at least six months, after which they would review his progress. (Kafer Dec. ¶ 6e, Ex. 2-D.) Lisan also testified that, at the time he made his request, he did not know how long he would require an accommodation. (Lisan Tr. 128:21-130:7) Based on his medical documentation, Lisan requested to be removed from the call rotation for an indeterminate length of time, which is not a reasonable accommodation. Therefore, Lisan was not an "otherwise qualified" individual and this Court should dismiss his failure to accommodate claim.[3]

### B.  Lisan's Disability Discrimination Claim Also Fails.

In order to state a prima facie case of disability discrimination, or disparate treatment, under the Rehabilitation Act, Lisan must prove the following:

1. that he is an individual with a disability;
2. he is otherwise qualified to perform the job requirements, with or without reasonable accommodation; and
3. he suffered an adverse employment action *solely* by reason of his disability.

*Jones*, 488 F.3d at 403. In a case such as this, where the plaintiff intends to prove his case with circumstantial evidence, the *McDonnell-Douglas* framework applies, as it did to his gender discrimination claim. Although it is not entirely clear from the Complaint, it appears that Lisan's

---

[3]Lisan also claims that "Defendants (sic) violated the 'Interactive Process' required for Requests for Reasonable Accommodation." (ECF No. 1 Compl, ¶ 22, PageID #21.) However, a failure to engage in the interactive process is not an independent violation, and is actionable only if a qualified employee establishes that he proposed a reasonable accommodation. *Vaughn v. Parkwest Med. Ctr.*, 716 F. App'x 428, 434 (6th Cir. 2017) (citations omitted). In this case, Lisan is not otherwise qualified and did not propose a reasonable accommodation. Even if he had, the VA complied with its obligations by explaining the process, providing the appropriate documents, considering Lisan's requested accommodation, and offering Lisan the option of a part-time position. *See Porter*, 2018 WL 5779490 at *11 (employer engaged in interactive process and any violation not actionable because plaintiff did not propose a reasonable accommodation).

disability discrimination claim is based upon his 10-day suspension without pay, which, as discussed above, is the only alleged adverse action in this case.

As discussed, Lisan cannot show that he was an otherwise qualified individual who could perform the essential functions of his position with or without reasonable accommodation. For this reason alone, he cannot prove his prima facie case and this Court should dismiss his claim.

Even if Lisan could show that he was otherwise qualified, he could not show that any adverse action occurred solely because of his disability. As discussed above, Lisan was suspended for conduct completely unrelated to his disability or accommodation request. He offers no evidence that his suspension was related to his accommodation request. The suspension occurred more than two months after his accommodation was denied. Therefore, Lisan cannot establish a prima facie case of disability discrimination.

Even if Lisan could set forth a prima facie case, the VA articulated a legitimate, non-discriminatory reason for suspending him, as addressed above. Lisan also cannot show that the VA's reason for his suspension is pretextual. Therefore, the VA is entitled to summary judgment on Lisan disability discrimination claim.

## VI.    LISAN FAILS TO STATE A RETALIATION CLAIM.

Title VII, at 42 U.S.C. § 2000e-3(a), prohibits retaliation against an employee "because [she] has opposed any practice made an unlawful employment practice . . . or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." To state a prima facie case of retaliation, a plaintiff must prove that: (1) she engaged in protected activities; (2) her exercise of her civil rights was known by the defendants; (3) defendants thereafter took an employment action that was materially adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). Retaliation claims under

23

the Rehabilitation Act employ the same framework used in Title VII retaliation claims. *Gribcheck v. Runyon,* 245 F.3d 547, 550 (6th Cir.2001).

For a complaint or other action to constitute protected activity, it must concern the type of discrimination that is made unlawful by Title VII, such as race or gender discrimination or the Rehabilitation Act. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 520 (6th Cir. 2009). Furthermore, the Supreme Court has held that the causation element "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (Title VII); *Lutz v. Donahoe*, No. 13CV11335, 2014 WL 2218042, *4 (plaintiff must show "but-for" causation in Rehabilitation Act retaliation claim). Thus, a plaintiff must show that the defendant would not have taken the materially adverse action if the plaintiff had not engaged in protected activity. *Id.*; *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

Lisan engaged in the protected activity of requesting an accommodation and complaining about discrimination through his attorney's letter. (Kafer Dec. ¶ 5-6; Raphaely Dec. ¶ 11). Also, management knew of this activity. Therefore, he meets the first two prongs of the prima facie case.

