In The Matter of:

Ronald M. Lisan, M.D.

vs

Robert Wilke, etc.

---

Bruce Kafer, RN, MSN

March 08, 2019

Deposition

---



MEHLER HAGESTROM
Court Reporters

1660 West 2nd Street, Suite 780 | 50 South Main Street, Suite 720
Cleveland, Ohio 44113 | Akron, Ohio 44308
216.241.9000 | 330.535.7300
216.621.0050 Fax
www.MandH.com          Schedule@MandH.com

original filename: 190308_-_kafer_bruce

**1**

1         IN THE UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

3   RONALD M. LISAN, M.D.,

4            Plaintiff,
                              JUDGE PATRICIA A. GAUGHAN
5      -vs-                   CASE NO. 1:18-CV-00969

6   ROBERT WILKE, ACTING SECRETARY
    OF THE UNITED STATES DEPARTMENT
7   OF VETERANS AFFAIRS,

8            Defendant.

9                       -  -  -  -

10      Deposition of BRUCE KAFER, RN, MSN, taken as

11   if upon cross-examination before Pamela S.

12   Greenfield, a Certified Realtime Reporter,

13   Registered Diplomate Reporter and Notary Public

14   within and for the State of Ohio, at the offices

15   of Sindell & Sindell, LLP, 23611 Chagrin

16   Boulevard, Suite 227, Beachwood, Ohio, at

17   9:50 a.m. on Friday, March 8, 2019, pursuant to

18   notice and/or stipulations of counsel, on behalf

19   of the Plaintiff in this cause.

20                       -  -  -  -

21                  MEHLER & HAGESTROM
                   Court Reporters
22
          CLEVELAND                  AKRON
23   780 Skylight Office Tower  720 Akron Centre Plaza
      1660 West 2nd Street      50 South Main Street
24   Cleveland, Ohio 44113       Akron, Ohio 44308
          216.241.9000              330.535.7300
25               FAX 216.621.0050

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

2

1   APPEARANCES:

2       Steven A. Sindell, Esq.
        Rachel Sindell, Esq.
3       Sindell & Sindell, LLP
        23611 Chagrin Boulevard
4       Suite 227
        Beachwood, Ohio  44122
5       (216) 292-3393
        Info@SindellAttorneys.com,
6
            On behalf of the Plaintiff;
7
        Lisa Hammond Johnson, Esq.
8       Ruchi Asher, Esq.
        Assistant United States Attorneys
9       U.S. Department of Justice
        United States Attorney's Office
10      Northern District of Ohio
        United States Court House
11      801 West Superior Avenue
        Suite 400
12      Cleveland, Ohio  44113
        (216) 622-3679
13      Lisa.hammond.johnson@usdoj.gov
        Ruchi.Asher@usdoj.gov
14
            -and-
15
        Arlene T. Shively, Esq.
16      Deputy Chief Counsel
        United States Government
17      Department of Veterans Affairs
        441 Wolf Ledges Parkway
18      Suite 403
        Akron, Ohio 44311
19      (330) 258-8105
        Arlene.Shively@VA.gov,
20
            On behalf of the Defendant.
21
    ALSO PRESENT:
22
        Ronald Lisan, M.D.
23

24

25

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

3

```
1              W I T N E S S   I N D E X

2                                          PAGE

3     CROSS-EXAMINATION
      BRUCE KAFER, RN, MSN
4     BY MR. SINDELL                         6

5     CONTINUED CROSS-EXAMINATION
      BRUCE KAFER, RN, MSN
6     BY MR. SINDELL                        85

7

              E X H I B I T   I N D E X
8
      EXHIBIT                               PAGE
9
      Plaintiff's Exhibit 6, Kafer Report
10    of Investigation                       34

11    Plaintiff's Exhibit 7, Kafer CV        35

12    Plaintiff's Exhibit 8, 12/8/16
      Raphaely "Questions" email to Lisan    54
13
      Plaintiff's Exhibit 9, 12/16/16
14    Marciano note to Roach                 61

15    Plaintiff's Exhibit 10, 12/19/16
      Raphaely "Reasonable accommodations"
16    email to Kafer, et al.                 66

17    Plaintiff's Exhibit 11, 11/27/13 VA
      Handbook 5975.1 "Essential Functions"  95
18
      Plaintiff's Exhibit 12, 11/27/13 VA
19    Handbook 5975.1 "Denial of Reasonable
      Accommodation Requests"               104
20
      Plaintiff's Exhibit 13, 11/27/13 VA
21    Handbook 5975.1 "Interactive Process" 104

22    Plaintiff's Exhibit 14, 12/19/16
      Kafer VA Reasonable Accommodation
23    Request email to Lisan                126

24    Plaintiff's Exhibit 15, 12/20/16
      Kafer "Re:  VA Reasonable
25    Accommodation Request" email to Lisan 130
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**4**

```
 1   E X H I B I T   I N D E X   C O N T I N U E D

 2   EXHIBIT                                      PAGE

 3    Plaintiff's Exhibit 16, 12/23/16
      Kafer "Medical Documentation
 4    Received" email to Lisan, et al.      138

 5    Plaintiff's Exhibit 17, 12/27/16
      Request for Medical Documentation      138
 6
      Plaintiff's Exhibit 18, 1/11/17
 7    Raphaely "meeting CX" email to Lisan   144

 8    Plaintiff's Exhibit 19, 1/12/17
      Raphaely/Lisan, et al. "February Call
 9    Schedule" email string                 149

10    Plaintiff's Exhibit 20, 1/12/17 Lisan
      1/12/17 "Re: Meeting on Reasonable
11    Accommodation" email to Kafer          150

12    Plaintiff's Exhibit 21, 1/13/17 Lisan
      "Personal & Confidential -
13    Information on Reasonable
      Accommodation Request & Meeting"
14    email to Kafer                         156

15    Plaintiff's Exhibit 22, Kafer letter
      to Lisan                               156
16
      Plaintiff's Exhibit 23, 1/18/17 Kafer
17    "Follow Up On Call" email to Lisan     163

18    Plaintiff's Exhibit 24, Costanzo
      Report of Contact                      182
19
      Plaintiff's Exhibit 25, Foster Report
20    of Contact                             187

21    Plaintiff's Exhibit 26, 1/10/17
      "Sexual Harassment Allegation
22    Checklist"                             209

23

24

25
```

```
1                    INFORMATION REQUESTED

2
   REQUESTING ATTORNEY                    PAGE
3
    MR.  SINDELL                           26
4   MR.  SINDELL                          134
    MR.  SINDELL                          136
5   MR.  SINDELL                          142
    MR.  SINDELL                          143
6   MR.  SINDELL                          181

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**6**

```
 1            BRUCE KAFER, RN, MSN, of lawful age, called
 2      by the Plaintiff for the purpose of
 3      cross-examination, as provided by the Rules of
 4      Civil Procedure, being by me first duly sworn, as
 5      hereinafter certified, deposed and said as
 6      follows:
 7           CROSS-EXAMINATION OF BRUCE KAFER, RN, MSN
 8      BY MR. SINDELL:
 9                   MR. SINDELL:  Let the record show
10              that this deposition is being taken in the
11              case of Lisan versus Wilkie.
12                   In addition to the court reporter
13              and myself, present today here is my
14              client, Ron Lisan.  The witness, Mr. Bruce
15              Kafer.  Lisa Hammond Johnson.  Ruchi Asher.
16              Arlene Shively.  My partner, Rachel
17              Sindell, and we're ready to go.
18      BY MR. SINDELL:
19  Q.  As you probably figured out, I'm Steve Sindell.
20      I represent Ron Lisan in this matter, Mr. Kafer,
21      and have you ever had your deposition taken
22      before?
23  A.  Yes.
24  Q.  Okay.  This may be a little repetitious but you
25      need to use a full word when you answer a
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

7

```
 1        question rather than um-hmm or uh-huh or

 2        something like that; and if you forget, I'll

 3        remind you.

 4            I don't have to tell you you're under oath.

 5        You know that so we, if there's any question I

 6        ask you you don't understand, I would appreciate

 7        your not answering such a question but ask me to

 8        clarify it and I'll be happy to at least try to

 9        do so.

10            If you do answer a question, I'm going to

11        assume that you understood it.  Fair enough?

12   A.   Fair enough.

13   Q.   Good.

14            If you need a break, you know, just let us

15        know.  Other than that, it seems to be just a

16        perennial problem with all depositions, and I'm

17        not blaming lawyers or witnesses, we're probably

18        all at fault, but the idea is that the court

19        reporter can only take down one person speaking

20        at a time.  Okay?

21            And therefore, it's important that in my

22        case, you wait until I finish the question even

23        if you almost are certain what the question is

24        going to be because otherwise we're not going to

25        have a record that protects everything.  I mean
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

8

1      we want a record that's clear so, and sometimes

2      it's surprising.  I might say something in the

3      end of the question that wasn't what you expected

4      so it's good to wait and if you interrupt me

5      without realizing it or whatever, I'll let you

6      know; but it works the same the other way.

7          I should not interrupt your answer and if I

8      do that, please indicate that you haven't

9      completed it yet, you know, and let's try to do

10     that.  Okay?

11         That's pretty much it.  Do you have any

12     questions other than that about what goes on here

13     or what we're doing?

14  A.  No questions.

15  Q.  Okay.  Very good.

16         Why don't you state your full name for the

17     record, please.

18  A.  Bruce Kafer.

19  Q.  Spell that.

20  A.  B-R-U-C-E.  K-A-F-E-R.

21  Q.  Do you have a middle name?

22  A.  Yes.

23  Q.  What is it?

24  A.  Lawrence.

25  Q.  How do you spell that?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

9

```
 1    A.   L-A-W-R-E-N-C-E.

 2    Q.   Thank you.  You live in the Cleveland area?

 3         Cuyahoga County?

 4    A.   Lorain County.

 5    Q.   What's your address?

 6    A.   35275 Greenwich Avenue, North Ridgeville, Ohio.

 7         44039.

 8    Q.   G-R-E-E-N-W-I-C-H one word?

 9    A.   Yes.

10    Q.   And how long have you lived there?

11    A.   Approximately two years.

12    Q.   And, sir, are you married?

13    A.   Yes.

14    Q.   And your wife's name is?

15    A.   Annette.

16    Q.   Does she work outside the home?

17    A.   Not currently.

18    Q.   Has she?

19    A.   Yes.

20    Q.   And what did she do?

21    A.   She was a, I forget what the term was where she

22         worked at a hospital called Clear Vista and then

23         prior to that she worked for the county

24         prosecutor's office.

25    Q.   Is she an attorney?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

10

1    A.  In Lorain, yes.

2    Q.  **And what is your birth date?**

3    A.  February 2nd, 1962, which is Groundhog's Day.

4    Q.  **Thank you for that.**

5    A.  You're welcome.

6    Q.  **So let's do the math.  38 plus 19, right?**

7    A.  47 years old.

8    Q.  **Okay.**

9    A.  I'm just kidding.  I'm actually 57.

10   Q.  **So I wasn't listening.**

11   A.  I look younger.

12   Q.  **Well, I refuse to comment on that.  Okay?**

13   A.  Okay.

14   Q.  **Because I don't want anybody commenting on how I**

15       **look.**

16          All right.  Now, did you grow up in the

17       Cleveland area?

18   A.  Yes.

19   Q.  **And whereabouts?**

20   A.  Berea, Ohio.

21   Q.  **Graduated from high school, Berea?**

22   A.  Yes.

23   Q.  **What year?**

24   A.  1980.

25   Q.  **And I take it you went to college of course?**

11

1    A.   Correct.

2    Q.   **And that was at Case I think?  Is that right?**

3    A.   I'm currently a student at Case.

4            Prior to that I went to Cuyahoga Community

5         College and Cleveland State University.

6    Q.   **Did you obtain a college degree?**

7    A.   Yes, I did.

8    Q.   **And where was that?**

9    A.   All of those schools listed with the exception of

10        Case.  I'm working on a degree.

11   Q.   **So what degree do you have from college?**

12   A.   I have a Master's of Nursing.  I have a

13        Bachelor's of Nursing and I have a Associate of

14        Applied Science in mental health technology.

15   Q.   **Do you have a nursing license?**

16   A.   Yes.

17   Q.   **What kind is it, registered?**

18   A.   Yeah.  It's a registered nurse license in the

19        State of Ohio.

20   Q.   **When did you get that?**

21   A.   Upon graduation from Cleveland State.

22   Q.   **Which was?  Approximately?**

23   A.   Approximately 1999.

24   Q.   **Did you work as a nurse?**

25   A.   Yes.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

12

1   Q.  And where would that have been?

2   A.  For the Cleveland VA Medical Center.

3   Q.  And can you give me the years you worked at the

4       Cleveland VA?

5   A.  I began working in 1999 and am currently still

6       employed.

7   Q.  As a nurse?

8   A.  Correct.

9   Q.  So do you take care of patients as a part of your

10      regular job at this time?

11  A.  No.

12  Q.  How long did you have hands-on care for patients

13      at the VA?

14  A.  Until approximately 2009, thereabouts.

15  Q.  And then?

16  A.  And then I transferred to a different position.

17  Q.  Which was?

18  A.  Which is the position I'm currently in.

19  Q.  Which is?

20  A.  A registered nurse position.

21  Q.  Do you hold a position as a reasonable

22      accommodation coordinator?

23  A.  Yes.

24  Q.  And I have some trouble with this.  It's not

25      anybody's fault I guess but I don't know what to

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

13

1      call your position.  I've seen different labels.

2      Like LRAC and so forth.  What is the actual title

3      of your position in that regard at the VA?

4  A.  You are correct in that I have a number of

5      titles; so --

6  Q.  I didn't know that either.

7  A.  -- if you were to view me in a denotative sense

8      from the OPM, Office of Personnel Management,

9      standpoint, I would be an outpatient registered

10     nurse.

11  Q.  What about the coordinating position?

12  A.  In that role as an outpatient registered nurse, I

13     do reasonable accommodation and I assist our EEO

14     office with various activities.

15  Q.  Okay.  Mr. Kafer, what I'm actually asking you,

16     though, is a little more technical.

17        The name of your title in that capacity, is

18     there a name for it?

19  A.  When I'm working on reasonable accommodation?

20  Q.  Yes.

21  A.  The name is reasonable accommodation coordinator.

22  Q.  That's what I wanted to know.

23        Now let's talk about that position,

24     reasonable accommodation coordinator.

25        When did you begin serving in that capacity

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

14

```
 1        in some way with the VA?
 2   A.   Approximately 2010?  January?  Thereabouts.
 3   Q.   That's fine.  Now what percentage of 100 percent
 4        of the work you do as of January 2010 would be
 5        the reasonable accommodation coordinator
 6        position?  Just roughly?
 7   A.   66 percent.
 8   Q.   Okay.  Two-thirds.
 9             All right.  Now, have you consistently been
10        spending about two-thirds of your time in the
11        reasonable accommodation coordinator position
12        since January 2010 to the present time or has
13        that changed?
14   A.   I don't know.
15   Q.   Approximately?
16   A.   I would approximate for the past three or four
17        years I would have been spending 66 percent of
18        the time doing reasonable accommodation
19        coordination activities.
20   Q.   Okay.  I understand that.  All right.  Now, my
21        sense is just from contact with this case that
22        you also play some kind of role in equal
23        employment opportunity activities?
24   A.   Yes.
25   Q.   Am I talking about the other third?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

15

1   A.  Yes.

2   Q.  So just a guess, tell me if this is correct,

3       equal employment opportunity coordinator, is that

4       another title of yours?

5   A.  No.

6   Q.  Okay.  You do some equal employment opportunity

7       investigations, don't you?

8   A.  No.

9   Q.  You did in this case?

10  A.  No.

11  Q.  Okay.  You wrote a report that sounds like you

12      were involved in some kind of investigation of a

13      sexual harassment issue?

14  A.  That is correct.

15  Q.  Okay.  In what capacity were you doing that?

16  A.  It was a fact finding investigation.

17  Q.  Okay.  But it was certainly not in the reasonable

18      accommodation area?

19  A.  Correct.

20  Q.  Okay.  So as a fact finding investigation, it was

21      in the, would you agree the equal employment

22      opportunity area?

23  A.  Perhaps in the broadest sense.

24  Q.  Let me just get to the point.  Are you going to

25      take the position here that you made a mistake of

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

16

1    **law regarding unwelcome remarks in your report?**

2              MS. JOHNSON:  Objection.  You may

3        answer.

4  A.  What?

5              MS. JOHNSON:  Do you want to -- I

6        objected.  You can go ahead and answer.

7  **Q.  She can object but you can still answer.**

8              MS. JOHNSON:  You still answer.

9        Right.

10             So wait.  Ask her to read --

11             MR. SINDELL:  He looks confused.

12             MS. JOHNSON:  I don't think he

13        remembers the question.  I've objected.

14        You may answer.

15  A.  Okay.

16             MS. JOHNSON:  And then if you

17        don't remember the question, the court

18        reporter will read it back for you if you

19        don't remember what the question was.  I've

20        objected just to put my objection on the

21        record but when I tell you you can answer,

22        that's, then you can answer.  But don't

23        listen to him.  Listen to me.

24  A.  Okay.

25  **Q.  No.  I happen to agree with that actually.**

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

17

```
 1    A.   Okay.  Would you please repeat the question.

 2         Something about did I make a mistake.

 3                    THE NOTARY:  "Are you going to

 4              take the position here that you made a

 5              mistake of law regarding unwelcome remarks

 6              in your report?"

 7    A.   No, I am not going to take that position.

 8    Q.   Good.  All right.  You've defined your role, at

 9         least in Dr. Lisan's case, as fact finder, okay?

10    A.   Correct.

11    Q.   Is there a title for that?

12    A.   I don't know.

13    Q.   Have you ever been a fact finder before?

14    A.   Yes.

15    Q.   For what kinds of matters have you been a fact

16         finder?

17    A.   In cases where there is a question of whether or

18         not there is some form of harassment or conflict

19         or there is a lack of clarity surrounding events

20         which are alleged.

21    Q.   That conflict and lack of clarity could apply to

22         many different kinds of issues.  Harassment seems

23         a little more content-wise specific.  That's a

24         type of matter.  Some kind of harassment, right?

25         I mean conflict could be in anything.  Clarity or
```

18

1    lack of clarity could be in any kind of issue; so

2    what I'm interested in is your fact finding

3    capacity limited just to harassment matters?

4  A.  No.

5  Q.  Okay.  Then please tell me what other kinds of

6    matters besides harassment your fact finding is

7    related to.

8       Do you understand my question?

9  A.  It sounds like you're asking me the same

10    question.

11  Q.  I'm really not trying to ask you the same

12    question but it may be my fault.

13       So I'll try again.  Are you a fact finder

14    with reasonable accommodation matters?

15  A.  No.  I process reasonable accommodation claims.

16  Q.  Are you a fact finder with issues involving

17    wages?

18  A.  No.

19  Q.  Are you a fact finder with issues involving work

20    issues other than harassment?

21  A.  Sometimes, yes.

22  Q.  That's what I'm asking you.  What kinds of things

23    are you fact finding about?  Is that a clearer

24    way of putting it?

25  A.  Yes.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

19

1    Q.   Okay.  Thank you.  I'm sorry to have been

2         confusing.  I didn't mean to.

3              So what, I want you to just give me examples

4         of the kinds of areas or issues that you do fact

5         finding in.

6    A.   If there is conflict within a work group.  If

7         there is --

8    Q.   What kind of conflict?

9    A.   Disagreement or difficulty getting along with one

10        another.

11   Q.   Interpersonal relationships at work?

12   A.   Yes.

13   Q.   Okay.  I got that.

14             Anything else?

15   A.   Or relationships within teams.

16   Q.   Okay.  Anything else?

17   A.   Questions of or allegations of workplace

18        harassment.

19   Q.   And when you say "harassment," what type of

20        harassment?

21   A.   Racial.

22   Q.   Sexual?

23   A.   Yes.  And there may be others that I'm not

24        thinking of at the moment.

25   Q.   Well, let me at least throw this out as a

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

20

```
 1        suggestion.  It sounds like you're talking about
 2        discrimination issues of some kind or another.
 3        Is that part of what you were talking about?
 4   A.   Allegations of.
 5   Q.   Yeah, well, allegations.
 6   A.   Of discrimination issues or suggestions of
 7        discrimination.
 8   Q.   And does the phrase Title VII mean anything to
 9        you?
10   A.   Yes.
11   Q.   So you know that in Title VII there are different
12        kinds of discriminations that are set forth
13        therein, right?
14   A.   Yes.
15   Q.   Do you know what they are?
16   A.   Offhand not at the moment.
17   Q.   Let's see if these ring bells, okay?
18   A.   Okay.
19   Q.   Race, gender or sex?  Does that ring a bell?
20   A.   Yes.
21   Q.   Religion?
22   A.   Is that a question?
23   Q.   Yes.
24   A.   Yes.
25   Q.   Religion question mark.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

21

```
 1            National origin?

 2   A.   Yes.

 3   Q.   That kind of thing.  Age?

 4   A.   Yes.

 5   Q.   Disability?  That's a different statute but

 6        disability kinds of issues?  Discrimination with

 7        respect to?

 8   A.   Related to disability?

 9   Q.   Yes.

10   A.   Yes.

11   Q.   So to do a fact finding investigation in those

12        kinds of areas you would have to -- withdrawn.

13            Do you have any knowledge or training about

14        the laws in those areas?

15                    MS. JOHNSON:  Objection.  You may

16            answer.

17   A.   Yes.

18   Q.   Okay.  Please explain to me what your legal type

19        training is on discrimination or harassment

20        issues.

21                    MS. JOHNSON:  Again, same

22            objection.  You may go ahead.

23   A.   I've taken all the VA trainings that we have

24        related to those areas.  I've also attended the

25        Employment Law Institute.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

22

```
 1   Q.   What's the Employment Law Institute?

 2   A.   It's an institute that provides training on those

 3        issues.

 4   Q.   That's for lawyers as well, isn't it?

 5   A.   Correct.

 6   Q.   Have you ever attended law school?

 7   A.   No.

 8   Q.   Have you had outside of the VA any legal

 9        coursework or training of a formal nature?

10   A.   Only the legal training that's required for my RN

11        licensure and any coursework contained within the

12        curriculums for the degrees that I possess.

13   Q.   Was there any?

14   A.   Yes.

15   Q.   Could you tell me about it?

16   A.   I don't recall the exact names.

17   Q.   Generally?

18   A.   I don't recall the exact names.

19   Q.   Well, how about the subject matter?

20   A.   I would have to guess so I don't recall the exact

21        names.

22   Q.   I don't want you to guess.

23             All right.  Now, I'd like to focus, since

24        you've raised this, Mr. Kafer, on what you

25        described as VA trainings.  I think you used that
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

23

```
 1        phrase?  You've got to answer --
 2   A.   Yes.
 3   Q.   Those trainings included issues pertaining to
 4        sexual harassment; is that correct?
 5   A.   Yes.
 6   Q.   I would like you to describe the format that you
 7        were exposed to in those trainings.  What are we
 8        talking about:  On-line?  Attendance at meetings?
 9        Coursework?  Seminars?  I don't know.  You tell
10        me.
11   A.   There were on-line trainings.  I don't recall the
12        exact nature of training that we received to
13        become train the trainers for sexual harassment
14        as it was some time ago.
15   Q.   Well, let me ask you when?
16   A.   I don't remember.
17   Q.   Well, within the last five years?
18   A.   Yes.
19   Q.   But when you say other than on-line trainings,
20        what's the format that you're talking about?
21   A.   Where there would be a presenter or someone who
22        would be regarded as a subject matter expert that
23        would impart knowledge to attendees.
24   Q.   I know this may be a difficult question to
25        answer.  I want to know if you can answer it.
```

24

```
 1              How many on-line trainings ballpark do you
 2         think you've actually listened to and watched?
 3    A.   I have no idea.  I've been employed at the VA,
 4         I'm in my 20th year.
 5    Q.   Well, it sounds like it could be in the dozens?
 6    A.   I don't know.
 7    Q.   Well, would it be more than 10?
 8    A.   I would have to guess.
 9    Q.   Once a year at least?
10    A.   You said not to guess.
11    Q.   No.  I'm asking you that -- I don't want you to
12         guess -- didn't you at least once a year during
13         your tenure at the VA have on-line training that
14         dealt in part with sexual harassment?
15    A.   I think there are more than once a year.
16    Q.   Well, if you were there for 20 years, then it
17         could be 20, 30 on-line, something like that?
18    A.   Are you informing me that it could be that many?
19    Q.   I'm asking you.
20    A.   I don't know.  I would have to guess.
21    Q.   I don't want you to guess.  But approximately.
22         Let me -- withdrawn.
23              Let me give you a, maybe a format to answer
24         those kinds of questions.  Okay?  I certainly
25         don't want you to make some wild speculating
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

25

1        guess.  Okay?

2             And I'm not asking you for an exact number.

3        Okay?  So I would think that would be kind of

4        speculative, okay?  So it's not that.

5             I'm asking you for whether or not you can

6        have your best recollection of a rough estimate,

7        would I won't be holding you to any exact number

8        of times or to speculate about something like

9        that but I would be asking you for your best

10       recollection if you have one.  Okay?  Of the

11       rough approximate number of times and that's what

12       I'm trying to work through.  Okay?

13            So if it's a wild guess without any idea at

14       all, I'm not -- then you can say it would be a

15       guess; but if you have some recollection -- and

16       I'm trying to help stimulate that with my

17       questions actually -- then I would like you to

18       give me your best rough estimate recollection.

19            Do you understand at least what I've just

20       said?

21   A.   Yes.

22   Q.   Good.

23   A.   So I have no rough recollection.  I do know that

24       there is a record of the trainings that I've

25       taken so if I wanted to answer that question, I

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

26

```
 1        would just refer to that record.
 2   Q.   Okay.  And the, where is that record kept?  Do
 3        you have it?
 4   A.   It's an on-line record and it's, we can access it
 5        and then I have, sometimes you can print out when
 6        you complete trainings but you don't have to.
 7        You're not required to print out.
 8   Q.   Is that something that can readily be obtained by
 9        your counsel or by you and give to your counsel?
10   A.   It could be obtained.
11                    MR. SINDELL:  So I'm asking for
12             it.  And I would like that marked so I can
13             have a continuing list of what my various
14             requests are which I will not remember on
15             my own.
16   BY MR. SINDELL:
17   Q.   Would you agree with me that whatever number of
18        on-line trainings you've had with issues
19        involving sexual harassment or meetings,
20        seminars, that type of thing, educational
21        programs dealing with that subject, it's been
22        fairly extensive?  Would you agree with that?
23   A.   "Fairly extensive"?
24   Q.   Yeah.  So you have a working knowledge of what
25        the issues are?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

27

```
 1   A.  Yes.

 2   Q.  That's all.  I'm not asking you if you could

 3       write a legal brief on it.  I just want to know

 4       that.  Okay.  So you've answered it.  Thank you.

 5           Now I want to ask you the same kinds of

 6       questions about education and training on the

 7       reasonable accommodation coordinator side of it.

 8       Okay?

 9   A.  Uh-huh.

10   Q.  Is that yes?

11   A.  Yes.

12   Q.  Okay.  You know, trying to make a record here.

13           Maybe we can make this simple.  Have you had

14       fairly extensive exposure to on-line trainings

15       and seminars and programs dealing with reasonable

16       accommodation issues?

17   A.  Yes.

18   Q.  Would it at least parallel to some degree the

19       extent of your training with fact finding EEO

20       kinds of issues?

21   A.  Yes.

22   Q.  Okay.  Would you also -- withdrawn.

23           Do you agree with me that in order to be a

24       competent fact finder, you have to have that kind

25       of background and training in reasonable, excuse
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

28

```
 1        me, in areas of sexual harassment in order to be

 2        an effective fact finder?

 3                        MS. JOHNSON:  Objection.  You may

 4             answer.

 5   A.   Yes.

 6   Q.   And the same kind of knowledge would be necessary

 7        to process reasonable accommodation claims

 8        effectively, right?

 9   A.   Yes.

10   Q.   Now I'd like to, there's a manual that the VA

11        has, I think it's called a handbook.  In fact let

12        me be very specific.

13           Yes.  There's a VA handbook and I have a few

14        pages from it but you've seen that handbook

15        before?

16   A.   Yes.

17   Q.   And would you agree with me that that handbook

18        sets forth references to rules, regulations,

19        considerations, discussions about reasonable

20        accommodation processes and issues?

21   A.   Yes.

22   Q.   Would you say the same for sexual harassment

23        issues?

24   A.   That that handbook?

25   Q.   Yes.  Covers that subject?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

29

| | |
|---|---|
| 1 | A. The VA handbook on reasonable accommodation does |
| 2 | not cover -- |
| 3 | Q. No.  No.  There's a VA handbook also that -- |
| 4 | well, maybe it's not called a handbook but there |
| 5 | are written VA observations, rules, |
| 6 | considerations written down about sexual |
| 7 | harassment? |
| 8 | A. Yes.  There are policies. |
| 9 | Q. Okay.  Policies.  Appreciate that word.  That |
| 10 | helps. |
| 11 | And when I talk about reasonable |
| 12 | accommodation that includes policies, right? |
| 13 | A. Yes. |
| 14 | Q. Would you consider yourself familiar with |
| 15 | policies in the reasonable accommodation area? |
| 16 | A. Yes. |
| 17 | Q. Would you consider yourself familiar with |
| 18 | policies in the sexual harassment area? |
| 19 | A. Yes. |
| 20 | Q. Okay.  Now I'd like to talk to you about your |
| 21 | understanding of sexual harassment policies. |
| 22 | Okay?  That's not a question.  That's a |
| 23 | statement. |
| 24 | In order for -- withdrawn. |
| 25 | Sexual harassment can take verbal forms, |

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

30

```
 1        correct?

 2   A.   Yes.

 3   Q.   And it can take physical forms, correct?

 4   A.   Yes.

 5   Q.   Or both?

 6   A.   Yes.

 7   Q.   Clearly sexual harassment, whatever that means,

 8        which we'll discuss but let's just use that

 9        phrase, is prohibited as between conduct of

10        employees and also supervisors at the VA?

11                  MS. JOHNSON:  Objection.  You may

12             answer.

13   A.   Yes.

14   Q.   That's just a very general statement.  It's also

15        against the law, isn't it?

16   A.   Yes.

17   Q.   And sexual harassment can be any kind of gender

18        combination.

19           In other words, a woman can sexually harass a

20        man, a man can sexually harass a man or same sex

21        as well; is that correct?

22   A.   Correct.

23   Q.   Now let's talk about verbal sexual harassment.

24           Would you agree with me that verbal sexual

25        harassment, and I think we've said this already,
```

31

1      is completely distinguishable from physical

2      sexual harassment:  One involves touching, one

3      involves communication and words?

4  A.  Correct.

5  Q.  Okay.  Would you agree with me that sexual

6      harassment by one employee of another at the VA

7      would have to involve something offensive to the

8      recipient of the verbal communication from the

9      other employee?

10                     MS. JOHNSON:  Objection.  You may

11              answer.

12  A.  You're asking me if I would agree with you if

13      sexual harassment --

14  Q.  It has to be something offensive.  It has to

15      be -- withdrawn.  I'll say it again differently.

16         In order for a communication from employee 1

17      to be sexually harass -- sexual harassment of

18      employee 2, that communication needs to be

19      offensive in some way to employee 2?

20  A.  Yes.

21  Q.  Now to make it sexual, it has to have some kind

22      of sexual content or implication as opposed to

23      non sexual?

24  A.  Yes.

25  Q.  Now, if employee 1 says something to employee 2

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

32

1      that is offensive to employee 2, in and of itself

2      does that constitute sexual harassment?

3                  MS. JOHNSON:  Objection.  You may

4           answer.

5   A.  No.

6   Q.  And why not?

7   A.  Because there was no determination made as to

8      whether or not it was sexually offensive or

9      harassment -- or harassing.

10  Q.  What do you mean by that?  Can you expand that?

11  A.  You gave me an example where one person said

12     something to another and you said is that

13     sexually harassing or offensive.

14  Q.  Right.

15  A.  So that example in and of itself in the context

16     in which we work would not be.  There would have

17     to be a determination made about that.

18  Q.  In order for a communication from employee 1 to

19     employee 2 to constitute sexual harassment by

20     employee 1 against employee 2, does employee 2

21     have to indicate to employee 1 that they find it

22     offensive?

23  A.  No, they do not have to.

24  Q.  Okay.  If they don't do that, how does employee 1

25     know it's offensive?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

33

1   A.   If employee 2 makes a sexual harassment complaint

2        or an allegation to management, then a fact

3        finding investigation would ensue.  At some point

4        employee number 1 would be informed that employee

5        number 2 found some behavior sexually offensive.

6   Q.   All right.  Now, so if employee 1 -- withdrawn.

7             Do you recall your report in this case?  Have

8        you reviewed it on the sexual harassment issue,

9        your fact finding report?

10  A.   I briefly reviewed it.

11  Q.   Do you recall concluding that there was no sexual

12       harassment?

13  A.   Yes.

14  Q.   Do you remember why?

15  A.   No.

16            In general it would have been.

17  Q.   She's trying to tell you not to say anything

18       more.  That was a hint.  She grabbed your arm and

19       said don't keep talking.

20  A.   Withdrawn.

21  Q.   Okay.  Did you want to complete your answer

22       notwithstanding the coaching from your lawyer?

23  A.   No.  Thank you.

24                 MR. SINDELL:  I would appreciate

25            if you would not do that again, Lisa.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

34

```
 1              Okay?  Let him answer whatever he

 2        wants to say.

 3              MS. JOHNSON:  There was no

 4        question pending.

 5              MR. SINDELL:  He was answering the

 6        question.

 7              MS. JOHNSON:  He had already

 8        answered.

 9              MR. SINDELL:  And you grabbed his

10        arm to stop him.

11              MS. JOHNSON:  I did not grab his

12        arm.

13              MR. SINDELL:  He stopped talking

14        and I saw you grab his arm.

15              MS. JOHNSON:  I did not grab his

16        arm.

17              MR. SINDELL:  Please do not do

18        that again.  Okay?

19     BY MR. SINDELL:

20  Q.  Now you, I'm reading -- you know what?  I'll give

21      it to you.

22                     -  -  -  -

23        (Thereupon, Plaintiff's Exhibit 6, Kafer

24        Report of Investigation, was marked for

25        purposes of identification.)
```

35

1                               -   -   -   -

2   Q.   All right.  I'm going to hand you what's been

3        marked as Plaintiff's Exhibit 6.  I want you,

4        Mr. Kafer, I want you to do what you're doing.

5        Take a minute or whatever time you need and read

6        through this and then I'll ask you some questions

7        about it.

8   A.   Okay.

9                               -   -   -   -

10            (Thereupon, a discussion was had off the

11            record.)

12                              -   -   -   -

13            (Thereupon, Plaintiff's Exhibit 7, Kafer CV,

14            was marked for purposes of identification.)

15                              -   -   -   -

16                    MR. SINDELL:  Back on the record.

17                    Just for the record I am marking

18            as Number 7 Mr. Kafer's CV just so you know

19            that.

20                    MS. JOHNSON:  All right.

21  Q.   Back on the record.

22        You've had an opportunity to read over

23        Exhibit 6; is that correct?

24  A.   Yes.

25  Q.   And could you identify this document, please,

36

1        Mr. Kafer?

2   A.   This is a document with the subject heading

3        "Report of Investigation Into Allegations of

4        Sexual Harassment CRNAs Complaints Against Ronald

5        Lisan, M.D."

6   Q.   What does "Thru:  EEO Affirmative Employment

7        Manager" mean?

8            What's that reference indicate?

9   A.   That just means that the EEO affirmative

10       employment manager is aware that this report is

11       being sent to the medical center director.

12  Q.   And who is the manager?

13  A.   Andrea Freeman.

14  Q.   Who is Leshelle Reese?

15  A.   She is an EEO specialist.

16  Q.   Does she report to Andrea Freeman?

17  A.   Yes.

18  Q.   What does the reference to Associate Medical

19       Center Director mean?

20  A.   In a hierarchical chain of command, there is the

21       EEO affirmative employment manager.  There is the

22       associate medical center director.  There is the

23       medical center director at the top.

24  Q.   And who's the, at this time, I don't know if this

25       has actually a date.  I don't see a date on this

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

37

```
 1      thing.  Did you date it?
 2                   MS. JOHNSON:  I don't see one
 3          either.
 4  A.  I do not see a date on my copy.
 5  Q.  Do you have any recollection of approximately
 6      when this was issued?
 7  A.  I don't have an exact recollection.
 8  Q.  I didn't ask you for an exact recollection.
 9      Approximate?  If you don't, I can probably help
10      you.
11  A.  No, I don't have an approximate recollection.
12  Q.  Okay.  Does this refresh your recollection that
13      it was, I think it was in March of 2017?
14                   MS. JOHNSON:  Objection.  You may
15          answer.
16  Q.  Does March of 2017 sound about right?
17  A.  It may have been March of 2017.
18  Q.  Okay.  We can pin it down.  That's not a big
19      deal.
20          Okay.  Who was the associate medical center
21      director referenced at that time at the top of
22      this page?
23  A.  I don't know.
24  Q.  Who is the medical center director?
25  A.  Susan Fuehrer.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

38

```
 1   Q.  And she was at this time, too, correct?

 2   A.  Correct.

 3   Q.  So you don't know who the associate was below

 4       her?

 5   A.  No.  Because our associate and our deputy like

 6       would switch around so I don't know the exact

 7       person.

 8   Q.  Does this mean that Susan Fuehrer would not have

 9       gotten a copy of this?

10   A.  She would have gotten a copy.

11   Q.  How do you know?

12   A.  Because that's the protocol that we follow.

13   Q.  So let's -- okay.  So it's to the medical center

14       director as you indicated?

15   A.  Correct.

16   Q.  So that means she got a copy?

17   A.  Yes.

18   Q.  And of course it's shown here that Dr. Raphaely

19       got a copy?

20   A.  Correct.

21   Q.  Did anybody else get a copy?

22   A.  The associate medical center director would have

23       gotten a copy and the EEO affirmative employment

24       manager would have gotten a copy as well.

25   Q.  Andrea Freeman?
```

39

```
 1    A.  Correct.

 2    Q.  Do you report to Andrea Freeman?

 3    A.  Yes.

 4    Q.  Is that a direct reporting relationship?

 5    A.  Yes.

 6    Q.  All right.  Now I'm going to leave this for some

 7        questions later.  I just wanted you to be aware

 8        of it.  Okay?

 9            Now I'm going back to your understanding of

10        the protocols for sexual harassment reporting and

11        so forth.  Okay?

12            You told me that somebody, employee 2 is the

13        one who allegedly was harassed in my example.

14        You remember that?

15    A.  Yes.

16    Q.  And I was giving you a verbal example, correct?

17    A.  Correct.

18    Q.  Employee 2 you testified does not have to express

19        an objection or indicate offensiveness to

20        employee number 1 at the time of the alleged

21        offensive communication; is that correct?

22    A.  Correct.

23    Q.  In order for it to be considered sexual

24        harassment?

25    A.  Correct.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

40

1   Q.  But it still can be considered sexual harassment

2       at some later point after investigation depending

3       on a lot of circumstances?

4   A.  Yes.

5   Q.  And your fact finding efforts are designed to

6       probe into that matter, whether it is or isn't

7       sexual harassment, the communication?

8   A.  The fact finding investigation is to --

9   Q.  That you do?

10  A.  Correct.  Particularly in this case --

11  Q.  Yes.

12  A.  -- was to obtain the facts related to the

13      allegation.

14  Q.  Well, the purpose of doing that is to make a

15      determination, isn't it?

16  A.  No.  The purpose of doing the fact finding

17      investigation is to obtain the facts related to

18      the allegation.

19  Q.  Yes.  But that's not being done without any

20      purpose or reason.  There's a reason you take the

21      time to investigate the facts, isn't there?

22  A.  Yes.  The reason is the allegation.

23  Q.  Right.  And the reason is to get what the facts

24      are as best as you can to reach some conclusions

25      about whether sexual harassment occurred?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

41

```
1   A.  Is that a question or a statement?

