In The Matter of:

Ronald M. Lisan, M.D.

vs

Robert Wilke, etc.

_____

Susan M. Fuehrer (Vol I)

April 02, 2019

Deposition

_____



MEHLER HAGESTROM
Court Reporters

1660 West 2nd Street, Suite 780 | 50 South Main Street, Suite 720
Cleveland, Ohio 44113 | Akron, Ohio 44308
216.241.9000 | 330.535.7300
216.621.0050 Fax
www.MandH.com          Schedule@MandH.com

original filename: 190402_-_fuehrer_susan_m

**1**

1          IN THE UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

3    RONALD M. LISAN, M.D.,

4               Plaintiff,
                              JUDGE PATRICIA A. GAUGHAN
5       -vs-                  CASE NO. 1:18-CV-00969

6    ROBERT WILKE, ACTING SECRETARY
     OF THE UNITED STATES DEPARTMENT
7    OF VETERANS AFFAIRS,

8               Defendant.   VOLUME I

9                    -  -  -  -

10       Deposition of SUSAN M. FUEHRER, taken as if

11   upon cross-examination before Pamela S.

12   Greenfield, a Certified Realtime Reporter,

13   Registered Diplomate Reporter and Notary Public

14   within and for the State of Ohio, at the offices

15   of Sindell & Sindell, LLP, 23611 Chagrin

16   Boulevard, Suite 227, Beachwood, Ohio, at

17   1:43 p.m. on Tuesday, April 2, 2019, pursuant to

18   notice and/or stipulations of counsel, on behalf

19   of the Plaintiff in this cause.

20                    -  -  -  -

21                 MEHLER & HAGESTROM
                    Court Reporters
22
             CLEVELAND                  AKRON
23   780 Skylight Office Tower  720 Akron Centre Plaza
      1660 West 2nd Street        50 South Main Street
24    Cleveland, Ohio 44113       Akron, Ohio 44308
          216.241.9000               330.535.7300
25                 FAX 216.621.0050

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

2

1  APPEARANCES:

2      Steven A. Sindell, Esq.
       Rachel Sindell, Esq.
3      Sindell & Sindell, LLP
       23611 Chagrin Boulevard
4      Suite 227
       Beachwood, Ohio  44122
5      (216) 292-3393
       Info@SindellAttorneys.com,
6
           On behalf of the Plaintiff;
7
       Lisa Hammond Johnson, Esq.
8      Ruchi Asher, Esq.
       Assistant United States Attorney
9      U.S. Department of Justice
       United States Attorney's Office
10     Northern District of Ohio
       United States Court House
11     801 West Superior Avenue
       Suite 400
12     Cleveland, Ohio  44113
       (216) 622-3679
13     Lisa.hammond.johnson@usdoj.gov
       Rushi.Asher@usdoj.gov,
14
           On behalf of the Defendant.
15
    ALSO PRESENT:
16
       Ronald Lisan, M.D.
17

18

19

20

21

22

23

24

25

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

3

```
 1              W I T N E S S   I N D E X

 2                                          PAGE

 3    CROSS-EXAMINATION
      SUSAN M. FUEHRER
 4    BY MR. SINDELL                          4

 5

               E X H I B I T   I N D E X
 6
      EXHIBIT                                PAGE
 7
      Plaintiff's Exhibit 31, 1/6/17
 8    Sindell letter to Fuehrer/Altose       38

 9    Plaintiff's Exhibit 32, 3/19/19
      Elaine Costanzo deposition transcript  62
10
      Plaintiff's Exhibit 33, 1/10/17
11    "Sexual Harassment Allegation
      Checklist (Alleged Harasser)"          82
12
      Plaintiff's Exhibit 34, Reports of
13    Contact                                88

14    Plaintiff's Exhibit 35, "Sexual
      Harassment Allegation Checklist
15    (Alleged Victim)" form                 97

16

17

18

19

20

21

22

23

24

25
```

**4**

1          SUSAN M. FUEHRER, of lawful age, called by

2     the Plaintiff for the purpose of

3     cross-examination, as provided by the Rules of

4     Civil Procedure, being by me first duly sworn, as

5     hereinafter certified, deposed and said as

6     follows:

7          CROSS-EXAMINATION OF SUSAN M. FUEHRER

8     BY MR. SINDELL:

9  Q.  Ms. Fuehrer?

10 A.  Yes.

11 Q.  Did I pronounce that correct?

12 A.  Yes, you did.

13 Q.  Correctly?

14 A.  Yes.

15 Q.  I'm just going to say for the record this case is

16     the case of Lisan versus Wilkie in the United

17     States District Court of the Northern District of

18     Ohio, Eastern Division.  This is the deposition

19     of Ms. Susan Fuehrer.  Present today in addition

20     to myself and the court reporter is our witness,

21     Ms. Fuehrer; my client, Ronald Lisan; counsel

22     Ruchi Asher and -- that's U.S. Attorney Ruchi

23     Asher and U.S. Attorney Lisa Hammond Johnson.

24          I'm not sure that we can finish this

25     deposition in three hours.  I'll do my very best

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

5

1      but in any event, you had indicated off the

2      record you've had a couple of depositions but let

3      me give you a couple of just very basic ground

4      rules which counsel's probably shared with you

5      anyway; but if I ask you a question, Ms. Fuehrer,

6      that you don't fully understand or need

7      clarification about, please don't answer it.  Let

8      me know what your issue with the question is and

9      I'll try to clarify it.

10          If you answer a question, I'm going to assume

11     that you understood it.  Fair enough?

12  A.  Yes.

13  Q.  I'm glad you used a whole word yes because

14     there's a tendency sometimes to say um-hmm or

15     huh-huh or something like that in answer to a

16     question and that creates, can create an accuracy

17     problem for the court reporter; so you should try

18     to use a full word like yes or no to answer a

19     question and I'll remind you if there's a

20     problem.  Okay?

21  A.  Okay.

22  Q.  And I don't have to remind you you're under oath.

23     Is that clear?

24  A.  I understand.

25  Q.  Sure.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

6

```
 1         I am Steve Sindell, as you probably figured

 2      out.  I represent Dr. Lisan; is that correct?

 3   A.  To the best of my knowledge, yes.

 4   Q.  You understand that?

 5   A.  Yes.

 6   Q.  All right.  Would you state your full name for

 7      the record, please.

 8   A.  Susan M. Fuehrer.  F-U-E-H-R-E-R.

 9   Q.  And where do you live, Ms. Fuehrer?

10   A.  I live in Westlake, Ohio.

11   Q.  And what is your address?

12   A.  2077 Waters Edge Drive, Westlake, Ohio.

13                  MR. SINDELL:  Off the record.

14                      -  -  -  -

15      (Thereupon, a discussion was had off the

16      record.)

17                      -  -  -  -

18   Q.  Back on the record.

19         How long have you lived there?

20   A.  Well, 12 years.

21   Q.  Did you grow up in Cleveland?

22   A.  No.

23   Q.  Whereabouts?

24   A.  I graduated high school in Connecticut.  We had a

25      second home in New Hampshire.  I went to
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

7

```
 1        undergraduate school in New Hampshire.  My father
 2        worked for Moen faucets which is based in Ohio,
 3        Cleveland, Ohio.
 4    Q.  Your father was?
 5    A.  Worked for Moen faucets.
 6    Q.  Okay.  What is that?
 7    A.  Moen is M-O-E-N.  It's a faucet company.
 8    Q.  Oh, okay.
 9    A.  And his brother got sick.
10    Q.  Well, you're going beyond my question.
11    A.  Okay.
12    Q.  I don't need that much detail.
13            You say you did your undergraduate, meaning
14        college?
15    A.  Yes.
16    Q.  And where was that?
17    A.  University of New Hampshire.
18    Q.  When did you graduate from college?
19    A.  1986.
20    Q.  And how about high school?
21    A.  Tolland, Connecticut, T-O-L-L-A-N-D.
22    Q.  But when was the --
23    A.  1981.
24    Q.  And you obtained a degree from the University of
25        New Hampshire, I assume?
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

8

1    A.  Yes.

2    Q.  And what was that?

3    A.  Bachelor of Science.

4    Q.  That's a B.S. degree, okay.

5        Do you have any other formal degrees beyond

6        that?

7    A.  Yes.

8    Q.  Please.

9    A.  I graduated from from Case Western Reserve with

10       an MBA in 1990.

11   Q.  You're married?

12   A.  Yes.

13   Q.  And your husband's name is?

14   A.  Russell J. Fuehrer, the Third.

15   Q.  Children?

16   A.  No.

17   Q.  Is Russell employed outside the home?

18   A.  Yes.

19   Q.  What does he do?

20   A.  He is the general manager for Dove Die &

21       Stamping.

22   Q.  What is that?

23   A.  A stamping company.

24   Q.  Stamping?

25   A.  Metal stamping.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

9

1    Q.   Was that in the Cleveland area?

2    A.   Yes.

3    Q.   I would like just a brief description of your

4         work history.

5              Let me start after your -- well, you

6         graduated from college.

7              Did you go directly into Case after New

8         Hampshire?  University of New Hampshire?

9    A.   I started working at the VA in the, in May of

10        1986.

11   Q.   In what capacity?

12   A.   As a student intern.

13   Q.   And was that the Cleveland VA?

14   A.   It was the Brecksville VA.

15   Q.   Oh, that's right.  They had two of them at that

16        time?

17   A.   Correct.

18   Q.   I remember that.

19              And how long did you work as a student

20        intern?

21   A.   For a couple years and then I was promoted to a

22        program analyst for a couple years and --

23   Q.   Slow down.

24              Go ahead.

25   A.   And then I was an EEO manager.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

10

| | | |
|---|---|---|
| 1 | Q. | And when were you an EEO manager, what years |
| 2 | | approximately? |
| 3 | A. | Approximately 1987 to 1989. |
| 4 | Q. | What did you do as an EEO manager? |
| 5 | A. | It was a collateral assignment back then so I was |
| 6 | | still a program assistant but I did informal |
| 7 | | counseling for employees that filed EEO |
| 8 | | complaints. |
| 9 | Q. | What do you mean by "informal counseling"? |
| 10 | A. | Prior to an employee going, filing an official |
| 11 | | formal complaint. |
| 12 | Q. | Did -- a formal complaint, when you use that |
| 13 | | phrase, is a kind of an official step internally |
| 14 | | at the VA as a first step to file an EEO |
| 15 | | complaint; is that correct?  If you want to make |
| 16 | | an EEO complaint a formal one, that's done within |
| 17 | | the facility?  Maybe it wasn't back then.  I |
| 18 | | don't know. |
| 19 | A. | So it's with the Office of Resolution Management |
| 20 | | now.  It wasn't, there was not an Office of |
| 21 | | Resolution Management back then. |
| 22 | Q. | I see.  Okay.  Sorry about that. |
| 23 | | In any event, it was something that was |
| 24 | | investigated locally, wasn't it?  At some level? |
| 25 | A. | Yes. |

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

11

1    Q.  And that would typically be within the facility

2        or maybe back then in facilities because there

3        was more than one; is that correct?

4    A.  Yes, sir.

5    Q.  Okay.  Now, when you say counseling prior to a

6        formal complaint, did this include efforts to

7        resolve whatever EEO complaint existed on the

8        part of an employee with an eye toward avoiding a

9        formal complaint?

10   A.  So 30 years ago, so we're talking some time,

11       prior to the Office of Resolution Management

12       where the Office of Resolution Management now has

13       EEO counselors that do a preliminary, you know,

14       not one side versus the other, a preliminary

15       summary of the events and that was my role at

16       that time.

17   Q.  I see.  Okay.  Now, there have developed some --

18       well, let's find out about your employment so you

19       can continue to --

20   A.  So --

21   Q.  Go ahead.

22   A.  As an EEO counselor, that was a collateral duty.

23   Q.  Sure.

24   A.  That was a program assistant.

25           I then took on supervising coders, billing

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

12

1    coders in 1989.

2         Subsequent to that --

3  Q.  **Was this here in Cleveland?**

4  A.  Yes.  All in Cleveland.

5  Q.  **Have you been entirely in Cleveland?**

6  A.  Almost.  We'll get there.

7  Q.  **Okay.**

8  A.  So I supervised the ICD-9 coders.

9  Q.  **What is that?**

10 A.  They are people that go through the medical

11     record and identify diagnoses and then put it in

12     a database so the people can bill or you can use

13     it for research.

14          Subsequent to that, I became the chief of IT,

15     information technology, and subsequent to that --

16 Q.  **What year were you chief of IT?**

17 A.  Probably 1991 or so.  '92.

18 Q.  **Was that the advent of the Internet?**

19 A.  Might have been a little bit before the Internet

20     but the VA has a strong history of electronic

21     medical record.

22 Q.  **Okay.**

23 A.  Subsequent to that I was in charge of quality

24     management as well as IT.

25 Q.  **What is quality management?**

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

13

1   A.  Quality management oversees the quality --

2       patient safety quality activities of the hospital

3       so Joint Commission accreditation, external

4       reviews, patient safety complaints.

5   **Q.  Okay.**

6   A.  And in approximately 1996 or so I became the

7       chief information officer for the region which is

8       the State of Ohio and it was called VISN 10,

9       Veterans --

10  **Q.  Hold on.  Chief information officer.  Can you**

11  **define, just describe the job for me a little**

12  **bit?**

13  A.  Sure.  So it was for the five VA facilities in

14      the State of Ohio and I oversaw all information

15      technology to include phones, computer systems,

16      software.

17  **Q.  So it was kind of a broader IT kind of function?**

18  A.  Correct.

19  **Q.  What years were you CIO?  Is that what they**

20  **called you, chief --**

21  A.  Yes.

22  **Q.  Can you give me a time frame approximately?**

23  A.  Can I have a piece of paper?  I have to go

24      backwards.

25  **Q.  If you had brought a resumé, it would have been**

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

14

1      helpful.

2    A.   Yes, I should have.

3    **Q.   Well, I asked your counsel to do that for you.**

4    A.   Oh, I'm sorry.  I didn't know that.

5         So it was probably until about 2000 that I

6         was the chief information officer.

7    **Q.   So from '90 --**

8    A.   '4 to 2000.

9    **Q.   How about after that?**

10   A.   I became the chief operating officer at the

11        Cleveland VA.

12   **Q.   Now, at that point it was just Louis Stokes?**

13   A.   Correct.  Well, it was still Brecksville and

14        Louis Stokes.

15   **Q.   Oh, it was?**

16   A.   Yes.  And 16 other locations.

17   **Q.   Okay.  When you say the Cleveland VA, are you**

18        **talking about the two facilities?**

19   A.   And the outpatient clinics, yes.

20   **Q.   Oh, all over the place?**

21   A.   Yes.

22   **Q.   In the Cleveland area?**

23   A.   Yes.

24   **Q.   Okay.  Understood.  That's got to be a pretty**

25        **broad job, COO?**

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

15

```
 1   A.   Yes.

 2   Q.   Covered a lot of things?  Okay.

 3            As the COO -- well, why don't you give me the

 4        years.  I assume it started around 2000,

 5        something like that?

 6   A.   Yes.  2000 to 2010 approximately.

 7   Q.   Okay.  So that's ten years.

 8            Did you have responsibilities as COO for any

 9        aspects of reasonable accommodation requests?

10   A.   Those have historically fallen under the EEO

11        manager which fell under the director.

12   Q.   So --

13   A.   No.

14   Q.   Okay.  That's what I was looking for.

15            All right.  What about EEO complaints for

16        discrimination, retaliation, hostile work

17        environment, harassment, and such?

18   A.   For those administrative services that fell under

19        my control.

20   Q.   Okay.  So you had ten years of involvement with

21        EEO but not necessarily reasonable accommodation?

22   A.   Not unless they fell within my direct role, yes.

23   Q.   Okay.  So a number of protocols existed --

24        withdrawn.

25            From 2000 to 2010 we're talking about; is
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

16

1          that correct?

2    A.   Approximately.

3    Q.   Approximately, okay.

4            During that period of time you had to be

5          familiar with the various protocols and systems

6          and rules, handbook provisions, regulations

7          pertaining to EEO matters in general.  Is that

8          correct?

9    A.   Yes.

10   Q.   In fact would you consider EEO to have been

11         during that ten-year period a significant part of

12         your job as COO?

13   A.   No.

14   Q.   It represented a small aspect of it; is that

15         correct?

16   A.   Yes.

17   Q.   What was the nature of your involvement in EEO

18         matters when you were COO?

19   A.   When I was COO, my involvement was if someone had

20         an EEO complaint against me or one of my direct

21         subordinates.

22   Q.   Okay.  And your direct subordinates would be who?

23   A.   Chiefs of departments:  Chief of logistics.

24         Chief of fiscal.  Chief of supplies.

25   Q.   These are relatively high positions in

Susan M. Fuehrer (Vol I) - April 02, 2019
Deposition

17

1      management; are they not?

2  A.   Yes.

3  Q.   How about department heads or chairs?  Would that

4       have been part of your responsibilities as COO in

5       EEO matters, if complaints were made against

6       them?

7  A.   We call them service chiefs in the VA.

8  Q.   Okay.  Dr. Raphaely is a service chief?

9  A.   Yes.

10 Q.   What would Dr. Altose have been?

11 A.   Chief of staff.

12 Q.   Is that a service chief or somebody else?

13 A.   He's higher than a service chief.

14 Q.   It's interesting, I've been referring to what

15      you're calling a service chief, which is the

16      first time I've heard that term applied, to be

17      honest with you, as the department chair, the

18      chair of the anesthesiology department or head of

19      the anesthesiology department.

20          I would like to be able to continue to use

21      that because I probably can't help myself.

22          Would you be able to understand that I'm

23      talking about Dr. Raphaely in that capacity?

24 A.   Yes.

25 Q.   Okay.  Good.  I don't think I can make the

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

18

```
 1      switch.
 2           Fair enough.
 3           Would somebody like Dr. Raphaely in that
 4      position, chair of the department of
 5      anesthesiology, be the kind of person that you
 6      would be responsible for as COO in your EEO
 7      capacity?
 8  A.  No.
 9  Q.  So she would be too low for that?
10  A.  She would report to Dr. Altose, the chief of
11      staff who is responsible for all the clinical
12      service chiefs/department heads.
13  Q.  So Altose would be the direct report to you then?
14  A.  Not as chief operating officer.
15  Q.  As chief of staff?  Chief of the medical staff,
16      correct?
17  A.  The chief of the medical staff does not report to
18      the chief operating officer in the VA.
19  Q.  I got you.  Okay.
20           Then in 2010 did your position change?
21  A.  Yes.
22  Q.  What did you become at that point?
23  A.  I became the medical center director or the CEO.
24  Q.  Does anybody use the term executive director?
25  A.  They use lots of terms.  If you want to call it
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

19

1      executive director, that's fine.

2   Q.  I may do that but that's what I'm talking about.

3       Or medical director.

4           So approximately what date did you become

5       medical director?

6   A.  September 28th, 2010.

7   Q.  And you have been continuously in that position

8       since September 28th, 2010?

9   A.  Yes.

10  Q.  To and including the present time?

11  A.  Yes.

12  Q.  And that is still your position now?

13  A.  Yes.

14  Q.  You said something about there was a point in

15      time when you weren't at the VA and we would get

16      to it but I don't think we got to it.

