In The Matter of:

Ronald M. Lisan, M.D.

vs

Robert Wilke, etc.

---

Susan M. Fuehrer (Vol II)

April 26, 2019

Deposition

---



MEHLER HAGESTROM

Court Reporters

1660 West 2nd Street, Suite 780 | 50 South Main Street, Suite 720
Cleveland, Ohio 44113 | Akron, Ohio 44308
216.241.9000 | 330.535.7300
216.621.0050 Fax

www.MandH.com          Schedule@MandH.com

original filename: 190426_-_fuehrer_(vol_ii)_susan_m

**104**

1          IN THE UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

3    RONALD M. LISAN, M.D.,

4              Plaintiff,
                              JUDGE PATRICIA A. GAUGHAN
5      -vs-                   CASE NO. 1:18-CV-00969

6    ROBERT WILKE, ACTING SECRETARY
     OF THE UNITED STATES DEPARTMENT
7    OF VETERANS AFFAIRS,

8              Defendant.   VOLUME II

9                        -  -  -  -

10       Continued deposition of SUSAN M. FUEHRER,

11   taken as if upon cross-examination before Pamela

12   S. Greenfield, a Certified Realtime Reporter,

13   Registered Diplomate Reporter and Notary Public

14   within and for the State of Ohio, at the offices

15   of Sindell & Sindell, LLP, 23611 Chagrin

16   Boulevard, Suite 227, Beachwood, Ohio, at 1:35

17   p.m. on Friday, April 26, 2019, pursuant to

18   notice and/or stipulations of counsel, on behalf

19   of the Plaintiff in this cause.

20                        -  -  -  -

21               MEHLER & HAGESTROM
                  Court Reporters
22
          CLEVELAND                AKRON
23   780 Skylight Office Tower  720 Akron Centre Plaza
       1660 West 2nd Street       50 South Main Street
24    Cleveland, Ohio 44113       Akron, Ohio 44308
          216.241.9000               330.535.7300
25               FAX 216.621.0050

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**105**

```
 1   APPEARANCES:

 2        Steven A. Sindell, Esq.
          Rachel Sindell, Esq.
 3        Sindell & Sindell, LLP
          23611 Chagrin Boulevard
 4        Suite 227
          Beachwood, Ohio  44122
 5        (216) 292-3393
          Info@SindellAttorneys.com,
 6
              On behalf of the Plaintiff;
 7
          Ruchi Asher, Esq.
 8        Assistant United States Attorney
          U.S. Department of Justice
 9        United States Attorney's Office
          Northern District of Ohio
10        United States Court House
          801 West Superior Avenue
11        Suite 400
          Cleveland, Ohio  44113
12        (216) 622-3679
          Rushi.Asher@usdoj.gov,
13
              On behalf of the Defendant.
14

15

16

17

18

19

20

21

22

23

24

25
```

**106**

1                W I T N E S S   I N D E X

2                                              PAGE

3    CONTINUED CROSS-EXAMINATION
     SUSAN M. FUEHRER
4    BY MR. SINDELL                            107

5

              E X H I B I T   I N D E X
6
     EXHIBIT                                   PAGE
7
     Plaintiff's Exhibit 76, Fuehrer
8    4/2/19 deposition excerpt                 107

9    Plaintiff's Exhibit 77, Bearss 4/5/19
     deposition excerpt                        132
10
     Plaintiff's Exhibit 78, 6/20/17
11   Fuehrer letter to Lisan                   183

12   Plaintiff's Exhibit 79, "Response of
     Dr. Ron Lisan to the Proposed
13   Suspension at the Request of Dr.
     Raphaely (5-10-17)"                       202
14
     Plaintiff's Exhibit 80, 3/20/17
15   Raphaely letter to Lisan                  207

16   Plaintiff's Exhibit 81, 6/15/17
     Metzger letter to Sindell                 224
17

18

19

20

21

22

23

24

25

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

107

1       SUSAN M. FUEHRER, of lawful age, called by

2    the Plaintiff for the purpose of

3    cross-examination, as provided by the Rules of

4    Civil Procedure, being by me first duly sworn, as

5    hereinafter certified, deposed and said as

6    follows:

7    CONTINUED CROSS-EXAMINATION OF SUSAN M. FUEHRER

8    BY MR. SINDELL:

9  Q.  **We've already gone through the process of a**

10      **deposition and that we don't want to interrupt**

11      **each other if we can avoid it.  You have to use a**

12      **full word to answer a question and if you don't**

13      **understand a question, rather than answer it, ask**

14      **me to explain it.  I'll be happy to do that.**

15 A.  I understand.

16 Q.  **Right.  I just wanted to make sure that we're in**

17      **the same ballpark and of course you continue to**

18      **be under oath.  I know you know that.**

19 A.  Yes.

20 Q.  **I guess we'd better mark this because it's new**

21      **stuff.**

22                       - - - -

23      (Thereupon, Plaintiff's Exhibit 76, Fuehrer

24      4/2/19 deposition excerpt, was marked for

25      purposes of identification.)

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

108

1              - - - -

2   Q.  There are just a couple things here from your

3       prior deposition that I wanted to clarify with

4       you, and that's what this is.  These are a couple

5       of transcript pages from your previous deposition

6       that we had.  Okay?  So you know what I'm talking

7       about.

8   A.  Okay.

9   Q.  This is Exhibit 76.  It's two pages of the

10      transcript of your previous deposition.  I forget

11      the date, but whenever it was.

12          But I want to focus on the first page of it,

13      on Page 80, do you see where it says that?  Lower

14      right corner?

15  A.  Yes.

16  Q.  And toward the bottom, Line 22, do you see that?

17  A.  Yes.

18  Q.  And I'll just read it for the record.

19          "Do you intend to take any further action in

20      that regard or don't you know?"

21          Do you understand "in that regard," it was

22      bringing up the context of fear of retaliation by

23      Ms. Costanzo and I asked you if you found it

24      disturbing to you and you said yes?

25          You're free to read that portion if you want

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

109

```
 1        just to get the context.
 2   A.   I'm sorry, I can't remember.
 3   Q.   That's okay.  Go ahead and, you know, I want you
 4        to get the gist of it.
 5   A.   Okay.
 6   Q.   Are you with me?
 7   A.   Yes.
 8   Q.   So at Line 22, question:  "Do you intend to take
 9        any further action in that regard or don't you
10        know?"
11            And you said, "I will have to consult with
12        attorneys because I don't -- I have not had --
13        this is the first time I've seen this.  I don't
14        know the context.  I don't know where we're at,
15        so I would need to talk to somebody."
16            Question:  "You'd need to investigate
17        further?"
18            Answer:  "Yes."
19            Right?
20   A.   Correct.
21   Q.   Now, who would you talk to?  That's what I didn't
22        follow up with and I would like to understand
23        when you say "I'd have to talk to somebody, I'd
24        have to investigate further," who do you talk to?
25   A.   So I received a snippet of a testimony, one
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

110

1     person's testimony.  I didn't have the

2     opportunity to read the entire --

3  Q.  **I'm not asking --**

4  A.  -- testimony.  Please let me finish.

5  Q.  **Okay.  But I want you to answer my question.**

6  A.  And I will.

7         So when it is appropriate that I can read all

8     the testimony and read it in context, I will then

9     determine whether or not appropriate action needs

10    to be taken further.

11 Q.  **Okay.  So let's say that you want to discuss it**

12    **with somebody about further investigation.  Who**

13    **would you go to?**

14 A.  The Office of General Counsel.

15 Q.  **Okay.  Now, the Office of General Counsel is not**

16    **a person.  It's an office.  And I assume there**

17    **are people that work in the Office of General**

18    **Counsel; is that correct?**

19 A.  Correct.

20 Q.  **Where is the Office of General Counsel?**

21 A.  Well, there are several.  The main office is in

22    Akron, Ohio.

23 Q.  **Is that where you would go?**

24 A.  Well, I would probably send an email or have a

25    conference call to initiate, yes.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

111

1    Q.  You'd have contact with the Office of General

2        Counsel?

3    A.  Yes.

4    Q.  In Akron?

5    A.  Yes.

6    Q.  Who's the head of that office?

7    A.  Dennis McGuier, M-C-G-U-I-E-R, and he is an

8        attorney.

9    Q.  I would think so.  And is that the person that

10       you would most likely contact directly or is

11       there somebody else who's more of an executive

12       function there or something?

13   A.  Dennis is the executive.

14   Q.  Is that who you would generally go to?

15   A.  Yes.

16   Q.  Is there any other office that you would contact

17       besides Mr. McGuier at the general counsel office

18       in Akron?

19   A.  It would probably, I would also include employee

20       labor relations at the hospital.

21   Q.  Is there somebody there who you would generally

22       contact?

23   A.  The section chief is Steve Savino.  S-A-V-I-N-O.

24   Q.  I assume that you have a superior?

25   A.  Yes.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

112

1   Q.  To whom do you report?

2   A.  Well, when we met the last time, I let you know

3       that it was Denise Deitzen.  D-E-I-T-Z-E-N.

4   Q.  D-E-I-T?

5   A.  Z-E-N.

6   Q.  Boy, I don't remember that but if you do, I

7       believe you.

8   A.  I thought you asked me.  Well, maybe I'm --

9   Q.  That doesn't help me.

10  A.  Usually people ask me who I report to.

11  Q.  Well, see, I didn't finish my deposition so...

12          What's the first name, Denise?

13  A.  Denise.  D-E-N-I-S-E.

14  Q.  What is her title?

15  A.  So her title was acting network director.

16  Q.  Where is her office?  In the VA here?

17  A.  In Cincinnati and in Ann Arbor.  There are two

18      offices.

19  Q.  Acting network what?

20  A.  Director serving the states of Ohio, Michigan and

21      Indiana.

22  Q.  The states of Ohio, Michigan and Indiana and you

23      said Ann Arbor and where?

24  A.  Cincinnati.

25  Q.  Which office?  Or doesn't it matter?  That you

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

113

1      would, where you would contact her?

2  A.  It doesn't matter.  Whenever she happens to be.

3      However, she is no longer the acting network

4      director.  We have a new acting director and his

5      name is Ron.

6  Q.  **New acting network director?**

7  A.  Network director, yes.

8  Q.  **And his name is?**

9  A.  Ronald Stertzbach, S-T -- it's easier if I write

10     it.

11 Q.  **That's okay.  As long as you tell me.**

12 A.  S-T-E-R-T-Z-B-A-C-H.

13 Q.  **Does he have a main office where he --**

14 A.  He's mainly in Cincinnati.  Denise was equal

15     distant between the two.

16 Q.  **Now, when you say Cincinnati, is there a specific**

17     **office or is it a specific facility or however?**

18 A.  There is an executive office suite for the VISN.

19 Q.  **I guess what I'm asking is if I wanted to**

20     **communicate with Ronald Stertzbach or send him a**

21     **document -- I'm not saying I'm going to do that,**

22     **but I could.  I mean it might be a subpoena, I**

23     **don't know -- where would that go?  What's the**

24     **physical location?**

25 A.  Do you need an address?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

114

```
 1   Q.  Yeah.

 2   A.  I don't know it.

 3   Q.  Would you know the street?

 4   A.  No.  I know how to get there in my car.  I can

 5       try to Google if you'd like.

 6   Q.  Well, I don't need the driving directions.

 7   A.  No.  I meant to try to find the --

 8   Q.  I'm kidding.  Go ahead.

 9          Is it a VA facility?

10   A.  It's an executive office building.

11   Q.  Of the VA?  Or is it just a general office --

12   A.  They lease space in an executive office building.

13   Q.  Okay.  Then I do want to know.

14   A.  VISN office.  It's technically --

15   Q.  What is the office called?

16   A.  The VISN office.

17   Q.  The what office?

18   A.  The VISN office.

19   Q.  VISN?

20   A.  V-I-S-N, Veterans Integrated Service Network and

21       the address is --

22   Q.  Okay.  Wait.  Slow down.  VISN, what is the V

23       for?

24   A.  Veterans.

25   Q.  Veterans?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**115**

1    A.   Integrated.

2    Q.   Integrated Service Network?

3    A.   Correct.

4    Q.   All right.  Office.  Okay.  Sorry.  Go ahead.

5         What's the address?

6    A.   11500 Northlake Drive, all one word, Suite 200.

7    Q.   Suite 200?

8    A.   Cincinnati, Ohio, 45249.

9    Q.   45 what?

10   A.   249.  Want a phone number, too?

11   Q.   Shoot.

12   A.   513-247-4621.

13   Q.   Does he live in Cincinnati, if you know?

14   A.   I have no idea where he lives.

15   Q.   Okay.  Have you ever met him?

16   A.   Yeah.

17   Q.   Okay.  Good.

18   A.   His brother worked for the canteen in Cleveland.

19        He's in Georgia now but I don't know where he

20        lives.

21   Q.   His brother is not of interest to me.

22        Now, just very generally can you tell me what

23        the network or the Veterans Integrated Service

24        Network actually is?

25   A.   Sure.  So in our VISN, you understand VISN now,

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

116

```
 1        right?  There are 11 facilities in the states of
 2        Ohio, Indiana and Michigan.
 3   Q.   You mean like facilities like --
 4   A.   Like Cleveland.
 5   Q.   -- say like Louis Stokes?
 6   A.   Correct.  So, you know, they're a health system
 7        so there's one in Ann Arbor and one in Cincinnati
 8        and Dayton and Columbus and so we are one of 11.
 9        By far the biggest, but one of 11 and the VISN
10        office has a director and an operating officer of
11        very similar structure and they oversee a region
12        of VA hospitals and there are 23 networks across
13        the country, so our number is 10.
14   Q.   Well, what is Ronald Stertzbach's responsibility?
15        I mean what does he do?  What does he have
16        responsibility over exactly?
17   A.   Well, sometimes I don't know, to be honest.
18            But they are a region and they act as
19        liaisons between the facilities and the folks in
20        Washington, D.C.
21   Q.   I see.  Is there anybody in Washington, D.C. that
22        you would contact about any problems directly?
23   A.   No.  Usually I go through the Office of General
24        Counsel or the VISN.
25   Q.   Is Mr. Stertzbach an attorney?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

117

```
 1    A.   No.  He's an engineer.
 2    Q.   When you say with Washington, D.C., with whom
 3         does the network director liaison with in
 4         Washington, D.C.?
 5                    MS. ASHER:  Objection.  Relevance.
 6              Go ahead.
 7    A.   Many people but his, in his acting capacity, he
 8         reports directly to another person who is acting
 9         and her name is Renee O'Shinski.
10    Q.   Renee.  Is that a woman?
11    A.   Yes.
12    Q.   Two Es?
13    A.   Yes.
14    Q.   Renee what?
15    A.   O'Shinski.  O apostrophe S-H-I-N-S-K-I and she is
16         the acting, she's the acting DUSHOM.  Which is
17         D-U-S-H-O-M and stands for deputy --
18    Q.   Just a minute.  S-H-O-M?  DUSHOM?
19    A.   Yes.
20    Q.   And that's what now?
21    A.   Deputy Under Secretary For Health and Operations.
22    Q.   What's the M stand for?
23    A.   Management.
24    Q.   Is this somebody who reports to the secretary of
25         the VA?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**118**

1  A.  She reports to the under secretary for health who

2      reports to the secretary for the VA.

3  **Q.  Have you ever met Ms. O'Shinski?**

4  A.  Yes.  Her day job is VISN director in VISN 12,

5      which is Chicago.  She's just, I said she's

6      acting in Washington, so her permanent job --

7  **Q.  Sounds like everybody's acting.**

8  A.  Everybody is acting.

9  **Q.  Except for you.  You're not acting?**

10 A.  Nope.

11 **Q.  You're for real?**

12 A.  Hopefully.

13 **Q.  Have you had any reports, communications or**

14     **discussions with the acting network director,**

15     **whomever it might have been, at any time**

16     **regarding Dr. Raphaely or issues pertaining to**

17     **her?**

18 A.  No.

19                  MS. ASHER:  Objection, but go

20          ahead.

21 A.  Sorry.  No.

22 **Q.  Have you had any such discussions involving**

23     **Dr. Raphaely with Mr. McGuier?**

24                  MS. ASHER:  Objection.  Go ahead.

25 A.  No.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

119

```
 1   Q.  Could I ask why not?
 2               MS. ASHER:  Objection.  Go ahead.
 3   A.  I've seen no need.
 4   Q.  We've talked about the Brenda Spicer report.  You
 5       read the whole thing while we were at your last
 6       deposition?
 7   A.  Yes.
 8   Q.  Have you ever mentioned or discussed the Spicer
 9       report or anything related to it with the network
10       director or with general counsel?
11   A.  No.
12   Q.  Why not?
13               MS. ASHER:  Objection.
14   A.  At this point I haven't seen a need.
15   Q.  Any what?
16   A.  I have not seen a need.
17   Q.  Oh, a need.  I'm sorry.  I didn't properly hear
18       you.  Okay.  Apparently you mentioned --
19       withdrawn.
20           You also mentioned the, what did you call it,
21       the labor group or labor relations?
22   A.  Employee labor relations.
23   Q.  Thank you.  I'm sorry.  I didn't remember the
24       name.  Labor relations.  And I think you've told
25       us Steve Savino --
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

120

```
 1   A.  Correct.
 2   Q.  -- is the section chief.
 3         Has he been the section chief for the last
 4       few years to your knowledge?
 5   A.  Yes.
 6   Q.  He's not acting?
 7   A.  No.
 8   Q.  Have you ever had any discussions in any way
 9       related to the Brenda Spicer report with
10       Mr. Savino?
11   A.  I may have.  I can't recall specifically talking
12       specific to Steve, but I may have.
13   Q.  How about in writing?
14   A.  Nothing in writing to my knowledge.
15   Q.  All right.
16         If you may have had discussions about the
17       Spicer report with him, when might that have been
18       approximately?
19                   MS. ASHER:  Objection.  Go ahead.
20   A.  After its release.
21   Q.  Well, of course.
22   A.  After I read it.  I don't recall the exact date.
23   Q.  I can't imagine you would have done it before you
24       read it.  But okay.
25         Let's, it came out June 18, 2018.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

121

```
 1        If you would have discussed it with him,
 2    would it have been within a relative period after
 3    that date?
 4 A.  Yes.
 5 Q.  So within a month or so maybe?
 6 A.  Yes.
 7 Q.  Well, if you would have discussed it with him,
 8    why would you have discussed it with him?
 9              MS. ASHER:  Objection.  Go ahead.
10 A.  So we would have, when reports like this get
11    released, we -- and I don't recall one, to be
12    honest, so we might not have had one but we would
13    have perhaps EEO and employee relations and
14    myself sit down and discuss that.
15 Q.  Did I ask you, and I might or might not have,
16    where Mr. Savino is located?
17 A.  He's located at the medical center.
18 Q.  The VA here?
19 A.  Yes.
20 Q.  Why would you, if you didn't discuss it with him
21    and you can't recall that you did as you sit here
22    now, would it be for the same reasons you gave
23    regarding Mr. McGuier or the network director,
24    that there just didn't seem to be a need for it?
25              MS. ASHER:  Objection.  Go ahead.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

122

1    A.  Correct.

2    Q.  So let me just ask you this:  Would it be fair to

3        say that as you sit here now, you didn't feel

4        compelled to discuss with Mr. Savino the Brenda

5        Spicer report even though you might have

6        discussed it at some point?

7                    MS. ASHER:  Objection.  Go ahead.

8    A.  Yes.

9    Q.  That's a correct statement?

10   A.  Yes.

11   Q.  Why wouldn't you feel compelled with a report

12       like that to discuss it with the employee labor

13       relations section chief, Steve Savino?

14   A.  I can't answer that.  I didn't see any reason to

15       discuss it with him.

16   Q.  Because it wasn't important enough to you

17       perhaps?

18                    MS. ASHER:  Objection.

19   Q.  Is that right?

20                    MS. ASHER:  Objection.  Go ahead.

21   A.  No.  Because there may have been other people in

22       the medical center, such as the acting chief of

23       staff that would have done it instead.

24   Q.  But you don't know that for a fact either, do

25       you?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

123

```
 1   A.  Not at this time, no.
 2   Q.  But there wasn't an acting chief of staff.  There
 3       was a chief of staff -- no, no.  Wait a minute.
 4       He may have left at that point.  Dr. Altose may
 5       have left but you don't even know that anybody
 6       else discussed it with him?
 7                   MS. ASHER:  Objection.
 8   A.  I can't recall.
 9   Q.  Well, who was the acting chief of staff who
10       followed Dr. Altose?
11   A.  There were a series of acting chiefs of staff.
12   Q.  Did you discuss the Spicer report or anything
13       related to it with any of the acting chiefs of
14       staff who followed after the retirement of
15       Dr. Altose?
16   A.  I can't recall.
17   Q.  So you didn't feel compelled to have any
18       discussions about the Spicer report with any of
19       the chiefs of staff subsequent to Dr. Altose; is
20       that correct?
21                   MS. ASHER:  Objection.
22   A.  To my recollection, yes.
23   Q.  All right.  And is that because you didn't think
24       it was important enough?
25                   MS. ASHER:  Objection.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

124

```
 1   A.   No.

 2   Q.   Why?

 3   A.   It has nothing to do with importance.  It has

 4        something to do with whether there was action

 5        that was required and I don't see that there was

 6        action that was required from that report.

 7   Q.   Now you've been talking about going to the Office

 8        of General Counsel; is that correct?

 9                  MS. ASHER:  Objection.

10   Q.   You mentioned it here just now?

11   A.   What I said was when I have the opportunity to

12        read all the information that you have access to,

13        I may feel the need to go to the Office of

14        General Counsel.

15   Q.   You said, "I don't know where we're at, so I

16        would need to talk to somebody," if you'll take a

17        look at what you actually testified to.

18                  MS. ASHER:  Can you direct her to

19             a page?

20   Q.   Yeah.  It's actually at the bottom of 80 and the

21        top of 81.

22   A.   I think --

23   Q.   I read that right?  You did say, "I would need to

24        talk to somebody"?  Right?  You see where I'm

25        referring to it?  It's the top of 81.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**125**

1    A.   So at the top of 81 I also say I have not seen --

2         "This is the first time I've seen this.  I don't

3         know the context.  I don't know where we're at."

4              So in looking at everything together, maybe I

5         was not clear, I would have to look at everything

6         and then determine if I would have to talk to

7         somebody.

8    Q.   Okay.  So you don't even know that you would

9         have -- at this point you don't know that you

10        need to talk to somebody; is that correct?

11   A.   Correct.

12   Q.   Even though -- it isn't clear.  I agree with you.

13             Well, let's see if we can clarify it a little

14        more for you.

15             You can take out this one question because

16        it's going to come from here.

17             I'm just reading from the unredacted -- one

18        sentence.  I'll just read it to you unredacted.

19                       MS. ASHER:  Before you start, can

20             we mark this confidential.

21                        -  -  -  -

22             (Begin confidential portion.)

23                        -  -  -  -

24

25

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

127

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14                         -   -   -   -
15              (End of confidential portion.)
16                         -   -   -   -
17   Q.  If you'll take a look at the same document.
18                    MS. ASHER:  Are you talking about
19            Exhibit 76?
20                    MR. SINDELL:  Yes.  I am.
21       BY MR. SINDELL:
22   Q.  So I will read this out loud starting at Page 77,
23       Line 18, so you can follow right along with me,
24       and this was a question I asked of Ms. Costanzo.
25            "Question:  'As you sit here now,
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

128

1   Ms. Costanzo, do you have any fear that if you

2   say things in this deposition which are upsetting

3   or disturbing or critical with respect to

4   Dr. Raphaely, that you might be retaliated

5   against by her?'"

6        And the answer was:  "Yes."

7        And then skipping down to Line 12 of Page 78:

8   "Doesn't that disturb you that somebody would be

9   afraid to testify truthfully under oath if it

10  meant saying something bad or negative about

11  Dr. Raphaely because fear of retaliation?"

12       And the answer to that was:  Yes."

13       Okay?  And then if you skip over again, the

14  same section we're talking about, on Page 79, and

15  it would be Line 23.

16       "Question:  'Did you ever tell Mr. Greenspan

17  that you were fearful of telling the whole truth

18  in answer to his question because of retaliation

19  from Dr. Raphaely?'

20       "Answer:  'I told him that I wanted to make

21  sure that I absolutely had to participate in it

22  before I actually participated in it because I

23  didn't want to get myself involved with this

24  situation.'

25       "Question:  'Did you tell him why you didn't

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

129

```
 1        want to get involved with it?'
 2             "Answer:  'I feared my boss.  I feared
 3        Dr. Raphaely.'
 4             "Question:  'Feared retaliation against you
 5        from her?'
 6             "Answer:  'Yes.'"
 7             And then my question to you was on Line 14 at
 8        Page 80, "Does that disturb you" and the answer
 9        was "yes."
10             Okay?
11   A.   Yes.
12   Q.   You want to change that testimony?
13                  MS. ASHER:  Objection.
14   A.   No.
15   Q.   You want to say you need to know more about the
16        context before it disturbs you to hear that?
17                  MS. ASHER:  Objection.
18   Q.   Is that what your testimony is?
19                  MS. ASHER:  Objection.
20   A.   My testimony was that I do not want any employee
21        to be fearful of a supervisor; so, yes, it is
22        disturbing if an employee or employees say
23        they're fearful.
24   Q.   So my, my -- I'm sorry.  Did you finish your
25        answer?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

130

```
 1   A.   Yes.

 2   Q.   Okay.  I thought I might have been interrupting

 3        you and I didn't mean to.

 4             Okay.  So my question is simply this:  I read

 5        you, and this part is going to be separate.

 6                       MS. ASHER:  We'll mark it as

 7             separate.

 8                            -  -  -  -

 9             (Begin confidential portion.)

10                            -  -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

131

```
 1              -  -  -  -

 2          (End confidential portion.)

 3              -  -  -  -

 4   Q.  Okay.  Let's go on.

 5          We also have somebody by the name of Robert

 6       Bearss.  Do you know who he is?  You probably

 7       don't remember because it came up in the last

 8       deposition, but I'll remind you, okay?  I

 9       apologize.  I should have realized that.

10       Mr. Bearss is the way he pronounces it,

11       B-E-A-R-S-S, is the chief CRNA, okay?

12   A.  Okay.

13   Q.  Sometimes referred to as the lead CRNA who has

14       some aspects of supervisory leadership with

15       respect to the other 15, 16 or whatever number

16       CRNAs are in the department of anesthesiology.

17       Do you understand who he is now?

18   A.  Yes.

19   Q.  Does that ring a bell from the previous

20       deposition?

21   A.  Yes.

22   Q.  Okay.  Great.

23          So I'm going to hand you now a document that

24       I'm going to mark as Exhibit 77.

25              -  -  -  -
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

132

```
 1              (Thereupon, Plaintiff's Exhibit 77, Bearss
 2              4/5/19 deposition excerpt, was marked for
 3              purposes of identification.)
 4                        -   -   -   -
 5     Q.   And let's start with where I'm going to go anyway
 6          and see if there's enough context here.
 7              Page 54.  It's the very first page of this
 8          package.
 9              Page 54, lower left block.
10              Question:  "As you sit here now testifying,
11          do you have any fear that if she" -- meaning
12          Dr. Raphaely -- "becomes aware of something you
13          testified to that reflects badly on her that she
14          may retaliate against you?"
15              Answer:  "I don't have a fear of it, I'm
16          pretty sure it would happen."
17              Do you see where I am?
18     A.   No.  I don't.  I'm sorry.  You said block 54.
19          Line?
20     Q.   Oh, I'm sorry.  I'll start again.  It's the very
21          last line.  Line 25, the very bottom of --
22     A.   Okay.  I'm sorry.  I was looking at the top.
23     Q.   No, you don't have to be sorry about it.  It's my
24          fault.
25     A.   No problem.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

133

1   Q.   Okay.  Let's start again.

2          This is Line 25, the last line on 54, jumping

3        up to the upper right, 55, right?

4   A.   Yes.

5   Q.   "As you sit here now testifying, do you have any

6        fear that if she" -- meaning Dr. Raphaely --

7        "becomes aware of something you testified to that

8        reflects badly on her that she may retaliate

9        against you?"

10         Answer:  "I don't have fear of it, I'm pretty

11       sure it would happen."

12         Question:  "What would happen?"

13         Answer:  "There would be, she would do

14       something or try to do something to me because

15       she's upset about my testimony."

16         And then skipping down to Line 19 in the same

17       Page 55:

18         Question:  "So if I follow you correctly, you

19       expect that she" -- meaning Dr. Raphaely -- "will

20       make efforts to retaliate against you in the some

21       way?"

22         Answer:  "Yes."

23         Okay.  Now, same question:  Is that

24       disturbing to you?

25                     MS. ASHER:  Objection.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

134

 1  A.  As I previously stated, if there's any employee

 2      that is feeling that they are in fear of

 3      retaliation, that does concern me.

 4  Q.  He said he wasn't in fear.  That's one of the

 5      reasons I read that part to you.  He says, "I

 6      don't have fear of it, I'm pretty sure it would

 7      happen."

 8          And then he said -- I asked him, "So if I

 9      follow you correctly, you expect she will make

10      efforts to retaliate against you in some way?"

11          And he said "yes."  But he didn't say he was

12      afraid of it.

13          So that's why I'm asking you is nevertheless,

14      is this disturbing to you?

15                  MS. ASHER:  Objection.

16  A.  Yes.

17  Q.  That's because merely the fact that an employee

18      believes that Dr. Raphaely would retaliate

19      against him because of testimony that she

20      disliked that he gave, that would be disturbing

21      as well whether he feared it or not, correct?

22                  MS. ASHER:  Objection.

23  A.  Yes.

24  Q.  Are you aware that the, I think we've covered

25      three people, Bonfili and Costanzo and

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

135

1    Mr. Bearss.

2        Are you aware that there are other people in

3    addition to them who have expressed a fear of

4    retaliation if they said something disturbing to

5    Dr. Raphaely, retaliation from her?

6 A.  I was not aware of Mr. Bearss until this

7    testimony that I just read now and I am not aware

8    of anyone else.

9 Q.  If I told you that there are others, that would

10   be disturbing, too, right?

11              MS. ASHER:  Objection.

12 A.  I can -- yes.

13 Q.  Does that make you feel compelled to discuss this

14   with general counsel?

15              MS. ASHER:  Objection.

16 A.  I would like to see all the testimony before I

17   made a decision.

18 Q.  Well, that pushes you in that direction, though,

19   doesn't it?

20              MS. ASHER:  Objection.

21 Q.  What I've just showed you?

22              MS. ASHER:  Objection.

23 A.  Yes.

24 Q.  And of course there is the Spicer report which

25   describes 15 out of 16 CRNAs who collectively in

136

1    some number expressed concerns about retaliation

2    and discrimination by Dr. Raphaely which you had

3    much earlier than this deposition, correct?

4              MS. ASHER:  Objection.

5    A.  Yes.

6    Q.  All right.  Now I'd like to review with you some

7    further things, if you will, but before we do

8    that, let me just ask you this:  Withdrawn.

9        Turn the page.

10             MS. ASHER:  On Exhibit 77?

11   Q.  Yes.  I'm sorry.  That's right.

12       Off the record.

13                   -  -  -  -

14       (Thereupon, a discussion was had off the

15       record.)

16                   -  -  -  -

17   Q.  All right.  I'd like you to look at Page 76.

18       This is still, as it says at the very top,

19   the deposition of Robert Bearss who we've been

20   talking about, right?  You see where it says

21   Robert Bearss, CRNA, April 5th?

22   A.  Page?

23   Q.  Right at the top.

24   A.  Okay.  Yes, I see that.

25   Q.  I just wanted you to know it's his deposition.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

137

1    A.  Yes.

2    Q.  So I asked him, if you'll go to Page 76, which is

3        the lower right, Line 7.  Are you with me?

4    A.  Yes.

5    Q.  It says, "Did you ever hear Karin Bonfili

6        indicate that she or any other CRNA of the group

7        of four..."

8            You know what the group of four is, correct?

9                    MS. ASHER:  Objection.

10   Q.  Do you understand what the group of four is in

11       that question?  Four CRNAs?

12   A.  The four that made allegations of --

13   Q.  You're absolutely right.

14   A.  Okay.

15   Q.  "Did you ever hear Karin Bonfili indicate that

16       she or any other CRNA of the group of four was

17       coached or instructed by Dr. Raphaely as to what

18       to write on any documents connected with the

19       investigation of Dr. Lisan?"

20           The answer was "yes."

21           Question:  "Could you explain that?"

22           Answer:  "I was told by Karin Bonfili that

23       she was coached on how to fill out her report and

24       also that Dr. Raphaely was looking over her

25       shoulder while she was filling out the report."

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

138

1      Question:  "'The report' meaning the ROC

2  report?"

3      Answer:  "The ROC."

4      Question:  "Report of contact?"

5      Answer:  "Correct."

6      "And that would have been around January

7  sometime of 2017, to the best of your knowledge?

8  You can answer."

9      Answer:  "It was on more than one occasion

10  she told me she was coached."

11      Question:  "More than one occasion?"

12      Answer:  "More than one occasion."

13      "With respect to ROC?"

14      "Correct."

15      "How about affidavit?"

16      Answer:  "Yes."

17      Question:  "How about testimony in her

18  deposition?"

19      And she said, "No."

20      And then if you will look at Page 79 which is

21  directly to the right of 77, on Line 6 -- or 7.

22      Line 7.

23      "Did you have any reason to believe that

24  she" -- meaning Karin Bonfili -- "was coached one

25  way or the other as to the truth or falsity of

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

139

```
 1        the contents of what she wrote on the ROC?"