### A.   <u>Adverse Actions</u>

The standard for adverse actions in retaliation claims differs from the showing necessary for adverse employment actions in the discrimination context. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse," which the Supreme Court defined as an action that would dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). A "'mere inconvenience or an alteration of job responsibilities'" or a "'bruised ego'" will not constitute an adverse employment action." *White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789, 797 (6th Cir. 2004) (*quoting Kocsis,* 97 F.3d at 886). As the Supreme Court stated, "[w]e speak

of material adversity because we believe it is important to separate significant from trivial harms." *Burlington*, 548 U.S. at 68.

To the extent that Lisan claims that he was suspended in retaliation for his request for an accommodation or his complaints about gender discrimination, he is incorrect. His suspension was based on his inappropriate and insubordinate conduct—his blatant disregard of an order to have no non-business related contact with specific co-workers. *Rattigan v. Holder*, 604 F.Supp. 2d 33, 49 (D.D.C. 2009) ("Title VII anti-retaliation provision "'was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work.'") (*quoting Armstrong v. Index Journal Co.*, 647 F.2d 441,448 (4th Cir. 1981)); *Mason v. Geithner*, 811 F. Supp. 2d 128, 204 (D.D.C.2011), *aff'd*, 492 F. App'x 122 (D.C. Cir. 2013).

Lisan asserts that several actions constituted retaliation. In his Complaint, Lisan asserts that Dr. Raphaely retaliated against him when she "solicited, pursued, threatened, coached and/or coerced four female CRNAs. . . to make written false accusations against Plaintiff Lisan for supposedly sexually harassing them." (ECF No. 1 Compl., ¶ 12A, PageID # 5.) However, each CRNA has testified under oath that the allegations were true and uncoerced. (Bonfili Dec. ¶¶ 2-3; Constanzo Dec. ¶¶ 2-4; Foster Dec. ¶¶ 2-3; Verb Dec. ¶¶ 2-4.) Lisan's "solicitation" accusation is based on the timing of the sexual harassment complaints and his view that "Dr. Raphaely had been creating a totally hostile work environment for me in trying to push me out of the department by causing more anxiety, et cetera." (Lisan Tr. 279:17-281:10.)

Lisan also claims that Dr. Raphaely cancelled a meeting with Mr. Kafer regarding his accommodation as retaliation. (Lisan Tr., 189:17-190:6.) Cancelling a meeting is not materially adverse. Second, Mr. Kafer testified that he cancelled the meeting and asked Dr. Raphaely to inform Lisan. (Kafer Dec. ¶ 6.) Lisan also believes that Dr. Raphaely gave him a written notice and cease and desist in order to retaliate against him. (Lisan Tr., 191:21-21.) These letters were not disciplinary

in nature, and did not affect Lisan's pay or work responsibilities. Therefore, they were not materially adverse actions. *See, e.g., Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir. 2013) (letter of reprimand not materially adverse action); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) (letter of counseling not materially adverse action). Lisan cannot show that a materially adverse action occurred other than the suspension.

### B. Lisan Cannot Prove Causation

Lisan also must show that the Defendant took the adverse actions because of his participation in prior EEO activity and prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 503 (6th Cir. 2014). To satisfy this burden, a plaintiff must provide evidence from which a reasonable jury could find that the Defendant would not have imposed the materially adverse actions had the plaintiff not made a charge or complaint. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015).

Lisan cannot show that he was suspended solely based on his request for an accommodation or his complaints to the VA. As discussed above, the VA had legitimate, non-discriminatory reasons for its actions, and Lisan cannot carry his burden to show pretext. Therefore, this Court should dismiss Lisan's retaliation claims.

## VII. LISAN CANNOT STATE A HOSTILE WORK ENVIRONMENT CLAIM.

To establish a prima facie case of gender or disability discrimination based on a hostile work environment, a plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to harassment, either through words or actions, based on his gender or disability; (3) the harassment had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile or offensive work environment; and (4) there exists some basis for liability on the part of the employer. *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008).

Harassment following a discrimination complaint also can constitute retaliation for the purposes of Title VII. *See Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir.2003). The standard for "severe or pervasive" harassment is "the same in the retaliation context as in the sexual and racial discrimination contexts." *Id.* (*quoting Broska v. Henderson*, 70 F. App'x 262, 269 (6th Cir. 2003)). The harassment must be "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 791-92 (6th Cir. 2000). The "conduct in question must be judged by both an objective and a subjective standard: the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (citations omitted). To assess whether the harassment unreasonably interfered with the work performance and created a hostile environment, courts must consider the totality of the circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance. . . .'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris*, 510 U.S. at 23). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment. . . " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]imple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (*Id.*) (internal citations and quotation omitted.)