2   Q.  Yes.

3   A.  What's the question please?

4                   MR. SINDELL:  Read it back to him.

5                   THE NOTARY:  "And the reason is to

6           get what the facts are as best as you can

7           to reach some conclusions about whether

8           sexual harassment occurred?"

9   A.  Yes.

10                  MR. SINDELL:  Off the record.

11                       -  -  -  -

12          (Thereupon, a discussion was had off the

13          record.)

14                       -  -  -  -

15  Q.  In this report, Exhibit 6; you did express some

16      conclusion as to whether or not there was sexual

17      harassment in the verbal exchanges that were

18      reported by the CRNAs; is that correct?

19  A.  I expressed a conclusion.

20  Q.  Now, going back to employee 1 and 2, employee 1

21      makes a communication to employee 2 which

22      employee 2 believes is offensive to employee 2,

23      believes it's sexually offensive to employee 2.

24          Employee 2 chooses not to express to employee

25      1 that it was offensive, employee 1's
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

42

1      communication.  Okay?

2          What can or should employee 2 do to remedy

3      the situation?

4   A.  Employee 2 should report to management what

5      occurred.

6   Q.  Can you define management?  Well, withdrawn.

7          Do you know who Robert Bearss is?  Bearss,

8      B-E-A-R-S-S, and I can tell you who if you don't

9      know.

10  A.  No.

11  Q.  Okay.  There's a group of CRNAs obviously in the

12     anesthesia department.  Mr. Bearss is called the

13     lead person.  Okay?  At least he's been described

14     that way by one CRNA.

15         So does that concept mean anything, a lead

16     CRNA?

17                    MS. JOHNSON:  Objection.  You may

18             answer.

19  A.  Lead in the VA generally connotes that that

20     individual has additional responsibilities and

21     they may vary depending on who this person is.

22  Q.  Understand.

23         Okay.  Would it be appropriate nomenclature

24     to characterize the lead CRNA as a first line

25     supervisor of the other CRNAs in the

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

43

```
 1       anesthesiology department?
 2                      MS. JOHNSON:  Objection.  You may
 3            answer.
 4   A.   I don't know.
 5   Q.   Would a lead person in your understanding be the
 6        kind of management person that employee number 2
 7        in my example could go to?
 8                      MS. JOHNSON:  Objection.  You may
 9            answer.
10   A.   In some cases leads have management authority for
11        certain areas and in other cases they do not.
12   Q.   Do you have any idea -- I'm sorry.  Did you
13        finish your answer?
14   A.   Yes.
15   Q.   Do you have any idea, Mr. Kafer, whether the lead
16        person, Robert Bearss, would be an appropriate
17        person for a subordinate CRNA in the anesthesia
18        department to go to with that kind of concern
19        about offensive communication of a sexual nature?
20   A.   No.
21   Q.   Do you know whether or not Mr. Bearss,
22        B-E-A-R-S-S, is considered a management person at
23        the VA with management authority?
24   A.   No.
25   Q.   Okay.  I'm going to ask you to assume that he
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

44

```
 1      was.
 2            Would that change your answer as to whether
 3      or not he would be an appropriate possible person
 4      for a CRNA to go to to complain about another
 5      employee communicating offensive sexually
 6      harassing communications?
 7                      MS. JOHNSON:  Objection.  You may
 8            answer.
 9  A.  You're asking me to make an assumption?
10  Q.  Assume he's in a management position with
11      management authority.
12  A.  If Mr. Bearss was a member of management and an
13      ensuing process occurred related to sexual
14      harassment allegations, then he would have been
15      an appropriate person.
16  Q.  Okay.  Now, Dr. Susan Raphaely was the, I don't
17      know if they call her the head or the chair?
18  A.  Chief.
19  Q.  Chief, okay.  That's good.
20            Chief of the anesthesiology department.  You
21      know that?
22  A.  Uh-huh.
23  Q.  You have to say yes.
24  A.  Yes.
25  Q.  Okay.  She would clearly be in a management
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

45

1       position, right?

2   A.  Correct.

3   Q.  So would it have been appropriate for a CRNA who

4       had some kind of complaint about another member

5       of the anesthesia department communicating some

6       offensive sexual harassment remark to go to

7       Dr. Raphaely?

8   A.  Yes.

9   Q.  Now let's add an assumption to the other

10      assumptions that that occurred.  That's not a

11      question.

12                  MS. JOHNSON:  No.  I know.

13  Q.  Okay.  Let me say it again.

14          Let's assume that a CRNA went to Dr. Raphaely

15      with such a complaint.  Can you --

16  A.  Okay.

17  Q.  -- make that assumption?  In fact that occurred

18      here?

19                  MS. JOHNSON:  Objection.

20                  MR. SINDELL:  Which are you

21              objecting to?  "In fact that occurred"?

22                  MS. JOHNSON:  Yes.  Because you're

23              testifying.

24                  MR. SINDELL:  I'm asking a

25              question.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

46

```
 1                    MS. JOHNSON:  You're saying this
 2            is what happened here.  That's testifying.
 3    Q.  In fact that occurred?  Question mark.  Is that
 4        right?
 5    A.  You're asking what occurred?
 6    Q.  I'm asking you a simple question:
 7            Isn't it a fact that four CRNAs reported
 8        complaints of Dr. Lisan verbally sexually
 9        harassing them to Dr. Raphaely?  Isn't that in
10        fact what happened in this case?  I think you
11        repeated it four or five times in here.
12    A.  I don't know if all four complainants went
13        directly to Dr. Raphaely or if they came to the
14        EEO office first.
15    Q.  Okay.  Do you know if any of them did?  Any of
16        the four?  Went to Dr. Raphaely?
17    A.  I don't know.  I do know that they eventually
18        were all interviewed by Leshelle and me.
19    Q.  I do know that.  You know that.  You've reported
20        that.
21    A.  Right.
22    Q.  But I'm asking you something else.
23            So as far as I understand you, you don't know
24        if any of them or all of them or some of them
25        went directly first to Dr. Raphaely?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

47

1    A.  Correct.

2    Q.  **Okay.  You were doing an investigation of the**

3        **facts about this, weren't you?**

4    A.  Yes.

5    Q.  **Okay.  Would that be an important fact as to**

6        **where they went first?**

7    A.  It would only be a fact to note.

8            For instance, there would be no requirement

9        to go to Dr. Raphaely first.  If they came to the

10       EEO office first, a fact finding investigation

11       could ensue.

12   Q.  **Isn't it a fact that it is important for you to**

13       **know as a fact finder where the CRNA made a**

14       **complaint for the first time about any sexual**

15       **harassment from Dr. Lisan?**

16   A.  When you're initially responding to a complaint

17       or an allegation, you would know that at the time

18       of the complaint.

19           However, in this forum, I may not be able to

20       recall those specifics.

21   Q.  **Did you -- well, wouldn't that be something you**

22       **would put in your report, that they first went to**

23       **Dr. Raphaely?  Isn't that a fact that you would**

24       **think would go in such a report of fact finding?**

25   A.  You're asking me would that be something that I

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

48

1      would put into my report?

2  Q.  Yes.  That's exactly what I'm asking you.

3  A.  Not necessarily.

4  Q.  Isn't it something that you would want to find

5      out?

6  A.  It would have been something I would have known

7      at the time.

8  Q.  Okay.  Well, in making a full fact finding

9      investigation, wouldn't it be important for you

10     to know what the communication was initially by

11     the person, the CRNA making the complaint?

12 A.  Can you repeat the question.

13                 THE NOTARY:  "Well, in making a

14            full fact finding investigation, wouldn't

15            it be important for you to know what the

16            communication was initially by the person,

17            the CRNA making the complaint?"

18 A.  The most important thing to know would be what is

19     the nature of the complaint.

20 Q.  Wouldn't it be important to know in considering

21     the facts what the original communication was

22     with the first person to whom the complaint was

23     communicated in management?

24 A.  It would be most important to know which

25     management official was communicated to which

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

49

1        would reflect the allegation which you would then

2        investigate.

3   Q.   **Excuse me.  I didn't ask you what was most**

4        **important.  Now I want her to read back the**

5        **question and I want you to answer it if you can**

6        **the way I asked it.  Answer my question.**

7             **Please repeat the question.**

8                     THE NOTARY:  "Wouldn't it be

9                important to know in considering the facts

10               what the original communication was with

11               the first person to whom the complaint was

12               communicated in management?"

13  A.   Yes.

14  Q.   **Okay.**

15  A.   But the level of importance may be different.

16  Q.   **I didn't ask you about level of importance.**

17  A.   But that's my answer.

18  Q.   **But you're supposed to answer my questions.**

19  A.   I did.

20  Q.   **Okay.  That's fine.**

21           **Now, wouldn't it be important for you in**

22      **making a fact finding investigation to speak to**

23      **Dr. Raphaely if in fact all of the CRNAs first**

24      **communicated their complaints about Dr. Lisan to**

25      **Dr. Raphaely?**

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

50

```
 1              MS. JOHNSON:  Objection.  You may
 2         answer.
 3    A.  So you're asking me a conditional question.
 4    Q.  I don't want you to characterize it.
 5    A.  Because you have included the word "if."
 6    Q.  I want you to just answer the question, not
 7         characterize it.
 8              Please repeat the question, and just answer
 9         it.
10              THE NOTARY:  "Now, wouldn't it be
11         important for you in making a fact finding
12         investigation to speak to Dr. Raphaely if
13         in fact all of the CRNAs first communicated
14         their complaints about Dr. Lisan to
15         Dr. Raphaely?"
16    A.  Yes.
17    Q.  Did you?
18    A.  Yes.
19    Q.  You talked to Dr. Raphaely about the complaints
20         that were made to her by the CRNAs?
21    A.  At some point I talked to Dr. Raphaely.
22    Q.  I thought you said --
23    A.  Along with Leshelle Reese.
24    Q.  I thought you said you didn't remember that?
25    A.  What do you mean?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

51

1  Q.  I thought you said you didn't know whether the

2      CRNAs ever went to Dr. Raphaely when they first

3      made their complaints about Dr. Lisan, didn't

4      you?

5                    MS. JOHNSON:  Objection.  That

6          mischaracterizes the prior testimony.

7                    MR. SINDELL:  You really think so?

8                    MS. JOHNSON:  Yes, I do think so.

9          Would you go back to the question where he

10         asked whether he knew that, whether the

11         CRNAs went to Dr. Raphaely or not?  And he

12         said he didn't know and now you're

13         characterizing it as he said that he didn't

14         know if he talked to Dr. Raphaely or not.

15         Those are two different questions.

16 Q.  Okay.  Let me, they may be, but let me -- read it

17      back.  Read back the question I asked and see if

18      you can answer it, please.

19                    THE NOTARY:  "I thought you said

20         you didn't know whether the CRNAs ever went

21         to Dr. Raphaely when they first made their

22         complaints about Dr. Lisan, didn't you?"

23 A.  Correct.  It was a question about who they

24      initially went to and then I reviewed that they

25      could either come to the EEO office first or they

**52**

1    may have come to Dr. Raphaely first.

2  Q.  Did you know that Dr. Raphaely -- withdrawn.  Did

3    you know at the time you first learned that there

4    was -- withdrawn.

5        When you first learned there were CRNA

6    complaints of sexual harassment against

7    Dr. Lisan, did you know that prior to that time

8    Dr. Lisan had communicated a complaint of

9    disability discrimination and gender

10    discrimination about Dr. Raphaely to VA

11    management including Dr. -- or Ms. Fuehrer and

12    Dr. Altose?

13  A.  I don't know.

14  Q.  Do you think that would have been something of

15    any interest to you at that time to know?

16  A.  No.

17  Q.  Okay.

18            MS. JOHNSON:  Steve, could we

19       possibly take like a five minute break.

20            MR. SINDELL:  We can certainly do

21       that.

22            -  -  -  -

23    (Thereupon, a discussion was had off the

24    record.)

25            -  -  -  -

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

53

```
 1    Q.  I'd like to for now switch to reasonable

 2        accommodation.  Okay?

 3    A.  Okay.

 4    Q.  And do you have any files or records that you

 5        keep dealing with your processing of Dr. Lisan's

 6        claim of reasonable accommodations?

 7    A.  Yes.

 8    Q.  You didn't bring it with you?

 9    A.  No.

10              MS. JOHNSON:  I have not had a

11          chance to review those, Steve, so we'll

12          provide them.

13              MR. SINDELL:  I'm sure but I may

14          have some questions about them.

15              MS. JOHNSON:  Sure.

16    Q.  Then we may have the pleasure of meeting again if

17        that happens.

18    A.  Okay.

19    Q.  But it won't be as long.

20          But I have some documents.

21    A.  Okay.

22    Q.  Do you recall that it was in early December of

23        2016 that Ron returned from a leave?

24    A.  I recall receiving information sometime in

25        December related to Dr. Lisan's request for
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

54

1    reasonable accommodation.

2  Q.  All right.  I think these documents will refresh

3      your recollection.

4  A.  Okay.

5  Q.  Some of this, by the way, you may not be privy to

6      but it might be helpful in refreshing?

7                    -  -  -  -

8          (Thereupon, Plaintiff's Exhibit 8, 12/8/16

9          Raphaely "Questions" email to Lisan, was

10         marked for purposes of identification.)

11                    -  -  -  -

12 Q.  I'm going to hand you what's been marked as

13     Exhibit 8.

14         This is 8 for me and let's just pass these

15     around?

16                 DR. LISAN:  Is it just the one

17         page?

18 Q.  Yes.

19         Exhibit 8, I'll identify it, is apparently an

20     email from Dr. Raphaely dated December 8, 2016 to

21     Dr. Lisan which I'd like you to just read.

22 A.  "Ron:  Hope your return" --

23 Q.  No, not out loud.

24         To yourself.

25 A.  I thought you wanted me to read it out loud.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

55

```
 1                    MS. JOHNSON:  That was a good
 2            story time voice.
 3    A.  I read it.
 4    Q.  Okay.  Go ahead.
 5    A.  I did read it.
 6    Q.  All right.  I'm using this partly to give you a
 7        time frame.
 8            Dr. Lisan returned on December 7th, 2016,
 9        physically returned after a period of time away.
10        Right?
11    A.  That is my understanding.
12    Q.  Okay.  And Dr. Raphaely is writing:  "Hope
13        your" -- I'll read part of it.
14            "Hope your return is going smoothly.  I spoke
15        with Dr. Altose."
16            Do you know who Dr. Altose is?
17    A.  At the time Dr. Altose was the chief of staff.
18    Q.  So she would be the immediate superior to
19        Dr. Raphaely; is that right?
20    A.  Correct.
21    Q.  "I spoke with Dr. Altose about making no call
22        accommodations for you."
23            Did I read that correctly?
24    A.  Yes.
25    Q.  "Is this something you can have your doctors
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

56

1     request on a more formal basis?"  With a question

2     mark, right?

3  A.  Yes.

4  Q.  Then it says, "What are your thoughts about

5     covering late duty?"

6         Do you know what late duty is?

7  A.  No.  I assume it's duty that occurs late.

8  Q.  Yes.

9  A.  We're a 24 hour facility.

10  Q.  Okay.  Late duty in this case means beyond the

11     regular workday and it is, I don't want to get

12     into a long confusing discussion about on call,

13     first on call, third on call but I think you know

14     what on call means?

15  A.  Yes.

16  Q.  That's like following a workday or part of a

17     workday you stay beyond that and you're on call

18     in case there's an emergency and you're away from

19     the facility; is that correct?

20  A.  Correct.

21  Q.  But that could be a 24 hour obligation in an

22     anesthesiologist's case because you're operating

23     on a 24 hour basis.  By that I mean medically

24     operating?

25  A.  Correct.

57

1  Q.  Then she asks, "Lastly, are you able to cover the

2      Christmas holidays as originally planned?"  And

3      then, "I look forward to hearing from you."

4      Okay?

5  A.  Uh-huh.

6  Q.  So that kind of gives you a time frame that we're

7      looking at and she's asking him about making no

8      call accommodations, correct?

9  A.  She is asking him if this is something you can.

10  Q.  No, she's not asking him.  You're right.

11      She's telling him, Dr. Raphaely is telling

12      Dr. Lisan that she had discussed with Dr. Altose

13      making no call accommodations, correct?

14  A.  No.  She said she spoke with Dr. Altose about

15      making no call accommodations for you.  She does

16      not mention the discussion.  She asks.

17  Q.  I don't want to mince words with you.  She spoke

18      to her about it?

19  A.  She asked a specific question.

20  Q.  Right.  So she raised the question apparently or

21      communicated in some way with Dr. Altose about

22      making no call accommodations for Dr. Lisan,

23      right?  That's pretty clear, isn't it?

24      I don't want to sit here discussing spoke to,

25      said it.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

58

```
 1        I mean, you know there was communication on

 2     that subject?

 3               MS. JOHNSON:  Objection.  You may

 4          answer.

 5  Q.  Right?  It speaks for itself.  It's very clear,

 6     isn't it?

 7  A.  There is a written communication.

 8  Q.  All right.

 9  A.  From Dr. Raphaely to Dr. Lisan.

10  Q.  Right.  Which says that?

11  A.  Where she asks him a specific question about

12     having his doctor request on a more formal basis.

13     That is what I see.

14  Q.  Okay.  And what I'm concentrating on is the

15     previous sentence which represents from

16     Dr. Raphaely to Dr. Lisan that she spoke with

17     Dr. Altose about making no call accommodations

18     for Dr. Lisan.  Is that correct?

19               MS. JOHNSON:  Objection.  You may

20          answer.

21  A.  I have no knowledge about what Dr. Raphaely spoke

22     to Dr. Altose about.

23        All I know is what is written in this email

24     where she states, "I spoke with Dr. Altose about

25     making no call accommodations for you."
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

59

1    Q.   Okay.  Is there anything about that sentence that

2         you don't understand?

3    A.   No.

4    Q.   Thank you.  All right.  Now, are you --

5         withdrawn.

6              In your processing of Dr. Lisan's reasonable

7         accommodation request did you learn one way or

8         the other whether Dr. Raphaely had previously

9         told Dr. Lisan that Dr. Raphaely thought that a

10        no accommodation -- I'm sorry, a no call

11        accommodation was doable or words to that effect?

12                    MS. JOHNSON:  I'm sorry.  I didn't

13              get all of that question.

14                    MR. SINDELL:  I'll say it again.

15                    MS. JOHNSON:  Or I was just going

16              to have her read it back.  I just didn't

17              hear it.

18                    MR. SINDELL:  Oh, you didn't hear

19              it?

20                    MS. JOHNSON:  Yes, I didn't hear

21              it, Steve.  I wasn't trying to interrupt.

22                    MR. SINDELL:  Read it back.

23                    THE NOTARY:  "In your processing

24              of Dr. Lisan's reasonable accommodation

25              request did you learn one way or the other

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

60

```
 1              whether Dr. Raphaely had previously told
 2              Dr. Lisan that Dr. Raphaely thought that a
 3              no accommodation -- I'm sorry, a no call
 4              accommodation was doable or words to that
 5              effect?"
 6                   MS. JOHNSON:  Okay.  Thank you.
 7    A.  I don't know.
 8    Q.  Did you ever ask that question to Ron Lisan about
 9        his reasonable accommodation request?
10    A.  Ask what question?
11    Q.  Whether or not he was told --
12    A.  I don't recall.
13    Q.  Wait.  I've got to finish my question.  I'm
14        sorry.
15          Did you ever ask Ron Lisan in connection with
16        your reasonable accommodation processing whether
17        he had any discussions with Dr. Raphaely about
18        whether a no call accommodation was doable?
19    A.  I don't recall.
20    Q.  Would that be in your notes?
21    A.  It does not seem like the type of question I
22        would ask in the processing of a reasonable
23        accommodation request.
24    Q.  Okay.  I got it.
25                        - - - -
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

61

```
 1              (Thereupon, Plaintiff's Exhibit 9, 12/16/16
 2              Marciano note to Roach, was marked for
 3              purposes of identification.)
 4                           -  -  -  -
 5   Q.  Let's take a look at Exhibit 9.
 6              Okay.  This is Exhibit 9.
 7                      MS. JOHNSON:  This is 9, right?
 8   Q.  Yes.
 9              Would you take a look at Exhibit 9 please?
10   A.  Yes.
11   Q.  Do you recall receiving this document as part of
12       submissions from Dr. Lisan to you in connection
13       with your processing of the reasonable
14       accommodation request?
15   A.  Yes.
16   Q.  And it's simply a letter from what appears to be
17       an LISW, social worker?
18   A.  Yes.
19   Q.  Who's Kevin Roach?
20   A.  I think he is an administrative officer within
21       surgical service.
22   Q.  Okay.  Do you know --
23   A.  At least that's what he is now because I had
24       recent -- I don't remember if he was at the time.
25   Q.  I'm sorry.  Go ahead.  What did you just say?
```

62

1   A.  I am aware that Kevin Roach is an administrative

2       officer.  He may have been the administrative

3       officer in anesthesiology service at the time.

4                   MS. JOHNSON:  And did you say now

5              he's in the surgery service?

6   A.  It may be medicine service.  It's one of those.

7   Q.  **Would it be helpful for you to assume that -- is**

8       **it Dr. or Mr.?**

9                   DR. LISAN:  Mr. Roach.

10  Q.  **Mr. Roach was with anesthesiology at the time of**

11      **this communication of December 16, 2016 in**

12      **Exhibit 9?**

13                  MS. JOHNSON:  I'm going to object.

14             You may answer.

15  A.  I don't know if it would be helpful for me to

16      assume that; but I know that these administrative

17      officer persons like Mr. Roach all play a similar

18      role when it comes to reasonable accommodation

19      requests.

20  Q.  **And what's the role?**

21  A.  Typically they pass on information from a

22      requester to either a service chief or to me.

23  Q.  **And when you say a service chief, who would the**

24      **service chief be in this case?**

25  A.  Dr. Raphaely.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

63

```
 1   Q.  Does Dr. Raphaely play any role at all in the

 2       reasonable accommodation request?

 3   A.  Yes.

 4   Q.  What would that be?

 5   A.  She would, in the face of a request, she would

 6       pass information to me and then ultimately she

 7       would have the final decision-making authority

 8       about the provision of an accommodation as to

 9       whether to provide it or to deny it.

10   Q.  She decides whether or not there should be a

11       reasonable accommodation as requested or not?

12   A.  Correct.

13   Q.  Doesn't anybody else have anything to say about

14       that?

15   A.  When you say "have anything to say about it,"

16       what does that mean?

17   Q.  Well, I mean doesn't anybody else review it and

18       make a decision above Dr. Raphaely or separate

19       and apart from her?

20   A.  No.  Dr. Raphaely has the authority to make a

21       decision.

22   Q.  Okay.  Does she make the final decision?

23   A.  Yes.

24   Q.  Is there anyone else who participates in making

25       that final decision?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

64

```
 1   A.   No.
 2   Q.   So the chief of the department would be the
 3        appropriate person in this case to decide whether
 4        or not Ron Lisan's reasonable accommodation
 5        request would be accepted or denied?
 6   A.   Correct.
 7   Q.   What about Dr. Altose?  Does he have anything --
 8        withdrawn.
 9             Did Dr. Altose as the medical director have
10        any role in the decision to grant or deny
11        reasonable accommodation?
12   A.   No.
13   Q.   Is there any reason you can understand why
14        Dr. Raphaely wanted to check on that matter with
15        Dr. Altose?
16   A.   I have no knowledge as to why she checked with
17        Dr. Altose.
18   Q.   But she did not need to, did she?
19   A.   I don't know.  You're asking me about
20        Dr. Raphaely's needs?
21   Q.   Yes.  I'm asking you whether -- withdrawn.
22             She had no obligation to consult with him.
23        She could have made the decision all by herself
24        if she chose, right?
25   A.   I don't know.  She may have wanted to consult
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**65**

 1      Dr. Altose for some reason that I'm unaware of.

 2  Q.  Okay.  Here's my question.

 3          There's nothing of course that would prevent

 4      a chief of a department of anesthesiology from

 5      consulting with anyone about a reasonable

 6      accommodation decision, correct?  I mean within

 7      the VA?

 8  A.  As long as it was a professional consultation.

 9  Q.  Yes.  Yes.

10  A.  Okay.  Then yes.

11  Q.  I mean she could consult with Dr. Altose, she can

12      consult with you.  She can consult as I

13      understand you with anybody who might have

14      knowledge to give her about it.  Right?

15  A.  Perhaps.

16  Q.  Well, she could if she chose?

17  A.  If she chose to, yes.

18  Q.  Okay.  Now, when you're processing a reasonable

19      accommodation request, is it part of your job to

20      communicate with the, in this case, physician,

21      Dr. Lisan, making the request?

22  A.  Yes.

23  Q.  Okay.  I think they call that the interactive

24      process, don't they?

25  A.  Correct.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

66

1   Q.  And you're familiar with that, aren't you?

2   A.  Correct.

3   Q.  And that's something that falls within your

4       responsibility; isn't it?

5   A.  Correct.

6   Q.  Let me be clear about something.

7           You've testified that the final decision on

8       reasonable accommodation rests exclusively with

9       Dr. Raphaely in this case?

10  A.  Yes.

11  Q.  On what do you base that?  Where does that

12      statement you're making come from?

13  A.  The VA policy that's in the handbook on

14      reasonable accommodation.

15  Q.  Did you review those policies in preparation for

16      this deposition?

17  A.  No.

18                          -  -  -  -

19          (Thereupon, Plaintiff's Exhibit 10, 12/19/16

20          Raphaely "Reasonable accommodations" email to

21          Kafer, et al., was marked for purposes of

22          identification.)

23                          -  -  -  -

24  Q.  All right.  This is Exhibit 10.

25          All right.  I'd like you to take a look at

67

1      Exhibit 10 if you would, please.

2  A.  Okay.

3  Q.  Oh, I'm sorry.  Have you read it?

4  A.  Yes.

5                    MR. SINDELL:  Off the record.

6                         -  -  -  -

7      (Thereupon, a discussion was had off the

8      record.)

9                         -  -  -  -

10  Q.  Now, this, do you have any recollection of this

11      email?

12  A.  Yes.  Now that I'm reviewing it, I recall this

13      email.

14  Q.  Good.  Let's just identify Exhibit 10, this

15      email.

16      It's from Dr. Raphaely sent December 19,

17      Monday December 19, 2016 at 10:50 a.m. in the

18      morning to you, correct?

19  A.  Correct.

20  Q.  To Dr. Lisan, correct?

21  A.  Correct.

22  Q.  Who is Jelena Zekanovic?

23  A.  She was the employee labor relations specialist

24      at the time.  She is considered a subject matter

25      expert in human resources.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

68

```
 1   Q.  Any particular reason you can understand why she

 2       would be copied on this?

 3   A.  Normal protocol.

 4   Q.  Kevin Roach is copied and we've talked about him,

 5       right?

 6   A.  Correct.

 7   Q.  And who is Shawn Beham?

 8   A.  He was a assistant reasonable accommodation

 9       coordinator at the time and an EEO specialist.

10   Q.  Why would he get a copy of this?

11   A.  Because he would assist me with cases.

12   Q.  Was he assisting you on this case?

13   A.  Not to my recollection.

14   Q.  Okay.  So it's a formality in this case for him?

15   A.  Right.  In the event I'm absent or...

16   Q.  No, I understand.

17           And the subject of course as indicated is

18       reasonable accommodations, correct?

19   A.  Correct.

20   Q.  Now this is, as follows, the way it's written:

21       "Bruce:  I am reaching out to you for your

22       assistance with a request I have received for

23       accommodations by Dr. Ronald Lisan."

24           Did I read that correctly?

25   A.  Yes.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

69

1   Q.   There's nothing unusual about a department chief

2        writing to you with a question like that, or

3        reaching out to you?

4   A.   Yeah.  It's typical.

5   Q.   Typical, okay.

6        "Dr. Lisan is a long-standing member of the

7        anesthesia department and due to changes in his

8        health status, he is stating he is unable to

9        participate in call."

10       Did I read that correctly?

11  A.   Yes.

12  Q.   Did you ever ask Dr. Lisan if he was stating he

13       is unable to participate in call?

14  A.   I don't recall ever asking him that specific

15       question.

16  Q.   Do you ever recall sitting down with him

17       face-to-face and discussing his request with him?

18  A.   I recall we had a meeting where we sat down and

19       you were on the phone but I don't recall the

20       nature of our discussion.

21  Q.   Okay.  Well, that was a discussion about EEO

22       matters, if you'll recall.  That had nothing to

23       do with reasonable accommodation.

24  A.   In reasonable accommodation, the interactive

25       process is mainly accomplished through email.

70

1    Q.  Wait.  Wait.  You're not answering a question.

2        You're just talking about something else.

3            Let's stay with your last remark.

4            You said you recalled a conversation with me

5        on the phone.  Okay?

6            That was not a conversation about reasonable

7        accommodation at all, was it?  If you can recall?

8        We didn't discuss that at all?

9    A.  I don't know.  That was the only conversation I

10       can recall where we sat down.  You asked me did

11       you sit down with Dr. Lisan.  That was the one I

12       recalled.

13   Q.  Okay.  So now my next question is:  Is it your

14       recollection that in that conversation where I

15       was present on the phone, correct?

16   A.  Yes.

17   Q.  That reasonable accommodation was discussed?

18   A.  I have no recollection of what we discussed at

19       that meeting where I sat down in person with

20       Dr. Lisan.

21   Q.  There were other people present in your office at

22       that time; is that correct?

23   A.  Yes.  I recall others being present.

24   Q.  Matter of fact, it was Carlton Daniel was

25       present, wasn't he?  Union guy?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

71

```
 1    A.   Maybe.

 2    Q.   You don't recall for sure?

 3    A.   I don't recall for sure.  I know other people

 4         were there.

 5                    MS. JOHNSON:  Can we just go off a

 6              record for a second.

 7                         -  -  -  -

 8         (Thereupon, a discussion was had off the

 9         record.)

10                         -  -  -  -

11    Q.   See if this refreshes your recollection.

12         Do you recall refusing to discuss anything

13         about reasonable accommodation at that meeting?

14    A.   I don't recall the content of what we discussed

15         at that meeting.

16    Q.   Do you recall when it was?

17    A.   No.

18    Q.   Do you recall that his reasonable accommodation

19         had been rejected by the time of that meeting?

20    A.   No.

21    Q.   Okay.

22    A.   All I recall is we had one meeting.

23    Q.   Do you remember at that meeting that I spoke on

24         the phone?

25    A.   Yes.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

72

1   Q.   Do you remember at that meeting I asked you to

2         recuse yourself?

3   A.   No.

4   Q.   You don't remember that?

5   A.   No.

6   Q.   Okay.  Do you remember that I asked you to recuse

7         yourself because you had already dealt with the

8         reasonable accommodation issue?

9                   MS. JOHNSON:  Objection.  You may

10         answer.

11   A.   No.

12   Q.   You're not denying it.  You just don't recall,

13         right?

14   A.   Correct.

15   Q.   All right.  Reading on, if you'll follow me,

16         please, with this.  Oh, withdrawn.  Let me just

17         ask you this:

18             Is it your testimony that the only

19         face-to-face meeting that you had with Dr. Lisan

20         was this meeting where I was on the phone?

21   A.   No.  I'm not testifying to that.

22   Q.   Were there others?

23   A.   I don't know.  There may have been others.

24   Q.   Do you recall any others?

25   A.   I recall Dr. Lisan coming to the office but I

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

73

```
 1        don't recall the nature of his appearance in the
 2        office.
 3    Q.  Do you recall any discussions directly with
 4        Dr. Lisan face to face about his reasonable
 5        accommodation request?
 6    A.  Not at this moment.
 7    Q.  Now she goes on, "she" being Dr. Raphaely, and
 8        says:  "After much consideration, I feel that as
 9        a department we're are unable" -- I'm going to
10        start that again.
11            "After much consideration, I feel that as a
12        department we are unable to meet his request."
13            Did I read that correctly?
14    A.  Yes, the second time.
15    Q.  Right.  Thank you for that.
16    A.  You're welcome.
17    Q.  Now, would you agree with me that the
18        characterization of Dr. Lisan's request for
19        reasonable accommodation as indicated in this
20        email by Dr. Raphaely is that he not be required
21        to participate in on-call duty?
22    A.  No.  I don't agree with you.
23    Q.  Okay.  What do you think it means when it says
24        "due to changes in his health status he is
25        stating he is unable to participate in call"?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

74

```
1    A.   What I think that means is he has made a
2         statement.  I have no way of knowing in the realm
3         of reasonable accommodation whether that
4         statement is true or not.
5    Q.   I didn't ask you that.
6    A.   Only that he has made that statement.
7    Q.   I don't think you followed my question,
8         Mr. Kafer, so I'm going to ask her to read the
9         question before this last one and listen
10        carefully to it because I don't think you're
11        answering my question.
12                  THE NOTARY:  "What do you think it
13             means when it says "due to changes in his
14             health status he is stating he is unable to
15             participate in call?"
16                  MS. JOHNSON:  Objection.  You may
17             answer.
18   Q.   I just asked you what do you think that means?
19   A.   It means that Dr. Lisan has made a statement
20        about his health status and this is the type of
21        typical statements people make when they're
22        making reasonable accommodation requests.
23   Q.   Okay.  I don't care whether it's typical or not.
24             Unable to participate in call is a
25        representation by Dr. Raphaely of Dr. Lisan's
```

75

```
 1        reasonable accommodation request, correct?
 2   A.   A representation, yes.
 3   Q.   Okay.  Did you have any reason to believe or
 4        disbelieve Dr. Raphaely's representation?
 5   A.   No.  Her representation was essentially
 6        irrelevant.
 7   Q.   Man, I didn't ask you if it was irrelevant or
 8        relevant or good or bad or anything.  I just
 9        asked you one question about it.
10           Would you read it back.  And please answer
11        that question.
12                     MS. JOHNSON:  Objection.  He did
13             answer that question.
14   A.   I already answered that question.
15                     MR. SINDELL:  Yeah, but he's
16             throwing in a lot of other stuff.
17   A.   Is that prohibited?
18   Q.   Yeah, you're supposed to answer the question, not
19        some other question.
20                     MS. JOHNSON:  I'm going to object,
21             Steve.  He did answer the question.
22                     MR. SINDELL:  Okay.
23                     MS. JOHNSON:  I think if Pam reads
24             back his answer, he did answer the
25             question.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

76

```
 1                    MR. SINDELL:  Yes.  But he
 2              included in his answer, though, a non
 3              answer to the question.
 4                    MS. JOHNSON:  Well, he's a allowed
 5              to include whatever explanation he believes
 6              is appropriate in an answer.
 7                    MR. SINDELL:  That's not an
 8              explanation.
 9    A.   Yes, it was.
10    Q.   I would appreciate if you could at least confine
11         yourself just to completely answering my
12         questions.  Okay?
13    A.   But I am aware your questions have to do with
14         reasonable accommodation in this case so I want
15         to make sure that you're informed.
16    Q.   In any event, you write -- she writes, I'm sorry.
17              "After much consideration, I feel that as a
18         department we are unable to meet his request."
19              Now I'm going to ask you this question:  Did
20         I read that correctly first of all?
21    A.   Yes.
22    Q.   Okay.  She writes, and I'm repeating it, "We are
23         unable to meet his request," meaning Dr. Lisan's
24         request, correct?
25    A.   Correct.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

77

```
 1    Q.  Tell me what you understand Dr. Lisan's request

 2        to have been in this email.

 3    A.  That there was an assertion he made that he was

 4        unable to do call.

 5    Q.  That he was requesting not to have call?

 6    A.  That was his request.

 7    Q.  Okay.  And for how long was he requesting not to

 8        have call?

 9    A.  I don't remember.  I only remember that it was

10        temporary.

11    Q.  Do you remember how temporary?

12    A.  No.

13    Q.  Now it says, "Taking call is" -- withdrawn.

14            Did you ever ask Dr. Raphaely the length of

15        time that he was requesting not to take call?

16    A.  I don't recall if I asked Dr. Raphaely for the

17        length of time.

18            I believe I was informed otherwise.

19    Q.  What do you mean, "otherwise"?

20    A.  I recall there was documentation that Dr. Lisan

21        had provided which stated or suggested how long

22        his temporary request was for.

23    Q.  Do you know who stated it?

24    A.  No.

25    Q.  "Taking call is an essential position" -- I'm
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

78

```
 1        sorry.
 2             "Taking call is an essential function of his
 3        position."
 4             Did I read that correctly?
 5   A.   Yes.
 6   Q.   Did you ever discuss what an essential function
 7        was with Dr. Raphaely?
 8   A.   No.
 9   Q.   Did she ever ask you what an essential function
10        was?
11   A.   No.
12   Q.   Is that a term of art so to speak in the handbook
13        defining what it is?
14   A.   Yes.
15   Q.   Do you know whether or not Dr. Raphaely
16        understood the VA's definition in the handbook of
17        essential function?
18   A.   Yes.
19   Q.   How do you know she knew that?
20   A.   Because Dr. Raphaely is the service chief of the
21        department and you cannot ascend to that position
22        without understanding what the essential
23        functions are of an anesthesiologist.
24   Q.   Well, whether she actually understood it or not
25        is, as defined by the VA handbook, is something
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

79

```
 1       you don't know; is that correct?
 2   A.  Are you asking me if she understood the
 3       definition of essential function as it's
 4       described in the VA handbook on reasonable
 5       accommodation?
 6                   MR. SINDELL:  Read him back the
 7              question.  I think it's clear.  Go ahead.
 8                   THE NOTARY:  "Well, whether she
 9              actually understood it or not is, as
10              defined by the VA handbook, is something
11              you don't know; is that correct?"
12   A.  I have no knowledge if she is aware of the VA
13       handbook.
14   Q.  Okay.  But isn't essential function something
15       that is specifically defined by the VA handbook?
16   A.  Yes.
17   Q.  So it's not just out of the dictionary,
18       "essential function" I mean as a loose form of
19       discussion.  I mean it's a very specific term
20       with meaning?
21   A.  Yes.
22   Q.  And you're saying she's supposed to know that?
23   A.  Yes.
24   Q.  Because she is a department chief, correct?
25   A.  I'm saying she would know what an essential
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

80

 1    function of his position is as she wrote in this

 2    email.  That is what I'm saying.