17  A.  When I was the chief information officer for the

18      five facilities in Ohio, I reported to a regional

19      director in Cincinnati and I actually worked in

20      Cincinnati.

21  Q.  But you were still connected to the VA?

22  A.  Yes.

23  Q.  Oh, okay.

24  A.  I thought you said had I been in Cleveland the

25      entire time and I had not been in Cleveland the

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

20

```
1       entire time.
2    Q.  I might have said that.  Okay.  I understand.
3           Now I'd like to ask you if there's been any
4       significant change in any of the protocols,
5       procedures, rules, regulations for handling EEO
6       complaints since December 2016 to the present
7       time?
8    A.  I would not consider anything significant to
9       change.
10   Q.  That's a very good answer.  I appreciate that.
11          So assuming then that in material ways
12      everything's been the same, I can ask you a
13      question that would have applied from December
14      2016 to the present time in that regard, rules,
15      regulations, procedures, protocols for EEO
16      complaints?
17   A.  Yes.
18   Q.  Now, if -- withdrawn.
19          Have you had an opportunity to discuss any of
20      these issues with your counsel before you came
21      here?  I don't want to know what you said, just
22      whether you had a chance to consult them?
23   A.  Briefly.
24   Q.  Did you do anything else to prepare for this
25      deposition?
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

21

```
 1    A.   No.

 2    Q.   Did you read any of the documents connected with

 3         this case to refresh your recollection?  You may

 4         have previously but I mean just for preparing

 5         for --

 6    A.   No.

 7    Q.   -- the testimony?

 8              Got to let me finish, even if you know what

 9         the question is.  And if I interrupt you, by the

10         way, you let me know, too.

11              I don't mean to.  Sometimes I do maybe, but,

12         okay, back on the record.

13              Now, part of the nature of this case --

14         withdrawn.

15              As medical director of the entire Cleveland

16         VA, would that be a correct statement of your

17         title?

18    A.   No.

19    Q.   The description?

20    A.   I would like to clarify.

21    Q.   Sure.

22    A.   I do not -- while the chief of staff reports to

23         me, there is a difference of medical oversight,

24         which is the chief of staff functions, from the

25         chief executive officer.  I do not have direct
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

22

1       involvement in medical executive decisions,

2       medical executive committee decisions since I am

3       not a physician.

4   Q.  Okay.  Now, I guess my question would be this:

5       Do you have under your scope of responsibility as

6       CEO of the Cleveland VA reasonable accommodation

7       issues?

8   A.  Yes.

9   Q.  Even though obviously that involves to some

10      extent medical things?

11  A.  Yes.

12  Q.  And I am certain that you'll answer yes to the

13      same, which is EEO matters; is that correct?  In

14      your capacity as CEO that also comes within your

15      purview and scope of responsibility; is that

16      correct?

17              MS. ASHER:  Objection.  Go ahead.

18          Answer.

19  A.  So the Office of Resolution Management has broad

20      oversight over all EEO related matters.

21  Q.  Right.

22  A.  For initial EEO prior to formal, I do have

23      oversight at the Cleveland VA.

24  Q.  Okay.  And when you say "prior to formal," please

25      define formal for me.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

23

1   A.   So I don't have the policy directly in front of

2        me.  Formal is when an employee elects with the

3        Office of Resolution Management to have them

4        formally investigate their case, at which time

5        then it is an Office of Resolution Management

6        issue, not a medical center issue.

7   Q.   Okay.  So before it gets filed as a formal

8        complaint -- withdrawn.

9            The formal complaint is something that needs

10       to be filed, if you know this, within

11       approximately 45 days and maybe exactly 45 days

12       of the occurrence that gave rise to the

13       complaint.

14           Is that your understanding or don't you know

15       that?

16  A.   I believe it is 45 days.  I'm not going to quote

17       it's 45 days.

18  Q.   I understand but I mean there's a time period

19       something like that?

20  A.   There is a designated time period.

21  Q.   Okay.  But it's in that range.  I mean something

22       like that.  It's not a year or something like

23       that?

24  A.   Correct.

25  Q.   Now, by the way, it's 45 days.  Okay?

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

24

```
 1              Prior to the filing of a formal complaint by
 2      an employee with the ORM, Office of Resolution
 3      Management, you seemed to be indicating you have
 4      some responsibility under the scope of your job
 5      as CEO; is that correct?
 6                   MS. ASHER:  Objection.  Go ahead
 7           and answer.
 8   A.   My scope is limited to being notified that there
 9        is an employee that is considering to file an EEO
10        from the EEO manager.  I get that information
11        from the EEO manager.
12   Q.   Okay.  But you are familiar with in general the
13        procedures that go on before the filing of a
14        formal complaint; is that correct?  You have some
15        idea of that period of time irrespective of your
16        direct involvement.  You know what's supposed to
17        go on?
18   A.   Yes.
19   Q.   Okay.  And you're familiar with the rules and
20        regulations that would govern a supervisor or
21        head of a department receiving that kind of a
22        complaint that fits into an EEO category, right?
23   A.   Yes.
24   Q.   Okay.  I didn't hear you.
25   A.   Yes.
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

25

1    Q.  That's okay.

2                        -  -  -  -

3          (Thereupon, a discussion was had off the

4          record.)

5                        -  -  -  -

6    Q.  Back on the record.

7          All right.  Now I'm going to concentrate on

8      the department of anesthesiology at the VA, at

9      the Louis Stokes VA and when I say VA now, I mean

10     Louis Stokes unless otherwise indicated so we're

11     clear.  Okay?

12   A.  Understood.

13   Q.  Good.

14         Now, you are aware I'm sure that among the

15     employees in the department of anesthesiology,

16     there are CRNAs, certified registered nurse

17     anesthesiologists?

18                    DR. LISAN:  Anesthetists.

19          Anesthetists.

20   Q.  Anesthetists.  Sorry.

21         See I am not a doctor.  Well, I am

22     technically.

23          A CRNA, okay?

24          And there are anesthesiologists who are

25     physicians, M.D.s, D.O.s, that type of thing,

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

26

1          correct?

2     A.   Yes.

3     Q.   And others, techs and things like that, right?

4     A.   Yes.

5     Q.   If a CRNA believes that there has been an

6          inappropriate verbal communication giving rise to

7          some kind of EEO issue and -- excuse me.  Issue,

8          that employee has a right to take it to the

9          chairperson of the department of anesthesiology

10         in this case, correct?

11    A.   Every employee has the right to raise an issue of

12         concern.

13    Q.   But I'm talking about with whom.

14              In the anesthesiology department an issue of

15         concern, as you put it, can be brought to the

16         chairperson of the department of anesthesiology.

17         Is that correct?

18    A.   Yes.

19    Q.   They can also bring it to -- withdrawn.

20              Do you know who Robert Bearss is,

21         B-E-A-R-S-S?

22    A.   No.

23    Q.   He's the lead person or head of the group of

24         CRNAs, he himself is a CRNA and he reports

25         directly like the others to Dr. Raphaely as the

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

27

```
 1        chair.
 2             That's who he is.
 3   A.   Okay.
 4   Q.   A CRNA could go to him as well with a complaint
 5        about an EEO concern, correct?
 6   A.   Yes.
 7   Q.   Now let's take the, at this point these are
 8        hypothetical questions but you might suspect they
 9        have something to do with this case hopefully.
10             When a supervisor receives information of
11        that nature from a CRNA as an example, what
12        should he or she as the chair of the department
13        of anesthesiology do, if anything, at that point?
14                       MS. ASHER:  Objection.  Go ahead
15             and answer.
16   A.   Can you clarify your specific question?
17   Q.   Okay.  What is it you don't understand about it?
18   A.   What kind of issue?
19   Q.   Okay.  I'll be more specific then.
20             Let's say that a CRNA complained that an
21        anesthesiologist made a statement to her in
22        conversation that made her uncomfortable?
23   A.   Okay.
24   Q.   She did not relate it to the anesthesiologist
25        that she was uncomfortable but instead spoke with
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

28

1      the chair of the department about it.  In this

2      case, Dr. Raphaely.

3          Does that clarify it for you?

4  A.  Yes.

5  Q.  Okay.  What if anything should Dr. Raphaely do or

6      say?

7  A.  So if the complaint was sexual in nature, you

8      know, I guess the first step would be to get a

9      report of contact from the employee to understand

10     the specifics and that could be a verbal or a

11     discussion.

12         Depending on the specific situation,

13     Dr. Raphaely has a responsibility to review and

14     either do an informal investigation herself or

15     speak to the EEO counselor so that the EEO

16     officer can do a review.

17 Q.  You said if it's in the nature of sexual

18     harassment.  Did you say that just now in your

19     answer?

20 A.  Yes.

21 Q.  What if it isn't pertaining to sexual harassment?

22 A.  This is where I was asking for the clarification

23     and I don't want to get into a hypothetical

24     discussion because lots of things happen in the

25     hospital.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

29

1          If someone goes to Dr. Raphaely and says an

2     anesthesiologist didn't like the color of my

3     hair, that would be a different response than

4     something else.  That's why I was asking for

5     clarification.

6  Q.  Okay.  That's fine.

7          Let's say that it's not sexual in nature but

8     simply has to do with a remark or question about

9     how somebody's marriage is going, not about

10    sexual aspects of it but just how's your marriage

11    or my marriage isn't going well.  How's your

12    marriage going, that type of thing.

13                    MS. ASHER:  Objection.

14 Q.  I haven't finished.  I haven't even asked a

15    question yet.  Of course I don't know why you'd

16    be objecting either, but my question is:  Did you

17    follow it up to that point, the preamble?

18         Okay.  In a situation you like that, what

19    kind of response or action or statement would you

20    consider should be taken by the head of the

21    department?

22                    MS. ASHER:  Are you done?

23                    MR. SINDELL:  Yes.

24                    MS. ASHER:  Objection.  You may

25         answer.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

30

1    A.   I would think it highly inappropriate for a

2         professional to be asking another employee about

3         their marriage.

4    Q.   Why?

5                   MS. ASHER:  Objection.  You may

6              answer.

7    Q.   Why?  Wouldn't it -- well, let me ask you this:

8         I'll withdraw that.

9             Wouldn't it depend on their relationship?

10        What if they're close friends?  That's possible,

11        isn't it?

12   A.   I can tell you no one including my close friends

13        has asked me about my marriage relationship at

14        work.

15   Q.   Oh, at work.  Okay.

16            I don't really care what your experience has

17        been at work.

18            But the fact of the matter is that people can

19        be friendly at work and talk about all kinds of

20        things that have nothing to do with work during

21        down time.  Wouldn't you agree with that?  All

22        kinds of conversations?  All kinds of subjects,

23        personal, impersonal and in between?

24   A.   There is a --

25                   MS. ASHER:  Sorry.  Objection.  Go

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

31

```
 1                        ahead.
 2   Q.  Wouldn't you agree with that general statement?
 3   A.  No.
 4   Q.  No.  Okay.
 5           Nobody can talk about anything personal at
 6       work even if they're not working at the time?
 7                       MS. ASHER:  Objection.  Go ahead
 8           and answer.
 9   A.  There is a code of conduct and employees go
10       through employee training, and discussions at
11       work should remain professional.
12   Q.  I see.  So if somebody wants to for example talk
13       about their kids and what they were doing over
14       the weekend, that would be contrary to the code
15       of conduct?
16   A.  I view there's a difference between what someone
17       elects to tell someone and what someone asks.
18   Q.  Well, you didn't make that distinction until just
19       now?
20   A.  I apologize.
21   Q.  Okay.  So nobody should ever bring up, then,
22       something like what they were doing with their
23       kids over the weekend at a coffee break in the
24       CRNA lounge.
25           Is that your testimony?
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

32

```
 1                    MS. ASHER:  Objection.  Asked and
 2            answered.
 3   Q.  Anything like that would be contrary to the code
 4       of conduct at work?
 5                    MS. ASHER:  Objection.  Go ahead
 6            Ms. Fuehrer.
 7   A.  As I said, what someone elects to say is
 8       different than what someone may inappropriately
 9       or appropriately ask.
10   Q.  Okay.  Let's talk about this:  Let's say people
11       are sitting around in the CRNA lounge and one
12       CRNA says to the other:  So how are your kids
13       doing this week at the beginning of school?
14       Would that be against the code of conduct?
15                    MS. ASHER:  Objection.  Asked and
16            answered.
17   A.  No.
18   Q.  But they initiated a question about somebody
19       else, so you really don't mean that chitchat
20       about personal related matters in the lives of
21       people that work together is against the code of
22       conduct --
23                    MS. ASHER:  Objection.
24   Q.  -- per se, do you?
25                    MS. ASHER:  Same objection.  Go
```

**33**

1          ahead and answer.

2    A.   I believe I've answered it already.

3                   MR. SINDELL:  Read it back and

4          answer it.

5                   THE NOTARY:  "But they initiated a

6          question about somebody else, so you really

7          don't mean that chitchat about personal

8          related matters in the lives of people that

9          work together is against the code of

10         conduct per se, do you?"

11                  MS. ASHER:  Same objection.  You

12         can go ahead.

13   A.   As I've said, in a professional environment,

14        there is an employee code of conduct and asking

15        about children is different than asking about a

16        marriage.

17   Q.   Yes, it is depending upon the relationship

18        between the people.

19            Let's posit an example where two CRNAs are

20        close personal friends socially, in each other's

21        homes and so on and so forth and have

22        historically shared personal information about

23        each other.

24                  MS. ASHER:  Objection.

25   Q.   Would --

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

34

```
 1              MS. ASHER:  I'm sorry.  I didn't
 2         realize you weren't finished.
 3              MR. SINDELL:  It isn't even a
 4         question, so how could you not realize it?
 5              MS. JOHNSON:  She didn't, Steve.
 6              MS. ASHER:  Steve, go ahead and
 7         finish your question.  It's a little hard
 8         to tell sometimes when you ask a question.
 9              MR. SINDELL:  Well, why don't you
10         listen carefully.  I'm sure you'll be able
11         to figure it out.
12              MS. JOHNSON:  Let's take a break,
13         please.
14              MR. SINDELL:  Okay.  How long a
15         break do you want?
16              MS. JOHNSON:  I'd like to actually
17         talk to you for a moment, please.
18                   -  -  -  -
19         (Thereupon, a recess was had.)
20                   -  -  -  -
21    BY MR. SINDELL:
22    Q.  Have you ever been in an operating room during an
23        operation?
24    A.  No.
25    Q.  Let me ask you this:  If there is a complaint by
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

35

1     a CRNA to the chair of the anesthesiology

2     department about being uncomfortable with

3     something that was said by an anesthesiologist to

4     the CRNA, would it be appropriate in any

5     circumstance for the department chair to try to

6     mediate and work out any differences or feelings

7     about the matter without immediately moving

8     toward an EEO formal procedure or an ROC in

9     writing?

10  A.  Not necessarily.

11  Q.  It might be?  It depends on the circumstances,

12     right?

13  A.  If the employee is upset and it is regarding an

14     inappropriate comment, the policy is to let the

15     EEO manager know.

16  Q.  Yes, I know that.

17       That wasn't the question.  Maybe I'll, maybe

18     I didn't say it right.

19       When the -- oh, the EEO manager.  I'm sorry.

20     That's the appropriate thing.  You don't try to

21     work it out to see if you can smooth over any

22     misunderstandings between the people so that you

23     don't get into an EEO claim?

24  A.  Whenever in doubt, you report to the EEO manager.

25  Q.  Where is that written?

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

36

1  A.  I believe it's in medical center policy.

2  Q.  **Wherever in doubt, report to the EEO manager?  Is**

3  **that what you think the rule is?**

4  MS. ASHER:  Objection.  Go ahead

5  and answer.

6  A.  So I am sorry that I didn't -- it's not

7  quote/unquote written that way; however, it is

8  medical center policy that issues of

9  inappropriate conduct should be reported to EEO.

10  Q.  **Well, when you say "issues," shouldn't the head**

11  **of the department before ROCs and EEO complaints**

12  **attempt to talk to the individual who's being**

13  **accused of making a CRNA uncomfortable before**

14  **that?**

15  MS. ASHER:  Objection.  You may go

16  ahead and answer.

17  A.  No.

18  Q.  **No?**

19  **If I told you that the education department**

20  **made presentations indicating in fact that that**

21  **was, in instances appropriate, a necessary and**

22  **helpful step, would you disagree with it?**

23  MS. ASHER:  Objection.  Go ahead.

24  A.  It is hard for me to understand the questions

25  you're asking because they're very obtuse.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

37

1   Q.  Okay.  I just think -- well, withdrawn.  It would

2       seem -- withdrawn again.

3           It would seem that depending upon the

4       circumstances, early resolution avoiding formal

5       charges, formal ROCs, would be something to

6       consider if possible in almost any case.

7           Wouldn't you agree with that?

8   A.  That is the role of the EEO management office.

9       When they do their informal review.

10  Q.  It has nothing to do with the head of the

11      department?  Is that your testimony?

12  A.  I didn't say it had nothing to do with the head

13      of the department.  I --

14  Q.  Does it have anything to do with it?

15  A.  I said, if I may, the EEO manager, the EEO

16      office, does the informal review.  That could

17      include the service chief.

18  Q.  The service chief is the department head in --

19  A.  I use the term service chief.

20  Q.  Okay.  I thought we were going to interchange,

21      okay?

22  A.  They're the same.  Interchange.

23  Q.  Okay.  Very good.  All right.  I'm going to now

24      mark some documents along the way here.