 2             And the answer was "yes."

 3             My question to you is:  Does that disturb you

 4        as well?

 5                       MS. ASHER:  Objection.

 6   Q.   What I just read?

 7                       MS. ASHER:  Objection.

 8   A.   I don't understand why Karin Bonfili filled out a

 9        police report and I believe that when Karin

10        Bonfili filled out a police report, Dr. Raphaely

11        was not there, so I, to me I question why she

12        feels she was compelled or forced by Dr. Raphaely

13        is what you're intimating that Karin complete an

14        ROC but yet on her own in March she went and

15        completed a police report.

16   Q.   Okay.  I hear what you're saying, but my question

17        is are you telling me this doesn't disturb you

18        because you think that Karin Bonfili is

19        inconsistent in some way here?

20                       MS. ASHER:  Objection.

21   A.   It's odd that Robert Bearss is testifying on what

22        he may or may not know for Ms. Bonfili; but yet

23        Ms. Bonfili to my knowledge went on her own to

24        file a police report two months later.

25   Q.   And what if in fact she was told to go to the
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

140

1      police -- withdrawn.

2           What if in fact the actual circumstances were

3      that Dr. Raphaely advised her to go to Mr. Kafer

4      who was the EEO coordinator and Mr. Kafer told

5      her to go to the police?

6                     MS. ASHER:  Objection.

7                Mischaracterization.  Go ahead.

8   A.  So obviously we have a zero tolerance or we try

9      to have a zero tolerance for inappropriate

10     conduct and inappropriate behavior in our medical

11     center and as any supervisor if they hear that an

12     employee is fearful or feels that, you know,

13     someone has acted inappropriate to them, it is

14     their obligation to refer them either to EEO

15     and/or the police.

16  Q.  Okay.  You do understand that the report of

17     contact being referred to here is the report of

18     contact she initially made to Dr. Raphaely.

19          Do you understand that to be the case?

20  A.  Yes.  They just don't seem to make sense to me.

21  Q.  It doesn't make sense to you that the first time

22     she went to Dr. Raphaely and Dr. Raphaely sat

23     over her shoulder and coached her on the truth or

24     falsity of the contents of her statement but when

25     she made two months later another report of

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

141

```
 1       contact, she went to the police on the advice of
 2       Mr. Kafer?  What does one have to do with the
 3       other?
 4                    MS. ASHER:  Objection.
 5   A.  So there were, to my recollection, a series of
 6       events in early January by several CRNAs that
 7       came to Dr. Raphaely's attention.  As a
 8       supervisor, I believe Dr. Raphaely did what was
 9       appropriate and asked them to put a report of
10       contact together.  I can't speak to how they were
11       coached, if they were told to put the facts in,
12       how they were coached.
13            I do know subsequent to that Dr. Lisan was
14       asked to stay away from these CRNAs and a couple
15       months later after Dr. Lisan had been asked a few
16       times to stay away, he didn't and there were
17       issues with both Ms. Costanzo and Ms. Bonfili at
18       which time, you know, the situation is different
19       because, you know, it happens once, you're asked
20       to stop.  You've been warned to stop.  The
21       behavior continues --
22   Q.  I think you're speaking way beyond the question I
23       asked.
24   A.  I apologize.
25   Q.  So I'll ask it again, okay?  Well, let me ask it
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

142

1     a different way.

2          Do you think it's appropriate under any

3     circumstances for Dr. Raphaely to be coaching

4     somebody making a report of contact alleging

5     sexual harassment on the part of Dr. Lisan as to

6     the truth or falsity of the contents of the ROC?

7     Do you think that's appropriate for Dr. Raphaely

8     to do that?

9                    MS. ASHER:  Objection.

10  A.  I don't know what you mean by "coached."  I

11     wasn't there.

12          I mean if she said tell the facts and nothing

13     but the facts, and helped that, I don't see an

14     issue with that.

15          If she said, you know, make up a story and

16     tell a lie here, I have a problem with that.

17  Q.  Let's go on with this, okay?

18          References to Rhonda Verb on Page 79 and she

19     says -- I don't know why it says answer here.

20          "Let's go back to the Rhonda Verb thing,

21     though, for a second, if we may."

22          Question:  "Yes."

23          Answer:  "Dr. Raphaely approached me to ask

24     Rhonda if she had any complaints about Dr. Lisan

25     and, if so, to talk to Dr. Raphaely, and

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

143

1      initially when she asked me that I didn't think

2      anything about it, but after the fact it makes me

3      wonder why she asked me to ask Rhonda."

4          Question:  "As you sit and wonder about that,

5      does it appear to you that she was soliciting

6      negative things to produce and write about

7      Dr. Lisan?"

8          Answer:  "Yes."

9          Question:  "Taking into account what you just

10     read dated January 6, 2017, Exhibit 31" -- that's

11     a letter you got.  Remember it?

12  A.  Yes.

13  Q.  -- "does it appear that these solicitations for

14     improprieties against Dr. Lisan were retaliatory

15     in nature?"

16          His answer is "yes."

17          Question:  "And why do you believe that?"

18          Answer:  "Because she asked me to ask

19     somebody who hadn't complained if they had a

20     complaint."

21          Question:  "Had that ever happened with

22     Dr. Raphaely before where she came to you

23     soliciting complaints?"

24          Answer:  "Yes."

25          Question:  "Who did she do that with respect

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

144

1    to?"

2         Answer:  "She sent an email to all the

3    physicians asking if anybody had any problems

4    with Rhonda Verb's practice."

5         Question:  "Did you or do you believe that

6    that was retaliatory against Rhonda Verb?"

7         Answer:  "Yes."

8         Question:  "And why do you believe that?"

9         Answer:  "Because the accusation of

10   falsifying a medical record wasn't substantiated

11   by the documents that she had so she was

12   soliciting more evidence to pursue that

13   complaint."

14        Question:  "Is it your belief based on the

15   evidence you reviewed regarding Rhonda Verb's

16   alleged falsification of data of a patient that

17   Dr. Raphaely knew that the claim was untrue when

18   she made the accusation?"

19        Answer:  "Yes."

20        Question:  "So if I understand your testimony

21   correctly, Dr. Raphaely intentionally made a

22   false accusation against Rhonda Verb knowing in

23   advance that it wasn't true, but rather that it

24   was false.  Is that what you're saying?"

25        Answer:  "Yes."

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

145

```
1          Question:  "Would that be a pretty good

2      definition of your understanding of the word

3      'malicious'?"

4          Answer:  "Yes."

5      Did I read that correctly?

6                     MS. ASHER:  Objection.

7                     MR. SINDELL:  "Did I read that

8          correctly," objection?

9                     MS. ASHER:  I don't believe you

10          did read it correctly.

11                     MR. SINDELL:  What was the

12          mistake?

13                     MS. ASHER:  There are a number of

14          objections that are in the transcript that

15          you omitted.

16                     MR. SINDELL:  Of course I did.

17          Those aren't part of the answers.

18                     MS. ASHER:  Well, they're part of

19          what's written, so it's not read correctly.

20  Q.  Did I read what I read correctly?  The words that

21      I did read appear on this document as questions

22      and answers?

23  A.  You read certain questions and answers.  You did

24      not read the entire document but what you chose

25      to read, you read correctly.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

146

1    Q.   Thank you.   I was hoping you'd say that.

2              Okay.   Isn't that disturbing to you?

3                    MS. ASHER:   Objection.

4    Q.   Under oath Mr. Bearss, the lead chief CRNA,

5         testifying under oath that way?   Isn't that

6         disturbing to you?

7                    MS. ASHER:   Objection.

8              Characterization.

9    A.   I don't have the facts; so when I, when you read

10        what you read to me, if in fact someone had made

11        an allegation that someone had falsified a

12        medical record, that's a pretty serious offense;

13        and as a supervisor, I think there is a

14        responsibility to determine if this was an

15        isolated incident, if it wasn't accurate or if

16        there were more and, you know, was due diligence

17        being done or was it considered malicious.   Based

18        on what you read to me, I cannot provide an

19        answer to you.

20   Q.   Yes.   You would need more information, correct?

21   A.   Yes.

22   Q.   But let's just assume for a moment that this

23        testimony as it is is accurate, that Mr. Bearss

24        himself personally investigated it and

25        concluded -- I'm telling you this, not reading it

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

147

```
 1        to you -- and concluded that there was absolutely

 2        nothing to support the charge of falsification

 3        and in fact no further action was taken after

 4        that was made known.

 5             If that was the case, wouldn't that disturb

 6        you?

 7                      MS. ASHER:  Objection.

 8                 Characterization.

 9   A.   I don't interpret it the same way you're

10        interpreting it.

11   Q.   Oh, okay.

12   A.   You know, I don't know what Mr. Bearss may or may

13        not have known.  If he knew the complete story.

14   Q.   Do you have any reason -- I'm sorry.  Go ahead.

15   A.   I don't have any reason to doubt anybody.

16   Q.   Well, you have no reason to doubt him either?

17   A.   No, but I don't have the complete information.

18   Q.   But is it alarming enough for you to look into it

19        and find out what the facts are?

20   A.   Yes.

21   Q.   Thank you.  So you plan to do that, then, right?

22                      MS. ASHER:  Objection.

23   A.   When I get all the documents that you are privy

24        to, I will review everything.

25   Q.   So four years from now you may have a chance to
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

148

```
 1      review it all?
 2                    MS. ASHER:  Objection.
 3   Q.  Is that what you're saying?
 4                    MS. ASHER:  Objection.
 5   A.  I would hope it would be sooner than four years.
 6   Q.  And what would that take?  How long?
 7                    MS. ASHER:  Objection.
 8   Q.  How long would it take for you to do it?
 9                    MS. ASHER:  Objection.
10   A.  As long until I can get the same information that
11      you have.
12   Q.  Okay.  You don't have to wait to start looking
13      into some of this stuff, do you?
14                    MS. ASHER:  Objection.  Vague.
15   A.  I don't know.
16   Q.  What don't you know?
17   A.  I don't know if this is an active investigation
18      right now with what's going on.  I don't know who
19      has privy to this information.
20   Q.  I'd like to know if as of this point in time, and
21      there's going to be more to come right here in
22      this deposition, but as of this moment in time
23      you intend to begin immediately looking into some
24      of these matters?
25                    MS. ASHER:  Objection.  This is
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**149**

```
 1              not an appropriate question for this
 2              deposition.
 3                      MR. SINDELL:  I don't think you're
 4              right.
 5      BY MR. SINDELL:
 6   Q.  But go ahead.
 7   A.  I will be looking into these matters to the best
 8       of my ability; but I don't have the same
 9       documentation that you have, and can I take these
10       with me?
11   Q.  I will be happy, and so will your counsel, to
12       supply you with all of the testimony under oath
13       and all of the supporting documentation in this
14       case.
15   A.  And I would appreciate that.
16   Q.  Well, I'm not the one who's your, I mean it isn't
17       my job to present you with material because
18       you're represented by counsel.  So you're asking
19       counsel to do that?
20   A.  If I am able to ask counsel, I will ask counsel
21       if they can provide this to me now.
22   Q.  Okay.  Why wouldn't you be able to ask counsel?
23                      MS. ASHER:  Objection.
24   Q.  Is there some reason you can't talk to your own
25       lawyer?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

150

1          MS. ASHER:  Objection.

2    A.   No.  I just don't -- I'm sorry, I don't

3         understand the, if there are procedural issues

4         that would prevent me from having it.  If I'm --

5    **Q.   Oh, they'll tell you if there are procedural**

6         **issues, won't they?**

7                    MS. ASHER:  Objection.  You are

8              not going to answer that.  Now you're

9              intruding into attorney/client privileged

10             information.

11                   MR. SINDELL:  No, I'm not.

12                   MS. ASHER:  Yes, you are.  And

13             this area of deposition questioning is

14             highly inappropriate.

15                   MR. SINDELL:  I don't think I am.

16                   MS. ASHER:  I think you are.

17                   MR. SINDELL:  And I'll tell you

18             why I'm not:  Because it's not legal

19             advice.  It's a request for information.

20             That's not your giving any legal advice to

21             anybody.  It's even a conversation that

22             hasn't taken place, so therefore it isn't

23             covered by any privilege at all and what I

24             think is clear here, and I will bring it up

25             if necessary, is that you are being told on

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

151

```
 1              the record by the head of the agency that
 2              you represent that she wants to have the
 3              records that go into these things now and
 4              that's what's on the record.
 5                    So you've been told, you've been
 6              asked and I intend to stand on that; but
 7              let's continue with the deposition.
 8      BY MR. SINDELL:
 9   Q.  I'd like you to take a look at Page 83 at the
10       top, Line 8.
11           "Can you tell me what you recall Karin
12       Bonfili saying on that subject of being used by
13       Dr. Raphaely?"
14           Answer:  "She thought Karin, Karin thought
15       that Dr. Raphaely was concerned about her
16       complaint and the fact that she was concerned
17       about Karin and in reality she was more concerned
18       about getting the complaint than she was about
19       the contents of the complaint."
20           Question:  "And that's what Karin, Karin
21       Raphaely communicated to you?"
22           And his answer was, because I said it wrong:
23       "That's what Karin Bonfili communicated."
24           Question:  "Karin Bonfili.  Let me repeat the
25       question."  Oh, I actually repeated it.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

152

1          "That's what Karin Bonfili stated to you,

2      what you've just said?"

3          Answer:  "That is correct."

4          Is that a matter of concern to you?

5                    MS. ASHER:  Objection.

6   Q.  If you assume that Karin Bonfili expressed that

7       about Dr. Raphaely, if you just assume that,

8       isn't that worth looking further into in your

9       mind?

10                   MS. ASHER:  Objection.

11  A.  Sure.

12  Q.  Okay.  You don't seem overly enthused about it?

13  A.  No, I'm not.  It's getting he said/she said/he

14      said.  I mean there's just a lot of, you know.

15  Q.  Well, isn't that the way that investigations and

16      the concerns are triggered, he said and she said?

17  A.  These are very highly paid professional people

18      and I would think if someone had concerns or

19      whatever, they would bring these things to the

20      attention rather than this; but that's just me.

21  Q.  No.  No.  I understand you think they'd bring

22      them to, your answer was they'd bring them to the

23      attention of a manager or higher authority,

24      correct?

25  A.  Right.  I've seen better behavior out of our

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

153

1       housekeepers.

2    Q.  Is that correct that you thought that they would

3        just bring it to a higher authority?

4    A.  Yes.

5    Q.  So let's take a look at 84 now that you just

6        mentioned that.

7            Question, Line 16.  Are you with me?

8    A.  Yes.

9    Q.  "Do you recall Karin Bonfili expressing to you

10       that she was afraid to tell the whole truth to

11       Investigator Greenspan of the VA investigating

12       Dr. Lisan's issues out of fear of retaliation

13       against her by Dr. Raphaely?"

14           Answer:  "Yes."

15           Now, you've already agreed that that's

16       disturbing, that she'd be afraid to talk to

17       somebody investigating this?

18   A.  Yes.

19   Q.  Because she'd be afraid of being retaliated

20       against?

21   A.  Yes.

22   Q.  And as a matter of fact, if we --

23                   MS. ASHER:  We'll mark this

24           section.

25                   MR. SINDELL:  I'm not sure -- this

**154**

1    will be separated, just this one area here.

2                    -   -   -   -

3        (Begin confidential portion.)

4                    -   -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

156

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16                            -   -   -   -

17              (End of confidential portion.)

18                            -   -   -   -

19  Q.  I'd like to have you turn to the next page, Page

20      85 I think it is, and that would be --

21                  MS. ASHER:  That's on 77 again?

22  Q.  Yes.  We're still on... are you with me on that

23      page?

24  A.  85?

25  Q.  Yes.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

157

```
 1   A.  Yes.

 2   Q.  I'm going to start at Line 19 and this is, again,

 3       to Mr. Bearss.

 4           Question:  "So tell me what Karin Bonfili

 5       actually told you that you heard her say on the

 6       subject of her fear of retaliation in connection

 7       with ...  Mr. Greenspan?"

 8           Answer:  "Karin Bonfili told me she didn't

 9       want to talk to Mr. Greenspan for fear of

10       retaliation from Dr. Raphaely."

11           Question:  "Did she share with you that she

12       told Mr. Greenspan that?"

13           Answer:  "Yes, she did."

14           And my question to you is:  Does that alarm

15       you?

16                   MS. ASHER:  Objection.

17   Q.  If you assume the truth of that testimony?

18                   MS. ASHER:  Objection.

19           Characterization.  Go ahead.

20   A.  This alarms me.  It also alarms me if Ms. Bonfili

21       then completed a false police report.

22   Q.  I would agree with that, too.  Okay?  But I

23       mean --

24   A.  I mean some things just, this just doesn't add

25       up.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

158

1  Q.  What if she testified under oath that she

2      couldn't remember any of this?

3              MS. ASHER:  Objection.

4          Characterization.

5  Q.  Would that surprise you?  Withdraw.  I withdraw

6      that, you're right.

7          Question, I'm looking at Page 86 Line 4:

8      "Did she ever, did she Karin Bonfili ever

9      indicate that Dr. Raphaely had called her into

10     Dr. Raphaely's office to tell her not to indicate

11     that she had been coached by Dr. Raphaely?"

12         Answer:  "Yes."

13         Would that disturb you in light of what we've

14     already revealed here in some of this testimony?

15             MS. ASHER:  Objection.  Go ahead.

16 A.  If this is true, yes.

17 Q.  Yes, of course.  That's pretty shocking, isn't

18     it?

19             MS. ASHER:  Objection.

20 A.  The whole thing is bizarre.

21 Q.  Okay.  I'd like you to turn the page, please.

22 A.  99?

23 Q.  99.  You got it.

24 A.  Yes.

25 Q.  It's the upper right box Line 6.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

159

1    Question:  "Did Dr. Raphaely ever express an

2    interest or desire or intention to get Dr. Lisan

3    out of the department of anesthesiology at the

4    Cleveland VA?"

5        Answer:  "Yes."

6        Question:  "When was that?"

7        Answer:  "I can't give you a specific date.

8    It was after, it was after this letter was sent."

9        Question:  "After January 6th?"

10       That's the letter that you received, that's

11   the letter that we're referring to here.

12                    MS. ASHER:  Objection.

13   Q.  Do you understand that?

14   A.  Yes.  It was also done likely after the reports

15       of contact from the CRNAs.

16   Q.  Yes.

17   A.  That came in like the 7th, 8th and 9th.  Right?

18       Wasn't that January 7th, 8th and this is when

19       they came?  No?

20   Q.  No.  The first one was January 10th?

21                    MS. ASHER:  Objection.

22   A.  Okay.

23   Q.  Okay.  After January 6th, 2017?  Yes.  Okay.

24       Let's assume it was true.  Do you think it's

25       appropriate for Dr. Raphaely to desire or intend

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

160

1   to get Dr. Lisan out of the department of

2   anesthesiology simply because an allegation was

3   made against him?

4                    MS. ASHER:  Objection.

5              Characterization.

6   A.  I can't answer that question.

7   Q.  **Why not?**

8   A.  Because there may have been other factors.

9   Q.  **The allegation of sexual harassment was found not**

10      **to even be sexual harassment.  Based on an**

11      **allegation like that, do you think intending to**

12      **get rid of him from the department is somewhat**

13      **disturbing?**

14                   MS. ASHER:  Objection.

15             Characterization.

16  A.  There may have been other factors.  This may not

17      have been the entire factor.  There may have been

18      issues such as tardiness that may have led to

19      that.

20  Q.  **But the tardiness was never a major issue here.**

21      **Did you know that?**

22                   MS. ASHER:  Objection.

23             Characterization.

24                   MR. SINDELL:  Yes, it is a

25             characterization.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

161

1           MS. ASHER:  Mischaracterization.

2   Q.  It was mentioned but it wasn't a basis for any

3       disciplinary action that was taken in connection

4       with this matter.  Did you know that?

5   A.  Yes.

6   Q.  Then doesn't that tell you that she wouldn't get

7       rid of him because of tardiness?

8   A.  Well, we certainly want all of our very highly

9       paid physicians to come on time.  If you were

10      wanting surgery, you'd want your case to start on

11      time.

12  Q.  And do you know if any case didn't start on time

13      because he was tardy?  Do you have any reason to

14      believe that?

15  A.  I do know that as a whole our medical center had

16      issues with late start times as measured by a

17      national report.

18  Q.  And you think that's the reason that on

19      January -- after January 6th Dr. Raphaely

20      expressed a desire to get rid of Dr. Lisan

21      because of tardiness?

22  A.  I don't --

23          MS. ASHER:  Objection.

24  A.  I don't know.

25  Q.  Yes, you do in the sense, in the sense that if

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

162

1      it's not --

2  A.  Please don't shake your finger to me.

3  Q.  -- if it's not even on, if it's not even on the

4      suspension that you yourself affirmed for

5      Dr. Lisan, you know very well that it wouldn't be

6      a reason why she'd want to get rid of him.

7                    MS. ASHER:  Objection.

8  A.  I think in your letter response to Dr. Altose,

9      you bring up the tardiness.

10  Q.  Well, I may bring it up.

11  A.  You said that there wasn't an issue and there was

12      an issue as documented by the chief of anesthesia

13      prior to Dr. Raphaely, Dr. David Kazdan.

14  Q.  But it wasn't a current issue, was it?

15                    MS. ASHER:  Objection.

16  A.  I believe there were issues with Dr. Lisan coming

17      to work on time.

18  Q.  With Dr. Raphaely?  Current issues at this time

19      January 2017?

20                    MS. ASHER:  Objection.  Go ahead.

21  A.  It is my recollection, yes.

22  Q.  Uh-huh.

23      Did you know when he returned from months of

24      absence for medical treatment?  Do you know what

25      date he returned?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

163

1   A.   I do not know the specific date.

2   Q.   **December 7th, 2016.  Okay?  At that particular**

3        **time were there any pending issues of tardiness**

4        **at that time?**

5   A.   I can't answer that.  I don't have the specific

6        dates.

7   Q.   **Well, if --**

8   A.   Dr. Lisan is four or five levels below me and I

9        can't keep track of time and attendance for

10       thousands of employees.

11  Q.   **So you're suggesting that it might have been that**

12       **the reason after January 6th, 2017 that**

13       **Dr. Raphaely might have desired to get Dr. Lisan**

14       **out of the department of anesthesiology at the VA**

15       **was because of tardiness?  Is that your**

16       **testimony?**

17                 MS. ASHER:  Objection.  Go ahead.

18  A.   My testimony was that this may not have been the

19       only reason, so you asked me to assume and I said

20       there could be other reasons.

21  Q.   **There could be, and the one you've identified as**

22       **a possible other reason is tardiness?**

23  A.   Which was included in your response to Dr. Altose

24       so obviously it was an issue at some point.

25  Q.   **Let's go to Page 101, the next page.  It's the**

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

164

1     last page, top left.  You see it?  Line 1?

2  A.  Yes.

3  Q.  Question:  "Did she" -- meaning Dr. Raphaely --

4     "ever indicate that she wanted Ken Moss" --

5     that's another anesthesiologist?

6  A.  I know Dr. Moss.

7  Q.  -- "out of the department?"

8       Answer:  "Yes."

9       "When did you hear that?"

10       "Around the same time."

11       "But did she tell you why she wanted Ken Moss

12     out of the department?"

13       "No."

14       So now what would you like to suggest as the

15     reason, if you know, that she also wanted to get

16     rid of Dr. Moss?

17  A.  I don't have any information on that.

18  Q.  Did you know that Dr. Moss was also pursuing an

19     EEO complaint against Dr. Raphaely at the time --

20     well, in approximately the same time?

21            MS. ASHER:  Objection.

22  A.  I know Dr. Moss was filing an EEO.  I can't

23     recall the time.

24  Q.  Was what?  I'm sorry?

25  A.  I know Dr. Moss was, had some issues and it may

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

165

1      have been an EEO but I don't recall the exact

2      time.

3                    MR. SINDELL:  Okay.  You want to

4            take a break?

5                        -   -   -   -

6            (Thereupon, a recess was had.)

7                        -   -   -   -

8                    MR. SINDELL:  Back on the record.

9      BY MR. SINDELL:

10  Q.  So do you know what this is?

11  A.  Yes.

12  Q.  Do you need to read the whole thing?

13  A.  Can I glance at it please?

14  Q.  Time's up.

15  A.  That was a glance, okay.

16  Q.  It's just really a couple sentences here.  Can I

17      tell you where I'm going to be?

18  A.  Sure.

19  Q.  I'm looking at Page 2, Part B, so one little

20      paragraph.  "Responsibilities."

21  A.  Got it.

22  Q.  All right.  I'm showing you what has been

23      previously marked as Exhibit 6 and can you

24      identify this as the report of Bruce Kafer in his

25      capacity as EEO affirmative employment manager

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

166

```
1         with a copy to Dr. Raphaely and the medical --
2         actually, you, medical center director.  That's
3         you?
4    A.   That's me.
5    Q.   So you got a copy of this as well?
6    A.   Yes.
7    Q.   Do you remember receiving it?
8    A.   Yes.
9    Q.   All right.  So I'd like to direct your attention
10        to Page 2 Section B and to this sentence:  "When
11        conduct perceived as sexual harassment occurs, it
12        is incumbent on the recipient to verbally direct
13        the perpetrator of the unwanted conduct to cease
14        and desist the unwanted actions," and then it
15        goes on to say, "and then report the occurrence
16        to the appropriate management official and also
17        provide written documentation regarding the
18        incident."  Okay?
19   A.   Yes.
20   Q.   Now, concentrating on the sentence, "When conduct
21        perceived as sexual harassment occurs, it is
22        incumbent on the recipient to verbally direct the
23        perpetrator of the unwanted conduct to cease and
24        desist the unwanted actions."
25            Do you agree with that sentence?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**167**

1    A.   Yes.

2    Q.   **Isn't that part of the rules and protocols of the**

3         **policy of the medical center?**

4    A.   Yes.

5    Q.   **Do you have any disagreement with that?**

6    A.   No.  In fact, we actually had a group of people

7         go and talk to all of anesthesia in March I

8         think, after, shortly after the police report to

9         let everybody, give everybody the policy and let

10        everybody know because it seemed like people were

11        making statements and we just wanted everybody in

12        the entire service to have a copy of the policy

13        so we actually shared that with them.

14   Q.   **Okay.  I think you even spoke there.**

15   A.   I spoke, yes.

16   Q.   **Anybody else?**

17   A.   I don't recall who spoke.  I can tell you who was

18        there.

19             We had someone there from the Office of

20        General Counsel.  We had Dr. Altose.  We had the

21        chief of human resource management.  We had the

22        EEO manager.  There may have been others but

23        those are probably, so, you know, we tried to

24        cover EEO.  We tried to cover employee relations.