The incidents alleged in this case do not constitute severe and pervasive harassment sufficient to constitute a hostile work environment. None of the incidents were physically threatening or intimidating. Instead, they were normal workplace disagreements. The alleged incidents do not indicate a workplace "permeated" with "discriminatory intimidation, ridicule and

insult." The Sixth Circuit has held that such minor annoyances as those alleged in this case are insufficient to constitute a hostile work environment. *See, e.g., Willey v. Slater*, 20 F. App'x 404, 405 (6th Cir. 2001) (quoting *Harris*, 510 U.S. at 21); *Cleveland v. S. Disposal Waste Connections*, 491 F. App'x 698, 707 (6th Cir. 2012); *see also Blake v. Potter*, Nos. 1:04CV2112, 1:05CV649, 2006 WL 355321, at * 13 (N.D. Ohio Feb. 15, 2006) (Nugent, J.). Otherwise, Title VII would become a "general civility code" for the workplace. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)); *see also Thorn v. Sebelius*, 766 F. Supp. 2d 585, 601 (D. MD 2011), *aff'd*, 465 F. App'x 274 (4th Cir. 2012) ("Thorn disagreed with the management style or decisions of those who supervised him— and that alone is not actionable under Title VII.")

To state a claim for a hostile work environment, courts have required plaintiffs to allege much more severe hardships than the at most minor annoyances suffered by Lisan. *See,e.g., Morris*, 201 F.3d at 793 (reversing grant of summary judgment in favor of employer when supervisor followed employee from work, destroyed employee's television set, threw nails onto employee's driveway, and visited and telephoned employee repeatedly merely to harass employee); *Austion v. City of Clarksville*, 244 F. App'x 639, 652 (6th Cir. 2007) (affirming denial of motion for judgment as a matter of law where a letter referred to the plaintiff, a police officer, as "complainer" and "disgruntled employee;" the Chief yelled at plaintiff for making allegations of racial harassment; a drive-by shooting occurred at another officer's house, with suspicion of intra-department racial motivation; a noose was hanging in the police station; and racist remarks were made); *Bligh-Glover v. Rizzo*, No 1:08CV2788, 2012 WL 4506029, *13 (N.D. Ohio Sept. 30, 2012) (Pearson, J.) (court found hostile work environment when sexually inappropriate remarks directed at male plaintiff; male plaintiff was grabbed in groin area, kissed on forehead, and touched on back and buttocks; and teased about his sex life and mother's sex life). Lisan's claims simply do not rise to this level.

Even if Lisan could show severe or pervasive harassment, Lisan still fails to establish a prima facie case because he cannot show that the alleged harassment was based on his gender, his disability, or retaliation for his prior EEO activity.  *See Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 342–43 (6th Cir. 1998) (plaintiff could not establish prima facie case where conflict was the result of personal distaste rather than discriminatory animus).  Lisan can present no evidence that any of the alleged harassment occurred because of his gender or alleged disability.  Lisan has no evidence of retaliation for his EEO activity other than his own speculation.  Such subjective beliefs are insufficient to show pretext.  *See Mitchell*, 964 F.2d at 585 (stating that "rumors, conclusory allegations and subjective beliefs" are "wholly insufficient evidence to establish a claim of discrimination, as a matter of law.") (citations omitted).  All of the work-related incidents in this case were the result of standard workplace disputes.

The alleged harassment in this case is not sufficiently severe or pervasive to constitute discrimination based on gender, disability, or retaliation.  Therefore, this Court should dismiss Lisan's hostile work environment claims.

## CONCLUSION

For all of the foregoing reasons, this Court should grant summary judgment in favor of Defendant, and dismiss this case with prejudice, with costs to Lisan.

29

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By:     *s/ Lisa Hammond Johnson*
        Lisa Hammond Johnson (#0061681)
        Ruchi V. Asher (#0090917)
        Assistant U.S. Attorneys
        Carl B. Stokes U.S. Courthouse
        801 West Superior Avenue, Suite 400
        Cleveland, Ohio 44113-1852
        (216) 622-3684 (Direct)
        (216) 522-4982 (Facsimile)
        Lisa.Hammon.Johnson@usdoj.gov
        Ruchi.Asher@usdoj.gov

        Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)

Pursuant to 28 U.S.C. § 1746, undersigned declares under penalty of perjury that this Memorandum in Support of Defendant's Motion for Summary Judgment is twenty-nine (29) pages in length and is within the 30-page limitation set by this Court's May 13, 2019 Order granting Defendant's Motion to Exceed Page Limitations (ECF No. 25).

                            */s/ Lisa Hammond Johnson*
                            Lisa Hammond Johnson
                            Assistant United States Attorney

30