 3  Q.  **And when you say, "what an essential function is"**

 4    **that she would know, you mean as defined in the**

 5    **VA handbook?**

 6  A.  No.

 7  Q.  **Then that's --**

 8  A.  I'm not saying that she is referencing the VA

 9    handbook in this email.

10    I'm saying that she is referencing an

11    essential function of his position because she

12    holds her position as service chief and is

13    knowledgeable about what the essential functions

14    of an anesthesiologist are.

15  Q.  **Okay.  In a medical sense?**

16  A.  Correct.

17  Q.  **But not in a definitional sense from the**

18    **handbook?**

19  A.  I have no knowledge if she knows anything about

20    the handbook.

21  Q.  **Okay.  Did you think it was important for her to**

22    **be informed by you as to what the VA defined an**

23    **essential function as?**

24  A.  Did I think it was important at that time or

25    currently?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

81

```
1   Q.  Yes, sir, at that time.

2   A.  I don't recall if I thought that.

3   Q.  Did you assume that she knew what the VA handbook

4       definition of essential function was?

5   A.  I don't recall making any assumptions about

6       Dr. Raphaely and her knowledge about the VA

7       handbook and the definition of essential

8       function.

9   Q.  Did she ever ask you to describe for her what was

10      an essential function as defined by reasonable

11      accommodation rules in the VA handbook?

12  A.  I do not recall.

13  Q.  Okay.  Could you have told her if she did?

14  A.  Of course.

15  Q.  Your job as processing a reasonable accommodation

16      claim -- withdrawn.

17          In fulfilling your responsibility as the

18      reasonable accommodation coordinator, do you have

19      a job description for that role?

20  A.  Yes.

21  Q.  Do you know where it is?

22  A.  Yes.

23  Q.  Where is it?

24  A.  In the handbook on reasonable accommodation.

25  Q.  Okay.  Is it your understanding that it is part
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

82

1          of your duty to ensure that the people who are

2          making final decisions about reasonable

3          accommodation such as a department chief

4          understand what the rules are as promulgated by

5          the Veterans Association handbook?

6     A.   My duty is to ensure they comply with the

7          regulations.

8     Q.   **I'm sorry.  I couldn't hear you.**

9     A.   My duty is to ensure they comply with the

10         regulations and the policies contained within the

11         handbook.

12                    MR. SINDELL:  Okay.  Would you

13              read back his answer please.

14                    THE NOTARY:  "My duty is to ensure

15              they comply with the regulations and the

16              policies contained within the handbook."

17    Q.   **Okay.  It says "All the anesthesiologists within**

18         **the service who work primarily at Wade Park need**

19         **to be able to participate in the call schedule."**

20         **Did I read that correctly?**

21    A.   Yes.

22    Q.   **Okay.  Does that mean that they need to**

23         **participate in the call schedule at all times**

24         **during their employment?**

25                    MS. JOHNSON:  Objection.  You can

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

83

```
 1              answer.
 2    Q.   If you know.
 3    A.   I don't know because I don't know if you're
 4         asking me about if they're on vacation for
 5         instance.
 6    Q.   Yeah.  Let's say they're on vacation.
 7    A.   So I would have no knowledge about their
 8         practices for vacations.
 9    Q.   Okay.  I'm not asking you if they're not there
10         whether they have to participate in on call
11         because if they're on vacation, I wouldn't expect
12         they would be obligated to work at all.
13    A.   Let's hope not.
14    Q.   Okay.
15                   DR. LISAN:  Only the residents.
16              Sorry.  Off the record.
17                       -  -  -  -
18         (Thereupon, a discussion was had off the
19         record.)
20                       -  -  -  -
21    Q.   Obviously if somebody is ill, they wouldn't be
22         expected to come in for on call or any other
23         duty; is that correct?
24    A.   I don't know.
25    Q.   You think that somebody who is ill in bed at home
```

84

1    would be expected to show up for on-call duty?

2  A.  Only if it was a resident.

3              MR. SINDELL:  Let's take a break.

4                    -  -  -  -

5          (Thereupon, a recess was had.)

6                    -  -  -  -

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

85

```
 1                    AFTERNOON SESSION

 2              (Friday, March 8, 2019, 1:28 p.m.)

 3                      -  -  -  -

 4              CONTINUED CROSS-EXAMINATION

 5                 OF BRUCE KAFER, RN, MSN

 6       BY MR. SINDELL:

 7   Q.  Back on the record.

 8            There are a number of jobs and duties which

 9       are part of any position at the VA, right?

10       Everyone has integrated duties and jobs and

11       tasks?

12   A.  Yes.

13   Q.  They are part of, why is the word escaping me.

14       What is that sheet?

15   A.  Hierarchy?  Organizational chart?

16   Q.  No.  No.

17                    MS. JOHNSON:  Organizational chart

18           or job description.

19   Q.  That's it.  Thank you.  Job description.

20            They're part of job descriptions, okay?  But

21       job descriptions describe positions, don't they?

22   A.  Yes.

23   Q.  And CRNA is a position, correct?

24   A.  Uh-huh.

25   Q.  Is that a yes?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

86

1    A.  Yes.

2    Q.  Anesthesiologist would be a position?

3    A.  Yes.

4    Q.  I don't know what you call your position.

5    A.  Registered nurse.

6    Q.  Okay.  That's a position.

7        And there might be types of slants of jobs in

8        certain kinds of positions that define something

9        a little more specific about it, correct?

10   A.  Correct.

11   Q.  But, and within positions -- withdrawn.

12       Within job descriptions and positions in job

13       description, some of the activities and duties in

14       a job description are essential functions?

15   A.  Correct.

16   Q.  But not all of them are essential functions?

17   A.  Correct.

18   Q.  So in order to determine whether something is an

19       essential function, you would have to distinguish

20       between different tasks within the job

21       description to decide which ones were and which

22       ones were not essential functions?

23   A.  Uh-huh.

24   Q.  Is that yes?

25   A.  You didn't ask a question.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

87

1  Q.  Question mark at the end of that.  You want her

2      to read it back?

3  A.  Yes.  Please read it back.

4              THE NOTARY:  "So in order to

5          determine whether something is an essential

6          function, you would have to distinguish

7          between different tasks within the job

8          description to decide which ones were and

9          which ones were not essential functions?"

10 A.  Yes.

11 Q.  And there are certain prescribed standards in the

12     VA handbook for making that determination as to

13     which tasks within a job description are

14     essential functions and which are not?

15 A.  Yes.  If you're referring to the reasonable

16     accommodation handbook.

17 Q.  Yes, of course I am.  Sorry.  Thank you.

18 A.  Okay.

19 Q.  Now, for somebody to express a view, including a

20     department chief, that some task in a job

21     description is an essential function, wouldn't it

22     be necessary for them to know what essential

23     function means under the handbook definition?

24 A.  No.

25 Q.  They can make up their own definition of

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

88

1      essential function and pick between tasks and

2      decide this one's an essential function and this

3      one isn't, irrespective of the handbook?  Is

4      that --

5   A.  Potentially.

6   Q.  Just a minute.  Is that correct?  Please answer

7      my question.

8   A.  Here is my answer to your question:  Potentially

9      they could make up their own definition or they

10     could actually know what the definition of an

11     essential function is and as a subject matter

12     expert, they could provide a citation of what the

13     essential functions are of a position as in the

14     case of Dr. Raphaely.

15  Q.  Okay.  Now as in the case of Dr. Raphaely, does

16     his job description as an anesthesiologist say

17     that on-call duty is an essential function?

18     Actually say that?

19  A.  I don't know.

20  Q.  Now I want to be clear about this because I

21     thought you said, and correct me if I'm wrong,

22     that the department chief can choose as an option

23     to use his or her own personal definition of

24     essential function in describing whether a task

25     is or isn't an essential function irrespective of

89

1      the definitions in the VA handbook.

2           Is that what you're saying?

3   A.  I said that's something they could do.  I did not

4       imply or suggest that it would be in alignment

5       with policies or regulations or anything having

6       to do with doing a position professionally.

7   Q.  So are you saying it's something they shouldn't

8       do?

9   A.  What I am saying in answer to your question is

10      that a service chief, especially Dr. Raphaely,

11      knows what the essential functions of an

12      anesthesiologist are and because of that, she was

13      able to convey that to me.

14  Q.  How do you know what she knows?

15  A.  I never said that I knew what she knows.

16  Q.  You just did.

17  A.  Let's --

18  Q.  Read back his last answer, please, where he said

19      she knows.

20           Read it back and listen carefully to what you

21      said, Mr. Kafer.

22  A.  Okay.

23                  THE NOTARY:  "What I am saying in

24           answer to your question is that a service

25           chief, especially Dr. Raphaely, knows what

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

90

```
 1                the essential functions of an

 2                anesthesiologist are and because of that,

 3                she was able to convey that to me."

 4    Q.  Now, do you want to leave that answer stand

 5        exactly as you said it or would you like to

 6        clarify it?

 7    A.  Here is my answer to your question:

 8    Q.  Well, what was the last thing you just said?  Was

 9        that an answer?

10    A.  You have to let me answer.

11    Q.  I don't know what question you're answering

12        anymore.

13    A.  You just asked me a question and I said "here is

14        my answer."

15    Q.  No, I didn't.

16    A.  You said do you want to let that stand as your

17        answer or do you want to change it and I said

18        here is my answer and then you interrupted me and

19        in the beginning of this process you said that

20        you were not going to interrupt me, so my

21        expectation is that you allow me to answer.

22    Q.  Your expectation should be that in fairness to

23        you, I want you to hear the question before you

24        answer it again so that you know exactly what the

25        question was that you're answering.  That's all I
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

91

1      wanted to do.

2          I thought that just having the answer might

3      not be as clear to you as I would like it to be,

4      so in fairness to you, I want you to hear the

5      question if you're going to answer it again.

6          Now, allow her to read the question so you

7      can hear it again before you answer.

8  A.  Now, look --

9  Q.  Please read the question to him.

10 A.  I understand you're informing me of what you

11     want.

12         I was prepared to answer and you interrupted

13     me.

14 Q.  Right.  Because I thought you needed --

15 A.  There is no justification for interrupting me.

16             MS. JOHNSON:  Okay.  Let's, let's

17         just --

18 Q.  You need to talk to him.

19     Don't tell me what there's justification for.

20     I want you to hear the question.

21 A.  Now you're giving me a directive?

22 Q.  Yes.  Exactly.

23             MS. JOHNSON:  Let's stop.  Let's

24         stop.  We're all going to be calm in this

25         room.  Okay?  We're going to take a deep

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

92

```
 1              breath.

 2                     I think, I think that you did have

 3              a question after the one that he just read

 4              an answer to, so I think that that's what

 5              he was trying to answer.

 6                     MR. SINDELL:  I'm just trying to

 7              be fair to him.  That's all.

 8                     MS. JOHNSON:  Yes, and I think

 9              that's what he was trying to answer.

10   Q.  So let me have her ask you the question that

11       preceded your answer so you can hear the question

12       and then answer it.  Okay?

13   A.  Okay.

14   Q.  And I think that's just in fairness to you.

15           All right.  Go read way back there where you

16       read the answer, read the question this time.

17                     THE NOTARY:  "Now as in the case

18              of Dr. Raphaely, does his job description

19              as an anesthesiologist say that on-call

20              duty is an essential function?  Actually

21              say that?"

22                     ANSWER:  "I don't know."

23                     QUESTION:  "Now I want to be clear

24              about this because I thought you said, and

25              correct me if I'm wrong, that the
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

93

1  department chief can choose as an option to

2  use his or her own personal definition of

3  essential function in describing whether a

4  task is or isn't an essential function

5  irrespective of the definitions in the VA

6  handbook.

7           "Is that what you're saying?"

8           ANSWER:  "I said that's something

9  they could do.  I did not imply or suggest

10  that it would be in alignment with policies

11  or regulations or anything having to do

12  with doing a position professionally."

13          QUESTION:  "So are you saying it's

14  something they shouldn't do?"

15          ANSWER:  "What I am saying in

16  answer to your question is that a service

17  chief, especially Dr. Raphaely, knows what

18  the essential functions of an

19  anesthesiologist are and because of that,

20  she was able to convey that to me."

21          MR. SINDELL:  Okay.  Now I want

22  you to re-read that last question to the

23  witness.

24          THE NOTARY:  "So are you saying

25  it's something they shouldn't do?"

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

94

```
 1   Q.  Do you understand it now, the question and the

 2       answer that you want to give?  Because I'm

 3       prepared to let it sit there.

 4   A.  Are you saying, are you asking me the answer that

 5       I gave, do I want to change it?

 6                   MS. JOHNSON:  No.  The question

 7             that she just read I believe is --

 8   Q.  Okay.  Read his answer then.  Give me his answer

 9       to that, "so are you saying," give me the answer

10       he gave to that question because I think this is

11       critical here.

12                   THE NOTARY:  "What I am saying in

13             answer to your question is that a service

14             chief, especially Dr. Raphaely, knows what

15             the essential functions of an

16             anesthesiologist are and because of that,

17             she was able to convey that to me."

18   Q.  You know what?  I'm going to let that stand just

19       like that.

20          Now you heard her read back your answer,

21       didn't you?

22   A.  Yes.

23   Q.  Okay.  When you said, "She knows what the

24       essential functions of an anesthesiologist are,"

25       you remember that?
```

95

1    A.   Yes.

2    Q.   When Dr. Raphaely says -- with withdrawn.

3         When you said that Dr. Raphaely knows what

4    the essential functions of an anesthesiologist

5    are, you're referring to the position of an

6    anesthesiologist; is that correct?

7    A.   Yes.

8    Q.   Thank you.  Now, I might as well just go right

9    into this.  This will be Exhibit 11.

10                        -  -  -  -

11        (Thereupon, Plaintiff's Exhibit 11, 11/27/13

12        VA Handbook 5975.1 "Essential Functions" was

13        marked for purposes of identification.)

14                        -  -  -  -

15   Q.   Let me ask you this question:  In your view, does

16   the number of other employees available to

17   perform the function or among whom the

18   performance of the function can be distributed

19   factor into whether it's an essential function?

20   A.   Yes.

21   Q.   Does the degree of expertise or skill required to

22   perform the function factor into an essential

23   function?

24   A.   Yes.

25   Q.   Does a written job description before advertising

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

96

1      or interviewing applicants for the job factor

2      into what an essential function is?

3  A.  Sometimes.

4  Q.  Does the amount of time actually spent on the job

5      performing the function impact whether or not

6      it's an essential function?

7  A.  Does the amount of time spent performing on the

8      job?  Can you read that back, please?

9  Q.  Sure.  Does the amount of time actually spent on

10     the job performing the function factor into

11     whether or not it's an essential function?

12 A.  It can.

13 Q.  Does the consequences of not requiring the

14     incumbent to perform the function factor into it?

15 A.  It can.

16 Q.  Does the terms of the, any collective bargaining

17     agreement, it's really not applicable here, but

18     does that factor into it, if you know?

19 A.  I don't know.

20 Q.  Does the work experience of past incumbents in

21     the job factor into whether it's an essential

22     function?

23 A.  I am uncertain.

24 Q.  Does the current work experience of the incumbent

25     in similar jobs factor into whether it's an

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

97

```
 1        essential function?
 2   A.   I don't know.
 3   Q.   Okay.  Now I'm going to -- I'll give you this,
 4        so -- all I did, by the way was just read what it
 5        said.  And I'd like you to review it.
 6            This is Exhibit 11.
 7   A.   Okay.  I've reviewed the document.
 8   Q.   I'd like you to, let me just ask you to your
 9        knowledge is this the handbook definition of the
10        VA of an essential function?
11   A.   Yes.
12   Q.   Okay?
13   A.   It also states what is considered in determining
14        whether a job function is essential.
15   Q.   Yes, it does.  I'm not excluding anything.
16   A.   Right.
17   Q.   All right.  Now let's take a look at the
18        paragraph above all those bullet points.  You see
19        it?
20   A.   Yes.
21   Q.   I'd like you to look at the, looks like the
22        second last sentence.  It says:  "If a function
23        is listed in the position description as an
24        essential function, but is not performed by the
25        incumbent or takes only a few hours per week, it
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

98

1      is not usually considered 'essential' for

2      purposes of accommodation."

3          Did I read that correctly?

4  A.  Yes, you did.

5  Q.  Do you take any issue or disagreement with that

6      sentence?

7  A.  No.

8  Q.  Would you agree -- withdrawn.

9          Do you have any idea how many hours on call

10     takes in terms of the weekly hours of a full-time

11     anesthesiologist?

12 A.  In general or specifically related to the

13     Cleveland VA's anesthesiology service or is this

14     anesthesiologists in general or on average?

15 Q.  I'm sorry I didn't make that clear.

16         Let me repeat it and I do mean the Cleveland

17     VA; so at the Cleveland VA in the department of

18     anesthesiology at the Cleveland VA, at the time

19     of December 2016 and the first part of 2017.

20     Okay?

21         Do you know how many hours per week it takes

22     a full-time anesthesiologist to do on-call duty?

23 A.  No.

24 Q.  Do you think that the knowledge of that would be

25     important in determining whether or not a

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

99

1      function is essential for the position of

2      anesthesiologist?

3                      MS. JOHNSON:  You can answer.

4   A.  No.  And here is the rest of my answer:

5   Q.  **I didn't ask you why.  I just --**

6   A.  You're interrupting me now and I haven't finished

7      answering.  Remember what you said:  No

8      interrupting.

9   Q.  **Yes.  But --**

10  A.  There's no buts.  Those were the rules.

11  Q.  **No, they're not the rules.**

12  A.  You established them in the beginning.  You

13     said --

14                     MS. JOHNSON:  Let's stop.

15                     MR. SINDELL:  I'm going to ask

16             counsel this and I'm not directing it to

17             the witness, okay?

18                     The witness has a right to give a

19             full answer and I fully agree with that.

20             Let me finish.

21                     MS. JOHNSON:  I will.

22                     MR. SINDELL:  Plus -- however, he

23             does not have a right to just make answers

24             that are not responsive to a yes or no

25             question.

**100**

```
 1                    MS. JOHNSON:  Well, I think that
 2           he is allowed to answer.  If you don't
 3           think it's relevant, you don't have to deal
 4           with it but he did answer the question no
 5           and he apparently --
 6                    MR. SINDELL:  He can explain it.
 7                    MS. JOHNSON:  And he apparently
 8           wants to explain that a little bit.
 9                    MR. SINDELL:  Okay.
10                    MS. JOHNSON:  So he's permitted to
11           do that.
12  Q.  Okay.  Now why don't you explain your answer
13       then.  Go ahead.
14  A.  Please repeat the question.
15                    THE NOTARY:  "Do you think that
16           the knowledge of that would be important in
17           determining whether or not a function is
18           essential for the position of
19           anesthesiologist?"
20  A.  My knowledge of -- wait.  I'm lost.
21                    THE NOTARY:  "Do you know how many
22           hours per week it takes a full-time
23           anesthesiologist to do on-call duty?"
24                    ANSWER:  "No."
25                    QUESTION:  "Do you think that the
```

101

1              knowledge of that would be important in

2              determining whether or not a function is

3              essential for the position of

4              anesthesiologist?"

5  A.  The knowledge of the number of hours -- is this

6      question, are you asking if I had that knowledge

7      or if Dr. Raphaely had that knowledge?

8  **Q.  The question I think is clear.**

9  A.  Are you unable to answer my question?  I need to

10     know --

11              MS. JOHNSON:  You're not supposed

12          to be asking questions.

13 A.  Okay.  Sorry.

14              MS. JOHNSON:  So could you read

15          back the question again.

16              MR. SINDELL:  Sure.  Let's keep

17          reading it back.

18 A.  Like whose knowledge are we referring to is what

19     I need to know.

20              MS. JOHNSON:  I think it's yours.

21 A.  My knowledge?  If I am aware of how many hours?

22 **Q.  No.  No.  Listen to the question.**

23              MS. JOHNSON:  Listen to the

24          question.

25 **Q.  And then I think it's very clear.  I stand on**

102

1      that question as being quite clear.

2  A.  So it's asking about my knowledge?

3              MS. JOHNSON:  I believe so.  So

4         listen to the question.

5              MR. SINDELL:  Did you take her

6         statement down just now?

7              THE NOTARY:  Yes.

8              MR. SINDELL:  Because I don't know

9         that that's true, but read the question.

10              MS. JOHNSON:  Well, let's read the

11         question.

12              THE NOTARY:  "Let me repeat it and

13         I do mean the Cleveland VA; so at the

14         Cleveland VA in the department of

15         anesthesiology at the Cleveland VA, at the

16         time of December 2016 and the first part of

17         2017.  Okay?

18              "Do you know how many hours per

19         week it takes a full-time anesthesiologist

20         to do on-call duty?"

21              ANSWER:  "No."

22              QUESTION:  "Do you think that the

23         knowledge of that would be important in

24         determining whether or not a function is

25         essential for the position of

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

103

1              anesthesiologist?"

2    A.   It is not necessarily relevant to determine the

3         essential functions of an anesthesiologist

4         because I can be informed by subject matter

5         experts like Dr. Raphaely or the human resources

6         person, Jelena who is referenced in some of the

7         documents.

8    Q.   Okay.  Fine.

9              Now, do you know what considerations

10        Dr. Raphaely took into account when she told you

11        that on-call duty is an essential function of an

12        anesthesiologist's job at the Cleveland VA?

13   A.   No, I do not know what considerations

14        Dr. Raphaely thought about or was on her mind

15        prior to informing me that on call was an

16        essential function.

17   Q.   Did you have any discussions with her about what

18        the VA regulations, policies and handbook said

19        about what an essential function of the position

20        is --

21   A.   I don't recall.

22   Q.   -- in connection with Ronald Lisan's reasonable

23        accommodation request?

24   A.   I have no recollection of any such conversations.

25   Q.   Okay.  That's fine.  This will be Exhibit 12.

104

1                              -  -  -  -

2              (Thereupon, Plaintiff's Exhibit 12, 11/27/13

3              VA Handbook 5975.1 "Denial of Reasonable

4              Accommodation Requests" was marked for

5              purposes of identification.)

6                              -  -  -  -

7    Q.   This is just going to be fairly quick.

8              Here's Exhibit 12.  I'm just going to ask him

9         to identify it.  Okay?

10             Can you identify Exhibit 12?  Is it from the

11        handbook?

12   A.   It looks to be Section 21 from the handbook on

13        reasonable accommodation.

14   Q.   It looks familiar to you?

15   A.   Yes.

16   Q.   Okay.  Thank you.  That's all.  I'm not asking

17        you any questions about it.

18   A.   Okay.

19                             -  -  -  -

20             (Thereupon, Plaintiff's Exhibit 13, 11/27/13

21             VA Handbook 5975.1 "Interactive Process" was

22             marked for purposes of identification.)

23                             -  -  -  -

24   Q.   This is just ID only.  I'm not going to give you

25        the one I marked for myself.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

105

```
 1                    DR. LISAN:  This is 13?
 2   Q.  13.
 3           Do you have 13 in front of you?
 4   A.  Yes.
 5   Q.  Are you able to identify that as a section on the
 6       interactive process from the VA handbook?
 7   A.  Yes.
 8   Q.  Thank you.
 9           I'm going back to Exhibit 10.  Can you pull
10       that out?  There you go.
11           We covered a lot of this but I'm going to
12       read another sentence in the middle of it.
13           "All the anesthesiologists within the service
14       who work primarily at Wade Park need to be able
15       to participate in the call schedule."
16           Did I read that correctly?
17   A.  Yes.
18   Q.  Does it, do you understand that to mean that all
19       the anesthesiologists within the service who work
20       primarily at Wade Park need to be able to
21       participate in the call schedule on every single
22       day that they work?
23   A.  I understand it to mean they participate, they
24       need to be able to participate in the call
25       schedule because it is an essential function.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

106

1    Q.  Yes, but even if it's an essential function, does

2        it mean they have to be able to do it every

3        single day they're at work?

4    A.  Oh.  I don't know if they need to be able to do

5        it every single day.  My understanding was it is

6        rotated.

7    Q.  When Ron was on leave for a period of many weeks

8        if not months, other people covered on call; is

9        that correct?

10                      MS. JOHNSON:  Objection.  You may

11               answer.

12   Q.  Do you know that?  They kept doing on call?

13   A.  It would be normal if someone was on a legitimate

14       leave status that someone else would have to

15       cover.

16   Q.  Right.  You don't stop doing on call because

17       somebody's on leave?

18   A.  Right.  Other people would have to cover the

19       on-call duties.

20   Q.  Or else you would have to add or hire somebody

21       else to fill in for the person who's away, right?

22   A.  Correct.

23   Q.  Do you know if it was necessary when Ron was away

24       to hire or add any other anesthesiologists to the

25       anesthesiology department at the VA in Cleveland

Bruce Kafer, RN, MSN - March 08, 2019
**Deposition**

107

1       to cover on-call duty?

2   A.  I don't know if it was necessary but I would

3       assume it would be necessary because I know that

4       someone has to cover.

5   **Q.  I'm asking you what you know.**

6   A.  Okay.

7   **Q.  Do you know or don't you know?**

8   A.  Do I know if --

9   **Q.  I don't want you to assume anything.**

10          **Do you know or don't you know whether anybody**

11      **was added to the anesthesiology staff to cover**

12      **the on-call duty at the VA in the absence of**

13      **Ronald Lisan for at least several weeks?**

14  A.  I do not know if anybody was added to the staff.

15  **Q.  Do you know if anybody was brought in on some**

16      **temporary basis other than the existing staff to**

17      **do on-call duty at the VA --**

18  A.  I do not know.

19  **Q.  -- anesthesiology department during Ronald**

20      **Lisan's leave of absence in 2016?**

21  A.  I don't know.

22  **Q.  That's fine.  Thank you.**

23          **Now let's go on to the next.  Would it**

24      **surprise you to know that nobody was added?**

25                      MS. JOHNSON:  Objection.  You may

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

108

```
 1              answer.

 2   Q.   Withdrawn.  I'm going to withdraw that question.

 3        I'm sorry.

 4            It says in the next sentence, "We do have one

 5        position for a full-time, no call

 6        anesthesiologist that works exclusively at the

 7        ASC but that position is currently filled."

 8            Did I read that correctly?

 9   A.   Yes.

10   Q.   Can you tell me what ASC means?

11   A.   Yes.

12   Q.   What is it?

13   A.   Ambulatory surgery center.

14   Q.   So do you understand this sentence to mean that

15        Dr. Raphaely is identifying a position, even

16        though it was filled, for a full-time

17        anesthesiologist that does not require any

18        on-call duty?

19   A.   Yes; and she indicated it was with the ambulatory

20        surgery center.

21   Q.   Yes.  And that's part of the Cleveland VA, isn't

22        it?

23   A.   Yes, it is.  It is a unit that functions during

24        the daytime and then they have no patients

25        staying overnight as compared with the inpatient
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

109

1      anesthesiology.

2  Q.  In the context of this email, can you explain to

3      me your understanding of why she would be raising

4      the matter of a position for a full-time

5      anesthesiologist that does not require on-call

6      duty?

7                    MS. JOHNSON:  Objection.  You may

8           answer.

9  A.  My understanding is she is informing me by

10     providing an overview of what is essential and

11     what they have.  This would be typical of the

12     types of communications I receive in the

13     processing of RA requests.

14 Q.  Okay.  But she's, so I understand your answer to

15     my question, she's informing you of a position

16     that does not require any on-call duty; is that

17     correct?

18 A.  Yes.  She referenced one position that had no

19     on-call duties.

20 Q.  Right.  Now, does that suggest to you that her

21     understanding of Dr. Lisan's reasonable

22     accommodation request was to have a position as

23     an anesthesiologist which required no on-call

24     duty whatsoever?

25 A.  Can you read that back.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

110

```
 1                 THE NOTARY:  "Now, does that
 2           suggest to you that her understanding of
 3           Dr. Lisan's reasonable accommodation
 4           request was to have a position as an
 5           anesthesiologist which required no on-call
 6           duty whatsoever?"
 7                 MS. JOHNSON:  Objection.  You may
 8           answer.
 9    A.   No.
10    Q.   How do you know that?
11                 MS. JOHNSON:  Same objection.
12    A.   How do I know that it didn't suggest it to me?
13    Q.   Yes.  Why doesn't that suggest to you that that's
14         what she understood the accommodation or claimed
15         to understand the accommodation that Dr. Lisan
16         was seeking no on-call duty in his
17         anesthesiologist position?
18    A.   Okay.  Here's my answer to your question:
19           It is clear from this communication that she
20         is informing me of the essential functions of an
21         anesthesiologist like Dr. Lisan and those types
22         of positions and she's contrasting it with one
23         ambulatory care position where there is one
24         anesthesiologist who does not have on-call
25         duties; therefore I was able to conclude from
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

111

1    this that Dr. Lisan had on-call duties as an

2    essential function; so because this message was

3    sent on December 19th, 2016, this was prior to

4    any informative or required medical documentation

5    I would have needed to move forward in the

6    reasonable accommodation process.

7        So this information was helpful as the

8    reasonable accommodation coordinator when you

9    begin to put together all the pieces of what's

10    needed to proceed.

11  Q.  **How is this information helpful to you to do that**

12      **right here, this information about**

13      **anesthesiologist job with no on-call duty?  How**

14      **is it helpful?**

15  A.  It lets me know that there is a position that has

16      no on-call duty but it's filled because in some

17      cases when you have a reasonable accommodation

18      request, you can move staff around and then, but

19      since that was filled, it did not look like

20      anybody could be moved into that position because

21      it was filled and also it informs me what the

22      essential functions are.

23  Q.  **She already told you what the essential function**

24      **was regarding on call, didn't she?  Very clearly?**

25          **Taking call is an essential function of his**

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

112

```
 1        position.  That's as clear as a bell, isn't it?
 2   A.   Yes.
 3   Q.   So adding that there's a non -- a no call
 4        anesthesiology position doesn't help inform you
 5        that on call is an essential function for his
 6        anesthesiology position, does it?  She's already
 7        informed you of that?
 8   A.   What it does is inform me about aspects that are
 9        relevant to this reasonable accommodation
10        process.
11   Q.   Okay.  Let me ask you a different question.
12        Let's just -- withdrawn.
13             The last sentence reads, and I'll read it, as
14        follows -- not last sentence.  Looks like second
15        last sentence.
16             "Therefore, am I would request that if
17        Dr. Lisan is indeed unable to perform the
18        essential functions of his position, you could
19        assist him in alternative reasonable
20        accommodations."
21             Did I read that correctly?
22   A.   Yes.
23   Q.   The alternative reasonable accommodations would
24        appear to be an anesthesiologist position with no
25        on-call duties from this email; is that correct?
```

113

1   A.  I have no way of knowing what she means by

2       alternative reasonable accommodations because

3       that's not a term that I utilize or would be

4       utilized in this process, especially at this

5       early stage of processing a request so that

6       sentence, while it references essential functions

7       and it says you could assist him, those are the

8       key points for me; so when I look at that, it is

9       not very informative.

10  **Q.  Did you ask her what she meant at any time before**

11  **the determination of the reasonable accommodation**

12  **request of Dr. Lisan was made, what Dr. Raphaely**

13  **meant by alternative reasonable accommodations?**

14  A.  No.

15  **Q.  Why not?**

16  A.  Because it would be irrelevant.

17  **Q.  It's irrelevant?**

18  A.  It would be irrelevant at this juncture on

19      December 19th.

20  **Q.  Okay.**

21  A.  Or upon my reading this, if I read it like the

22      next day.

23  **Q.  Did you ever ask her before the reasonable**

24  **accommodation was turned down?**

25  A.  Did I ever ask her if there was a, what she

114

1      meant?

2  Q.  What alternate reasonable accommodations were?

3  A.  I have no recollection if I actually asked her

4      that question but I doubt it.

5  Q.  Now, if there, if he was unable to perform, let's

6      assume this:  If Dr. Lisan -- withdrawn.

7          If Dr. Lisan were unable to perform his

8      regular anesthesiologist job because he couldn't

9      do the essential function of the position, which

10     is, includes on-call duty according to

11     Dr. Raphaely, and there was no position for an

12     anesthesiologist in the VA that was open for him

13     to have an anesthesiology job without on-call

14     duty, what would be the consequence of that

15     circumstance?

16 A.  Here is my answer to your question about if

17     Dr. Lisan was unable to perform his essential

18     functions:  And I recognize that this was not the

19     case, so my understanding is you're asking me to

20     speculate what would occur.

21 Q.  Well, let's take it this way:  I don't want you

22     to speculate.

23         If there wasn't a job for a full-time

24     anesthesiologist with on-call duty and there was

25     no job without on-call duty that was available,

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

115

1    he wouldn't be able to have a job as an

2    anesthesiologist at that time at the Cleveland

3    VA, correct?

4  A.  Again, you're asking me one of these if

5    questions.

6  Q.  No, it's -- sorry.  I don't think it's an if

7    question.  I asked you to assume exactly what --

8    withdrawn.

9        I asked you to assume that there was no

10    anesthesiology position with on-call duty

11    available to him and I asked you to assume there

12    was no anesthesiology job without on-call duty

13    available to him.  Now those are two very clear

14    assumptions.

15        If that's the case, he's out of there, isn't

16    he?  Without a job as an anesthesiologist at the

17    VA at that time, correct?

18  A.  You're asking to make, me to make two

19    assumptions --

20  Q.  Yes, sir.

21  A.  -- that are unrelated to his case.

22  Q.  I'm asking you to make two assumptions period.

23        Now, can you make them or not?  Sorry.

24    Withdrawn.  Let me say it again.  I don't think

25    these assumptions are things that you're

116

1     incapable of making.

2          Is it a fact that if he couldn't do on-call

3     duty as an anesthesiologist, he couldn't take a

4     job with on-call duty as an anesthesiologist,

5     that's true, isn't it?  Isn't that just simply

6     true?

7  A.  Here is my answer:

8  Q.  How about yes or no?

9                    MS. JOHNSON:  He can answer how he

10          sees fit, Steve.

11                    MR. SINDELL:  No he can't.

12                    MS. JOHNSON:  And then if he

13          can't --

14  Q.  I would like --

15                    MS. JOHNSON:  Steve --

16  Q.  Just a moment.  I would like a yes or no answer

17     if possible to this question.

18          You can explain anything else you want to

19     about it after you answer my question.  Okay?

20     You can say anything you want but I want you to

21     answer my question.

22                    MS. JOHNSON:  I object.

23  A.  Tell me when I should answer.

24                    MS. JOHNSON:  I object to this

25          tone and I think that we need to step back

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**117**

1   a little bit.

2           MR. SINDELL:  All right.  Fine.

3           MS. JOHNSON:  Steve, he, you may

4   want a yes or no answer --

5           MR. SINDELL:  Well, he doesn't

6   have to give me a yes or no answer if he

7   wants to talk around it but I think it's a

8   yes or no question, and let me be real

9   clear about it.

10          He does have to give a yes or no

11  answer, counsel, to a question that calls

12  for a yes or no answer or explain to me why

13  he can't answer it yes or no.

14          And then if --

15          MS. JOHNSON:  Yes, and I think he

16  was trying to do that.

17          MR. SINDELL:  Let me finish.

18          And if I think that the question

19  is clear as a bell and that it's just --

20          MS. JOHNSON:  Then you may follow

21  up.

22          MR. SINDELL:  Just let me finish,

23  please.

24          MS. JOHNSON:  You have not let me

25  finish at all.

118

1        MR. SINDELL:  I'm talking right

2   now and then I'll let you talk.  Okay?

3        Let me finish.

4        I want the court to understand at

5   this point in the record that if I am

6   correct that this is a simple question that

7   can be answered yes or no and he can

8   explain anything else he wants about his

9   answer, I am going to make a motion, which

10  I hate to do, to have him come back and

11  answer the question for failure to give a

12  straight answer and for being evasive and I

13  believe that by telling me here that that's

14  not appropriate or that he doesn't have to

15  give a yes or no answer to an obvious

16  question, that you are participating in his

17  doing that.

18        MS. JOHNSON:  No.

19        MR. SINDELL:  Now, that's what I

20  say.

21        Say anything you want now for the

22  record.

23        MS. JOHNSON:  No, you did not, A,

24  let me finish my objection and discuss it

25  with you.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**119**

1          MR. SINDELL:  Sure.

2          MS. JOHNSON:  Okay?

3          MR. SINDELL:  Sure.

4          MS. JOHNSON:  B, I am not

5     participating in any sort of coverup and I

6     resent that accusation.

7          MR. SINDELL:  I didn't use the

8     word coverup.

9          MS. JOHNSON:  Or evasion or

10    whatever you were saying.

11         I resent that and that is not true

12    and you know it.

13         MR. SINDELL:  I don't know

14    anything.

15         MS. JOHNSON:  I was telling you

16    that while you may think it is a yes or no

17    question, sometimes it isn't a yes or no

18    question and if the witness needs to answer

19    it in a different way than you think it

20    should be answered, he should be allowed to

21    do that and then you are allowed to follow

22    up on the question --

23         MR. SINDELL:  Yes.  I know that.

24         MS. JOHNSON:  -- like you've been

25    doing.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

120

```
 1                    MR. SINDELL:  I agree with that.
 2                    MS. JOHNSON:  So I think I'm
 3           objecting to the tone because I think we're
 4           getting into --
 5                    MR. SINDELL:  Okay.
 6                    MS. JOHNSON:  -- badgering
 7           territory.
 8                    I'm not done yet.
 9                    And I would like to take a little
10           brief break --
11                    MR. SINDELL:  No.  I don't want to
12           take a break now because I don't want you
13           talking to this witness at this point.
14                    MS. JOHNSON:  I was going to talk
15           to this witness and tell him to calm down.
16           Okay?
17                    MR. SINDELL:  Okay.  I think he
18           heard you and so did I and I'm calmed down
19           and I think he is, too.
20                    Now let's go on.  Okay?
21      BY MR. SINDELL:
22   Q.  I'm asking you to assume hypothetically that on
23       or about December 19, 2016 Dr. Lisan was unable
24       to do on-call duty for a short period of time and
25       therefore was precluded from taking a position as
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

121

```
 1        an anesthesiologist at the VA which required

 2        on-call duty.

 3            My first question is can you simply just

 4        assume that?

 5  A.    No.  And the reason I cannot assume that is

 6        because there is no evidence of that.

 7                        MR. SINDELL:  Is that a reason for

 8                him to say no, he can't assume it?  Is that

 9                really a reason for him to do that?

10                        MS. JOHNSON:  Are you asking me?

11                        MR. SINDELL:  I asked him to

12                assume that hypothetically.

13                        MS. JOHNSON:  I think you may

14                answer the question yes or no whether you

15                can assume that.  I think you can do -- I

16                think he --

17                        MR. SINDELL:  Oh, he can say no, I

18                can't assume that?  That's his answer?