25                          -  -  -  -

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

38

```
 1              (Thereupon, Plaintiff's Exhibit 31, 1/6/17
 2              Sindell letter to Fuehrer/Altose, was marked
 3              for purposes of identification.)
 4                        -  -  -  -
 5    Q.   This is Exhibit 31.  I've just clipped them
 6         together and I'm going to ask you to take a look
 7         at that.
 8              It is a three-page letter from me to you and
 9         to Dr. Altose dated January 6, 2017 sent by I
10         think special delivery mail and also by email.
11              Have you had a chance to read it?
12    A.   Yes.
13    Q.   Good.
14              Do you recollect ever receiving this letter?
15    A.   Yes.
16    Q.   And when did you receive it?
17    A.   Probably a few days after it's dated.  I don't
18         recall the exact date.
19    Q.   You really don't know at all, do you?  Within a
20         few days?  It could have been January 6th, 7th,
21         8th, 9th?
22    A.   Correct.  Within a few days of the date of
23         January 6th, 2017.
24    Q.   Right.  Right.  I understand.
25              Is that your correct email?
```

**39**

```
 1   A.  Yes.

 2   Q.  Do you happen to know if that's the correct one

 3       for Dr. Altose?

 4   A.  I don't know.

 5   Q.  Do you ever get letters like this --

 6   A.  Yes.

 7   Q.  -- in your capacity as medical director/CEO?

 8   A.  Yes.

 9   Q.  Okay.  Is this something that only you would read

10       or does somebody else read your email to pick out

11       things or help you with things?

12   A.  I read my own email.

13   Q.  So nobody else would have given this to you?

14   A.  No.

15   Q.  And when you read it, did you have any particular

16       reaction to it?

17   A.  Not particularly.

18   Q.  Well, did you think it was important?

19   A.  I forwarded it to our --

20   Q.  You didn't answer my question.

21           Did you think it was important?

22   A.  I thought that it needed to be sent to the Office

23       of General Counsel and employee labor relations

24       because I believe by the time I received this in

25       January I was aware that there were issues with
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

40

1       Dr. Lisan in anesthesia service.

2    Q. **How did you become aware that there were issues**

3       **with Dr. Lisan?**

4    A. I don't recall specifically when, when there may

5       have been an EEO filed or when I had received

6       complaints from employees about Dr. Lisan.

7    Q. **Was it around January 6th or don't you know?**

8    A. I don't know.

9    Q. **It could have been a year later?**

10                  MS. ASHER:  Objection.  Go ahead.

11   A. I doubt it was a year later.

12   Q. **But you don't know?**

13   A. I don't know.

14   Q. **Isn't it a fact that you shared this with**

15      **Dr. Raphaely?**

16   A. I may have.  I don't recall.

17   Q. **Wouldn't that be a logical thing to do since she**

18      **was the primary subject of this letter?**

19   A. I may have sent it, as I said, to the Office of

20      General Counsel and the employee labor relations

21      and let them share it with Dr. Raphaely.

22   Q. **You had no doubt in your mind that this would be**

23      **promptly taken to Dr. Raphaely at some point,**

24      **correct?**

25                  MS. ASHER:  Objection.  Go ahead.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

41

1    A.    I don't know what you mean by no doubt in my

2          mind.

3    Q.    **Okay.  Wouldn't you expect a letter like this to**

4          **be shared with Dr. Raphaely?**

5    A.    Perhaps.

6    Q.    **Maybe not?**

7    A.    Maybe not.

8    Q.    **Why not?**

9    A.    If employee labor relations and the Office of

10         General Counsel were already working on it and if

11         there had been reviews, they may not have elected

12         to share it with Dr. Raphaely.

13   Q.    **I see.  Well, what about you?  Wouldn't you elect**

14         **to share it with the head of a department,**

15         **something like the contents of this letter?**

16   A.    Dr. Raphaely is not my direct report.

17   Q.    **And that's the reason you didn't think it was**

18         **necessary or indicated for you to share this with**

19         **her?**

20   A.    That may have been.  I may have shared it, sir.

21         As I said, I don't recall.

22   Q.    **Wouldn't it be standard operating procedure for**

23         **you to share it with her?**

24   A.    No.

25   Q.    **How about Dr. Altose?  He's her immediate**

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

42

```
 1        supervisor, isn't he?
 2   A.   Is that a question?  Are you done?
 3   Q.   Please read back the question.
 4                      -  -  -  -
 5             (Thereupon, the requested portion of
 6             the record was read by the Notary.)
 7                      -  -  -  -
 8   A.   I'm sorry.  I didn't hear the last part.
 9            Yes.
10   Q.   Wouldn't you expect him to share it with her?
11   A.   I can't speak for Dr. Altose.
12   Q.   Why not?
13   A.   I'm not Dr. Altose.
14   Q.   Well, I know you're not Dr. Altose but you
15        certainly understand his position as chief of
16        staff.  Given his position and his
17        responsibilities, wouldn't it be logical and
18        standard operating procedure for him to share it
19        with Dr. Raphaely or can't you say?
20   A.   I can't say.
21   Q.   Well, why not?  Why can't you say that?
22   A.   Because he may have had additional information
23        besides this letter where it would have been
24        appropriate for him to share with employee
25        relations or the Office of General Counsel.
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

43

1   Q.  But that doesn't preclude him from sharing it

2       with Dr. Raphaely, does it?

3   A.  It does not.

4           As I said, I can't speak for him.  I don't

5       know what he did or didn't do.

6   Q.  I'm asking you what you think he should do.

7                   MS. ASHER:  Objection.  You can

8           answer.

9   Q.  As -- withdrawn.  Let me repeat it in this way:

10          In your capacity as CEO medical director,

11      what should Dr. Altose have done as chief of

12      staff when he received the letter Exhibit 31?

13  A.  He should have made sure that the Office of

14      General Counsel, our attorneys, and the employee

15      labor relations section of the human resource

16      management department have a copy.

17  Q.  But not necessarily Dr. Raphaely.  Is that your

18      testimony?

19  A.  That is my testimony.

20  Q.  Okay.  Good.

21  A.  We would seek advice from them.

22  Q.  All right.  Let me ask you this:  Dr. Raphaely --

23      withdrawn.

24          Would it be appropriate for Dr. Raphaely to

25      retaliate against Dr. Lisan for making these

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

44

1    complaints when she was aware of them by

2    soliciting CRNAs to make false or misleading

3    claims against Dr. Lisan for sexual harassment or

4    other supposedly inappropriate conduct?

5                     MS. ASHER:  Objection.  Go ahead.

6  A.  So to restate the question.  It was long.

7        You're asking if it would be inappropriate

8    for Dr. Raphaely to retaliate against Dr. Lisan

9    by asking people to fabricate stories about

10   sexual harassment?

11 Q.  Or inappropriate conduct?

12 A.  Yes.

13 Q.  The answer to my question is yes or --

14 A.  Yes.

15 Q.  Did it ever come to your attention that a number

16   of CRNAs in the department of anesthesiology

17   collectively claimed that Dr. Raphaely was

18   vindictive and retaliatory toward them?

19 A.  I am aware that there were some CRNAs that were

20   not happy with Dr. Raphaely's leadership style.

21 Q.  When you say "some" CRNAs, could you give me an

22   approximate number of CRNAs?

23 A.  No.

24 Q.  Are you aware of the Spicer report?

25 A.  Yes.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

45

1   Q.  Doesn't it contain a specific number of CRNAs who

2       specifically shared with Ms. Spicer their

3       complaint that Dr. Raphaely was vindictive and

4       retaliatory?

5   A.  It's been a long time since I've seen the Spicer

6       report.

7   Q.  Well, let's take a look at it.  This is already

8       out there, so we're going to call it 27, but I'll

9       hand it to you.

10          All right.  Do you want to sit here and read

11      this whole thing and refresh your recollection?

12  A.  Please.

13  Q.  Okay.  Maybe, would you mind we'll leave you in

14      some quiet because it's a long, it's a 14 page

15      document, so you might need a little bit of time

16      and we'll take a little break and you can sneak

17      one in yourself if you want?

18  A.  Five minutes?

19  Q.  Five minutes is great.

20  A.  Okay.

21                      -  -  -  -

22              (Thereupon, a recess was had.)

23                      -  -  -  -

24  Q.  I take it you've seen this before?

25  A.  Yes.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

46

1  Q.  All right.  If you will look at the very last

2      page, Page 14 of 14, it says at the bottom left:

3      "Humbly submitted:"  I have never seen that

4      before.

5          But "Humbly submitted:  Brenda A. Spicer,

6      June 18, 2018."

7          Have I read that correctly?

8  A.  Yes.

9  Q.  Does that give you some idea of when you might

10     have read this for the first time?

11 A.  Yes.

12 Q.  When was it?

13 A.  Probably a few days after June 18th, 2018.

14 Q.  Now, this is a partially redacted version here.

15     You can see that?

16 A.  Yes.

17 Q.  Did you read an unredacted version?

18 A.  I probably did.

19 Q.  Now, you would then recall that Dr. Raphaely is

20     the subject of a lot of this document?

21 A.  Yes.

22 Q.  And various references are made -- there have

23     been other witnesses.  I should tell you other

24     CRNAs have testified in deposition like you and I

25     would say almost I think everybody has indicated

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

47

1    they were aware that these were references to

2    Dr. Raphaely where it indicated about various

3    things.  Okay?

4        So is that consistent with your recollection?

5  A.  Yes.

6  Q.  Did you ever read this since you first read it

7    back in let's say approximately June of 2018 I

8    believe it was?

9  A.  Not to my recollection.

10  Q.  Okay.  Well, what did you do with this document

11    after you read it?

12  A.  I worked with, I asked the EEO manager to work

13    with Dr. Altose to develop a plan for

14    Dr. Raphaely.

15  Q.  Did you talk to Dr. Raphaely?

16  A.  I did not.

17  Q.  Why not?

18  A.  She's not my direct report.

19  Q.  So what?  You can talk to anybody you want to in

20    the VA, can't you?

21  A.  Yes.

22  Q.  So why didn't you choose to talk to her since

23    she's the subject of this?

24  A.  Because in these matters we follow chain of

25    command.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

48

1   Q.   In other words, you're prohibited from talking to

2        Dr. Raphaely directly?

3   A.   No.

4   Q.   You just chose not to?

5                    MS. ASHER:   Objection.   Go ahead.

6   Q.   Is that correct?  Or is -- well, let me say:   You

7        said "we follow chain of command."   I don't know

8        what you mean by "we."

9             Why don't you tell me who "we" is.

10  A.   The medical center.

11            So there are approximately 5500 VA employees

12       and it would be hard for me to talk to every

13       single employee.

14  Q.   Of course.

15  A.   So we use the chain of command.

16  Q.   Okay.   How many heads of the department of

17       anesthesiology were there in June of 2018?

18  A.   One.

19  Q.   Okay.

20  A.   There are probably 60 service chiefs or

21       department heads in the VA.

22  Q.   How many heads of departments in the VA do you

23       get reports of this nature about that indicate

24       vindictiveness and retaliation and many other

25       such things in them?   How many of those do you

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

49

1      get?

2   A.  A few.

3   Q.  Hopefully you can count them on one hand in a

4       given year, correct?

5   A.  Maybe not.

6   Q.  But it's just a few.  Why can't you talk to those

7       few as executive -- excuse me, as medical

8       director/CEO?

9                   MS. ASHER:  Objection.  Go ahead.

10  A.  I could.  I did not.

11  Q.  It says here that, if you look on the first page,

12      excuse me, first page under "Background."  Do you

13      see it?

14  A.  Yes.

15  Q.  Second paragraph says in the last part of the

16      last sentence, "part of the undertaking is to

17      identify the facts surrounding allegations of

18      retaliation, discrimination and unequal treatment

19      by," and that would be Dr. Raphaely, correct?

20  A.  Yes.

21  Q.  Is that what your understanding of part of this

22      report was about?

23  A.  Yes.

24  Q.  Okay.  Let's take a look at Page 4.

25          If you'll take a look at Roman Numeral II at

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

50

```
 1          the top it says "Change in Work Environment and

 2          Perceptions."  Do you see that?

 3     A.   Yes.

 4     Q.   Under that there's a second paragraph which

 5          begins with the words:  "Many CRNAs."

 6               Do you see that?

 7     A.   Yes.

 8     Q.   I'm going to read it, if I may:  "Many CRNAs

 9          indicated that about a year or a year-and-a-half

10          ago," and that would be Dr. Raphaely's, "actions

11          began to change."

12               Did I read that correctly?

13     A.   Yes.

14     Q.   "Their initial impression of her changes to the

15          operation changed from being one who cared for

16          them as employees and wanting to make sure they

17          were treated with respect by others to become

18          someone who is vindictive, retaliatory, hostile,

19          discriminatory and divisive."

20               Did I read that correctly?

21     A.   Yes.

22     Q.   Do you have any reason to question the accuracy

23          of those adjectives as put here, written here by

24          Ms. Spicer?

25     A.   No.
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

51

```
 1   Q.  Are you aware of the fact that Ms. Spicer had

 2       personal interviews on a one-to-one basis with

 3       the vast majority of people -- of CRNAs, excuse

 4       me, in the department of anesthesiology?

 5                   MS. ASHER:  Object.

 6   Q.  Are you aware of that?

 7                   MS. ASHER:  Objection.  Go ahead.

 8   A.  I'm aware of what it says in the report, that she

 9       met with the three groups.  Some were one on one.

10   Q.  That were not one on one?

11   A.  Some were one on one I believe it said.

12   Q.  So you don't know how many were one on one?

13   A.  No.

14   Q.  It could be as many as 15?

15                   MS. ASHER:  Objection.

16   A.  I can't say.

17   Q.  Do you know how many CRNAs there are in the

18       department?

19   A.  Per her report it says 16.

20   Q.  Do you remember the number 15 also?

21   A.  15 is on the last page.

22   Q.  Yes, I know.  You remember that, don't you?

23   A.  I read it.

24   Q.  Okay.

25           Does that refresh your memory of what you
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

52

1     read in June of 2018?

2   A.  Yes, sir.

3   Q.  **Okay.  Let me ask you this:  Is it appropriate to**

4       **have as a head of a department somebody who the**

5       **majority of CRNAs in the department believe is**

6       **vindictive, retaliatory, hostile, discriminatory**

7       **and divisive?**

8               MS. ASHER:  Objection.  Go ahead.

9   A.  It is appropriate to have a strong leader in the

10      department.

11  Q.  **Why don't you answer my question?**

12  A.  It can be appropriate to have a supervisor that

13      -- or a department head, I'm sorry.  That's how

14      you refer to it.  A department head that has a

15      plan to improve.

16          May I ask who's here?

17              MS. SINDELL:  I'm Rachel Sindell.

18  Q.  **Oh, she's an attorney and she's my partner.**

19              MS. SINDELL:  I'm the FBI.  I just

20          came to investigate you.

21  A.  You wouldn't be the first.

22  Q.  **I didn't even see her come in but, yes, you can**

23      **ask and you got an answer.**

24  A.  I'm sorry.  I wasn't sure if it was his wife or

25      who it was.  I'm sorry, I'm just asking.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

53

1  Q.  Well, we are married actually but we're also

2      partners, law partners.

3  A.  I was actually thinking it might have been

4      Dr. Lisan's wife.  I'm sorry.

5  Q.  Gees I hope not.  Last time I checked she was my

6      wife.

7  A.  Sorry.

8  Q.  Don't worry about it.  That's not a violation of

9      my code of conduct.  That's off the record

10     please.

11         Okay.  Now, I'm going to ask you again the

12     very simple question:  Is it good or bad to have

13     a department head of the department of

14     anesthesiology who's vindictive toward CRNAs?

15 A.  This report does not say she was vindictive.  It

16     says the employees' perception was she was

17     vindictive.

18 Q.  Okay.  Is that a good thing?

19 A.  No.  It --

20 Q.  Is it a good thing for the employees to have the

21     perception that the head of the department is

22     retaliatory?

23 A.  Perceptions are not always reality.

24 Q.  Is it a good thing for that perception to exist?

25 A.  I can't comment if it's good or bad because it's

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

54

```
 1      perception.  It is not fact.
 2  Q.  Don't you believe the honesty of the CRNAs who
 3      got together and made these complaints using this
 4      kind of descriptive language?  Don't you believe
 5      them?
 6  A.  I believe it is their perception.
 7  Q.  Well, is that a good thing for the VA to have 15
 8      people in a department of 16 believe that their
 9      boss is retaliatory?  Is that a good thing?
10              MS. ASHER:  Objection.  Go ahead.
11  A.  If it is because the boss is holding them
12      accountable to provide good care and to show up
13      on time, it may be appropriate for employees to
14      not be happy with their boss.
15  Q.  I don't think you actually meant that.  You want
16      to hear your answer again?  Listen to your
17      answer.  I think you might want to amend that.
18      Could you read it back, her answer.
19              THE NOTARY:  "If it is because the
20          boss is holding them accountable to provide
21          good care and to show up on time, it may be
22          appropriate for employees to not be happy
23          with their boss."
24  Q.  Okay.  So it's appropriate for employees not to
25      be happy with their boss because their boss wants
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

55

 1      them to come to work on time?  Is that what

 2      you're saying?

 3  A.  I think I'm --

 4  Q.  All right.  Never mind.

 5          Is it -- okay.  You would give the same

 6      answer, then, I assume for somebody who's, for

 7      perception of hostility on the part of the

 8      department head, might or might not be a good

 9      thing depending on why?

10  A.  Correct.

11  Q.  And discriminatory, is that a good thing, or that

12      perception to exist in the majority of the

13      department?

14  A.  For a perception.

15  Q.  And divisive.  That depends on the reason for it,

16      right?

17  A.  Yes.

18  Q.  Did you investigate personally in any way to find

19      out what the basis of vindictive was?

20  A.  I did not.

21  Q.  Did you read anything that indicated what the

22      vindictive aspect was?

23  A.  This report.

24  Q.  Other than this report is there any fact at all

25      that came to your attention indicating what

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

56

```
1        justification, if any, there would be for 15 out
2        of the 16 CRNAs to think that their department
3        head was vindictive, retaliatory, hostile,
4        discriminatory and divisive?
5    A.  No.
6    Q.  Why not?  Didn't that interest you?
7                    MS. ASHER:  Objection.  Go ahead.
8    A.  Because we had the Office of General Counsel
9        attorneys and the employee labor relations group
10       looking at this matter.
11   Q.  Yes.  But you're the CEO executive -- medical
12       director of the whole place.
13           Isn't this something that requires your
14       hands-on immediate attention?
15   A.  Not in my opinion.
16   Q.  Not in your opinion.  Okay?  What about the
17       opinion of your superiors?  Do you have any idea
18       what their opinion is?
19   A.  You'd have to ask them.
20   Q.  Did you?
21   A.  I did not.
22   Q.  Why not?
23   A.  I didn't.
24   Q.  I didn't ask you that.
25           I asked you why didn't you ask them?
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