25        We tried to cover any legal aspects just to try

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

168

```
 1        to make sure that every employee heard the same

 2        message at the same time.

 3   Q.   This was a meeting in March?

 4   A.   I believe so.

 5   Q.   Would it have been a meeting with the

 6        anesthesiology staff on March 13, 2017?

 7   A.   That sounds about right.

 8   Q.   To address appropriate medical center contact and

 9        the need to timely report?

10   A.   Yes, and conduct.  I think it was conduct.  Was

11        that contact or conduct?

12   Q.   Contact here.

13            I'm reading so, you know, I'm reading, I just

14        got this today, the response to an interrogatory

15        we had sent to the defendant, to the VA and

16        that's the answer.

17   A.   Okay.

18   Q.   Part of the answer, I should say referring to

19        March 13.  I thought that was the one you were

20        talking about?

21   A.   Yes, it was.

22   Q.   And you said you handed out --

23   A.   I think this policy.

24   Q.   The 003 policy?

25   A.   The 003, I believe so.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

169

1    Q.   I guess then I would have to ask we asked for a

2        request for production.  It says please produce

3        all documents, attendance, sign-in sheets and

4        materials referenced in plaintiffs Interrogatory

5        Number 5, which is the one I just was reading

6        that referred to March 13, also an April 19

7        meeting, but the one you're talking about --

8    A.   I'm not aware of the April 19th meeting.

9    Q.   I understand.  March 13, 2017, so it refers to

10       producing all documents, materials referenced for

11       each education meeting, team meeting, team

12       building or other meeting at which sexual

13       harassment or related matters were discussed.

14          You know what?  I don't know how it got into

15       that.  This was in 2017.  I might have misstated

16       it.  Withdrawn.  My mistake.

17          Okay.  To your knowledge were those the only

18       materials that were passed out that day?

19    A.   Yes.  Just the policy.

20    Q.   Okay.  Now, if you will turn to Page 5 of this

21       document and if you will look at the last full

22       paragraph beginning with "While the complainants

23       have cited."

24          Do you see that?

25    A.   Yes.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

170

1   Q.  Why don't you take a moment and look at that.

2   A.  I've read it.

3   Q.  Okay.

4   A.  Yes.

5   Q.  So I'll read it for the record.  And then I have

6       a question.

7            "While the complainants have cited that

8       Dr. Lisan has engaged in sexually inappropriate

9       jokes and commentary throughout the course of

10      their employment" -- their being I think CRNAs --

11      "there is no indication that anyone informed him

12      to stop with the exception of Elaine Costanzo,

13      after which he stopped."

14           Would you agree that with the exception of

15      Elaine Costanzo mentioned there, the other

16      complaining CRNAs did not comply by not telling

17      him to cease and desist or stop --

18  A.  But they had.

19  Q.  -- when -- I haven't finished the question.

20  A.  I'm sorry.  I apologize.

21  Q.  Would you agree that with the exception of Elaine

22      Costanzo, that if no other of the CRNA

23      complainants, that's three others out of the

24      four, told him to stop saying or doing whatever

25      it was that made them uncomfortable, that that

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

171

1       was contrary to the policy annunciated by

2       Mr. Kafer on Page 2 that we just read that it's

3       incumbent on the recipient to verbally direct the

4       perpetrator of the unwanted conduct to cease and

5       desist?

6                    MS. ASHER:  Objection.  Go ahead.

7   A.  But the employees had, several employees had

8       written report of contacts and Dr. Lisan had been

9       asked by Dr. Raphaely to please stop and that was

10      in January and in March there was a police report

11      where Dr. Lisan had gone into an operating room

12      for which he did not have official business to do

13      and, per the police report, put his hands on

14      Ms. Bonfili and there was also a report of

15      contact in March, after Dr. Lisan had been asked

16      by his supervisor to only have official business,

17      called another CRNA, I believe it was

18      Ms. Costanzo, at home saying she needed to get

19      someone else to work because she didn't say hi to

20      him in the hallway or something like that.

21  Q.  There were four initial complaints, initial ones

22      which were before any -- well, which were

23      certainly before the police report issue, that

24      policy, the initial ones, and it was only the

25      Elaine Costanzo in references to that complaint

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

172

1    that asked him to stop.

2        The other three with respect to their initial

3    complaints to Dr. Raphaely did not ask him to

4    stop nor did they ask him for all the period of

5    time that allegedly preceded the date of

6    December -- or January 2017; is that correct?

7                    MS. ASHER:  Objection.  Go ahead.

8  A.  Regardless, Dr. Lisan --

9  Q.  I didn't ask you regardless.  Excuse me.

10       The question is is that correct?

11  A.  No.

12  Q.  Okay.  Why is that not correct?

13  A.  Because Dr. Lisan had received direction from his

14    supervisor to not have contact; so while the

15    employees did not tell him, they told their

16    supervisor, the supervisor told him and he chose

17    to ignore the direction of his supervisor and two

18    months later entered an operating room with a

19    patient under anesthesia undergoing a surgery and

20    touched a CRNA that required another doctor to

21    come in so that she could leave.  That is a

22    patient safety matter and that is the concern

23    that I have.

24  Q.  Okay.  But I didn't ask you that.

25  A.  I'm sorry, but that's the whole content.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

173

1   Q.   My question to you for the third time is:  Prior

2        to the instructions from Dr. Raphaely, nobody

3        except Elaine Costanzo complained directly to

4        Dr. Lisan at the time he was allegedly making

5        them uncomfortable that they objected to these

6        unwanted alleged remarks; is that correct?

7                      MS. ASHER:  Objection.  Go ahead.

8   A.   In 2015 it's documented that Dr. Lisan was

9        talking about his own male genitalia, I would

10       expect an anesthesiologist that has high degrees

11       that has completed harassment --

12                     MR. SINDELL:  Okay.  We're going

13            to -- her answers to these questions are so

14            derelict that I'm going to consider right

15            now, unless you can talk to her and tell

16            her to answer my questions, to terminate

17            this deposition and go to court.

18                 Now, she knows very well that I

19            said except for Elaine Costanzo and I asked

20            her a very simple question and she's

21            choosing not to answer it and I am about to

22            terminate this deposition and seek

23            sanctions from the court.

24                     MS. ASHER:  Steve.

25                     MR. SINDELL:  Now, either she's

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

174

1   going to answer questions or we're going to

2   terminate this deposition.  This is not a

3   soapbox for --

4           MS. ASHER:  This is not a soapbox

5   for anybody, Steve.

6           MR. SINDELL:  -- this witness to

7   just talk about whatever she'd like to say

8   irrespective of the question that's asked.

9   It is, I believe it is something that she's

10  doing which is just completely improper and

11  I can't imagine that she doesn't know the

12  question that's being asked.

13          I'm going to do this one more

14  time.  I'm going to ask the court reporter

15  to repeat the question and if she does this

16  again, I will terminate this deposition.

17          MS. ASHER:  Now, before you do,

18  however, I'm going to respond to your

19  comments.

20          MR. SINDELL:  You can respond all

21  you want.

22          MS. ASHER:  First of all, none of

23  us are entitled to a soapbox here.  Second

24  of all, you asked a question that doesn't

25  have a simple answer.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

175

1          The question might be simple but

2    the answer is complicated --

3          MR. SINDELL:  The court rule --

4          MS. ASHER:  -- and the witness has

5    the right to explain her answer fully.

6          MR. SINDELL:  She didn't answer at

7    all.

8          MS. ASHER:  So I'm going to ask

9    you --

10         MR. SINDELL:  She didn't answer at

11   all.

12         MS. ASHER:  No, Steve.  You need

13   to give her the opportunity to answer your

14   question fully.

15         MR. SINDELL:  I've given her the

16   opportunity to fully answer.

17         MS. ASHER:  Then please allow her

18   to fully answer.

19         MR. SINDELL:  She stops talking

20   and it's not an answer.  Now your statement

21   on this record is also part of it.

22         MS. ASHER:  I understand.

23         MR. SINDELL:  And you know very

24   well, you do know very well that she's not

25   explaining an answer.  She's not giving an

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

176

1  answer and the record is so --

2      MS. ASHER:  I disagree with you.

3  I heard her answer your question twice.

4      MR. SINDELL:  Then you can tell

5  the judge that because I think what you're

6  doing is contrary to what you should be

7  doing which is telling her to answer

8  questions and if you don't, if you don't

9  want to give her that instruction and you

10  don't agree with me, then the judge will

11  have to decide whether your statement on

12  this record conforms to what actually

13  occurred, and it doesn't.

14      Now I'm going to, one more time

15  I'm going to have the court reporter read

16  it and if she doesn't discontinue this, I

17  will stop the deposition, and I mean it,

18  and I will seek sanctions, and I mean it.

19      Now read back the last question I

20  asked before the long answer and I expect

21  it to be answered and that includes every

22  other question.  We're not going to have

23  long narratives that have nothing to do

24  with the question I ask.  It's a simple

25  question, and you know it.  Go ahead and

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

177

```
 1              read it back to her.
 2                   THE NOTARY:  "My question to you
 3              for the third time is:  Prior to the
 4              instructions from Dr. Raphaely, nobody
 5              except Elaine Costanzo complained directly
 6              to Dr. Lisan at the time he was allegedly
 7              making them uncomfortable that they
 8              objected to these unwanted alleged remarks;
 9              is that correct?"
10   A.  I don't know.
11   Q.  Would you please explain to me what you think
12        Mr. Kafer meant on Page 5 when he wrote, "There
13        is no indication that anyone informed him to stop
14        with the exception of Elaine Costanzo, after
15        which he stopped."  What's that?
16   A.  There is the --
17                   MS. ASHER:  Objection.  Go ahead.
18   A.  I'm sorry.
19                   MS. ASHER:  Go ahead.
20   A.  While there is no indication, I don't know that
21        means that it didn't happen.  I'm sorry.
22   Q.  You believe what Mr. Kafer wrote?
23                   MS. ASHER:  Objection.  Go ahead.
24   A.  Yes.
25   Q.  If that's true, then would you agree with me that
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

178

1     to the extent that there was no request on the

2     part of the recipient complaining CRNA

3     communicating to Dr. Lisan that they were

4     unwelcome remarks, that that would be contrary to

5     the policy on Page 2 that Mr. Kafer annunciated?

6              MS. ASHER:  Objection.

7  A.  Yes.  I'm sorry.

8              MS. ASHER:  Go ahead and answer.

9  A.  Yes.

10  Q.  All right.  I'd like to have you look at Exhibit

11     42.

12     Have you ever seen this before?

13  A.  I don't recall.

14  Q.  Okay.  It is a memorandum is from Dr. Raphaely to

15     Dr. Lisan dated March 9, 2017 called "Written

16     Warning" and it's under a document called

17     "Memorandum;" is that correct?

18  A.  Yes.

19  Q.  It says, if you look at Number 2 in the middle,

20     it says:  "You were previously instructed to

21     refrain from discussing this allegation,"

22     referring to allegations that made CRNAs

23     uncomfortable allegedly of a sexual nature, and

24     it says, "You were previously instructed to

25     refrain from discussing this allegation with your

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

179

```
 1      coworkers."
 2           Did I read that correctly?
 3   A.  Yes.
 4   Q.  Would you agree with me that coworkers is not by
 5       itself limited, limit itself to simply the four
 6       CRNAs as it's written here?
 7                    MS. ASHER:  Objection.
 8   A.  Yes.
 9   Q.  Do you think it's a proper mandate from
10       Dr. Raphaely to Dr. Lisan --
11   A.  I don't have --
12   Q.  -- to refrain from discussing allegations of
13       sexual harassment with every single one of his
14       coworkers in the department of anesthesiology?
15                    MS. ASHER:  Objection.
16                Characterization.  Go ahead.
17   A.  I don't have an issue with it.
18   Q.  What?
19   A.  I do not have issue with it.
20   Q.  In other words, it's okay, within her authority
21       to do that, for Dr. Raphaely to say don't talk to
22       any of your coworkers about it.  Is that your
23       testimony?
24                    MS. ASHER:  Objection.  Go ahead.
25   A.  If that's what Dr. Raphaely instructed, yes.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

180

```
 1    Q.  Do you think Leshelle Reece, you know who she is?

 2    A.  Yes.

 3    Q.  Do you think she's qualified to answer that

 4        question about whether that's a proper

 5        instruction from Dr. Raphaely?

 6    A.  Yes.

 7                    MS. ASHER:  Objection.

 8    A.  Yes.

 9    Q.  If she said that that's not proper, would you

10        have any reason to disagree with her?

11    A.  No.

12    Q.  Do you know of any restrictions Dr. Raphaely

13        placed on any of the complaining CRNAs, the four

14        of them, not to talk to anybody or any particular

15        people about the matter, the allegations?

16    A.  No.

17    Q.  So to your understanding these four complaining

18        witnesses, complaining CRNAs were free to talk to

19        anybody and everybody in the entire department of

20        anesthesiology about these allegations, correct?

21                    MS. ASHER:  Objection.  Go ahead.

22    A.  I don't know if they were given anything, I don't

23        know.

24    Q.  They weren't.  Okay?

25            Do you see a problem with Dr. Lisan being
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

181

1      prohibited from talking to coworkers about these

2      allegations where the CRNAs who are complaining

3      about Dr. Lisan could talk to anybody and

4      everybody in the entire department anytime they

5      wanted to?

6                    MS. ASHER:  Objection.  Go ahead.

7   A.  I believe at my first deposition we went through

8      the checklist and we identified a discrepancy and

9      we've addressed that.

10         May I add one more thing?  Please?

11         Most of these letters of counseling are

12      prepared in conjunction with employee relations

13      labor specialists and --

14  Q.  You don't know if this was or wasn't?

15  A.  I don't know for sure, but I suspect it was.

16  Q.  Well, Leshelle Reece did not indicate at any time

17      that she had anything to do with that?

18                    MS. ASHER:  Objection.

19  A.  It would not be from Ms. Reece.  It would have

20      been from the employee labor relations section.

21  Q.  And so the employee labor relations section would

22      have participated in prohibiting Dr. Lisan from

23      talking to any of his coworkers in the entire

24      department about any of the allegations against

25      him; is that your testimony?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

182

```
 1                    MS. ASHER:  Objection.
 2   A.  I'm just stating that based on what was written
 3       here, it probably wasn't written unilaterally by
 4       Dr. Raphaely.
 5   Q.  Which tells me then that you believe it was
 6       likely endorsed by an employee relations
 7       specialist?
 8   A.  It may have been.
 9   Q.  That would be kind of derelict, wouldn't it, of
10       an employee relations specialist to prohibit
11       Dr. Lisan from talking to any coworker in the
12       entire department of anesthesiology about these
13       allegations; wouldn't you agree?
14                    MS. ASHER:  Objection.
15   A.  I can't comment.
16   Q.  You can't comment on that?  Okay.
17           It also says, and I'll have you look at it:
18       "Additionally you are to refrain from discussing
19       these allegations with your coworkers."  It says
20       it again, coworkers.
21           Do you see that?  It starts with the word
22       "additionally."
23   A.  Okay.
24   Q.  Correct?
25   A.  Yes.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

183

1   Q.   Okay.  When you sustained the proposed suspension

2        prepared by Dr. Raphaely of Dr. Lisan, did you

3        have knowledge of this memorandum?

4   A.   It may have been in the evidence file.

5   Q.   Do you have any -- well, did you actually read

6        the evidence file before you affirmed his

7        suspension?

8   A.   Yes.

9   Q.   But you don't remember if this was in there?

10                  MS. ASHER:  Objection.  Go ahead.

11  A.   It probably was but I don't recall specifically.

12       It's been a couple years.

13  Q.   Okay.  Let's actually take a look at your

14       suspension decision.  I don't think we've marked

15       this ever; but if we did, for the record and all

16       others concerned, I apologize.

17            This is Exhibit 78.

18                      -  -  -  -

19            (Thereupon, Plaintiff's Exhibit 78, 6/20/17

20            Fuehrer letter to Lisan, was marked for

21            purposes of identification.)

22                      -  -  -  -

23  Q.   All right.  First of all, can you identify this

24       document?

25  A.   Yes.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

184

1   Q.   What is it?

2   A.   It's my decision regarding the suspension of

3        Dr. Lisan.

4   Q.   On Number 4, do you see it down there on the

5        first page?

6   A.   Yes, sir.

7   Q.   The first sentence says, "The sustained reasons

8        do not involve a question of professional conduct

9        or competence."

10           Are you with me?

11  A.   Yes.

12  Q.   Could you define what you meant by "professional

13       conduct"?

14  A.   For employees that are Title 38, which are,

15       meaning clinical employees, physicians and

16       nurses, there are differences for disciplinary

17       action when they involve professional conduct or

18       competence such that is he qualified to be an

19       anesthesiologist, were there issues with his

20       ability to perform anesthesia and conduct his

21       clinical duties versus nonprofessional conduct is

22       what that means.

23  Q.   Okay.  When you use the phrase "professional

24       conduct," does that include making the

25       inappropriate remarks to employees?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

185

1  A.  No.  To me this means professional conduct in his

2      ability to conduct himself as a physician, a

3      clinician.

4  **Q.  You mean actually --**

5  A.  Performing his, in conducting his clinical

6      duties.

7  **Q.  So when you say "clinical duties," you mean**

8  **taking care of patients and that kind of thing?**

9  A.  Like, you know, so for nurses, you know, did the

10     nurse have professional conduct such as did you

11     abuse a patient, physically abuse, mentally

12     abuse.

13 **Q.  It has nothing to do with how you treat**

14 **employees, professional conduct?**

15 A.  I don't think so but I don't know.  It's relating

16     to this handbook.  That's my understanding.

17 **Q.  This is the same language you put in everything,**

18 **isn't it?**

19 A.  Correct.

20 **Q.  So when you want to affirm something, you just**

21 **fill in the blanks on the dates and the charges,**

22 **if you're going to sustain it and paragraph 2, it**

23 **just says all the things you considered and the**

24 **rest of it is pretty much boilerplate, correct?**

25                   MS. ASHER:  Objection.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

186

 1   A.   Yes.

 2   Q.   And is that your signature, by the way?

 3   A.   Yes.

 4   Q.   So there were no actual reasons given indicating

 5        why you sustained it specifically, sustained the

 6        proposed suspension, correct?

 7                     MS. ASHER:  Objection.  Go ahead.

 8   A.   Yes.

 9   Q.   In the middle of paragraph 2 it says, "The

10        consistency -- one of the considerations is the

11        consistency of the penalty with those imposed

12        upon other employees for the same or similar

13        offenses."

14             Do you see where I'm reading?

15   A.   Yes.

16   Q.   What did you do to decide that a 10-day unpaid

17        suspension was consistent, a consistent penalty

18        with penalties imposed upon other employees for

19        the same or similar offenses?

20   A.   So the evidence file identified that there was a

21        proposed mediation to a letter of counseling,

22        written counseling that was denied.

23   Q.   What do you mean, what was denied?

24   A.   It is my understanding through the evidence file

25        that Dr. Altose at the oral reply or subsequent

187

1    to the oral reply agreed to mediate the

2    suspension, remove the suspension and provide a

3    written letter of counseling which is not an

4    official disciplinary action.  It's like a letter

5    of expectation.

6  Q.  **Well, he said it was, by the way, but...**

7  A.  And that Dr. Lisan refused to do that.

8  Q.  **Okay.  Can I ask you --**

9  A.  Refused to accept it.

10 Q.  **Why do you say that counseling is not any kind of**

11     **disciplinary action?**

12 A.  I think it's like a letter of expectation.  In

13     the many years that I've worked at the actual

14     formal disciplinary action starts with an

15     admonishment, reprimand, suspension, termination

16     but generally letters of written counseling

17     aren't considered disciplinary action.

18 Q.  **Isn't it a fact that the mediation and the**

19     **possible negotiations that are involved in**

20     **mediation, isn't that completely irrelevant to**

21     **the decisions that are made on whether or not to**

22     **sustain the suspension?**

23               MS. ASHER:  Objection.  Go ahead.

24 A.  If the mediation had resulted in an agreement for

25     a letter of counseling, the proposed suspension

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

188

```
 1        would have never come to me.
 2            Once I got the letter, the actions were that
 3        doctor --
 4   Q.   What letter?
 5   A.   I'm sorry, the evidence file with the proposal to
 6        make the decision.  I reviewed the evidence, you
 7        know, the facts in the case as I read them were
 8        that there were allegations by several women,
 9        numerous, four at the beginning, two at the later
10        end including a police report, including entry
11        into an OR, issues with patient safety and based
12        on that, there needed to be a suspension.
13   Q.   Well, but you sustained a 10-day suspension
14        without pay?
15   A.   Yes, I did.
16   Q.   Okay.  Well, why is -- if your own chief of staff
17        recommended counseling, a counseling approach,
18        that would be far -- you didn't even consider
19        that disciplinary?  Is what you're telling me?
20   A.   Correct.
21   Q.   You could have, you could have rejected the
22        suspension and suggested counseling, too, or
23        ordered counseling, right?
24   A.   I could have.
25   Q.   Why didn't you do that?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

189

1  A.  Because, as I said, Dr. Lisan was asked by his

2      supervisor on a couple -- on several occasions as

3      well as in writing, as we discussed earlier, he

4      was in fact asked by a couple nurses to stop, and

5      he failed.  He didn't show remorse.  He didn't

6      say, acknowledge that he, his behavior was not

7      appropriate and in an OR setting, which if any of

8      us were in the OR, I would hope that none of us

9      would want someone feeling threatened or feeling

10     like they had to leave the OR and get someone to

11     come in because someone else had entered the OR

12     that wasn't even involved in the case, and I

13     think that this is a very strong message.  And

14     this, mind you, was in advance of the hashtag

15     MeToo but certainly, you know, in this era, you

16     know, sexual harassment, sexual tones, touching

17     is totally unacceptable.

18  Q.  My question to you was, of course -- withdrawn.

19          The actual allegation was that he violated

20      the gag order by talking about this.  Wasn't that

21      part of it?

22                  MS. ASHER:  Objection.

23          Mischaracterizes.

24  Q.  He was ordered not to discuss it and he allegedly

25      discussed it with Karin Bonfili or somebody else?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

190

1      Is that correct?

2                    MS. ASHER:  Objection.  Go ahead.

3   A.  The, I would have to look at the actual charges

4      but I think there were the, it was conduct and

5      failing to follow supervisory orders is my

6      recollection.  I don't recall anything specific

7      to the gag order.

8   Q.  **Okay.  But the question here that you're**

9      **representing in this boilerplate part of the**

10     **letter is one of the considerations was the**

11     **consistency of the penalty with those imposed**

12     **upon other employees for the same or similar**

13     **offenses.**

14        **What did you consider or look at to see if**

15     **the penalty was consistent with those imposed**

16     **upon other employees with the same or similar**

17     **offenses?  Did you look into that at all?**

18                    MS. ASHER:  Objection.  Go ahead.

19  A.  So we have a large workforce.  As I said before,

20     55-5600 employees.  And Dr. Lisan is not the

21     first person that has acted inappropriately and

22     made sexual-like or inappropriate comments and in

23     consultation with employee relations we took

24     similar action compared to what we have done with

25     other employees.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

191

1    Q.  Who did you consult with there at employee

2         relations?

3    A.  It was the employee relations specialist at the

4         time.  I don't know if it was Jelena then or not.

5    Q.  Who?

6    A.  Jelena.

7    Q.  Jelena who?

8    A.  She was --

9    Q.  Is that a first or last name?

10   A.  First name.

11   Q.  How about the last name?

12   A.  Something with a Z.  She doesn't work here

13        anymore.

14   Q.  Okay.

15   A.  What I can tell you that is in my opinion, if

16        employees -- if this had been a housekeeping

17        aide, this employee would have been terminated.

18   Q.  If it was a housekeeping aide?

19   A.  Yes.  Other employees have received more severe

20        penalty for the behaviors I saw in the evidence

21        file than Dr. Lisan received.

22   Q.  Okay.  Let me ask you this:  What consideration,

23        if any, did you give -- withdrawn.

24            Why did you mention that he was offered and

25        he denied accepting at the mediation a

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

192

1     counseling?  Why did you mention that?

2  A.  Because that was in the evidence file and that

3     was brought to my attention and --

4  Q.  **What do you mean it was brought to your**

5     **attention?**

6  A.  Well, it was in the evidence file, okay?  So I

7     read the evidence file.

8  Q.  **But why would you mention it here?  What was your**

9     **purpose in talking about a negotiation of some**

10    **kind that failed to resolve the issue which**

11    **resulted in having to go through the process of a**

12    **decision?  Why was that something that you felt a**

13    **need to talk about here?**

14             MS. ASHER:  Objection.

15  Q.  **What did that have to do with anything?**

16             MS. ASHER:  Objection.

17  A.  It, to me it's important information.

18  Q.  **Okay.  Tell me why.**

19  A.  Because it shows to me that the agency offered a

20    mediation.  It was not accepted.  Dr. Lisan did

21    not accept --

22  Q.  **Well, he accepted the mediation.  He just didn't**

23    **accept the offer.**

24  A.  I'm sorry.  I'm sorry.  He didn't accept the

25    offer.  I apologize, sir.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

193

1   Q.  That's okay.  Go ahead.

2   A.  And, you know, one of the things that I look for

3       is remorse, rehabilitality?

4   Q.  Rehabilitation?

5   A.  Rehabilitation.

6           You know, was this behavior going to stop.

7           What did we need to do to get the message

8       across to Dr. Lisan that he could not go into ORs

9       for which he had no professional business to be

10      in and initiate an inappropriate comment and

11      touch CRNAs that was putting our nation's heroes

12      at risk, our veterans.

13  Q.  So what you're telling me is that part of your

14      fact finding considerations in making your

15      decision to sustain his proposed suspension was

16      the fact that by refusing to accept an offer of a

17      counseling, he failed to show any remorse for his

18      conduct or an indication acceptable to you that

19      this wouldn't occur again?

20              MS. ASHER:  Objection.

21  Q.  Is that correct?

22              MS. ASHER:  Objection.  Go ahead.

23  A.  That and the comments that were made in the oral

24      reply, so.

25  Q.  The oral reply?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

194

```
 1   A.   To Dr. Altose.

 2   Q.   There's no record made of it, was there?

 3   A.   Yes.

 4   Q.   Was it in writing?

 5   A.   Yes.

 6   Q.   Was that something that was typed up or written

 7        out by hand?

 8   A.   I believe it was typed.

 9                  MS. ASHER:  We produced it.

10   Q.   Who provided that?

11   A.   It was in the evidence file.

12   Q.   Was that ever given to Dr. Lisan or his counsel?

13   A.   If it was in the evidence file, I would assume it

14        would be.

15                  MS. ASHER:  It was given to you

16             with the initial disclosures.  We gave that

17             to you many months ago actually.

18                  MR. SINDELL:  Yes, there were just

19             two or three documents and I don't recall

20             that that was one of your disclosures.

21                  MS. ASHER:  It was.

22                  MR. SINDELL:  But there weren't

23             two or three documents.  It was a mountain.

24             I don't remember it.  I'm not saying it

25             wasn't there.
```

Susan M. Fuehrer (Vol II) - April 26, 2019
**Deposition**

195

1                    MS. ASHER:  It sounded like you

2          were insinuating that we didn't produce it.

3          We did.

4                    MR. SINDELL:  I just don't

5          remember it.

6                    MS. ASHER:  Okay.

7                    MR. SINDELL:  But are you talking

8          about the Douglas factor consideration

9          worksheet?

10                   MS. ASHER:  That's part of it.

11         That's part of the evidence file.

12                   MR. SINDELL:  But this doesn't

13         deal with what he said in the Dr. Altose

14         meeting.

15                   MS. ASHER:  Do you want to talk

16         about this off the record?  Because it has

17         to do with the document production.

18                   MR. SINDELL:  Okay.  Let's go off

19         the record.

20                          -  -  -  -

21         (Thereupon, a discussion was had off the

22         record.)

23                          -  -  -  -

24    Q.   Back on the record.

25              I may have been unclear.  I accept counsel's

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

196

1          representation that it was made part of the

2          initial disclosures.  What she means by initial

3          disclosures are documents which both sides give

4          to each other after a lawsuit has been filed in

5          federal court.  Okay?

6              I'm asking a different question.

7      A.  All right.

8      Q.  You said something about the transcript of the

9          meeting with Dr., I call it a meeting not a

10         hearing, but whatever, with Dr. Altose.

11             My question is:  Were we supposed to get a

12         copy of that --

13     A.  So I --

14     Q.  -- at the time it came into existence and was put

15         in a file?

16     A.  I don't think so because you were, you were there

17         I believe.

18     Q.  Well, I might have been there but I don't know

19         what --

20     A.  So what happened, so I can just tell you what I

21         know is that when I get an evidence file and

22         there has been an oral reply, someone in employee

23         relations takes notes on what happened during

24         that meeting and the comments and I read that as

25         part of the evidence file and I use that, it's

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

197

1      not an official transcript, I shouldn't say, you

2      know, it's notes and I use that and I used the

3      comments and the statements that were made by

4      Dr. Lisan in making my decision.

5  Q. **Well, you are correct that I was there and let me**

6      **share with you that there were no notes being**

7      **taken by Dr. Altose, although he certainly**

8      **listened.  The notes were being taken by Lisa**

9      **Clark who was an attorney representing the VA.**

10     **She was the only person that I saw constantly**

11     **writing as the proceedings were going on and as**

12     **Dr. Lisan was speaking.**

13     **You don't recall the source of the notes?**

14 A. I don't recall the source of the notes.  Usually

15     it's an ELR specialist.  However, I could see if

16     in fact the employee had counsel, maybe

17     Dr. Altose had counsel with Lisa Clark, so I

18     don't know.

19 Q. **I'm not objecting to counsel being present.**

20 A. Yeah.  I don't know who wrote the notes.  I just

21     know they were in the evidence file and I read

22     them.

23 Q. **What was it in the notes, if you can recall, that**

24     **specifically influenced you in that regard?**

25 A. What's, you know, and I'm paraphrasing because I

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

198

1    can't remember the specifics, was that, you know,

2    discussion about inappropriate behavior and that

3    Dr. Lisan did not agree that he had done anything

4    inappropriate.  You know, there was discussion

5    about whether it was sexual in nature.  My

6    recollection is Dr. Altose said, you know, the

7    charges were for inappropriate conduct and that

8    that was not acknowledged either.

9  Q.  Did you know -- withdrawn.

10       Are you familiar with the mediation process

11   that is used at the VA to try to resolve these

12   kinds of issues?  Are you familiar with that?

13  A.  Somewhat.

14  Q.  Is it your understanding that the discussions in

15   mediation are made part of an evidence file to be

16   used to determine the sanction or punishment to

17   be meted out in discipline to an employee if

18   necessary?

19              MS. ASHER:  Objection.

20  A.  So I don't know the specifics.  I can just tell

21   you, sir, what was in the file and I, at some

22   point I had seen, you know, that there had been,

23   you know.

24  Q.  I understand.

25  A.  And I thought it was through the oral reply that,

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

199

1   you know, there was a discussion to, you know --

2   when I say "mediate," I don't mean like

3   mediation.  I'm thinking lessen the penalty to a

4   written counseling and that's what I read in

5   these notes.

6   **Q.  That came up in the mediation.**

7   A.  It didn't come up in the...

8   **Q.  No, it didn't.  To my knowledge.**

9       **But it came up in the mediation?**

10  A.  I didn't know there was a mediation, so -- or I

11      don't recall specifically.

12  **Q.  I am sure that you used the word "mediation" when**

13      **you first testified to that.**

14      **In fact I think you used it several times.**

15  A.  So --

16  **Q.  Did you think that the meeting with Dr. Altose**

17      **was a mediation?**

18                  MS. ASHER:  Objection.  Go ahead.

19  A.  No.  It was an oral reply and --

20  **Q.  But I'm asking you, you used the word**

21      **"mediation."  Are you going to take that back?**

22      **You didn't think it was a mediation?**

23  A.  May I please clarify?

24      During the oral reply it was my understanding

25      through the notes that Dr. Altose offered, and

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

200

```
 1        maybe I'm using the term wrong, a mediation to a
 2        lesser penalty.  Not a mediation meeting, that he
 3        was going to mediate the penalty to a lesser
 4        degree.
 5                         MS. ASHER:  Do you
 6             mean mitigation?
 7   A.   Huh?
 8   Q.   The mediation that --
 9   A.   I might be using the wrong word.  Maybe I'm --
10   Q.   There may have been some discussion --
11   A.   Remediate?
12   Q.   If I may finish.
13   A.   Sorry.
14   Q.   There may have been some discussion about sorting
15        it out --
16   A.   I'm sorry.  Mitigate.
17   Q.   -- at the hearing.
18             But the mediation is not supposed to be part
19        of any kind of evidentiary file.
20   A.   I think maybe --
21                         MS. ASHER:  Objection.  The
22             evidence file does speak for itself.
23   Q.   Did you know that?
24                         MS. ASHER:  Objection.
25   A.   I'm sorry.  Could you repeat your question.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**201**

```
 1              THE NOTARY:  "But the mediation is
 2         not supposed to be part of any kind of
 3         evidentiary file"...
 4              "Did you know that?"
 5              MS. ASHER:  Objection.  The
 6         evidence file speaks for itself.
 7  A.   Yes.  And if I may, the evidence -- I can't tell
 8       you what's in the evidence file right now.  We'd
 9       have to pull the evidence file.  I think when I
10       was saying -- and I'm, I apologize.  I know
11       better.  I think I met mitigation, and I
12       apologize.  That Dr. Altose offered to mitigate
13       it to a lower level.
14  Q.   But that came up in the mediation.
15            Okay.  We'll have to take a look at that.
16            I'll just have to take a look at that but
17       you're -- okay.  We had no opportunity to respond
18       to that at all.
19            Let me ask you this:  Do you think that
20       Dr. Altose, who is a responding party, should
21       have recused himself from conducting that
22       particular hearing?
23  A.   No.
24  Q.   Okay.  Now I don't think this has ever been
25       marked.  This is going to be Exhibit 79.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

202

1                      -  -  -  -

2           (Thereupon, Plaintiff's Exhibit 79, "Response

3           of Dr. Ron Lisan to the Proposed Suspension

4           at the Request of Dr. Raphaely (5-10-17)" was

5           marked for purposes of identification.)

6                      -  -  -  -

7    Q.  It is what we gave to Dr. Altose.  The hearing

8        date was May 11, 2017.  That's the day before

9        that this was prepared, just so you know.

10   A.  I see that.

11   Q.  We asked him to recuse himself and so forth.

12           But I assume that this was part of the

13       evidence file?

14   A.  Yes, I believe it was.

15   Q.  Do you remember it?

16   A.  I do.

17   Q.  Okay.

18   A.  Based on the last statement that we had already

19       talked about.