19                        MS. JOHNSON:  I think he --

20                        MR. SINDELL:  You're going to

21                allow him to do that?

22                        MS. JOHNSON:  No.  You didn't let

23                me finish, Steve.

24                        MR. SINDELL:  Sure.  Finish.

25                        MS. JOHNSON:  You need to answer
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

122

1   the question.

2           You need to ask the question.

3           MR. SINDELL:  I just did.

4           MS. JOHNSON:  And I think we all

5   need to answer the question and move on,

6   because we're getting way out of line here.

7           MR. SINDELL:  Okay.  Read it back

8   to him, please, and --

9           MS. JOHNSON:  And you again didn't

10  let me finish.

11          MR. SINDELL:  Oh, I'm sorry.  I

12  thought you were.

13          MS. JOHNSON:  No, I was not

14  finished.

15          I'm asking you whether we need to

16  just take a break and calm down because I

17  think everyone's getting a little angry and

18  I think you want to have him answer the

19  question first; is that correct?

20          MR. SINDELL:  What I want him to

21  do is do what every witness and every

22  lawyer would tell him to do, which is to

23  assume something that may not be factually

24  the case as it occurred; but hypothetically

25  if he is unable to take a position with

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

123

1    on-call duty, okay?  Can he assume that to

2    have been the case for purposes of my

3    question.  And there is no way --

4          MS. JOHNSON:  And I would --

5          MR. SINDELL:  -- any witness can

6    say no, I won't assume it because it didn't

7    happen.

8          MS. JOHNSON:  Well --

9          MR. SINDELL:  And any attorney in

10   my opinion would have to tell him that.

11         MS. JOHNSON:  Now, Steve --

12         MR. SINDELL:  Now, if you want to

13   take a break and tell him that, I'll step

14   out and you can take a break.  Okay?  Tell

15   him.  Now you got a break.  Tell him.

16         MS. JOHNSON:  Okay.

17         MR. SINDELL:  I'm not going to

18   take very long -- you got to step out,

19   too -- and you tell him but I don't think

20   that should take very long.  I'll knock on

21   the door in a couple minutes.  How's that?

22   And we're going to be here all day or we

23   may have to simply adjourn the deposition

24   right now if we're going to keep doing this

25   because that's not proper in my opinion.

**124**

```
 1              In my opinion, he has to at least give me

 2              the benefit of assuming something like

 3              that.

 4                      MS. JOHNSON:  Are we now off the

 5              record?

 6                      -  -  -  -

 7              (Thereupon, a recess was had.)

 8                      -  -  -  -

 9       BY MR. SINDELL:

10       Q.  If we assume hypothetically that Dr. Lisan could

11           not take his regular anesthesiologist position at

12           the Cleveland VA because it had as an essential

13           function on-call duty and we further assume that

14           the position of anesthesiologist without on-call

15           duty -- no call duty was filled and not available

16           and there were no other such no call duty

17           anesthesiology positions available, what his

18           alternative would be would be to have to leave

19           the VA and find employment elsewhere.

20              Wouldn't you agree with that?

21       A.  No.

22       Q.  Okay.

23       A.  Hypothetically if he was unable to perform an

24           essential function like on-call duty, he may need

25           to use an appropriate leave status because if he
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

125

1    was unable to perform an essential function like

2    on call, he may hypothetically have been unable

3    to perform other essential functions so we don't

4    know in the hypothetical scenario if he had leave

5    time, where we were at, what the rest of his

6    record was but it would be unlikely that he would

7    have to leave the VA, especially if it was a

8    temporary condition.

9   Q.  **Let me ask you this:  If we just talk about**

10      **anesthesiology positions in the anesthesia**

11      **department and not some other position, okay?**

12      **Would you agree that he would not be able to at**

13      **that time assume an anesthesiology position with**

14      **or without on-call duty under those assumptions?**

15  A.  If in this hypothetical scenario he was unable to

16      perform an essential function, then he would have

17      to take an appropriate leave status.

18  Q.  **Okay.  What if he didn't have any leave?**

19  A.  He could request additional leave and then a

20      determination would be made by management as to

21      whether or not it would be granted.

22  Q.  **And if it wasn't granted, he would have to leave**

23      **the VA?**

24  A.  Potentially.

25                          - - - -

126

1          (Thereupon, Plaintiff's Exhibit 14, 12/19/16

2          Kafer VA Reasonable Accommodation Request

3          email to Lisan, was marked for purposes of

4          identification.)

5                          -   -   -   -

6     Q.   Have you had a chance to read 14?

7     A.   Yes.

8     Q.   Okay.  That's Exhibit 14.

9          You write in this email dated also the 19th

10         of December at 1:50 p.m. to Ronald Lisan --

11         that's the only person you're writing to here it

12         looks like; is that correct?

13    A.   Correct.

14    Q.   "I have attached instructions for your health

15         provider and also the form that is needed."

16         So I assume that form was attached?  You've

17         got to use words.

18                    MS. JOHNSON:  Say yes or no.

19    A.   Oh, yes.

20    Q.   Okay.  "I understand at this juncture you are

21         requesting to be taken off the," quote, "on

22         call," end quote, "schedule.  However the

23         duration for this is unknown by me."

24         So let me stop right there.

25         How did you understand that he was requesting

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

127

1          to be taken off the on-call schedule?

2     A.   I don't recall exactly how I understood he was to

3          be taken off the on-call schedule; however, when

4          I look at the previous Exhibit 10, it references

5          at 10:50 in the morning, and Exhibit 14 is at

6          1:50 in the afternoon, Dr. Raphaely provides

7          descriptions about this request by Dr. Lisan so I

8          believe, as I look at these documents, that is

9          how I was informed that he was requesting to be

10         taken off the on-call schedule hence my question

11         to him in conveying what my understanding was at

12         that point that he was requesting to be taken off

13         the on-call schedule.

14    Q.   Okay.  So to try to restate and summarize what I

15         think you said, the reason you wrote at 1:50 p.m.

16         on Monday, December 19, 2016 to Ron Lisan that he

17         was requesting to be taken off the on-call

18         schedule is because of Exhibit 10 which you

19         received, what, a couple hours or so, three hours

20         earlier actually from Dr. Raphaely that indicated

21         that to you?

22    A.   Yes.

23    Q.   And where, let's look at Exhibit 10.

24         Will you please tell me where in Exhibit 10

25         there is anything that led you to believe that he

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

128

1         wished to be taken off the 'on call' schedule?

2    A.   In the sentence, in the second sentence in

3         Exhibit 10 it says, "Dr. Lisan is a long-standing

4         member of the anesthesia department and due to

5         changes in his health, he is stating he is unable

6         to participate in call."

7    Q.   Okay.  So you're basing your conclusion on the

8         statement of Dr. Raphaely that Dr. Lisan is

9         stating he's unable to participate in call?

10   A.   Correct.

11   Q.   Is that correct?

12   A.   Correct.

13   Q.   Did you ever ask Dr. Lisan about what he was

14        stating he was able or unable to participate in?

15   A.   Yes.

16   Q.   When did you ask him that?

17   A.   In the second sentence of Exhibit 14 where I

18        wrote, "I understand at this juncture you are

19        requesting to be taken off the on-call schedule."

20   Q.   Okay.  That's a question?  To quote you?  That's

21        a question?

22   A.   Yes, it is a question.

23   Q.   So --

24   A.   Are you referring to the grammar and the absence

25        of my question mark?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

129

1    Q.  Just like you are with me.

2            That was a joke.  So let's not play any

3        games.  I'll call that an inquiry.  Okay?  That

4        you understood that he was requesting to be taken

5        off the on-call schedule?

6    A.  Yes.

7    Q.  Okay.  So what you're telling me is that you were

8        open to hearing from him; is that correct?

9    A.  Yes, and I'm aware subsequent to this he provided

10       medical documentation.

11   Q.  I understand that but let me just go on.

12   A.  Okay.

13   Q.  You say, "However, the duration for this is

14       unknown by me."

15           Why did you write that?

16   A.  Because --

17   Q.  What does the duration make any difference for?

18   A.  Because the duration is always relevant.

19   Q.  Why?

20   A.  Because you need to know how long is this

21       request?  Is this --

22   Q.  Why?

23   A.  Because it may factor into whether or not an

24       accommodation can be provided.

25   Q.  And it may factor into whether or not on call is

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

130

1      an essential function for the position as listed

2      in the handbook as well if the duration is very

3      short, correct?

4   A.  Possibly.

5   Q.  Thank you.  Now, you also say in the last

6      sentence, "Please advise me, feel free to call me

7      if you have any questions."

8   A.  Yes, it says that.

9   Q.  And you meant that, didn't you?

10  A.  Yes.

11  Q.  You didn't mind if he called you on the phone?

12  A.  No.

13  Q.  You didn't mind if he wanted to meet with you in

14     person?

15  A.  No.

16                  -   -   -   -

17          (Thereupon, Plaintiff's Exhibit 15, 12/20/16

18          Kafer "Re:  VA Reasonable Accommodation

19          Request" email to Lisan, was marked for

20          purposes of identification.)

21                  -   -   -   -

22  Q.  Okay.  I'd like you to look at Exhibit 15.

23                  MS. JOHNSON:  Off the record.

24                  -   -   -   -

25          (Thereupon, a discussion was had off the

131

1              record.)

2                        -    -    -    -

3  Q.  Have you had a chance to read 15?

4  A.  Yes.

5  Q.  Okay.  This is on December 20th, the next day,

6      from you to Dr. Lisan; is that correct,

7      Mr. Kafer?

8  A.  Yes, that is correct.

9  Q.  And he is the only recipient, right?

10 A.  Yes.

11 Q.  All right.  And sent toward the end of the day at

12     4:21 p.m., right?

13 A.  Yes.

14 Q.  Dr. Lisan -- I'm going to read it and then ask

15     questions.

16          "Dr. Lisan, do you have time to meet tomorrow

17     morning individually in person with me?"

18          I assume you wanted to meet with him in

19     person, correct?

20 A.  I was asking if he had time to meet.

21 Q.  Well, why were you asking him if you didn't want

22     to meet with him?

23 A.  I don't recall at the time but based on this

24     document, it appears I was interested in finding

25     this out.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

132

```
 1   Q.  Okay.  So --

 2   A.  Sometimes people can meet, sometimes they can't,

 3       so sometimes you have to do everything by email.

 4   Q.  But you wanted to speak with him, did you not?

 5   A.  I wanted to communicate with him and I was aware

 6       there were different modalities of communication.

 7   Q.  Okay.  I understand.  You can communicate by

 8       telephone?

 9   A.  Correct.

10   Q.  You can communicate in writing?

11   A.  Correct.

12   Q.  You can communicate in person?

13   A.  Correct.

14   Q.  Usually -- withdrawn.

15           Would you agree with me that when you say

16       "time to meet," you're using that in the face to

17       face sense?

18   A.  Yes.

19   Q.  So you were certainly open to meeting with him

20       face to face?

21   A.  Yes.

22   Q.  And the reason you wrote "do you have time to

23       meet" is because you thought it was a good idea

24       for him to meet with you, right?

25   A.  It is important for me to know if an individual
```

133

1    is available to meet because like Dr. Lisan is an

2    anesthesiologist and he's busy so I needed to

3    acquire that information to know whether or not I

4    was going to be able to meet with him or could I

5    get everything I needed electronically.

6    Q.  **But you wanted to meet with him or communicate**

7    **with him, didn't you?  That's why you asked him**

8    **if he had time?**

9    A.  Probably, yeah.

10   Q.  **Probably?**

11   A.  Well, it says here "do you have time to meet;" so

12   clearly I'm asking about does he have time to

13   meet.

14   Q.  **And that meant you wanted to meet with him; is**

15   **that correct?**

16              MS. JOHNSON:  I'm going to object.

17        I think this has been asked and answered.

18        You may answer.

19   Q.  **All right.  Fine.  If he wants to do that, it's**

20   **fine.**

21   **"I can appreciate the sincerity of your**

22   **assertions and thank you for making them."**

23   **What assertions were you referring to that**

24   **Dr. Lisan had made?**

25   A.  I was referring to whatever assertions he had

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**134**

```
 1       made.  I don't recall the exact assertions.
 2   Q.  Do you recall any of them?
 3   A.  Not exactly, no.
 4   Q.  Do you recall them generally?
 5   A.  In the most general sense, I could characterize
 6       them if you wanted me to.
 7   Q.  Characterize them the best as you can from your
 8       recollection or if you can't, then don't guess.
 9   A.  Dr. Lisan was conveying that there was
10       justification for him not to do call but in his
11       conveyance of these assertions he also conveyed
12       that he was performing on call and indicated or
13       suggested that it was his preference not to do
14       it.
15   Q.  Okay.  How did he indicate that to you?
16   A.  In writing.
17   Q.  Okay.  Do you have anything in writing where he
18       actually said something like that?
19   A.  With me right now?
20   Q.  No.  In your possession or anywhere?
21   A.  I believe I do.
22                   MR. SINDELL:  Okay.  Please mark
23           that.  I obviously would like to see that.
24       BY MR. SINDELL:
25   Q.  It says, "However, I do think it is important you
```

135

1    understand the VA Reasonable Accommodation

2    process and what is involved in this concept of

3    essential functions."

4        Why did he need to understand the concept of

5    essential functions from you?

6  A.  Because when an RA requester -- when I say RA,

7    I'm referring to reasonable accommodation --

8    understands the process, they're more readily

9    able to participate in the process, which

10    expedites matters.

11  Q.  Okay.  Had he asked you for an explanation of the

12    concept of essential functions --

13  A.  I don't recall him asking.

14  Q.  I didn't say he did, so you need to let me

15    finish?

16  A.  Did you ask me a question?

17  Q.  I haven't finished the question.  That's the

18    problem.

19  A.  Please continue.

20  Q.  Well, how about I start again, okay?

21        If you had had the opportunity to explain to

22    him the concept of essential functions as you

23    used that phrase in this email Exhibit 15, what

24    would you have told him about the concept of

25    essential functions?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**136**

1   A.   As I recall, I explained in an email to him these

2        concepts, the concept of essential functions as

3        well as other aspects of the reasonable

4        accommodation process that essential functions

5        cannot be removed in an accommodation.

6   **Q.   So you say you actually did explain it?**

7   A.   In writing.

8   **Q.   In writing.**

9                MR. SINDELL:  And so I don't have

10               that either, so once again, I would like a

11               copy of that.

12               Are we going to get these

13               productions in time for me to review them?

14               MS. JOHNSON:  What do you mean "in

15               time for me to review them"?

16               MR. SINDELL:  Well, I mean I might

17               have to ask him some questions about it and

18               we've got some limited time.

19               MS. JOHNSON:  Well, you just gave

20               me your discovery requests today; but, yes,

21               I'm going to get them to you after I've had

22               a chance to look at them myself because I

23               haven't had a chance.

24               MR. SINDELL:  Three or four days

25               before the discovery cutoff, right?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

137

```
 1                    MS. JOHNSON:  No.  And if you look
 2             at the bottom here, just you do see part of
 3             an email from your client, so I wonder if
 4             your client might have that email as well.
 5                    MR. SINDELL:  Oh, I haven't found
 6             it, but you're right.
 7                    MS. JOHNSON:  So I just wanted to
 8             show you that.
 9                    MR. SINDELL:  Thank you for that
10             because I didn't notice it.  You're
11             absolutely right.
12                    MS. JOHNSON:  So I think there's
13             more of a chain with this --
14                    MR. SINDELL:  There may well be.
15                    MS. JOHNSON:  -- that is not
16             included.
17                    MR. SINDELL:  Obviously I'm
18             requesting the chain.
19                    MS. JOHNSON:  Sure.
20        BY MR. SINDELL:
21    Q.  All right.  Then you say, "I am also available
22        Thursday or Friday" -- December 20th is a
23        Tuesday -- "so please advise if you have time to
24        meet."
25             Right?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

138

1   A.  Yes, that's what it says.

2                        -  -  -  -

3           (Thereupon, Plaintiff's Exhibit 16, 12/23/16

4           Kafer "Medical Documentation Received" email

5           to Lisan, et al., was marked for purposes of

6           identification.)

7                        -  -  -  -

8   Q.  All right.  This is Exhibit 16.  16 is a simple

9       email with copies as indicated dated December

10      23rd, 2016, correct?

11  A.  Yes.

12  Q.  You indicate to Dr. Lisan that you received his

13      medical documentation and that you'll be meeting

14      with HR about his case and so on and so forth

15      that it's private and what you're going to

16      discuss.  It's self-explanatory, right?

17  A.  Yes.

18                       -  -  -  -

19          (Thereupon, Plaintiff's Exhibit 17, 12/27/16

20          Request for Medical Documentation, was marked

21          for purposes of identification.)

22                       -  -  -  -

23  Q.  Now let's go to Exhibit 17 and I will take off

24      the note.

25                  MS. JOHNSON:  You're no fun.

139

1   Q.  It really isn't anything revealing.  Nothing

2       brilliant.

3           All right.  You can take a minute and look at

4       it.

5   A.  Okay.

6   Q.  This is, can you identify this document?

7   A.  Yes, I can.

8   Q.  Okay.  What is it?

9   A.  It is a VA form 0857e filled out by Dr. Kramer

10      and he signed it on --

11  Q.  She.

12  A.  It's a she?

13  Q.  Yes.

14  A.  She signed it on December 27th, 2016.

15  Q.  Okay.  And I take it you read this?

16  A.  Yes, I did.

17  Q.  Okay.  Did you pass it on to somebody?

18  A.  No.

19  Q.  Did you send it to Dr. Raphaely?

20  A.  No.

21  Q.  For what purpose did you need this?

22  A.  To process Dr. Lisan's RA request.

23  Q.  What use did you make of this record to process

24      his request?

25  A.  I was able to determine from this medical

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**140**

1    documentation that I did not have what was

2    needed, that all I had in this documentation was

3    what could happen to Dr. Lisan.

4        What was missing was the medical

5    documentation that's needed that describes how

6    his disability was impairing the performance of

7    essential functions.

8  **Q.  Okay.  Would you please elaborate for me on what**

9  **you mean by "how his disability was impairing his**

10  **ability to perform essential functions" that you**

11  **just stated?  What do you mean by that that you**

12  **were looking for?**

13  A.  Okay.  What I mean is at this point with this

14    initial medical documentation and everything else

15    that was provided, there was nothing that

16    informed me how his disability impaired the

17    performance of essential functions.

18        This says what could happen.  What could

19    happen is irrelevant because it's a future based

20    notation.

21        What I need to know is, for instance, in a

22    hypothetical example, if I may.

23  **Q.  Yes, you may.**

24  A.  If walking was an essential function of

25    Dr. Lisan's job and he got ran over by a car and

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

141

1      lost his leg and he was no longer able to walk,

2      that would be, and it was documented that he is

3      unable to walk, that would be a clear delineation

4      of an impairment of an essential function.

5           Nowhere in this medical documentation or any

6      other medical documentation that was supplied to

7      me did I have that kind of information.

8           All I had was this information which failed

9      to meet the criteria needed and Dr. Lisan's

10     statements that were in writing that he was

11     performing on-call duties.

12  Q.  **Okay.  What did the fact that he was performing**

13      **on-call duties mean to you?**

14  A.  That there was no impairment from his disability

15      that he was unable to perform on-call duties.

16  Q.  **So you concluded that he was able to perform**

17      **them?**

18  A.  Upon receiving this and whenever I received his

19      documentation that said he was doing that, that's

20      what I was concluding; but as I recollect in

21      looking at the sequence of things, likely at this

22      juncture I would have been looking for that and

23      then subsequent to this, I would have sent him a

24      message saying what we needed and why this didn't

25      meet the criteria.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

142

1  Q.  Well, did you do that?

2  A.  Yes.

3  Q.  Did what?

4  A.  Sent him a communication about what was needed.

5  Q.  **And that communication said what?  Said we needed**

6  **what?**

7  A.  Medical documentation that shows how your

8  disability impairs the performance of essential

9  functions.

10  Q.  **Did you send that to him?**

11  A.  Yes.

12  MR. SINDELL:  Okay.  I don't have

13  it so, we're going to ask that that

14  document be made available.

15  BY MR. SINDELL:

16  Q.  **As of the date of Exhibit --**

17  MS. JOHNSON:  Are you looking for

18  17?

19  MR. SINDELL:  17.

20  MS. JOHNSON:  Here you go.

21  Q.  **I got it.  I'm just looking for the date.**

22  **Which was received on December 23rd by you,**

23  **according to your email, anyway, right?**

24  A.  On my email of December 23rd I referenced

25  receiving medical documentation.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

143

1    Q.   Okay.

2    A.   However, I do not know -- it could not have been

3         this because this is dated the 27th.

4             A large file was also sent to me that

5         included extensive medical documentation.

6    Q.   **From Rogers, the place where he was?**

7    A.   Yes.  The inpatient facility.

8    Q.   **Did you ever send that to him?**

9    A.   No.

10   Q.   **Is he entitled to it?  It's his record?**

11   A.   If he wanted it, he could have requested it.

12                  MR. SINDELL:  Okay.  I'm

13            requesting it now.

14                  So I'm asking for his medical

15            record.

16                  MS. JOHNSON:  Well, he has his own

17            medical records.

18                  MR. SINDELL:  I don't know what he

19            has or doesn't have.

20                  MS. JOHNSON:  Well, he should have

21            his own medical records.

22                  MR. SINDELL:  I'd like to have

23            what you were sent.

24                  MS. JOHNSON:  Okay.

25                  -  -  -  -

Bruce Kafer, RN, MSN - March 08, 2019
Deposition

144

```
 1              (Thereupon, Plaintiff's Exhibit 18, 1/11/17

 2              Raphaely "meeting CX" email to Lisan, was

 3              marked for purposes of identification.)

 4                        -  -  -  -

 5    Q.  All right.  Now, Exhibit 18.

 6              Okay.  Have you had a chance to look at

 7         Exhibit 18?

 8    A.  Yes.

 9    Q.  Okay.  This is not copied to you?

10    A.  Correct.

11    Q.  Have you ever seen this email before?

12    A.  No.

13    Q.  Has it ever been described to you before?

14    A.  I don't recall.  This is, this has your name at

15         the top, Steven Sindell.

16    Q.  I know what it has.

17    A.  And, so no.

18    Q.  Okay.  It's a letter or an email rather dated

19         January 11th, 2017 at 10:55 a.m. from Susan

20         Raphaely to Ron?

21    A.  Yes.

22    Q.  And I'll read it.

23              It says, "Ron:  Our meeting scheduled for

24         10:00 a.m. Thursday," so this is the day before,

25         correct?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

145

1    A.   Correct.

2    Q.   "Has been cancelled.  Bruce Kafer, the Reasonable

3         Accommodation Coordinator, stated he will reach

4         out to you directly with what has been decided

5         based on your medical documentation."

6              Did I read that correctly?

7    A.   Yes, you did.

8    Q.   Okay.  Well, it attributes to you a statement?

9    A.   Yes, it does.

10   Q.   Is that accurate?  Did you state that you will

11        reach out to Ron directly with what's been

12        decided based on his medical documentation?

13   A.   Probably.

14   Q.   Well, what's your doubt about it?

15   A.   Well, I don't have an exact, a recollection of

16        the chronology of the events because I sent more

17        than one message to Dr. Lisan explaining about

18        the medical documentation and what was needed and

19        it's not uncommon that that would occur, that

20        people need explanations because it's kind of an

21        unusual process.

22             Generally speaking, you have to convey this

23        message, this information to every requester

24        because there is a need for clarification.

25   Q.   My question to you, let me see if I can simplify

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

146

1      it.

2           She's attributing to you a statement that you

3      will reach out to him "directly with what has

4      been decided based upon your medical

5      documentation."

6           Do you understand that to mean that there's

7      no need for an actual meeting and that between

8      you, Dr. Lisan and her, because it says "our

9      meeting," that it's simply going to be decided

10     now?

11  A.  What I understand this to mean is that I was,

12     made decisions about his medical documentation

13     and needed to communicate with him.

14          There was an opportunity to set up a meeting

15     and then the meeting was cancelled and then I

16     would have followed up with him by email or

17     provided more emails about the documentation and

18     what was needed.

19  Q.  Okay.  So --

20  A.  Because that is the standard process.

21  Q.  Okay.  So do I understand you then to be saying

22     that on Wednesday January 11, 2017 at 10:55 a.m.

23     your understanding was that you were waiting for

24     more communication with Ron Lisan and more

25     medical details before a decision about his

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

147

1         reasonable accommodation request would be made?

2     A.  Not exactly.

3     Q.  Okay.  Why don't you correct it, then, and tell

4         me what's correct.

5     A.  Because he needed more information about what I

6         received and why this was insufficient and what

7         was needed, so the practice is when you receive

8         medical documentation and it doesn't meet what's

9         needed, you let the requester know so they can go

10        back to their provider and get it if there is

11        actually medical documentation about what's

12        needed but the requester has to communicate with

13        their provider.

14    Q.  Okay.  But you got what you called inadequate

15        information, medical information from him?

16    A.  Correct.

17    Q.  Back on December 23rd, didn't you?

18    A.  Yes.

19    Q.  Okay.  So you needed more?

20    A.  Yes.

21    Q.  It would be December 23rd and January 10 or 11

22        that you would have communicated with him that

23        you needed something more, correct?

24    A.  Possibly.

25    Q.  Or not?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

148

1    A.  I don't have an exact recollection.

2    **Q.  Well, wouldn't that seem to be the case here?**

3    A.  It is clear I was asking for more medical

4        documentation because I was not getting what was

5        needed.

6            It is also possible that I was going to

7        inform him that I don't have what's needed and we

8        need to move on to the next step.

9            This was in 2017.  I don't have an exact

10       recollection.

11   **Q.  What was the next step?**

12   A.  The next step would have been that his case would

13       have been, that there would have been a closure

14       of his case, of his reasonable accommodation

15       request because it didn't meet the criteria.

16   **Q.  Okay.  Meet the criteria of describing how his**

17       **disability might impair his ability to do the**

18       **functions of the job.  Is that what you mean?**

19   A.  No.  Not might.  How his disability impairs the

20       performance of essential functions.

21   **Q.  Not might, but does?**

22   A.  Right.

23   **Q.  Well, let's see if this clarifies things just a**

24       **little bit.  This will be Exhibit 19.**

25                                  -  -  -  -

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**149**

```
 1              (Thereupon, Plaintiff's Exhibit 19, 1/12/17
 2              Raphaely/Lisan, et al. "February Call
 3              Schedule" email string, was marked for
 4              purposes of identification.)
 5                           -  -  -  -
 6   Q.   Okay.  Were I'm concentrating on the bottom one,
 7        Susan Raphaely January 12, 2017.  Do you see
 8        that?
 9   A.   Yes.  Okay.
10   Q.   This is not to you, obviously, correct?
11   A.   Correct.
12   Q.   It's Dr. Raphaely to Ron Lisan basically saying
13        we're making the schedule and if you want to
14        continue to work in the full-time anesthesia
15        service, you will be placed on the February call
16        schedule.
17             Is that what it says?
18   A.   Yes.
19   Q.   So you would consider that to be something
20        that -- withdrawn.
21             Since he wasn't given at this point in time,
22        January 12th, 2017, a reasonable accommodation
23        for any gradual assumption of on-call duty, would
24        you agree that this is an appropriate email from
25        Susan Raphaely to him?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**150**

1     A.   Yes.

2     Q.   Okay.  This will be Exhibit 20.

3                      -  -  -  -

4          (Thereupon, Plaintiff's Exhibit 20, 1/12/17

5          Lisan 1/12/17 "Re: Meeting on Reasonable

6          Accommodation" email to Kafer, was marked for

7          purposes of identification.)

8                      -  -  -  -

9     Q.   All right.  Go ahead and take a minute and read

10         it if you would.

11    A.   Okay.

12    Q.   This date, this is an email from Ron Lisan to

13         you, right?

14    A.   Correct.

15    Q.   Do you remember it?

16    A.   Somewhat, yes.

17    Q.   It is dated Thursday January 12th at --

18    A.   6:44 p.m.

19    Q.   -- 6:44 p.m., right.  On the subject of

20         reasonable accommodation; is that correct?

21    A.   Yes.

22    Q.   Okay.  This was the day after the meeting was

23         cancelled that had been planned for the date of

24         January 12th, 2017?

25    A.   Correct.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

151

1   Q.   Okay.   So the 18th the meeting was cancelled?

2   A.   No.

3   Q.   Here.   It's right here.

4   A.   January 11th.

5   Q.   I'm sorry.

6   A.   The meeting was cancelled.

7   Q.   You are correct.   The day before.   On January

8        11th the meeting was cancelled for January 12th,

9        the meeting that was set for January 12th,

10       correct?

11  A.   I think so.

12  Q.   Well, it says it, doesn't it?   10:00 a.m.?

13  A.   Oh.   Yeah.   Thursday.

14  Q.   Yes?

15  A.   Okay.   Yes.

16  Q.   And the cancellation letter refers to "our

17       meeting."   Would that have included Dr. Raphaely?

18  A.   Possibly.   It looks to be that way.

19  Q.   Okay.

20  A.   It would not be unusual for a supervisor to be in

21       a meeting with, related to RA.

22  Q.   Okay.   Who cancelled the meeting?

23  A.   I did.

24  Q.   Why?

25  A.   I don't recall exactly.   There was a conflict so

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

152

```
 1        I communicated as quickly as possible because I
 2        know he's busy and Dr. Raphaely seemed to be able
 3        to always find him, so...
 4   Q.   Okay.  So on Wednesday the meeting for Thursday
 5        is cancelled.  The cancellation says that you're
 6        going to reach out directly.  You, Bruce Kafer --
 7   A.   Correct.
 8   Q.   -- "will reach out directly with what has been
 9        decided based on your medical documentation;" is
10        that correct?  That's what it says?
11   A.   Correct.  That's what it says.
12   Q.   All right.  Then the next day instead of a
13        meeting that had already been cancelled Ronald
14        Lisan writes the following to you:
15            "I was notified yesterday that the planned
16        meeting for my reasonable accommodation request
17        was cancelled - I was not given a reason why."
18            Did I read that correctly?
19   A.   Yes, you did.
20   Q.   Okay.  And that's accurate.  It was cancelled
21        yesterday, meaning on Wednesday the 11th of
22        January, right?
23   A.   Yes.
24   Q.   Then he writes, "That is currently a significant
25        issue, since I have received communication from
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

153

1          Dr. Raphaely requesting me to submit my call

2          request for February as soon as possible as well

3          as to discuss the holiday" coverage call -- I'm

4          sorry, "holiday call coverage I will take."

5                  Did I read that correctly?

6     A.   Yes.

7     Q.   "Obviously I cannot put in my call requests until

8          I have the parameters for the reasonable

9          accommodation defined."

10                 Did I read that correctly?

11    A.   You read that correctly.

12    Q.   "As you know from my medical documentation,

13         working gradually back into the regular call

14         schedule has been recommended by my providers."

15                 Did I read that correctly?  Did I read it

16         correctly?

17    A.   Yes.  And what's notable --

18                        MR. SINDELL:  That's the only

19              question --

20    A.   -- about this --

21                        MR. SINDELL:  -- I asked him.  I

22              didn't ask him any other question.

23                        MS. JOHNSON:  Right.  Now, he did

24              answer, though, your question.

25                        MR. SINDELL:  Now he wants to

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**154**

```
 1                    explain an answer "yes"?

 2   A.   I was interrupted again.

 3                    MS. JOHNSON:  Well, no, stop.

 4                    MR. SINDELL:  A question that says

 5           "did I read it correctly" does not call for

 6           an explanation.

 7                    MS. JOHNSON:  But he did answer

 8           yes, that you read it correctly.

 9                    MR. SINDELL:  Yes.  But he was

10           going on to give some more talk about it.

11           What's beyond yes?

12                    MS. JOHNSON:  Well, if he thinks

13           he needs to add to his answer, he's

14           permitted to do that.

15   Q.   You need to add to the answer yes, I read it

16        correctly?

17   A.   Yes.

18   Q.   What more do you need to add to answer the

19        question did I read it correctly?

20   A.   Because you read "As you know from my medical

21        documentation, working gradually back into the

22        regular call schedule has been recommended by my

23        providers."

24           And that is relevant because a recommendation

25        is much different than documentation --
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

155

```
 1               MR. SINDELL:  Oh, I -- that's not
 2          answering my question.
 3   A.  -- that shows there is an impairment of essential
 4       function.
 5               MS. JOHNSON:  Bruce, let's stop
 6          for a second here.  I think you're going
 7          beyond the question.  I agree with Steve
 8          here.
 9   A.  Okay.  Well, I have no way of knowing.
10               MS. JOHNSON:  So let's just go on,
11          please.
12   Q.  I do want to give you an opportunity to explain
13       it, but you need to wait until I ask you that.
14   A.  Well, I'm new at this, Mr. Sindell.
15   Q.  I thought you had had depositions before.
16   A.  I've had one deposition before in my entire
17       lifetime and this is my second one.
18               MS. JOHNSON:  Stop.  Stop.
19   Q.  All right.  Let's get over this.
20   A.  Oh, okay.
21   Q.  All right.  I want to -- you know what?  I don't
22       have any more questions about this.
23   A.  Okay.
24   Q.  All right.  This will be Exhibit 21.
25                         -  -  -  -
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**156**

```
 1              (Thereupon, Plaintiff's Exhibit 21, 1/13/17
 2         Lisan "Personal & Confidential - Information
 3         on Reasonable Accommodation Request &
 4         Meeting" email to Kafer, was marked for
 5         purposes of identification.)
 6                        -  -  -  -
 7   A.   Okay.
 8   Q.   Do you recall this email?
 9   A.   Yes.
10   Q.   And by "recall this email," I mean recall
11        receiving it?
12   A.   Yes.
13   Q.   At about the time indicated?
14   A.   Correct.
15   Q.   I just used that for ID.  I'm going to hand you
16        Exhibit 22.
17                        -  -  -  -
18              (Thereupon, Plaintiff's Exhibit 22, Kafer
19         letter to Lisan, was marked for purposes of
20         identification.)
21                        -  -  -  -
22   A.   Okay.
23   Q.   All right.  Now I'd like to, first of all, you
24        wrote this to Dr. Lisan; is that correct?
25   A.   Correct.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

157

1    Q.  Okay.  It doesn't have a date on it anywhere.

2         Can you help me out with that?

3    A.  It looks like it was in response to a message he

4        had sent me on Thursday January 19th, 2017 at

5        9:23 a.m.

6    Q.  That's what I thought, too.

7         Does that look -- it looks that way to you as

8        well, right?

9    A.  Yes.

10   Q.  So I'd like you to look at the third paragraph on

11       the first page?

12   A.  Okay.

13   Q.  It's actually numbered Page 2?

14   A.  Got it.

15   Q.  But it's the first page of your email.

16        This was an email, wasn't it?

17   A.  To my knowledge this was an email.

18   Q.  It's almost like a letter.  Okay?

19                 MS. JOHNSON:  It's kind of, this

20            format looks funny.  It looks like it's

21            gotten reformatted in some weird way.

22   A.  It could have been an attachment.

23                 DR. LISAN:  This part is missing

24            up here.

25   Q.  Okay.  It's not important, Ron.  I think we got

158

1      it right.

2          Okay.  It says here in the third paragraph,

3      "In your case," meaning in Dr. Lisan's case,

4      correct?

5  A.  Right.  Referring to his reasonable accommodation

6      case.

7  Q.  Yes, of course.

8          "In your case, being" quote, "on call,"

9      quote, "is an essential function of your position

10     as an anesthesiologist."

11 A.  Correct.

12 Q.  And I read that correctly; is that right?

13 A.  Yes, you did.

14 Q.  "You are requesting the VA to take away an

15     essential function."

16         Did I read that correctly?

17 A.  Yes, sir.

18 Q.  Where did you get the idea that Dr. Lisan was

19     requesting the VA to take away an essential

20     function?

21 A.  Because he was requesting to be exempted from

22     call duty.

23 Q.  And how do you know that other than Dr. Raphaely

24     told you that?

25 A.  I know that from the medical documentation that

159

1         was submitted and Dr. Raphaely's message and

2         possibly emails sent by Dr. Lisan although I

3         cannot recall those specific emails at this time.

4    Q.   Okay.  What Dr. Kramer said in her medical report

5         related to certain risks and recommendations --

6    A.   Correct.

7    Q.   Let me finish.  I hadn't finished but I

8         understand why you didn't know that.  Okay?

9             Dr. Kramer's medical information sent to you

10        indicated certain risks to Dr. Lisan with respect

11        to his obsessive-compulsive disorder problem; is

12        that correct?

13   A.   Yes.

14   Q.   It did not have to do with his being impaired in

15        doing the so-called essential function of the

16        anesthesiology position of on call, right?

17   A.   Can you say that again?

18                   MR. SINDELL:  Read it back.

19                   TH NOTARY:  "It did not have to do

20            with his being impaired in doing the

21            so-called essential function of the

22            anesthesiology position of on call, right?"

23   A.   Correct.

24   Q.   So there is nothing in Dr. Kramer's medical

25        documentation that you received which stated that

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

160

1       Dr. Lisan was requesting that on call be

2       eliminated or taken away from his position, is

3       there?

4  A.  It says in the medical documentation, Plaintiff's

5       Exhibit 17, in Section 3 where it says, "To be

6       excused from 'on-call' duties for nights,

7       weekdays, weekends and holidays, et cetera.  It

8       is unclear if this is a time limited request."

9  Q.  Okay.  Now, that's what she wrote concerning his

10      condition and her recommendations?

11  A.  I don't know if she wrote that.

12  Q.  Well, let's assume she did.  Okay?  It's her

13      record.  I think she even signed it.

14         We're not going to quibble about what's

15      written there.

16         All I'm saying is simply that that comes,

17      that isn't written by Dr. Lisan, is it?

18  A.  All I'm noting is that --

19  Q.  Please answer my question.

20  A.  -- the top is typed and then Dr. Kramer wrote in

21      printing.

22  Q.  Oh, yes but Dr. --

23  A.  So I don't know.

24  Q.  Dr. Kramer did not say anything about what

25      Dr. Lisan personally was requesting in the way of

161

1    on-call duty or not on-call duty.

2  A.  No.  It appeared she was responding to what's

3      written in Number 3.

4  Q.  Right.  Okay.

5          But that's, but the person who requests the

6      reasonable accommodation is not the medical

7      doctor, it's the employee, isn't it?

8  A.  The employee is the requester and they must get

9      their medical documentation from their medical

10     doctor.

11 Q.  But you still have to know what the employee is

12     requesting before you can make any decision about

13     the reasonable accommodation, don't you?

14 A.  Who has to know?

15 Q.  You.

16 A.  Yes.  I knew that he was requesting to be

17     exempted from on call.

18 Q.  Okay.  And that's based, but that's not based on

19     what Dr. Kramer wrote, is it?  It doesn't say

20     what he's requesting, does it?

21 A.  No.

22 Q.  Okay.

23 A.  Except for Number 3.

24 Q.  No.  Except for nothing.  It doesn't say he's

25     requesting it.  It says he should be excused from

162

1        it?