57

```
 1   A.  Because I didn't think I needed to ask them.
 2   Q.  Why not?
 3   A.  Because I did not believe this was a matter that
 4       they needed to hear about.
 5   Q.  Your superiors don't need to hear about
 6       perceptions like that in an entire department of
 7       anesthesiology which puts patients to sleep on
 8       the operating table?  Is that your testimony?
 9   A.  They need to hear the complete fact finding.
10   Q.  And you don't even know if there has been any
11       fact finding, do you, as you sit here now?
12                   MS. ASHER:  Objection.
13   A.  I am aware that the Office of General Counsel and
14       employee labor, the employee labor relations
15       group has looked at this matter extensively.
16   Q.  Do you know if any action has been taken?
17   A.  I know they have made recommendations for
18       Dr. Raphaely that have been completed.
19   Q.  Completed successfully?
20   A.  Completed.
21   Q.  The recommendations have been completed.  Is that
22       what you mean?
23   A.  Yes.
24   Q.  Have they been carried out?
25   A.  To my knowledge, yes.
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

58

1   Q.  You don't think that there's any indication that

2       CRNAs believe Dr. Raphaely is still acting in a

3       way that's vindictive, retaliatory, hostile,

4       discriminatory and divisive?  Is that what your

5       testimony is?

6   A.  I can tell you I have not had any complaints.

7   Q.  It says, "If she is proven wrong, she retaliates

8       and penalizes the entire CRNA group."

9           Do you think that's a good or bad perception

10      for the 15 out of the 16 CRNAs to have had?

11  A.  I would need to see the specific instance.

12  Q.  You don't have any reason to believe --

13      withdrawn.

14          Do you have any reason to believe as you sit

15      here now that Dr. Raphaely was doing anything

16      wrong prior to June 18, 2018?

17                  MS. ASHER:  Objection.  Go ahead.

18  A.  As I said, there were actions.  There were

19      corrective actions that have been recommended and

20      have been completed.

21  Q.  Okay.  What does "corrective actions" mean?

22  A.  Training.

23  Q.  Training for Dr. Raphaely?

24  A.  Yes.

25  Q.  Do you know if she was subjected to any training?

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

59

1   A.  Yes.

2   Q.  **Oh, you do know that?**

3   A.  She's completed training.

4   Q.  **Well you didn't tell me that.  I asked you if you**

5       **knew what steps were taken; but, okay.**

6           **What kind of training did she have?**

7   A.  She's completed or attended new supervisor

8       training.  She has participated in healthcare

9       leadership development program for the VA.  There

10      are what we call TMS, talent management -- I

11      don't know what TMS stands for.  I apologize.

12      But computer training that she has completed.

13      She has been connected with a mentor.

14  Q.  **What do you mean, a mentor?**

15  A.  A service chief or a department chair.

16  Q.  **Who is that?**

17  A.  I believe Dr. Kinnard is one of them.

18  Q.  **Kinnard?**

19  A.  Yes.

20  Q.  **How do you spell that?**

21  A.  K-I-N-N-A-R-D.

22  Q.  **Is that a male or female?**

23  A.  Female.

24  Q.  **What's the first name?**

25  A.  Margaret.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

60

1  Q.  Have you spoken to Dr. Kinnard about her

2      training?

3  A.  No, I have not.

4  Q.  There are a number of very specific examples

5      given here about Dr. -- withdrawn.

6          Has Dr. Raphaely been disciplined in any way?

7                  MS. ASHER:  Objection.  That's --

8          you cannot answer that under the Privacy

9          Act.

10 Q.  Okay.  What is a corrective action besides a

11     recommendation to -- withdrawn.

12         Corrective action is one of the disciplinary

13     steps formally set forth in the protocols; isn't

14     it?  Somebody receives a corrective action, it

15     means they've been doing something that needs to

16     be corrected, correct?

17 A.  A corrective action, the way I meant it is that

18     there were steps to make improvements, an

19     improvement plan.

20 Q.  Was she suspended?

21                 MS. ASHER:  Objection.  You can't

22         answer that under the Privacy Act.

23 Q.  If you'll look at Page 4, continuing, are you, do

24     you see the part in a box, "Yelling and

25     Condescending Tones Toward the Staff"?

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

61

1   A.   Yes.

2   Q.   And it says, "the majority of CRNAs describe her

3        yelling as 'a lot,' 'it's not uncommon,' and

4        'multiple times.'"

5             Did I read that correctly?

6   A.   Yes, sir.

7   Q.   And do you have any -- withdrawn.

8             Did you have any concerns about that?

9   A.   When I read it, yes, I have concerns.

10  Q.   Well, is that just some subjective kind of

11       perception?

12  A.   It could be.

13  Q.   Could be.

14            Did you make any determination as to whether

15       it was or wasn't?

16  A.   I did not.

17  Q.   Let me ask you this:  Would it be appropriate for

18       Dr. Raphaely to coach a CRNA about her upcoming

19       deposition testimony?

20                 MS. ASHER:  Objection.  Go ahead.

21  A.   It would be inappropriate.

22  Q.   Would it appropriate for Dr. Raphaely to coach a

23       CRNA as to how she should fill out an affidavit

24       for an investigator into Ron Lisan's complaints?

25                 MS. ASHER:  Objection.  Go ahead.

Susan M. Fuehrer (Vol I) - April 02, 2019
Deposition

62

1    A.   To clarify, if she coached say complete the form

2         to the best of your ability, to complete the form

3         honestly, that's appropriate.

4             If she coached in a way where she was putting

5         words into someone's mouth, that would be

6         inappropriate.

7    Q.   **Telling someone what to write, for example, would**

8         **be inappropriate.**

9    A.   Correct.

10   Q.   **Are you aware that there has been sworn testimony**

11        **that that's exactly what she did as recently as**

12        **the last couple of months?**

13                    MS. ASHER:   Objection.   Go ahead.

14   A.   I'm not aware.

15   Q.   **We'll mark this whole deposition transcript as**

16        **Exhibit 32.**

17                         -  -  -  -

18            (Thereupon, Plaintiff's Exhibit 32, 3/19/19

19            Elaine Costanzo deposition transcript, was

20            marked for purposes of identification.)

21                         -  -  -  -

22   Q.   **And I will give that to you.  And I only have one**

23        **more copy, so...**

24            **I'd like you to turn to Page 71.**

25            **This is the sworn testimony of Elaine**

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

63

```
 1        Costanzo.  Does that name ring a bell?  You've

 2        got to use a word.

 3   A.   Oh.  No.  The sorry.

 4   Q.   That's okay.

 5            And she's a CRNA, just so you know.  Okay?

 6   A.   Yes.

 7   Q.   And if you'll take a look at Page 71, well,

 8        actually 70 at the very bottom left, and I'll

 9        read it out loud.

10            Question:  "Please tell me if there was any

11        statements or discussion you heard that Karin

12        Bonfili" --

13            That's another CRNA who complained about Ron

14        Lisan.  And Elaine Costanzo also complained about

15        him, so you know.

16   A.   She was one of the four?

17   Q.   Yes.  Those two, Costanzo and Bonfili were among

18        the four.  Okay?  You've got --

19   A.   Yes.

20   Q.   All right.

21            Again I'll start at Page 70 Line 24.

22            Question:  "Please tell me if there was any

23        statements or discussion you heard that Karin

24        Bonfili said that Dr. Raphaely had any

25        discussions with Karin Bonfili about anything
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

64

1   Karin Bonfili wrote in a report of contact

2   concerning Ron Lisan and complaints about him."

3        And her answer was:  "So nothing in regards

4   to the report of contact."

5        Question:  "Okay."

6        Answer:  "The only thing that I heard was in

7   regards to the EEO complaint."

8        Question:  "And what did you hear in regards

9   to the EEO complaint?"

10       Answer:  "I heard that Karin felt she was

11  told what to write on the EEO complaint."

12       Question:  "And was that by Dr. Raphaely?"

13       Answer:  "I don't know for sure but I can

14  only assume that that was the case."

15       "Is that your best recollection?"

16       Answer:  "Best recollection.  Whether or not

17  that actually happened, I don't know."

18       Question:  "I didn't ask you that."

19       "Okay."

20       "Do you recall when you heard that?"

21       Answer:  "No, I do not recall."

22       Question:  "So I take it if you don't recall

23  when you heard Karin Bonfili say that then; is

24  that correct?"

25       Answer:  "It would have been around the time

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

65

1    that we were filling out our affidavits for the

2    EEO."

3          Which was conducted by Mr. Greenspan.  Okay?

4    A.  Yes.

5    Q.  Now, that's one testimony.

6          Do you find that disturbing?

7                    MS. ASHER:  Objection.  The

8              testimony speaks for itself.

9    Q.  If that's true, isn't that disturbing to you?

10   A.  Elaine says that she doesn't know that it's true.

11   Q.  No.  She knows that that's what Karin Bonfili

12   told her occurred.

13         Now I'm just asking you --

14   A.  Her testimony says, "Whether or not that actually

15   happened, I don't know."

16   Q.  Right.  I'm asking you a question:

17         If it's true, wouldn't that be disturbing to

18   you?

19                    MS. ASHER:  Objection.  You can

20             answer.

21   A.  It doesn't say that it's true.

22   Q.  And you won't answer my question, will you?

23         If it's true, if it's true?

24   A.  If it's true?

25   Q.  Yes.  I said it four times.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

66

```
 1            If it's true, that's very disturbing to you,
 2       isn't it?
 3  A.   Not necessarily because it doesn't say exactly
 4       what she was told to put on the affidavit.  It
 5       could have said complete the affidavit correctly.
 6  Q.   All right.  Let me ask you this:  Are you aware
 7       that the first alleged, not alleged -- withdrawn.
 8            Are you aware that the first complaints that
 9       were documented by Dr. Raphaely were
10       approximately four days after the email, email
11       letter of January 6th, 2017 that we went over
12       earlier?
13  A.   No.
14  Q.   If I told you that the complaints against, by
15       these CRNAs against Dr. Lisan surfaced
16       approximately four days after that email letter
17       in which he complained or I complained on his
18       behalf to you and to Dr. Altose, would you find
19       that curiously coincidental?
20                  MS. ASHER:  Objection.  Go ahead.
21  A.   Which four emails?
22  Q.   Start over.
23            January 6th, 2017 was the date we emailed a
24       letter to you.  It was Exhibit 31.  You have it
25       in front of you?
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

67

```
 1   A.  Yes.
 2   Q.  And it describes complaints about discrimination,
 3       disability, sex discrimination, reasonable
 4       accommodation in general, correct?
 5   A.  Yes.
 6   Q.  Okay.  The first surfacing of complaints from
 7       CRNAs about Dr. Lisan generated by Dr. Raphaely
 8       were January 10th, 2017, four days later.
 9           Did you know that?
10   A.  I don't know if that was the first.
11   Q.  Well, assume it was.  Okay?
12           If that's the case, do you find the beginning
13       of these complaints and followed shortly
14       thereafter by three more to be suspiciously
15       coincidental?
16                   MS. ASHER:  Objection.  Go ahead.
17   A.  Not necessarily.  Not if they were aware that
18       there had been a letter from an attorney, if
19       Dr. Lisan had told them.
20           I mean if they were aware something was
21       coming, it could -- I can't say that, no.
22   Q.  Okay.  So it doesn't cause you to wonder why
23       after 30 years in practice without any complaints
24       from any CRNAs anywhere, four days after we sent
25       or I sent on his behalf, Dr. Lisan's behalf this
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

68

```
1        letter, all these complaints started surfacing
2        from Dr. Raphaely's office?
3                     MS. ASHER:  Objection.  Go ahead.
4    A.  No.  No more than I noticed in your letter that
5        you attribute all the issues with Dr. Raphaely,
6        yet I am aware that the prior service chief,
7        Dr. Kazdan had documented that Dr. Lisan had, was
8        chronically late in his performance evaluation.
9    Q.  I don't know what -- how that's an answer to my
10       question other than you just wanted to throw
11       something in.
12           My question to you is all of these complaints
13       surfaced four days after my letter.
14           Is it your testimony that you don't see
15       anything a little bit suspicious about that?
16                    MS. ASHER:  Objection.  Go ahead.
17   A.  Correct.
18   Q.  Okay.  That's all I wanted to know.
19           Would it be appropriate for Dr. Raphaely to
20       solicit complaints, if any, about Dr. Lisan from
21       other CRNAs within days after this letter was
22       sent?
23   A.  Yes.
24   Q.  Okay.  I'd like you to turn to Page 85.
25                    MS. ASHER:  Are you talking about
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

69

```
 1              in Exhibit 32?
 2   Q.   I'm sorry, yes.
 3            This is again the same deposition.
 4   A.   Yes.
 5   Q.   If you'll look at Page 85, Line 14, it's the
 6        upper left box.
 7            Got it?  Are you with me?
 8   A.   Yes.
 9   Q.   I'll read it.
10            The question is:  "Is it correct that
11        Dr. Raphaely shared with you in her phone call to
12        you at home in early January 2017 that she had
13        heard about something you told somebody else
14        about an experience" blah-blah-blah -- "about an
15        experience that was uncomfortable to you with
16        Dr. Lisan; is that correct?"
17            Answer:  "She had heard an experience that I
18        had with Dr. Lisan that she was encouraging me to
19        write up."
20            And then question:  "Did she tell you what
21        experience she heard from somebody else?"
22            And then she says, answer:  "Yes.  We --"
23            Question:  "What did she tell you she heard
24        from somebody else?"
25            Answer:  "She heard that I had had, when I
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

70

1      first started working there, I had an

2      uncomfortable -- two uncomfortable encounters

3      with Dr. Lisan that I kind of brushed off as

4      inappropriate and went on with my life."

5           Question:  "Who was it that she heard this

6      from?"

7           Answer:  "Jessica Foster."

8           She was the very first complainant about

9      Dr. Lisan.

10          Question:  "Did she share with you why she

11     was talking to Jessica Foster about Ron Lisan?"

12          "No."

13          "Did she tell you she was investigating

14     complaints about Ron Lisan?"

15          "Yes."

16          Okay.  Now, does that trouble you at all?

17                    MS. ASHER:  Objection.  Testimony

18          speaks for itself but go ahead.

19  A.  The way I read this is that Dr. Raphaely had

20      complaints and she was trying to make sure that

21      anyone that felt that they had been treated

22      inappropriately had the opportunity to write a

23      report of contact or to identify their concerns.

24  Q.  Okay.  So she had every reason, then, because she

25      had one complaint or two complaints, whatever, to

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

71

1      solicit the entire department to see if anybody

2      else had complaints about Dr. Lisan.

3           Is that your testimony?

4   A.  Can you repeat the question?

5   Q.  Sure.  Read it back.

6                THE NOTARY:  "So she had every

7             reason, then, because she had one complaint

8             or two complaints, whatever, to solicit the

9             entire department to see if anybody else

10            had complaints about Dr. Lisan.

11                "Is that your testimony?"

12  A.  So this testimony doesn't identify whether she

13      had solicited everyone else.  I will say she has

14      an obligation if there are complaints to make

15      sure that all employees have the right to be

16      heard.

17  Q.  Okay.  And that means you can solicit any or all

18      or whatever number of employees to find out if

19      anybody else has any complaints about Dr. Lisan.

20      Is that your testimony?

21                MS. ASHER:  Objection.  Go ahead.

22  A.  The way I read this testimony, it says that she

23      had reason to believe that there was some

24      indication that this employee had some issues.

25  Q.  Okay.  It was -- okay.  So that was appropriate

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

72

1       for her to call her up, ask her about that and

2       encourage her to write it up.  Is that your

3       testimony?

4  A.  She has an obligation if there is an employee

5       that feels threatened to make sure the employee

6       has the right to write it up, has the

7       opportunity.

8  Q.  But she went after this employee.  This employee

9       didn't come to her?

10              MS. ASHER:  Objection.

11  Q.  Isn't that correct?

12              MS. ASHER:  Objection.  You can

13       answer.

14  Q.  Isn't that correct?

15              MS. ASHER:  Same objection.

16  Q.  Ms. Costanzo did not come to her.  She went to

17       Ms. Costanzo; isn't that correct?

18              MS. ASHER:  Same objection.  You

19       may answer.

20  A.  As a service chief, she has the obligation to

21       make sure that employees have the right to be

22       heard.

23  Q.  But this employee wasn't seeking to be heard, was

24       she?

25              MS. ASHER:  Objection.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

73

```
 1   A.  That doesn't mean we don't have an obligation to

 2       make sure the employee understands their rights

 3       and has the opportunity to be heard.

 4   Q.  I see.

 5           So you think that she, that there was some

 6       concern she had that the employee didn't know

 7       that she could go to Dr. Raphaely.  Is that what

 8       you're saying?  She wanted to make sure she knew

 9       she could go to her?

10   A.  I can't speak for Dr. Raphaely but since we're

11       talking about different scenarios, that could be

12       a scenario.

13   Q.  Okay.  And that's a scenario that you think was

14       completely appropriate for Dr. Raphaely?

15   A.  It could be.

16   Q.  It could not be, too.  Isn't that right?

17                  MS. ASHER:  Objection.  Go ahead.

18   A.  It could not be.  There's not enough information

19       here to provide an answer.

20   Q.  Okay.  Now, do you recall when you read this

21       report that Dr. Lisan's name appeared several

22       times in it?

23                  MS. ASHER:  Objection.

24   Q.  Even though on the copy we have here it's blacked

25       out?
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

74

 1   A.  It may have.

 2   Q.  **Do you recall -- well, let me be very frank with**

 3       **you.  We just received, and I'll show it to**

 4       **you --**

 5                   DR. LISAN:  I got this in the

 6              mailing yesterday.

 7   Q.  **Yes.  We just got it yesterday.**

 8           A FOIA request was responded to made by

 9       Dr. Lisan and we received back a copy -- which I

10       will give to you.  I just don't have copies of

11       it -- my copy indicates that where it's blacked

12       out on the original, Dr. Lisan's name appears in

13       that section one, two, three, this is Page 10.

14       One, two, three, four, five, six times on Page

15       10.  Once on Page 11.  Once on Page 12.  I think

16       that's where it is, right?

17                   DR. LISAN:  I think so.  I did a

18              quick review.

19   Q.  **10, 11 and 12?**

20                   DR. LISAN:  In my quick review,

21              that's all I saw.

22   Q.  **All right.  So that's a number of times.**

23       **Obviously somebody said something about it that**

24       **was in this report.**

25           **Now, do you have any recollection as to the**

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

75

1        context or details pertaining to Dr. Lisan --

2    A.  No.

3    Q.  -- that were in -- you got to let me finish my

4        question.

5            That were in Ms. Spicer's report?

6    A.  No.

7    Q.  Okay.  I'd like you to take Exhibit 31 and please

8        go to Page 13.

9    A.  So that's not Exhibit 31.

10                   MS. ASHER:  Are you talking about

11        Exhibit 27.

12   Q.  I'm sorry, you're right.  27.  It's my mistake.

13       I apologize.

14   A.  Which page?

15   Q.  13.

16   A.  Thank you.

17   Q.  We were looking -- we might have been looking at

18       this.  "Conclusion."  Second paragraph.  "It is

19       important to note"?

20   A.  Yes.

21   Q.  Okay.  All right.  I'm going to read it again.

22           "It is important to note that dissatisfaction

23       among one, two or five employees many times would

24       not be considered significant depending on the

25       concerns."

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

76

1              Do you happen to agree with that?

2    A.   Yes.

3    Q.   Now it goes on:  "But, there are 15 CRNAs who

4         have concerns with the common theme of

5         experiencing fear of retaliation, policies that

6         seem to be implemented as a punishment for the

7         entire group and contrary to the master

8         agreement, constant reminders of how much money

9         they make and constant reminders that they can

10        find another job if they are dissatisfied."

11             Did I read that correctly?

12   A.   Yes.

13   Q.   Okay.  Does that, starting with the word "but"

14        and thereafter in that paragraph disturb you in

15        any way?

16   A.   Certainly warrants further review.

17   Q.   And you're satisfied now the review is done and

18        that everything's fine?

19                  MS. ASHER:   Objection.

20   Q.   Is that correct?

21                  MS. ASHER:   Same objection.

22   A.   As I've previously stated, we have a performance

23        improvement plan that we are working on within

24        anesthesia.

25   Q.   Okay.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

77

```
 1   A.  I have not -- yes.  I have not seen any recent

 2       complaints.

 3   Q.  Okay.  Let's see if you consider this a

 4       complaint.

 5           If you'll take 31.

 6   A.  32.

 7   Q.  32.  Thank you very much.  Off the record.

 8                      -  -  -  -

 9           (Thereupon, a discussion was had off the

10           record.)

11                      -  -  -  -

12                   MS. ASHER:  Have you given us a

13           page number yet or not yet?

14   Q.  Okay.  I'd like you to turn to Page 30.

15           And at the bottom in Line 24, this is again

16       Ms. Costanzo's deposition, correct?

17   A.  Yes.

18   Q.  Question:  "As you sit here now, Ms. Costanzo, do

19       you have any fear that if you say things in this

20       deposition which are upsetting or disturbing or

21       critical with respect to Dr. Raphaely, that you

22       might be retaliated against by her?"

23           Answer:  "Yes."

24           Question:  Skipping to the question:  "I

25       think I can speak for both sets of attorneys
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

78

1      here, but I'll speak for myself first, that our

2      goal as attorneys and professionals in our field

3      is to obtain the truth and that means the whole

4      truth.

5          "You understand that, don't you?"

6          Answer:  "Yes."

7          Okay.  Now this deposition was taken the

8      other day, March 19th, 2019?

9                    MS. ASHER:  Is there a question?

10  Q.  Well, I just want to make sure she's with me.

11  A.  Yes.

12  Q.  I just want you to be able to assume that that's

13      true.  Okay?