20   Q.  Did you understand that a new panel was being

21       formed to reinvestigate the prior EEO report?

22       Did you know that?

23   A.  I may have.

24   Q.  Well, it's right here in the document.

25   A.  Okay.  I knew.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

203

1   Q.   It's in here.

2           Do you think that the matter should have been

3        continued until a hearing -- excuse me.

4           Until a reinvestigation had taken place?

5   A.   No.

6   Q.   Did you know that Mr. Kafer never discussed with

7        Dr. Lisan the specifics of any of the initial

8        complaints of the four CRNAs?  Did you know that?

9   A.   Yes.

10  Q.   Did you think that was appropriate?

11                  MS. ASHER:  Objection.  Go ahead.

12  A.   I think if you read his report, and I can't

13       remember the specifics, but he addresses why he

14       did or did not do that.  I can't recall the

15       specifics but I think it's in there.

16  Q.   Okay.  Did you know that that was one of the

17       reasons why any reinvestigation was created by a

18       panel, a new panel?

19                  MS. ASHER:  Objection.

20  A.   Not to my knowledge.

21  Q.   Well, why would it have to be reinvestigated?

22                  MS. ASHER:  Objection.

23  Q.   Did you wonder about that when you saw that, when

24       we asked for a continuance until the

25       investigation was complete?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

204

```
 1                    MS. ASHER:  Objection.
 2   A.   I reviewed the evidence file.  Based on the facts
 3        in the evidence file, it was clear that Dr. Lisan
 4        failed to leave the women alone.  He continued to
 5        approach them.  He continued to enter ORs, he
 6        called them at home months after he had been
 7        asked to stop and he continued.
 8   Q.   Did you see any details of what Dr. Lisan said to
 9        explain these issues of what he supposedly said?
10                    MS. ASHER:  Objection.  Vague.  Go
11            ahead.
12   A.   He responded in the oral reply.  I read his oral
13        reply.
14   Q.   An investigation was done where he was given an
15        opportunity to state the context of the
16        allegations that were made against him.
17            Did you know that?
18                    MS. ASHER:  Objection.
19   A.   I don't understand the question.  I'm sorry.
20   Q.   Did you know that after this whole meeting with
21        Dr. Altose an investigation was made and
22        conducted by Leshelle Reece after this meeting of
23        May 11, 2017?
24   A.   That's the one that was much after, like a year
25        later, right?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

205

1   Q.  A year later?

2   A.  Am I thinking of the '18?  The allegations in

3       '18?

4   Q.  No.  Leshelle Reece did her own investigation

5       with a new panel and that occurred after, I don't

6       know exactly when off the top of my head but it

7       was after the meeting of May 11, 2017.

8           Did you know that?

9                   MS. ASHER:  Objection.  Go ahead.

10  A.  This is a EEO.  This has nothing to do with the

11      discipline -- it says here that Ms. Reece is

12      reinvestigating the prior EEO report.  Not the

13      allegations of action by Dr. Lisan.

14  Q.  What?  Look.  The proposed suspension is based

15      upon the alleged misconduct on the part of

16      Dr. Lisan, right?

17  A.  Yes.

18  Q.  Including all kinds of allegedly inappropriate if

19      not sexually harassing remarks.  Isn't that what

20      it was?  I mean we can look at the proposed

21      suspension.  That's what it included.  It was the

22      exact EEO investigation that was made by

23      Mr. Kafer.  They did it all over again.

24                   MS. ASHER:  Objection.

25  Q.  Did you know that?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

206

1           MS. ASHER:  Objection.

2   A.  I can't recall right now, sir.

3   Q.  Well, it says here Dr. Altose is, and this is

4       exhibit, which one?

5   A.  79.

6   Q.  Exhibit 79.

7           "Dr. Altose is or should be aware that a new

8       panel is being formed (per Leshelle Reece) to

9       reinvestigate the prior EEO report, a

10      reinvestigation currently underway.  The proposed

11      suspension is based upon the conclusions reached

12      in the original EEO investigation.  As Dr. Altose

13      knows, that investigation is currently

14      incomplete.  Additionally, with the hearing

15      currently scheduled for this Thursday, May

16      11th" -- oh, this is where she had him working

17      all night before the hearing.

18          So it was incomplete.  The very one you were

19      dealing with.  It says it right here.

20          Do you think that you should have been

21      making -- first of all, do you think that you

22      should, he should have shouldn't -- withdrawn.

23          Don't you think the hearing before Dr. Altose

24      should have been continued until the

25      investigation of this EEO report was complete?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

207

```
 1                    MS. ASHER:  Objection.
 2    Q.  Don't you think that would be fair to Dr. Lisan?
 3                    MS. ASHER:  Objection.  Go ahead.
 4    A.  No.  The decision was based on the reports of
 5        contact from the people in January, the letters
 6        from Dr. Raphaely asking, and counselings asking
 7        Dr. Lisan to stop, the police report in March and
 8        the report from Elaine Costanzo saying that
 9        Dr. Lisan was calling her at home.  That's what I
10        based my decision on.
11    Q.  Okay.  Well, let's see what you based your
12        decision on.  This will be, I'm going to end up
13        remarking this, but so what.  This is Number 80
14        again.
15                         -  -  -  -
16            (Thereupon, Plaintiff's Exhibit 80, 3/20/17
17            Raphaely letter to Lisan, was marked for
18            purposes of identification.)
19                         -  -  -  -
20    Q.  You've seen this, haven't you, proposed
21        suspension?
22    A.  Yes.
23    Q.  Okay.  This is what was being proposed that you
24        were reviewing, correct?
25                    MS. ASHER:  Objection.
```

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

208

1   A.  Yes.

2   Q.  I'm sorry?

3   A.  Yes.

4   Q.  Okay.  Take a look at the second page of it.

5       "Inappropriate Conduct."  Roman Numeral II,

6       right?

7   A.  Yes.

8   Q.  Every one of these, A, B, C, D, E, all of those

9       are going back to January, Ms. Foster, the

10      initial complaint allegedly by her, the date of

11      it, Karin Bonfili, January 5th and January 6th,

12      Elaine Costanzo March 7th, all of those were the

13      initial complaints which was part of the proposed

14      suspension, correct?

15  A.  Yes.

16  Q.  That's what was being reinvestigated.  Didn't you

17      know that?

18              MS. ASHER:  Objection.

19  A.  These allegations in my opinion and when I read

20      it stand for themselves.  They are individual

21      reports of contact.  The one is considered a

22      police report and this is describing of

23      inappropriate behavior for which Dr. Lisan was

24      asked to stop and he did not.

25  Q.  But they're referring to events that occurred way

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

209

1        before he got any kind of -- not way before, but

2        before he even got a checklist, he even got an

3        order not to talk about it.

4             It's not just based upon a failure to follow

5        orders which is in number I?

6                       MS. ASHER:  Objection.

7             Mischaracterizes.

8    Q.   Number I has to do with the failure to follow

9        orders.  Number II has to do with the conduct

10       itself which was being reinvestigated.

11                      MS. ASHER:  Objection.

12            Mischaracterization.  Go ahead.

13   Q.   Did you know that?

14   A.   Yes, sir.

15            Failure to follow orders on January 10th, the

16       checklist was provided.

17   Q.   What was the inappropriate conduct?  They're

18       claiming that I'm not -- on Thursday January 5th

19       discussing a case with you that you were assigned

20       to work the next day, so this is January 5th.

21   A.   I'm referring to particularly D and E.

22   Q.   But it's all in here.

23   A.   D and E alone result -- in my opinion result in a

24       10-day suspension and frankly I could have

25       terminated him based on prior actions that we've

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

210

1    taken against other people in the hospital.

2  Q.  You're not going to go off into a long thing now.

3        What I want to understand from you is why you

4    didn't -- withdrawn.

5        Mr. Kafer never spoke as a fact finder to

6    Dr. Lisan about some of these allegations and the

7    proposed suspension; isn't that correct?

8                    MS. ASHER:  Objection.  Go ahead.

9  A.  The document --

10  Q.  Isn't that correct?

11  A.  The document we just looked at explains his

12    reasoning and I took his reasoning into account.

13  Q.  Whose reasoning?

14  A.  Mr. Kafer's.  I don't know what exhibit that was.

15  Q.  Mr. Kafer did not comment upon many of these

16    allegations.  He never spoke to Dr. Lisan about

17    it?

18  A.  May we please revisit that exhibit?

19  Q.  No.  I'm satisfied with it.

20        All right.  My question to you is:  How could

21    you endorse sustaining a suspension without

22    knowing what the result of a reinvestigation of

23    the same matter was?

24                    MS. ASHER:  Objection.

25  Q.  Including, including the matter of the police

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

211

1    report and touching allegedly the back of Karin

2    Bonfili and all of that?

3              MS. ASHER:  Objection.

4  Q.  **How could you, how could you reach a conclusion**

5    **stating something when you knew all of that was**

6    **being reinvestigated?**

7              MS. ASHER:  Objection.

8  A.  How could I have not is my response.

9  Q.  **Oh, great.**

10 A.  We have an anesthesiologist that is highly

11   professional, that should be professional and

12   should not be going into operating rooms that he

13   had no business going into that he had been told

14   not once, not twice but at least three times to

15   not do and he went into an operating room active

16   with a patient, spoke to someone, touched the

17   CRNA, a physician came in, a separate physician

18   came in, asked him to leave.  He refused to

19   leave.  Another physician came in to excuse the

20   CRNA.

21        That alone is how I made this decision to

22   suspend him.

23 Q.  **And that alone was never asked about to**

24   **Dr. Lisan.  That is based upon a one-sided report**

25   **by one CRNA and maybe a couple of other witnesses**

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

```
 1        without any contact or question being addressed

 2        about it to Dr. Lisan.

 3             Did you know that?

 4                      MS. ASHER:  Objection.

 5             Mischaracterization.

 6   A.   There was a police report.

 7   Q.   Did you know that Dr. Lisan was never given the

 8        opportunity to address those issues that you were

 9        so interested in sustaining his suspension about?

10        Did you know that?

11                      MS. ASHER:  Objection.

12             Characterization.

13   A.   I believed the police report that was done by the

14        police detective --

15   Q.   We're --

16                      MS. ASHER:  We're going to take a

17             break.  Can we take a break?  Steve, can we

18             talk outside?

19                      MR. SINDELL:  You and me?

20                      MS. ASHER:  Yes.  Let's take a

21             minute and talk outside.

22                      MR. SINDELL:  No.  We're going to

23             talk right here on the record.

24                      MS. ASHER:  No, we're not going to

25             talk on the record, Steve.  I'd like you to
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

213

1    step outside.

2            MR. SINDELL:  So take your break.

3            MS. ASHER:  No.  I am calling a

4    break.  We are going to talk off the

5    record.

6            MR. SINDELL:  You're in trouble

7    here I think because we've got a situation

8    where a decision was made knowing that

9    Dr. Lisan had never had an opportunity to

10   present his side.

11           MS. ASHER:  Steve, you want to do

12   this on the record, let's do this on the

13   record.

14           MR. SINDELL:  Yes, on the record.

15           MS. ASHER:  You are being

16   extremely rude and disrespectful to this

17   witness.  I can tell everyone in this room

18   is a little bit agitated.  I think it's in

19   our best interest --

20           MR. SINDELL:  All right.  Let's

21   take a break.

22           MS. ASHER:  -- to take a break

23   right now and I would expect that when we

24   return, that this go a lot faster if you

25   can speak to the witness in a more

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

214

1  respectful and less rude manner.

2        MR. SINDELL:  I don't --

3        MS. ASHER:  Understood?

4        MR. SINDELL:  I understand what

5  you said.  Now let me speak.

6        MS. ASHER:  Okay.

7        MR. SINDELL:  Where do you think

8  that because a witness is, it's being

9  pointed out to a witness that something

10  that appears to be extremely unfair or may

11  be unfair is rude and unprofessional?  It

12  is not unprofessional because it's damaging

13  to your client.

14        MS. ASHER:  And I'm not saying

15  that.

16        MR. SINDELL:  It is not rude

17  because it's damaging to your client.

18        MS. ASHER:  Steve, I'm saying your

19  tone is rude, the fact that you are leaning

20  across the table and --

21        MR. SINDELL:  I am not leaning --

22        MS. ASHER:  -- that you are

23  shaking your hand in my witness' --

24        MR. SINDELL:  I am not leaning

25  across the table.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**215**

```
 1                        MS. ASHER:  All right.  Let's take
 2            a break, then.
 3                        MR. SINDELL:  But you've been
 4            standing up during this --
 5                        MS. ASHER:  Yes.  Because I asked
 6            for a break and I asked us to step outside.
 7                        MR. SINDELL:  You got it.  Take a
 8            break.  Go ahead.  When do you want to come
 9            back, ten minutes?
10                        MS. ASHER:  Five minutes.
11                          -  -  -  -
12                  (Thereupon, a recess was had.)
13                          -  -  -  -
```

14    Q.   All right.  I'd like you to, what exhibit do you

15         have?

16    A.   I have 80 and 79.

17    Q.   80 is, which one is 80, the proposed?

18    A.   Yes.

19    Q.   Okay.  I'd like you to look at the first page,

20         Number 1, "Proposed Suspension."

21              Do you see it?

22    A.   Yes.

23    Q.   And it says on Friday, January -- second

24         paragraph in here or third, I guess.

25              "On Friday, January 6th, 2017"?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

216

1    A.   Yes.

2    Q.   "I was informed that you may have engaged in

3         inappropriate behavior of a sexual nature

4         involving female coworkers."

5              Do you see that?

6    A.   Yes.

7    Q.   Do you think that Friday January 6th, 2017 was a

8         correct date when she was informed, "she" being

9         Dr. Raphaely?

10   A.   I don't know.  It was around that date, but...

11   Q.   Yeah.  It was January 10th according to the

12        testimony of Dr. Bearss.  Including a written

13        statement --

14                   MS. ASHER:  Objection.

15   Q.   -- to that effect.

16                   MS. ASHER:  Objection.

17   Q.   I assume you didn't, you weren't aware of that

18        because his deposition was just taken recently.

19   A.   Okay.

20   Q.   All right.  So you accepted it as true, the

21        January 6th, 2017 date, didn't you?

22   A.   I did.

23   Q.   And that was the date you got your letter?

24                   MS. ASHER:  Objection.

25   Q.   Did you know that?  It was dated January 6th?

217

```
 1    A.  Yes.  Okay.

 2    Q.  And it was sent by email.

 3    A.  Okay.

 4    Q.  You're familiar with the concept of retaliation,

 5        aren't you?

 6    A.  Yes.

 7    Q.  Okay.  Retaliation means that after somebody

 8        makes a complaint about some form of unfair

 9        employment practice like discrimination or

10        something of that nature that it's illegal to

11        retaliate against them for making that kind of

12        complaint, right?

13    A.  Yes.

14    Q.  Okay.  But you'd have to know that a complaint

15        was made in order to retaliate against somebody

16        for doing that, making that complaint, right?

17    A.  Yes.

18    Q.  All right.

19            Did it ever occur to you that the date of

20        January 6, 2017 was put in there to avoid the

21        concession that she knew about the January 6th

22        complaint of 2017, "she" being Dr. Raphaely

23        before she took action against Dr. Lisan?

24                    MS. ASHER:  Objection.

25                Mischaracterization.  Go ahead.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

218

1   A.   Further in the document it says, "On Wednesday,

2        January 4, Ms. Jessica Foster" and then on charge

3        II, "Inappropriate Conduct," B --

4   Q.   **Where are you reading from?**

5   A.   I'm on page, the second page.  If you'd flip the

6        page, "Inappropriate Conduct," it says, "On

7        Wednesday, January 4," and then it says, "On

8        Thursday, January 5th" and then it says, "On

9        Friday, January 6th" so I guess when I read that,

10       I didn't take issue with on Friday, January 6th.

11  Q.   **All right.  January 4th, January 5th and January**

12       **6th -- withdrawn.**

13       **Okay.  You assumed all of that as true,**

14       **didn't you?**

15                    MS. ASHER:  Objection.  Go ahead.

16  A.   Yes.  It comes from the employee labor relation

17       section and I assume it's technically accurate.

18  Q.   **Did you assume also that the context of the**

19       **content of Part A is true?**

20  A.   Where are you at, sir, please.

21  Q.   **Page 2, second page.  Did you assume that was**

22       **true, that Dr. Lisan said all the things that are**

23       **alleged there?**

24  A.   I did.

25  Q.   **In the context in which they're presented here?**

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

219

1    A.   Yes.

2    Q.   You thought that was true; is that right?

3    A.   I believed it was there.  As I previously said,

4         you know, I really focused in on D and E in

5         making my decision.

6    Q.   I asked you about A.  Are you going to answer me

7         or not?

8    A.   I said yes.

9    Q.   Okay.  So you assumed it was true, correct?  Yes?

10   A.   Yes.  I don't know how many more times I need to

11        say it.

12   Q.   How about B?  Did you assume that was true, too,

13        and in context?

14   A.   Yes.

15   Q.   Okay.  C, same answer?

16   A.   Yes, sir.

17   Q.   You assumed that was true, too?

18   A.   Yes.

19   Q.   In fact you focused on that one, right?

20   A.   Not on C.

21   Q.   Not on C?  Okay.

22        But you assume C was true?

23   A.   Yes.

24   Q.   Okay.  D was Elaine Costanzo.

25        You said -- was D one of them that you

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

220

1           emphasized?  You thought you focused on?

2   A.  D and E, yes.

3   Q.  D and E, okay.  So you assumed that D was true as

4           well?

5   A.  Yes.

6   Q.  And E, the whole incident in the operating room

7           on March 8th?

8   A.  Yes.

9   Q.  Did you assume all that was true?

10  A.  Yes, sir.

11  Q.  Now did you know -- withdrawn.

12          I don't see anything in here involving

13          Dr. Lisan's replies to any of these things.

14          Did you receive any information as to exactly

15          what Dr. Lisan's explanation and response was to

16          each one A, B, C, D and E?

17                      MS. ASHER:  Objection.  Go ahead.

18  A.  So this was the proposed suspension.

19  Q.  No.  Answer my question.

20  A.  And -- I'm trying, please.

21          And my understanding of how this works is

22          that Dr. Lisan had the opportunity to present to

23          Dr. Altose his response for each of these

24          allegations during the oral reply.

25  Q.  Okay.  Do you recall his reply?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

221

```
 1   A.   That's the notes that I referred to when I read,

 2        when I made my decision.

 3   Q.   Well, you told me you didn't see any remorse on

 4        his part?

 5   A.   Yes.

 6   Q.   But I want to know if there's anything in the

 7        notes that you read from the meeting with

 8        Dr. Altose that address in detail the context and

 9        circumstances from Dr. Lisan's point of view of

10        specifically A, B, C, D and E of the proposed

11        suspension?

12   A.   I would have to review that document again.

13             I do not recall that Dr. Lisan took the

14        opportunity to review A, B, C, specifically and I

15        also didn't necessarily see it in the response of

16        Dr. Lisan proposed suspension that would be

17        Exhibit 79 dated 5/10/17.

18   Q.   But you did see that it was under reinvestigation

19        with a new panel.  You saw that?

20   A.   Yes.

21   Q.   But you didn't want to wait for any information

22        coming from the new panel?

23                      MS. ASHER:  Objection.

24   Q.   Is that correct?  Before you made a decision?

25                      MS. ASHER:  Objection.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

222

1   A.   I made a decision with the information that I

2        had.

3   Q.   **Which did not include the information about**

4        **Dr. Lisan's side of it from Dr. Lisan based on**

5        **the investigation that Leshelle Reece was**

6        **conducting, correct?**

7                     MS. ASHER:   Objection.   Go ahead.

8   A.   Dr. Lisan had the opportunity to provide his side

9        during the oral reply and through his written

10       response.

11  Q.   **And in answer to my question, you did not wait to**

12       **see what the investigation, the reinvestigation**

13       **resulted in, did you?**

14  A.   Correct.

15  Q.   **And you don't think you should have done that,**

16       **either?**

17                    MS. ASHER:   Objection.

18  Q.   **You just thought you should read what's in the**

19       **file at the time and not wait until the full**

20       **investigation was over; is that what you think?**

21                    MS. ASHER:   Objection.   Go ahead.

22  A.   I made the decision I made.

23  Q.   **Okay.  Yes, you did.**

24       **All right.  Now you were supposed to, there**

25       **are timetables for your decision to respond to**

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

223

1    the suspension, proposed suspension; is that

2    correct?  You had a certain time limit?

3  A.  Yes.

4  Q.  It's 30 days from the date of the hearing before

5    Dr. Altose; is that correct?

6  A.  I guess.  I don't know the specifics, but okay.

7  Q.  That doesn't sound -- well, do you have any

8    reason to disagree with that?

9  A.  No.

10  Q.  Did you comply with that 30-day period?

11    The date is May 11th of the actual hearing

12    date.  May 11th, 2017.

13    Your decision was --

14  A.  June 20th.

15  Q.  Yes.  It says June 20 but in fact you didn't sign

16    it until at least I think five to seven days

17    later than that.  Did you know that?

18  A.  No.

19  Q.  Okay.  Well, now, what would -- well, let me see.

20    I'm going to hand you, now you try to keep up

21    with these obligations about dates, don't you?

22  A.  I relied on the employee labor relations

23    specialist to keep up with the dates.

24  Q.  Well, that's their job, right?

25  A.  Yes.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

224

```
 1                         -  -  -  -
 2            (Thereupon, Plaintiff's Exhibit 81, 6/15/17
 3            Metzger letter to Sindell, was marked for
 4            purposes of identification.)
 5                         -  -  -  -
 6   Q.   This is Plaintiff's Exhibit 81.
 7            I'm not interested in asking you any
 8        questions about the contents specifically of this
 9        document.  Only that it's dated June 15, 2017,
10        correct?
11   A.   Yes.
12   Q.   It comes from Lyons, New Jersey, the ORM, Office
13        of Resolution Management, Department of Veterans
14        Affairs, correct?
15   A.   Yes.
16   Q.   And it's the notice of acceptance of Dr. Lisan's
17        EEO complaint against officials of the Louis
18        Stokes Cleveland Veterans Administration Medical
19        Center in Cleveland, Ohio, isn't it?
20   A.   Yes.
21   Q.   Now, if you will be kind enough to turn to the
22        second last page, it appears that you were sent a
23        copy of this; is that correct?
24   A.   Yes.
25   Q.   Do you remember receiving it?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

225

1    A.   I think so, yes.

2    Q.   So even though you were beyond the deadline for

3         getting in your reply within a very short period

4         of time after you found out that the Department

5         of Veterans Affairs accepted Dr. Lisan's EEO

6         complaint against the Cleveland VA, you turned

7         around and affirmed his suspension at the

8         earliest on June 20th, 2017, correct?

9    A.   Yes.

10   Q.   So you really weren't going to make a decision

11        about it until you found out that the VA accepted

12        his complaint for action; is that correct?

13                    MS. ASHER:   Objection.

14   A.   I'm sorry.  I don't understand the question.

15   Q.   Is there any relationship between June 15th that

16        you received the notice of acceptance of

17        Dr. Lisan's complaint by the EEO in New Jersey

18        and within five days at the most you decided to

19        suspend him?

20                    MS. ASHER:   Objection.  Go ahead.

21   Q.   To affirm his suspension.  Is there any

22        relationship between those two?

23                    MS. ASHER:   Objection.  Go ahead.

24   A.   No.

25   Q.   You think it's just a coincidence?

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

226

1    A.   Often when employees are proposed with

2         disciplinary action, they exercise their right to

3         file an EEO.

4    Q.   I'm sorry.  We're not talking about the right to

5         file it.

6    A.   Or accept.  It was accepted.

7    Q.   Well, not everything is accepted by the EEO, is

8         it?

9    A.   The vast majority.

10   Q.   There's no relationship between your action and

11        that acceptance?

12   A.   No.

13   Q.   Is that your testimony?

14   A.   Yes.

15   Q.   Have you ever heard a detailed rendition of

16        Dr. Lisan's responses to A, B, C, D and E in the

17        proposed suspension?  Have you ever heard --

18                  MS. ASHER:  Objection.

19   Q.   -- them or read them?

20                  MS. ASHER:  Objection.  Go ahead.

21   A.   Only through what you provided as his counsel and

22        what was, he and you stated at the oral reply.

23   Q.   Wasn't there -- withdrawn.  There was a --

24        withdrawn.

25            To your knowledge was there a report made by

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

227

1      the new panel that reinvestigated this matter?

2                      MS. ASHER:  Objection.  Go ahead.

3   A.  I don't recall.

4   Q.  Wouldn't that be something you'd receive?

5   A.  I may have.

6   Q.  Can you think of any reason why it wouldn't be

7       available to you?

8   A.  No.

9   Q.  Did you ever seek it out and find out what the

10      new panel had to say about it?

11  A.  No.

12  Q.  You did know at the time that you sustained the

13      proposed suspension that the claims of sexual

14      harassment against Dr. Lisan were rejected by the

15      EEO; is that correct?

16                      MS. ASHER:  Objection.

17  A.  Yes, but that's not what the action was based on.

18  Q.  I didn't -- it wasn't based on that?  Is that

19      what your testimony is?  Your action was not

20      based on the results of the EEO investigation?

21  A.  It was based on inappropriate conduct.

22  Q.  Oh, it wasn't based on sexual harassment; is that

23      correct?

24  A.  Yes.

25  Q.  It was based on inappropriate conduct; is that

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

228

1      right?

2   A.   Yes.

3   Q.   I'm sorry.  I couldn't hear you.

4   A.   Yes.  Sorry.

5   Q.   Thank you.

6               MS. ASHER:  She has to hear you.

7   A.   It's hard for me to hear him sometimes.

8   Q.   I'm going to have you -- this is previously

9        marked Exhibit 31.  Okay?  And it's actually

10       Exhibits 31 through 34, so if you'll turn to 34.

11           That's several pages in, it's.  I'm looking

12       at the reports of contact.  See?  Right here?

13  A.   Yes.

14  Q.   You got it.  Okay.  This is, turn to the second

15       one in after 34.  Jessica Foster.  You see it?

16  A.   Yes.

17  Q.   Okay.  Let's go over this.  Let me just ask you:

18       Did you ever read this report of contact as part

19       of your review of this case in your decision to

20       sustain the suspension of Dr. Lisan?

21  A.   It was part of the evidence file.  Yes.

22  Q.   Well, was this a factor in the decision you made

23       to suspend him?

24  A.   While I took this into consideration, as I've

25       said, I really focused in on the two March

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

229

1    incidents more so than these incidents because

2    Dr. Raphaely -- these were given and then

3    Dr. Lisan was asked to stop so, yes, I did read

4    them but they were not my sole reason for making

5    the decision.

6  Q.  Okay.  I didn't ask you if they were the sole

7      reason, and I understand that you read them.

8          You said you considered them but didn't give

9      them as much weight as other parts of the file;

10     is that correct?

11 A.  Yes.

12 Q.  Well, let's take a look at this since you

13     considered it and weighed it.

14         It says, "On January 4th, 2017," this is

15     Jessica Foster's report, "I was on call with

16     Dr. Lisan, stopped by his office to sign out to

17     him at the end of my shift.  Dr. Lisan stated he

18     had two things to tell me.  Then asked me to

19     close the door of the office."

20         Do you believe that's what happened?

21 A.  I have no reason to doubt Ms. Foster.

22 Q.  Okay.  Do you know what Dr. Lisan said about that

23     in the reinvestigation?

24              MS. ASHER:  Objection.  Go ahead.

25 Q.  Do you know?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

230

1    A.  He denied, I think.

2    Q.  Denied what?

3    A.  There was -- I should say on some of the,

4        somewhere I saw something that Dr. Lisan may have

5        denied.  I don't know.

6    Q.  You really don't know what he denied

7        specifically, do you?

8    A.  No.

9    Q.  "The first thing was that another physician was

10       going to be covering his call overnight.  The

11       second part of the conversation started with 'I'm

12       not trying to hit on you, ask you out or have sex

13       with you, but I would,'" end quote.

14           Okay?  You see that in quotes?

15   A.  Yes.

16   Q.  Now, that's not a threat of any kind, is it?

17                   MS. ASHER:  Objection.  Go ahead.

18   A.  No.

19   Q.  All right.  Do you have any idea what Dr. Lisan's

20       response about that claim was from Jessica

21       Foster?  Do you know?

22   A.  No.

23   Q.  Okay.  Do you know that during the

24       reinvestigation he gave his side of what he

25       claimed was said there and the context.  Did you

231

1      know that?

2  A.  Okay.  Why wasn't, why didn't he give it at the

3      oral reply?

4  Q.  I get to ask the questions.

5  A.  I'm sorry.

6  Q.  And you get to answer them.

7  A.  I apologize.

8  Q.  "Dr. Lisan then proceeded to tell me that he saw

9      similarities" well, let's just take that

10     statement.

11        "I am not trying to hit on you, ask you out

12     or have sex with you, but I would."

13        Let's just assume he said that just for our

14     discussion's sake.  Okay?  Because you believed

15     it anyway?

16  A.  Yes.

17  Q.  How egregious is that in terms of sexual

18     harassment?

19  A.  Pretty egregious.

20  Q.  Oh, that's pretty egregious, huh?  Is it?

21               MS. ASHER:  Objection.

22  Q.  Is it a proposition to have sex with her?  No, it

23     isn't, is it?

24               MS. ASHER:  Objection.  You can

25        answer.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

232

1    A.  Can I put anything in context or not?  I don't --

2    Q.  **You weren't there to put it in context and you**

3        **don't know what Dr. Lisan said about it; is that**

4        **correct?**

5    A.  That's correct.

6    Q.  **So rather than try to put it in context when you**

7        **don't know the context, or tell me what Dr. Lisan**

8        **said about it, which you also don't know, I'm**

9        **asking you to take it at face value.**

10       **Do you believe that that's an egregious**

11       **remark to make constituting sexual harassment**

12       **with Jessica Foster, yes or no?**

13   A.  I do, yes.

14   Q.  **Okay.  And how egregious is it?  Very egregious**

15       **or mildly?**

16                   MS. ASHER:  Objection.  Go ahead.

17   A.  The middle.

18   Q.  **Oh, middle, okay.**

19       **Well, is it a proposition?**

20                   MS. ASHER:  Objection.  Go ahead.

21   Q.  **Is he propositioning her?**

22   A.  It's a leading proposition.

23   Q.  **Is there a quid pro quo in there?**

24   A.  But I would --

25   Q.  **Well, it sounds like for some women it might even**

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

233

```
 1        be a compliment.

 2                    MS. ASHER:  Objection.

 3   A.  Clearly not.

 4   Q.  Why not?

 5                    MS. ASHER:  Objection.

 6   Q.  Some women might say that he's telling her he

 7        found her attractive.  Isn't that possible?

 8                    MS. ASHER:  Objection.

 9   A.  Not in 2017.

10   Q.  Well, how can you speak for all women in 2017, in

11        2005 or in 1980?  How can you speak for all

12        women?

13                    MS. ASHER:  Objection.

14   Q.  Anytime?

15                    MS. ASHER:  Objection.  It's an

16            inappropriate question.

17                    MR. SINDELL:  What's inappropriate

18            about it?

19                    MS. ASHER:  Don't raise your voice

20            to me, Steve.