2    A.  It doesn't say who wrote it.  In Number 3.

3    Q.  Oh, you're reading Number 3?

4    A.  Correct.

5    Q.  Well, it's typed there, isn't it?

6    A.  That's what I said.

7    Q.  I'm sorry.  I wasn't looking at it.  I should

8        have been, so I apologize.

9            So you typed in here in Number 3, not

10       Dr. Lisan, "to be excused from on-call duties for

11       nights, weekdays, weekends and holidays, et

12       cetera.  It is unclear if this is a time limited

13       request."

14           You typed that, didn't you?

15   A.  Possibly or Dr. Lisan did because in some cases

16       the requester types these areas in and in other

17       cases, I will type them in to assist them.

18           I don't have recollection because I do so

19       many of these.

20   Q.  But you could have typed it in; is that correct?

21   A.  Yes, I could have.

22   Q.  And if Dr. Kramer didn't type it in?

23   A.  It would be unlikely Dr. Kramer would type that

24       in because it looks like Dr. Kramer wrote in

25       handwriting.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

163

1   Q.   Okay.  And if Ron didn't type it in?

2   A.   Then it would be possible that I typed it in.

3   Q.   Okay.  Why would you type that in?

4   A.   If I were to type this in, I would be conveying

5        to the doctor what the request is.

6   Q.   Okay.  And when you wrote that the request --

7        withdrawn.

8            I know you're telling me you don't remember

9        if you wrote it; but let's assume that you did

10       for a moment.  Okay?

11           "To be excused from on-call duties for

12       nights, weekends, weekends and holidays, et

13       cetera."

14           If you wrote that, where would you have

15       gotten that information to write that or type

16       that in there on Number 3?

17  A.   Either from Dr. Lisan or Dr. Raphaely.

18  Q.   Do you remember which one?

19  A.   No.

20  Q.   It could have been just from Dr. Raphaely?

21  A.   It's possible in the absence of my recollection.

22                       -  -  -  -

23           (Thereupon, Plaintiff's Exhibit 23, 1/18/17

24           Kafer "Follow Up On Call" email to Lisan, was

25           marked for purposes of identification.)

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

164

```
 1                          -  -  -  -

 2   Q.  All right.  I hand you what's been marked as --

 3       you know I didn't staple these so I'm going to

 4       give this one to you just like that.

 5                   MS. JOHNSON:  Okay.  Are we on 23?

 6                   MR. SINDELL:  Yes.  How's that for

 7           moving along?

 8                          -  -  -  -

 9       (Thereupon, a discussion was had off the

10       record.)

11                          -  -  -  -

12   Q.  You've got 23?

13   A.  Yes.  I read it.

14   Q.  All right.  Let me know when you're ready.

15       Okay?  Are you ready?

16   A.  I am ready.

17   Q.  All right.  This was Wednesday, January 18, 2017

18       from you to Dr. Lisan, right?

19   A.  Yes.

20   Q.  And you called it "follow-up on call" with high

21       importance, right?

22   A.  Yes.

23   Q.  And you wrote:  "Dr. Lisan:  I want to make you

24       aware that you are free to make a transfer

25       request to another position which has no
```

165

1      'on-call' duties."

2          My first question is were you referring to an

3      anesthesiology position?

4   A.  I don't know.  I did not specify.  All I said was

5      another position.

6   Q.  So you don't know if it was an anesthesiology

7      position?

8   A.  Correct.

9   Q.  Okay.  What other position might it have been?

10  A.  Medical doctor, physician.

11  Q.  But you know he's an anesthesiologist.  He's not

12      an internist.  He's not a surgeon?

13  A.  Correct.

14  Q.  So what --

15  A.  But I recall at the time he had a problem with

16      the on-call paging duties.

17  Q.  But in any event, whatever he had a problem with,

18      my question again is:  What other position in the

19      VA -- you're referring to the VA, aren't you?

20  A.  Yes.

21  Q.  Okay.  What other position in the VA other than

22      one having to do with his specialty would you

23      expect him to be seeking?

24  A.  I didn't have any expectations about seeking.  I

25      wanted to inform him of that option because it

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

166

1    seemed like the on-call duties were a major issue

2    to him and it seemed like he was trying to use

3    the reasonable accommodation process to get out

4    of them.

5        Because he didn't meet the criteria for

6    reasonable accommodation, he still wanted to get

7    out of them, so I wanted to let him know that he

8    could transfer to another position that didn't

9    have -- potentially transfer that did not have

10   on-call duties and like we have a lot of

11   physicians that work ambulatory care jobs or

12   outpatient care jobs where they would not be on

13   call and so you never know what somebody is

14   interested in, so I was providing this as a

15   courtesy to him.

16   Q.  I see.

17   A.  And also informing him about Carlton Daniel.

18   Q.  **You had no expectation one way or the other that**

19       **he would find an available position that had**

20       **nothing to do with anesthesiology, did you?**

21   A.  I had no expectations beyond providing him this

22       information.

23   Q.  **Right.  You had no way of knowing what his**

24       **prospects were for another position; is that**

25       **correct --**

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

167

```
 1   A.   Well --
 2   Q.   -- at the VA?
 3   A.   I -- the only awareness I have is when I look at
 4        the USA Jobs postings a lot because we're also
 5        dealing with reassignment for people.
 6             So when an RA requester, for instance, is
 7        unable to perform the essential functions of
 8        their position due to a disability and we're
 9        unable to provide an accommodation so they can,
10        then we look at reassignment.
11             So I'm often looking at USA Jobs and I do see
12        physician postings because it seems like we are
13        always in need of physicians.  Dr. Lisan is a
14        physician.  Dr. Lisan didn't want to do call
15        work.  I had really no knowledge beyond what I
16        had in front of me but that's what was evident at
17        the time so that's why I wanted to inform him
18        maybe you could get another job where there's no
19        on call if this is a real issue and Carlton could
20        help you.
21   Q.   When you say "maybe," okay?  You have no way of
22        assessing how positive or negative the maybe was?
23   A.   Right.
24   Q.   For Dr. Lisan?
25   A.   Correct.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

168

1    Q.   At the VA?

2    A.   Correct.

3    Q.   That's all I'm asking.

4    A.   Okay.

5    Q.   Okay?  Now, you wanted to take a break?

6                   MS. JOHNSON:  Yes.

7                      -  -  -  -

8              (Thereupon, a recess was had.)

9                      -  -  -  -

10   Q.   Let's start with Exhibit 6.

11        All right.  I have some questions about the

12        sexual harassment protocol that we left off I

13        talked to you about it early in the deposition

14        and then skipped to the reasonable accommodation.

15        So I want to go back to what your knowledge

16        is of the procedure and protocol of the sexual

17        harassment complaint.

18   A.   Okay.

19   Q.   And, again, just for context, I kind of like the

20        employee 1/employee 2 example where employee 1

21        says something that has a sexual innuendo that

22        may be or is offensive to employee 2?

23   A.   Okay.

24   Q.   Remember that?

25   A.   Yes.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

169

```
 1   Q.  Now, we did talk about the appropriateness of
 2       going to Dr. Raphaely if you were a CRNA who had
 3       a complaint of sexual harassment against an
 4       anesthesiologist or another employee in the
 5       department of anesthesiology and we talked a
 6       little bit about Robert Bearss but I'm going to
 7       take with Raphaely because there's no question
 8       about that appropriateness that you've indicated.
 9   A.  Uh-huh.
10   Q.  Yes?
11   A.  Yes.
12   Q.  Now, let me just share this with you.
13           I've talked to a number of CRNAs,
14       anesthesiologists but mostly CRNAs who have been
15       to these education meetings on sexual harassment
16       and also done the trainings on-line and there
17       were a number of them.  You, I can't imagine you
18       had anything to do with those particular
19       trainings, right?
20   A.  No, I was not involved in any of the trainings.
21   Q.  But I mean some of them were mandatory and they
22       had signatures when they attended, attendance
23       sheets and so forth but this is what I'm basing
24       it on:  What their recollections were, as I
25       understood it, of what they were told.
```

**170**

 1   A.   Okay.

 2   Q.   So what I'm going to do, I'm just telling you

 3        this to help out, maybe speed it up, is to ask

 4        you what your knowledge is from your perspective

 5        in your position as a fact finder about the

 6        things that they believed they were trained in

 7        and taught about the procedures.  Okay?

 8   A.   Okay.

 9   Q.   So you got the context.

10   A.   Yes.

11   Q.   All right.  Now, if a complaint is made by a CRNA

12        to Dr. Raphaely about Dr. Lisan which has some

13        indication of a remark or statements verbally

14        that Dr. Raphaely allegedly made that were

15        offensive to --

16                    MS. JOHNSON:  I'm sorry to

17              interrupt you, Steve, but I think you said

18              Dr. Raphaely and you pointed to him so I

19              just wanted to make sure the record was

20              clear.

21   Q.   Thank you.  Let me say it again.

22        If a CRNA went to Dr. Raphaely to make a

23        complaint about allegedly offensive remarks that

24        Dr. Raphaely made --

25                    MS. SINDELL:  Dr. Lisan.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

171

1   Q.  Dr. Lisan, excuse me, made to them, it would be

2       appropriate for Dr. Raphaely to say to the CRNA

3       please write it up?

4   A.  Yes.

5   Q.  In an ROC, report of contact, form?

6   A.  Correct.

7   Q.  Presumably sign it, there's a space to sign

8       there; is that correct?

9   A.  Yes.

10  Q.  And do you know upon being informed of such a

11      complaint of sexual harassment or offensive

12      verbal communication by a CRNA whether

13      Dr. Raphaely has any function or protocol

14      requirement to try to mediate the offensive

15      conduct that's alleged?  In other words talk to

16      the allegedly offending party, talk to the

17      complaining party, possibly get them together or

18      at least try to work it out so it doesn't happen

19      again?

20  A.  Yes.  In this Medical Center Policy 003.003 it

21      has --

22  Q.  MCP?

23  A.  Yes.  003-003 as referred to on or referenced on

24      Exhibit 6, there are things listed that

25      Dr. Raphaely should do which include the things

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

172

```
 1        that you were referencing.  In other words she

 2        plays a part in addressing the allegation of

 3        sexual harassment with the broader goal of

 4        responding appropriately to the allegation and

 5        then also ideally preventing future examples of

 6        sexual harassment.

 7    Q.  What does MCP stand for?

 8    A.  Medical Center Policy.

 9    Q.  What kind of a form would those things be written

10        in?

11    A.  They would be written in like a Microsoft Word

12        document.  Looks similar to this format.  They're

13        all available on the intranet site.

14    Q.  When you say the Internet site, available to me

15        or available to Ron?

16    A.  You would not be able to access the intranet

17        site.  I'm unaware if you would be able to get

18        them on the Internet site.  You might be able to

19        but Ron would have the ability to access all

20        medical center policies.

21                    DR. LISAN:  Would I be able to

22            forward it though to Steve?

23    A.  Only if you saved it to a file and then forwarded

24        it from the file, so you'd use the save as

25        function and then you could attach it to an email
```

**173**

1    and send it to him.

2   Q.  **So I don't need Lisa to send it to me. He can**

3      **get it?**

4  A.  He could.

5            DR. LISAN: Of course it's easier

6      if they did. Easier for me.

7            MR. SINDELL: Pardon me?

8            DR. LISAN: It's easier for me if

9      she sends it.

10           MR. SINDELL: She'll take her time

11      possibly to send it because she's busy,

12      okay? And so are you. Well, that's

13      important. Off the record.

14           - - - -

15      (Thereupon, a discussion was had off the

16      record.)

17           - - - -

18  Q.  **Do you recall, and you may not, the general gist**

19      **of those kinds of policies that you're talking**

20      **about now?**

21  A.  Only in general that the manager would have

22    responsibilities to make sure that, you know,

23    identifying people who might have information or

24    be clear on who maybe else should be talked to

25    because if you're conducting a fact finding,

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**174**

1    those fact finders would need to know that

2    information.

3  Q.  I lost you now.

4        If who's conducting?

5  A.  Like when Leshelle and I conducted the fact

6    finding information.

7  Q.  Oh, at that left?

8  A.  Right.  Dr. Raphaely might say hey, talk to that

9    Bearss guy, maybe he would -- he might have

10    information, so that's the type of role she would

11    play or she would assist us in freeing up Karin

12    Bonfili's schedule because normally she'd be

13    doing procedures and she would need time to then

14    come talk to us so she would help to coordinate

15    all those things.

16  Q.  So that's interacting with the fact finding

17    people at your level?

18  A.  Right.

19  Q.  But I'm talking about before we get to your

20    level, okay?

21        I'm saying if somebody comes and makes a

22    complaint, simply a complaint.  Two years ago he

23    made an offensive remark or the other day he said

24    something that suggested to me that he wanted to

25    sleep with me or something, you know, something

**175**

1      like that kind of thing -- we can go over them

2      but you may remember, I don't know -- but those

3      kinds of things, would you agree with me that

4      sometimes just a simple discussion that this is

5      offensive and I didn't mean to be offensive and

6      so on and so forth can resolve it?

7   A.  Possibly.

8   Q.  Yeah.  I mean isn't it worth the effort to

9      resolve those kinds of things rather than

10      immediately file a charge?

11  A.  Well, resolution is important but if a manager

12      thinks there may be an allegation of sexual

13      harassment, then it's incumbent upon them to

14      follow MCP 003.003.

15  Q.  And what does the actual MCP 000.003 --

16  A.  Medical Center Policy 003.003.

17  Q.  What does it say that they have to file?

18  A.  It's the prevention and management of sexual

19      harassment.

20  Q.  Okay.  Well, I can read it so that's what we

21      need.

22          Would you agree with me that threatening

23      CRNAs on the part of a manager or supervisor such

24      as Dr. Raphaely -- I'm not saying this as a fact

25      but as a hypothetical.  Okay?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

176

1  A.  Okay.

2  Q.  **Threatening CRNAs and coercing them to make false**

3     **claims of sexual harassment or sexual offense or**

4     **any kind of offense against an anesthesiologist**

5     **in order to get rid of him would be highly**

6     **improper?**

7  A.  I would agree.

8  Q.  **What should be the consequence or procedure if**

9     **something like that actually were to occur?  And**

10    **again it's a hypothetical; but if something like**

11    **that were to actually occur, what remedy would**

12    **there be for the injured individual to deal with**

13    **a manager or a chief or somebody who would do**

14    **something like that?**

15 A.  I have no idea.  I would have to ask our agency

16    attorney or someone from human resources if for

17    some reason I wanted the answer to that question.

18 Q.  **Who would you go to first?**

19 A.  Human resources employee labor relations.

20 Q.  **Human resources is different than employee**

21    **relations, isn't it?**

22 A.  Employee labor relations is an aspect.  It's one

23    of the divisions of human resources.  Those are

24    the individuals who prescribe what discipline is

25    warranted based on whatever occurred.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

177

```
 1    Q.   Okay.  So that's where you'd make your complaint?

 2    A.   That's where I would make my initial inquiry.

 3    Q.   Initial inquiry?

 4    A.   If I wanted to know what would be the recourse

 5         for an individual who experienced that.

 6    Q.   Okay.  Would there be anything out of line or

 7         inappropriate about writing directly to the

 8         executive director, Ms. Fuehrer?

 9    A.   It may be appropriate to CC her on communications

10         to employee labor relations but you really need

11         the subject matter experts to know like what

12         should be done.

13    Q.   Well, if it was a CRNA or an anesthesiologist who

14         had a complaint of that nature, would it be

15         appropriate to go to the medical director

16         position formerly held by Dr. Altose?

17    A.   They could go to any member of management and if

18         they were reporting in this hypothetical scenario

19         that something inappropriate occurred, it would

20         be incumbent upon that management official to

21         follow up.

22    Q.   When you say "incumbent" upon that official, they

23         would, they could simply -- well, withdrawn.

24             I'm interested in what you mean by follow up.

25         Follow up meaning?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

178

1    A.   They would have a responsibility, especially in a

2         sexual harassment case, to notify the appropriate

3         persons.

4    **Q.   Okay.**

5    A.   Which would also include the medical center

6         director.

7    **Q.   How about, if you know, outside the specific VA**

8         **facility but within the VA system?  Are there any**

9         **avenues where you can bring those kinds of**

10        **complaints up such as special counsel?  Inspector**

11        **general?**

12   A.   Yes.  If you wanted to, you could report it to

13        any of those entities.

14   **Q.   And they could decide whether it's appropriate**

15        **for them to do something like that?**

16   A.   Right.

17   **Q.   To take steps.  Okay?**

18   A.   They would likely contact our medical center

19        director who would then task our local EEO

20        office, Leshelle and me, with following up on it.

21   **Q.   Let me ask you this:  If VA counsel, attorneys**

22        **like for example Ms. Shively's office were to**

23        **become aware of evidence that something like this**

24        **that I've already described with a manager was**

25        **going on, do you have any idea or understanding**

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

179

```
 1        if they would have some kind of duty within the

 2        VA as VA agents or employees to take any kind of

 3        action about it?

 4   A.   To, in this hypothetical scenario?

 5   Q.   Yes.

 6   A.   If Ms. Shively's office was involved, she would

 7        work with management towards an appropriate

 8        resolution.

 9   Q.   She would have some responsibility to do

10        something if there was credible evidence and she

11        was presented with that and believed it that it

12        was a problem that needed to be solved of that

13        nature, correct?

14                    MS. JOHNSON:  Objection.  You may

15              answer.

16   A.   Possibly.  I have no way of knowing what her

17        specific responsibilities would be.

18   Q.   Okay.  I understand.

19            And of course I'll ask you the same question

20        about the U.S. Attorney's Office, civil division.

21        You'd probably say it depends on what they

22        perceive their responsibilities to be as well.

23        You wouldn't know exactly, correct?

24   A.   Right.

25   Q.   Okay.  Now, I would like to ask you a few
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

180

```
 1        questions, let's look at Page, the top of Page 3?
 2                    MS. JOHNSON:  Of Exhibit 6?  Of
 3            Exhibit 6?
 4                    MR. SINDELL:  Oh, I'm sorry, yes,
 5            of course.
 6                    MS. JOHNSON:  Okay.
 7    Q.  Of Exhibit 6, thank you.
 8            At the bottom of Page 2 it says, "the CRNAs
 9        alleging sexual harassment complaints are as
10        follows."
11            You wrote this report, right?
12    A.  I wrote the final draft.
13    Q.  How about the one you're looking at right now?
14    A.  Yes, this is the final draft.
15    Q.  Okay.  So you wrote this?
16    A.  I took what was written and then --
17    Q.  Well, you're attributing it to yourself.  You're
18        signing off on it as yours?
19    A.  It's actually signed off on, it's coauthors Bruce
20        Kafer and Leshelle Reese.
21    Q.  Okay.  Do you accept your coauthorship?
22    A.  Yes.  I don't want to take all the credit.
23    Q.  Is there any disagreement to your knowledge
24        between you and Leshelle Reese about the contents
25        of this report?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

181

```
 1   A.   No, there is not.
 2   Q.   All right.  So you'll see the four women, CRNAs
 3        at the top, Bonfili, Foster, Costanzo, Verb,
 4        right?
 5   A.   Yes.
 6   Q.   Now tell me did you personally face to face have
 7        conversations with any or all or some of them,
 8        those four?
 9   A.   All four of them.
10   Q.   In person?
11   A.   Yes.
12   Q.   Okay.
13   A.   With Leshelle Reese.
14   Q.   With Leshelle Reese, so the two of you were
15        together?
16   A.   Correct.
17   Q.   Did you take notes on what they were telling you?
18   A.   I may have taken notes.
19   Q.   Would you have kept them?
20   A.   If I did, I would have given them to Leshelle
21        Reese to put in the, like the folder for the
22        case.
23             MR. SINDELL:  Well, that's the
24        folder I'm requesting from counsel, so just
25        so we're clear, and whatever is in there,
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

182

1          unless there's some privilege I'm not aware

2          of.

3  Q.  Okay.  Now, did you also see their ROCs?  Read

4      their ROCs?

5  A.  Probably.

6  Q.  You're not sure?

7  A.  Well, I don't have a specific recollection of

8      reading their ROCs but that would be a standard

9      procedure.

10       "Reports of contact were obtained from each

11     complainant and direct interviews were

12     conducted."

13       So I would say yes.

14  Q.  Okay.  That's your best recollection?

15  A.  Yes, it is.

16  Q.  Okay.  Let's mark 24.

17               -  -  -  -

18      (Thereupon, Plaintiff's Exhibit 24, Costanzo

19      Report of Contact, was marked for purposes of

20      identification.)

21              -  -  -  -

22  Q.  This is Exhibit 24.  This is one of the exhibits.

23      We haven't had a deposition of Elaine Costanzo

24      but she's one of the four obviously mentioned by

25      you, correct?

183

1          I'm sorry.  You're reading.

2    A.   Okay.

3    Q.   The first question I have is does that refresh

4         your recollection of something that you actually

5         previously read in connection with your fact

6         finding of the EEOC issue?

7    A.   It has some familiarity.

8    Q.   Okay.  Does it refresh your recollection about

9         what Ms. Costanzo may have told you aside from

10        what's written here?

11   A.   Yes.

12   Q.   She says, "In light of recent events involving my

13        female colleagues, I have decided to report the

14        following incidents as they pertain to Dr. Ron

15        Lisan and his inappropriate comments of a sexual

16        nature while caring for patients in the operating

17        room.  These two incidents occurred roughly one

18        week apart two years ago when I first began my

19        CRNA position in the Cleveland VA."

20             Does the fact that these events occurred two

21        years ago affect anything about your evaluation

22        of them?  Just that fact?

23   A.   Yes.

24   Q.   Tell me what.

25   A.   Timeliness.

184

1    Q.   What do you mean by timeliness?

2    A.   That it was so long ago that this occurred that

3         it would not have been serious enough at the time

4         to report it and so it would not be a basis for

5         arriving at a finding of -- the singular

6         incidents referenced here from two years ago

7         would not provide a basis to find for a finding

8         of sexual harassment.

9    Q.   Okay.  So the time factor then is a factor in

10        weighing whether there's sexual harassment or

11        not?

12   A.   Correct.

13   Q.   What did you understand or obtain from

14        Ms. Costanzo, if anything, regarding her

15        motivation "in light of recent events involving

16        my female colleagues"?  Would that mean anything

17        to you or --

18   A.   No.  Just that she was reporting what happened

19        two years ago.

20   Q.   Is there any indication here that she ever told

21        Ron Lisan that she was offended by anything

22        described here?

23   A.   On this form?

24   Q.   Yes.

25   A.   No.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

185

1   Q.  Or any of these events?

2   A.  Are you referring to the events referenced on the

3       form?

4   Q.  Yes.

5   A.  Only looking at this form and considering what's

6       written here, then no.

7   Q.  All right.  Is there some kind of one to ten or

8       zero to ten scale on the gravity of an alleged

9       sexual harassment or offensive conduct, offensive

10      verbal conduct report?

11  A.  Yes.

12  Q.  Okay.  Would you explain to me what that means?

13  A.  What it means is would a reasonable person

14      conclude that repeated events or unwelcomed

15      advances created a hostile work environment based

16      on sexual harassment.

17          So it's the reasonable person standards.  You

18      would be looking at everything.

19  Q.  Right.  Taking into account all the circumstances

20      you became aware of?

21  A.  Right.

22  Q.  Okay.  So is ten the most egregious and zero the

23      least?

24  A.  There's no quantitative scale that is used like

25      that.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

186

1    Q.  Oh, I'm sorry.  I may have misunderstood you.

2        You don't put numbers out there on them?

3    A.  No.  There's no quantitative scale that is used

4        like zero to ten in terms of severity.  It is a

5        qualitative scale.

6    Q.  Okay.  Explain that to me.

7    A.  It would be what a reasonable person would

8        conclude.

9    Q.  Okay.  But if you gradate them in any way -- well

10       let me back up then.

11       Do they get gradated in any way?

12   A.  No.

13   Q.  So nobody would -- withdrawn.

14       Did Leshelle Reese ever use or refer to that

15       kind of a scale, whether it's official or not,

16       it's a zero, it's an eight, it's a six, it's a

17       ten?  Say something like that?

18   A.  Not to my knowledge.

19   Q.  You wouldn't know what she told Ron Lisan, would

20       you?

21   A.  No.

22   Q.  Well, basically you don't, I think you've told me

23       what you thought about this as a sexual

24       harassment complaint.

25       So you don't believe that this qualifies as a

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

187

1        valid sexual harassment complaint against Ron

2        Lisan under the sexual harassment policy of the

3        VA, this Exhibit 24 from Elaine Costanzo?

4     A.  I view this as a sexual harassment allegation

5        that did not rise to the level of sexual

6        harassment.

7     Q.  Thank you.

8            Now, I'd like to go to this one.  This is 25.

9                     - - - -

10           (Thereupon, Plaintiff's Exhibit 25, Foster

11           Report of Contact, was marked for purposes of

12           identification.)

13                    - - - -

14    Q.  This is Exhibit 25.  Please take a moment and

15        look at that.

16    A.  Okay.

17    Q.  Again same kind of question as the other one.

18           Does this -- well, this comes from Jessica

19        Foster, who is a CRNA, correct?

20    A.  Yes.

21    Q.  To your knowledge do you know who typed this?

22    A.  I'm making an assumption that it's Jessica

23        Foster.

24    Q.  It says at the bottom, "Executed By (signature

25        and title)."  It's a box, right?  At the bottom

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

188

```
 1      right?
 2   A.  Oh, yes.
 3   Q.  Yes.  Did you notice that?  Okay.
 4          It's blank in this one.
 5          Isn't it supposed to be signed?
 6   A.  I would think so.
 7   Q.  Did you, do you recall ever reading this document
 8       before?
 9   A.  I think I have.
10   Q.  Okay.  Did it strike you as a problem that it
11       wasn't signed?
12   A.  It's not always a problem because a person could
13       hand it to me and say they typed it.
14   Q.  Okay.  Well, do you know what happened here?
15   A.  Do I know what happened as far as the signature?
16   Q.  No.  As far as handing it to you or not?
17   A.  I don't recall.
18   Q.  Well --
19   A.  What would have happened is we would have asked
20       her questions about this in the interview.
21   Q.  Sure.  I'm sure of that.
22          So it doesn't particularly matter to you
23       necessarily if the person actually signs it?
24   A.  In this case it would not have.
25   Q.  When would it?
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

189

1   A.  If somehow I acquired it and I had no knowledge

2       of who it was from or if there was reason to

3       question the contents of what was written.

4   Q.  **Isn't it the clear intent of a report of contact**

5       **that the person fills it out sign it?**

6               MS. JOHNSON:  Objection.  You may

7           answer.

8   A.  The clear intent of a report of contact is to

9       convey information.

10  Q.  **But doesn't it include in conveying information**

11      **by having a place here where somebody's supposed**

12      **to sign to attest to what is written in here that**

13      **in fact that person be required to sign the**

14      **document?**

15  A.  Ideally they should sign the document.  They

16      could also submit a report of contact within an

17      email so, or you could attach this to your email,

18      if it's in electronic version.

19  Q.  **I understand that.**

20  A.  It's just a statement.

21  Q.  **Okay.  I understand.**

22      **Well, do you remember what Jessica Foster**

23      **told you about this?**

24  A.  Just what it says in the statement, that she had

25      this interaction.  She felt uncomfortable.  She

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

190

1     left the office.

2  Q.  Did you have any indication whether she told

3     Dr. Lisan that she felt uncomfortable about it?

4  A.  No.  She did not -- I recall nothing about her

5     informing him she was uncomfortable.

6  Q.  All right.  Did, do you recall Elaine Costanzo,

7     the first one I brought up here, telling you that

8     she informed Ron Lisan that she was uncomfortable

9     with anything he did or said?

10  A.  I don't recall that.

11      I know that one of them informed him to stop

12     with sexual commentary and he did stop but I

13     don't remember which one at this time.

14  Q.  Well, it's in your report.  I'll show it to you;

15     but the other three did not --

16  A.  Correct.

17  Q.  -- tell Ron they were being offended in some way?

18  A.  Correct.

19  Q.  Is that, does that have any significance at all

20     to you in terms of the merits or demerits either

21     way of the claim of sexual harassment?

22  A.  No.  It would be irrelevant because sometimes

23     people are scared to say something.

24  Q.  No.  I understand.

25      I have one here from Karin Bonfili but I

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

191

1      don't have the number, so that would be --

2                    MS. JOHNSON:  It's Exhibit 2.

3  A.  Yes.  Exhibit 2.

4  Q.  Do you remember that one?

5  A.  Yes, and I would like to read it.

6  Q.  Oh, go ahead, yes.  I don't want to stop you from

7      reading it.

8  A.  Okay.

9  Q.  Does this refresh your recollection as

10     to either --

11  A.  Yes.

12  Q.  -- what you had for lunch.

13        No.  Off the record.

14                    -   -   -   -

15      (Thereupon, a discussion was had off the

16      record.)

17                    -   -   -   -

18  Q.  Does this refresh your recollection concerning

19      your meeting with Karin Bonfili?

20  A.  Yes.

21  Q.  And do you think you read this before?

22  A.  Yes.

23  Q.  And the last one would be, it's not the last one.

24        There was a statement that she made, I don't

25      know which number it is?

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

192

```
 1   A.  3 or 4?
 2   Q.  That's it.  You've got it.  You're holding it
 3       right there.
 4   A.  3.  Follow-up from Karin Bonfili?
 5   Q.  Yes.  There was another one dated March 8th,
 6       2017?
 7   A.  Yes, I have it.
 8   Q.  Did you actually ever read that before?
 9   A.  I need to read it now to see if it refreshes my
10       memory.
11   Q.  All right.
12   A.  Okay.
13   Q.  Did you read that?
14   A.  Yes, I did.
15   Q.  Had you read that before?
16   A.  I believe so.
17   Q.  Did you, after reading that, tell Karin Bonfili
18       to go to the police, the VA police?
19   A.  I think so.
20   Q.  Okay.  Do you know if the police, VA police
21       followed up with anything?
22   A.  I'm sure they followed up.
23   Q.  Do you know if any action was taken beyond
24       talking to Ron Lisan about it?
25   A.  To my knowledge, there was no crime determined by
```

193

1      the police.  That's the sole reason for their

2      involvement is to determine if a crime occurred,

3      so then typically then they give it back to us if

4      there's any further administrative follow-up,

5      then we work with management.

6   Q.  **Okay.  So you think, you weren't making a**

7       **determination based on this document whether or**

8       **not a crime was involved, were you?**

9   A.  No, that was not my role.

10  Q.  **Right.  You just thought that it should be**

11      **examined by the police?**

12  A.  Yes, because there was touching reported --

13      allegations of touching.

14  Q.  **And it was an allegation of touching her in the**

15      **back?**

16  A.  Yes.

17  Q.  **All right.  Now you indicated you talked to all**

18      **four of the CRNAs who made complaints?**

19  A.  Okay.

20  Q.  **Before you made your report as part of your fact**

21      **finding, right?**

22  A.  Right.

23  Q.  **Okay.  Now, did you talk to Ron Lisan about these**

24      **written complaints?**

25  A.  I don't recall.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

194

1    Q.   Wouldn't it be part of a fact finding to hear

2         what the alleged harasser said about the claims

3         being made against him?

4    A.   Generally yes.  I thought I saw in one of the

5         reports, the exhibits that he responded but in a

6         case where there is no finding of sexual

7         harassment, I could see where it would not be as

8         important.

9    Q.   Let me ask you this:  To the best of your

10        recollection, would it be fair to say that you

11        did not discuss with Dr. Lisan the allegations of

12        sexual harassment by Elaine Costanzo or by

13        Jessica Foster or by Rhonda Verb?

14   A.   I would say it would be possible that I did not

15        discuss the case with Dr. Lisan; however I do not

16        know if Leshelle discussed it or if I would have

17        been absent that day and that could have been the

18        reason.

19   Q.   Before you made your report, Exhibit 6, would it

20        be fair to say that you did not have any

21        discussion or knowledge of any discussion with

22        Dr. Lisan by anyone else including Leshelle

23        Reese?

24   A.   I would say that is possible.

25   Q.   Well, do you have any recollection of actually

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

195

```
 1        reading something that Leshelle Reese said
 2        before --
 3   A.   No.  I have no recollection of --
 4   Q.   Hold on.
 5             Before this report was issued?
 6   A.   No, I have no recollection.
 7   Q.   All right.  But I think what you're saying is
 8        that your finding was that none of these four
 9        claims, and I haven't even shown you Rhonda
10        Verb's but, okay, here it is.  We'll get that one
11        in, too.
12             But none of these complaints were --
13        withdrawn.  You didn't read anything about any
14        interviews with Ron Lisan before you wrote up and
15        signed your fact finding report here with,
16        regarding the complaints of those three, all of
17        them except Bonfili; is that correct?
18   A.   What I'm saying is I do not have a specific
19        recollection.
20             However, in this exhibit, I see there's
21        reference to an interview with Dr. Lisan.
22   Q.   Yes.  You had an interview with him and I was on
23        the phone.  It lasted, do you recall how long?
24                      MS. JOHNSON:  Objection.  You may
25             answer.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**196**

1   A.  That was the meeting.  You were on the phone.

2   **Q.  Yes.**

3   A.  Okay.

4   **Q.  That was the meeting.  That's the only meeting**

5       **you recall ever having with Ron Lisan.  You even**

6       **said that before?**

7   A.  Okay.  So that is why this is in here.

8   **Q.  Okay.  But that was not, during that discussion,**

9       **is it your testimony -- change that.**

10      **During that meeting, isn't it a fact that you**

11      **did not ever ask him about the details in the**

12      **reports of contact of Elaine Costanzo or Jessica**

13      **Foster or Rhonda Verb; is that correct?**

14   A.  Let me see here:  It is possible that he was not

15       asked about those individuals and I am wondering

16       if the reason was due to when their allegations

17       occurred in time, if they were so long ago it

18       would have been --

19   **Q.  I really wasn't going into the reasons.  I just**

20      **wanted to know whether or not it's a fact that at**

21      **least during one meeting that you had with**

22      **Dr. Lisan, you never asked him anything about the**

23      **written ROC charges or even factually about the**

24      **details of any of those charges of those three**

25      **individuals, Foster, Costanzo or Verb.  That's**

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

197

1      all I'm asking.

2   A.   I don't have any recollection of asking him about

3        those things during the meeting that we had where

4        you were on the phone.

5   Q.   **Okay.  Do you remember asking him about those**

6        **details with those three CRNAs at any time prior**

7        **to the authoring and final version that we're**

8        **holding here, Exhibit 6, of this fact finding**

9        **report?**

10  A.   I don't recall any recollection of any time of

11       asking him; and the time that I would have been

12       most likely to ask him would have been during the

13       meeting when you were on the phone.

14  Q.   **Thank you.  Do you recall even asking him about**

15       **any of the details of the claims being made by**

16       **Karin Bonfili during that meeting that you just**

17       **mentioned when I was on the phone?**

18  A.   I don't have a recollection about the contents of

19       the meeting; however I see that I wrote he stated

20       that he did touch Karin Bonfili in the interview

21       section in this report.

22  Q.   **On the back?**

23  A.   Correct.

24  Q.   **All right.  Now, you wrote, and if you will be**

25       **kind enough to turn to Page 5 of 6, and I'm going**

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

198

```
 1        to refer to the "Conclusion" section.
 2   A.   Okay.
 3   Q.   Let's start with the second paragraph in the
 4        conclusion.  "While the complainants"?
 5   A.   Yes.
 6   Q.   You say "While the complainants."
 7             Complainants in this sentence means the four
 8        CRNAs, right?
 9   A.   Correct.
10   Q.   "Have cited that Dr. Lisan has engaged in
11        sexually inappropriate jokes and commentary
12        throughout the course of their employment, there
13        is no indication that anyone informed him to stop
14        with the exception of Elaine Costanzo after which
15        he stopped."
16             Why did you put that in here if it didn't
17        matter?
18   A.   Because when you're making a determination of
19        sexual harassment, if there are repeated
20        instances, and there's an example of someone
21        saying stop and they continue, that is where you
22        can find a sexual harassment decision.
23             That did not occur in this case.
24   Q.   I understand.
25             You went on to write, and I'm just reading
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

199

```
 1      starting with the bottom of the page, if you'll
 2      follow me, "In reviewing the totality of the
 3      case."
 4           That includes all four CRNAs, right?
 5   A.  Correct.
 6   Q.  "In reviewing the totality of the case," you
 7      write here, "it fails to rise to the legal of
 8      sexual harassment as defined in policy which was
 9      promulgated pursuant to Equal Opportunity
10      Employment law."
11           Did you write that sentence?
12   A.  Yes.
13   Q.  Do you agree with it?
14   A.  Yes.
15   Q.  And could you summarize why none of the four
16      complaints rise to the level of sexual harassment
17      as defined in policy which was promulgated
18      pursuant to equal opportunity employment law?
19   A.  Because there was no indication that what's
20      required to have a finding of sexual harassment
21      was met.
22   Q.  Can you identify for me what was missing?
23   A.  Repeated instances especially when a person asks
24      you to stop or a management official asks you to
25      stop which would meet the measure where a
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

200

```
 1        reasonable person would conclude a hostile work
 2        environment has been created based on sexual
 3        harassment.
 4   Q.   Now let's look at the very last two sentences on
 5        Page 6 at the top.  Are you with me?
 6   A.   Yes.
 7   Q.   It says, "However, it is clear sexually
 8        inappropriate behavior was occurring.
 9        Moreover" -- well, okay.  Let me just stop with
10        that sentence.  I'm sorry.  Let me read it again.
11            "However, it is clear sexually inappropriate
12        behavior was occurring."
13            You wrote that as well?
14   A.   Correct.
15   Q.   Now, this is a fact finding document, isn't it?
16   A.   Yes.
17   Q.   To reach a conclusion that sexually inappropriate
18        behavior was occurring, a significant part of
19        that would have to be based on the assumption
20        that the facts related in the CRNAs' ROCs, report
21        of contacts, were true, right?
22   A.   Yes.  As well as the interviews.
23   Q.   Yes.  So you interviewed all four of the CRNAs,
24        correct?
25   A.   Yes.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

201

1   Q.  You read these different ROCs, report of

2       contacts, that they filled out?

3   A.  Uh-huh.

4   Q.  All right.  And you concluded they were telling

5       the truth; is that correct?

6   A.  Telling the truth?

7   Q.  Yes.  About what happened?

8   A.  Yes.

9   Q.  You didn't have any doubts about that, did you?

10  A.  No.

11  Q.  You never talked to Dr. Raphaely about any issues

12      she might have been having with Dr. Lisan?

13  A.  Related to sexual harassment?

14  Q.  No.  Related to any complaints he made about her?

15  A.  No.

16  Q.  Did you ever ask her if she believed these

17      accusations?

18  A.  Not to my recollection.

19  Q.  But in believing all of these statements made by

20      these four CRNAs including the context of the

21      statements as described in writing, you never

22      discussed them detail by detail with my client,

23      Dr. Lisan, did you?

24  A.  As I said, I had no recollection of what we

25      talked about in our meeting.