14          Doesn't that disturb you that somebody would

15      be afraid to testify truthfully under oath if it

16      meant saying something bad or negative about

17      Dr. Raphaely because of fear of retaliation?

18                    MS. ASHER:  Objection.  The

19              testimony speaks for itself.  You can

20              answer.

21  A.  Yes.

22  Q.  I'd like you to turn to Page 75.  It's 74 but

23      it's the same page.

24  A.  I'm there.

25  Q.  You see it that's line -- are you with me?

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

79

1    A.   Page 74, yes.

2    Q.   Okay.  Good.  I'm sorry.  I just wanted to be

3         sure.

4              Line 20.  Now Mr. Greenspan, just so you

5         understand the part I'm reading, he is, I think I

6         mentioned him before.  He's an investigator

7         appointed by I guess it's the ORM investigation

8         arm to investigate Dr. Lisan's complaints and he

9         was doing his investigation talking to people, so

10        you know who that is, okay?

11   A.   Yes.

12                   MS. ASHER:   Objection.

13   A.   Oh.

14                   MS. ASHER:   That's okay.

15   Q.   And you may assume that the approximate time was

16        in October of 2017.  That's when this occurred.

17        Just so you have a time frame.  I'm asking you to

18        assume that.  Okay?  The affidavits were sent in

19        about that time, October 2017.  All right?

20             Now I'll read you the question so you know.

21             This is the testimony of Ms. Costanzo just

22        the other day.  Line 20 on Page 74.

23             Question:  "Did you ever tell Mr. Greenspan

24        that you were fearful of telling the whole truth

25        in answer to his questions because of retaliation

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

80

1      from Dr. Raphaely?"

2          Answer:  "I told him that I wanted to make

3      sure that I absolutely had to participate in it

4      before I actually participated in it because I

5      didn't want to get myself involved with this

6      situation."

7          Question:  "Did you tell him why you didn't

8      want to get involved with it?"

9          Answer:  "I feared my boss.  I feared

10     Dr. Raphaely."

11         Question:  "Feared retaliation against you

12     from her?"

13         Answer:  "Yes."

14         Does that disturb you?

15                 MS. ASHER:  Objection.  Go ahead.

16  A.  Yes.

17  Q.  Does that indicate to you that maybe the matters

18      raised in the Spicer report have not been

19      completely addressed?

20                 MS. ASHER:  Objection.  Go ahead.

21  A.  Yes.

22  Q.  Do you intend to take any further action in that

23      regard or don't you know?

24                 MS. ASHER:  Objection.  Go ahead.

25  A.  I will have to consult attorneys because I

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

81

```
 1        don't -- I have not had -- this is the first time
 2        I've seen this.  I don't know the context.  I
 3        don't know where we're at, so I would need to
 4        talk to somebody.
 5   Q.   You'd need to investigate further?
 6   A.   Yes.
 7   Q.   Okay.  That's fair.  I understand.
 8            You do understand there's a lot of other
 9        sworn testimony and other testimony in this case
10        besides this?
11                    MS. ASHER:  Objection.  And that
12            testimony speaks for itself.
13   Q.   Did you know that?
14                    MS. ASHER:  Go ahead.
15   A.   I don't know who you've spoken to and who you
16        haven't spoken to.
17   Q.   Okay.  I understand.
18            You got to leave at four and I understand
19        that.  I understood that before, but I got a ways
20        to go.
21            I mean it will probably go faster but I am
22        not complete here.  I'm nowhere near.  This is
23        the first time I've had that problem actually
24        where I haven't -- off the record.
25                          -   -   -   -
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

```
 1           (Thereupon, a discussion was had off the

 2           record.)

 3                        -   -   -   -

 4   Q.  Now I'd like to show you what I'm going to mark

 5       as Exhibit 33.

 6                        -   -   -   -

 7           (Thereupon, Plaintiff's Exhibit 33, 1/10/17

 8           "Sexual Harassment Allegation Checklist

 9           (Alleged Harasser)" was marked for purposes

10           of identification.)

11                        -   -   -   -

12   Q.  I barely got it in there.

13           Okay.  This is Exhibit 33.  And that's for

14       you.

15           Do you recognize this sheet?

16   A.  Yes.

17   Q.  Okay.  Do you recognize the sheet with the

18       writing on it or just the form?

19   A.  Just the form.  I'm sorry.

20   Q.  Okay.  It says, "Sexual Harassment Allegation

21       Checklist" and it's in parentheses below it,

22       "(Alleged Harasser)," correct?

23   A.  Yes.

24   Q.  You want to take a minute and look at it?

25   A.  Okay.
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

83

```
 1    Q.  I can tell you that the handwriting on there is
 2        Dr. Raphaely's.
 3                      DR. LISAN:  That's Raphaely's,
 4            yeah.
 5    Q.  The part here where it says Dr. Lisan, et cetera?
 6    A.  Okay.
 7                      MS. JOHNSON:  There's no
 8            foundation for that.
 9    Q.  Yes.  The initials, however, are my client's.
10                      MS. ASHER:  Objection.
11            Foundation.  Go ahead.
12    A.  Okay.
13    Q.  Let me ask you this:  How would you define sexual
14        harassment according to VA standards?
15    A.  I would --
16                      MS. ASHER:  Objection.  Which is
17            it?  How would she define it or how is it
18            defined according to VA standards?  Sorry,
19            it's just hard.
20    Q.  All right.  I'll rephrase the question.
21                      MS. ASHER:  Okay.
22    Q.  What is your understanding of the VA's definition
23        of sexual harassment?
24    A.  My understanding is any comments that are
25        provided to an employee that are unwelcomed and
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

84

1        unwanted.

2    **Q.  Any comments?**

3    A.  That are sexual or could be construed as sexual

4        in nature.

5    **Q.  Right.  Okay.  But they have to be sexual?**

6    A.  Or perceived as...

7    **Q.  Reasonably perceived as sexual, correct?**

8                    MS. ASHER:  Objection.  You may

9            answer.

10   A.  You can file a complaint whether it's reasonable

11       or not.  If it's perceived, you can file a

12       complaint.

13   **Q.  Okay.  I didn't ask you what the standard was to**

14       **file a complaint.  I asked you what your**

15       **understanding is of the VA's definition of sexual**

16       **harassment and I think your answer was it has to**

17       **at least be reasonably perceived as having a**

18       **sexual connotation or is that wrong?**

19   A.  I did not say that it has to be reasonable.

20   **Q.  Oh.  It could be unreasonable.  It would still be**

21       **sexual harassment?**

22   A.  We work for the government, yes.

23   **Q.  So you can make an unreasonable claim of sexual**

24       **harassment that really isn't sexual harassment**

25       **but it is sexual harassment?  Is that what you're**

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

85

1      saying?

2                        MS. ASHER:  Objection.

3   A.  The policy says -- and I'm paraphrasing --

4   Q.  **Sure.**

5   A.  -- that you cannot make comments to someone that

6       they find unwanted or inappropriate and that is

7       what they perceive; so I don't know why you keep

8       on asking me about "reasonable" because I can't

9       address "reasonable" based on an employee's

10      perception.

11  Q.  **Okay.  I want to be very clear about your answer,**

12      **however.**

13      **You said unwanted or unwelcome?**

14  A.  Or -- yes.

15  Q.  **But you didn't say sexual in nature.**

16                        MS. ASHER:  Objection.  Yes, she

17              did.  There's transcript with her answer.

18              We can go back.

19                        MR. SINDELL:  Let's read it back

20              and see if you're right.

21                        Read back her last answer and

22              let's see if she said sexual.

23                        MS. ASHER:  Well, you've asked

24              this question several times and --

25                        MR. SINDELL:  I don't care if I've

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

86

```
 1              asked it several times.  She didn't say

 2              sexual.

 3                     MS. JOHNSON:  Steve, you just

 4              interrupted her.

 5                     MS. ASHER:  Right.

 6                     MR. SINDELL:  Oh my.  I'm sorry.

 7                     Cut it out.

 8                     MS. ASHER:  Steve, you've

 9              interrupted this witness' testimony a

10              couple of times and so if you want to ask

11              her what her testimony is, we have a

12              transcript of what her testimony is but

13              she's addressed this question several times

14              now.

15                     MR. SINDELL:  Would you please

16              read back her last answer.

17                     THE NOTARY:  "The policy says --

18              and I'm paraphrasing -- that you cannot

19              make comments to someone that they find

20              unwanted or inappropriate and that is what

21              they perceive; so I don't know why you keep

22              on asking me about 'reasonable' because I

23              can't address 'reasonable' based on an

24              employee's perception."

25  Q.  Okay.  To be exact.  I understand the part about
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

87

1    reasonable and unreasonable.  Okay?

2        But your answer used two words:  That the

3    receiver of the verbal comment finds unwanted or

4    inappropriate.  Those are the words you used.

5    But there is nothing in what you answered on that

6    occasion that says it had to have anything to do

7    with sex.  In order to be sexual harassment, it

8    has to have something to do with sex, doesn't it?

9                    MS. ASHER:  Objection.  You can

10              answer.

11   A.  I apologize.  You've asked several times.  I

12       thought it was understood that we were talking

13       about the sexual harassment allegation checklist.

14       I apologize for not being specific enough for

15       you.

16   Q.  That's okay.  I just want to make sure we're on

17       the same page.

18           And I understand that you meant it has to be

19       sexual or it couldn't be sexual harassment by

20       definition, correct?

21   A.  Yes.

22   Q.  Okay.  All right, now, if we can take a look at

23       something here, I have to find it and I

24       apologize.

25           I'm going to mark this as Exhibit 34.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

88

```
 1                              -   -   -   -

 2            (Thereupon, Plaintiff's Exhibit 34, Reports

 3            of Contact, was marked for purposes of

 4            identification.)

 5                              -   -   -   -

 6    Q.   Okay.  This is 34 and I'll tell you what it is.

 7            These are four, the four initial CRNA

 8         complaints.  Okay?

 9            I'm going to, let's take them in the order

10         I'm going to pick here.  Okay?  If you'll turn to

11         the third page in, and I will give you of course

12         a chance to read it.

13    A.   Yes.

14    Q.   Please do.

15    A.   I have completed reading.

16    Q.   Okay.  Well, do you see this as a sexual remark?

17    A.   Yes.

18    Q.   Okay.  Because he said, "What time should I be

19         over?"  That's what you're referring to?

20                      MS. ASHER:  Objection.  Go ahead.

21    A.   The tone of the email, yes.

22    Q.   Okay.  Well, I mean that's the highlight, isn't

23         it --

24                      MS. ASHER:  Objection.

25    Q.   -- that makes you think there's a possible sexual
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

89

1      innuendo?

2                    MS. ASHER:  Objection.  Go ahead.

3    A.  I read the entire report of context -- report of

4        contact in context, excuse me.

5    Q.  **You're doing fine.**

6                    MS. JOHNSON:  That is hard.

7    Q.  **Now, first of all, this is the statement of the**

8        **CRNA Rhonda Verb.  Is that what you understand?**

9    A.  That's what it says.

10   Q.  **Yeah.  Well, she signed it and wrote her name**

11       **below.  I don't see a date but my understanding**

12       **is that she typed this out herself and signed it**

13       **as her statement?**

14   A.  My understanding, too.

15   Q.  **Good.  Is this true?  Did Ron Lisan say this to**

16       **Rhonda Verb?**

17                   MS. ASHER:  Objection.

18   A.  I don't know.

19   Q.  **Okay.  Well, if you were investigating this**

20       **matter as Dr. Raphaely was, according to you,**

21       **would you want to talk to Dr. Lisan to find out**

22       **his take on the conversation?**

23                   MS. ASHER:  Objection.  Go ahead.

24   Q.  **As part of the investigation?**

25                   MS. ASHER:  Same objection.  Go

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

90

```
 1            ahead.
 2   A.   I don't know what Dr. Raphaely was doing, if she
 3        was collecting this information to provide to
 4        employee relations or EEO for them to do the fact
 5        finding.  I don't -- I can't answer that
 6        beyond --
 7   Q.   Well, let's not pin it down to Dr. Raphaely.
 8            Whoever the fact finder was making an
 9        investigation, wouldn't you expect that the fact
10        finder would want to talk to Ron Lisan, Dr. Ron
11        Lisan to get his side of what he recalled?
12   A.   They may.
13   Q.   And they may not?
14                    MS. ASHER:  Objection.  Go ahead.
15   Q.   Is that what you're saying?  May or may not in an
16        investigation of this allegation talk to the
17        person they're accusing?
18   A.   It depends on the stage of the investigation.  If
19        it's a formal investigation, yes.  If it's an
20        administrative investigation, yes.
21            If it's an informality fact finding maybe
22        yes, maybe no.
23   Q.   Well, do you know who Mr. Kafer is?
24   A.   Bruce, yes.
25   Q.   Yes.  Bruce Kafer.  I'm sorry.
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

91

1     Mr. Bruce Kafer, you know who he is, don't

2     you?

3   A.   Yes.

4   Q.   And he is the EEO coordinator, isn't he?

5   A.   He handles reasonable accommodation also.

6   Q.   Yes, I know that.  But he also is in a capacity

7        as the EEO coordinator, isn't he?

8   A.   I think he works -- I don't think he's called the

9        EEO coordinator.  I don't think that's his

10       official title.

11  Q.   That's what he calls himself.

12  A.   Okay.

13  Q.   But at any rate --

14  A.   There's several then.

15  Q.   That could be.  But in any event, he was given

16       the fact finding role in this case and in fact

17       wrote a report.

18            Are you aware of that?

19  A.   I may have been.  I don't recall.

20  Q.   Okay.  Well, I'm going to ask you to assume that

21       he was the fact finder.

22  A.   Okay.

23  Q.   In this matter and that in fact he did write a

24       report which at some point in time I'm going to

25       show you.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

92

1   A.   Okay.

2   Q.   You can assume that to be true.

3        Do you know what he found in his report?

4             MS. ASHER:  Objection.  Go ahead.

5   A.   I don't recall.

6   Q.   Okay.  Would it help refresh your memory if I

7        told you he found there was no sexual harassment

8        in any of the complaints of the CRNAs because

9        they didn't rise to a level of sexual harassment.

10       Did you know that?

11            MS. ASHER:  Objection.  Go ahead.

12  A.   I may have and I don't recall.

13  Q.   Okay.  That's fine.

14       Well, my question is:  If he was the fact

15       finder, wouldn't you expect that he would show

16       Dr. Lisan as part of his fact finding the claims

17       and allegations made against him by each CRNA and

18       ask him, Dr. Lisan, for his recollection of the

19       various incidents?

20  A.   I can't say.  You just said he didn't find that

21       they rose, so maybe if he found the comments did

22       not rise, he didn't feel the need to speak with

23       Dr. Lisan.

24  Q.   Wouldn't you think -- well, you just said you

25       thought that there was sexual harassment here.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

93

1          Let me just ask you this:  Let's say you were
2     the fact finder hypothetically.  Okay?
3          You can imagine that, can't you?  You did
4     similar work to that years and years ago?
5  A.  A long time ago.
6  Q.  But you did.  Okay?
7          As a fact finder, don't you talk to both
8     sides?
9                  MS. ASHER:  Objection.  Go ahead.
10  A.  If necessary.
11  Q.  Okay.  Well, if you saw something like this and
12     you thought it was an indication of sexual
13     harassment, wouldn't you want to the talk to the
14     person who's being accused to see what he had to
15     say about it?
16                  MS. ASHER:  Objection.  Asked and
17              answered.  Steve, I think this could be
18              more efficient if we don't keep doing the
19              same question over and over.
20                  MR. SINDELL:  I don't think I'm
21              doing the same question over and over.  I
22              think you're just interrupting
23              inappropriately and I don't mind telling
24              you that.
25                  MS. ASHER:  Well, we have five

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

94

1  minutes and I think you have an interest in

2  having this be efficient, too.

3         MR. SINDELL:  I think you're

4  wasting time and I think you're

5  interrupting and I think I'm doing fine and

6  I don't think --

7         MS. ASHER:  Proceed to your next

8  question.  Are you ready?

9         MR. SINDELL:  No.  I was

10 interrupted.  I don't think I've gotten

11 answers to questions.  I've been doing this

12 a long time.

13        MS. ASHER:  I understand, Steve.

14        MR. SINDELL:  I haven't finished.

15        MS. ASHER:  Steve you're

16 interrupting me, please.

17        MR. SINDELL:  No.  You're

18 interrupting me.

19        MS. ASHER:  I thought that you

20 were done.  I would appreciate if you could

21 respect the professional that I am, Steve.

22 You've asked this question several times

23 and you've gotten an answer.  I understand

24 it's not the answer that you want to hear

25 but it is an answer.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

95

1               MR. SINDELL:  You don't understand
2          anything that I don't want to hear so don't
3          put words into my head or my mouth.
4               Now, would you please read back
5          the last question that I asked.
6               THE NOTARY:  "Well, if you saw
7          something like this and you thought it was
8          an indication of sexual harassment,
9          wouldn't you want to the talk to the person
10         who's being accused to see what he had to
11         say about it?"
12              MS. ASHER:  Same objection.  Go
13         ahead.
14    A.   So if I was doing the investigation, you've
15         already pointed out that I'm incorrect, that it
16         was ruled not to be sexual harassment, so I would
17         have.
18         But Bruce Kafer may not have because he
19         didn't view it as sexual harassment.
20    **Q.   Okay.  But if you viewed it as sexual harassment,**
21         **would you want to talk to the person being**
22         **accused?**
23              MS. ASHER:  Same objection.
24    A.   Yes.
25              MR. SINDELL:  Thank you.  Finally.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

96

1          I want the record to show here, I

2    want you to mark this spot.

3          I want the record to show here

4    that I don't believe until just now the

5    witness answered my question.  I also think

6    that that was very clear on the record and

7    I want to show my strong objection to a

8    very interruptive and disruptive narrative

9    basically that counsel interposed there

10   which was totally unwarranted and I want to

11   have that spot highlighted because I don't

12   think until just now I got a direct answer

13   to the question.  Okay?

14          We have five --

15          MS. ASHER:  You're entitled to

16   believe that.  Your objection is noted.

17          MR. SINDELL:  Who's noting it?

18   You?

19          MS. ASHER:  I'm acknowledging that

20   I've heard your objection, Steve.

21          MR. SINDELL:  Well, wonderful.  I

22   thought you did.

23          MS. JOHNSON:  We've got three

24   minutes.

25          MR. SINDELL:  I'm glad to be

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

97

```
 1              informed that you heard it.  I thought you
 2              did.
 3                   MS. ASHER:  Okay.  Is there a
 4              question?
 5   Q.   Yeah.  I'm going to, I don't know if we've got
 6        enough time for another one.
 7              All right.  This is Exhibit 35.
 8                   -  -  -  -
 9              (Thereupon, Plaintiff's Exhibit 35, "Sexual
10              Harassment Allegation Checklist (Alleged
11              Victim)" form, was marked for purposes of
12              identification.)
13                   -  -  -  -
14   Q.   Okay.  Here's Exhibit 35.
15              There you go.  Okay.  Does that -- this is
16        not a filled out form.  But does it look
17        familiar?  It's, one is, just so you know, one's
18        for alleged victim.  The other is for alleged
19        harasser.
20   A.   Correct.
21   Q.   I think we can see that, right?
22   A.   Yes.
23   Q.   I noticed that it says here in, which one is
24        that?  The last one is 35?
25   A.   35.
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

98

```
 1   Q.   So in 34, then?