21                    MR. SINDELL:  We're talking about

22            an accusation of sexual harassment which

23            she has defined as moderately egregious and

24            you're telling me it's inappropriate to ask

25            her about what all women would think about
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

234

```
 1              it or what some women might think otherwise
 2              about it?  Do you really think that's an
 3              improper question?
 4                      MS. ASHER:  I do.
 5                      MR. SINDELL:  Okay.  Then object
 6              to it.
 7                      MS. ASHER:  And I did.
 8                      MR. SINDELL:  You did more than
 9              that.
10                      MS. ASHER:  You may answer.
11   Q.  But, okay.
12       Let me ask you:  Isn't it conceivable to you
13   in any year including 2019 that some women might
14   actually find that as a compliment?
15                      MS. ASHER:  Objection.
16   A.  Me personally, no.
17   Q.  Okay.  I understand that.
18       So if it was offensive to you personally if
19   something like that were to occur, you would say
20   I don't appreciate that or that makes me
21   uncomfortable or please don't talk that way to
22   me, wouldn't you?
23                      MS. ASHER:  Objection.
24   A.  It depends.  If President Trump, my ultimate boss
25   said that, I might not.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

235

```
1          In this case, it was an attending physician
2    saying something to a CRNA.  She may not have
3    felt comfortable saying anything.
4    Q.  He was not her boss, and you know that, don't
5        you?
6                MS. ASHER:  Objection.  Go ahead.
7    A.  They are in the operating room together and when
8        they were in the operating room, the
9        anesthesiologist directs the CRNA how to work.
10   Q.  It doesn't sound like they were in the operating
11       room.  It sounds like --
12   A.  No, but at times they are so that is their
13       relationship.
14   Q.  Okay.  So he's her supervisor in the operating
15       room and that makes it more intimidating to her.
16       Is that what you're saying?
17   A.  It may.
18   Q.  It may, right.  Did you know that they kidded and
19       joked about various things of a sexual
20       implication over the years?  Did you know that?
21                MS. ASHER:  Objection.  Go ahead.
22   A.  I know that she was concerned enough to put a
23       report of contact down.
24   Q.  But she wasn't concerned enough to tell him that
25       it offended her, was she?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

236

```
 1                    MS. ASHER:  Objection.
 2   Q.  At the time?
 3   A.  She may have been afraid.
 4   Q.  Does it say she was afraid?
 5   A.  It does not.
 6   Q.  Is there anything about that statement that would
 7       put somebody in fear on a reasonable basis?
 8                    MS. ASHER:  Objection.  Go ahead.
 9   A.  The last statement says, "I just feel I need to
10       come forward at this time because the current
11       situation has made me feel extremely
12       uncomfortable to be at work."
13   Q.  That's about her feeling, not what she said,
14       okay?
15           But my question is:  What on Earth would
16       prevent her from saying to Dr. Lisan "that
17       suggestion makes me uncomfortable," if it really
18       did?
19                    MS. ASHER:  Objection.
20   Q.  What would prevent her from doing that?
21                    MS. ASHER:  Objection.  Go ahead.
22   A.  Fear.  Uncomfortableness.
23   Q.  But she doesn't express fear?
24   A.  She reported it to her supervisor.  She reported
25       it to the service chief.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

237

```
 1   Q.  I know that but that's not my question but we'll
 2       not belabor that.
 3            "Dr. Lisan then proceeded to tell me that he
 4       saw similarities between my marriage and his,
 5       that I don't necessarily talk about my husband
 6       the same way as other people do and that he
 7       wanted far too -- and that he wasted far too many
 8       years in his own unhappy marriage."
 9            Okay?
10            Is that sexual harassment?
11   A.  No.
12   Q.  It may be an inappropriate comment as she felt
13       it?
14   A.  Yes.
15   Q.  Okay.  It wouldn't be for everybody.  It depends
16       on their relationship, right?
17                    MS. ASHER:  Objection.
18   A.  Can't comment.
19   Q.  Why can't you?  If somebody's a personal friend
20       and they talk about those kinds of things all the
21       time, then it wouldn't be offensive to that kind
22       of a relationship; is that correct?
23                    MS. ASHER:  Objection.  Go ahead.
24   A.  I can't put myself in that position.
25   Q.  Why not?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

238

1    A.   Because I'm in a happy marriage so.

2    Q.   **So you can't know anything about an unhappy**

3         **marriage?**

4    A.   I guess I don't.

5    Q.   **Oh, you know what?  This isn't.  I think that's a**

6         **flip answer, but let me ask it again:  Okay?**

7              **My question to you is:  Whether or not that's**

8         **an offensive or inappropriate remark would depend**

9         **upon the relationship between the speaker and the**

10        **recipient of it, in this case Dr. Lisan and**

11        **Ms. Foster, wouldn't it?**

12                       MS. ASHER:  Objection.  Go ahead.

13   A.   Okay.

14   Q.   **What do you mean okay?  Isn't that true?  It**

15        **wouldn't be inappropriate for anybody in the**

16        **world; it would depend on the relationship of the**

17        **people?**

18   A.   Okay.  It depends on the relationship, yes.

19   Q.   **Thank you.  All right.  She says, "I was**

20        **completely appalled at the context of the**

21        **conversation and it made me extremely**

22        **uncomfortable."**

23             **Okay?  Well, let's assume that's true, okay?**

24                       MS. ASHER:  Objection.

25   A.   Yes.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

239

1  Q.  If she was appalled and uncomfortable, you're

2      saying she was too afraid to say I'm

3      uncomfortable about that?  I'd rather not talk

4      about that?  I don't like that subject matter?

5      Could we talk about something else?

6          She was afraid to say that?  Is that what

7      you're positing?

8                    MS. ASHER:  Objection.  Go ahead.

9  A.  Yes.

10 Q.  Without knowing anything about their prior

11     communications or relationship, you posit that

12     she was afraid to tell him that she was

13     uncomfortable?

14                    MS. ASHER:  Objection.  Go ahead.

15 A.  Yes.

16 Q.  But you don't know that.  That's pure speculation

17     on your part that she was afraid?

18                    MS. ASHER:  Objection.  Go ahead.

19 A.  She was uncomfortable enough to report it to her

20     supervisor.

21 Q.  Which isn't my question.

22 A.  And the -- okay.

23 Q.  It isn't my question.

24 A.  I'm sorry.

25 Q.  I know she reported it.  And I know that she was

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

240

1    uncomfortable enough supposedly to report it or

2    at least she claims that.

3        That isn't my question.

4        My question has to do with it is incumbent

5    upon the recipient of the unwelcome remark to say

6    something about it, just what we read in

7    Mr. Kafer's report.  Isn't it incumbent upon her

8    under those circumstances to say something about

9    it?  A policy that you yourself said you agreed

10   with?

11   A.  She should have.  She did not.

12   Q.  Thank you.

13       "At this point I responded by defending my

14   husband in marriage trying to and the

15   conversation -- oh, trying to end the

16   conversation as rapidly as possible."  Okay?

17       "Then as I was leaving" to -- I'm sorry, "I

18   was leaving, he stated again that another

19   physician would be taking his call shift.  I

20   joking said if he didn't pass along that I was

21   the CRNA on call, then the following doctor would

22   not be able to call me in."

23       Did I read that correctly?

24   A.  Yes.

25   Q.  Did she say that "I jokingly said" or "joking

241

1      said"?

2  A.   Yes.

3  Q.   Does it sound like somebody who's scared to death

4       to say anything if she's joking with him?

5               MS. ASHER:  Objection.

6  A.   She's in an office behind a closed door with him.

7       She may have made a joke to try to get out.

8  Q.   That's pure speculation on your part, isn't it?

9               MS. ASHER:  Objection.  Go ahead.

10 A.   Yes.

11 Q.   "Dr. Lisan's response was, 'How much is it worth

12      to you?'"

13      Okay.  Is that an egregious inappropriate

14      remark?

15 A.   It's inappropriate.

16 Q.   Let me ask you this:  Do you see that as a sexual

17      implication?

18 A.   Potentially.

19 Q.   You do?

20 A.   Yes.

21 Q.   Is it conceivable to you that it might have been

22      a phrase he used a lot of times referring to

23      getting coffee or getting food or things having

24      nothing to do with sex or things that are

25      innocuous?  Did that ever occur to you?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

242

1    A.  It could be, too.

**2    Q.  But you don't know the answer to that, do you?**

3    A.  That's why I said it was potential.

**4    Q.  A what?**

5    A.  You asked me first and I said potentially.

**6    Q.  Potentially, okay.  It would be helpful to know**

**7        what Dr. Lisan said about it?**

8                    MS. ASHER:  Objection.  Go ahead.

9    A.  Dr. Lisan had the opportunity in the oral reply

10       to tell Dr. Altose.  He had these.  He could have

11       responded during the oral reply.

**12   Q.  And you're saying because it wasn't in the notes,**

**13       he didn't say it?  Correct?  Is that right?**

14   A.  I used what I had in the evidence folder, yes.

**15   Q.  Okay.  "I basically walked away at this point and**

**16       let his office door close behind me.  This is not**

**17       the first time unsolicited inappropriate sexual**

**18       comments, jokes have been made to me by**

**19       Dr. Lisan."**

**20       But she never complained before about any of**

**21       them to even a manager; is that correct?**

22   A.  Yes.

**23   Q.  Okay.  So she must not have taken them so**

**24       gravely, did she?**

25                   MS. ASHER:  Objection.  Go ahead.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

243

1    A.  I can't comment.

2    Q.  **No, that you won't speculate about, will you?**

3                MS. ASHER:  Objection.

4    Q.  **You don't want to speculate about the fact that**

5        **obviously they weren't that grave and egregious**

6        **to her, she never said anything to anybody about**

7        **it.  You don't want to speculate about that, do**

8        **you?**

9                MS. ASHER:  Objection.  Go ahead.

10   A.  What I'd like to say is that, you know, in this

11       country right now there are women that are coming

12       forward with things that happened decades ago.

13   Q.  **Okay.  So he, Dr. Lisan should be a victim of**

14       **your assessment of the political situation in the**

15       **whole country?**

16   A.  Absolutely not.

17   Q.  **Did the whole country get rid of due process of**

18       **law?**

19               MS. ASHER:  Objection.

20   A.  Absolutely not.

21   Q.  **Did the whole country get rid of fairness towards**

22       **people that are subjects of accusations?**

23               MS. ASHER:  Objection.

24   A.  Absolutely not.

25   Q.  **Do you think everybody agrees with the MeToo**

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

244

1      movement?  Including women?  Do you think all

2      women agree with that?

3                     MS. ASHER:  Objection.

4   A.  No.

5   Q.  "I just feel I need to come forward at this time

6      because the current situation has made me feel

7      extremely uncomfortable to be at work."

8         Okay.  So that's her statement, right?

9   A.  Yes.

10  Q.  And this is what you call in the middle

11     egregiousness, not light and not heavy but sort

12     of in the middle?

13                    MS. ASHER:  Objection.  Go ahead.

14  Q.  That's what you call this?

15  A.  I had in the evidence file numerous issues.  I

16     took them all into account.

17  Q.  Okay.  But you characterized this one as being in

18     the middle?

19  A.  Yes.

20  Q.  All right.  What's the highest?  Rape?

21                    MS. ASHER:  Objection.

22  Q.  Is that the worst?

23                    MS. ASHER:  Objection.

24  Q.  Physical assault?

25                    MS. ASHER:  Objection.  Steve,

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

245

1              that's not a proper question.  You know

2              that.

3                   MR. SINDELL:  No, I don't.  I

4              think it's a perfectly proper question and

5              I'd like to know what she thinks the

6              extreme end is.

7    A.  The worst would be murder.

8    Q.  Oh, okay.  I'd like you to take a look at the

9        Costanzo one that's this page here.  It's double

10       spaced so it's easy to see.  Okay?

11           Now I'm sure you're going to tell me that

12       it's inappropriate to describe, for a man to

13       describe his male genitalia, correct?

14   A.  Yes.

15   Q.  Is it always inappropriate?

16   A.  In the workplace, most likely.

17   Q.  Most likely but it doesn't have to be, depending

18       on the relationship between the two people?

19   A.  Depending on the relationship.

20   Q.  It always depends on that, doesn't it?  Correct?

21   A.  Yes.

22   Q.  Now, when did this occur?

23   A.  In early 2015, some time ago.

24   Q.  So that would have been two years earlier, right?

25   A.  Yes.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

246

```
 1   Q.   Did you know that Elaine Costanzo testified that
 2        if she had any idea as to how her complaint was
 3        going to be used, she never would have made it in
 4        the first place?
 5                     MS. ASHER:   Objection.
 6             Mischaracterization.
 7   Q.   Did you know she testified to that?
 8          Do you want me to read it?
 9   A.   I believe you.
10   Q.   Do you really want me to do that?
11                     MS. ASHER:   I believe it's out of
12               context.  Look.  I'm just placing an
13               objection on the record.  She can answer.
14   A.   I believe you already did read that to me.
15   Q.   No, I didn't read that, I don't believe.  I read
16        the other section.
17   A.   Maybe I read it while you were reading the other
18        section.
19   Q.   Maybe you did.
20          Okay.  Well let's try -- I don't think I have
21        it down here.  Let's try not to get it mixed up
22        because I can't know what you read to yourself.
23   A.   Right.
24   Q.   But she did object, didn't she?  She told him she
25        didn't like it?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

247

1    A.  Yes.

2    Q.  **And he stopped; is that correct?  That's what**

3        **Bruce Kafer found?**

4    A.  Was that this incident --

5    Q.  **Yes.**

6    A.  -- in 2015 or was it the incident that she

7        complained of in 2017?

8    Q.  **She didn't complain in 2017.**

9    A.  Wasn't she the one that complained in March?

10   Q.  **No.**

11   A.  Elaine wasn't?

12   Q.  **She only made this complaint, yes.**

13                    MS. ASHER:  Just focus on the

14           question he's asking you and the document

15           in front you right now.

16   Q.  **You can take a look.  I mean go ahead.**

17   A.  "On Tuesday March 7th, Ms. Elaine Costanzo..."

18   Q.  **Yes, this is it.**

19   A.  "Called on her personal telephone work hours"?

20   Q.  **Oh, that.  I thought you meant it was a -- okay.**

21   A.  That was the one I was referring to.  I'm sorry.

22   Q.  **Okay.  Don't you think that the length of time**

23       **that went by makes this kind of complaint rather**

24       **stale?**

25   A.  Yes, but there was a more recent one from March

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

248

1      of 2017 which this --

2    Q.  A sexual one?

3    A.  One of feeling uncomfortable being called at

4        home.

5    Q.  Oh, well, you don't know what Ron's take -- Ron

6        Lisan's take on that is either, his side of it,

7        do you?

8                    MS. ASHER:  Objection.  Go ahead.

9    A.  He didn't present it in his oral reply.

10   Q.  Did he present it in the reinvestigation that

11       needed to be conducted?

12   A.  He may have.

13   Q.  Do you have any idea what he said?

14   A.  I do not.

15   Q.  And you don't think you needed to wait for that

16       reinvestigation to occur?

17                   MS. ASHER:  Objection.  Asked and

18           answered.

19   Q.  Is that correct?

20   A.  I answered it, "Incorrect.  I did not."

21   Q.  Now let's take a look at Rhonda Verb.  That's the

22       one right before.

23           Oh, by the way, I meant to ask you how

24       egregious did you consider Elaine Costanzo's

25       report that we just read?  Where is that?  Is

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

249

1    that in the middle, on the low end, on the high

2    end?

3  A.  So as we discussed, it was old.

4  Q.  What?

5  A.  As we discussed, it was old in date.  It was from

6    prior time, so, and I did take into the fact that

7    she had told him to not do it and so he had been

8    warned by a woman in the area that his comments

9    were not welcome.

10 Q.  And did you take into account that he stopped

11    making the comments after he was told?

12 A.  For a period of time and then in January there

13    were new reports of contact and he was asked and

14    then he...

15 Q.  You mean calling her at home is some kind of

16    statement to her that made her uncomfortable?  Or

17    just being called at home?  I mean is that in the

18    same category as talking about your genitalia?

19 A.  No.  But he called her at home and said she

20    needed to find her own coverage because he

21    couldn't work with her because she wouldn't say

22    hello to him and greet him.  I'm not saying that

23    that is sexual and he wasn't charged in the

24    proposed action or the sustained action for

25    sexual misconduct but failure to --

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

250

| | | |
|---|---|---|
| 1 | Q. | Calling her at home was some kind of violation in |
| 2 | | this circumstance?  Is that what you're saying? |
| 3 | | MS. ASHER:  Objection.  Go ahead. |
| 4 | A. | I think it was inappropriate for him to call her |
| 5 | | at home and tell her she needed to find a |
| 6 | | replacement to work with him. |
| 7 | Q. | Do you understand that there was a conversation |
| 8 | | that preceded that? |
| 9 | | MS. ASHER:  Objection. |
| 10 | Q. | Between her and him?  Did you know that? |
| 11 | | MS. ASHER:  Objection.  Go ahead. |
| 12 | A. | I know what was in the evidence file. |
| 13 | Q. | Was that in the evidence file? |
| 14 | A. | No. |
| 15 | Q. | Are you sure? |
| 16 | A. | No. |
| 17 | Q. | Are you sure -- withdrawn. |
| 18 | | Did you know that she brought up to him that |
| 19 | | they shouldn't be placed together in the same |
| 20 | | operating room because she felt uncomfortable and |
| 21 | | then he called her at home to tell her she should |
| 22 | | get somebody else if that's how she felt?  Did |
| 23 | | you know that? |
| 24 | | MS. ASHER:  Objection.  Go ahead. |
| 25 | A. | He could have made it very clear in his oral |

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

251

1      reply.

2   Q.  Did you know that?

3   A.  I did not know it and if he had an issue, he

4       could have gone to Dr. Raphaely rather than

5       called her at home.

6   Q.  And you could have waited until the full

7       investigation was complete, couldn't you have?

8              MS. ASHER:  Objection.  Go ahead.

9   Q.  And answer my question.

10  A.  Yes.  The investigation from Bruce Kafer

11      acknowledged that the allegations did not rise to

12      a sexual nature.

13         The issue for the action was not based on

14      sexual issues.  It was based on inappropriate

15      conduct by Dr. Lisan.

16  Q.  I don't -- will you answer my question?

17             MS. ASHER:  She did.

18  Q.  You could have, you could have taken into account

19      that the investigation that was taking place

20      could have been completed before any final

21      judgment was made, couldn't you?

22             MS. ASHER:  Objection.  Asked and

23         answered.  Go ahead.

24  Q.  Couldn't you?

25  A.  I could have.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

252

1    Q.   Thank you.  That's the question I asked.

2                   MS. ASHER:  Can we just take a

3           minute off the record?

4                   MR. SINDELL:  Yes.

5                      -   -   -   -

6           (Thereupon, a discussion was had off the

7           record.)

8                      -   -   -   -

9    Q.   Karin Bonfili, that's 34.  It's the one that the

10        Number 34 on it.  All right?

11             Okay.  It says, "On Friday, January 6th I was

12        assigned to work with Dr. Lisan for the day."

13             Let's see here.  Okay.  I'd like you to --

14        excuse me.

15             Did you have -- this was part of the evidence

16        file, wasn't it?  All these different statements

17        we're going over?

18   A.   Yes.

19   Q.   Okay.  I want to, I just noticed something

20        myself.

21             It says, "On Friday, January 6th, I was" --

22        this is Karin Bonfili, right?

23   A.   Yes.

24   Q.   "I was assigned to work with Dr. Lisan for the

25        day."

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

253

1        And then it talks about what he said and so

2     forth, but that's the date, January 6th, right?

3  A.  Yes.

4  Q.  Okay.  Interestingly enough, it was the same date

5     that Karin Bonfili -- excuse me.  Withdrawn.

6        It was, January 6th was the same date that we

7     emailed the letter to you?

8  A.  Right.

9  Q.  Right?  Isn't that correct?  The complaint letter

10    from, about Dr. Raphaely?

11 A.  Yes.

12 Q.  So it says, "On Friday, January 6th I was

13    assigned to work with Dr. Lisan" and then it goes

14    through a whole series of making a better offer

15    and so on and so forth, right?

16 A.  Yes.

17 Q.  Just to identify, but if you take a look at,

18    which one is the proposed suspension?

19 A.  That's Exhibit 80.

20 Q.  80, okay.  Please take a look at Page 2 and look

21    under B.

22 A.  Yes.

23 Q.  In Exhibit 34, one of the quotes in here is that

24    he said, "unless you can make me a better offer."

25       Do you see that?  On Exhibit 34?

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**254**

1   A.  Yes.

2   Q.  And if you look at B, it says, "unless you can

3       make me a better offer," right?

4   A.  Yes.

5   Q.  But the date is on Friday, January 6th, 2017 in

6       the report of contact?

7               MS. ASHER:  Objection.

8   Q.  Isn't it?

9               MR. SINDELL:  What's the

10          objection?

11              MS. ASHER:  That's not actually,

12          it's not -- if you keep reading...

13  A.  Read the second or third sentence.

14  Q.  "On Friday, January 6th, 2017 I was assigned to

15      work with Dr. Lisan for the day.  Throughout the

16      day he continued to make sexually oriented

17      comments.  For example, in the morning...  about

18      bed.  I reviewed everything... response...

19      unless you make me a better offer."

20              MS. ASHER:  You skipped something.

21              MR. SINDELL:  What did I skip?

22              MS. ASHER:  The second example.

23          "On Thursday, January 5th I was trying to

24          discuss a case"...

25              MR. SINDELL:  Oh, okay.  You're

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

255

```
 1                right.  So the dates, you're absolutely
 2                right.  Thank you.
 3      BY MR. SINDELL:
 4      Q.  Okay.  Let's go through it.
 5               "I was assigned to work with Dr. Lisan for
 6          the day.  Throughout the day Dr. Lisan continued
 7          to make sexually oriented comments."
 8               She doesn't specify, does she?
 9      A.  No.
10      Q.  So you don't know what they are, do you?
11      A.  No.
12      Q.  Do you have some speculation about what they
13          were?
14                    MS. ASHER:   Objection.
15      A.  No.
16      Q.  Okay.  "For example, in the morning I stated that
17          I was tired and wanted to go home and get back in
18          my bed.  His response was something about 'Sounds
19          good to me.  We can go now and get in your bed.'"
20               Do you believe that that's what he said?
21      A.  I do.
22      Q.  Okay.  Because she said so?
23      A.  Because she reported it, yes.
24      Q.  Yes.  That's the only reason you have?
25      A.  Yes.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

256

```
 1    Q.   Okay.  But you don't know what he told the
 2         reinvestigation that you didn't wait for; is that
 3         correct?
 4                        MS. ASHER:  Objection.
 5    A.   Yes.
 6    Q.   Second example.  "On Thursday, January 5th, 2017
 7         I was trying to discuss the case that I was going
 8         to do with him on Friday, January 6th.  I
 9         reviewed everything I know about this patient
10         with him and said, 'So are you leaving now?'  And
11         his response was, 'Unless you can make me a
12         better offer.'"
13              Did you see that as a sexual -- assuming it's
14         true, is that sexual?
15    A.   Not necessarily, no.
16    Q.   Was it offensive?
17    A.   It wouldn't be to me but it was important to her
18         to put on the report of contact.
19    Q.   So that makes him guilty, right?
20    A.   No.
21    Q.   "A few weeks prior I had asked, 'Do you have
22         someone coming to relieve me to go home?'  His
23         response:  'If I get you out, what are you going
24         to do for me?'"
25              Did you consider that sexual?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

257

```
 1    A.  Could or could not be.

 2    Q.  Okay.  Is it inappropriate?

 3    A.  Could or could not be.

 4    Q.  Sounds like you think it's fairly mild?

 5    A.  Yes.

 6    Q.  "When I was reviewing the case with Dr. Lisan on

 7        Thursday, January 5th another OR staff member

 8        happened to be present after Dr. Lisan spoke with

 9        sexual undertones to me."

10        We don't know what they were, do we?

11    A.  No.

12    Q.  Do you have any speculation about it?

13                    MS. ASHER:  Objection.

14    A.  No.

15    Q.  "And though in sexual comments he walked away

16        when we were done discussing the case."

17        Did I miss something here?

18        "After Dr. Lisan spoke with sexual undertones

19        to me and though in sexual comments, he walked

20        away when we were discussing the case.  The other

21        OR staff member that was present asked me if I

22        felt uncomfortable because he felt uncomfortable

23        for me hearing how he spoke to me."

24        It doesn't mention the name, does it, of the

25        other OR staff member, correct?
```

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

258

1   A.  Correct.

2   Q.  Do you happen to know the name?

3   A.  I do not.

4   Q.  "Although I cannot write this in quotes verbatim

5       because I'm trying to account for what has been

6       occurring the last several weeks, I can tell you

7       that I am not comfortable with this type of

8       sexual talk at work."

9           Do you see anything in this thus far that

10      would prevent her from telling Dr. Lisan that she

11      didn't appreciate his comments or innuendoes?

12                      MS. ASHER:  Objection.  Go ahead.

13  Q.  Anything that prevented her from doing that?

14  A.  She could have.

15  Q.  According to Mr. Kafer, that was recommended by

16      the policy of the VA, right?

17  A.  And the other staff member could have said

18      something, too.

19  Q.  Uh-huh, but you didn't answer my question.

20  A.  I did.  I did.  I thought I did.  I agree.

21  Q.  "And the other staff member could have said

22      something, too?"

23  A.  If the other --

24  Q.  That's an answer to my question?

25  A.  I thought I answered and then said something

Susan M. Fuehrer (Vol II) - April 26, 2019
**Deposition**

**259**

1      else.

2   Q.  Well, let's take my question.

3         Was there anything that prevented her --

4   A.  No.

5   Q.  -- from saying I didn't appreciate it at the

6       time?

7   A.  No.

8   Q.  And that's contrary to the recommended policy of

9       the VA that Mr. Kafer cited in his report,

10      correct?

11  A.  Yes.

12  Q.  Okay.  "Although Dr. Lisan has always made

13      sexually oriented jokes, recently I feel that the

14      level of the sexual talk has escalated and I feel

15      extremely uncomfortable.  I have not said

16      anything in response because I'm so uncomfortable

17      and uneasy when it is happening."

18        Do you believe that, that she's so

19      uncomfortable when he makes these jokes or

20      remarks?

21  A.  Yes.

22  Q.  You thought they were kind of mild, didn't you?

23                    MS. ASHER:  Objection.  Go ahead.

24  A.  But I could see where she would be uncomfortable.

25  Q.  Well, you, yeah, I understand that but they're

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

260

```
 1        not even sexual, really, are they?
 2                    MS. ASHER:  Objection.  Go ahead.
 3   A.   She didn't really go into the depth of what they
 4        were.
 5   Q.   Well, she says sexually oriented?
 6   A.   Right.
 7   Q.   Do you think they were?
 8   A.   I have no reason to not believe her.
 9   Q.   Well, I asked you if they were sexual and you
10        said maybe/maybe not?
11   A.   Well, she's describing them as sexual talk at
12        work.
13   Q.   So she talks, she describes it as sexual, that
14        means that he violated something because she
15        heard it that way?
16                    MS. ASHER:  Objection.
17   Q.   Right?  Isn't that what you're saying?
18   A.   No, that's not what I said.  I said I have no
19        reason to doubt what she put in her report of
20        contact.
21   Q.   Okay.  "I don't know how to respond."
22            Do you believe that?  "I don't know how to
23        respond"?
24                    MS. ASHER:  Objection.  Go ahead.
25   A.   I do.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

261

1   Q.  You believe that she didn't know how to respond?

2   A.  Yes.

3   Q.  "And frequently I am caught off guard when he

4       says it.  I do not want to come to work feeling

5       uncomfortable in the workplace because we work

6       together in a," quote, "team," quote, "care

7       setting.  I just want to work in a respectable

8       and professional environment and not feel uneasy

9       while being at work."

10          Okay.  Well, if she feels that way, why

11       didn't she just tell him?

12  A.  I can't answer for her.

13  Q.  Could he -- oh, I don't want to -- okay.  Well,

14       this is also mentioned in your report.

15          Now, the gag order, and I call it that, which

16       is meaning the checklist and statement not to

17       bring up the allegations to the CRNAs who made

18       complaints in the direction of Dr. Raphaely to

19       Mr. -- to Dr. Kafer, I mean.  Gees.

20  A.  Mr. Kafer.

21  Q.  To Dr. Lisan.  Should I start that again?

22  A.  Please.

23                  MS. ASHER:  Sounds like you need

24           the day to be over, too.

25  Q.  That is correct.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

262

1           The order that Dr. Raphaely issued to

2      Dr. Lisan not to discuss the allegations of the

3      CRNAs with any of the complaining CRNAs -- so are

4      we on the same page here about what I'm talking

5      about?

6   A.  Yes.

7   Q.  Yes?

8   A.  Yes.

9   Q.  Okay.  So I'm going to call that the gag order

10      preventing him from talking about it to the

11      CRNAs?

12           MS. ASHER:  Objection.

13           Characterization.  Go ahead.

14  Q.  That's my characterization.  Okay?

15  A.  I would like, could we just call it the letter

16      to, the letter of instruction.

17  Q.  That's a little long.  Why don't we just call it

18      the -- you're looking for something neutral.

19           The non-discussion order?

20  A.  Okay.

21  Q.  Okay.  The non-discussion order regarding the

22      allegations made by the sexual, by the CRNAs who

23      complained.  Okay?

24           That kind of order occurs when there is an

25      allegation of sexual harassment, it's called a

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

263

```
1        sexual harassment checklist, isn't it?

2   A.   Yes.

3   Q.   Okay.  But wouldn't you agree with me that for

4        something that is pretty clearly not sexual

5        harassment, there wouldn't be any need for such a

6        do not discuss order like that with that

7        checklist?  Wouldn't you agree with that?

8                    MS. ASHER:  Objection.  Go ahead.

9   A.   It's the policy, you know.  I'm sorry, it is the

10       policy I believe.  I think.  It's, the checklist

11       is part of the policy.

12  Q.   For what?

13  A.   Allegations.

14  Q.   Of?

15  A.   Potential or alleged sexual harassment.

16  Q.   No.  It doesn't say potential?

17  A.   Or alleged.

18                   MS. ASHER:  It does say alleged.

19  A.   I think it --

20  Q.   Yes, but --

21  A.   -- says alleged.

22  Q.   I don't think it says anything like any of that;

23       but let's, maybe you're right.  Let's take a

24       look.

25           Let's see if I have the checklist here.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

264

1        Alleged harasser.  It doesn't say alleged --

2    it says sexual harassment allegation checklist,

3    you're right.  I would say that means alleged.

4  A.  Okay.

5  Q.  And that's Exhibit 33, by the way, you see it

6    there?

7  A.  I'm there.

8  Q.  Okay.  Wouldn't you agree with me that it's quite

9    a stretch to characterize any of these complaints

10    as an allegation of sexual harassment?  Don't you

11    think that's quite a stretch?

12              MS. ASHER:  Objection.  Go ahead.

13  A.  I don't consider it a stretch.

14  Q.  Really?  All right.  If the alleged victim does

15    not register any complaint or objection to the

16    unwelcome remarks, don't you think that that

17    tends to reduce the likelihood that it's

18    harassment of any kind?

19              MS. ASHER:  Objection.  Go ahead.

20  A.  No.

21  Q.  No?

22  A.  No.  We care for lots of veterans of military

23    sexual trauma and many of them have not so raised

24    issues.  These women went to their supervisor and

25    the supervisor spoke on their behalf.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

265

```
 1    Q.  That kind of sexual trauma is not based upon

 2        little innuendos that are made by somebody in

 3        passing remarks or even direct remarks.  That's

 4        not the kind of sexual trauma that you're talking

 5        about here, is it?

 6                    MS. ASHER:  Objection.  Go ahead.

 7    A.  It could be.

 8    Q.  But it isn't?

 9                    MS. ASHER:  Objection.  Go ahead.

10    A.  It was harassment or can be construed as unwanted

11        and unwelcomed.

12    Q.  It may be unwanted and unwelcomed, that doesn't

13        make it harassment at all.