202

1   Q.  But you have a recollection of meeting with the

2       CRNAs, right?

3   A.  Yes, because I was able to refresh my memory by

4       reading their ROC statements.

5   Q.  Yes.  I understand but you never, but you have no

6       recollection of ever talking directly to

7       Dr. Lisan about the actual detailed accusations

8       being made against him?

9   A.  Correct.  Right now I don't have a recollection

10      of that meeting.

11                  MR. SINDELL:  Would you read his

12          last answer, please?  Just read it to me.

13                  THE NOTARY:  "Correct.  Right --"

14                  MR. SINDELL:  Stop there.

15      BY MR. SINDELL:

16  Q.  Don't you think that, in all fairness, Mr. Kafer,

17      that you should have asked Dr. Lisan what his

18      response was to the details that were being

19      alleged against him before concluding that he in

20      fact made inappropriate remarks?

21  A.  It is possible that I asked him that during our

22      meeting.

23  Q.  Okay.  He says -- let me just ask you to assume.

24      I was listening to the meeting.  Okay?  Several

25      other people were listening to the meeting.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

203

1    Dr. Lisan was in the meeting and to the best of

2    my knowledge -- and I was listening very

3    carefully -- you never brought up at least three

4    of the CRNAs in any detail or read any part of

5    any accusation of any report of contact.

6        My question to you is:  Are you disagreeing

7    with what I just said?

8                   MS. JOHNSON:  Objection.  You are

9              testifying.  You may answer.

10   Q.  I mean we can call in all these people and have

11       them state their recollections in addition to

12       Ron, Dr. Lisan; but don't you think -- let me --

13       withdrawn.

14           Don't you think it was incumbent upon you,

15       whether you remember or don't remember, it was

16       incumbent upon you to present Dr. Lisan with the

17       specific details of what these CRNAs were saying

18       against him and give him an opportunity to

19       respond?

20   A.  As I said, I may have said that during the

21       meeting because I see that he responded to one of

22       the questions and it was included in the report.

23       I also recall that you were not present for the

24       entire meeting via phone.

25   Q.  Okay.  Mr. Kafer, I'm going to have her read --

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**204**

```
 1        we're about over here, so we can conclude this.

 2        I'm going to have her read the question because I

 3        don't, again, because I don't believe you

 4        actually answered my question so I want you to

 5        listen to it very carefully and see if you can

 6        answer directly the question that I asked you.

 7   A.   Okay.

 8                    THE NOTARY:  "Don't you think it

 9              was incumbent upon you, whether you

10              remember or don't remember, it was

11              incumbent upon you to present Dr. Lisan

12              with the specific details of what these

13              CRNAs were saying against him and give him

14              an opportunity to respond?"

15                    MS. JOHNSON:  And what was his

16              answer, please?  Could I hear his answer as

17              well please.

18                    MR. SINDELL:  Now he's going to

19              forget the question if she does that.

20                    MS. JOHNSON:  Well, because you

21              were saying he didn't answer the question,

22              I wanted to please hear his answer.

23                    MR. SINDELL:  Okay.  Answer the

24              question.  The question, let me just --

25              this is off the record, if I may.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

205

```
 1                        -   -   -   -
 2          (Thereupon, a discussion was had off the
 3          record.)
 4                        -   -   -   -
 5                   MR. SINDELL:  Okay.  That's fine.
 6          Read it back.
 7                   THE NOTARY:  "Don't you think it
 8          was incumbent upon you, whether you
 9          remember or don't remember, it was
10          incumbent upon you to present Dr. Lisan
11          with the specific details of what these
12          CRNAs were saying against him and give him
13          an opportunity to respond?"
14                   ANSWER:  "As I said, I may have
15          said that during the meeting because I see
16          that he responded to one of the questions
17          and it was included in the report.  I also
18          recall that you were not present for the
19          entire meeting via phone."
20                   MR. SINDELL:  That's not an answer
21          to the question.
22                   MS. JOHNSON:  I think you may
23          reask it.
24  Q.  Okay.  Did you hear the question again okay?  Can
25      you answer my question?
```

**206**

1  A.  It was incumbent upon me to ask about the most

2      relevant details of what the complainants

3      alleged.

4  Q.  **When you say "the most relevant details," are you**

5      **saying it was incumbent of you to ask him about**

6      **the main accusations against him by each of the**

7      **CRNAs as reflected in the reports of contact that**

8      **each of them made?**

9  A.  No.

10  Q.  **Oh, no?**

11  A.  I'm saying the most relevant details, which would

12     be the most immediate things as I look at this

13     and reoriented this.

14         For instance, the things that were reported

15     as occurring like two years ago would be

16     irrelevant and a waste of time to ask Dr. Lisan

17     about.

18         However, the more recent events from the one

19     ROC, I think it was dated the 4th or the 7th or

20     the 17th, where she came forward and asked and

21     then there was another, and this follow-up one

22     from, on Exhibit 3, these are, these are the

23     types of things that would be relevant.

24  Q.  **Okay.  Well, we're going to have to -- I'm going**

25      **to have to extend this thing, very briefly**

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

207

1   hopefully, when you say that because I want you

2   to point out to me, and you have them all right

3   there, so you can just pick them up and read

4   them.  Let's take, you said Costanzo's is so

5   old -- withdrawn.

6        You made a statement that he made

7   inappropriate remarks.  Okay?

8   A.  Uh-huh.

9   Q.  Is that a yes?

10  A.  Yes.

11  Q.  Did he make any inappropriate remarks to Elaine

12      Costanzo?

13  A.  I need some direction.  Which one is Elaine

14      Costanzo?  What exhibit?

15               MS. SHIVELY:  24.

16  A.  24.  I see that this is the one signed by Elaine

17      Costanzo.

18  Q.  Yes.

19  A.  Yes.  For instance, this one by Elaine Costanzo I

20      would have not felt a need to cover the specific

21      details of what she alleged had occurred two

22      years ago.

23  Q.  What was it?

24  A.  She alleged two years ago that he made comments,

25      inappropriate comments of a sexual nature while

**208**

1       caring for patients in the operating room.

2   Q.  So that isn't something, then, that you

3       considered as part of inappropriate remarks?

4   A.  I would consider it inappropriate remarks;

5       however, I would not, in the context of a sexual

6       harassment fact finding investigation where the

7       purpose is to determine were there facts that

8       rise to the level of sexual harassment --

9   Q.  But I'm not asking you that.  I want to be clear.

10      This is not about sexual harassment.  You wrote

11      in a sentence here:  "It is clear sexually

12      inappropriate behavior was occurring."  Okay?

13  A.  Right.

14  Q.  What sexually inappropriate behavior are you

15      referring to?

16  A.  Oh, okay.  I would be referring to anything that

17      is characterized as sexually inappropriate from

18      these four complainants because it would

19      demonstrate a pattern of sexually inappropriate

20      behavior.

21  Q.  Well, give me some examples.  What did you

22      consider sexually --

23  A.  Talking about your genitalia.

24  Q.  Okay.

25  A.  But the reason why I would not have covered the

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

209

```
 1        specific details of sexually inappropriate
 2        behavior in the meeting is because the purpose of
 3        the meeting had to do with sexual harassment
 4        which is different than sexually inappropriate
 5        behavior.
 6    Q.  Well, then if you weren't investigating -- well,
 7        whether it's sexual harassment or sexually
 8        inappropriate behavior, you still have to
 9        determine if the behavior that was sexually
10        inappropriate actually occurred, don't you?
11    A.  I can write what my impression is in the report
12        based on the facts I obtain.
13    Q.  Okay.  I guess, all right, last thing here.  Let
14        me just bring this up.
15            Are you familiar with the sexual harassment
16        checklist?
17    A.  Yes.  It's contained in the policy.
18    Q.  All right.  I understand.
19                        -  -  -  -
20            (Thereupon, Plaintiff's Exhibit 26, 1/10/17
21            "Sexual Harassment Allegation Checklist", was
22            marked for purposes of identification.)
23                        -  -  -  -
24    Q.  This is marked Plaintiff's Exhibit 26 and it does
25        come from Medical Center Policy 003-003.
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

210

1    A.   Excellent.

2    Q.   Thank you for the compliment.

3    A.   You've acquired relevant documents.

4    Q.   Do you recognize this document?

5    A.   Yes.

6    Q.   It says here, I was -- well, first of all, it

7         says at the top "Sexual Harassment Allegation

8         Checklist.  (Alleged harasser.)"

9             There's also a list for the complainer, isn't

10        there?

11   A.   There's also a what?

12   Q.   A checklist for the complainer?  The one

13        complaining about harassment?

14   A.   Oh, the complainant.

15   Q.   Complainant, the complainant?

16   A.   Correct.

17   Q.   All right.  This is the alleged harasser?

18   A.   Got you.

19   Q.   Now, it says, "I have ordered the alleged

20        harasser to cease any contact with the alleged

21        victim except that which is absolutely required

22        for official business."

23            Did I read that correctly?

24   A.   Yes.

25   Q.   Is that what you think Ron Lisan violated?  It

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

211

1      says in your report here in the very last

2      sentence, "Lisan had violated the supervisory

3      order"?

4  A.   To have no contact?

5  Q.   I think that's what you're referring to.  I'm

6      asking you that.

7  A.   Yes.

8  Q.   Is that what you're referring to?

9  A.   Yes.

10  Q.   Okay.  So this is a contact for sexual harassment

11      allegations in a case where there was no conduct

12      that rose to the level of sexual harassment?

13  A.   Okay.

14  Q.   Is that correct?

15  A.   Yes.

16  Q.   Okay:  Is it appropriate without any mediation

17      effort on the part of the supervisor to

18      immediately send something for EEOC complaints of

19      a sexual harassment nature and order the alleged

20      harasser not to have any contact other than

21      strictly business necessity with the complainant

22      for these kinds of allegations?

23  A.   Yes.

24  Q.   Okay.  Would it be also appropriate for the

25      manager to order the complainant not to have any

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

212

1   contact with the harasser other than strict

2   business necessity?

3   A. Did you say would it be appropriate for the --

4   Q. **Well, is there a checklist that says the same**

5   **thing for the complainant, that the complainant**

6   **is ordered to cease contact with the alleged**

7   **harasser except that which is absolutely required**

8   **for official business?**

9   A. I don't recall the checklist, if it says that or

10   not.

11   Q. **Okay.  If I told you it did, is that something**

12   **that should be presented to the complainant?**

13                  MS. JOHNSON:  Objection.  You may

14       answer.

15   A. Possibly.

16   Q. **Oh, you mean it must be given to the harasser but**

17   **only possibly should be reported to the**

18   **complainant?**

19   A. That is my recollection.

20   Q. **Okay.  So the complainant is free to talk about**

21   **it and discuss it with whomever including the**

22   **harasser but the harasser can't talk about it to**

23   **the complainant.  Is that what you think?**

24   A. I don't know about talking about or what that

25   means.

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

213

| | | |
|---|---|---|
| 1 | Q. | Talking about the harassment issue? |
| 2 | A. | You mean is there like an imposed gag order on |
| 3 | | them? |
| 4 | Q. | Yes. |
| 5 | A. | I don't know. |
| 6 | Q. | Well, you don't know about the complainant but |
| 7 | | you do know about the harasser? |
| 8 | A. | You were asking me about contact and now you're |
| 9 | | talking about talk about it. |
| 10 | Q. | Okay.  I'll make it so clear that there's no |
| 11 | | question. |
| 12 | A. | Okay. |
| 13 | Q. | It says I have -- on the Exhibit 26, it says, "I |
| 14 | | have ordered the alleged harasser to cease any |
| 15 | | contact with the alleged victim except that which |
| 16 | | is absolutely required for official business." |
| 17 | | Okay?  Did I read it right? |
| 18 | A. | Yes. |
| 19 | Q. | Now, there is also a sexual harassment checklist |
| 20 | | for the alleged complainant, correct? |
| 21 | A. | I believe so but I do not recall the specifics of |
| 22 | | that checklist.  Do you have it? |
| 23 | Q. | I have it.  I can't find it at the moment but I |
| 24 | | do, but I do have it. |
| 25 | A. | Okay. |

214

1   Q.  I actually do and I believe I know what's on it,

2       too.

3           My question to you is:  Isn't it, if you

4       know, a fact that the exact same order is on the

5       complainant's checklist that the complainant

6       should cease to have any contact with the alleged

7       harasser except that which is absolutely required

8       for official business?  Do you know one way or

9       the other?

10  A.  Right now, I do not recall if that is on there.

11  Q.  And if it is, then that should be presented to

12      the alleged complainant, shouldn't it?

13  A.  I would say possibly.

14  Q.  Under what circumstance, if it's on the alleged

15      complainant's form checklist, should it only

16      possibly be presented to the alleged complainant

17      and not, and possibly to the harasser?

18  A.  Because this checklist is completed typically by

19      the manager.  In some cases an EEO fact finding

20      team would perform some of these functions

21      therefore not all of these would be checked off

22      by the manager.

23  Q.  If the alleged complainant made contact with the

24      alleged harasser contrary to an order on a

25      checklist given by the manager, would that be a

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

215

1      violation as well of an order from the VA?

2   A.   If it was about official business, it would not

3        be a violation.

4   Q.   **No, not official business.**

5           **About the contents and issues of the**

6        **harassment.  Wouldn't that be a violation too?**

7   A.   If the checklist says the same thing that this

8        checklist says and the complainant violated an

9        order, then that would be regarded as a violation

10       of an order.

11  Q.   **Would it be a problem if only the harasser was**

12       **allegedly punished for the violation but not the**

13       **complainant punished for the violation?**

14  A.   I would have no knowledge about the issuance of

15       discipline related to violations of orders

16       because I do not, I am not involved in

17       discipline.

18                   MR. SINDELL:  Okay.  Very good.

19            Let's take a quick break.

20                   -  -  -  -

21            (Thereupon, a recess was had.)

22                   -  -  -  -

23                   MS. JOHNSON:  So after the

24            deposition is transcribed by Pam, you have

25            the opportunity to read it and correct any

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

216

1   errors or you can waive that right.

2          I would recommend reading the

3   transcript in this case so you need to tell

4   Pam what your decision will be about that.

5          THE WITNESS:  Okay.

6                 -   -   -   -

7          (Deposition concluded.)

8                 -   -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

217

1

2

3                    SIGNATURE PAGE

4

5

6            I, BRUCE KAFER, RN, MSN, having

7  read the foregoing deposition, do hereby certify

8  said testimony is a true and accurate transcript;

9

10  _____ I submit no changes.

11

12  _____ I submit the following changes on
            the _____ errata sheet(s) attached hereto
13          and made a part hereof.

14

15            _____

16            BRUCE KAFER, RN, MSN

17            _____

18            DATE SIGNED

19

20

21

22

23

24

25

218

1

2

3                    C E R T I F I C A T E

4

5    The State of Ohio, )   SS:
     County of Cuyahoga.)

6

7        I, Pamela S. Greenfield, a Notary Public
     within and for the State of Ohio, authorized to
     administer oaths and to take and certify
8    depositions, do hereby certify that the
     above-named witness was by me, before the giving
9    of their deposition, first duly sworn to testify
     the truth, the whole truth, and nothing but the
10   truth; that the deposition as above-set forth was
     reduced to writing by me by means of stenotypy,
11   and was later transcribed into typewriting under
     my direction; that this is a true record of the
12   testimony given by the witness; that the deponent
     or a party requested that the deposition be
13   reviewed by the deponent; that said deposition
     was taken at the aforementioned time, date and
14   place, pursuant to notice or stipulations of
     counsel; that I am not a relative or employee or
15   attorney of any of the parties, or a relative or
     employee of such attorney or financially
16   interested in this action.

17       IN WITNESS WHEREOF, I have hereunto set my
     hand and seal of office, at Cleveland, Ohio, this
18   18th of March, 2019.

19

20

21   _____
     Pamela S. Greenfield, CRR, RDR
22   Notary Public, State of Ohio
     My commission expires July 2, 2023

23

24

25

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

219

```
 1   DO NOT WRITE IN TRANSCRIPT EXCEPT TO SIGN.
     Please note any word changes/corrections on this
 2   sheet only.  Thank you.

 3   Page/Line    Correction

 4   _____   _____

 5   _____   _____

 6   _____   _____

 7   _____   _____

 8   _____   _____

 9   _____   _____

10   _____   _____

11   _____   _____

12   _____   _____

13   _____   _____

14   _____   _____

15   _____   _____

16   _____   _____

17   _____   _____

18   _____   _____

19   _____   _____

20   _____   _____

21   _____   _____

22   _____   _____

23   _____   _____

24   _____   _____

25   _____   _____
```

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**Exhibits**

**Kafer_Exhibits_6_ thru_26**

**0**

**000.003** 175:15
**003-003** 171:23 209:25
**003.003** 171:20 175:14,16
**0857e** 139:9

**1**

**1** 31:16,25 32:18,20, 21,24 33:4,6 39:20 41:20,25 168:20
**1's** 41:25
**1/10/17** 209:20
**1/11/17** 144:1
**1/12/17** 149:1 150:4, 5
**1/13/17** 156:1
**1/18/17** 163:23
**1/employee** 168:20
**10** 24:7 66:19,24 67:1,14 105:9 127:4, 18,23,24 128:3 147:21
**100** 14:3
**10:00** 144:24 151:12
**10:50** 67:17 127:5
**10:55** 144:19 146:22
**11** 95:9,11 97:6 146:22 147:21
**11/27/13** 95:11 104:2,20
**11th** 144:19 151:4,8 152:21
**12** 103:25 104:2,8,10 149:7
**12/16/16** 61:1
**12/19/16** 66:19 126:1
**12/20/16** 130:17
**12/23/16** 138:3
**12/27/16** 138:19
**12/8/16** 54:8
**12th** 149:22 150:17, 24 151:8,9
**13** 104:20 105:1,2,3
**14** 126:1,6,8 127:5 128:17
**15** 130:17,22 131:3 135:23
**16** 62:11 138:3,8
**17** 138:19,23 142:18, 19 160:5
**17th** 206:20
**18** 144:1,5,7 164:17

**18th** 151:1 218:18
**19** 10:6 67:16,17 120:23 127:16 148:24 149:1
**1962** 10:3
**1980** 10:24
**1999** 11:23 12:5
**19th** 111:3 113:19 126:9 157:4
**1:28** 85:2
**1:50** 126:10 127:6,15

**2**

**2** 31:18,19,25 32:1, 19,20 33:1,5 39:12,18 41:20,21,22,23,24 42:2,4 43:6 157:13 168:20,22 180:8 191:2,3 218:22
**20** 24:16,17 150:2,4
**2009** 12:14
**2010** 14:2,4,12
**2016** 53:23 54:20 55:8 62:11 67:17 98:19 102:16 107:20 111:3 120:23 127:16 138:10 139:14
**2017** 37:13,16,17 98:19 102:17 144:19 146:22 148:9 149:7, 22 150:24 157:4 164:17 192:6
**2019** 85:2 218:18
**2023** 218:22
**20th** 24:4 131:5 137:22
**21** 104:12 155:24 156:1
**22** 156:16,18
**23** 163:23 164:5,12
**23rd** 138:10 142:22, 24 147:17,21
**24** 56:9,21,23 182:16, 18,22 187:3 207:15, 16
**25** 187:8,10,14
**26** 209:20,24 213:13
**27th** 139:14 143:3
**2nd** 10:3

**3**

**3** 160:5 161:3,23 162:2,3,9 163:16 180:1 192:1,4 206:22
**30** 24:17
**35275** 9:6
**38** 10:6

**4**

**4** 192:1
**44039** 9:7
**47** 10:7
**4:21** 131:12
**4th** 206:19

**5**

**5** 197:25
**57** 10:9
**5975.1** 95:12 104:3, 21

**6**

**6** 34:23 35:3,23 41:15 168:10 171:24 180:2, 3,7 194:19 197:8,25 200:5
**66** 14:7,17
**6:44** 150:18,19

**7**

**7** 35:13,18
**7th** 55:8 206:19

**8**

**8** 54:8,13,14,19,20 85:2
**8th** 192:5

**9**

**9** 61:1,5,6,7,9 62:12
**9:23** 157:5

**A**

**a.m.** 67:17 144:19,24 146:22 151:12 157:5
**ability** 140:10 148:17 172:19
**above-named** 218:8
**above-set** 218:10
**absence** 107:12,20 128:24 163:21
**absent** 68:15 194:17
**absolutely** 137:11 210:21 212:7 213:16 214:7
**accept** 180:21
**accepted** 64:5
**access** 26:4 172:16, 19
**accommodation** 12:22 13:13,19,21,24 14:5,11,18 15:18 18:14,15 27:7,16 28:7,20 29:1,12,15

53:2 54:1 59:7,10,11, 24 60:3,4,9,16,18,23 61:14 62:18 63:2,8,11 64:4,11 65:6,19 66:8, 14 68:8 69:23,24 70:7,17 71:13,18 72:8 73:5,19 74:3,22 75:1 76:14 79:5 81:11,15, 18,24 82:3 87:16 98:2 103:23 104:4,13 109:22 110:3,14,15 111:6,8,17 112:9 113:11,24 126:2 129:24 130:18 135:1, 7 136:4,5 145:3 147:1 148:14 149:22 150:6, 20 152:16 153:9 156:3 158:5 161:6,13 166:3,6 167:9 168:14
**accommodations** 53:6 55:22 57:8,13, 15,22 58:17,25 66:20 68:18,23 112:20,23 113:2,13 114:2
**accomplished** 69:25
**account** 103:10 185:19
**accurate** 145:10 152:20 217:8
**accusation** 119:6 203:5
**accusations** 201:17 202:7 206:6
**acquire** 133:3
**acquired** 189:1 210:3
**action** 179:3 192:23 218:16
**activities** 13:14 14:19,23 86:13
**actual** 13:2 146:7 175:15 202:7
**add** 45:9 106:20,24 154:13,15,18
**added** 107:11,14,24
**adding** 112:3
**addition** 6:12 203:11
**additional** 42:20 125:19
**address** 9:5
**addressing** 172:2
**adjourn** 123:23
**administer** 218:7
**administrative** 61:20 62:1,2,16 193:4
**advances** 185:15
**advertising** 95:25
**advise** 130:6 137:23
**affect** 183:21
**affirmative** 36:6,9, 21 38:23

**aforementioned** 218:13
**afternoon** 85:1 127:6
**age** 6:1 21:3
**agency** 176:15
**agents** 179:2
**agree** 15:21 16:25 26:17,22 27:23 28:17 30:24 31:5,12 73:17, 22 98:8 99:19 120:1 124:20 125:12 132:15 149:24 155:7 175:3, 22 176:7 199:13
**agreement** 96:17
**ahead** 16:6 21:22 55:4 61:25 79:7 100:13 150:9 191:6
**alignment** 89:4 93:10
**allegation** 33:2 40:13,18,22 47:17 49:1 172:2,4 175:12 187:4 193:14 209:21 210:7
**allegations** 19:17 20:4,5 36:3 44:14 193:13 194:11 196:16 211:11,22
**alleged** 17:20 39:20 171:15 185:8 194:2 202:19 206:3 207:21, 24 210:8,17,19,20 211:19 212:6 213:14, 15,20 214:6,12,14,16, 23,24
**allegedly** 39:13 170:14,23 171:16 215:12
**alleging** 180:9
**allowed** 76:4 100:2 119:20,21
**alternate** 114:2
**alternative** 112:19, 23 113:2,13 124:18
**Altose** 52:12 55:15, 16,17,21 57:12,14,21 58:17,22,24 64:7,9, 15,17 65:1,11 177:16
**ambulatory** 108:13, 19 110:23 166:11
**amount** 96:4,7,9
**Andrea** 38:16 38:25 39:2
**anesthesia** 42:12 43:17 45:5 69:7 125:10 128:4 149:14
**anesthesiologist** 78:23 80:14 86:2 88:16 89:12 90:2 92:19 93:19 94:16,24 95:4,6 98:11,22 99:2

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

100:19,23 101:4
102:19 103:1,3 108:6,
17 109:5,23 110:5,17,
21,24 111:13 112:24
114:8,12,24 115:2,16
116:3,4 121:1 124:11,
14 133:2 158:10
165:11 169:4 176:4
177:13
**anesthesiologist's**
56:22 103:12
**anesthesiologists**
82:17 98:14 105:13,
19 106:24 169:14
**anesthesiology**
43:1 44:20 62:3,10
65:4 98:13,18 102:15
106:25 107:11,19
109:1 112:4,6 114:13
115:10,12 124:17
125:10,13 159:16,22
165:3,6 166:20 169:5
**angry** 122:17
**Annette** 9:15
**answering** 7:7 34:5
70:1 74:11 76:11
90:11,25 99:7 155:2
**answers** 99:23
**anybody's** 12:25
**anymore** 90:12
**apologize** 162:8
**apparently** 54:19
57:20 100:5,7
**appearance** 73:1
**appeared** 161:2
**appears** 61:16
131:24
**applicable** 96:17
**applicants** 96:1
**Applied** 11:14
**apply** 17:21
**appropriately** 172:4
**appropriateness**
169:1,8
**approximate** 14:16
25:11 37:9,11
**approximately** 9:11
11:22,23 12:14 14:2,
15 24:21 37:5
**area** 9:2 10:17 15:18,
22 29:15,18
**areas** 19:4 21:12,14,
24 28:1 43:11 162:16
**Arlene** 6:16
**arm** 33:18 34:10,12,
14,16
**arriving** 184:5
**art** 78:12
**ASC** 108:7,10
**ascend** 78:21
**Asher** 6:15

**asks** 57:1,16 58:11
199:23,24
**aspect** 176:22
**aspects** 112:8 136:3
**assertion** 77:3
**assertions** 133:22,
23,25 134:1,11
**assessing** 167:22
**assist** 13:13 68:11
112:19 113:7 162:17
174:11
**assistance** 68:22
**assistant** 68:8
**assisting** 68:12
**associate** 11:13
36:18,22 37:20 38:3,
5,22
**Association** 82:5
**assume** 7:11 43:25
44:10 45:14 56:7
62:7,16 81:3 107:3,9
114:6 115:7,9,11
120:22 124:4,5,8,12,
15,18 122:23 123:1,6
124:10,13 125:13
126:16 131:18 160:12
163:9 202:23
**assuming** 124:2
**assumption** 44:9
45:9,17 149:23
187:22 200:19
**assumptions** 45:10
81:5 115:14,19,22,25
125:14
**attach** 172:25
189:17
**attached** 126:14,16
217:12
**attachment** 157:22
**attendance** 23:8
169:22
**attended** 21:24 22:6
169:22
**attendees** 23:23
**attest** 189:12
**attorney** 9:25 123:9
176:16 218:15
**Attorney's** 179:20
**attorneys** 178:21
**attributes** 145:8
**attributing** 146:2
180:17
**authoring** 197:7
**authority** 43:10,23
44:11 63:7,20
**authorized** 218:7
**Avenue** 9:16
**avenues** 178:9
**average** 98:14
**aware** 36:10 39:7
62:1 76:13 79:12
101:21 129:9 132:5

164:24 178:23 182:1
185:20
**awareness** 167:3

---
**B**
---

**B-E-A-R-S-S** 42:8
43:22
**B-R-U-C-E** 8:20
**Bachelor's** 11:13
**back** 16:18 35:16,21
39:9 41:4,20 49:4
51:9,17 59:16,22
75:10,24 79:6 82:13
85:7 87:2,3 89:18,20
92:15 94:20 96:8
101:15,17 105:9
109:25 116:25 118:10
122:7 147:10,17
153:13 154:21 159:18
168:15 186:10 193:3,
15 197:22 205:6
**background** 27:25
**bad** 75:8
**badgering** 120:6
**ballpark** 24:1
**bargaining** 96:16
**base** 66:11
**based** 131:23 140:19
145:5,12 146:4 152:9
161:18 176:25 185:15
193:7 200:2,19
209:12
**basically** 149:12
186:22
**basing** 128:7 169:23
**basis** 56:1,23 58:12
107:16 184:4,7
**Bearss** 42:7,12
43:16,21 44:12 169:6
174:9
**bed** 83:25
**began** 12:5 183:18
**begin** 13:25 111:9
**beginning** 90:19
99:12
**Beham** 68:7
**behavior** 33:5
200:8,12,18 208:12,
14,20 209:2,5,8,9
**believed** 170:6
179:11 201:16
**believes** 41:22,23
76:5
**believing** 201:19
**bell** 20:19 112:1
117:19
**bells** 20:17
**benefit** 124:2
**Berea** 10:20,21
**big** 37:18
**birth** 10:2

**bit** 100:8 117:1
148:24 169:6
**blaming** 7:17
**blank** 188:4
**Bonfili** 181:3 190:25
191:19 192:4,17
195:17 197:16,20
**Bonfili's** 174:12
**bottom** 137:2 149:6
180:8 187:24,25
199:1
**box** 187:25
**break** 7:14 52:19
84:3 120:10,12
122:16 123:13,14,15
168:5 215:19
**breath** 92:1
**briefly** 33:10 206:25
**brilliant** 12:24
**bring** 53:8 178:9
209:14
**broader** 172:3
**broadest** 15:23
**brought** 107:15
190:7 203:3
**Bruce** 6:1,7,14 8:18
68:21 85:5 145:2
152:6 155:5 180:19
217:6,15
**bullet** 97:18
**business** 210:22
211:21 212:2,8
213:16 214:8 215:2,4
**busy** 133:2 152:2
173:11
**buts** 99:10

---
**C**
---

**call** 13:1 44:17 55:21
56:12,13,14,17 57:8,
13,15,22 58:17,25
59:10 60:3,18 65:23
69:9,13 73:25 74:15,
24 77:4,5,8,13,15,25
78:2 82:19,23 83:10,
22 86:4 98:9 103:15
105:15,21,24 106:8,
12,16 108:5 111:24,
25 112:3,5 124:15,16
125:2 126:22 128:1,6,
9 129:3,25 130:6
134:10,12 149:2,15
153:1,3,4,7,13 154:5,
22 158:8,22 159:16,
22 160:1 161:17
163:24 164:20 166:13
167:14,19 203:10
**called** 6:1 9:22 28:11
29:4 42:12 130:11
147:14 164:20
**calls** 117:11

**calm** 91:24 120:15
122:16
**calmed** 120:18
**cancellation** 151:16
152:5
**cancelled** 145:2
146:15 150:23 151:1,
6,8,22 152:5,13,17,20
**capacity** 13:17,25
15:15 18:3
**car** 140:25
**care** 12:9,12 74:23
110:23 166:11,12
**carefully** 74:10
89:20 203:3 204:5
**caring** 183:16 208:1
**Carlton** 70:24
166:17 167:19
**case** 6:11 7:22 11:2,
3,10 14:21 15:9 17:9
33:7 40:10 46:10
56:10,18,22 62:24
64:3 65:20 66:9
68:12,14 76:14 88:14,
15 92:17 114:19
115:15,21 122:24
123:2 138:14 148:2,
12,14 158:3,6,8 178:2
181:22 188:24 194:6,
15 198:23 199:3,6
211:11 216:3
**cases** 17:17 43:10,
11 68:11 111:17
162:15,17 214:19
**cease** 210:20 212:6
213:14 214:6
**center** 12:2 36:11,
19,22,23 37:20,24
38:13,22 108:13,20
171:20 172:8,20
175:16 178:5,18
209:25
**certified** 6:5
**certify** 217:7 218:7,8
**cetera** 160:7 162:12
163:13
**chain** 36:20 137:13,
18
**chair** 44:17
**chance** 53:11 126:6
131:3 136:22,23
144:6
**change** 44:2 90:17
94:5 196:9
**changed** 14:13
**changes/
corrections** 219:1
**characterization**
73:18
**characterize** 42:24
50:4,7 134:5,7

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**characterized** 208:17

**characterizing** 51:13

**charge** 175:10

**charges** 196:23,24

**chart** 85:15,17

**check** 64:14

**checked** 64:16 214:21

**checklist** 209:16,21 210:8,12 212:4,9 213:19,22 214:5,15, 18,25 215:7,8

**chief** 44:18,19,20 55:17 62:22,23,24 64:2 65:4 69:1 78:20 79:24 80:12 82:3 87:20 88:22 89:10,25 93:1,17 94:14 176:13

**choose** 88:22 93:1

**chooses** 41:24

**chose** 64:24 65:16, 17

**Christmas** 57:2

**chronology** 145:16

**circumstance** 114:15 214:14

**circumstances** 40:3 185:19

**citation** 88:12

**cited** 198:10

**civil** 6:4 179:20

**claim** 53:6 81:16 190:21

**claimed** 110:14

**claims** 18:15 28:7 176:3 194:2 195:9 197:15

**clarification** 145:24

**clarifies** 148:23

**clarify** 7:8 90:6

**clarity** 17:19,21,25 18:1

**clear** 8:1 9:22 57:23 58:5 66:6 79:7 88:20 91:3 92:23 98:15 101:8,25 102:1 110:19 112:1 115:13 117:9,19 141:3 148:3 170:20 173:24 181:25 189:4,8 200:7,11 208:9,11 213:10

**clearer** 18:23

**Cleveland** 9:2 10:17 11:5,21 12:2,4 98:13, 16,17,18 102:13,14, 15 103:12 106:25 108:21 115:2 124:12 183:19 218:17

**client** 6:14 137:3,4 201:22

**closure** 148:13

**coaching** 33:22

**coauthors** 180:19

**coauthorship** 180:21

**coercing** 176:2

**colleagues** 183:13 184:16

**collective** 96:16

**college** 10:25 11:5, 6,11

**combination** 30:18

**command** 36:20

**comment** 10:12

**commentary** 190:12 198:11

**commenting** 10:14

**comments** 183:15 207:24,25

**commission** 218:22

**communicate** 65:20 132:5,7,10,12 133:6 146:13 147:12

**communicated** 48:23,25 49:12,24 50:13 52:8 57:21 147:22 152:1

**communicating** 44:5 45:5

**communication** 31:3,8,16,18 32:18 39:21 40:7 41:21 42:1 43:19 48:10,16,21 49:10 58:1,7 62:11 110:19 132:6 142:4,5 146:24 152:25 171:12

**communications** 44:6 109:12 177:9

**Community** 11:4

**compared** 108:25

**competent** 27:24

**complain** 44:4

**complainant** 182:11 210:14,15 211:21,25 212:5,12, 18,20,23 213:6,20 214:5,12,16,23 215:8, 13

**complainant's** 214:5,15

**complainants** 46:12 198:4,6,7 206:2 208:18

**complainer** 210:9, 12

**complaining** 171:17 210:13

**complaint** 33:1 45:4,15 47:14,16,18 48:11,17,19,22 49:11 52:8 168:17 169:3 170:11,23 171:11

**174:22 177:1,14 186:24 187:1**

**complaints** 36:4 46:8 49:24 50:14,19 51:3,22 52:6 178:10 180:9 193:18,24 195:12,16 199:16 201:14 211:18**

**complete** 26:6 33:21

**completed** 8:9 214:18

**completely** 31:1 76:11

**compliment** 210:2

**comply** 82:6,9,15

**concentrating** 58:14 149:6

**concept** 42:15 135:2,4,12,22,24 136:2

**concepts** 136:2

**concern** 43:18

**conclude** 110:25 185:14 186:8 200:1 204:1

**concluded** 141:16 201:4 216:7

**concluding** 33:11 141:20 202:19

**conclusion** 41:16, 19 128:7 198:1,4 200:17

**conclusions** 40:24 41:7

**condition** 125:8 160:10

**conditional** 50:3

**conduct** 30:9 171:15 185:9,10 211:11

**conducted** 174:5 182:12

**conducting** 173:25 174:4

**Confidential** 156:2

**confine** 76:10

**conflict** 17:18,21,25 19:6,8 151:25

**confused** 16:11

**confusing** 19:2 56:12

**connection** 60:15 61:12 103:22 183:5

**connotes** 42:19

**consequence** 114:14 176:8

**consequences** 96:13

**consideration** 73:8, 11 76:17

**considerations** 28:19 29:6 103:9,13

**considered** 39:23 40:1 43:22 67:24 97:13 98:1 208:3

**consistently** 14:9

**constitute** 32:2,19

**consult** 64:22,25 65:11,12

**consultation** 65:8

**consulting** 65:5

**contact** 14:21 171:5 178:18 182:10,19 187:11 189:4,8,16 196:12 203:5 206:7 210:20 211:4,10,20 212:1,6 213:8,15 214:6,23

**contacts** 200:21 201:2

**contained** 22:11 82:10,16 209:17

**content** 31:22 71:14

**content-wise** 17:23

**contents** 180:24 189:3 197:18 215:5

**context** 32:15 109:2 168:19 170:9 201:20 208:5

**continue** 135:19 149:14 198:21

**CONTINUED** 85:4

**continuing** 26:13

**contrary** 214:24

**contrasting** 110:22

**conversation** 70:4, 6,9,14

**conversations** 103:24 181:7

**convey** 89:13 90:3 93:20 94:17 145:22 189:9

**conveyance** 134:11

**conveyed** 134:11

**conveying** 127:11 134:9 163:4 189:10

**coordinate** 174:14

**coordinating** 13:11

**coordination** 14:19

**coordinator** 12:22 13:21,24 14:5,11 15:3 27:7 68:9 81:18 111:8 145:3

**copied** 68:2,4 144:9

**copies** 138:9

**copy** 37:4 38:9,10, 16,19,21,23,24 68:10 136:11

**correct** 11:1 12:8 13:4 15:2,14,19 17:10 22:5 23:4 30:1,3,21, 22 31:4 35:23 38:1,2, 15,20 39:1,16,17,21, 22,25 40:10 41:18

**45:2 47:1 51:23 55:20 56:19,20,25 57:8,13 58:18 63:12 64:6 65:6,25 66:2,5 67:18, 19,20,21 68:6,18,19 70:15,22 72:14 75:1 76:24,25 79:1,11,24 80:16 83:23 85:23 86:9,10,15,17 88:6,21 92:25 95:6 106:9,22 109:17 112:25 115:3, 17 118:6 122:19 126:12,13 128:10,11, 12 129:8 130:3 131:6, 8,19 132:9,11,13 133:15 138:10 144:10,25 145:1 147:3,4,16,23 149:10, 11 150:14,20,25 151:7,10 152:7,10,11 156:14,24,25 158:4, 11 159:6,12,23 162:4, 20 165:8,13 166:25 167:25 168:2 171:6,8 179:13,23 181:16 182:25 184:12 187:19 190:16,18 195:17 196:13 197:23 198:9 199:5 200:14,24 201:5 202:9,13 210:16 211:14 213:20 215:25

**Correction** 219:3

**correctly** 55:23 68:24 69:10 73:13 76:20 78:4 82:20 98:3 105:16 108:8 112:21 145:6 152:18 153:5, 10,11,15,16 154:5,8, 16,19 158:12,16 210:23