 2   A.   33.

 3   Q.   How did I get 35?

 4                  MS. JOHNSON:  You had marked the

 5           ROCs as 34.

 6   Q.   What did I do?

 7                  MS. JOHNSON:  I'm sorry, Steve,

 8           you marked the four ROCs, you marked as 34.

 9   Q.   Oh, okay.

10                  MS. JOHNSON:  So you were right on

11           35.

12   Q.   Okay.  33, I guess I mean then.

13           The alleged harasser one, right?

14   A.   Yes.

15   Q.   Okay.  It says -- number 4 says:  "I have ordered

16        the alleged harasser to cease any contact with

17        the alleged victim except that which is

18        absolutely required for official business."

19           Did I read that correctly?

20   A.   Yes.

21   Q.   Now, if you look on the next one, however, 35,

22        the alleged victim, I don't see anything like

23        that on that.

24           Do you?

25   A.   No.
```

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

99

1  Q.  Can you explain how it is that the alleged

2      harasser should be forbidden to talk to the

3      alleged victim about any matters at all except

4      for strictly business whereas the alleged victim

5      can talk to anybody and everybody about anything

6      without restriction?  Does that make sense to

7      you?

8              MS. ASHER:  Objection.  Go ahead.

9  A.  Never considered it.  I can tell you that I

10     believe these are national forms.

11 Q.  You don't think they were changed around by

12     Dr. Raphaely so that the alleged victim was free

13     to say anything they want to anybody about

14     anything but the alleged harasser could not talk

15     to the alleged victim at all except matters of

16     strictly business?

17             MS. ASHER:  Objection.  Go ahead.

18 A.  I have no information as to whether this is the

19     exact copy that's in the policy or if it's been

20     altered.

21 Q.  I understand.  Okay.

22         I think I notice here that this is a form for

23     a sexual harassment allegation, 33, Exhibit 33,

24     correct?

25 A.  Yes.

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

100

1    Q.   Shouldn't a department head such as Dr. Raphaely

2         know how the VA officially defines sexual

3         harassment?

4                    MS. ASHER:  Objection.  Go ahead.

5    A.   Dr. Raphaely should know that if she has a

6         question, she should seek the appropriate person.

7         I don't think that we expect every service chief

8         to know the intricacies of every single medical

9         center policy.

10   Q.   Okay.  Fair enough.

11        Don't you think that Dr. Raphaely should

12        either know how the VA defines sexual harassment

13        or find out from an authoritative source how the

14        VA defines sexual harassment before getting

15        involved in an issue like Dr. Lisan's?

16   A.   Yes.

17                    MR. SINDELL:  I think we're out of

18             time, our time's up.  I want to thank you

19             very much for coming, not that you had a

20             choice.  We are going to have to try -- off

21             the record.

22                        -  -  -  -

23        (Thereupon, a discussion was had off the

24        record.)

25                    (Deposition adjourned.)

101

1

2

3                        SIGNATURE PAGE

4

5

6              I, SUSAN M. FUEHRER, having read

7    the foregoing deposition, do hereby certify said

8    testimony is a true and accurate transcript;

9

10   _____ I submit no changes.

11

12   _____ I submit the following changes on
            the _____ errata sheet(s) attached hereto
13          and made a part hereof.

14

15                      _____

16                      SUSAN M. FUEHRER

17                      _____

18                      DATE SIGNED

19

20

21

22

23

24

25

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

102

1

2

3              C E R T I F I C A T E

4

5    The State of Ohio, )   SS:
     County of Cuyahoga.)

6

7          I, Pamela S. Greenfield, a Notary Public
     within and for the State of Ohio, authorized to
     administer oaths and to take and certify
8    depositions, do hereby certify that the
     above-named witness was by me, before the giving
9    of their deposition, first duly sworn to testify
     the truth, the whole truth, and nothing but the
10   truth; that the deposition as above-set forth was
     reduced to writing by me by means of stenotypy,
11   and was later transcribed into typewriting under
     my direction; that this is a true record of the
12   testimony given by the witness; that the deponent
     or a party requested that the deposition be
13   reviewed by the deponent; that said deposition
     was taken at the aforementioned time, date and
14   place, pursuant to notice or stipulations of
     counsel; that I am not a relative or employee or
15   attorney of any of the parties, or a relative or
     employee of such attorney or financially
16   interested in this action.

17         IN WITNESS WHEREOF, I have hereunto set my
     hand and seal of office, at Cleveland, Ohio, this
18   8th of April, 2019.

19

20

21   _____
     Pamela S. Greenfield, CRR, RDR
22   Notary Public, State of Ohio
     My commission expires July 2, 2023

23

24

25

**Mehler & Hagestrom**
**800.822.0650**

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

103

1    DO NOT WRITE IN TRANSCRIPT EXCEPT TO SIGN.
     Please note any word changes/corrections on this
2    sheet only.  Thank you.

3    Page/Line    Correction

4    _____  _____

5    _____  _____

6    _____  _____

7    _____  _____

8    _____  _____

9    _____  _____

10   _____  _____

11   _____  _____

12   _____  _____

13   _____  _____

14   _____  _____

15   _____  _____

16   _____  _____

17   _____  _____

18   _____  _____

19   _____  _____

20   _____  _____

21   _____  _____

22   _____  _____

23   _____  _____

24   _____  _____

25   _____  _____

## Susan M. Fuehrer (Vol I) - April 02, 2019
## Deposition

---

**Exhibits**

**Fuehrer Plaintiff's Exhibits 31 through 35**

---

**1**

**1/10/17** 82:7
**1/6/17** 38:1
**10** 13:8 74:13,15,19
**10th** 67:8
**11** 74:15,19
**12** 6:20 74:15,19
**13** 75:8,15
**14** 45:14 46:2 69:5
**15** 51:14,20,21 54:7 56:1 58:10 76:3
**16** 14:16 51:19 54:8 56:2 58:10
**18** 46:6 58:16
**18th** 46:13
**1981** 7:23
**1986** 7:19 9:10
**1987** 10:3
**1989** 10:3 12:1
**1990** 8:10
**1991** 12:17
**1996** 13:6
**19th** 78:8

---

**2**

**2** 102:22
**20** 79:4,22
**2000** 14:5,8 15:4,6, 25
**2010** 15:6,25 18:20 19:6,8
**2016** 20:6,14
**2017** 38:9,23 66:11, 23 67:8 69:12 79:16, 19
**2018** 46:6,13 47:7 48:17 52:1 58:16
**2019** 78:8 102:18
**2023** 102:22
**2077** 6:12
**24** 63:21 77:15
**27** 45:8 75:11,12
**28th** 19:6,8

---

**3**

**3/19/19** 62:18
**30** 11:10 67:23 77:14
**31** 38:1,5 43:12 66:24 75:7,9 77:5
**32** 62:16,18 69:1 77:6,7
**33** 82:5,7,13 98:2,12 99:23

---

**34** 87:25 88:2,6 98:1, 5,8
**35** 97:7,9,14,24,25 98:3,11,21

---

**4**

**4** 14:8 49:24 60:23 98:15
**45** 23:11,16,17,25

---

**5**

**5500** 48:11

---

**6**

**6** 38:9
**60** 48:20
**6th** 38:20,23 40:7 66:11,23

---

**7**

**70** 63:8,21
**71** 62:24 63:7
**74** 78:22 79:1,22
**75** 78:22
**7th** 38:20

---

**8**

**85** 68:24 69:5
**8th** 38:21 102:18

---

**9**

**90** 14:7
**92** 12:17
**9th** 38:21

---

**A**

**ability** 62:2
**above-named** 102:8
**above-set** 102:10
**absolutely** 80:3 98:18
**accommodation** 15:9,21 22:6 67:4 91:5
**accountable** 54:12, 20
**accreditation** 13:3
**accuracy** 5:16 50:22
**accurate** 101:8
**accused** 36:13 93:14 95:10,22
**accusing** 90:17
**acknowledging** 96:19
**Act** 60:9,22
**acting** 58:2

---

**action** 29:19 57:16 60:10,12,14,17 80:22 102:16
**actions** 50:10 58:18, 19,21
**activities** 13:2
**addition** 4:19
**additional** 42:22
**address** 6:11 85:9 86:23
**addressed** 80:19 86:13
**adjectives** 50:23
**adjourned** 100:25
**administer** 102:7
**administrative** 15:18 90:20
**advent** 12:18
**advice** 43:21
**affidavit** 61:23 66:4, 5
**affidavits** 65:1 79:18
**aforementioned** 102:13
**afraid** 78:15
**age** 4:1
**agree** 30:21 31:2 37:7 76:1
**agreement** 76:8
**ahead** 9:24 11:21 22:17 24:6 27:14 31:1,7 32:5 33:1,12 34:6 36:4,16,23 40:10,25 44:5 48:5 49:9 51:7 52:8 54:10 56:7 58:17 61:20,25 62:13 66:20 67:16 68:3,16 70:18 71:21 73:17 80:15,20,24 81:14 83:11 88:20 89:2,23 90:1,14 92:4, 11 93:9 95:13 99:8,17 100:4
**allegation** 82:8,20 87:13 90:16 97:10 99:23
**allegations** 49:17 92:17
**alleged** 66:7 82:9,22 97:10,18 98:13,16,17, 22 99:1,3,4,12,14,15
**altered** 99:20
**Altose** 17:10 18:10, 13 38:9 39:3 41:25 42:11,13,14 43:11 47:13 66:18
**amend** 54:17
**analyst** 9:22
**anesthesia** 40:1 76:24
**anesthesiologist** 27:21,24 29:2 35:3

---

**anesthesiologists** 25:17,24
**anesthesiology** 17:18,19 18:5 25:8,15 26:9,14,16 27:13 35:1 44:16 48:17 51:4 53:14 57:7
**Anesthetists** 25:18, 19,20
**answers** 94:11
**apologize** 31:20 59:11 75:13 87:11,14, 24
**appeared** 73:21
**appears** 74:12
**applied** 17:16 20:13
**appointed** 79:7
**appropriately** 32:9
**approximate** 44:22 79:15
**approximately** 10:2,3 13:6,22 15:6 16:2,3 19:4 23:11 47:7 48:11 66:10,16
**April** 102:18
**area** 9:1 14:22
**arm** 79:8
**Asher** 4:22,23 22:17 24:6 27:14 29:13,22, 24 30:5,25 31:7 32:1, 5,15,23,25 33:11,24 34:1,6 36:4,15,23 40:10,25 43:7 44:5 48:5 49:9 51:5,7,15 52:8 54:10 56:7 57:12 58:17 60:7,21 61:20, 25 62:13 65:7,19 66:20 67:16 68:3,16, 25 70:17 71:21 72:10, 12,15,18,25 73:17,23 75:10 76:19,21 77:12 78:9,18 79:12,14 80:15,20,24 81:11,14 83:10,16,21 84:8 85:2,16,23 86:5,8 87:9 88:20,24 89:2, 17,23,25 90:14 92:4, 11 93:9,16,25 94:7, 13,15,19 95:12,23 96:15,19 97:3 99:8,17 100:4
**asks** 31:17
**aspect** 16:14 55:22
**aspects** 15:9 29:10
**assignment** 10:5
**assistant** 10:6 11:24
**assume** 5:10 7:25 15:4 55:6 64:14 67:11 78:12 79:15,18 91:20 92:2
**assuming** 20:11

---

**attached** 101:12
**attempt** 36:12
**attended** 59:7
**attention** 44:15 55:25 56:14
**attorney** 4:22,23 52:18 67:18 102:15
**attorneys** 43:14 56:9 77:25 78:2 80:25
**attribute** 68:5
**authoritative** 100:13
**authorized** 102:7
**avoiding** 11:8 37:4
**aware** 25:14 39:25 40:2 44:1,19,24 47:1 51:1,6,8 57:13 62:10, 14 66:6,8 67:17,20 68:6 91:18

---

**B**

**B-E-A-R-S-S** 26:21
**B.S.** 8:4
**Bachelor** 8:3
**back** 6:18 10:5,17,21 11:2 21:12 25:6 33:3 42:3 47:7 54:18 71:5 74:9 85:18,19,21 86:16 95:4
**Background** 49:12
**backwards** 13:24
**bad** 53:12,25 58:9 78:16
**barely** 82:12
**based** 7:2 85:9 86:23
**basic** 5:3
**basically** 96:9
**basis** 51:2 55:19
**Bearss** 26:20
**began** 50:11
**beginning** 32:13 67:12
**begins** 50:5
**behalf** 66:18 67:25
**believes** 26:5
**bell** 63:1
**bill** 12:12
**billing** 11:25
**bit** 12:19 13:12 45:15 68:15
**blacked** 73:24 74:11
**blah-blah-blah** 69:14
**Bonfili** 63:12,17,24, 25 64:1,23 65:11
**boss** 54:9,11,14,20, 23,25 80:9
**bottom** 46:2 63:8 77:15
**box** 60:24 69:6
**break** 31:23 34:12, 15 45:16

---

# Susan M. Fuehrer (Vol I) - April 02, 2019
## Deposition

**Brecksville** 9:14 14:13
**Brenda** 46:5
**Briefly** 20:23
**bring** 26:19 31:21
**broad** 14:25 22:19
**broader** 13:17
**brother** 7:9
**brought** 13:25 26:15
**Bruce** 90:24,25 91:1 95:18
**brushed** 70:3
**business** 98:18 99:4,16

---

**C**

**call** 17:7 18:25 45:8 59:10 69:11 72:1
**called** 4:1 13:8,20 91:8
**calling** 17:15
**calls** 91:11
**capacity** 9:11 17:23 18:7 22:14 39:7 43:10 91:6
**care** 30:16 54:12,21 85:25
**cared** 50:15
**carefully** 34:10
**carried** 57:24
**case** 4:15,16 8:9 9:7 21:3,13 23:4 26:10 27:9 28:2 37:6 64:14 67:12 81:9 91:16
**category** 24:22
**cease** 98:16
**center** 18:23 23:6 36:1,8 48:10 100:9
**CEO** 18:23 22:6,14 24:5 43:10 56:11
**certified** 4:5 25:16
**certify** 101:7 102:7,8
**cetera** 83:5
**chain** 47:24 48:7,15
**chair** 17:17,18 18:4 27:1,12 28:1 35:1,5 59:15
**chairperson** 26:9,16
**chairs** 17:3
**chance** 20:22 38:11 88:12
**change** 18:20 20:4,9 50:1,11
**changed** 50:15 99:11
**changes/ corrections** 103:1
**charge** 12:23
**charges** 37:5
**checked** 53:5

**checklist** 82:8,21 87:13 97:10
**chief** 12:14,16 13:7, 10,20 14:6,10 16:23, 24 17:8,11,12,13,15 18:10,14,15,17,18 19:17 21:22,24,25 37:17,18,19 42:15 43:11 59:15 68:6 72:20 100:7
**chiefs** 16:23 17:7 48:20
**chiefs/department** 18:12
**children** 8:15 33:15
**chitchat** 32:19 33:7
**choice** 100:20
**choose** 47:22
**chose** 48:4
**chronically** 68:8
**Cincinnati** 19:19,20
**CIO** 13:19
**circumstance** 35:5
**circumstances** 35:11 37:4
**Civil** 4:4
**claim** 35:23 84:23
**claimed** 44:17
**claims** 44:3 92:16
**clarification** 5:7 28:22 29:5
**clarify** 5:9 21:20 27:16 28:3 62:1
**clear** 5:23 25:11 85:11 96:6
**Cleveland** 6:21 7:3 9:1,13 12:3,4,5 14:11, 17,22 19:24,25 21:15 22:6,23 102:17
**client** 4:21
**client's** 83:9
**clinical** 18:11
**clinics** 14:19
**clipped** 38:5
**close** 30:10,12 33:20
**coach** 61:18,22
**coached** 62:1,4
**code** 31:9,14 32:3, 14,21 33:9,14 53:9
**coders** 11:25 12:1,8
**coffee** 31:23
**coincidental** 66:19 67:15
**collateral** 10:5 11:22
**collecting** 90:3
**collectively** 44:17
**college** 7:14,18 9:6
**color** 29:2
**command** 47:25 48:7,15
**comment** 35:14 53:25 87:3

**comments** 83:24 84:2 85:5 86:19 92:21
**commission** 13:3 102:22
**committee** 22:2
**common** 76:4
**communication** 26:6
**company** 7:7 8:23
**complainant** 70:8
**complained** 27:20 63:13,14 66:17
**complaint** 10:11,12, 15,16 11:6,7,9 16:20 23:8,9,13 24:11,4,22 27:4 28:7 34:25 45:3 64:7,9,11 70:25 71:7 77:4 84:10,12,14
**complaints** 10:8 13:4 15:15 17:5 20:6, 16 36:11 40:6 44:1 54:3 58:6 61:24 64:2 66:8,14 