14                    MS. ASHER:  Objection.  Go ahead.

15    Q.  It may make it something that needs to be

16        commented upon or objected to but it doesn't mean

17        it's harassment in some serious vein that

18        requires don't talk to anybody about it or any of

19        these people about it.  I mean it's something

20        that's very simple to resolve.

21                    MS. ASHER:  Objection.  Is there a

22            question?

23    Q.  Isn't it?

24                    MS. ASHER:  Objection.  Go ahead.

25    A.  I don't understand the question.  Go ahead.
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

266

1    Q.   Isn't it something pretty easy to resolve, all

2         these little remarks and innuendos that are

3         suddenly the basis of reports of contact?  Don't

4         you think that they're fairly minor things that

5         could be easily discussed and disposed of?

6                   MS. ASHER:  Objection.  Go ahead.

7    A.   Yes, if the events of March 7th and March 8th had

8         not occurred.

9    Q.   Would you agree with me that sexual harassment is

10        a very serious thing?

11   A.   Yes.

12   Q.   And it shouldn't be tolerated, should it?

13   A.   No.

14   Q.   And somebody who engages in serious sexual

15        harassment should be seriously disciplined

16        including possible termination?

17   A.   Yes.

18   Q.   Is that right?  Okay.

19        And being as serious as I think we can all

20        agree real sexual harassment is, don't you think

21        that it is very dangerous to trivialize sexual

22        harassment by claiming it for trivial passing

23        remarks that could easily be expressed as

24        unwelcome by any woman who receives them?

25                  MS. ASHER:  Objection.  Go ahead.

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

267

```
 1   A.   Can you read -- can somebody repeat it?  I'm
 2        sorry.
 3   Q.   I'll repeat the question.
 4            Don't you think that making trivial
 5        complaints of exaggerated sexual harassment
 6        diminishes the seriousness of real sexual
 7        harassment?
 8   A.   No.
 9   Q.   Don't you think that the, what you're, since
10        you've mentioned it repeatedly, this new MeToo
11        era, don't you think this new MeToo era runs the
12        risk if it's not tempered with reality of causing
13        trivialization of sexual harassment that degrades
14        the seriousness of it?
15                  MS. ASHER:  Objection.
16   A.   No.
17   Q.   You think it's helpful for every little slight
18        that may have some sexual innuendo that could
19        easily be responded to should be blown up into a
20        10-day suspension or consequences of that nature
21        such as for some people if it's a housekeeper
22        fire them?
23                  MS. ASHER:  Objection.
24   Q.   Don't you think there's something wrong with
25        that?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

268

```
 1                 MS. ASHER:  Objection

 2            mischaracterization.  Go ahead.

 3  A.   No.  And Dr. Lisan went into an OR that he had no

 4       professional business --

 5  Q.   How do you know he had no professional business?

 6  A.   Because it stated so.

 7  Q.   Who stated it?

 8  A.   The CRNA, the other.

 9  Q.   Anybody else?

10  A.   The other anesthesiologist that asked him to

11       leave.

12  Q.   Which one?

13  A.   And the other anesthesiologist, we'll have to

14       look at the police report, and the other

15       anesthesiologist that went in to relieve the CRNA

16       because everyone was uncomfortable.

17  Q.   Let me suggest this to you:  That people walk

18       into OR operations all the time one or the other

19       OR room including anesthesiologists and CRNAs and

20       communicate chitchat from time to time.

21            Would that surprise you?

22                 MS. ASHER:  Objection.  Go ahead.

23  A.   If they were instructed by their supervisor not

24       to do that and if they placed hands on somebody.

25  Q.   Okay.  Let's talk about "placed hands on
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

269

1    somebody."  What hand was placed on what part of

2    somebody?  Do you know?

3  A.  He touched her shoulders.

4  Q.  **He touched her shoulder.**

5       **Is that what he did?  Put his hand on her**

6    **shoulder?**

7                    MS. ASHER:  Objection.

8  Q.  **Is that right?**

9  A.  That's what the police report says.

10 Q.  **Uh-huh.**

11      **Did he put his hand on her shoulder leaning**

12   **down?**

13 A.  Oh, my.

14 Q.  **Toward her breast?**

15                   MS. ASHER:  Objection.

16                   MR. SINDELL:  Why is it

17           objectionable?

18                   MS. ASHER:  It's an inappropriate

19           question.

20                   MR. SINDELL:  I want to know what

21           the touching was, what she thought the

22           touching was.

23                   MS. ASHER:  And as the witness

24           said, it's in the police report which you

25           have.

270

```
 1              MR. SINDELL:  You think it's
 2         objectionable to ask her what she
 3         understands the touching was?
 4              MS. ASHER:  When it's already
 5         answered, yes, I do think it's
 6         objectionable.
 7              MR. SINDELL:  Well, when it's
 8         answered.  That's not what you said.  You
 9         said it's an objectionable question.  No,
10         it isn't.
11              MS. ASHER:  Steve, don't raise
12         your voice at me.
13    Q.  All right.  Let me ask you again:  Do you know
14        what part of her back or shoulder he touched?
15    A.  Just per the police report her shoulders.
16    Q.  Do you interpret that as being the front of her
17        body?
18    A.  No.
19    Q.  Do you think that if you touch somebody's
20        shoulder, that that's a call to go to the police?
21              MS. ASHER:  Objection.  Go ahead.
22    Q.  Was that a police action matter?
23              MS. ASHER:  Same objection.  Go
24         ahead.
25    Q.  "He touched my shoulder"?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

271

```
 1                    MS. ASHER:  Objection.  Go ahead.
 2   A.  He was instructed not to have contact with her.
 3   Q.  Okay.  Is that a violation of law, an assault in
 4       your mind, to touch somebody's shoulder?
 5                    MS. ASHER:  Objection.
 6   A.  It's failure to follow the order.
 7   Q.  Do you think that it's a matter that requires
 8       police intervention, that he touched her
 9       shoulder?
10                    MS. ASHER:  Objection.
11   A.  Every employee is entitled to bring any issue of
12       concern they have to the police or anyone else.
13          If she was afraid, she was certainly entitled
14       to go to the police.
15   Q.  Do you believe that she was afraid when he
16       touched her shoulder?
17   A.  Yes, I do.
18   Q.  Do you know that he asked her if it was
19       permissible to touch her shoulder first?
20                    MS. ASHER:  Objection.
21   A.  It was not in the police report.
22   Q.  And of course since it wasn't in the notes that
23       you read that nobody else saw from our side of
24       the fence, you assume he didn't mention it to
25       Dr. Altose, correct?
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

272

```
 1                    MS. ASHER:  Objection.  Go ahead.
 2   A.  Yes.
 3   Q.  And you have any idea what mention was made of it
 4       to Leshelle Reece, correct?
 5                    MS. ASHER:  Objection.
 6   A.  Correct.
 7   Q.  As part of the investigation?
 8   A.  Correct.
 9   Q.  But you consider that a cause for concern because
10       he was ordered not to talk to her so he shouldn't
11       have touched her shoulder?
12   A.  Correct.
13   Q.  He wasn't ordered not to talk to her at all, was
14       he?
15                    MS. ASHER:  Objection.
16   A.  Correct.
17   Q.  Okay.  He was ordered -- he could talk to her
18       about anything to do with business matters?
19   A.  Correct.
20   Q.  You consider that a serious -- withdrawn.
21           It sounds like you considered that a very
22       serious breach that he didn't follow the order;
23       is that right?
24   A.  Yes.
25   Q.  Well, if he was talking to her about a business
```

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

273

1      matter and touched her shoulder, would that be a

2      different consequence on your part?

3                  MS. ASHER:  Objection.

4   Q.  Withdrawn.

5          Would you view it differently if it was a

6      legitimate conversation but he touched her

7      shoulder?

8   A.  Based on the series of events that had happened

9      over the previous couple months, he should not

10     have touched her period.

11  Q.  What happened over a couple of months other than

12     a bunch of CRNAs were solicited or maybe

13     initiated in some cases a complaint about him

14     which didn't constitute sexual harassment?

15  A.  But was unwanted and was not tolerated and it was

16     a bunch.  It wasn't just one.  It wasn't two.  It

17     wasn't three.  It was several with several

18     instances where it was unwanted and we do have a

19     policy that we cannot condone unwelcome harassing

20     conduct and that we will take action, and that's

21     what we did.

22  Q.  What's the person -- I'm sorry, go ahead.

23  A.  I'm done.

24                  MS. ASHER:  We're about a

25              half-hour past where you said you were

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**274**

```
 1              going to wrap up, so are we close to
 2              wrapping up now?
 3                   MR. SINDELL:  Yes.  We're close to
 4              wrapping up.  I think I don't have anything
 5              more.
 6    BY MR. SINDELL:
 7    Q.  Is there anything that you read or heard that
 8        Dr. Raphaely said that you don't believe?
 9                   MS. ASHER:  Objection.  Vague.  Go
10              ahead.
11    Q.  In connection with Ronald Lisan?
12    A.  There was, you know, one small report of contact
13        from Dr. Raphaely.  I placed most of my weight
14        based on the reports of contact from the CRNAs
15        and the police report.
16    Q.  Is there anything that any of the CRNAs presented
17        in writing that you read or statements they made
18        or statements you heard which you didn't believe?
19    A.  No.
20    Q.  You believed every single thing that every CRNA
21        reported a hundred percent?
22    A.  Yes.  I have no reason to doubt that they would
23        have said something different or had a reason to
24        say something different.
25                   MR. SINDELL:  No further
```

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

275

1    questions.

2         MS. ASHER:  And, Sue, as we

3    discussed, you have the right to read the

4    transcript of your deposition if it's

5    ordered.  You have the right to waive that

6    right, but I usually recommend that you

7    choose to read.

8         THE WITNESS:  I will.

9              -  -  -  -

10        (Deposition concluded.)

11             -  -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

276

1

2

3                           SIGNATURE PAGE

4

5

6              I, SUSAN M. FUEHRER, having read

7     the foregoing deposition, do hereby certify said

8     testimony is a true and accurate transcript;

9

10    _____ I submit no changes.

11

12    _____ I submit the following changes on
              the _____ errata sheet(s) attached hereto
13            and made a part hereof.

14

15                    _____

16                    SUSAN M. FUEHRER

17                    _____

18                    DATE SIGNED

19

20

21

22

23

24

25

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

277

1

2

3                    C E R T I F I C A T E

4

   The State of Ohio, )   SS:
5  County of Cuyahoga.)

6

7        I, Pamela S. Greenfield, a Notary Public
   within and for the State of Ohio, authorized to
8  administer oaths and to take and certify
   depositions, do hereby certify that the
9  above-named witness was by me, before the giving
   of their deposition, first duly sworn to testify
10 the truth, the whole truth, and nothing but the
   truth; that the deposition as above-set forth was
11 reduced to writing by me by means of stenotypy,
   and was later transcribed into typewriting under
12 my direction; that this is a true record of the
   testimony given by the witness; that said
13 deposition was taken at the aforementioned time,
   date and place, pursuant to notice or
14 stipulations of counsel; that I am not a relative
   or employee or attorney of any of the parties, or
15 a relative or employee of such attorney or
   financially interested in this action; that I am
16 not, nor is the court reporting firm with which I
   am affiliated, under a contract as defined in
17 Civil Rule 28(D).

18       IN WITNESS WHEREOF, I have hereunto set my
   hand and seal of office, at Cleveland, Ohio, this
19 7th of May, 2019.

20

21

22 _____
   Pamela S. Greenfield, CRR, RDR
23 Notary Public, State of Ohio
   My commission expires July 2, 2023

24

25

**Mehler & Hagestrom**
**800.822.0650**

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

278

1   DO NOT WRITE IN TRANSCRIPT EXCEPT TO SIGN.
    Please note any word changes/corrections on this
2   sheet only.  Thank you.

3   Page/Line    Correction

4   _____   _____

5   _____   _____

6   _____   _____

7   _____   _____

8   _____   _____

9   _____   _____

10  _____   _____

11  _____   _____

12  _____   _____

13  _____   _____

14  _____   _____

15  _____   _____

16  _____   _____

17  _____   _____

18  _____   _____

19  _____   _____

20  _____   _____

21  _____   _____

22  _____   _____

23  _____   _____

24  _____   _____

25  _____   _____

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

---

**Exhibits**

**Fuehrer_Exhibits_76_thru_81**

**0**

**003** 168:24,25

**1**

**1** 164:1 215:20
**10** 116:13
**10-day** 186:16
188:13 209:24 267:20
**101** 163:25
**10th** 159:20 209:15
216:11
**11** 116:1,8,9 202:8
204:23 205:7
**11500** 115:6
**11th** 206:16 223:11,
12
**12** 118:4 128:7
**13** 168:6,19 169:6,9
**14** 129:7
**15** 131:15 135:25
224:9
**15th** 225:15
**16** 131:15 135:25
153:7
**18** 120:25 127:23
205:2,3
**19** 133:16 157:2
169:6
**1980** 233:11
**19th** 169:8

**2**

**2** 165:19 166:10
171:2 178:5,19
185:22 186:9 218:21
253:20
**20** 223:15
**200** 115:6,7
**2005** 233:11
**2015** 173:8 245:23
247:6
**2016** 163:2
**2017** 138:7 143:10
159:23 162:19 163:12
168:6 169:9,15 172:6
178:15 202:8 204:23
205:7 215:25 216:7,
21 217:20,22 223:12
224:9 225:8 229:14
233:9,10 247:7,8
248:1 254:5,14 256:6
**2018** 120:25
**2019** 234:13
**20th** 223:14 225:8

**22** 108:16 109:8
**23** 116:12 128:15
**249** 115:10
**25** 132:21 133:2

**3**

**3/20/17** 207:16
**30** 223:4
**30-day** 223:10
**31** 143:10 228:9,10
**33** 264:5
**34** 228:10,15 252:9,
10 253:23,25
**38** 184:14

**4**

**4** 158:7 184:4 218:2,7
**4/2/19** 107:24
**4/5/19** 132:2
**42** 178:11
**45** 115:9
**45249** 115:8
**4th** 218:11 229:14

**5**

**5** 169:5,20 177:12
**5-10-17** 202:4
**5/10/17** 221:17
**513-247-4621**
115:12
**54** 132:7,9,18 133:2
**55** 133:3,17
**55-5600** 190:20
**5th** 136:21 208:11
209:18,20 218:8,11
254:23 256:6 257:7

**6**

**6** 138:21 143:10
158:25 165:23 217:20
**6/15/17** 224:2
**6/20/17** 183:19
**6th** 159:9,23 161:19
163:12 208:11 215:25
216:7,21,25 217:21
218:9,10,12 252:11,
21 253:2,6,12 254:5,
14 256:8

**7**

**7** 137:3 138:21,22
**76** 107:23 108:9
127:19 136:17 137:2
**77** 127:22 131:24
132:1 136:10 138:21
156:21
**78** 128:7 183:17,19
**79** 128:14 138:20
142:18 201:25 202:2

206:5,6 215:16
221:17
**7th** 159:17,18 163:2
208:12 247:17 266:7

**8**

**8** 151:10
**80** 108:13 124:20
129:8 207:13,16
215:16,17 253:19,20
**81** 124:21,25 125:1
224:2,6
**83** 151:9
**84** 153:5
**85** 156:20,24
**86** 158:7
**8th** 159:17,18 220:7
266:7

**9**

**9** 178:15
**99** 158:22,23
**9th** 159:17

**A**

**ability** 149:8 184:20
185:2
**absence** 162:24
**absolutely** 128:21
137:13 147:1 243:16,
20,24 255:1
**abuse** 185:11,12
**accept** 187:9
192:21,23,24 193:16
195:25 226:6
**acceptable** 193:18
**acceptance** 224:16
225:16 226:11
**accepted** 192:20,22
216:20 225:5,11
226:6,7
**accepting** 191:25
**access** 124:12
**account** 143:9
210:12 244:16 249:10
251:18 258:5
**accurate** 146:15,23
218:17
**accusation** 144:9,
18,22 233:22
**accusations** 243:22
**acknowledge** 189:6
**acknowledged**
198:8 251:11
**act** 116:18
**acted** 140:13 190:21
**acting** 112:15,19
113:3,4,6 117:7,8,16
118:6,7,8,9,14 120:6
122:22 123:2,9,11,13

**action** 108:19 109:9
110:9 124:4,6 147:3
161:3 184:17 187:4,
11,14,17 190:24
205:13 217:23 225:12
226:2,10 227:17,19
249:24 251:13 270:22
273:20
**actions** 166:14,24
188:2 209:25
**active** 148:17 211:15
**actual** 140:2 186:4
187:13 189:19 190:3
223:11
**add** 157:24 181:10
**addition** 135:3
**additionally** 182:18,
22 206:14
**address** 113:25
114:21 115:5 168:8
212:8 221:8
**addressed** 181:9
212:1
**addresses** 203:13
**Administration**
224:18
**admonishment**
187:15
**advance** 144:23
189:14
**advice** 141:1 150:19,
20
**advised** 140:3
**Affairs** 224:14 225:5
**affidavit** 138:15
**affirm** 185:20 225:21
**affirmative** 165:25
**affirmed** 162:4
183:6 225:7
**afraid** 128:9 134:12
153:10,16,19 236:3,4
239:2,6,12,17 271:13,
15
**age** 107:1
**agency** 151:1
192:19
**agitated** 213:18
**agree** 125:12 157:22
166:25 170:14,21
176:10 177:25 179:4
182:13 198:3 244:2
258:20 263:3,7 264:8
266:9,20
**agreed** 153:15 187:1
240:9
**agreement** 187:24
**agrees** 243:25
**ahead** 109:3 114:8
115:4 117:6 118:20,
24 119:2 120:19
121:9,25 122:7,20
140:7 147:14 149:6

157:19 158:15 162:20
163:17 171:6 172:7
173:7 176:25 177:17,
19,23 178:8 179:16,
24 180:21 181:6
183:10 186:7 187:23
190:2,18 193:1,12
199:18 203:11 204:11
205:9 207:3 209:12
210:8 215:8 217:25
218:15 220:17 222:7,
21 225:20,23 226:20
227:2 229:24 230:17
232:16,20 235:6,21
236:8,21 237:23
238:12 239:8,14,18
241:9 242:8,25 243:9
244:13 247:16 248:8
250:3,11,24 251:8,23
258:12 259:23 260:2,
24 262:13 263:8
264:12,19 265:6,9,14,
24,25 266:6,25 268:2,
22 270:21,24 271:1
272:1 273:22 274:10
**aide** 191:17,18
**Akron** 110:22 111:4,
18
**alarm** 157:14
**alarming** 147:18
**alarms** 157:20
**allegation** 146:11
160:2,9,11 178:21,25
189:19 262:25 264:2,
10
**allegations** 137:12
178:22 179:12
180:15,20 181:2,24
182:13,19 188:8
204:16 205:2,13
208:19 210:6,16
220:24 251:11 261:17
262:2,22 263:13
**alleged** 144:16
173:6 177:8 205:15
218:23 263:15,17,18,
21 264:1,3,14
**allegedly** 172:5
173:4 177:6 178:23
189:24 205:18 208:10
211:1
**alleging** 142:4
**Altose** 123:4,10,15,
19 162:8 163:23
167:20 186:25 194:1
195:13 196:10 197:7,
17 198:6 199:16,25
201:12,20 202:7
204:21 206:3,7,12,23
220:23 221:8 223:5
242:10 271:25

---

## Susan M. Fuehrer (Vol II) - April 26, 2019
## Deposition

**and/or** 140:15
**anesthesia** 162:12
167:7 172:19 184:20
**anesthesiologist**
164:5 173:10 184:19
211:10 235:9 268:10,
13,15
**anesthesiologists**
268:19
**anesthesiology**
131:16 159:3 160:2
163:14 168:6 179:14
180:20 182:12
**Ann** 112:17,23 116:7
**annunciated** 171:1
178:5
**answers** 145:17,22,
23 173:13
**anymore** 191:13
**anytime** 181:4
233:14
**apologize** 131:9
141:24 170:20 183:16
192:25 201:10,12
231:7
**apostrophe** 117:15
**appalled** 238:20
239:1
**Apparently** 119:18
**appears** 214:10
224:22
**approach** 188:17
204:5
**approached** 142:23
120:18 164:20
**April** 136:21 169:6,8
**Arbor** 112:17,23
116:7
**area** 150:13 154:1
249:8
**ASHER** 117:5
118:19,24 119:2,13
120:19 121:9,25
122:7,18,20 123:7,21,
25 124:9,18 125:19
127:18 129:13,17,19
130:6 133:25 134:15,
22 135:11,15,20,22
136:4,10 137:9 139:5,
7,20 140:6 141:4
142:9 145:6,9,13,18
146:3,7 147:7,22
148:2,4,7,9,14,25
149:23 150:1,7,12,16
152:5,10 153:23
156:21 157:16,18
158:3,15,19 159:12,
21 160:4,14,22 161:1,
23 162:7,15,20
163:17 164:21 171:6
172:7 173:7,24 174:4,

17,22 175:4,8,12,17,
22 176:2 177:17,19,
23 178:6,8 179:7,15,
24 180:7,21 181:6,18
182:1,14 183:10
185:25 186:7 187:23
189:22 190:2,18
192:14,16 193:20,22
194:9,15,21 195:1,6,
10,15 198:19 199:18
200:5,21,24 201:5
203:11,19,22 204:1,
10,18 205:9,24 206:1
207:1,3,25 208:18
209:6,11 210:8,24
211:3,7 212:4,11,16,
20,24 213:3,11,15,22
214:3,6,14,18,22
215:1,5,10 216:14,16,
24 217:24 218:15
220:17 221:23,25
222:7,17,21 225:13,
20,23 226:18,20
227:2,16 228:6
229:24 230:17
231:21,24 232:16,20
233:2,5,8,13,15,19
234:4,7,10,15,23
235:6,21 236:1,8,19,
21 237:17,23 238:12,
24 239:8,14,18 241:5,
9 242:8,25 243:3,9,
19,23 244:3,13,21,23,
25 246:5,11 247:13
248:8,17 250:3,9,11,
24 251:8,17,22 252:2
254:7,11,20,22
255:14 256:4 257:13
258:12 259:23 260:2,
16,24 261:23 262:12
263:8,18 264:12,19
265:6,9,14,21,24
266:6,25 267:15,23
268:1,22 269:7,15,18,
23 270:4,11,21,23
271:1,5,10,20 272:1,
5,15 273:3,24 274:9
275:2
**aspects** 131:14
167:25
**assault** 244:24
271:3
**assessment** 243:14
**assigned** 209:19
252:12,24 253:13
254:14 255:5
**assume** 110:16
111:24 146:22 152:6,
7 157:17 159:24
163:19 194:13 202:12
216:17 218:17,18,21
219:12,22 220:9

231:13 238:23 271:24
**assumed** 218:13
219:9,17 220:3
**assuming** 256:13
**attendance** 163:9
169:3
**attending** 235:1
**attention** 141:7
152:20,23 166:9
192:3,5
**attorney** 111:8
116:25 197:9
**attorney/client**
150:9
**attorneys** 109:12
**attractive** 233:7
**authority** 152:23
153:3 179:20
**avoid** 107:11 217:20
**aware** 132:12 133:7
134:24 135:2,6,7
169:8 206:7 216:17

---

## B

**B-E-A-R-S-S** 131:11
**back** 142:20 165:8
176:19 177:1 195:24
199:21 208:9 211:1
215:9 255:17 270:14
**bad** 128:10
**badly** 132:13 133:8
**ballpark** 107:17
**based** 144:14 146:17
160:10 182:2 188:11
202:18 204:2 205:14
206:11 207:4,10,11
209:4,25 211:24
222:4 227:17,18,20,
21,22,25 251:13,14
265:1 273:8 274:14
**basically** 242:15
**basis** 161:2 236:7
266:3
**Bearss** 131:6,10
132:1 135:1,6 136:19,
21 139:21 146:4,23
147:12 157:3 216:12
**bed** 254:18 255:18
**bed.'** 255:19
**begin** 125:22 130:9
148:23 154:3
**beginning** 169:22
188:9
**behalf** 264:25
**behavior** 140:10
141:21 152:25 189:6
193:6 198:2 208:23
216:3
**behaviors** 191:20
**belabor** 237:2
**belief** 144:14

**believed** 212:13
219:3 231:14 274:20
**believes** 134:18
**bell** 131:19
**biggest** 116:9
**bit** 213:18
**bizarre** 158:20
**blanks** 185:21
**block** 132:9,18
**blown** 267:19
**body** 270:17
**boilerplate** 185:24
190:9
**Bonfili** 134:25 137:5,
15,22 138:24 139:8,
10,18,22,23 141:17
151:12,23,24 152:1,6
153:9 157:4,8,20
158:8 171:14 189:25
208:11 211:2 252:9,
22 253:5
**boss** 129:2 234:24
235:4
**bottom** 108:16
124:20 132:21
**box** 158:25
**Boy** 112:6
**breach** 272:22
**break** 165:4 212:17
213:2,4,21,22 215:2,
6,8
**breast** 269:14
**Brenda** 119:4 120:9
122:4
**bring** 150:24 152:19,
21,22 153:3 162:9,10
261:17 271:11
**bringing** 108:22
**brother** 115:18,21
**brought** 192:3,4
**Bruce** 165:24 247:3
251:10
**building** 114:10,12
169:12
**bunch** 273:12,16
**business** 171:12,16
193:9 211:13 268:4,5
272:18,25

---

## C

**call** 110:25 119:20
196:9 229:15 230:10
240:19,21,22 244:10,
14 250:4 261:15
262:9,15,17 270:20
**called** 107:1 114:15
158:9 171:17 178:15,
16 204:6 247:19
248:3 249:17,19
250:21 251:5 262:25

**calling** 207:9 213:3
249:15 250:1
**canteen** 115:18
**capacity** 117:7
165:25
**car** 114:4
**care** 185:8 261:6
264:22
**case** 140:19 147:5
149:14 161:10,12
188:7 189:12 209:19
228:19 235:1 238:10
254:24 256:7 257:6,
16,20
**cases** 273:13
**category** 249:18
**caught** 261:3
**causing** 267:12
**cease** 166:13,23
170:17 171:4
**center** 121:17
122:22 140:11 161:15
166:2 167:3 168:8
224:19
**certified** 107:5
**chance** 147:25
**change** 129:12
**characterization**
146:8 147:8 157:19
158:4 160:5,15,23,25
179:16 212:12
262:13,14
**characterize** 264:9
**characterized**
244:17
**charge** 147:2 218:2
**charged** 249:23
**charges** 185:21
190:3 198:7
**checklist** 181:8
209:2,16 261:16
263:1,7,10,25 264:2
**Chicago** 118:5
**chief** 111:23 120:2,3
122:13,22 123:2,3,9
131:11 146:4 162:12
167:21 188:16 236:25
**chiefs** 123:11,13,19
**chitchat** 268:20
**choose** 275:7
**choosing** 173:21
**chose** 145:24 172:16
**Cincinnati** 112:17,
24 113:14,16 115:8,
13 116:7
**circumstance**
250:2
**circumstances**
140:2 142:3 221:9
240:8
**cited** 169:23 170:7
259:9

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**Civil** 107:4
**claim** 144:17 230:20
**claimed** 230:25
**claiming** 209:18 266:22
**claims** 227:13 240:2
**clarify** 108:3 125:13 199:23
**Clark** 197:9,17
**clear** 125:5,12 150:24 204:3 250:25
**Cleveland** 115:18 116:4 159:4 224:18, 19 225:6
**client** 214:13,17
**clinical** 184:15,21 185:5,7
**clinician** 185:3
**close** 229:19 242:16 274:1,3
**closed** 241:6
**coached** 137:17,23 138:10,24 140:23 141:11,12 142:10 158:11
**coaching** 142:3
**coffee** 241:23
**coincidence** 225:25
**collectively** 135:4
**Columbus** 116:8
**comfortable** 235:3 258:7
**comment** 182:15,16 193:10 210:15 237:12,18 243:1
**commentary** 170:9
**commented** 265:16
**comments** 174:19 190:22 193:23 196:24 197:3 242:18 249:8, 11 254:17 255:7 257:15,19 258:11
**communicate** 113:20 268:20
**communicated** 151:21,23
**communicating** 178:3
**communications** 118:13 239:11
**compared** 190:24
**compelled** 122:4,11 123:17 135:13 139:12
**competence** 184:9, 18
**complain** 247:8
**complainants** 169:22 170:7,23
**complained** 143:19 173:3 177:5 242:20 247:7,9 262:23

**complaining** 170:16 178:2 180:13, 17,18 181:2 262:3
**complaint** 143:20 144:13 151:16,18,19 164:19 171:25 208:10 217:8,12,14,16,22 224:17 225:6,12,17 246:2 247:12,23 253:9 264:15 273:13
**complaints** 142:24 143:23 171:21 172:3 203:8 208:13 261:18 264:9 267:5
**complete** 139:13 147:13,17 203:25 206:25 251:7
**completed** 139:15 157:21 173:11 251:20
**completely** 174:10 187:20 238:20
**complicated** 175:2
**compliment** 233:1 234:14
**comply** 170:16 223:10
**conceivable** 234:12 241:21
**concentrating** 166:20
**concept** 217:4
**concern** 134:3 152:4 172:22 271:12 272:9
**concerned** 151:15, 16,17 183:16 235:22, 24
**concerns** 136:1 152:16,18
**concession** 217:21
**concluded** 146:25 147:1 275:10
**conclusion** 211:4
**conclusions** 206:11
**condone** 273:19
**conduct** 140:10 166:11,13,20,23 168:10,11 171:4 184:8,13,17,20,21,24 185:1,2,10,14 190:4 193:18 198:7 208:5 209:9,17 218:3,6 227:21,25 251:15 273:20
**conducted** 204:22 248:11
**conducting** 185:5 201:21 222:6
**conference** 110:25
**confidential** 125:20, 22 127:15 130:9 131:2 154:3 156:17

**conforms** 176:12
**conjunction** 181:12
**connected** 137:18
**connection** 157:6 161:3 274:11
**consequence** 273:2
**consequences** 267:20
**consideration** 191:22 195:8 228:24
**considerations** 186:10 190:10 193:14
**considered** 146:17 185:23 187:17 208:21 229:8,13 272:21
**consistency** 186:10,11 190:11
**consistent** 186:17 190:15
**constantly** 197:10
**constitute** 273:14
**constituting** 232:11
**construed** 265:10
**consult** 109:11 191:1
**consultation** 190:23
**contact** 111:1,10,16, 22 113:1 116:22 138:4 140:17,18 141:1,10 142:4 159:15 168:8,11,12 171:15 172:14 207:5 208:21 212:1 228:12, 18 235:23 249:13 254:6 256:18 260:20 266:3 271:2 274:12, 14
**contacts** 171:8
**content** 172:25 218:19
**contents** 139:1 140:24 142:6 151:19 224:8
**context** 108:22 109:1,14 110:8 125:3 129:16 132:6 204:15 218:18,25 219:13 221:8 230:25 232:1,2, 6,7 238:20 246:12
**continuance** 203:24
**continue** 107:17 151:7
**continued** 107:7 203:3 204:4,5,7 206:24 254:16 255:6
**continues** 141:21
**contrary** 171:1 176:6 178:4 259:8