**Costanzo** 181:3 182:18,23 183:9 184:14 187:3 190:6 194:12 196:12,25 198:14 207:12,14,17, 19

**Costanzo's** 207:4

**counsel** 26:9 99:16 117:11 178:10,21 181:24 218:14

**county** 9:3,4,23 218:5

**couple** 123:21 127:19

**coursework** 22:9,11 23:9

**court** 6:12 7:18 16:17 118:4

**courtesy** 166:15

**cover** 29:2 57:1 106:15,18 107:1,4,11

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

207:20
**coverage** 153:3,4
**covered** 105:11 106:8 208:25
**covering** 56:5
**Covers** 28:25
**coverup** 119:5,8
**created** 185:15 200:2
**credible** 179:10
**credit** 180:22
**crime** 192:25 193:2, 8
**criteria** 141:9,25 148:15,16 166:5
**critical** 94:11
**CRNA** 42:14,16,24 43:17 44:4 45:3,14 47:13 48:11,17 52:5 85:23 169:2 170:11, 22 171:2,12 177:13 183:19 187:19
**CRNAS** 36:4 41:18 42:11,25 46:7 49:23 50:13,20 51:2,11,20 169:13,14 175:23 176:2 180:8 181:2 193:18 197:6 198:8 199:4 200:23 201:20 202:2 203:4,17 204:13 205:12 206:7
**CRNAS'** 200:20
**cross-examination** 6:3,7 85:4
**CRR** 218:21
**current** 96:24
**curriculums** 22:12
**cutoff** 136:25
**Cuyahoga** 9:3 11:4 218:5
**CV** 35:13,18
**CX** 144:2

**D**

**Daniel** 70:24 166:17
**date** 10:2 36:25 37:1, 4 142:16,21 150:12, 23 157:1 217:17 218:13
**dated** 54:20 126:9 138:9 143:3 144:18 150:17 192:5 206:19
**day** 10:3 105:22 106:3,5 113:22 123:22 131:5,11 144:24 150:22 151:7 152:12 174:23 194:17
**days** 136:24
**daytime** 108:24
**deal** 37:19 100:3 176:12

**dealing** 26:21 27:15 53:5 167:5
**dealt** 24:14 72:7
**December** 53:22,25 54:20 55:8 62:11 67:16,17 98:19 102:16 111:3 113:19 120:23 126:10 127:16 131:5 137:22 138:9 139:14 142:22,24 147:17,21
**decide** 64:3 86:21 87:8 88:2 178:14
**decided** 145:4,12 146:4,9 152:9 183:13
**decides** 63:10
**decision** 63:18,21, 22,25 64:10,23 65:6 66:7 146:25 161:12 198:22 216:4
**decision-making** 63:7
**decisions** 82:2 146:12
**deep** 91:25
**define** 42:6 86:8
**defined** 17:8 78:25 79:10,15 80:4,22 81:10 153:9 199:8,17
**defining** 78:13
**definition** 78:16 79:3 81:4,7 87:23,25 88:9,10,23 93:2 97:9
**definitional** 80:17
**definitions** 89:1 93:5
**degree** 11:6,10,11 27:18 95:21
**degrees** 22:12
**delineation** 141:3
**demerits** 190:20
**demonstrate** 208:19
**Denial** 104:3
**denied** 64:5
**denotative** 13:7
**deny** 63:9 64:10
**denying** 72:12
**department** 42:12 43:1,18 44:20 45:5 64:2 65:4 69:1,7 73:9, 12 76:18 78:21 79:24 82:3 87:20 88:22 93:1 98:17 102:14 106:25 107:19 125:11 128:4 169:5
**depending** 40:2 42:21
**depends** 179:21
**deponent** 218:12,13
**deposed** 6:5

**deposition** 6:10,21 66:16 123:23 155:16 168:13 182:23 215:24 216:7 217:7 218:9,10, 12,13
**depositions** 7:16 155:15 218:8
**deputy** 38:5
**describe** 23:6 81:9 85:21
**describes** 140:5
**describing** 88:24 93:3 148:16
**description** 81:19 85:18,19 86:13,14,21 87:8,13,21 88:16 92:18 95:25 97:23
**descriptions** 85:20, 21 86:12 127:7
**designed** 40:5
**detail** 201:22 203:4
**detailed** 202:7
**details** 146:25 196:11,24 197:6,15 202:18 203:17 204:12 205:11 206:2,4,11 207:21 209:1
**determination** 32:7, 17 40:15 87:12 113:11 125:20 193:7 198:18
**determine** 86:18 87:5 103:2 139:25 193:2 208:7 209:9
**determined** 192:25
**determining** 97:13 98:25 100:17 101:2 102:24
**dictionary** 79:17
**difference** 129:17
**differently** 31:15
**difficult** 23:24
**difficulty** 19:9
**direct** 39:4 182:11
**directing** 99:16
**direction** 207:13 218:11
**directive** 91:21
**directly** 46:13,25 73:3 145:4,11 146:3 152:6,8 177:7 202:6 204:6
**director** 36:11,19, 22,23 37:21,24 38:14, 22 64:9 177:8,15 178:6,19
**disability** 21:5,6,8 52:9 140:6,9,16 141:14 142:8 148:17, 19 167:8
**disagreeing** 203:6

**disagreement** 19:9 98:5 180:23
**disbelieve** 75:4
**discipline** 176:24 215:15,17
**discovery** 136:20, 25
**discrimination** 20:2,6,7 21:6,19 52:9, 10
**discriminations** 20:12
**discuss** 30:8 70:8 71:12 78:6 118:24 138:16 153:3 194:11, 15 212:21
**discussed** 57:12 70:17,18 71:14 194:16 201:22
**discussing** 57:24 69:17
**discussion** 35:10 41:12 52:23 56:12 57:16 67:7 69:20,21 71:8 79:19 83:18 130:25 164:9 173:15 175:4 191:15 194:21 196:8 205:2
**discussions** 28:19 60:17 73:3 103:17
**disorder** 159:11
**distinguish** 86:19 87:6
**distinguishable** 31:1
**distributed** 95:18
**division** 179:20
**divisions** 176:23
**doable** 59:11 60:4, 18
**doctor** 58:12 161:7, 10 163:5 165:10
**doctors** 55:25
**document** 35:25 36:2 61:11 97:7 131:24 139:6 142:14 172:12 188:7 189:14, 15 193:7 200:15 210:4
**documentation** 77:20 111:4 129:10 138:4,13,20 140:1,2, 5,14 141:5,6,19 142:7,25 143:5 145:5, 12,18 146:5,12,17 147:8,11 148:4 152:9 153:12 154:21,25 158:25 159:25 160:4 161:9
**documented** 141:2
**documents** 53:20 54:2 103:7 127:8

210:3
**door** 123:21
**doubt** 114:4 145:14
**doubts** 201:9
**dozens** 24:5
**draft** 180:12,14
**due** 69:7 73:24 74:13 128:4 167:8 196:16
**duly** 6:4 218:9
**duration** 126:23 129:13,17,18 130:2
**duties** 85:8,10 86:13 106:19 109:19 110:25 111:1 112:25 141:11, 13,15 160:6 162:10 163:11 165:1,16 166:1,10
**duty** 56:5,6,7,10 73:21 82:1,6,9,14 83:23 84:1 88:17 92:20 98:22 100:23 102:20 103:11 107:1, 12,17 108:18 109:6, 16,24 110:6,16 111:13,16 114:10,14, 24,25 115:10,12 116:3,4 120:24 121:2 123:1 124:13,15,16, 24 125:14 149:23 158:22 161:1 179:1

**E**

**earlier** 127:20
**early** 53:22 113:5 168:13
**easier** 173:5,6,8
**education** 27:6 169:15
**educational** 26:20
**EEO** 13:13 27:19 36:6,9,15,21 38:23 46:14 47:10 51:25 68:9 69:21 178:19 214:19
**EEOC** 183:6 211:18
**effect** 59:11 60:5
**effective** 28:2
**effectively** 28:8
**effort** 175:8 211:17
**efforts** 40:5
**egregious** 185:22
**elaborate** 140:8
**Elaine** 182:23 187:3 190:6 194:12 196:12 198:14 207:11,13,16, 19
**electronic** 189:18
**electronically** 133:5
**eliminated** 160:2
**email** 54:9,20 58:23 66:20 67:11,13,15

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

69:25 73:20 77:2
80:2,9 109:2 112:25
126:3,9 130:19 132:3
135:23 136:1 137:3,4
138:4,9 142:23,24
144:2,11,18 146:16
149:3,24 150:6,12
156:4,8,10 157:15,16,
17 163:24 172:25
189:17
**emails** 146:17 159:2,
3
**emergency** 56:18
**employed** 12:6 24:3
**employee** 31:6,9,16,
18,19,25 32:1,18,19,
20,21,24 33:1,4,6
39:12,18,20 41:20,21,
22,23,24,25 42:2,4
43:6 44:5 67:23
161:7,8,11 168:20,22
169:4 176:19,20,22
177:10 218:14,15
**employees** 30:10
95:16 179:2
**employment** 14:23
15:3,6,21 21:25 22:1
36:6,10,21 38:23
82:24 124:19 198:12
199:10,18
**end** 8:3 87:1 126:22
131:11
**engaged** 198:10
**ensue** 33:3 47:11
**ensuing** 44:13
**ensure** 82:1,6,9,14
**entire** 155:16 203:24
205:19
**entities** 178:13
**entitled** 143:10
**environment**
185:15 200:2
**equal** 14:22 15:3,6,
21 199:9,18
**errata** 217:12
**errors** 216:1
**escaping** 85:13
**essential** 77:25
78:2,6,9,17,22 79:3,
14,18,25 80:3,11,13,
23 81:4,7,10 86:14,
16,19,22 87:5,9,14,
21,22 88:1,2,11,13,
17,24,25 89:11 90:1
92:20 93:3,4,18
94:15,24 95:4,12,19,
22 96:2,6,11,21 97:1,
10,14,24 98:1 99:1
100:18 101:3 102:25
103:3,11,16,19
105:25 106:1 109:10
110:20 111:2,22,23,

25 112:5,18 113:6
114:9,17 124:12,24
125:1,3,16 130:1
135:3,5,12,22,25
136:2,4 140:7,10,17,
24 141:4 142:8
148:20 155:3 158:9,
15,19 159:15,21
167:7
**essentially** 75:5
**established** 99:12
**estimate** 25:6,18
**et al** 66:21 138:5
149:2
**evaluation** 183:21
**evasion** 119:9
**evasive** 118:12
**event** 68:15 76:16
165:17
**events** 17:19 145:16
183:12,20 184:15
185:1,2,14 206:18
**eventually** 46:17
**everyone's** 122:17
**evidence** 121:6
178:23 179:10
**evident** 167:16
**exact** 22:16,18,20
23:12 25:2,7 37:7,8
38:6 134:1 145:15
148:1,9 214:4
**examined** 193:11
**examples** 19:3
172:5 208:21
**Excellent** 210:1
**exception** 11:9
198:14
**exchanges** 41:17
**excluding** 97:15
**exclusively** 66:8
108:6
**excuse** 27:25 49:3
171:1
**excused** 160:6
161:25 162:10 163:11
**Executed** 187:24
**executive** 177:8
**exempted** 158:21
161:17
**exhibit** 34:23 35:3,
13,23 41:15 54:8,13,
19 61:1,5,6,9 62:12
66:19,24 67:1,14
95:9,11 97:6 103:25
104:2,8,10,20 105:9
126:1,8 127:4,5,18,
23,24 128:3,17
130:17,22 135:23
138:3,8,19,23 142:16
144:1,5,7 148:24
149:1 150:2,4 155:24
156:1,16,18 160:5

163:23 168:10 171:24
180:2,3,7 182:18,22
187:3,10,14 191:2,3
194:19 195:20 197:8
206:22 207:14
209:20,24 213:13
**exhibits** 182:22
194:5
**existing** 107:16
**expand** 32:10
**expect** 83:11 165:23
**expectation** 90:21,
22 166:18
**expectations**
165:24 166:21
**expected** 8:3 83:22
84:1
**expedites** 135:10
**experience** 96:20,
24
**experienced** 177:5
**expert** 23:22 67:25
88:12
**expertise** 95:21
**experts** 103:5
177:11
**expires** 218:22
**explain** 21:18 100:6,
8,12 109:2 116:18
117:12 118:8 135:21
136:6 154:1 155:12
185:12 186:6
**explained** 136:1
**explaining** 145:17
**explanation** 76:5,8
135:11 154:6
**explanations**
145:20
**exposed** 23:7
**exposure** 27:14
**express** 39:18
41:15,24 87:19
**expressed** 41:19
**extend** 206:25
**extensive** 26:22,23
27:14 143:5
**extent** 27:19

―――――――――――

**F**

**face** 63:5 73:4
132:16,17,20 181:6
**face-to-face** 69:17
72:19
**facility** 56:9,19
143:7 178:8
**fact** 15:16,20 17:9,
13,15 18:2,6,13,16,
19,23 19:4 21:11
27:19,24 28:2,11
33:2,9 40:5,8,16
45:17,21 46:3,7,10
47:5,7,10,12,13,23,24

48:8,14 49:22,23
50:11,13 70:24 116:2
141:12 170:5 173:25
174:1,5,16 175:24
183:5,20,22 189:13
193:20 194:1 195:15
196:10,20 197:8
200:15 202:20 208:6
214:4,19
**factor** 95:19,22 96:1,
10,14,18,21,25
129:23,25 184:9
**facts** 40:12,17,21,23
41:6 47:3 48:21 49:9
200:20 208:7 209:12
**factually** 122:23
196:23
**failed** 141:8
**fails** 199:7
**failure** 118:11
**fair** 7:11,12 92:7
194:10,20
**fairly** 26:22,23 27:14
104:7
**fairness** 90:22 91:4
92:14 202:16
**falls** 66:3
**false** 176:2
**familiar** 29:14,17
66:1 104:14 209:15
**familiarity** 183:7
**fault** 7:18 12:25
18:12
**February** 10:3
149:2,15 153:2
**feel** 73:8,11 76:17
130:6
**felt** 189:25 190:3
207:20
**female** 183:13
184:16
**figured** 6:19
**file** 143:4 172:23,24
175:10,17
**files** 53:4
**fill** 106:21
**filled** 108:7,16
111:16,19,21 124:15
139:9 201:2
**fills** 189:5
**final** 63:7,22,25 66:7
82:2 180:12,14 197:7
**financially** 218:15
**find** 32:21 48:4
124:19 152:3 166:19
184:7 198:22 213:23
**finder** 17:9,13,16
18:13,16,19 27:24
28:2 47:13 170:5
**finders** 174:1
**finding** 15:16,20
18:2,6,23 19:5 21:11

27:19 33:3,9 40:5,8,
16 47:10,24 48:8,14
49:22 50:11 131:24
173:25 174:6,16
183:6 184:5,7 193:21
194:1,6 195:8,15
197:8 199:20 200:15
208:6 214:19
**fine** 14:3 49:20
103:8,25 107:22
117:2 133:19,20
205:5
**finish** 7:22 43:13
60:13 99:20 117:17,
22,25 118:3,24
121:23,24 122:10
135:15 159:7
**finished** 99:6 122:14
135:17 159:7
**fit** 116:10
**focus** 22:23
**folder** 181:21,24
**follow** 38:12 72:15
117:20 119:21 163:24
175:14 177:21,24,25
199:2
**follow-up** 164:20
192:4 193:4 206:21
**foregoing** 217:7
**forget** 7:2 9:21
204:19
**form** 17:18 79:18
126:15,16 139:9
171:5 172:9 184:23
185:3,5 214:15
**formal** 22:9 56:1
58:12
**formality** 68:14
**format** 23:6,20 24:23
157:20 172:12
**forms** 29:25 30:3
**forum** 47:19
**forward** 57:3 111:5
172:22 206:20
**forwarded** 112:23
**Foster** 181:3 187:10,
19,23 189:22 194:13
196:13,25
**found** 33:5 137:5
**frame** 55:7 57:6
**free** 130:6 164:24
212:20
**freeing** 174:11
**Freeman** 36:13,16
38:25 39:2
**friday** 85:2 137:22
**front** 105:3 167:16
**Fuehrer** 37:25 38:8
52:11 177:8
**fulfilling** 81:17
**full** 6:25 8:16 48:8,14
99:19

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

full-time 98:10,22 100:22 102:19 108:5,16 109:4 114:23 149:14
fully 99:19
fun 138:25
function 78:2,6,9,17 79:3,14,18 80:1,3,11,23 81:4,8,10 86:19 87:6,21,23 88:1,2,11,17,24,25 92:20 93:3,4 95:17,18,19,22,23 96:2,5,6,10,11,14,22 97:1,10,14,22,24 99:1 100:17 101:2 102:24 103:11,16,19 105:25 106:1 111:2,23,25 112:5 114:9 124:13,24 125:1,16 130:1 140:24 141:4 155:4 158:9,15,20 159:15,21 171:13 172:25
functions 78:23 80:13 86:14,16,22 87:9,14 88:13 89:11 90:1 93:18 94:15,24 95:4,12 103:3 108:23 110:20 111:22 112:18 113:6 114:18 125:3 135:3,5,12,22,25 136:2,4 140:7,10,17 142:9 148:18,20 167:7 214:20
funny 157:20
future 140:19 172:5

G

G-R-E-E-N-W-I-C-H 9:8
gag 213:2
games 129:3
gave 32:11 94:5,10 136:19
gender 20:19 30:17 52:9
general 30:14 33:16 98:12,14 134:5 173:18,21 178:11
generally 22:17 42:19 134:4 145:22 194:4
genitalia 208:23
get all 59:13
gist 173:18
give 12:3 19:3 24:23 25:18 26:9 34:20 55:6 65:14 94:2,8,9 97:3 99:18 104:24 117:6,10 118:11,15 124:1 154:10 155:12 164:4 193:3 203:18 204:13 205:12 208:21

giving 39:16 91:21 218:8
goal 172:3
good 7:13 8:4,15 17:8 25:22 44:19 55:1 67:14 75:8 132:23 215:18
grab 34:11,14,15
grabbed 33:18 34:9
gradate 186:9
gradated 186:11
gradual 149:23
gradually 153:13 154:21
Graduated 10:21
graduation 11:21
grammar 128:24
grant 64:10
granted 125:21,22
gravity 185:8
Greenfield 218:6,21
Greenwich 9:6
Groundhog's 10:3
group 19:6 42:11
grow 10:16
guess 12:25 15:2 22:20,22 24:8,10,12,20,21 25:1,13,15 134:8 209:13
guy 70:25 174:9

H

Hammond 6:15
hand 35:2 54:12 156:15 164:2 188:13 218:17
handbook 28:11,13, 14,17,24 29:1,3,4 66:13 78:12,16,25 79:4,10,13,15 80:5,9, 18,20 81:3,7,11,24 82:5,11,16 87:12,16, 23 88:3 89:1 93:6 95:12 97:9 103:18 104:3,11,12,21 105:6 130:2
handing 188:16
hands-on 12:12
handwriting 162:25 140:3,18,19 171:18
happen 16:25 123:7 140:3,18,19 171:18
happened 46:2,10 184:18 188:14,15,19 201:7
happy 7:8
harass 30:19,20 31:17
harassed 39:13
harasser 194:2 210:8,17,20 211:20 212:1,7,16,22 213:7,14 214:7,17,24

215:11
harassing 32:9,13 44:6 45:6 46:9
harassment 15:13 17:18,22,24 18:3,6,20 19:18,19,20 21:19 23:4,13 24:14 26:19 28:1,22 29:7,18,21,25 30:7,17,23,25 31:2,6, 13,17 32:2,9,19 33:1, 8,12 36:4 39:10,24 40:1,7,25 41:8,17 44:14 47:15 52:6 168:12,17 169:3,15 171:11 172:3,6 175:13,19 176:3 178:2 180:9 184:8,10 185:9,16 186:24 187:1,2,4,6 190:21 194:7,12 198:19,22 199:8,16,20 200:3 201:13 208:6,8,10 209:3,7,15,21 210:7, 13 211:10,12,19 213:1,19 215:6
hate 118:10
head 44:17
heading 36:2
health 11:14 69:8 73:24 74:14,20 126:14 128:5
hear 59:17,18,20 82:8 90:23 91:4,7,20 92:11 194:1 204:16, 22 205:24
heard 94:20 120:18
hearing 57:3 129:8
held 177:16
helpful 54:6 62:7,15 111:7,11,14
helps 29:10
hereinafter 6:5
hereof 217:13
hereto 217:12
hereunto 218:17
hey 174:8
hierarchical 36:20
Hierarchy 85:15
high 10:21 164:20
highly 176:5
hint 33:18
hire 106:20,24
hold 12:21 195:4
holding 25:7 192:2 197:8
holds 80:12
holiday 153:3,4
holidays 57:2 160:7 162:11 163:12
home 9:16 83:25
hope 54:22 55:12,14 83:13

hospital 9:22
hostile 185:15 200:1
hour 56:9,21,23
hours 97:25 98:9,10, 21 100:22 101:5,21 102:18 127:19
How's 123:21 164:6
HR 138:14
human 67:25 103:5 176:16,19,20,23
hypothetical 125:4, 15 140:22 175:25 176:10 177:18 179:4
hypothetically 120:22 121:12 122:24 124:10,23 125:2

I

ID 104:24 156:15
idea 7:18 24:3 25:13 43:12,15 98:9 132:23 158:18 176:15 178:25
ideally 172:5 189:15
identification 34:25 35:14 54:10 61:3 66:22 95:13 104:5,22 126:4 130:20 138:6, 21 144:3 149:4 150:7 156:5,20 163:25 182:20 187:12 209:22
identify 35:25 54:19 67:14 104:9,10 105:5 139:6 199:22
identifying 108:15 173:23
ill 83:21,25
imagine 169:17
immediately 175:10 211:18
impact 96:5
impair 147:8
impaired 140:16 159:14,20
impairing 140:6,9
impairment 141:4, 14 155:3
impairs 142:8 148:19
impart 23:23
implication 31:22
imply 89:4 93:9
importance 49:15, 16 164:21
important 7:21 47:5, 12 48:9,15,18,20,24 49:4,9,21 50:11 80:21,24 98:25 100:16 101:1 102:23 132:25 134:25 157:25 173:13 175:11 194:8
imposed 213:2

impression 209:11
improper 176:6
inadequate 147:14
inappropriate 177:7,19 183:15 198:11 200:8,11,17 202:20 207:7,11,25 208:3,4,12,14,17,19 209:1,4,8,10
incapable 116:1
incidents 183:14,17 184:6
include 76:5 171:25 178:5 189:10
included 23:3 50:5 76:2 137:16 143:5 151:17 203:22 205:17
includes 29:12 114:10 199:4
including 52:11 87:19 194:22 201:20 212:21
incumbent 96:14,24 97:25 175:13 177:20, 22 203:14,16 204:9, 11 205:8,10 206:1,5
incumbents 96:20
indication 170:13 184:20 190:2 198:13 199:19
individual 42:20 132:25 176:12 177:5
individually 131:17
individuals 76:24 196:15,25
inform 112:4,8 148:7 165:25 167:17
information 53:24 62:21 63:6 111:7,11, 12 133:3 141:7,8 145:23 147:5,15 156:2 159:9 163:15 166:22 173:23 174:2, 6,10 189:9,10
informative 111:4 113:9
informed 33:4 76:15 77:18 80:22 103:4 112:7 127:9 140:16 171:10 190:8,11 198:13
informing 24:18 91:10 103:15 109:9, 15 110:20 166:17 190:5
informs 111:21
initial 140:14 177:2,3
initially 47:16 48:10, 16 51:24
injured 176:12
innuendo 168:21

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

inpatient 108:25 143:7
inquiry 129:3 177:2, 3
Inspector 178:10
instance 47:8 83:5 140:21 167:6 206:14 207:19
instances 198:20 199:23
institute 21:25 22:1, 2
instructions 126:14
insufficient 147:6
integrated 85:10
intent 189:4,8
interacting 174:16
interaction 189:25
interactive 65:23 69:24 104:21 105:6
interest 52:15
interested 18:2 131:24 166:14 177:24 218:16
Internet 172:14,18
internist 165:12
Interpersonal 19:11
interrupt 8:4,7 59:21 90:20 170:17
interrupted 90:18 91:12 154:2
interrupting 91:15 99:6,8
interview 188:20 195:21,22 197:20
interviewed 46:18 200:23
interviewing 96:1
interviews 182:11 195:14 200:22
intranet 172:13,16
investigate 40:21 49:2
investigating 209:6
investigation 15:12,16,20 21:11 33:3 34:24 36:3 40:2, 8,17 47:2,10 48:9,14 49:22 50:12 208:6
investigations 15:7
involve 31:7
involved 15:12 135:2 169:20 179:6 193:8 215:16
involvement 193:2
involves 31:2,3
involving 18:16,19 26:19 183:12 184:15
irrelevant 75:6,7 113:16,17,18 140:19 190:22 206:16

irrespective 88:3,25 93:5
issuance 215:14
issue 15:13 18:1 33:8 72:8 98:5 152:25 166:1 167:19 183:6 213:1
issued 37:6 195:5
issues 17:22 18:16, 19,20 19:4 20:2,6 21:6,20 22:3 23:3 26:18,25 27:16,20 28:20,23 201:11 215:5

**J**

January 14:2,4,12 144:19 146:22 147:21 149:7,22 150:17,24 151:4,7,8,9 152:22 157:4 164:17
Jelena 67:22 103:6
Jessica 187:18,22 189:22 194:13 196:12
job 12:10 65:19 81:15,19 85:18,19,20, 21 86:12,14,20 87:7, 13,20 88:16 92:18 95:25 96:1,4,8,10,21 97:14 103:12 111:13 114:8,13,23,25 115:1, 12,16 116:4 140:25 148:18 167:18
jobs 85:8,10 86:7 96:25 166:11,12 167:4,11
Johnson 6:15 16:2, 5,8,12,16 21:15,21 28:3 30:11 31:10 32:3 34:3,7,11,15 35:20 37:2,14 42:17 43:2,8 44:7 45:12,19,22 46:1 50:1 51:5,8 52:18 53:10,15 55:1 58:3,19 59:12,15,20 60:6 61:7 62:4,13 71:5 72:9 74:16 75:12,20,23 76:4 82:25 85:17 91:16,23 92:8 94:6 99:3,14,21 100:1,7,10 101:11,14,20,23 102:3,10 106:10 107:25 109:7 110:7, 11 116:9,12,15,22,24 117:3,15,20,24 118:18,23 119:2,4,9, 15,24 120:2,6,14 121:10,13,19,22,25 122:4,9,13 123:4,8, 11,16 124:4 126:18 130:23 133:16 136:14,19 137:1,7,12,

15,19 138:25 142:17, 20 143:16,20,24 153:23 154:3,7,12 155:5,10,18 157:19 164:5 168:6 170:16 179:14 180:2,6 189:6 191:2 195:24 203:8 204:15,20 205:22 212:13 215:23
joke 129:2
jokes 198:11
July 218:22
juncture 113:18 126:20 128:18 141:22
justification 91:15, 19 134:10

**K**

K-A-F-E-R 8:20
Kafer 6:1,7,15,20 8:18 13:15 22:24 34:23 35:4,13 36:1 43:15 66:21 74:8 85:5 89:21 126:2 130:18 131:7 138:4 145:2 150:6 152:6 156:4,18 163:24 180:20 202:16 203:25 217:6,15
Kafer's 35:18
Karin 174:11 190:25 191:19 192:4,17 197:16,20
Kevin 61:19 62:1 68:4
key 113:8
kidding 10:9
kind 11:17 14:22 15:12 17:24 18:1 19:8 20:2 21:3 25:3 27:24 28:6 30:17 31:21 43:6,18 45:4 57:6 141:7 145:20 157:19 168:19 172:9 175:1 176:4 179:1,2 185:7 186:15 187:17 197:25
kinds 17:15,22 18:5, 22 19:4 20:12 21:6,12 24:24 27:5,20 86:8 173:19 175:3,9 178:9 211:22
knew 51:10 78:19 81:3 89:15 161:16
knock 123:20
knowing 74:2 113:1 155:9 166:23 179:16
knowledge 21:13 23:23 26:24 28:6 58:21 64:16 65:14 79:12 80:19 81:6 83:7 97:9 98:24 100:16,20 101:1,5,6,7,18,21 102:2,23 157:17

167:15 168:15 170:4 180:23 186:18 187:21 189:1 192:25 194:21 203:2 215:14
knowledgeable 80:13
Kramer 139:9 159:4 160:20,24 161:19 162:22,23,24
Kramer's 159:9,24

**L**

L-A-W-R-E-N-C-E 9:1
labels 13:1
labor 67:23 176:19, 22 177:10
lack 17:19,21 18:1
large 143:4
lasted 195:23
Lastly 57:1
late 56:5,6,7,10
law 16:1 17:5 21:25 22:1,6 30:15 199:10, 18
lawful 6:1
Lawrence 8:24
laws 21:14
lawyer 33:22 122:22
lawyers 7:17 22:4
lead 42:13,15,19,24 43:5,15
leads 43:10
learn 59:7,25
learned 52:3,5
leave 39:6 53:23 90:4 106:7,14,17 107:20 124:18,25 125:4,7,17,18,19,22
led 127:25
left 168:12 174:7 190:1
leg 141:1
legal 21:18 22:8,10 27:3 199:7
legitimate 106:13
length 77:14,17
Leshelle 36:14 46:18 50:23 174:5 178:20 180:20,24 181:13,14,20 186:14 194:16,22 195:1
lets 111:15
letter 61:16 144:18 151:16 156:19 157:18
level 49:15,16 174:17,20 187:5 199:16 208:8 211:12
license 11:15,18
licensure 22:11
lifetime 155:17

light 183:12 184:15
limited 18:3 136:18 160:8 162:12
Lisa 6:15 33:25 173:2
Lisan 6:11,14,20 36:5 46:8 47:15 49:24 50:14 51:3,22 52:7,8 54:9,16,21 55:8 57:12,22 58:9,16,18 59:9 60:2,8,15 61:12 62:9 65:21 67:20 68:23 69:6,12 70:11, 20 72:19,25 73:4 74:19 77:20 83:15 105:1 107:13 110:15, 21 111:1 112:17 113:12 114:6,7,17 120:23 124:10 126:3, 10 127:7,16 128:3,8, 13 130:19 131:6,14, 16 133:1,24 134:9 138:5,12 140:3 144:2 145:17 146:8,24 149:12 150:5,12 152:14 156:2,19,24 157:23 158:18 159:2, 10 160:1,17,25 162:10,15 163:17,24 164:18,23 167:13,14, 24 170:12,25 171:1 172:21 173:5,8 183:15 184:21 186:19 187:2 190:3,8 192:24 193:23 194:11,15,22 195:14,21 196:5,22 198:10 201:12,23 202:7,17 203:1,12,16 204:11 205:10 206:16 210:25 211:2
Lisan's 17:9 53:5,25 59:6,24 64:4 73:18 74:25 76:23 77:1 103:22 107:20 109:21 110:3 139:22 140:25 141:9 158:3
list 26:13 210:9
listed 11:9 97:23 130:1 171:24
listen 16:23 74:9 89:20 101:22,23 102:4 204:5
listened 24:2
listening 10:10 202:24,25 203:2
LISW 61:17
live 9:2
lived 9:10
local 178:19
long 9:10 12:12 53:19 56:12 65:8 77:7,21 123:18,20

129:20 184:2 195:23
196:17
**long-standing** 69:6
128:3
**longer** 141:1
**loose** 79:18
**Lorain** 9:4 10:1
**lost** 100:20 141:1
174:3
**lot** 40:3 75:16 105:11
166:10 167:4
**loud** 54:23,25
**LRAC** 13:2
**lunch** 191:12

---

**M**

**M.D.** 36:5
**made** 15:25 17:4
32:7,17 47:13 50:20
51:3,21 64:23 74:1,6,
19 77:3 113:12
125:20 133:24 134:1
142:14 146:12 147:1
170:11,14,24 171:1
174:23 191:24
193:18,20 194:3,19
197:15 201:14,19
202:8,20 206:8 207:6,
24 214:23 217:13
**main** 206:6
**major** 166:1
**make** 17:2 24:25
27:12,13 31:21 40:14
44:9 45:17 63:18,20,
22 74:21 76:15 87:25
88:9 98:15 99:23
115:18,22,23 118:9
129:17 139:23 161:12
164:23,24 170:19,22
173:22 176:2 177:1,2
207:11 213:10
**makes** 33:1 41:21
174:21
**making** 48:8,11,13,
17 49:22 50:11 55:21
57:7,13,15,22 58:17,
25 63:24 65:21 66:12
74:22 81:5 82:2 87:12
116:1 133:22 149:13
187:22 193:6 198:18
**man** 30:20 75:7
**management** 13:8
33:2 42:4,6 43:6,10,
22,23 44:10,11,12,25
48:23,25 49:12 52:11
125:20 175:18
177:17,20 179:7
193:5 199:24
**manager** 36:7,10,
12,21 38:24 173:21
175:11,23 176:13
178:24 211:25

214:19,22,25
**mandatory** 169:21
**manual** 28:10
**March** 37:13,16,17
85:2 192:5 218:18
**Marciano** 61:2
**mark** 20:25 46:3 56:2
87:1 128:25 134:22
182:16
**marked** 26:12 34:24
35:3,14 54:10,12 61:2
66:21 95:13 104:4,22,
25 126:3 130:19
138:5,20 144:3 149:3
150:6 156:4,19
163:25 164:2 182:19
187:11 209:22,24
**marking** 35:17
**married** 9:17
**Master's** 11:12
**math** 10:6
**matter** 6:20 17:24
22:19 23:22 40:6
64:14 67:24 70:24
88:11 103:4 109:4
177:11 188:22 198:17
**matters** 17:15 18:3,
6,14 69:22 135:10
**MCP** 171:22 172:7
175:14,15
**meaning** 76:23
79:20 152:21 158:3
177:25
**means** 30:7 36:9
38:16 56:10,14 73:23
74:1,13,18,19 87:23
108:10 113:1 185:12,
13 198:7 212:25
218:10
**meant** 113:10,13
114:1 130:9 133:14
**measure** 199:25
**mediate** 171:14
**mediation** 211:16
**medical** 12:2 36:11,
18,22,23 37:20,24
38:13,22 64:9 80:15
111:4 129:10 138:4,
13,20 139:25 140:4,
14 141:5,6 142:7,25
143:5,14,17,21 145:5,
12,18 146:4,12,25
147:8,11,15 148:3
152:9 153:12 154:20
158:25 159:4,9,24
160:4 161:6,9 165:10
171:20 172:8,20
175:16 177:15 178:5,
18 209:25
**medically** 56:23
**medicine** 62:6

**meet** 73:12 76:18,23
130:13 131:16,18,20,
22 132:2,16,23,24
133:1,4,6,11,13,14
137:24 141:9,25
147:8 148:15,16
166:5 199:25
**meeting** 53:16 69:18
70:19 71:13,15,19,22,
23 72:1,19,20 132:19
138:13 144:2,23
146:7,9,14,15 150:5,
22 151:1,6,8,9,17,21,
22 152:4,13,16 156:4
191:19 196:1,4,10,21
197:3,13,16,19
201:25 202:1,10,22,
24,25 203:1,21,24
205:15,19 209:2,3
**meetings** 23:8 26:19
169:15
**member** 44:12 45:4
69:6 128:4 177:17
**memory** 192:10
202:3
**mental** 11:14
**mention** 57:16
**mentioned** 182:24
197:17
**merits** 190:20
**message** 111:2
141:24 145:17,23
157:3 159:1
**met** 199:21
**Microsoft** 172:11
**middle** 8:21 105:12
**mince** 57:17
**mind** 103:14 130:11,
13
**minute** 35:5 52:19
88:6 139:3 150:9
**minutes** 123:21
**mischaracterizes**
51:6
**missing** 140:4
157:23 199:22
**mistake** 15:25 17:2,
5
**misunderstood**
186:1
**modalities** 132:6
**moment** 19:24 20:16
73:6 116:16 163:10
187:14 213:23
**Monday** 67:17
127:16
**months** 106:8
**morning** 67:18
127:5 131:17
**motion** 118:9
**motivation** 184:15

**move** 111:5,18 122:5
148:8
**moved** 111:20
**moving** 164:7
**MSN** 6:1,7 85:5
217:6,15

---

**N**

**names** 22:16,18,21
**National** 21:1
**nature** 9:2 23:12
43:19 48:19 69:20
73:1 177:14 179:13
183:16 207:25 211:19
**necessarily** 48:3
103:2 188:23
**necessity** 211:21
212:2
**needed** 91:14 111:5,
10 126:15 133:2,5
140:2,5 141:9,24
142:4,5 145:18
146:13,18 147:5,7,9,
12,19,23 148:5,7
179:12
**negative** 167:22
**nights** 160:6 162:11
163:12
**nomenclature**
42:23
**normal** 68:3 106:13
**North** 9:6
**notable** 153:17
**Notary** 17:3 41:5
48:13 49:8 50:10
51:19 59:23 74:12
79:8 82:14 87:4 89:23
92:17 93:24 94:12
100:15,21 102:7,12
110:1 159:19 202:13
204:8 205:7 218:6,22
**notation** 140:20
**note** 47:7 61:2
138:24 219:1
**notes** 60:20 181:17,
18
**notice** 137:10 188:3
218:14
**notified** 152:15
**notify** 178:2
**noting** 160:18
**notwithstanding**
33:22
**number** 13:4 25:2,7,
11 26:17 33:4,5 35:18
39:20 43:6 85:8 95:16
101:5 161:3,23 162:2,
3,9 163:16 169:13,17
191:1,25
**numbered** 157:13
**numbers** 186:2

**nurse** 11:18,24 12:7,
20 13:10,12 86:5
**nursing** 11:12,13,15

---

**O**

**oath** 7:4
**oaths** 218:7
**object** 16:7 62:13
75:20 116:22,24
133:16
**objected** 16:6,13,20
120:3
**objecting** 45:21
120:3
**objection** 16:2,20
21:15,22 28:3 30:11
31:10 32:3 37:14
39:19 42:17 43:2,8
44:7 45:19 50:1 51:5
58:3,19 72:9 74:16
75:12 82:25 106:10
107:25 109:7 110:7,
11 118:24 179:14
189:6 195:24 203:8
212:13
**obligated** 83:12
**obligation** 56:21
64:22
**observations** 29:5
**obsessive-
compulsive** 159:11
**obtain** 11:6 40:12,17
184:13 209:12
**obtained** 26:8,10
182:10
**obvious** 118:15
**occur** 114:20 145:19
176:9,11 198:23
**occurred** 40:25 41:8
42:5 44:13 45:10,17,
21 46:3,5 122:24
176:25 177:19
183:17,20 184:2
193:2 196:17 207:21
209:10
**occurring** 200:8,12,
18 206:15 208:12
**occurs** 56:7
**offended** 184:21
190:17
**offending** 171:16
**offense** 176:3,4
**offensive** 31:7,14,19
32:1,8,13,22,25 33:5
39:21 41:22,23,25
43:19 44:5 45:6
168:22 170:15,23
171:11,14 174:23
175:5 185:9
**offensiveness**
39:19
**Offhand** 20:16