67:2,6,13,23 68:1,12,20 70:14,20, 25 71:2,8,10,14,19 77:2 79:8 88:8 92:8
**complete** 57:9 62:1, 2 66:5 81:22
**completed** 57:18, 19,20,21 58:20 59:3, 7,12 88:15
**completely** 73:14 80:19
**computer** 13:15 59:12
**concentrate** 25:7
**concern** 26:12,15 27:5 73:6
**concerns** 61:8,9 70:23 75:25 76:4
**Conclusion** 75:18
**Condescending** 60:25
**conduct** 31:9,15 32:4,14,22 33:10,14 36:9 44:4,11 53:9
**conducted** 65:3
**connected** 19:21 21:2 59:13
**Connecticut** 6:24 7:21
**connotation** 84:18
**considered** 75:24 99:9
**consistent** 47:4
**constant** 76:8,9
**construed** 44:3
**consult** 20:22 80:25
**contact** 28:9 64:1,4 70:23 88:3 89:4 98:16
**contents** 41:15

**context** 75:1 81:2 89:3,4
**continue** 11:19 17:20
**continuing** 60:23
**continuously** 19:7
**contrary** 31:14 32:3 76:7
**control** 15:19
**conversation** 27:22 89:22
**conversations** 30:22
**COO** 14:25 15:3,8 16:12,18,19 17:4 18:6
**coordinator** 91:4,7, 9
**copies** 74:10
**copy** 43:16 62:23 73:24 74:9,11 99:19
**correct** 4:11 6:2 9:17 10:15 11:3 13:18 14:13 16:1,8,15 18:16 21:16 22:13,16 23:24 24:5,14 26:1,10,17 27:5 38:22,25 39:2 40:24 48:6 49:4,19 55:10 60:16 62:9 64:24 67:4 68:17 69:10,16 72:11,14,17 76:20 77:16 82:22 84:7 87:20 97:20 99:24
**corrected** 60:16
**Correction** 103:3
**corrective** 58:19,21 60:10,12,14,17
**correctly** 4:13 46:7 50:12,20 61:5 66:5 76:11 98:19
**Costanzo** 62:19 63:1,14,17 72:16,17 77:18 79:21
**Costanzo's** 77:16
**counsel** 4:21 14:3 20:20 39:23 40:20 41:10 42:25 43:14 56:8 57:13 96:9 102:14
**counsel's** 5:4
**counseling** 10:7,9 11:5
**counselor** 11:22 28:15
**counselors** 11:13
**count** 49:3
**County** 102:5
**couple** 5:2,3 9:21,22 62:12 86:10
**court** 4:17,20 5:17
**Covered** 15:2

**create** 5:16
**creates** 5:16
**critical** 77:21
**CRNA** 25:23 26:5,24 27:4,11,20 31:24 32:11,12 35:1,4 36:13 58:8 61:11,23 63:5,13 88:7 89:8 92:17
**CRNAS** 25:16 26:24 33:19 44:2,16,19,21, 22 45:1 46:24 50:5,8 51:3,17 52:5 53:14 54:2 56:2 58:2,10 61:2 66:15 67:7,24 68:21 76:3 92:8
**cross-examination** 4:3,7
**CRR** 102:21
**curiously** 66:19
**Cut** 86:7
**Cuyahoga** 102:5

---

**D**

**D.o.s** 25:25
**database** 12:12
**date** 19:4 38:18,22 66:23 89:11 101:17 102:13
**dated** 38:9,17
**day** 78:8 79:22
**days** 23:11,16,17,25 38:17,20,22 46:13 66:10,16 67:8,24 68:13,21
**December** 20:6,13
**decisions** 22:1,2
**define** 13:11 22:25 83:13,17
**defined** 83:18
**defines** 100:2,12,14
**definition** 83:22 84:15 87:20
**degree** 7:24 8:4
**degrees** 8:5
**delivery** 38:10
**department** 17:3, 17,18,19 18:4 24:21 25:8,15 26:9,14,16 27:12 28:1 29:21 35:2,5 36:11,19 37:11,13,18 41:14 43:16 44:16 48:16,21 51:4,18 52:4,5,10,13, 14 53:13,21 54:8 55:8,13 56:2 57:6 59:15 71:1,9 100:1
**departments** 16:23 48:22
**depend** 30:9
**depending** 28:12 33:17 37:3 55:9 75:24

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

**depends** 35:11 55:15 90:18
**deponent** 102:12,13
**deposed** 4:5
**deposition** 4:18,25 20:25 46:24 61:19 62:15,19 69:3 77:16, 20 78:7 100:25 101:7 102:9,10,12,13
**depositions** 5:2 102:8
**describe** 13:11 61:2
**describes** 67:2
**description** 9:3 21:19
**descriptive** 54:4
**designated** 23:20
**detail** 7:12
**details** 75:1
**determination** 61:14
**develop** 47:13
**developed** 11:17
**development** 59:9
**diagnoses** 12:11
**Die** 8:20
**difference** 21:23 31:16
**differences** 35:6
**direct** 15:22 16:20, 22 18:13 21:25 24:16 41:16 47:18 96:12
**direction** 102:11
**directly** 9:7 23:1 26:25 48:2
**director** 15:11 18:23,24 19:1,3,5,19 21:15 43:10 56:12
**director/ceo** 39:7 49:8
**disability** 67:3
**disagree** 36:22
**disciplinary** 60:12
**disciplined** 60:6
**discrimination** 15:16 49:18 67:2,3
**discriminatory** 50:19 52:6 55:11 56:4 58:4
**discuss** 20:19
**discussion** 6:15 25:3 28:11,24 63:11, 23 77:9 82:1 100:23
**discussions** 31:10 63:25
**disruptive** 96:8
**dissatisfaction** 75:22
**dissatisfied** 76:10
**distinction** 31:18
**District** 4:17

**disturb** 76:14 78:14 80:14
**disturbing** 65:6,9, 17 66:1 77:20
**Division** 4:18
**divisive** 50:19 52:7 55:15 56:4 58:4
**doctor** 25:21
**document** 45:15 46:20 47:10
**documented** 66:9 68:7
**documents** 21:2 37:24
**doubt** 35:24 36:2 40:11,22 41:1
**Dove** 8:20
**Drive** 6:12
**duly** 4:4 102:9
**duty** 11:22

**E**

**earlier** 66:12
**early** 37:4 69:12
**Eastern** 4:18
**Edge** 6:12
**education** 36:19
**EEO** 9:25 10:1,4,7, 14,16 11:7,13,22 15:10,15,21 16:7,10, 17,20 17:5 18:6 20:5, 15 22:13,20,22 24:9, 10,11,22 26:7 27:5 28:15 35:8,15,19,23, 24 36:2,9,11 37:8,15 40:5 47:12 64:7,9,11 65:2 90:4 91:4,7,9
**efficient** 93:18 94:2
**efforts** 11:6
**Elaine** 62:19,25 63:14 65:10
**elect** 41:13
**elected** 41:11
**electronic** 12:20
**elects** 23:2 31:17 32:7
**email** 38:10,25 39:10,12 66:10,16 88:21
**emailed** 66:23
**emails** 66:21
**employed** 8:17
**employee** 10:10 11:8 23:2 24:2,9 26:8, 11 28:9 30:2 31:10 33:14 35:13 39:23 40:20 41:9 42:24 43:14 48:13 56:9 57:14 71:24 72:4,5,8, 23 73:2,6 83:25 90:4 102:14,15

**employee's** 85:9 86:24
**employees** 10:7 25:15 31:9 40:6 48:11 50:16 53:20 54:13,22, 24 71:15,18 72:21 75:23
**employees'** 53:16
**employment** 11:18
**encounters** 70:2
**encourage** 72:2
**encouraging** 69:18
**entire** 19:25 20:1 21:15 57:6 58:8 71:1, 9 76:7 89:3
**entitled** 96:15
**environment** 15:17 33:13 50:1
**errata** 101:12
**evaluation** 68:8
**event** 5:1 10:23 91:15
**events** 11:15
**everything's** 20:12 76:18
**exact** 38:18 86:25 99:19
**examples** 60:4
**excuse** 26:7 49:7,12 51:3 89:4
**executive** 18:24 19:1 21:25 22:1,2 49:7 56:11
**Exhibit** 38:1,5 43:12 62:16,18 66:24 69:1 75:7,9,11 82:5,7,13 87:25 88:2 97:7,9,14 99:23
**exist** 53:24 55:12
**existed** 11:7 15:23
**expect** 41:3 42:10 90:9 92:15 100:7
**experience** 30:16 69:14,15,17,21
**experiencing** 76:5
**expires** 102:22
**explain** 99:1
**extensively** 57:15
**extent** 22:10
**external** 13:3
**eye** 11:8

**F**

**F-U-E-H-R-E-R** 6:8
**fabricate** 44:9
**facilities** 11:2 13:13 14:18 19:18
**facility** 10:17 11:1
**fact** 16:10 30:18 36:20 40:14 51:1 54:1 55:24 57:9,11 90:4,8, 9,21 91:6,21,23

**employee's** — 
**facts** 49:17
**fair** 5:11 18:2 81:7 100:10
**fallen** 15:10
**false** 44:2
**familiar** 16:5 24:12, 19 97:17
**faster** 81:21
**father** 7:1,4
**faucet** 7:7
**faucets** 7:2,5
**FBI** 52:19
**fear** 76:5 77:19 78:17
**feared** 80:9,11
**fearful** 79:24
**feel** 92:22
**feelings** 35:6
**feels** 72:5
**fell** 15:11,18,22
**felt** 64:10 70:21
**female** 59:22,23
**field** 78:2
**figure** 34:11
**figured** 6:1
**file** 10:14 24:9 84:10, 11,14
**filed** 10:7 23:7,10 40:5
**filing** 10:10 24:1,13
**fill** 61:23
**filled** 97:16
**filling** 65:1
**Finally** 95:25
**financially** 102:15
**find** 11:18 55:18 65:6 66:18 67:12 71:18 76:10 85:6 86:19 87:23 89:21 92:20 100:13
**finder** 90:8,10 91:21 92:15 93:2,7
**finding** 57:9,11 90:5, 21 91:16 92:16
**finds** 87:3
**fine** 19:1 29:6 76:18 89:5 92:13 94:5
**finish** 4:24 21:8 34:7 75:3
**finished** 29:14 34:2 94:14
**fiscal** 16:24
**fits** 24:22
**FOIA** 74:8
**follow** 29:17 47:24 48:7
**forbidden** 99:2
**foregoing** 101:7
**form** 62:1,2 82:18,19 97:11,16 99:22
**formal** 8:5 10:11,12, 16 11:6,9 22:22,24,25

**23:2,7,9 24:1,14 35:8 37:4,5 90:19
**formally** 23:4 60:13
**forms** 99:10
**forwarded** 39:19
**Foster** 70:7,11
**found** 92:3,7,21
**foundation** 83:8,11
**frame** 13:22 79:17
**frank** 7:4,2
**free** 99:12
**friendly** 30:19
**friends** 30:10,12 33:20
**front** 23:1 66:25
**Fuehrer** 4:1,7,9,19, 21 5:5 6:8,9 8:14 32:6 101:6,15
**Fuehrer/altose** 38:2
**full** 5:18 6:6
**fully** 5:6
**function** 13:17
**functions** 21:24

**G**

**gave** 23:12
**Gees** 53:5
**general** 8:20 16:7 24:12 31:2 39:23 40:20 41:10 42:25 43:14 56:8 57:13 67:4
**generated** 67:7
**give** 5:3 13:22 15:3 44:21 46:9 55:5 62:22 74:10 88:11
**giving** 26:6 102:8
**glad** 5:13 96:25
**goal** 78:2
**good** 17:25 20:10 25:13 37:23 38:13 43:20 53:12,18,20,24, 25 54:7,9,12,21 55:8, 11 58:9 79:2 89:15
**govern** 24:20
**government** 84:22
**graduate** 7:18
**graduated** 6:24 8:9 9:6
**great** 45:19
**Greenfield** 102:6,21
**Greenspan** 65:3 79:4,23
**ground** 5:3
**group** 26:23 56:9 57:15 58:8 76:7
**groups** 51:9
**grow** 6:21
**guess** 22:4 28:8 79:7 98:12

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

**H**

hair 29:3
Hammond 4:23
Hampshire 6:25
7:1,17,25 9:8
hand 45:9 49:3
102:17
handbook 16:6
handles 91:5
handling 20:5
hands-on 56:14
handwriting 83:1
happen 28:24 39:2
76:1
happened 64:17
65:15
happy 44:20 54:14,
22,25
harasser 82:9,22
97:19 98:13,16 99:2,
14
harassment 15:17
28:18,21 44:3,10
82:8,20 83:14,23
84:16,21,24,25 87:7,
13,19 92:7,9,25 93:13
95:8,16,19,20 97:10
99:23 100:3,12,14
hard 34:7 36:24
48:12 83:19 89:6
head 17:18 24:21
26:23 29:20 36:10
37:10,12,18 41:14
52:4,13,14 53:13,21
55:8 56:3 95:3 100:1
heads 17:3 18:12
48:16,21,22
healthcare 59:8
hear 24:24 42:8
54:16 57:4,5,9 64:8
94:24 95:2
heard 17:16 63:11,
23 64:6,10,20,23
69:13,17,21,23,25
70:5 71:16 72:22,23
73:3 96:20 97:1
helpful 14:1 36:22
hereinafter 4:5
hereof 101:13
hereto 101:12
hereunto 102:17
high 6:24 7:20 16:25
higher 17:13
highlight 88:22
highlighted 96:11
highly 30:1
historically 15:10
33:22
history 9:4 12:20
Hold 13:10

holding 54:11,20
home 6:25 8:17
69:12
homes 33:21
honest 17:17
honestly 62:3
honesty 54:2
hope 53:5
hospital 13:2 28:25
hostile 15:16 50:18
52:6 56:3 58:3
hostility 55:7
hours 4:25
how's 29:10,11
huh-huh 5:15
human 43:15
Humbly 46:3,5
husband's 8:13
hypothetical 27:8
28:23
hypothetically 93:2

**I**

ICD-9 12:8
idea 24:15 46:9
56:17
identification 38:3
62:20 82:10 88:4
97:12
identify 12:11 49:17
70:23 71:12
II 49:25
imagine 93:3
immediately 35:7
impersonal 30:23
implemented 76:6
important 39:18,21
75:19,22
impression 50:14
improve 52:15
improvement 60:19
76:23
improvements
60:18
inappropriate 26:6
30:1 35:14 36:9 44:4,
7,11 61:21 62:6,8
70:4 85:6 86:20 87:4
inappropriately
32:8 70:22 93:23
incidents 92:19
include 11:6 13:15
37:17
including 19:10
30:12
incorrect 95:15
indicating 24:3
36:20 55:25
indication 58:1
71:24 93:12 95:8
individual 36:12

informal 10:6,9
28:14 37:9,16
informality 90:21
information 12:15
13:7,10,14 14:6 19:17
24:10 27:10 33:22
42:22 73:18 90:3
99:18
informed 97:1
initial 22:22 50:14
88:7
initials 83:9
initiated 32:18 33:5
innuendo 89:1
instance 58:11
instances 36:21
intend 80:22
interchange 37:20,
22
interest 56:6 94:1
interested 102:16
interesting 17:14
intern 9:12,20
internally 10:13
Internet 12:18,19
interposed 96:9
interrupt 21:9
interrupted 86:4,9
94:10
interrupting 93:22
94:5,16,18
interruptive 96:8
interviews 51:2
intricacies 100:8
investigate 23:4
52:20 55:18 79:8 81:5
investigated 10:24
investigating 70:13
89:19
investigation 28:14
79:7,9 89:24 90:9,16,
18,19,20 95:14
investigator 61:24
79:6
involved 80:5,8
100:15
involvement 15:20
16:17,19 22:1 24:16
involves 22:9
irrespective 24:15
issue 5:8 23:6 26:7,
11,14 27:18 100:15
issues 20:20 22:7
36:8,10 39:25 40:2
68:5 71:24

**J**

January 38:9,20,23
39:25 40:7 66:11,23
67:8 69:12
Jessica 70:7,11

job 13:11 14:25
16:12 24:4 76:10
Johnson 4:23 34:5,
12,16 83:7 86:3 89:6
96:23 98:4,7,10
Joint 13:3
July 102:22
June 46:6,13 47:7
48:17 52:1 58:16
justification 56:1

**K**

K-I-N-N-A-R-D
59:21
Kafer 90:23,25 91:1
95:18
Karin 63:11,23,25
64:1,10,23 65:11
Kazdan 68:7
kids 31:13,23 32:12
kind 10:13 13:17
18:5 24:21 26:7 27:18
29:19 54:4 59:6 61:10
70:3
kinds 30:19,22
Kinnard 59:17,18
60:1
knew 59:5 73:8
knowledge 6:3
57:25

**L**

labor 39:23 40:20
41:9 43:15 56:9 57:14
language 54:4
late 68:8
law 53:2
lawful 4:1
lead 26:23
leader 52:5
leadership 44:20
59:9
leave 45:13 81:18
left 46:2 63:8 69:6
letter 38:2,8,14
40:18 41:3,15 42:23
43:12 66:11,16,24
67:18 68:1,4,13,21
letters 39:5
level 10:24 92:9
life 70:4
limited 24:8
Lisa 4:23
Lisan 4:16,21 6:2
25:18 40:1,3,6 43:25
44:3,8 63:14 64:2
67:1,7,19 68:7,20
69:16,18 70:3,9,11,14
71:2,10,19 74:5,9,17,
20 75:1 83:3,5 89:15,
21 90:10,11 92:16,18,

23
Lisan's 53:4 61:24
67:25 73:21 74:12
79:8 100:15
listen 34:10 54:16
live 6:9,10
lived 6:19
lives 32:20 33:8
locally 10:24
locations 14:16
logical 40:17 42:17
logistics 16:23
long 6:19 9:19 34:14
44:6 45:5,14 93:5
94:12
looked 57:15
lot 15:2 46:20 61:3
81:8
lots 18:25 28:24
loud 63:9
Louis 14:12,14 25:9,
10
lounge 31:24 32:11
low 18:9

**M**

M-O-E-N 7:7
M.d.s 25:25
made 17:5 27:21,22
36:20 43:13 46:22
54:3 57:17 74:8 92:17
101:13
mail 38:10
mailing 74:6
majority 51:3 52:5
55:12 61:2
make 10:15 17:25
31:18 44:2 50:16
60:18 61:14 70:20
71:14 72:5,21 73:2,8
76:9 78:10 80:2 84:23
85:5 86:19 87:16 99:6
makes 88:25
making 36:13 43:25
90:8
male 59:22
management
10:19,21 11:11,12
12:24,25 13:1 17:1
22:19 23:3,5 24:3
37:8 43:16 59:10
manager 8:20 9:25
10:1,4 15:11 24:10,11
35:15,19,24 36:2
37:15 47:12
March 78:8
Margaret 59:25
mark 37:24 62:15
82:4 87:25 96:2
marked 38:2 62:20
82:9 88:3 97:11 98:4,
8