**conversation** 150:21 230:11 238:21 240:15,16 250:7 273:6
**coordinator** 140:4
**copy** 166:1,5 167:12 196:12 224:23
**corner** 108:14
**correct** 109:20 110:18,19 115:3 116:6 120:1 122:1,9 123:20 124:8 125:10, 11 134:21 136:3 137:8 138:5,14 146:20 152:3,24 153:2 172:6,10,12 173:6 177:9 178:17 180:20 182:24 185:19,24 186:6 188:20 190:1 193:21 197:5 207:24 208:14 210:7,10 216:8 219:9 221:24 222:6,14 223:2,5 224:10,14,23 225:8,12 227:15,23 229:10 232:4,5 237:22 242:13,21 245:13,20 247:2 248:19 253:9 256:3 257:25 258:1 259:10 261:25 271:25 272:4, 6,8,12,16,19
**correctly** 133:18 134:9 144:21 145:5,8, 10,19,20,25 179:2 240:23
**Costanzo** 108:23 127:24 128:1 134:25 141:17 170:12,15,22 171:18,25 173:3,19 177:5,14 207:8 208:12 219:24 245:9 246:1 247:17
**Costanzo's** 248:24
**counsel** 110:14,15, 18,20 111:2,17 116:24 119:10 124:8, 14 135:14 149:11,18, 19,20,22 167:20 194:12 197:16,17,19 226:21
**counsel's** 195:25
**counseling** 181:11 186:21,22 187:3,10, 16,25 188:17,22,23 192:1 193:17 199:4
**counselings** 207:6
**country** 116:13 243:11,15,17,21
**couple** 108:2,4 141:14 165:16 183:12 189:2,4 211:25 273:9,

11
**court** 173:17,23 174:14 175:3 176:15 196:5
**cover** 167:24,25
**coverage** 249:20
**covered** 134:24 150:23
**covering** 230:10
**coworker** 182:11
**coworkers** 179:1,4, 14,22 181:1,23 182:19,20 216:4
**created** 203:17
**critical** 128:3
**CRNA** 131:11,13 136:21 137:6,16 146:4 170:22 171:17 172:20 178:2 211:17, 20,25 235:2,9 240:21 268:8,15 274:20
**CRNAS** 131:16 135:25 137:11 141:6, 14 159:15 170:10,16 178:22 179:6 180:13, 18 181:2 193:11 203:8 261:17 262:3, 11,22 268:19 273:12 274:14,16
**cross-examination** 107:3,7
**current** 162:14,18 236:10 244:6

---

**D**

**D-E-I-T** 112:4
**D-E-I-T-Z-E-N** 112:3
**D-E-N-I-S-E** 112:13
**D-U-S-H-O-M** 117:17
**D.C.** 116:20,21 117:2,4
**damaging** 214:12, 17
**dangerous** 266:21
**data** 144:16
**date** 108:11 120:22 121:3 159:7 162:25 163:1 172:5 202:8 208:10 216:8,10,21, 23 217:19 223:4,11, 12 249:5 253:2,4,6 254:5
**dated** 143:10 178:15 216:25 221:17 224:9
**dates** 163:6 185:21 223:21,23 255:1
**David** 162:13
**day** 118:4 169:18 202:8 209:20 252:12, 25 254:15,16 255:6 261:24

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

| | | | | |
|---|---|---|---|---|
| **days** 223:4,16 225:18 | **describe** 245:12,13 260:13 | **discussion** 136:14 195:21 198:2,4 199:1 200:10,14 252:6 | **easy** 245:10 266:1 **education** 169:11 **EEO** 121:13 140:4,14 | **entry** 188:10 **environment** 261:8 **equal** 113:14 |

**Dayton** 116:8
**deadline** 225:2
**deal** 195:13
**dealing** 206:19
**death** 241:3
**decades** 243:12
**December** 163:2 172:6
**decide** 176:11 186:16
**decided** 225:18
**decision** 135:17 183:14 184:2 188:6 192:12 193:15 197:4 207:4,10,12 211:21 213:8 219:5 221:2,24 222:1,22,25 223:13 225:10 228:19,22 229:5
**decisions** 187:21
**defendant** 168:15
**defending** 240:13
**define** 184:12
**defined** 233:23
**definition** 145:2
**degrades** 267:13
**degree** 200:4
**degrees** 173:10
**Deitzen** 112:3
**denied** 186:22,23 191:25 230:1,2,5,6
**Denise** 112:3,12,13 113:14
**Dennis** 111:7,13
**department** 131:16 159:3 160:1,12 163:14 164:7,12 179:14 180:19 181:4, 24 182:12 224:13 225:4
**depend** 238:8,16
**depending** 245:17, 19
**depends** 234:24 237:15 238:18 245:20
**deposed** 107:5
**deposition** 107:10, 24 108:3,5,10 112:11 119:6 128:2 131:8,20 132:2 136:3,19,25 138:18 148:22 149:2 150:13 151:7 173:17, 22 174:2,16 176:17 181:7 216:18 275:4, 10
**depth** 260:3
**deputy** 117:17,21
**derelict** 173:14 182:9

**describes** 135:25 260:13
**describing** 208:22 260:11
**desire** 159:2,25 161:20
**desired** 163:13
**desist** 166:14,24 170:17 171:5
**detail** 221:8
**detailed** 226:15
**details** 204:8
**detective** 212:14
**determine** 110:9 125:6 146:14 198:16
**differences** 184:16
**differently** 273:5
**diligence** 146:16
**diminishes** 267:6
**direct** 124:18 166:9, 12,22 171:3 265:3
**direction** 135:18 172:13,17 261:18
**directions** 114:6
**directly** 111:10 116:22 117:8 138:21 173:3 177:5
**director** 112:15,20 113:4,6,7 116:10 117:3 118:4,14 119:10 121:23 166:2
**directs** 235:9
**disagree** 176:2 180:10 223:8
**disagreement** 167:5
**disciplinary** 161:3 184:16 187:4,11,14, 17 188:19 226:2
**discipline** 198:17 205:11
**disciplined** 266:15
**disclosures** 194:16, 20 196:2,3
**discontinue** 176:16
**discrepancy** 181:8
**discrimination** 136:2 217:9
**discuss** 110:11 121:14,20 122:4,12, 15 123:12 135:13 189:24 254:24 256:7 262:2 263:6
**discussed** 119:8 121:1,7,8 122:6 123:6 169:13 189:3,25 203:6 249:3,5 266:5 275:3
**discussing** 178:21, 25 179:12 182:18 209:19 257:16,20

**discussion's** 231:14
**discussions** 118:14,22 120:8,16 123:18 198:14
**disliked** 134:20
**disposed** 266:5
**disrespectful** 213:16
**distant** 113:15
**disturb** 128:8 129:8 139:3,17 147:5 158:13
**disturbing** 108:24 128:3 129:22 133:24 134:14,20 135:4,10 146:2,6 153:16 160:13
**disturbs** 129:16
**doctor** 172:20 188:3 240:21
**document** 113:21 127:17 131:23 145:21,24 169:21 178:16 183:24 195:17 202:24 210:9,11 218:1 221:12 224:9 247:14
**documentation** 149:9,13 166:17
**documented** 162:12 173:8
**documents** 137:18 144:11 147:23 169:3, 10 194:19,23 196:3
**door** 229:19 241:6 242:16
**double** 245:9
**doubt** 147:15,16 229:21 260:19 274:22
**Douglas** 195:8
**Drive** 115:6
**driving** 114:6
**due** 146:16 243:17
**duly** 107:4
**DUSHOM** 117:16,18 7
**duties** 184:21 185:6, 7

**E**

**earlier** 136:3 189:3 245:24
**earliest** 225:8
**early** 141:6 245:23
**Earth** 236:15
**easier** 113:9
**easily** 266:5,23 267:19

164:19,22 165:1,25 167:22,24 202:21 205:10,12,22 206:9, 12,25 224:17 225:5, 17 226:3,7 227:15,20
**effect** 216:15
**efforts** 133:20 134:10
**egregious** 231:17, 19,20 232:10,14 233:23 241:13 243:5 248:24
**egregiousness** 244:11
**Elaine** 170:12,15,21 171:25 173:3,19 177:5,14 207:8 208:12 219:24 246:1 247:11,17 248:24
**ELR** 197:15
**email** 110:24 144:2 217:2
**emailed** 253:7
**emphasized** 220:1
**employee** 111:19 119:22 121:13 122:12 129:20,22 134:1,17 140:12 167:24 168:1 181:12,20,21 182:6, 10 190:23 191:1,3,17 196:22 197:16 198:17 218:16 223:22 271:11
**employees** 129:22 163:10 171:7 172:15 184:14,15,25 185:14 186:12,18 190:12,16, 20,25 191:16,19 226:1
**employment** 165:25 170:10 217:9
**end** 127:15 131:2 156:17 188:10 207:12 229:17 230:13 240:15 245:6 249:1,2
**endorse** 210:21
**endorsed** 182:6
**engaged** 170:8 216:2
**engages** 266:14
**engineer** 117:1
**enter** 204:5
**entered** 172:18 189:11
**enthused** 152:12
**entire** 110:2 145:24 160:17 167:12 180:19 181:4,23 182:12
**entitled** 174:23 271:11,13

**era** 189:15 267:11
**Es** 117:12
**escalated** 259:14
**events** 141:6 208:25 266:7 273:8
**everybody's** 118:7
**evidence** 144:12,15 183:4,6 186:20,24 188:5,6 191:20 192:2, 6,7 194:11,13 195:11 196:21,25 197:21 198:15 200:22 201:6, 7,8,9 202:13 204:2,3 228:21 242:14 244:15 250:12,13 252:15
**evidentiary** 200:19 201:3
**exact** 120:22 165:1 205:22
**exaggerated** 267:5
**exception** 170:12, 14,21 177:14
**excerpt** 107:24 132:2
**excuse** 172:9 203:3 211:19 252:14 253:5
**executive** 111:11,13 113:18 114:10,12
**exercise** 226:2
**exhibit** 107:23 108:9 127:19 131:24 132:1 136:10 143:10 165:23 178:10 183:17,19 201:25 202:2 206:4,6 207:16 210:14,18 215:14 221:17 224:2, 6 228:9 253:19,23,25 264:5
**Exhibits** 228:10
**existence** 196:14
**expect** 133:19 134:9 173:10 176:20 213:23
**expectation** 187:5, 12
**explain** 107:14 137:21 175:5 177:11 204:9
**explaining** 175:25
**explains** 210:11
**explanation** 220:15
**express** 159:1 236:23
**expressed** 135:3 136:1 152:6 161:20 266:23
**expressing** 153:9
**extent** 178:1
**extreme** 245:6

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

extremely 213:16
214:10 236:11 238:21
244:7 259:15

**F**

face 232:9
facilities 116:1,3,19
facility 113:17 114:9
fact 122:24 134:17
139:25 140:2 143:2
146:10 147:3 151:16
153:22 167:6 187:18
189:4 193:14,16
197:16 199:14 210:5
214:19 219:19 223:15
243:4 249:6
factor 160:17 195:8
228:22
factors 160:8,16
facts 141:11 142:12,
13 146:9 147:19
188:7 204:2
failed 189:5 192:10
193:17 204:4
failing 190:5
failure 209:4,8,15
249:25 271:6
fair 122:2 207:2
fairly 257:4 266:4
fairness 243:21
false 144:22,24
157:21
falsification 144:16
147:2
falsified 146:11
falsifying 144:10
falsity 138:25 140:24
142:6
familiar 198:10,12
217:4
faster 213:24
fault 132:24
fear 108:22 128:1,11
132:11,15 133:6,10
134:2,4,6 135:3
153:12 157:6,9 236:7,
22,23
feared 129:2,4
134:21
fearful 128:17
129:21,23 140:12
federal 196:5
feel 122:3,11 123:17
124:13 135:13 236:9,
11 244:5,6 259:13,14
261:8
feeling 134:2 189:9
236:13 248:3 261:4
feels 139:12 140:12
261:10
felt 192:12 235:3
237:12 250:20,22

257:22
female 216:4
fence 271:24
file 139:24 183:4,6
186:20,24 188:5
191:21 192:2,6,7
194:11,13 195:11
196:15,21,25 197:21
198:15,21 200:19,22
201:3,6,8,9 202:13
204:2,3 222:19 226:3,
5 228:21 229:9
244:15 250:12,13
252:16
filed 196:4
filing 164:22
fill 137:23 185:21
filled 139:8,10
filling 137:25
final 251:20
find 114:7 147:19
227:9 234:14 249:20
250:5
finder 210:5
finding 193:14
finger 162:2
finish 110:4 112:11
129:24 200:12
finished 170:19
fire 267:22
flip 218:5 238:6
focus 108:12 247:13
focused 219:4,19
220:1 228:25
folder 242:14
folks 116:19
follow 109:22 127:23
133:18 134:9 190:5
209:4,8,15 271:6
272:22
food 241:23
forced 139:12
forget 108:10
form 217:8
formal 187:14
formed 202:21 206:8
forward 236:10
243:12 244:5
Foster 208:9 218:2
228:15 229:21 230:21
232:12 238:11
Foster's 229:15
found 108:23 160:9
225:4,11 233:7 247:3
frankly 209:24
free 108:25 180:18
frequently 261:3
Friday 215:23,25
216:7 218:9,10
252:11,21 253:12
254:5,14 256:8

friend 237:19
front 247:15 270:16
Fuehrer 107:1,7,23
183:20
full 107:12 169:21
222:19 251:6
fully 175:5,14,16,18
function 111:12

**G**

gag 189:20 190:7
261:15 262:9
gave 121:22 134:20
194:16 202:7 230:24
Gees 261:19
general 110:14,15,
17,20 111:1,17
114:11 116:23 119:10
124:8,14 135:14
167:20
generally 111:14,21
115:22 187:16
genitalia 173:9
245:13 249:18
Georgia 115:19
get all 147:23
gist 109:4
give 159:7 167:9
175:13 176:9 191:23
196:3 229:8 231:2
giving 150:20
175:25
glance 165:13,15
good 115:17 145:1
255:19
Google 114:5
grave 243:5
gravely 242:24
great 131:22 211:9
Greenspan 128:16
153:11 157:7,9,12
greet 249:22
group 119:21 137:6,
8,10,16 167:6
guard 261:3
guess 107:20 113:19
169:1 215:24 218:9
223:6 238:4
guilty 261:2

**H**

half-hour 273:25
hallway 171:20
hand 131:23 194:7
214:23 223:20 269:1,
5,11
handbook 185:16
handed 168:22
hands 171:13
268:24,25

happen 132:16
133:11,12 134:7
177:21 258:2
happened 143:21
196:20,23 229:20
243:12 257:8 273:8,
11
happening 259:17
happy 107:14
149:11 238:1
harasser 264:1
harassing 205:19
273:19
harassment 142:5
160:9,10 166:11,21
169:13 173:11 179:13
189:16 227:14,22
231:18 232:11 233:22
237:10 262:25 263:1,
5,15 264:2,10,18
265:10,13,17 266:9,
15,20,22 267:5,7,13
273:14
hard 228:7
hashtag 189:14
head 111:6 151:1
205:6
health 116:6 117:21
118:1
hear 119:17 129:16
137:5,15 139:16
140:11 164:9 228:3,6,
7
heard 157:5 168:1
176:3 226:15,17
260:15 274:7,18
hearing 196:10
200:17 201:22 202:7
203:3 206:14,17,23
223:4,11 257:23
heavy 244:11
helped 142:13
helpful 242:6 267:17
her?' 128:5 129:5
hereinafter 107:5
heroes 193:11
high 173:10 249:1
higher 152:23 153:3
highest 244:20
highly 150:14
152:17 161:8 211:10
hit 230:12 231:11
home 171:18 204:6
207:9 248:4 249:15,
17,19 250:1,5,21
251:5 255:17
home?' 256:22
honest 116:17
121:12
hope 148:5 189:8
hoping 146:1

hospital 111:20
210:1
hospitals 116:12
hours 247:19
housekeeper
267:21
housekeepers
153:1
housekeeping
191:16,18
human 167:21
hundred 274:21
husband 237:5
240:14

**I**

idea 115:14 230:19
246:2 248:13 272:3
identification
107:25 132:3 183:21
202:5 207:18 224:4
identified 163:21
181:8 186:20
identify 165:24
183:23 253:17
ignore 172:17
Il 208:5 209:9 218:3
illegal 217:10
imagine 120:23
174:11
immediately 148:23
implication 235:20
241:17
importance 124:3
important 122:16
123:24 192:17 256:17
imposed 186:11,18
190:11,15
improper 174:10
234:3
improprieties
143:14
inappropriate
140:9,10,13 150:14
170:8 184:25 190:22
193:10 198:2,4,7
205:18 208:5,23
209:17 216:3 218:3,6
227:21,25 233:16,17,
24 237:12 238:8,15
241:13,15 242:17
245:12,15 250:4
251:14 257:2 269:18
inappropriately
190:21
incident 146:15
166:18 220:6 247:4,6
incidents 229:1
include 111:19
184:24 222:3
included 163:23
205:21

## Susan M. Fuehrer (Vol II) - April 26, 2019
## Deposition

**includes** 176:21
**including** 188:10
205:18 210:25 216:12
234:13 244:1 266:16
268:19
**incomplete** 206:14,
18
**inconsistent**
139:19
**Incorrect** 248:20
**incumbent** 166:12,
22 171:3 240:4,7
**Indiana** 112:21,22
116:2
**indicating** 186:4
**indication** 170:11
177:13,20 193:18
**individual** 208:20
**influenced** 197:24
**information** 124:12
146:20 147:17
148:10,19 150:10,19
164:17 192:17 220:14
221:21 222:1,3
**informed** 170:11
177:13 216:2,8
**initial** 171:21,24
172:2 194:16 196:2
203:7 208:10,13
**initially** 140:18
143:1
**initiate** 110:25
193:10
**initiated** 273:13
**innocuous** 241:25
**innuendo** 267:18
**innuendoes** 258:11
**innuendos** 265:2
266:2
**insinuating** 195:2
**instances** 273:18
**instructed** 137:17
178:20,24 179:25
268:23 271:2
**instruction** 176:9
180:5 262:16
**instructions** 173:2
177:4
**Integrated** 114:20
115:1,2,23
**intend** 108:19 109:8
148:23 151:6 159:25
**intending** 160:11
**intention** 159:2
**intentionally**
144:21
**interest** 115:21
159:2 213:19
**interested** 212:9
224:7
**Interestingly** 253:4

**interpret** 147:9
270:16
**interpreting** 147:10
**interrogatory**
168:14 169:4
**interrupt** 107:10
**interrupting** 130:2
**intervention** 271:8
**intimating** 139:13
**intimidating** 235:15
**intruding** 150:9
**investigate** 109:16,
24
**investigated** 146:24
**investigating**
153:11,17
**investigation**
110:12 137:19 148:17
203:25 204:14,21
205:4,22 206:12,13,
15 222:5,12,20
227:20 251:7,10,19
272:7
**investigations**
152:15
**Investigator** 153:11
**involve** 184:8,17
**involved** 128:23
129:1 187:19 189:12
**involving** 118:22
216:4 220:12
**irrelevant** 187:20
**irrespective** 174:8
**isolated** 146:15
**issue** 142:14 160:20
162:11,12,14 163:24
171:23 179:17,19
192:10 218:10 251:3,
13 271:11
**issued** 262:1
**issues** 118:16
141:17 150:3,6
153:12 160:18 161:16
162:16,18 163:3
164:25 184:19 188:11
198:12 204:9 212:8
244:15 251:14 264:24
**it?'** 129:1

### J

**January** 138:6 141:6
143:10 159:9,18,20,
23 161:19 162:19
163:12 171:10 172:6
207:5 208:9,11
209:15,18,20 215:23,
25 216:7,11,21,25
217:20,21 218:2,7,8,
9,10,11 229:14
249:12 252:11,21
253:2,6,12 254:5,14,
23 256:6,8 257:7

**Jelena** 191:4,6,7
**Jersey** 224:12
225:17
**Jessica** 218:2
228:15 229:15 230:20
232:12
**job** 118:4,6 149:17
223:24
**joke** 241:7
**joked** 235:19
**jokes** 170:9 242:18
259:13,19
**joking** 240:20,25
241:4
**jokingly** 240:25
**judge** 176:5,10
**judgment** 251:21
**jumping** 133:2
**June** 120:25 223:14,
15 224:9 225:8,15

### K

**Kafer** 140:3,4 141:2
165:24 171:2 177:12,
22 178:5 203:6
205:23 210:5,15
247:3 251:10 258:15
259:9 261:19,20
**Kafer's** 210:14 240:7
**Karin** 137:5,15,22
138:24 139:8,9,13,18
151:11,14,17,20,23,
24 152:1,6 153:9
157:4,8 158:8 189:25
208:11 211:1 252:9,
22 253:5
**Kazdan** 162:13
**Ken** 164:4,11
**kidded** 235:18
**kidding** 114:8
**kind** 182:9 185:8
187:10 192:10 200:19
201:2 209:1 217:11
224:21 230:16 237:21
247:23 249:15 250:1
259:22 262:24 264:18
265:1,4
**kinds** 198:12 205:18
237:20
**knew** 144:17 147:13
202:25 211:5 217:21
**knowing** 144:22
210:22 213:8 239:10
**knowledge** 120:4,
14 138:7 139:23
169:17 183:3 199:8
203:20 226:25

### L

**labor** 111:20 119:21,
22,24 122:12 181:13,

20,21 218:16 223:22
**language** 185:17
**large** 190:19
**late** 161:16
**law** 243:18 271:3
**lawful** 107:1
**lawsuit** 196:4
**lawyer** 149:25
**lead** 131:13 146:4
**leadership** 131:14
**leading** 232:22
**leaning** 214:19,21,
24 269:11
**lease** 114:12
**leave** 172:21 189:10
204:4 211:18,19
268:11
**leaving** 240:17,18
256:10
**led** 160:18
**left** 123:4,5 132:9
164:1
**legal** 150:18,20
167:25
**legitimate** 273:6
**length** 247:22
**Leshelle** 180:1
181:16 204:22 205:4
206:8 222:5 272:4
**lessen** 199:3
**lesser** 200:2,3
**letter** 143:11 159:8,
10,11 162:8 183:20
186:21 187:3,4,12,25
188:2,4 190:10
207:17 216:23 224:3
253:7,9 262:15,16
**letters** 181:11
187:16 207:5
**level** 201:13 259:14
**levels** 163:8
**liaison** 117:3
**liaisons** 116:19
**lie** 142:16
**light** 158:13 244:11
**likelihood** 264:17
**limit** 179:5 223:2
**limited** 179:5
**Lisa** 197:8,17
**Lisan** 137:19 141:13,
15 142:5,24 143:7,14
159:2 160:1 161:20
162:5,16 163:8,13
170:8 171:8,11,15
172:8,13 173:4,8
177:6 178:3,15
179:10 180:25 181:3,
22 182:11 183:2,20
184:3 187:7 189:1
190:20 191:21 192:20
193:8 194:12 197:4,
12 198:3 202:3 203:7

204:3,8 205:13,16
207:2,7,9,17 208:23
210:6,16 211:24
212:2,7 213:9 217:23
218:22 220:22
221:13,16 222:4,8
227:14 228:20 229:3,
16,17,22 230:4 231:8
232:3,7 236:16 237:3
238:10 242:7,9,19
243:13 251:15
252:12,24 253:13
254:15 255:5,6 257:6,
8,18 258:10 259:12
261:21 262:2 268:3
274:11
**Lisan's** 153:12
220:13,15 221:9
222:4 224:16 225:5,
17 226:16 230:19
241:11 248:6
**listened** 197:8
**live** 115:13
**lives** 115:14,20
**located** 121:16,17
**location** 113:24
**long** 113:11 148:6,8,
10 176:20,23 210:2
262:17
**longer** 113:3
**looked** 210:11
**lot** 152:14 213:24
241:22
**lots** 264:22
**loud** 127:22
**Louis** 116:5 224:17
**low** 249:1
**lower** 108:13 132:9
137:3 201:13
**Lyons** 224:12

### M

**M-C-G-U-I-E-R**
111:7
**made** 135:17 137:12
140:18,25 144:18,21
146:10 147:4 160:3
170:25 178:22 187:21
190:22 193:23 194:2
196:1 197:3 198:15
204:16,21 205:22
211:21 213:8 217:15
221:2,24 222:1,22
226:25 228:22 236:11
238:21 241:7 242:18
244:6 246:3 247:12
249:16 250:25 251:21
259:12 261:17 262:22
265:2 272:3 274:17
**main** 110:21 113:13
**major** 160:20

## Susan M. Fuehrer (Vol II) - April 26, 2019
## Deposition

**majority** 226:9
**make** 107:16 128:20
133:20 134:9 135:13
140:20,21 142:15
168:1 188:6 225:10
232:11 253:24 254:3,
16,19 255:7 256:11
265:13,15
**makes** 143:2 217:8
234:20 235:15 236:17
247:23 256:19 259:19
**making** 142:4
167:11 173:4 177:7
184:24 193:14 197:4
206:21 217:11,16
219:5 229:4 249:11
253:14 267:4
**male** 173:9 245:13
**malicious** 146:17
**malicious'** 145:3
**man** 245:12
**management**
117:23 166:16 167:21
224:13
**manager** 152:23
165:25 167:22 242:21
**mandate** 179:9
**manner** 214:1
**March** 139:14 167:7
168:3,6,19 169:6,9
171:10,15 178:15
207:7 208:12 220:7
228:25 247:9,17,25
266:7
**mark** 107:20 125:20
130:6 131:24 153:23
**marked** 107:24
132:2 165:23 183:14,
20 201:25 202:5
207:17 224:3 228:9
**marriage** 237:4,8
238:1,3 240:14
**material** 149:17
**materials** 169:4,10,
18
**matter** 112:25 113:2
152:4 153:22 161:4
172:22 180:15 203:2
210:23,25 227:1
239:4 270:22 271:7
273:1
**matters** 148:24
149:7 169:13 272:18
**maybe/maybe**
260:10
**Mcguier** 111:7,17
118:23 121:23
**me?'** 256:24
**meaning** 132:11
133:6,19 138:1,24
164:3 184:15 261:16

**means** 177:21
184:22 185:1 196:2
217:7 260:14 264:3
**meant** 114:7 128:10
177:12 184:12 247:20
248:23
**measured** 161:16
**mediate** 187:1 199:2
200:3
**mediation** 186:21
187:18,20,24 191:25
192:20,22 198:10,15
199:3,6,9,10,12,17,
21,22 200:1,2,8,18
201:1,14
**medical** 121:17
122:22 140:10 144:10
146:12 161:15 162:24
166:1,2 167:3 168:8
224:18
**meeting** 168:3,5
169:7,8,11,12 195:14
196:9,24 199:16
200:2 204:20,22
205:7 221:7
**member** 257:7,21,25
258:17,21
**memorandum**
178:14,17 183:3
**mentally** 185:11
**mention** 191:24
192:1,8 257:24
271:24 272:3
**mentioned** 119:8,
18,20 124:10 153:6
161:2 170:15 261:14
267:10
**message** 168:2
189:13 193:7
**met** 112:2 115:15
118:3 201:11
**meted** 198:17
**Metoo** 189:15
243:25 267:10,11
**Metzger** 224:3
**Michigan** 112:20,22
116:2
**middle** 178:19 186:9
232:17,18 244:10,12,
18 249:1
**mild** 257:4 259:22
**mildly** 232:15
**military** 264:22
**mind** 152:9 189:14
271:4
**minor** 266:4
**minute** 117:18 123:3
212:21 252:3
**minutes** 215:9,10
**mischaracterizatio
n** 140:7 161:1 209:12
212:5 217:25 246:6

268:2
**Mischaracterizes**
189:23 209:7
**misconduct** 205:15
249:25
**misstated** 169:15
**mistake** 145:12
169:16
**mitigate** 200:16
201:12
**mitigation** 200:6
201:11
**mixed** 246:21
**moderately** 233:23
**moment** 146:22
148:22 170:1
**month** 121:5
**months** 139:24
140:25 141:15 162:23
172:18 194:17 204:6
273:9,11

### N

**narratives** 176:23
**nation's** 193:11
**national** 161:17
**nature** 143:15
178:23 198:5 216:3
217:10 251:12 267:20
**necessarily** 221:15
237:5 256:15
**needed** 171:18
188:12 248:11,15
249:20 250:5
**negative** 128:10
143:6
**negotiation** 192:9
**negotiations**
187:19
**network** 112:15,19
113:3,6,7 114:20
115:2,23,24 117:3
118:14 119:9 121:23
**networks** 116:12
**neutral** 262:18
**night** 206:17
**non-discussion**
262:19,21
**nonprofessional**
184:21
**Northlake** 115:6
**NOTARY** 177:2
201:1
**notes** 196:23 197:2,
6,8,13,14,20,23

199:5,25 221:1,7
242:12 271:22
**notice** 224:16
225:16
**noticed** 252:19
**number** 115:10
116:13 131:15 136:1
145:13 169:5 178:19
184:4 207:13 209:5,8,
9 215:20 252:10
**Numeral** 208:5
**numerous** 188:9
244:15
**nurse** 185:10
**nurses** 184:16 185:9
189:4

### O

**O'SHINSKI** 117:9,15
118:3
**oath** 107:18 128:9
146:4,5 149:12 158:1
**object** 234:5 246:24
**objected** 173:5
177:8 265:16
**objecting** 197:19
**objection** 117:5
118:19,24 119:2,13
120:19 121:9,25
122:7,18,20 123:7,21,
25 124:9 129:13,17,
19 133:25 134:15,22
135:11,15,20,22
136:4 137:9 139:5,7,
20 140:6 141:4 142:9
145:6,8 146:3,7
147:7,22 148:2,4,7,9,
14,25 149:23 150:1,7
152:5,10 157:16,18
158:3,15,19 159:12,
21 160:4,14,22
161:23 162:7,15,20
163:17 164:21 171:6
172:7 173:7 177:17,
23 178:6 179:7,15,24
180:7,21 181:6,18
182:1,14 183:10
185:25 186:7 187:23
189:22 190:2,18
192:14,16 193:20,22
198:19 199:18
200:21,24 201:5
203:11,19,22 204:1,
10,18 205:9,24 206:1
207:1,3,25 208:18
209:6,11 210:8,24
211:3,7 212:4,11
216:14,16,24 217:24
218:15 220:17
221:23,25 222:7,17,
21 225:13,20,23
226:18,20 227:2,16

229:24 230:17
231:21,24 232:16,20
233:2,5,8,13,15
234:15,23 235:6,21
236:1,8,19,21 237:17,
23 238:12,24 239:8,
14,18 241:5,9 242:8,
25 243:3,9,19,23
244:3,13,21,23,25
246:5,13 248:8,17
250:3,9,11,24 251:8,
22 254:7,10 255:14
256:4 257:13 258:12
259:23 260:2,16,24
262:12 263:8 264:12,
15,19 265:6,9,14,21,
24 266:6,25 267:15,
23 268:1,22 269:7,15
270:21,23 271:1,5,10,
20 272:1,5,15 273:3
274:9
**objectionable**
269:17 270:2,6,9
**objections** 145:14
**obligation** 140:14
**obligations** 223:21
**occasion** 138:9,11,
12
**occasions** 189:2
**occur** 193:19 217:19
234:19 241:25 245:22
248:16
**occurred** 176:13
205:5 208:25 266:8
**occurrence** 166:15
**occurring** 258:6
**occurs** 166:11,21
262:24
**odd** 139:21
**offended** 235:25
**offense** 146:12
**offenses** 186:13,19
190:13,17
**offensive** 234:18
237:21 238:8 256:16
**offer** 192:23,25
193:16 253:14,24
254:3,19
**offer.'** 256:12
**offered** 191:24
192:19 199:25 201:12
**office** 110:14,15,16,
17,20,21 111:1,6,16,
17 112:16,25 113:13,
17,18 114:10,11,12,
14,15,16,17,18 115:4
116:10,23 124:7,13
158:10 167:19 224:12
229:16,19 241:6
242:16
**officer** 116:10