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

office 9:24 13:8,14
46:14 47:10 51:25
70:21 72:25 73:2
178:20,22 179:6,20
190:1 218:17
officer 61:20 62:2,3,
17
official 48:25
177:20,22 186:15
199:24 210:22 212:8
213:16 214:8 215:2,4
Ohio 9:6 10:20 11:19
218:4,7,17,22
on-call 73:21 84:1
88:17 92:19 98:22
100:23 102:20 103:11
106:19 107:1,12,17
108:18 109:5,16,19,
23 110:5,16,24 111:1,
13,16 112:25 114:10,
13,24,25 115:10,12
116:2,4 120:24 121:2
123:1 124:13,14,24
125:14 127:1,3,10,13,
17 128:19 129:5
141:11,13,15 149:23
160:6 161:1 162:10
163:11 165:1,16
166:1,10
on-line 23:8,11,19
24:1,13,17 26:4,18
27:14 169:16
one's 88:2
open 114:12 129:8
132:19
operating 56:22,24
183:16 208:1
opinion 123:10,25
124:1
OPM 13:8
opportunity 14:23
15:3,6,22 35:22
135:21 146:14 155:12
199:9,18 203:18
204:14 205:13 215:25
opposed 31:22
option 88:22 93:1
165:25
order 27:23 28:1
29:24 31:16 32:18
39:23 86:18 87:4
176:5 211:3,19,25
213:2 214:4,24 215:1,
9,10
ordered 210:19
212:6 213:14
orders 215:15
Organizational
85:15,17
origin 21:1
original 48:21 49:10

originally 57:2
outpatient 13:9,12
166:12
overnight 108:25
overview 109:10

**P**

p.m. 85:2 126:10
127:15 131:12
150:18,19
Page/line 219:3
pages 28:14
paging 165:16
Pam 75:23 215:24
216:4
Pamela 218:6,21
paragraph 97:18
157:10 158:2 198:3
parallel 27:18
parameters 153:8
Pardon 173:7
Park 82:18 105:14,20
part 12:9 20:3 24:14
55:13 56:16 61:11
65:19 81:25 85:9,13,
20 98:19 102:16
108:21 137:2 157:23
172:2 175:23 193:20
194:1 200:18 203:4
208:3 211:17 217:13
participate 69:9,13
73:21,25 74:15,24
82:19,23 83:10
105:15,21,23,24
128:6,9,14 135:9
participates 63:24
participating
118:16 119:5
parties 218:15
partly 55:6
partner 6:16
party 171:16,17
218:12
pass 54:14 62:21
63:6 139:17
past 14:16 96:20
patients 12:9,12
108:24 183:16 208:1
pattern 208:19
pending 34:4
people 70:21 71:3
74:21 82:1 106:8,18
132:2 145:20 167:5
173:23 174:17 190:23
202:25 203:10
perceive 179:22
percent 14:3,7,17
percentage 14:3
perennial 7:16
perform 95:17,22
96:14 112:17 114:5,7,
17 124:23 125:1,3,16

140:10 141:15,16
167:7 214:20
performance 95:18
140:6,17 142:8
148:20
performed 97:24
performing 96:5,7,
10 134:12 141:11,12
period 55:9 106:7
115:22 120:24
permitted 100:10
154:14
person 7:19 32:11
38:7 42:13,21 43:5,6,
16,17,22 44:3,15
48:11,16,22 49:11
64:3 70:19 103:6
106:21 126:11 130:14
131:17,19 132:12
161:5 181:10 185:13,
17 186:7 188:12,23
189:5,13 199:23
200:1
personal 88:23 93:2
156:2
personally 160:25
181:6
Personnel 13:8
persons 62:17 178:3
perspective 170:4
pertain 183:14
pertaining 23:3
phone 69:19 70:5,15
71:24 72:20 130:11
195:23 196:1 197:4,
13,17 203:24 205:19
phrase 20:8 23:1
30:9 135:23
physical 30:3 31:1
physically 55:9
physician 65:20
165:10 167:12,14
physicians 166:11
167:13
pick 88:1 207:3
pieces 111:9
pin 37:18
place 143:6 189:11
218:14
Plaintiff 6:2
Plaintiff's 34:23
35:3,13 54:8 61:1
66:19 95:11 104:2,20
126:1 130:17 138:3,
19 144:1 149:1 150:4
156:1,18 160:4
163:23 182:18 187:10
209:20,24
planned 57:2 150:23
152:15
play 14:22 62:17
63:1 129:2 174:11

plays 172:2
pleasure 53:16
point 15:24 33:3
40:2 50:21 118:5
120:13 127:12 140:13
149:21 207:2
pointed 170:18
points 97:18 113:8
police 192:18,20
193:1,11
policies 29:8,9,12,
15,18,21 66:15 82:10,
16 89:5 93:10 103:18
172:20 173:19
policy 66:13 171:20
172:8 175:16 187:2
199:8,17 209:17,25
position 12:16,18,
20,21 13:1,3,11,23
14:6,11 15:25 17:4,7
44:10 45:1 77:25
78:3,21 80:1,11,12
85:9,23 86:2,4,6
88:13 89:6 93:12 95:5
97:23 99:1 100:18
101:3 102:25 103:19
108:5,7,15 109:4,15,
18,22 110:4,17,23
111:15,20 112:1,4,6,
18,24 114:9,11
115:10 120:25 122:25
124:11,14 125:11,13
130:1 158:9 159:16,
22 160:2 164:25
165:3,5,7,9,18,21
166:8,19,24 167:8
170:5 177:16 183:19
positions 85:21
86:8,11,12 110:22
124:17 125:10
positive 167:22
possess 22:12
possession 134:20
possibly 52:19
130:4 147:24 151:18
159:2 162:15 171:17
173:11 175:7 179:16
212:15,17 214:13,16,
17
postings 167:4,12
potentially 88:5,8
125:24 166:9
practice 147:7
practices 83:8
preceded 92:11
precluded 120:25
preference 134:13
preparation 66:15
prepared 91:12 94:3
prescribe 176:24
prescribed 87:11

present 6:13 14:12
70:15,21,23,25
203:16,23 204:11
205:10,18
presented 179:11
212:12 214:11,16
presenter 23:21
pretty 8:11 57:23
prevent 65:3
preventing 172:5
prevention 175:18
previous 58:15
127:4
previously 59:8
60:1 183:5
primarily 82:18
105:14,20
print 26:5,7
printing 160:21
prior 9:23 11:4 51:6
52:7 103:15 111:3
197:6
private 138:15
privilege 182:1
privy 54:5
probe 40:6
problem 7:16
135:18 159:11
165:15,17 179:12
188:10,12 215:11
procedure 6:4
168:16 176:8 182:9
procedures 170:7
174:13
proceed 111:10
process 18:15 28:7
44:13 65:24 69:25
90:19 104:21 105:6
111:6 112:10 113:4
135:2,8,9 136:4
139:22,23 145:21
146:20 166:3
processes 28:20
processing 53:5
59:6,23 60:16,22
61:13 65:18 81:15
109:13 113:5
productions 136:13
professional 65:8
professionally 89:6
93:12
programs 26:21
27:15
prohibited 30:9
75:17
promulgated 82:4
199:9,17
proper 123:25
prosecutor's 9:24
prospects 166:24
protects 7:25

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**protocol** 38:12 68:3 168:12,16 171:13
**protocols** 39:10
**provide** 53:12 63:9 88:12 167:9 184:7
**provided** 6:3 77:21 129:9,24 140:15 146:17
**provider** 126:15 147:10,13
**providers** 153:14 154:23
**providing** 109:10 166:14,21
**provision** 63:8
**Public** 218:6,22
**pull** 105:9
**punished** 215:12,13
**purpose** 6:2 40:14, 16,20 139:21 208:7 209:2
**purposes** 34:25 35:14 54:10 61:3 66:21 95:13 98:2 104:5,22 123:2 126:3 130:20 138:5,21 144:3 149:4 150:7 156:5,19 163:25 182:19 187:11 209:22
**pursuant** 199:9,18 218:14
**put** 16:20 47:22 48:1 111:9 153:7 181:21 186:2 198:16
**putting** 18:24

**Q**

**qualifies** 186:25
**qualitative** 186:5
**quantitative** 185:24 186:3
**question** 7:1,5,7,10, 22,23 8:3 16:13,17,19 17:1,17 18:8,10,12 20:22,25 23:24 25:25 29:22 34:4,6 41:1,3 45:11,25 46:3,6 48:12 49:5,6,7 50:3,6,8 51:9,17,23 56:1 57:19,20 58:11 59:13 60:8,10,13,21 65:2 69:2,15 70:1,13 74:7, 9,11 75:9,11,13,14, 18,19,21,25 76:3,19 79:7 86:25 87:1 88:7, 8 89:9,24 90:7,11,13, 23,25 91:5,6,9,20 92:3,10,11,16,23 93:13,16,22 94:1,6, 10,13 95:15 99:25 100:4,14,25 101:6,8, 9,15,22,24 102:1,4,9,

11,22 108:2 109:15 110:18 112:11 114:4, 16 115:7 116:17,19, 21 117:8,11,18 118:6, 11,16 119:17,18,22 121:3,14 122:1,2,5,19 123:3 127:10 128:20, 21,22,25 135:16,17 145:25 153:19,22,24 154:4,19 155:2,7 160:19 165:2,18 169:7 176:17 179:19 183:3 187:17 189:3 203:6 204:2,4,6,19, 21,24 205:21,24,25 213:11 214:3
**questions** 8:12,14 19:17 24:24 25:17 27:6 35:6 39:7 49:18 51:15 53:14 54:9 76:12,13 101:12 104:17 115:5 130:7 131:15 136:17 155:22 168:11 180:1 188:20 203:22 205:16
**quibble** 160:14
**quick** 104:7 215:19
**quickly** 152:1
**quote** 126:21,22 128:20 158:8,9

**R**

**RA** 109:13 135:6 139:22 151:21 167:6
**Race** 20:19
**Rachel** 6:16
**Racial** 19:21
**raised** 22:24 57:20
**raising** 109:3
**ran** 140:25
**Raphaely** 38:18 44:16 45:7,14 46:9, 13,16,25 47:9,23 49:23,25 50:12,15,19, 21 51:2,11,14,21 52:1,2,10 54:9,20 55:12,19 57:11 58:9, 16,21 59:8,9 60:1,2, 17 62:25 63:1,18,20 64:14 66:9,20 67:16 73:7,20 74:25 77:14, 16 78:7,15,20 81:6 88:14,15 89:10,25 92:18 93:17 94:14 95:2,3 101:7 103:5, 10,14 108:15 113:12 114:11 127:6,20 128:8 139:19 144:2, 20 149:7,12,25 151:17 152:2 153:1 158:23 163:17,20 169:2,7 170:12,14,18,

22,24 171:2,13,25 174:8 175:24 201:11
**Raphaely's** 64:20 75:4 159:1
**Raphaely/lisan** 149:2
**RDR** 218:21
**re-read** 93:22
**reach** 40:24 41:7 145:3,11 146:3 152:6, 8 200:17
**reaching** 68:21 69:3
**read** 16:10,18 35:5, 22 41:4 49:4 51:16,17 54:21,25 55:3,5,13,23 59:16,22 67:3 68:24 69:10 73:13 74:8 75:10 76:20 78:4 79:6 82:13,20 87:2,3 89:18,20 91:6,9 92:3, 15,16 94:7,8,20 96:8 97:4 98:3 101:14 102:9,10 105:12,16 108:8 109:25 112:13, 21 113:21 122:7 126:6 131:3,14 139:15 144:22 145:6 150:9 152:18 153:5, 10,11,15 154:5,8,15, 19,20 158:12,16 159:18 164:13 175:20 182:3 183:5 191:5,21 192:8,9,13,15 195:13 200:10 201:1 202:11, 12 203:4,25 204:2 205:6 207:3 210:23 213:17 215:25 217:7
**readily** 26:8 135:8
**reading** 34:20 72:15 101:17 113:21 162:3 182:8 183:1 188:7 191:7 192:17 195:1 198:25 202:4 216:2
**reads** 75:23 112:13
**ready** 6:17 164:14, 15,16
**real** 117:8 167:19
**realizing** 8:5
**realm** 74:2
**reask** 205:23
**reason** 40:20,22,23 41:5 64:13 65:1 68:1 75:3 121:5,7,9 127:15 132:22 152:17 176:17 189:2 193:1 194:18 196:16 208:25
**reasonable** 12:21 13:13,19,21,24 14:5, 11,18 15:17 18:14,15 27:7,15,25 28:7,19 29:1,11,15 53:1,6 54:1 59:6,24 60:9,16,

22 61:13 62:18 63:2, 11 64:4,11 65:5,18 66:8,14,20 68:8,18 69:23,24 70:6,17 71:13,18 72:8 73:4,19 74:3,22 75:1 76:14 79:4 81:10,15,18,24 82:2 87:15 103:22 104:3,13 109:21 110:3 111:6,8,17 112:9,19,23 113:2,11, 13,23 114:2 126:2 130:18 135:1,7 136:3 145:2 147:1 148:14 149:22 150:5,20 152:16 153:8 156:3 158:5 161:6,13 166:3, 6 168:14 185:13,17 186:7 200:1
**reasons** 196:19
**reassignment** 167:5,10
**recall** 22:16,18,20 23:11 33:7,11 47:20 53:22,24 60:12,19 61:11 67:12 69:14,16, 18,19,22 70:7,10,23 71:2,3,12,14,16,18,22 72:12,24,25 73:1,3 77:16,20 81:2,5,12 103:21 127:2 131:23 134:1,2,4 135:13 136:1 144:14 151:25 156:8,10 159:3 165:15 173:18 188:7, 17 190:4,6,10 193:25 195:23 196:5 197:10, 14 203:23 205:18 212:9 213:21 214:10
**recalled** 70:4,12
**receive** 109:12 147:7
**received** 23:12 68:22 127:19 138:4, 12 141:18 142:22 147:6 152:25 159:25
**receiving** 53:24 61:11 141:18 142:25 156:11
**recent** 61:24 183:12 184:15 206:18
**recess** 84:5 124:7 168:8 215:21
**recipient** 31:8 131:9
**recognize** 114:18 210:4
**recollect** 141:20
**recollection** 25:6, 10,15,18,23 37:5,7,8, 11,12 54:3 67:10 68:13 70:14,18 71:11 103:24 114:3 134:8

145:15 148:1,10 162:18 163:21 182:7, 14 183:4,8 191:9,18 194:10,25 195:3,6,19 197:2,10,18 201:18, 24 202:1,6,9 212:19
**recollections** 169:24 203:11
**recommend** 216:2
**recommendation** 154:24
**recommendations** 159:5 160:10
**recommended** 153:14 154:22
**record** 6:9 7:25 8:1, 17 16:21 25:24 26:1, 2,4 27:12 35:11,16, 17,21 41:10,13 52:24 67:5,8 71:6,9 83:16, 19 85:7 118:5,22 124:5 125:6 130:23 131:1 139:23 143:10, 15 160:13 164:10 170:19 173:13,16 191:13,16 204:25 205:3 218:11
**records** 53:4 143:17,21
**recourse** 177:4
**recuse** 72:2,6
**reduced** 218:10
**Reese** 36:14 50:23 180:20,24 181:13,14, 21 186:14 194:23 195:1
**refer** 26:1 186:14 198:1
**reference** 36:8,18 195:21
**referenced** 37:21 103:6 109:18 142:24 171:23 184:6 185:2
**references** 28:18 113:6 127:4
**referencing** 80:8,10 172:1
**referred** 171:23
**referring** 87:15 95:5 101:18 128:24 133:23,25 135:7 158:5 165:2,19 185:2 208:15,16 211:5,8
**refers** 151:16
**reflect** 49:1
**reflected** 206:7
**reformatted** 157:21
**refresh** 37:12 54:2 183:3,8 191:9,18 202:3
**refreshes** 71:11 192:9

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

refreshing 54:6
refuse 10:12
refusing 71:12
regard 13:3
regarded 23:22 215:9
registered 11:17,18 12:20 13:9,12 86:5
regular 12:10 56:11 114:8 124:11 153:13 154:22
regulations 28:18 82:7,10,15 89:5 93:11 103:18
rejected 71:19
related 18:7 21:8,24 40:12,17 44:13 53:25 98:12 151:21 159:5 200:20 201:13,14 215:15
relations 67:23 176:19,21,22 177:10
relationship 39:4
relationships 19:11,15
relative 218:14,15
relevant 75:8 100:3 103:2 112:9 129:18 154:24 206:2,4,11,23 210:3
Religion 20:21,25
remark 45:6 70:3 170:13 174:23
remarks 16:1 17:5 170:23 202:20 207:7, 11 208:3,4
remedy 42:2 176:11
remember 16:17,19 23:16 26:14 33:14 39:14 50:24 61:24 71:23 72:1,4,6 77:9, 11 94:25 99:7 150:15 163:8,18 168:24 175:2 189:22 190:13 191:4 197:5 203:15 204:10 205:9
remembers 16:13
remind 7:3
removed 136:5
reoriented 206:13
repeat 17:1 48:12 49:7 50:8 98:16 100:14 102:12
repeated 46:11 185:14 198:19 199:23
repeating 76:22
repetitious 6:24
report 15:11 16:1 17:6 33:7,9 34:24 36:3,10,16 39:2 41:15 42:4 47:22,24 48:1 159:4 171:5 178:12

180:11,25 182:19 183:13 184:4 185:10 187:11 189:4,8,16 190:14 193:20 194:19 195:5,15 197:9,21 200:20 201:1 203:5, 22 205:17 209:11 211:1
reported 41:18 46:7, 19 193:12 206:14 212:17
reporter 6:12 7:19 16:18
reporting 39:4,10 177:18 184:18
reports 182:10 194:5 196:12 206:7
represent 6:20
representation 74:25 75:2,4,5
represents 58:15
request 53:25 56:1 58:12 59:7,25 60:9,23 61:14 63:2,5 64:5 65:19,21 68:22 69:17 73:5,12,18 75:1 76:18,23,24 77:1,6,22 103:23 109:22 110:4 111:18 112:16 113:5, 12 125:19 126:2 127:7 129:21 130:19 138:20 139:22,24 147:1 148:15 152:16 153:2 156:3 160:8 162:13 163:5,6 164:25
requested 63:11 143:11 218:12
requester 62:22 135:6 145:23 147:9, 12 161:8 162:16 167:6
requesting 77:5,7, 15 126:21,25 127:9, 12,17 128:19 129:4 137:18 143:13 153:1 158:14,19,21 160:1, 25 161:12,16,20,25 181:24
requests 26:14 62:19 74:22 104:4 109:13 136:20 153:7 161:5
require 108:17 109:5,16
required 22:10 26:7 73:20 95:21 109:23 110:5 111:4 121:1 189:13 199:20 210:21 212:7 213:16 214:7
requirement 47:8 171:14

requiring 96:13
resent 119:6,11
resident 84:2
residents 83:15
resolution 175:11 179:8
resolve 175:6,9
resources 67:25 103:5 176:16,19,20, 23
respect 21:7 159:10
respond 203:19 204:14 205:13
responded 194:5 203:21 205:16
responding 47:16 161:2 172:4
response 157:3 202:18
responsibilities 42:20 173:22 179:17, 22
responsibility 66:4 81:17 178:1 179:9
responsive 99:24
rest 99:4 125:5
restate 127:14
rests 66:8
return 54:22 55:14
returned 53:23 55:8, 9
revealing 139:1
review 53:11 63:17 66:15 97:5 136:13,15
reviewed 33:8,10 51:24 97:7 218:13
reviewing 67:12 199:2,6
Rhonda 194:13 195:9 196:13
rid 176:5
Ridgeville 9:6
ring 20:17,19
rise 187:5 199:7,16 208:8
risks 159:5,10
RN 6:1,7 22:10 85:5 217:6,15
Roach 61:2,19 62:1, 9,10,17 68:4
Robert 42:7 43:16 169:6
ROC 171:5 196:23 202:4 206:19
ROCS 182:3,4,8 200:20 201:1
Rogers 143:6
role 13:12 14:22 17:8 62:18,20 63:1 64:10 81:19 174:10 193:9
Ron 6:14,20 53:23 54:22 60:8,15 64:4

106:7,23 127:16 144:20,23 145:11 146:24 149:12 150:12 157:25 163:1 172:15, 19 183:14 184:21 186:19 187:1 190:8, 17 192:24 193:23 195:14 196:5 203:12 210:25
Ronald 36:4 68:23 103:22 107:13,19 126:10 152:13
room 91:25 183:17 208:1
rose 211:12
rotated 106:6
rough 25:6,11,18,23
roughly 14:6 183:17
Ruchi 6:15
rules 6:3 28:18 29:5 81:11 82:4 99:10,11

S

sat 69:18 70:10,19
save 172:24
saved 172:23
scale 185:8,24 186:3,5,15
scared 190:23
scenario 125:4,15 177:18 179:4
schedule 82:19,23 105:15,21,25 126:22 127:1,3,10,13,18 128:1,19 129:5 149:3, 13,16 153:14 154:22 174:12
scheduled 144:23
school 10:21 22:6
schools 11:9
Science 11:14
seal 218:17
section 104:12 105:5 160:5 197:21 198:1
seeking 110:16 165:23,24
sees 116:10
self-explanatory 138:16
seminars 23:9 26:20 27:15
send 139:19 142:10 143:8 173:1,2,11 211:18
sends 173:9
sense 13:7 14:21 15:23 80:15,17 132:17 134:5
sentence 58:15 59:1 97:22 98:6 105:12 108:4,14 112:13,14,

15 113:6 128:2,17 130:6 198:7 199:11 200:10 208:11 211:2
sentences 200:4
separate 63:18
sequence 141:21
service 61:21 62:3, 5,6,22,23,24 78:20 80:12 82:18 89:10,24 93:16 94:13 98:13 105:13,19 149:15
serving 13:25
SESSION 85:1
set 20:12 146:14 151:9 218:17
sets 28:18
severity 186:4
sex 20:19 30:20
sexual 15:13 19:22 23:4,13 24:14 26:19 28:1,22 29:6,18,21,25 30:7,17,23,24 31:2,5, 13,17,21,22,23 32:2, 19 33:1,8,11 36:4 39:10,23 40:1,7,25 41:8,16 43:19 44:13 45:6 47:14 52:6 168:12,16,21 169:3, 15 171:11 172:3,6 175:12,18 176:3 178:2 180:9 183:15 184:8,10 185:9,16 186:23 187:1,2,4,5 190:12,21 194:6,12 198:19,22 199:8,16, 20 200:2 201:13 207:25 208:5,8,10 209:3,7,15,21 210:7 211:10,12,19 213:19
sexually 30:19,20 31:17 32:8,13 33:5 41:23 44:5 46:8 198:11 200:7,11,17 208:11,14,17,19,22 209:1,4,7,9
share 169:12
Shawn 68:7
she'd 174:12
She'll 173:10
sheet 85:14 219:2
sheet(s) 217:12
sheets 169:23
Shively 6:16 207:15
Shively's 178:22 179:6
short 120:24 130:3
show 6:9 84:1 137:8 190:14
shown 38:18 195:9
shows 142:7 155:3
side 27:7

# Bruce Kafer, RN, MSN - March 08, 2019
## Deposition

**sign** 171:7 189:5,12, 13,15 219:1
**signature** 187:24 188:15 217:3
**signatures** 169:22
**signed** 139:10,14 160:13 180:19 188:5, 11 195:15 207:16 217:17
**significance** 190:19
**significant** 152:24 200:18
**signing** 180:18
**signs** 188:23
**similar** 62:17 96:25 172:12
**simple** 27:13 46:6 118:6 138:8 175:4
**simplify** 145:25
**simply** 61:16 116:5 121:3 123:23 146:9 160:16 174:22 177:23
**sincerity** 133:21
**Sindell** 6:8,9,17,18, 19 16:11 26:11,16 33:24 34:5,9,13,17,19 35:16 41:4,10 45:20, 24 51:7 52:20 53:13 59:14,18,22 67:5 75:15,22 76:1,7 79:6 82:12 84:3 85:6 92:6 93:21 99:15,22 100:6, 9 101:16 102:5,8 116:11 117:2,5,17,22 118:1,19 119:1,3,7, 13,23 120:1,5,11,17, 21 121:7,11,17,20,24 122:3,7,11,20 123:5, 9,12,17 124:9 134:22, 24 136:9,16,24 137:5, 9,14,17,20 142:12,15, 19 143:12,18,22 144:15 153:18,21,25 154:4,9 155:1,14 159:18 164:6 170:25 173:7,10 180:4 181:23 202:11,14,15 204:18,23 205:5,20 215:18
**single** 105:21 106:3, 5
**singular** 184:5
**sir** 9:12 81:1 115:20 158:17
**sit** 57:24 70:11 94:3
**site** 172:13,14,17,18
**sitting** 69:16
**situation** 42:3
**skill** 95:21
**skipped** 168:14
**slants** 86:7

**sleep** 174:25
**smoothly** 55:14
**so-called** 159:15,21
**social** 61:17
**sole** 193:1
**solved** 179:12
**somebody's** 106:17 189:11
**sort** 119:5
**sound** 37:16
**sounds** 15:11 18:9 20:1 24:5
**space** 171:7
**speak** 49:22 50:12 78:12 132:4
**speaking** 7:19 145:22
**speaks** 58:5
**special** 178:10
**specialist** 36:15 67:23 68:9
**specialty** 165:22
**specific** 17:23 28:12 57:19 58:11 69:14 79:19 86:9 159:3 178:7 179:17 182:7 195:18 203:17 204:12 205:11 207:20 209:1
**specifically** 79:15 98:12
**specifics** 47:20 213:21
**speculate** 25:8 114:20,22
**speculating** 24:25
**speculative** 25:4
**speed** 170:3
**spell** 8:19,25
**spending** 14:10,17
**spent** 96:4,7,9
**spoke** 55:14,21 57:14,17,24 58:16,21, 24 71:23
**SS** 218:4
**staff** 55:17 107:11, 14,16 111:18
**stage** 113:5
**stand** 90:4,16 94:18 101:25 172:7
**standard** 146:20 182:8
**standards** 87:11 185:17
**standpoint** 13:9
**staple** 164:3
**start** 73:10 135:20 168:10 198:3
**starting** 199:1
**state** 8:16 11:5,19,21 145:10 203:11 218:4, 7,22

**stated** 77:21,23 140:11 145:3 159:25 197:19
**statement** 29:23 30:14 41:1 66:12 74:2,4,6,19 102:6 128:8 145:8 146:2 189:20,24 191:24 207:6
**statements** 74:21 141:10 170:13 201:19,21 202:4
**states** 58:24 97:13
**stating** 69:8,12 73:25 74:14 128:5,9, 14
**status** 69:8 73:24 74:14,20 106:14 124:25 125:17
**statute** 21:5
**stay** 56:17 70:3
**staying** 108:25
**stenotypy** 218:10
**step** 116:25 123:13, 18 148:8,11,12
**steps** 178:17
**Steve** 6:19 52:18 53:11 59:21 75:21 116:10,15 117:3 121:23 123:11 155:7 170:17 172:22
**Steven** 144:15
**stimulate** 25:16
**stipulations** 218:14
**stop** 34:10 91:23,24 99:14 106:16 126:24 154:3 155:5,18 190:11,12 191:6 198:13,21 199:24,25 200:9 202:14
**stopped** 34:13 198:15
**story** 55:2
**straight** 118:12
**strict** 212:1
**strictly** 211:21
**strike** 188:10
**string** 149:3
**student** 11:3
**stuff** 75:16
**subject** 22:19 23:22 26:21 28:25 36:2 58:2 67:24 68:17 88:11 103:4 150:19 177:11
**submissions** 61:12
**submit** 153:1 189:16 217:10,12
**submitted** 159:1
**subordinate** 43:17
**subsequent** 129:9 141:23

**suggest** 89:4 93:9 109:20 110:2,12,13
**suggested** 77:21 134:13 174:24
**suggestion** 20:1
**suggestions** 20:6
**summarize** 127:14 199:15
**superior** 55:18
**supervisor** 42:25 151:20 175:23 211:17
**supervisors** 30:10
**supervisory** 211:2
**supplied** 141:6
**supposed** 49:18 75:18 79:22 101:11 188:5 189:11
**surgeon** 165:12
**surgery** 62:5 108:13,20
**surgical** 61:21
**surprise** 107:24
**surprising** 8:2
**surrounding** 17:19
**Susan** 37:25 38:8 44:16 144:19 149:7, 25
**switch** 38:6 53:1
**sworn** 6:4 218:9
**system** 178:8

---

### T

**takes** 97:25 98:10,21 100:22 102:19
**taking** 77:13,25 78:2 111:25 120:25 185:19
**talk** 13:23 29:11,20 30:23 91:18 117:7 118:2 120:14 125:9 154:10 169:1 171:15, 16 174:8,14 193:23 212:20,22 213:9
**talked** 50:19,21 51:14 68:4 168:13 169:5,13 173:24 193:17 201:11,25
**talking** 14:25 20:1,3 23:8,20 33:19 34:13 70:2 118:1 120:13 173:19 174:19 192:24 202:6 208:23 212:24 213:1,9
**task** 87:20 88:24 93:4 178:19
**tasks** 85:11 86:20 87:7,13 88:1
**taught** 170:7
**team** 214:20
**teams** 19:15
**technical** 13:16
**technology** 11:14

**telephone** 132:8
**telling** 57:11 118:13 119:15 129:7 163:8 170:2 181:17 190:7 201:4,6
**temporary** 77:10, 11,22 107:16 125:8
**ten** 185:7,8,22 186:4, 17
**tenure** 24:13
**term** 9:21 78:12 79:19 113:3
**terms** 96:16 98:10 186:4 190:20
**territory** 120:7
**testified** 39:18 66:7
**testify** 218:9
**testifying** 45:23 46:2 72:21 203:9
**testimony** 51:6 72:18 196:9 217:8 218:12
**thereabouts** 12:14 14:2
**thing** 21:3 26:20 37:1 48:18 90:8 175:1 206:25 209:13 212:5 215:7
**things** 18:22 115:25 141:21 148:23 170:6 171:24,25 172:9 174:15 175:3,9 197:3 206:12,14,23
**thinking** 19:24
**thinks** 154:12 175:12
**thought** 50:22,24 51:1,19 54:25 59:9 60:2 81:2 88:21 91:2, 14 92:24 103:14 122:12 132:23 155:15 157:6 186:23 193:10 194:4
**thoughts** 56:4
**threatening** 175:22 176:2
**throw** 19:25
**throwing** 75:16
**Thursday** 137:22 144:24 150:17 151:13 152:4 157:4
**time** 7:20 12:10 14:10,12,18 23:14 35:5 36:24 37:21 38:1 39:20 40:21 47:14,17 48:7 52:3,7,15 55:2,7, 9,17 57:6 61:24 62:3, 10 67:24 68:9 70:22 71:19 73:14 77:15,17 80:24 81:1 92:16 96:4,7,9 98:18 102:16 113:10 115:2,17

# Bruce Kafer, RN, MSN - March 08, 2019
## Deposition

120:24 125:5,13
131:16,20,23 132:16,
22 133:8,11,12
136:13,15,18 137:23
149:21 156:13 159:3
160:8 162:12 165:15
167:17 173:10 174:13
184:3,9 190:13
196:17 197:6,10,11
206:16 218:13
**timeliness** 183:25
184:1
**times** 25:8,11 46:11
82:23
**title** 13:2,17 15:4
17:11 20:8,11 187:25
**titles** 13:5
**today** 6:13 136:20
**told** 39:12 59:9 60:1,
11 81:13 103:10
111:23 135:24 158:24
169:25 183:9 184:20
186:19,22 189:23
190:2 212:11
**tomorrow** 131:16
**tone** 116:25 120:3
**top** 36:23 37:21
144:15 160:20 180:1
181:3 200:5 210:7
**totality** 199:2,6
**touch** 197:20
**touching** 31:2
193:12,13,14
**train** 23:13
**trained** 170:6
**trainers** 23:13
**training** 21:13,19
22:2,9,10 23:12 24:13
27:6,19,25
**trainings** 21:23
22:25 23:3,7,11,19
24:1 25:24 26:6,18
27:14 169:16,19,20
**transcribed** 215:24
218:11
**transcript** 216:3
217:8 219:1
**transfer** 164:24
166:8,9
**transferred** 12:16
**trouble** 12:24
**true** 74:4 102:9
116:5,6 119:11
200:21 217:8 218:11
**truth** 201:5,6 218:9,
10
**Tuesday** 137:23
**turn** 197:25
**turned** 113:24
**two-thirds** 14:8,10
**type** 17:24 19:19
21:18 26:20 60:21

74:20 162:17,22,23
163:1,3,4,15 174:10
**typed** 160:20 162:5,
9,14,20 163:2 187:21
188:13
**types** 86:7 109:12
110:21 162:16 206:23
**typewriting** 218:11
**typical** 69:4,5 74:21,
23 109:11
**typically** 62:21
193:3 214:18

---

**U**

**U.S.** 179:20
**uh-huh** 7:1 27:9
44:22 57:5 85:24
86:23 169:9 201:3
207:8
**ultimately** 63:6
**um-hmm** 7:1
**unable** 69:8,13 73:9,
12,25 74:14,24 76:18,
23 77:4 101:9 112:17
114:5,7,17 120:23
122:25 124:23 125:1,
2,15 128:5,9,14
141:3,15 167:7,9
**unaware** 65:1
172:17
**uncertain** 96:23
**unclear** 160:8
162:12
**uncomfortable**
189:25 190:3,5,8
**uncommon** 145:19
**understand** 7:6
14:20 18:8 25:19
42:22 46:23 59:2
64:13 65:13 68:1,16
77:1 82:4 91:10 94:1
105:18,23 108:14
109:14 110:15 118:4
126:20,25 128:18
129:11 132:7 135:1,4
146:6,11,21 159:8
179:18 184:13
189:19,21 190:24
198:24 202:5 209:18
**understanding**
29:21 39:9 43:5 55:11
78:22 81:25 106:5
109:3,9,21 110:2
114:19 127:11 146:23
178:25
**understands** 135:8
**understood** 7:11
78:16,24 79:2,9
110:14 127:2 129:4
169:25
**Union** 70:25

**unit** 108:23
**University** 11:5
**unknown** 126:23
129:14
**unrelated** 115:21
**unusual** 69:1 145:21
151:20
**unwelcome** 16:1
17:5
**unwelcomed**
185:14
**USA** 167:4,11
**utilize** 113:3
**utilized** 113:4

---

**V**

**VA** 12:2,4,13 13:3
14:1 21:23 22:8,25
24:3,13 28:10,13
29:1,3,5 30:10 31:6
42:19 43:23 52:10
65:7 66:13 78:25
79:4,10,12,15 80:5,8,
22 81:3,6,11 85:9
87:12 89:1 93:5 95:12
97:10 98:17,18
102:13,14,15 103:12,
18 104:3,21 105:6
106:25 107:12,17
108:21 114:12 115:3,
17 121:1 124:12,19
125:7,23 126:2
130:18 135:1 139:9
158:14,19 165:19,21
167:2 168:1 178:7,8,
21 179:2 183:19
187:3 192:18,20
215:1
**VA's** 78:16 98:13
**vacation** 83:4,6,11
**vacations** 83:8
**valid** 187:1
**vary** 42:21
**Verb** 181:3 194:13
196:13,25
**Verb's** 195:10
**verbal** 29:25 30:23,
24 31:8 39:16 41:17
171:12 185:10
**verbally** 46:8 170:13
**version** 189:18
197:7
**versus** 6:11
**Veterans** 82:5
**victim** 210:21 213:15
**view** 13:7 87:19
95:15 187:4
**VII** 20:8,11
**violated** 210:25
211:2 215:8
**violation** 215:1,3,6,
9,12,13

**violations** 215:15
**Vista** 9:22
**voice** 55:2

---

**W**

**Wade** 82:18 105:14,
20
**wages** 18:17
**wait** 7:22 8:4 16:10
60:13 70:1 100:20
155:13
**waiting** 146:23
**waive** 216:1
**walk** 141:1,3
**walking** 140:24
**wanted** 13:22 25:25
39:7 54:25 64:14,25
91:1 130:13 131:18
132:4,5 133:6,14
134:6 137:7 143:11
165:25 166:6,7
167:17 168:5 170:19
174:24 176:17 177:4
178:12 196:20 204:22
**warranted** 176:25
**waste** 206:16
**watched** 24:2
**Wednesday** 146:22
152:4,21 164:17
**week** 97:25 98:21
100:22 102:19 183:18
**weekdays** 160:7
162:11
**weekends** 160:7
162:11 163:12
**weekly** 98:10
**weeks** 106:7 107:13
**weighing** 184:10
**weird** 157:21
**whatsoever** 109:24
110:6
**whereabouts** 10:19
**WHEREOF** 218:17
**whomever** 212:21
**wife's** 9:14
**wild** 24:25 25:13
**Wilkie** 6:11
**wished** 128:1
**withdraw** 108:2
**withdrawn** 21:12
24:22 27:22 29:24
31:15 33:6,20 42:6
52:2,4 59:5 64:8,21
72:16 77:13 81:16
86:11 95:2 98:8 108:2
112:12 114:6 115:8,
24 132:14 149:20
163:7 177:23 186:13
195:13 203:13 207:5
**witnesses** 7:17
**woman** 30:19

**women** 181:2
**wondering** 196:15
**word** 6:25 9:8 29:9
50:5 85:13 119:8
172:11 219:1
**words** 30:19 31:3
57:17 59:11 60:4
126:17 171:15 172:1
**work** 9:16 11:24 14:4
18:19 19:6,11 25:12
32:16 82:18 83:12
96:20,24 105:14,19,
22 106:3 149:14
166:11 167:15 171:18
179:7 185:15 193:5
200:1
**workday** 56:11,16,
17
**worked** 9:22,23 12:3
**worker** 61:17
**working** 11:10 12:5
13:19 26:24 153:13
154:21
**workplace** 19:17
**works** 8:6 108:6
**worth** 175:8
**write** 27:3 76:16
126:9 129:15 163:15
171:3 198:25 199:7,
11 209:11 219:1
**writes** 76:16,22
152:14,24
**writing** 55:12 69:2
126:11 132:10
134:16,17 136:7,8
141:10 177:7 201:21
218:10
**written** 29:5,6 58:7,
23 68:20 95:25
160:15,17 161:3
172:9,11 180:16
183:10 185:6 189:3,
12 193:24 196:23
**wrong** 88:21 92:25
**wrote** 15:11 80:1
127:15 128:18 132:22
156:24 160:9,11,20
161:19 162:2,24
163:6,9,14 164:23
180:11,12,15 195:14
197:19,24 200:13
208:10

---

**Y**

**year** 10:23 24:4,9,12,
15
**years** 9:11 10:7 12:3
14:17 23:17 24:16
174:22 183:18,21
184:6,19 206:15
207:22,24

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

**yesterday** 152:15, 21
**younger** 10:11

---
**Z**
---

**Zekanovic** 67:22