## Susan M. Fuehrer (Vol I) - April 02, 2019
## Deposition

**marriage** 29:9,10, 11,12 30:3,13 33:16
**married** 8:11 53:1
**master** 76:7
**material** 20:11
**matter** 30:18 35:7 56:10 57:3,15 89:20 91:23
**matters** 16:7,18 17:5 22:13,20 32:20 33:8 47:24 80:17 99:3,15
**MBA** 8:10
**meaning** 7:13
**means** 60:15 71:17 78:3 102:10
**meant** 54:15 60:17 78:16 87:18
**mediate** 35:6
**medical** 12:10,21 18:15,17,23 19:3,5 21:15,23 22:1,2,10 23:6 36:1,8 39:7 43:10 48:10 49:7 56:11 100:8
**memory** 51:25 92:6
**mentioned** 79:6
**mentor** 59:13,14
**met** 51:9
**Metal** 8:25
**mind** 40:22 41:2 45:13 55:4 93:23
**minute** 82:24
**minutes** 45:18,19 94:1 96:24
**misleading** 44:2
**mistake** 75:12
**misunderstandings** 35:22
**Moen** 7:2,5,7
**moment** 34:17
**money** 76:8
**months** 62:12
**mouth** 62:5 95:3
**moving** 35:7
**multiple** 61:4

### N

**narrative** 96:8
**national** 99:10
**nature** 16:17 21:13 27:11 28:7,17 29:7 48:23 84:4 85:15
**necessarily** 15:21 35:10 43:17 66:3 67:17
**needed** 39:22 57:1,4
**negative** 78:16
**Northern** 4:17
**Notary** 33:5 42:6 54:19 71:6 86:17 95:6 102:6,22

**note** 75:19,22 103:1
**noted** 96:16
**notice** 99:22 102:14
**noticed** 68:4 97:23
**notified** 24:8
**noting** 96:17
**number** 15:23 44:15,22 45:1 51:20 60:4 71:18 74:22 77:13 98:15
**Numeral** 49:25
**nurse** 25:16

### O

**oath** 5:22 78:15
**oaths** 102:7
**Object** 51:5
**objecting** 29:16
**objection** 22:17 24:6 27:14 29:13,24 30:5,25 31:7 32:1,5, 15,23,25 33:11,24 36:4,15,23 40:10,25 43:7 44:5 48:5 49:9 51:7,15 52:8 54:10 56:7 57:12 58:17 60:7,21 61:20,25 62:13 65:7,19 66:20 67:16 68:3,16 70:17 71:21 72:10,12,15,18, 25 73:17,23 76:19,21 78:18 79:12 80:15,20, 24 81:11 83:10,16 84:8 85:2,16 87:9 88:20,24 89:2,17,23, 25 90:14 92:4,11 93:9,16 95:12,23 96:7,16,20 99:8,17 100:4
**obligation** 71:14 72:4,20 73:1
**obtain** 78:3
**obtained** 7:24
**obtuse** 36:25
**occasion** 87:6
**occurred** 65:12 79:16
**occurrence** 23:12
**October** 79:16,19
**office** 10:19,20 11:11,12 22:19 23:3,5 24:2 37:8,16 39:22 40:19 41:9 42:25 43:13 56:8 57:13 68:2 102:17
**officer** 13:7,10 14:6, 10 18:14,18 19:17 21:25 28:16
**official** 10:10,13 91:10 98:18
**officially** 100:2

**Ohio** 4:18 6:10,12 7:2,3 13:8,14 19:18 102:4,7,17,22
**one's** 97:17
**one-to-one** 51:2
**operating** 14:10 18:14,18 34:22 41:22 42:18 57:8
**operation** 34:23 50:15
**opinion** 56:15,16,17, 18
**opportunity** 20:19 70:22 72:7 73:3
**order** 87:7 88:9
**ordered** 98:15
**original** 74:12
**ORM** 24:2 79:7
**other's** 33:20
**outpatient** 14:19
**oversaw** 13:14
**oversees** 13:1
**oversight** 21:23 22:20,23

### P

**Page/line** 103:3
**Pamela** 102:6,21
**paper** 13:23
**paragraph** 49:15 50:4 75:18 76:14
**paraphrasing** 85:3 86:18
**parentheses** 82:21
**part** 11:8 16:11 17:4 21:13 42:8 49:15,16, 21 55:7 60:24 79:5 83:5 86:25 89:24 92:16 101:13
**partially** 46:14
**participate** 80:3
**participated** 59:8 80:4
**parties** 102:15
**partner** 52:18
**partners** 53:2
**party** 102:12
**patient** 13:2,4
**patients** 57:7
**penalizes** 58:8
**people** 12:10,12 30:18 32:10,21 33:8, 18 35:22 44:9 51:3 54:8 79:9
**perceive** 85:7 86:21
**perceived** 84:6,7, 11,17
**perception** 55:16, 21,24 54:1,6 55:7,12, 14 58:9 61:11 85:10 86:24

**perceptions** 50:2 53:23 57:6
**performance** 68:8 76:22
**period** 16:4,11 23:18,20 24:15
**person** 18:5 26:23 90:17 93:14 95:9,21 100:6
**personal** 30:23 31:5 32:20 33:7,20,22 51:2
**personally** 55:18
**pertaining** 16:7 28:21 75:1
**phone** 69:11
**phones** 13:15
**phrase** 10:13
**physician** 22:3
**physicians** 25:25
**pick** 39:10 88:10
**piece** 13:23
**pin** 90:7
**place** 14:20 56:12 102:14
**Plaintiff** 4:2
**Plaintiff's** 38:1 62:18 82:7 88:2 97:9
**plan** 47:13 52:15 60:19 76:23
**point** 14:12 18:22 19:14 27:7,13 29:17 40:23 91:24
**pointed** 95:15
**policies** 76:5
**policy** 23:1 35:14 36:1,8 85:3 86:17 99:19 100:9
**portion** 42:5
**posit** 33:19
**position** 18:4,20 19:7,12 42:15,16 **positions** 16:25
**practice** 67:23
**preamble** 29:17
**preclude** 43:1
**preliminary** 11:13, 14
**prepare** 20:24
**preparing** 21:4
**present** 4:19 19:10 20:6,14
**presentations** 36:20
**pretty** 14:24
**previously** 21:4 76:22
**primary** 40:18
**prior** 10:10 11:5,11 22:22,24 24:1 58:16 68:6
**Privacy** 60:8,22

**problem** 5:17,20 81:23
**procedure** 4:4 35:8 41:22 42:18
**procedures** 20:5,15 24:13
**Proceed** 94:7
**professional** 30:2 31:11 33:13 94:21
**professionals** 78:2
**program** 9:22 10:6 11:24 59:9
**prohibited** 48:1
**promoted** 9:21
**promptly** 40:23
**pronounce** 4:11
**protocols** 15:23 16:5 20:4,15 60:13
**proven** 58:7
**provide** 54:12,20 73:19 90:3
**provided** 4:3 83:25
**provisions** 16:6
**Public** 102:6,22
**punishment** 76:6
**purpose** 4:2
**purposes** 38:3 62:20 82:9 88:3 97:11
**pursuant** 102:14
**purview** 22:15
**put** 12:11 26:15 50:23 66:4 95:3
**puts** 57:7
**putting** 62:4

### Q

**quality** 12:23,25 13:1,2
**question** 5:5,8,10, 16,19 7:10 20:13 21:9 22:4 27:16 29:8,15,16 32:18 33:6 34:4,7,8 35:17 39:20 42:2,3 44:6,13 50:22 52:11 53:12 63:10,22 64:5, 8,12,18,22 65:16,22 68:10,12 69:10,20,23 70:5,10 71:4 75:4 77:18,24 78:9 79:20, 23 80:7,11 83:20 85:24 86:13 92:14 93:19,21 94:8,22 95:5 96:5,13 97:4 100:6
**questions** 27:8 36:24 79:25 94:11
**quick** 74:18,20
**quiet** 45:14
**quote** 23:16
**quote/unquote** 36:7

### Susan M. Fuehrer (Vol I) - April 02, 2019
### Deposition

**R**

Rachel 52:17
raise 26:11
raised 80:18
range 23:21
Raphaely 17:8,23
18:3 26:25 28:2,5,13
29:1 40:15,21,23
41:4,12,16 42:19
43:2,17,22,24 44:8,17
45:3 46:19 47:2,14,15
48:2 49:19 57:18
58:2,15,23 60:6
61:18,22 63:24 64:12
66:9 67:7 68:5,19
69:11 70:19 73:7,10,
14 77:21 78:17 80:1,
10 89:20 90:2,7 99:12
100:1,5,11
Raphaely's 44:20
50:10 68:2 83:2,3
rate 91:13
RDR 102:21
reaction 39:16
read 21:2 33:3 38:11
39:9,10,12,15 42:3,6
45:10 46:7,10,17
47:6,11 50:8,12,20
51:23 52:1 54:18
55:21 61:5,9 63:9
69:9 70:19 71:5,22
73:20 75:21 76:11
79:20 85:19,21 86:16
88:12 89:3 95:4 98:19
101:6
reading 79:5 88:15
ready 94:8
reality 53:23
realize 34:2,4
reason 41:17 50:22
55:15 58:12,14 70:24
71:7,23
reasonable 15:9,21
22:6 67:3 84:10,19
85:8,9 86:22,23 87:1
91:5
recall 38:18 40:4,16
41:21 46:19 64:20,21,
22 73:20 74:2 91:19
92:5,12
recalled 90:11
receive 38:16
received 39:24 40:5
43:12 74:3,9
receiver 87:3
receives 27:10
60:14
receiving 24:21
38:14
recent 77:1

recently 62:11
recess 34:19 45:22
recognize 82:15,17
recollect 38:14
recollection 21:3
45:11 47:4,9 64:15,16
74:25 92:18
recommendation
60:11
recommendations
57:17,21
recommended
58:19
record 4:15 5:2 6:7,
13,16,18 12:11,21
21:12 25:4,6 42:6
53:9 77:7,10 81:24
82:2 96:1,3,6 100:21,
24 102:11
redacted 46:14
reduced 102:10
refer 52:14
references 46:22
47:1
referring 17:14
88:19
refresh 21:3 45:11
51:25 92:6
regard 14:20 80:23
region 13:7
regional 19:18
registered 25:16
regulations 16:6
20:5,15 24:20
relate 27:24
related 22:20 32:20
33:8
relations 39:23
40:20 41:9 42:25
43:15 56:9 57:14 90:4
relationship 30:9,
13 33:17
relative 102:14,15
remain 31:11
remark 29:8 88:16
remember 9:18
51:20,22
remind 5:19,22
reminders 76:8,9
repeat 43:9 71:4
rephrase 83:20
report 18:10,13,17
28:9 35:24 36:2 41:16
44:24 45:6 47:18
49:22 51:8,19 53:15
55:23,24 64:1,4 70:23
73:21 74:24 75:5
80:18 89:3 91:17,24
92:3
reported 19:18 36:9
reporter 4:20 5:17

reports 21:22 26:24
48:23 88:2
represent 6:2
represented 16:14
request 74:8
requested 42:5
102:12
requests 15:9
required 98:18
requires 56:13
research 12:13
Reserve 8:9
resolution 10:19,21
11:11,12 22:19 23:3,5
24:2 37:4
resolve 11:7
resource 43:15
respect 50:17 77:21
94:21
responded 74:8
response 29:3,19
responsibilities
15:8 17:4 42:17
responsibility 22:5,
15 24:4 28:13
responsible 18:6,11
restate 44:6
restriction 99:6
resumé 13:25
retaliate 43:25 44:8
retaliated 77:22
retaliates 58:7
retaliation 15:16
48:24 49:18 76:5
78:17 79:25 80:11
retaliatory 44:18
45:4 50:18 52:6 53:22
54:9 56:3 58:3
review 28:13,16
37:9,16 74:18,20
76:16,17
reviewed 102:13
reviews 13:4 41:11
Rhonda 89:8,16
rights 73:2
ring 63:1
rise 23:12 26:6 92:9,
22
Robert 26:20
ROC 35:8
ROCS 36:11 37:5
98:5,8
role 11:15 15:22 37:8
91:16
Roman 49:25
Ron 61:24 63:13
64:2 70:11,14 89:15
90:10
Ronald 4:21
room 34:22
rose 92:21

Ruchi 4:22
rule 36:3
ruled 95:16
rules 4:3 5:4 16:6
20:5,14 24:19
Russell 8:14,17

**S**

safety 13:2,4
satisfied 76:17
scenario 73:12,13
scenarios 73:11
school 6:24 7:1,20
32:13
Science 8:3
scope 22:5,15 24:4,8
seal 102:17
section 43:15 74:13
seek 43:21 100:6
seeking 72:23
sense 99:6
sentence 49:16
September 19:6,8
service 17:7,8,12,
13,15 18:12 37:17,18,
19 40:1 48:20 59:15
68:6 72:20 100:7
services 15:18
set 60:13 102:17
sets 77:25
sex 67:3 87:7,8
sexual 28:7,17,21
29:7,10 44:3,10 82:8,
20 83:13,23 84:3,5,7,
15,18,21,23,24,25
85:15,22 86:2 87:7,
13,19 88:16,25 92:7,
9,25 93:12 95:8,16,
19,20 97:9 99:23
100:2,12,14
share 40:21 41:12,
14,18,23 42:10,18,24
70:10
shared 5:4 33:22
40:14 41:4,20 45:2
69:11
sharing 43:1
sheet 82:15,17 103:2
sheet(s) 101:12
shortly 67:13
show 54:12,21 74:3
82:4 91:25 92:15
96:1,3,7
sick 7:9
side 11:14 90:11
sides 93:8
SIGN 103:1
SIGNATURE 101:3
signed 89:10,12
101:17
significant 16:11
20:4,8 75:24

similar 93:4
simple 53:12
simply 29:8
Sindell 4:8 6:1,13
29:23 33:3 34:3,9,14,
21 38:2 52:17,19
85:19,25 86:6,15
93:20 94:3,9,14,17
95:1,25 96:17,21,25
100:17
single 48:13 100:8
sir 11:4 41:20 52:2
61:6
sit 45:10 57:11 58:14
77:18
sitting 32:11
situation 28:12
29:18 80:6
Skipping 77:24
sleep 57:7
Slow 9:23
small 16:14
smooth 35:21
sneak 45:16
socially 33:20
software 13:16
solicit 68:20 71:1,8,
17
solicited 71:13
soliciting 44:2
somebody's 29:9
someone's 62:5
source 100:13
speak 28:15 42:11
43:4 73:10 77:25 78:1
92:22
speaks 65:8 70:18
78:19 81:12
special 38:10
specific 27:16,19
28:12 45:1 58:11 60:4
87:14
specifically 40:4
45:2
specifics 28:10
spell 59:20
Spicer 44:24 45:2,5
46:5 50:24 51:1 80:18
Spicer's 75:5
spoke 27:25
spoken 60:1 81:15,
16
spot 96:2,11
SS 102:4
staff 17:11 18:11,15,
17 21:22,24 42:16
43:12 60:25
stage 90:18
stamping 8:21,23,
24,25
standard 41:22
42:18 84:13

## Susan M. Fuehrer (Vol I) - April 02, 2019
## Deposition

standards 83:14,18
stands 59:11
start 9:5 63:21 66:22
started 9:9 15:4 68:1 70:1
starting 76:13
state 6:6 13:8,14 102:4,7,22
stated 76:22
statement 21:16 27:21 29:19 31:2 89:7,13
statements 63:11,23
States 4:17
stenotypy 102:10
step 10:13,14 28:8 36:22
steps 59:5 60:13,18
Steve 6:1 34:5,6 86:3,8 93:17 94:13,15,21 96:20 98:7
stipulations 102:14
Stokes 14:12,14 25:9,10
stories 44:9
strictly 99:4,16
strong 12:20 52:9 96:7
student 9:12,19
style 44:20
subject 40:18 46:20 47:23
subjected 58:25
subjective 61:10
subjects 30:22
submit 101:10,12
submitted 46:3,5
subordinates 16:21,22
subsequent 12:2,14,15,23
successfully 57:19
summary 11:15
superiors 56:17 57:5
supervised 12:8
supervising 11:25
supervisor 24:20 27:10 42:1 52:12 59:7
supplies 16:24
supposed 24:16
supposedly 44:4
surfaced 66:15 68:13
surfacing 67:6 68:1
surrounding 49:17
Susan 4:1,7,19 6:8 101:6,15
suspect 27:8
suspended 60:20

suspicious 68:15
suspiciously 67:14
switch 18:1
sworn 4:4 62:10,25 81:9 102:9
systems 13:15 16:5

### T

T-O-L-L-A-N-D 7:21
table 57:8
talent 59:10
talk 30:19 31:5,12 32:10 34:17 36:12 47:15,19,22 48:12 49:6 81:4 89:21 90:10,16 93:7,13 95:9,21 99:2,5,14
talking 11:10 14:18 15:25 17:23 19:2 26:13 48:1 68:25 70:11 73:11 75:10 79:9 87:12
technically 55:22
technology 12:15 13:15
techs 26:3
telling 62:7 79:24 93:23
ten 15:7,20
ten-year 16:11
tendency 5:14
term 17:16 18:24 37:19
terms 18:25
testified 46:24
testify 78:15 102:9
testimony 21:7 31:25 37:11 43:18,19 57:8 58:5 61:19 62:10,25 65:5,8,14 68:14 70:17 71:3,11,12,20,22 72:3 78:19 79:21 81:9,12 86:9,11,12 101:8 102:12
theme 76:4
thing 25:25 29:12 35:20 40:17 45:11 53:18,20,24 54:7,9 55:9,11 64:6
things 15:2 22:10 26:3 28:24 30:20 39:11 47:3 48:25 77:19
thinking 53:3
thought 19:24 37:20 39:22 87:12 92:25 93:12 94:19 95:7 96:22 97:1
threatened 72:5
three-page 38:8
throw 68:10

time 9:16 11:10,16 13:22 16:4 17:16 19:10,15,25 20:1,7,14 23:4,18,20 24:15 30:21 31:6 39:24 45:5,15 46:10 53:5 54:13,21 55:1 64:25 79:15,17,19 81:1,23 88:18 91:24 93:5 94:4,12 97:6 100:18 102:13
time's 100:18
times 65:25 73:22 74:14,22 75:23 85:24 86:1,10,13 87:11 94:22
times.' 61:4
title 21:17 91:10
TMS 59:10,11
today 4:19
told 36:19 64:11 65:12 66:4,14 67:19 69:13 80:2 92:7
Tolland 7:1
tone 88:21
Tones 60:25
top 50:1
totally 96:10
training 31:10 58:22,23,25 59:3,6,8,12 60:2
transcribed 102:11
transcript 62:15,19 85:17 86:12 101:8 103:1
treated 50:17 70:21
treatment 49:18
trouble 70:16
true 65:9,10,17,21,23,24 66:1 78:13 89:15 92:2 101:8 102:11
truth 78:3,4 79:24 102:9,10
truthfully 78:15
turn 62:24 68:24 77:14 78:22 88:10
type 25:25 29:12
typed 89:12
typewriting 102:11
typically 11:1

### U

U.S. 4:22,23
um-hmm 5:14
uncomfortable 27:22,25 35:2 36:13 69:15 70:2
uncommon 61:3
undergraduate 7:1,13

understand 5:6,24 6:4 17:22 20:2 23:18 27:17 28:9 36:24 38:24 42:15 78:5 79:5 81:7,8,17,18 86:25 87:18 89:8 94:13,23 95:1 99:21
understanding 23:14 49:21 83:22,24 84:15 89:11,14
understands 73:2
understood 5:11 14:24 25:12 81:19 87:12
undertaking 49:16
unequal 49:18
United 4:16
University 7:17,24 9:8
unreasonable 84:20,23 87:1
unredacted 46:17
unwanted 84:1 85:6,13 86:20 87:3
unwarranted 96:10
unwelcome 85:13
unwelcomed 83:25
upcoming 61:18
upper 69:6
upset 35:13
upsetting 77:20

### V

VA 9:9,13,14 10:14 12:20 13:13 14:11,17 17:7 18:18 19:15,21 21:16 22:6,23 25:8,9 47:20 48:11,21,22 54:7 59:9 83:14,18 100:2,12,14
VA's 83:22 84:15
vast 51:3
Verb 89:8,16
verbal 26:6 28:10 87:3
version 46:14,17
versus 4:16 11:14
Veterans 13:9
victim 97:11,18 98:17,22 99:3,4,12,15
view 31:16 95:19
viewed 95:20
vindictive 44:18 45:3 50:18 52:6 53:14,15,17 55:19,22 56:3 58:3
vindictiveness 48:24
violation 53:8
VISN 13:8

### W

wanted 68:10,18 73:8 79:2 80:2
wanting 50:16
warrants 76:16
wasting 94:4
Waters 6:12
ways 20:11 81:19
week 32:13
weekend 31:14,23
Western 8:9
Westlake 6:10,12
Whereabouts 6:23
WHEREOF 102:17
wife 52:24 53:4,6
Wilkie 4:16
withdraw 30:8
withdrawn 15:24 20:18 21:14 23:8 26:19 37:1,2 43:9,23 58:13 60:5,11 61:7 66:7
witness' 86:9
witnesses 46:23
wonderful 96:21
word 5:13,18 63:2 76:13 103:1
words 48:1 50:5 62:5 87:2,4 95:3
work 9:4,19 15:16 30:14,15,17,19,20 31:6,11 32:4,21 33:9 35:6,21 47:12 50:1 55:1 84:22 93:4
worked 7:2,5 19:19 47:12
working 9:9 31:6 41:10 70:1 76:23
works 91:8
worry 53:8
write 62:7 64:11 69:19 70:22 72:2,6 91:23 103:1
writing 35:9 82:18 102:10
written 35:25 36:7 50:23
wrong 58:7,16 84:18
wrote 64:1 89:10 91:17

### Y

year 12:16 23:22 40:9,11 49:4 50:9
year-and-a-half 50:9
years 6:20 9:21,22 10:1 11:10 13:19 15:4,7,20 67:23 93:4

**Susan M. Fuehrer (Vol I) - April 02, 2019**
**Deposition**

**yelling**  60:24 61:3
**yesterday**  74:6,7