## Susan M. Fuehrer (Vol II) - April 26, 2019
## Deposition

**offices** 112:18
**official** 166:16
171:12,16 187:4
197:1
**officials** 224:17
**Ohio** 110:22 112:20,
22 115:8 116:2
224:19
**omitted** 145:15
**one-sided** 211:24
**operating** 116:10
171:11 172:18
211:12,15 220:6
235:7,8,10,14 250:20
**operations** 117:21
268:18
**opinion** 191:15
208:19 209:23
**opportunity** 110:2
124:11 175:13,16
201:17 204:15 212:8
213:9 220:22 221:14
222:8 242:9
**oral** 186:25 187:1
193:23,25 196:22
198:25 199:19,24
204:12 220:24 222:9
226:22 231:3 242:9,
11 248:9 250:25
**order** 189:20 190:7
209:3 217:15 261:15
262:1,9,19,21,24
263:6 271:6 272:22
**ordered** 188:23
189:24 272:10,13,17
275:5
**orders** 190:5 209:5,
9,15
**oriented** 254:16
255:7 259:13 260:5
**original** 206:12
**ORM** 224:12
**ORS** 193:8 204:5
**overly** 152:12
**overnight** 230:10
**oversee** 116:11

---

**P**

**package** 132:8
**pages** 108:5,9
228:11
**paid** 152:17 161:9
**panel** 202:20 203:18
205:5 206:8 221:19,
22 227:1,10
**paragraph** 165:20
169:22 185:22 186:9
215:24
**paraphrasing**
197:25
**part** 130:5 134:5
142:5 145:17,18

165:19 167:2 168:18
175:21 178:2 189:21
190:9 193:13 195:10,
11 196:1,25 198:15
200:18 201:2 202:12
205:15 208:13 218:19
221:4 228:18,21
230:11 239:17 241:8
252:15 263:11 269:1
270:14 272:7 273:2
**participate** 128:21
**participated** 128:22
181:22
**parts** 229:9
**party** 201:20
**pass** 240:20
**passed** 169:18
**passing** 265:3
266:22
**past** 273:25
**patient** 144:16
172:19,22 185:11
188:11 211:16 256:9
**patients** 185:8
**pay** 188:14
**penalties** 186:18
**penalty** 186:11,17
190:11,15 191:20
199:3 200:2,3
**pending** 163:3
**people** 110:17
112:10 117:7 122:21
134:25 135:2 152:17
167:6,10 180:15
207:5 210:1 237:6
238:17 243:22 245:18
265:19 267:21 268:17
**perceived** 166:11,
21
**percent** 274:21
**perfectly** 245:4
**perform** 184:20
**Performing** 185:5
**period** 121:2 172:4
223:10 225:3 249:12
273:10
**permanent** 118:6
**permissible** 271:19
**perpetrator** 166:13,
23 171:4
**person** 110:16 111:9
117:8 190:21 197:10
273:22
**person's** 110:1
**personal** 237:19
247:19
**personally** 146:24
234:16,18
**pertaining** 118:16
**phone** 115:10
**phrase** 184:23
241:22

**physical** 113:24
244:24
**physically** 185:11
**physician** 185:2
211:17,19 230:9
235:1 240:19
**physicians** 144:3
161:9 184:15
**place** 150:22 203:4
246:4 251:19
**placing** 246:12
**Plaintiff** 107:2
**Plaintiff's** 107:23
132:1 183:19 202:2
207:16 224:2,6
**plaintiffs** 169:4
**plan** 147:21
**point** 119:14 122:6
123:4 125:9 148:20
163:24 198:22 221:9
240:13 242:15
**pointed** 214:9
**police** 139:9,10,15,
24 140:1,5,15 141:1
157:21 167:8 171:10,
13,23 188:10 207:7
208:22 210:25 212:6,
13,14 268:14 269:9,
24 270:15,20,22
271:8,12,14,21
274:15
**policy** 167:3,9,12
168:23,24 169:19
171:1,24 178:5 240:9
258:16 259:8 263:9,
10,11 273:19
**political** 243:14
**portion** 108:25
125:22 127:15 130:9
131:2 154:3 156:17
**posit** 239:11
**positing** 239:7
**position** 237:24
**potential** 242:3
263:15,16
**potentially** 241:18
242:5,6
**practice** 144:4 217:9
**preceded** 172:5
250:8
**prepared** 181:12
183:2 202:9
**present** 149:17
197:19 213:10 220:22
248:9,10 257:8,21
**presented** 218:25
274:16
**President** 234:24
**pretty** 132:16 133:10
134:6 145:1 146:12
158:17 185:24
231:19,20 263:4

266:1
**prevent** 150:4
236:16,20 258:10
**prevented** 258:13
259:3
**preventing** 262:10
**previous** 108:5,10
131:19 273:9
**previously** 134:1
165:23 178:20,24
219:3 228:8
**prior** 108:3 162:13
173:1 177:3 202:21
205:12 206:9 209:25
239:10 249:6 256:21
**privilege** 150:23
**privileged** 150:9
**privy** 147:23 148:19
**pro** 232:23
**problem** 132:25
142:16 180:25
**problems** 116:22
144:3
**procedural** 150:3,5
**Procedure** 107:4
**proceeded** 231:8
237:3
**proceedings**
197:11
**process** 107:9
192:11 198:10 243:17
**produce** 143:6
169:2 195:2
**produced** 194:9
**producing** 169:10
**production** 169:2
195:17
**professional**
152:17 184:8,12,17,
23 185:1,10,14 193:9
211:11 261:8 268:4,5
**prohibit** 182:10
**prohibited** 181:1
**prohibiting** 181:22
**pronounces** 131:10
**proper** 179:9 180:4,
9 245:1,4
**properly** 119:17
**proposal** 188:5
**proposed** 183:1
186:6,21 187:25
193:15 202:3 205:14,
20 206:10 207:20,23
208:13 210:7 215:17,
20 220:18 221:10,16
223:1 226:1,17
227:13 249:24 253:18
**proposition** 231:22
232:19,22
**propositioning**
232:21

**protocols** 167:2
**provide** 146:18
149:21 166:17 187:2
222:8
**provided** 107:3
194:10 209:16 226:21
**pull** 201:9
**punishment** 198:16
**pure** 239:16 241:8
**purpose** 107:2
192:9
**purposes** 107:25
132:3 183:21 202:5
207:18 224:4
**pursue** 144:12
**pursuing** 164:18
**pushes** 135:18
**put** 141:9,11 171:13
185:17 196:14 217:20
232:1,2,6 235:22
236:7 237:24 256:18
260:19 269:5,11
**putting** 193:11

---

**Q**

**qualified** 180:3
184:18
**question** 107:12,13
109:8,16 110:5
125:15 127:24,25
128:16,18,25 129:4,7
130:4 132:10 133:12,
18,23 137:11,21
138:1,4,11,17 139:3,
11,16 141:22 142:22
143:4,9,17,21,25
144:5,8,14,20 145:1
149:1 151:20,24,25
153:7 157:4,11,14
158:7 159:1,6,9 160:6
164:3 170:6,19
172:10 173:1,20
174:8,12,15,24 175:1,
14 176:3,19,22,24,25
177:2 180:4 184:8
189:18 190:8 196:6,
11 200:25 204:19
210:20 212:1 220:19
222:11 225:14 233:16
234:3 236:15 237:1
238:7 239:21,23
240:3,4 245:1,4
247:14 251:9,16
252:1 258:19,24
259:2 265:22,25
267:3 269:19 270:9
**questioning** 150:13
145:21,
23 173:13,16 174:1
176:8 224:8 231:4
275:1

Susan M. Fuehrer (Vol II) - April 26, 2019
Deposition

**quid** 232:23
**quo** 232:23
**quote** 230:13 261:6
**quotes** 230:14
253:23 258:4

**R**

**raise** 233:19 270:11
**raised** 264:23
**Rape** 244:20
**Raphaely** 118:16,23
128:4,11 132:12
133:6,19 134:18
135:5 136:2 137:17,
24 139:10,12 140:3,
18,22 141:8 142:3,7,
23,25 143:22 144:17,
21 151:13,15,21
152:7 153:13 157:10
158:9,11 159:1,25
161:19 162:13,18
163:13 164:3,19
166:1 171:9 172:3
173:2 177:4 178:14
179:10,21,25 180:5,
12 182:4 183:2 202:4
207:6,17 216:9
217:22 229:2 251:4
253:10 261:18 262:1
274:8,13
**Raphaely's** 141:7
158:10
**Raphaely.'** 129:3
**Raphaely?'** 128:19
**rapidly** 240:16
**reach** 211:4
**reached** 206:11
**read** 108:18,25
110:2,7,8 119:5
120:22,24 124:12,23
125:18 127:22 130:4
134:5 135:7 139:6
143:10 145:5,7,10,19,
20,21,23,24,25 146:9,
10,18 165:12 170:2,5
171:2 176:15,19
177:1 179:2 183:5
188:7 192:7 196:24
197:21 199:4 203:12
204:12 208:19 218:9
221:1,7 222:18
226:19 228:18 229:3,
7 240:6,23 246:8,14,
15,17,22 248:25
254:13 267:1 271:23
274:7,17 275:3,7
**reading** 125:17
146:25 168:13 169:5
186:14 218:4 246:17
254:12
**real** 118:11 266:20
267:6

**reality** 151:17
267:12
**realized** 131:9
**reason** 122:14
138:23 147:14,15,16
149:24 161:13,18
162:6 163:12,19,22
164:15 180:10 223:8
227:6 229:4,7,21
255:24 260:8,19
274:22,23
**reasonable** 236:7
**reasoning** 210:12,
13
**reasons** 121:22
134:5 163:20 184:7
186:4 203:17
**recall** 120:11,22
121:11,21 123:8,16
151:11 153:9 164:23
165:1 167:17 178:13
183:11 190:6 194:19
197:13,14,23 199:11
203:14 206:2 220:25
221:13 227:3
**receive** 220:14
227:4
**received** 109:25
159:10 172:13
191:19,21 225:16
**receives** 266:24
**receiving** 166:7
224:25
**recent** 247:25
**recently** 216:18
259:13
**recess** 165:6 215:12
**recipient** 166:12,22
171:3 178:2 238:10
240:5
**recollection** 123:22
141:5 162:21 190:6
198:6
**recommend** 275:6
**recommended**
188:17 258:15 259:8
**record** 108:18
136:12,15 144:10
146:12 151:1,4 165:8
170:5 175:21 176:1,
12 183:15 194:2
195:16,19,22,24
212:23,25 213:5,12,
13,14 246:13 252:3,7
**records** 151:3
**recuse** 202:11
**recused** 201:21
**reduce** 264:17
**Reece** 180:1 181:16,
19 204:22 205:4,11
206:8 222:5 272:4

**refer** 140:14
**referenced** 169:4,10
**references** 142:18
171:25
**referred** 131:13
140:17 169:6 221:1
**referring** 124:25
159:11 168:18 178:22
208:25 209:21 241:22
247:21
**refers** 169:9
**reflects** 132:13
133:8
**refrain** 178:21,25
179:12 182:18
**refused** 187:7,9
211:18
**refusing** 193:16
**regard** 108:20,21
109:9 197:24
**region** 116:11,18
**register** 264:15
**rehabilitality** 193:3
**Rehabilitation**
193:4,5
**reinvestigate**
202:21 206:9
**reinvestigated**
203:21 208:16 209:10
211:6 227:1
**reinvestigating**
205:12
**reinvestigation**
203:4,17 206:10
210:22 221:18 222:12
229:23 230:24
248:10,16 256:2
**rejected** 188:21
227:14
**related** 119:9 120:9
123:13 169:13
**relating** 185:15
**relation** 218:16
**relations** 111:20
119:21,22,24 121:13
122:13 167:24
181:12,20,21 182:6,
10 190:23 191:2,3
196:23 223:22
**relationship**
225:15,22 226:10
235:13 237:16,22
238:9,16,18 239:11
245:18,19
**relative** 121:2
**release** 120:20
**released** 121:11
**Relevance** 117:5
**relied** 223:22
**relieve** 256:22
268:15

**remark** 232:11 238:8
240:5 241:14
**remarking** 207:13
**remarks** 173:6 177:8
178:4 184:25 205:19
259:20 264:16 265:3
266:2,23
**Remediate** 200:11
**remember** 109:2
112:6 119:23 131:7
143:11 158:2 166:7
183:9 194:24 195:5
198:1 202:15 203:13
224:25
**remind** 131:8
**remorse** 189:5
193:3,17 221:3
**remove** 187:2
**rendition** 226:15
**Renee** 117:9,10,14
**repeat** 151:24
174:15 200:25 267:1,
3
**repeated** 151:25
**repeatedly** 267:10
**replacement** 250:6
**replies** 220:13
**reply** 186:25 187:1
193:24,25 196:22
198:25 199:19,24
204:12,13 220:24,25
222:9 225:3 226:22
231:3 242:9,11 248:9
251:1
**report** 112:1,10
119:4,9 120:9,17
122:5,11 123:12,18
124:6 135:24 137:23,
25 138:2,4 139:9,10,
15,24 140:16,17,25
141:9 142:4 157:21
161:17 165:24 166:15
167:8 168:9 171:8,10,
13,14,23 188:10
202:21 203:12 205:12
206:9,25 207:7,8
208:22 211:1,24
212:6,13 226:25
228:18 229:15 235:23
239:19 240:1,7
248:25 254:6 256:18
259:9 260:19 261:14
268:14 269:9,24
270:15 271:21
274:12,15
**report'** 138:1
**reported** 236:24
239:25 255:23 274:21
**reporter** 174:14
176:15
**reports** 117:8,24
118:1,2,13 121:10

159:14 207:4 208:21
228:12 249:13 266:3
274:14
**represent** 151:2
**representation**
196:1
**represented** 149:18
**representing** 190:9
197:9
**reprimand** 187:15
**request** 150:19
169:2 178:1 202:4
**required** 124:5,6
172:20
**requires** 265:18
271:7
**Resolution** 224:13
**resolve** 192:10
198:11 265:20 266:1
**resource** 167:21
**respect** 128:3
131:15 138:13 143:25
172:2
**respectable** 261:7
**respectful** 214:1
**respond** 174:18,20
201:17 222:25
260:21,23 261:1
**responded** 204:12
240:13 242:11 267:19
**responding** 201:20
**response** 162:8
163:23 168:14 202:2
211:8 220:15,23
221:15 222:10 230:20
241:11 254:18 255:18
256:11,23 259:16
**responses** 226:16
**Responsibilities**
165:20
**responsibility**
116:14,16 146:14
**rest** 185:24
**restrictions** 180:12
**result** 209:23 210:22
**resulted** 187:24
192:11 222:13
**results** 227:20
**retaliate** 132:14
133:8,20 134:10,18
217:11,15
**retaliated** 128:4
153:19
**retaliation** 108:22
128:11,18 129:4
134:3 135:4,5 136:1
153:12 157:6,10
217:4,7
**retaliatory** 143:14
144:6
**retirement** 123:14

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

return 213:24
returned 162:23,25
revealed 158:14
review 136:6 147:24
148:1 221:12,14
228:19
reviewed 144:15
188:6 204:2 254:18
256:9
reviewing 207:24
257:6
revisit 210:18
Rhonda 142:18,20,
24 143:3 144:4,6,15,
22 248:21
rid 160:12 161:7,20
162:6 164:16 243:17,
21
ring 131:19
rise 251:11
risk 193:12 267:12
Robert 131:5
136:19,21 139:21
ROC 138:1,3,13
139:1,14 142:6
Roman 208:5
Ron 113:5 202:3
248:5
Ron's 248:5
Ronald 113:9,20
116:14 274:11
room 171:11 172:18
211:15 213:17 220:6
235:7,8,11,15 250:20
268:19
rooms 211:12
rude 213:16 214:1,
11,16,19
rule 175:3
rules 107:3 167:2
runs 267:11

**S**

S-A-V-I-N-O 111:23
S-H-I-N-S-K-I
117:15
S-H-O-M 117:18
S-T 113:9
S-T-E-R-T-Z-B-A-C-
H 113:12
safety 172:22 188:11
said/he 152:13
said/she 152:13
sake 231:14
sanction 198:16
sanctions 173:23
176:18
sat 140:22
satisfied 210:19
Savino 111:23
119:25 120:10 121:16
122:4,13

scared 241:3
scheduled 206:15
secretary 117:21,24
118:1,2
section 111:23
120:2,3 122:13
128:14 153:24 166:10
181:20,21 218:17
246:16,18
seek 173:22 176:18
227:9
send 110:24 113:20
sense 140:20,21
161:25
sentence 125:18
166:10,20,25 184:7
254:13
sentences 165:16
separate 130:5,7
211:17
separated 154:1
series 123:11 141:5
253:14 273:8
seriousness 267:6,
14
service 114:20
115:2,23 167:12
236:25
serving 112:20
setting 189:7 261:7
severe 112:20
sex 230:12 231:12,22
241:24
sexual 142:5 160:9,
10 166:11,21 169:12
178:23 179:13 189:16
198:5 216:3 227:13,
22 231:17 232:11
233:22 235:19 237:10
241:16 242:17 248:2
249:23,25 251:12,14
256:13,14,25 257:9,
15,18,19 258:8
259:14 260:1,9,11,13
262:22,25 263:1,4,15
264:2,10,23 265:1,4
266:9,14,20,21 267:5,
6,13,18 273:14
sexual-like 190:22
sexually 170:8
205:19 254:16 255:7
259:13 260:5
shake 162:2
shaking 214:23
share 157:11 197:6
shared 167:13
she'd 153:16,19
162:6 174:7
sheets 169:3
shift 229:17 240:19
shocking 158:17

Shoot 115:11
short 225:3
shortly 167:8
shoulder 137:25
140:23 269:4,6,11
270:14,20,25 271:4,9,
16,19 272:11 273:1,7
shoulders 269:3
270:15
show 189:5 193:17
showed 135:21
showing 165:22
shows 192:19
side 213:10 222:4,8
230:24 248:6 271:23
sides 196:3
sign 223:15 229:16
sign-in 169:3
signature 186:2
similar 116:11
186:12,19 190:12,16,
24
similarities 231:9
237:4
simple 173:20
174:25 175:1 176:24
265:20
simply 130:4 160:2
179:5
Sindell 107:8
127:20,21 145:7,11,
16 149:3,5 150:11,15,
17 151:8 153:25
160:24 165:3,8,9
173:12,25 174:6,20
175:3,6,10,15,19,23
176:4 194:18,22
195:4,7,12,18 212:19,
22 213:2,6,14,20
214:2,4,7,16,21,24
215:3,7 224:3 233:17,
21 234:5,8 245:3
252:4 254:9,21,25
255:3 269:16,20
270:1,7 274:3,6,25
single 179:13 274:20
sir 184:6 192:25
198:21 206:2 209:14
218:20 219:16 220:10
sit 121:14,21 122:3
127:25 132:10 133:5
143:4
situation 141:18
213:7 236:11 243:14
244:6
situation.' 128:24
skip 128:13 254:21
skipped 254:20
skipping 128:7
133:16
slight 267:17

Slow 114:22
small 274:12
snippet 109:25
soapbox 174:3,4,23
sole 229:4,6
solicitations 143:13
solicited 273:12
soliciting 143:5,23
144:12
somebody's 237:19
270:19 271:4
sooner 148:5
sort 244:11
sorting 200:14
sound 223:7 235:10
241:3
sounded 195:1
sounds 118:7 168:7
232:25 235:11 255:18
257:4 261:23 272:21
source 197:13,14
space 114:12
spaced 245:10
speak 141:10 200:22
213:25 214:5 233:10,
11
speaker 238:9
speaking 141:22
197:12
speaks 201:6
specialist 182:7,10
191:3 197:15 223:23
specialists 181:13
specific 113:16,17
120:12 159:7 163:1,5
190:6
specifically 120:11
183:11 186:5 197:24
199:11 221:10,14
224:8 230:7
specifics 198:1,20
203:7,13,15 223:6
speculate 243:2,4,7
speculation 239:16
241:8 255:12 257:12
Spicer 119:4,8
120:9,17 122:5
123:12,18 135:24
spoke 167:14,15,17
210:5,16 211:16
257:8,18,23 264:25
staff 122:23 123:2,3,
9,11,14,19 168:6
188:16 257:7,21,25
258:17,21
stale 247:24
stand 117:22 151:6
208:20
standing 215:4
stands 117:17
start 125:19 132:5,20
133:1 148:12 157:2

161:10,12,16 261:21
started 230:11
starting 127:22
starts 182:21 187:14
state 204:15
stated 134:1 152:1
226:22 229:17 240:18
255:16 268:6,7
statement 122:9
140:24 175:20 176:11
202:18 216:13 231:10
236:6,9 244:8 249:16
261:16
statements 167:11
197:3 252:16 274:17,
18
states 112:20,22
116:1
stating 182:2 211:5
stay 141:14,16
step 213:1 215:6
Stertzbach 113:9,20
116:25
Stertzbach's
116:14
Steve 111:23 119:25
120:12 122:13 173:24
174:5 175:12 212:17,
25 213:11 214:18
233:20 244:25 270:11
Stokes 116:5 224:18
stop 141:20 170:12,
17,24 171:9 172:1,4
176:17 177:13 189:4
193:6 204:7 207:7
208:24 229:3
stopped 170:13
177:15 229:16 247:2
249:10
stops 175:19
story 142:15 147:13
street 114:3
stretch 264:9,11,13
strong 189:13
structure 116:11
stuff 107:21 148:13
subject 151:12
157:6 239:4
subjects 243:22
subpoena 113:22
subsequent 123:19
141:13 186:25
substantiated
144:10
suddenly 266:3
Sue 275:2
suggest 164:14
268:17
suggested 188:22
suggesting 163:11
suggestion 236:17

## Susan M. Fuehrer (Vol II) - April 26, 2019
### Deposition

**suite** 113:18 115:6,7
**superior** 111:24
**supervisor** 129:21
140:11 141:8 146:13
171:16 172:14,16,17
189:2 235:14 236:24
239:20 264:24,25
268:23
**supervisory** 131:14
190:5
**supply** 149:12
**support** 147:2
**supporting** 149:13
**supposed** 196:11
200:18 201:2 222:24
**supposedly** 204:9
240:1
**surgery** 161:10
172:19
**surprise** 158:5
268:21
**SUSAN** 107:1,7
**suspect** 181:15
**suspend** 211:22
225:19 228:23
**suspension** 162:4
183:1,7,14 184:2
186:6,17 187:2,15,22,
25 188:12,13,22
193:15 202:3 205:14,
21 206:11 207:21
208:14 209:24 210:7,
21 212:9 215:20
220:18 221:11,16
223:1 225:7,21
226:17 227:13 228:20
253:18 267:20
**sustain** 185:22
187:22 193:15 228:20
**sustained** 183:1
184:7 186:5 188:13
227:12 249:24
**sustaining** 210:21
212:9
**sworn** 107:4
**system** 116:6

**T**

**table** 214:20,25
**takes** 196:23
**taking** 143:9 185:8
240:19 251:19
**talk** 109:15,21,23,24
124:16,24 125:6,10
142:25 149:24 153:16
157:9 167:7 173:15
174:7 179:21 180:14,
18 181:3 192:13
195:15 209:3 212:18,
21,23,25 213:4
234:21 237:5,20
239:3,5 258:8 259:14

260:11 265:18 268:25
272:10,13,17
**talked** 119:4 202:19
**talking** 108:6 120:11
124:7 127:18 128:14
136:20 168:20 169:7
173:9 175:19 181:1,
23 182:11 189:20
192:9 195:7 226:4
233:21 249:18 262:4,
10 265:4 272:25
**talks** 253:1 260:13
**tardiness** 160:18,20
161:7,21 162:9 163:3,
15,22
**tardy** 161:13
**team** 169:11 261:6
**technically** 114:14
218:17
**telephone** 247:19
**telling** 128:17
139:17 146:25 170:16
176:7 188:19 193:13
233:6,24 258:10
**tells** 182:5
**tempered** 267:12
**ten** 215:9
**term** 200:1
**terminate** 173:16,22
174:2,16
**terminated** 191:17
209:25
**termination** 187:15
266:16
**terms** 231:17
**testified** 124:17
132:13 133:7 158:1
199:13 246:1,7
**testify** 128:9
**testifying** 132:10
133:5 139:21 146:5
**testimony** 109:25
110:1,4,8 129:12,18,
20 133:15 134:19
135:7,16 138:17
144:20 146:23 149:12
157:17 158:14
163:16,18 179:23
181:25 216:12 226:13
227:19
**thing** 119:5 142:20
158:20 165:12 181:10
185:8 210:2 230:9
266:10 274:20
**things** 108:2 128:2
136:7 143:6 151:3
152:19 157:24 185:23
193:2 218:22 220:13
229:18 235:19 237:20
241:23,24 243:12
266:4

**thinking** 199:3 205:2
**thinks** 245:5
**thought** 112:8 130:2
151:14 153:2 168:19
198:25 219:2 220:1
222:18 247:20
258:20,25 259:22
269:21
**thousands** 163:10
**threat** 230:16
**threatened** 189:9
**Thursday** 206:15
209:18 218:8 254:23
256:6 257:7
**time** 109:13 112:2
118:15 123:1 125:2
140:21 141:18
148:20,22 161:9,11,
12 162:17,18 163:3,4,
9 164:10,19,20,23
165:2 168:2 172:5
173:1,4 174:14
176:14 177:3,6
181:16 191:4 196:14
222:19 223:2 225:4
227:12 236:2,10
237:21 242:17 244:5
245:23 247:22 249:6,
12 259:6 268:18,20
**Time's** 165:14
**timely** 168:9
**times** 141:16 161:16
199:14 211:14 219:10
235:12 241:22
**timetables** 222:25
**tired** 255:17
**title** 112:14,15
184:14
**today** 168:14
**told** 119:24 128:20
135:9 137:22 138:10
139:25 140:4 141:11
150:25 151:5 157:5,8,
12 170:24 172:15,16
211:13 221:3 246:24
249:7,11 256:1
**tolerance** 140:8,9
**tolerated** 266:12
273:15
**tone** 214:19
**tones** 189:16
**top** 124:21,25 125:1
132:22 136:18,23
151:10 164:1 205:6
**totally** 189:17
**touch** 193:11 270:19
271:4,19
**touched** 172:20
211:16 269:3,4
270:14,25 271:8,16
272:11 273:1,6,10

**touching** 189:16
211:1 269:21,22
270:3
**track** 163:9
**transcript** 108:5,10
145:14 196:8 197:1
275:4
**trauma** 264:23
265:1,4
**treat** 185:13
**treatment** 162:24
**triggered** 152:16
**trivial** 266:22 267:4
**trivialization** 267:13
**trivialize** 266:21
**trouble** 213:6
**true** 144:23 158:16
159:24 177:25 216:20
218:13,19,22 219:2,9,
12,17,22 220:3,9
238:14,23 256:14
**Trump** 234:24
**truth** 128:17 138:25
140:23 142:6 153:10
157:17
**truthfully** 128:9
**Tuesday** 247:17
**turn** 136:9 156:19
158:21 169:20 224:21
228:10,14
**turned** 225:6
**type** 258:7
**typed** 194:6,8

**U**

**Uh-huh** 162:22
258:19 269:10
**ultimate** 234:24
**unacceptable**
189:17
**unclear** 195:25
**uncomfortable**
170:25 173:5 177:7
178:23 234:21
236:12,17 238:22
239:1,3,13,19 240:1
244:7 248:3 249:16
250:20 257:22
259:15,16,19,24
261:5 268:16
**Uncomfortablenes
s** 236:22
**undergoing** 172:19
**understand** 107:13,
15 108:21 109:22
115:25 131:17 137:10
139:8 140:16,19
144:20 150:3 152:21
159:13 169:9 175:22
198:24 202:20 204:19
210:3 214:4 225:14
229:7 234:17 250:7

259:25 265:25
**understanding**
145:2 180:17 185:16
186:24 198:14 199:24
220:21
**understands** 270:3
**Understood** 159:1
**undertones** 257:9,
18
**underway** 206:10
**uneasy** 259:17
261:8
**unfair** 214:10,11
217:8
**unhappy** 237:8
238:2
**unilaterally** 182:3
**unpaid** 186:16
**unprofessional**
214:11,12
**unredacted** 125:17,
18
**unsolicited** 242:17
**untrue** 144:17
**unwanted** 166:13,
14,23,24 171:4 173:6
177:8 265:10,12
273:15,18
**unwelcome** 178:4
240:5 264:16 266:24
273:19
**unwelcomed**
265:11,12
**upper** 133:3 158:25
**upset** 133:15
**upsetting** 128:2

**V**

**V-I-S-N** 114:20
**VA** 112:16 114:9,11
116:12 117:25 118:2
121:18 153:11 159:4
163:14 168:15 197:9
198:11 225:6,11
258:16 259:9
**Vague** 148:14
204:10 274:9
**vast** 226:9
**vein** 265:17
**Verb** 142:18,20
144:6,22 248:21
**Verb's** 144:4,15
**verbally** 166:12,22
171:3
**verbatim** 258:4
**versus** 184:21
**veterans** 114:20,24,
25 115:23 193:12
224:13,18 225:5
264:22
**victim** 243:13 264:14

**Susan M. Fuehrer (Vol II) - April 26, 2019**
**Deposition**

**view**  221:9 273:5
**violated**  189:19
260:14
**violation**  250:1
271:3
**VISN**  113:18 114:14,
16,18,19,22 115:25
116:9,24 118:4
**voice**  233:19 270:12

---

**W**

**wait**  114:22 123:3
148:12 221:21
222:11,19 248:15
256:2
**waited**  251:6
**waive**  275:5
**walk**  268:17
**walked**  242:15
257:15,19
**wanted**  107:16
108:3 113:19 128:20
136:25 164:4,11,15
167:11 181:5 237:7
255:17
**wanting**  161:10
**warned**  141:20
249:8
**Warning**  178:16
**Washington**
116:20,21 117:2,4
118:6
**wasted**  237:7
**Wednesday**  218:1,7
**weeks**  256:21 258:6
**weighed**  229:13
**weight**  229:9 274:13
**whomever**  118:15
**withdraw**  158:5
**withdrawn**  119:19
136:8 140:1 169:16
189:18 191:23 198:9
206:22 210:4 218:12
220:11 226:23,24
250:17 253:5 272:20
273:4
**witness'**  214:23
**witnesses**  180:18
211:25
**woman**  117:10
249:8 266:24
**women**  188:8 204:4
232:25 233:6,10,12,
25 234:1,13 243:11
244:1,2 264:24
**word**  107:12 115:6
145:2 182:21 199:12,
20 200:9
**words**  145:20
179:20
**work**  110:17 162:17
171:19 191:12 209:20

235:9 236:12 244:7
247:19 249:21 250:6
252:12,24 253:13
254:15 255:5 258:8
260:12 261:4,5,7,9
**worked**  115:18
187:13
**workforce**  190:19
**working**  206:16
**workplace**  245:16
261:5
**works**  220:21
**worksheet**  195:9
**world**  238:16
**worst**  244:22 245:7
**worth**  152:8 241:11
**would,'**  230:13
**wrap**  274:1
**wrapping**  274:2,4
**write**  113:9 137:18
143:6 258:4
**writing**  120:13,14
189:3 194:4 197:11
274:17
**written**  145:19
166:17 171:8 178:15
179:6 182:2,3 186:22
187:3,16 194:6 199:4
216:12 222:9
**wrong**  151:22 200:1,
9 267:24
**wrote**  139:1 177:12,
22 197:20

---

**Y**

**year**  204:24 205:1
234:13
**years**  120:4 147:25
148:5 183:12 187:13
235:20 237:8 245:24
**Yes.'**  129:6
**you?'**  241:12

---

**Z**

**Z-E-N**  112:5