## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICTG OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| RONALD M. LISAN | ) | CASE NO. 1:18-CV-0969 |
| | ) | |
| Plaintiff, | ) | JUDGE: PATRICIA A. GAUGHAN |
| | ) | |
| VS. | ) | |
| | ) | |
| ROBERT WILKE, | ) | |
| Acting Secretary of Veterans | ) | Plaintiff's Brief in Opposition to |
| Affairs | ) | Defendant's Motion for Summary |
| | ) | Judgment |
| Defendant | ) | |

Sindell and Sindell, LLP
Attorneys and Counselors at Law
Chagrin Plaza West
23611 Chagrin Boulevard, Suite 227
Cleveland, Ohio 44122
Telephone: (216) 292-3393
Facsimile: (216) 292-3577

Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment,

timely filed, is attached hereto.

Respectfully Submitted,

-------------------------------------------
Steven A. Sindell, Esq. (0002508)
Rachel Sindell, Esq. (0078463)
23611 Chagrin Blvd., Suite 227
Beachwood, Ohio 44122
Tel: (216) 292-3393:
Fax: (216) 292-3577
Email: info@sindellattorneys.com

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………………………………………………ii

STATEMENT OF FACTS………………………………………………………………………………………1

LEGAL ARGUMENT……………………………………………………………………………………………26

CONCLUSION…………………………………………………………………………………………………… 30

## TABLE OF AUTHORITIES

### CASES

Asmo v. Keane, Inc., 471 F.3d 588,593(6th Cir., 2006)..........................................................................29

Burlington N. & Santa Fe Ry. Co. v White,, 548 U.S. 53, 60-61, 67 (2006)........................................29

Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 707 (6th Cir., 2008)……………………………27

DiCarlo v. Potter, 398 F.3d 408, 421 (6th Cir. 2004)..........................................................................29

Goller v. Ohio Dept. of Rehab. & Corr., 285 Fed. Appx. 250, 257 (6th Cir., 2008)..........................................29

Rodgers v. Cty of Cleveland, 2006 U.S. Dist. LEXIS 60574 (U.S.D.C., N.Dist. of Ohio, Eastern Div., 2006)..27

Washington v. Marymount Hosp., Inc., 2010 U.S. Dist. LEXIS 9265, (U.S.D.C., N. Dist. of Ohio, Eastern Div., 2010 at *19-20)..........................................................................27

White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789 (6th cir. 2004)..........................................27

Younger v. Ingersoll-Rand Co., 2013 U.S. Dist. LEXIS 170313 (U.S.D.C., So. Dist. of Ohio, Western Division, 2013)..........................................................................27, 29

### REGULATIONS

VA Disciplinary and Adverse Actions Policies..........................................................................23, 34

VA Sexual Harassment Policies..........................................................................18

## STATEMENT OF FACTS

Preliminarily, please note that Plaintiff is providing evidence related to his Reasonable Accommodation Request and sex and disability discrimination claims as part of his proof in support of his retaliation claim. The only claim of relief he is pursuing is his retaliation claims arising out of his protected activities related to Reasonable Accommodation, Sex and Disability Discrimination.

The evidentiary record in this case presents proof which, if believed by a jury, would support the following factual conclusions:

(1) Plaintiff Dr. Lisan was a board certified anesthesiologist from 1990 to 2006 at MetroHealth, and from 2006 to the present time at the Louis Stokes VA in Cleveland (hereafter the "VA") (Doc. 44,Lisan depo 15, 27). During his entire career preceding the arrival of Dr. Susan Raphaely as Service Chief of the VA Department of Anesthesiology in January 2015, Dr. Lisan had never been disciplined, nor even accused in 25 years of practice of any sexual or inappropriate misconduct toward other employees or co-workers. (e.g., id. at 24)

(2) Dr. Lisan was formally diagnosed as suffering from OCD (Obsessive Compulsive Disorder) with related depression and anxiety in 2016. However, he had been aware of indicative symptoms for as much as the previous 20 years. However, he sought treatment in2016, when his condition became so disabling that he was unable to function in ordinary life and certainly could not work. (id., 34-37).

He last worked until his vacation in July 2016. Using a combination of sick leave, personal time, vacation and FMLA, he undertook treatment. This included an intensive in-patient stay for specialized treatment of OCD and related conditions at Rogers

1

Memorial Hospital in Wisconsin from approximately September 7, 2016 (id., 46 and 74)

to mid-November 2016. He returned to work at the VA on December 7, 2016 (id., 123

and 136) after a continuous total absence of approximately 5 months. Dr. Lisan's FMLA

available leave was almost exhausted when he returned to work. He had 2 weeks of

FMLA left (until December 21, 2016) and would not become eligible for another 12

weeks of FMLA until September 25, 2017. (Exh. 82)

      (3) Dr. Lisan made significant progress during his medical leave in developing

modalities to cope with his OCD, depression and anxiety. When he returned to work at

the VA on December 7, 2016, he was fully able to undertake full-time daily

anesthesiology and practice in the OR. However, his physicians and providers believed

that on a temporary basis, Dr. Lisan should gradually acclimate himself to the

resumption of full on-call service, where the lack of sleep and long hours of on-call

readiness risked "flooding", which essentially means overstressed and overburdened

before the readjustment to full daytime hours plus  additional call duty was complete.

(Dr. Kramer and Ms. Marciano's reports, [Exh. 83] and Kramer Form Response, Pl's

Exhs. 17 and 83). Dr. Lisan had conversations with Dr. Raphaely in November 2016,

before his return to the VA; he explained to her his need to gradually increase and

adjust to taking full call. **Dr. Raphaely repeatedly told him that no-call was doable**

**and should be no problem.** She urged Dr. Lisan to request a no-call reasonable

accommodation and support his request with medical backup. (Doc. 44, Lisan, 125-

130). As soon as Dr. Lisan requested no call duty and supplied his medical support for

it, Dr. Raphaely changed her mind about Dr. Lisan's request for a reasonable

accommodation of gradual resumption of no-call. Suddenly, what was no problem and

"doable" became impossible. Dr. Raphaely emailed the HR Representative Ms. Zekanovic and the Local Reasonable Accommodation Coordinator (LRCA) as follows:

"Taking call is an essential function of his position ...We do have one position for a full time, no call anesthesiologist... but that position is currently filled. Therefore, I would request that if Dr. Lisan is indeed unable to perform the essential function of his position you could assist him in alternative reasonable accommodations". (Pl's Exh. 10)

What was the "alternative reasonable accommodation"? This is shorthand for someplace outside of the Anesthesiology Department at the Cleveland VA.

(4) This was not the first time Dr. Raphaely tried to force Dr. Lisan to risk his health. In 2015, Dr. Lisan began experiencing "more and more severe" "unstable angina". He also experienced "Shortness of breath and fatigue. It was getting worse and worse."(Doc. 44, Lisan 49-52) Dr. Lisan's physicians recommended an endarterectomy, which involves putting in two stents. Despite Dr. Raphaely's hostility, Dr. Lisan had the surgery done. According to Dr. Lisan's testimony:

"And Dr. Raphaely made it very clear she didn't want me to take off any time from work. I explained to her this is unstable angina. She said well, I can't give you any time. I can only give you these two days. I said I need to get these done. When can you get back. I need you back. My procedure was Tuesday, I need you back on Thursday." (Lisan, p. 51, ll. 14-21)

Dr. Lisan further testified:

"I had the procedure done. I had two stents put in, that's an endarterectomy. Basically they cut out the plaque in the arteries. And I believe it was December of 2015. And because I was having still some chest pain afterwards they kept me in the hospital, did another stress test. I called Dr. Raphaely and she made clear that she was very unhappy with me for having to stay in the hospital and not being immediately back to work. Even though I told her I was having chest pain, she made it clear she was not happy and she was angry at me for that. So that's the kind of thing that was going on." (Lisan, p. 52, ll 7-21)

(5) Dr. Raphaely's and VA attorney Lisa Clark's interference with the Interactive

3

Process, LRAC Bruce Kafer's condonation of it, Dr. Raphaely's intentional misapplication of the difference between gradual resumption of call duty as part of an overall position of anesthesiologist and twisting Dr. Lisan's request into one for a totally new "no-call" anesthesiologist POSTION without any consultation with Dr. Lisan is noted to demonstrate that Dr. Lisan's written complaint and objection dated January 6, 2016 ( Exh. 47) to Dr. Raphaely's disability/reasonable accommodation discrimination was premised upon good faith and a reasonable factual basis. It relates to a pattern of retaliation and reprisal against Dr. Lisan by Dr. Raphaely and others for making a written complaint and objection to discrimination.

(6) There is likewise abundant evidence that Dr. Raphaely had a bias against male anesthesiologists and unlawfully discriminated against male anesthesiologists because of their gender. Just before Dr. Raphaely became Service Chief of the Department of Anesthesiology at the VA, the full-time Anesthesiology Staff was comprised of 11 males and 2 females. (Doc. 41, Moss, 129-130) After Dr. Moss, a Staff Anesthesiologist, resigned on April 12, 2018 (id., 18), there remained 11 full-time Staff Anesthesiologists at the VA, 4 male and 7 female. (id., 132-133). So from January 2015 (when Dr. Raphaely became Anesthesiology Service Chief to April 2018, when Dr. Moss resigned, in less than 1.5 years, "Seven anesthesiologist left, six of whom were male, one of whom was female, replaced by five female anesthesiologists and one male", (id., 132-133) Dr. Raphaely "just unilaterally hired people, didn't confer with anyone". (id., 152-153) Dr. Raphaely put up a poster in her office mocking male workers as lazy compared to female workers. (id., 155-156). Dr. Raphaely, referring to a male anesthesiologist she hired, Dr. Matt Kellums, told Karen Wright, an RN at the VA in

4

approximately 2016-2017, "that nobody can accuse her [Dr. Raphaely} of being biased or sexist" because "she has hired Matt Kellums", as her "token" male. (Doc. 38, Wright, 17-19) Dr. Moss testified that Dr. Raphaely "has a very negative opinion of men". (Doc. 44, Moss, 123, l. 24).  Dr. Moss, from personal contact and knowledge concerning the massive departure of male anesthesiologists replaced by Dr. Raphaely's unilateral hires of female anesthesiologists, testified to his personal knowledge of the reasons these numerous male anesthesiologists left the VA during the first 16 months of her tenure as the Service Chief. One by one, Dr. Moss described how in most cases each of several male anesthesiologists left the VA because they claimed to have been abusively and unfairly mistreated by Dr. Raphaely and feared her threatening misconduct. (id., 133-140); (Doc. 35, Myers, 27-28).

(7) As with Dr. Lisan's written complaint and objection to Dr. Raphaely's disability discrimination, the purpose of the aforementioned explication of Dr. Raphaely's sex discrimination is to demonstrate that Dr. Lisan had a good faith and factually grounded basis to include Dr. Raphaely's sex discrimination in his written complaint of January 6, 2016 to Dr. Altose (Medical Chief of the Staff) and Ms. Fuehrer (VA Executive Director). ( Exh. 47)

## RETALIATION

We have now set the stage for Plaintiff's claim for relief in this case, to wit, retaliation/reprisal against Dr. Lisan for complaining about disability and sex discrimination, pursuing an EEO Complaint and/or pursuing a reasonable accommodation request.

Dr. Raphaely's retaliation against Dr. Lisan is not an isolated event. On June 18,

2018, Brenda Spicer issued a "Climate Assessment" based upon an extensive review of

the Anesthesiology Service of the VA. (Exh. 27) (Exh. 27 is a redacted version; the

unredacted portions are subjects of a Protective Order which is electronically filed as

Exh. 84, Sealed Document A.)

Ms. Brenda Spicer met with three separate groups of anesthesiology employees,

including techs, CRNAs (Certified Registered Anesthesiology Nurses), Dr. Raphaely,

anesthesiologists, and other management employees. She also met in one-on-one

interview sessions. (Exh. 27, "Action", first-page). This Report was a result of CRNA

complaints concerning Dr. Raphaely.

These are some of the findings regarding Dr. Raphaely:

" Many CRNAs indicated that about a year or a year and a half ago, Dr. Raphaely's actions began to change. Their initial impression of her changes to the operation changed from being one who cared for them as employees and wanting to make sure they were treated with respect by others to becoming someone who is **vindictive, retaliatory, hostile, discriminatory and divisive**. They noticed that whenever someone questions her, she gets upset. If she is proven wrong, she retaliates and penalizes the entire CRNA group and she takes away privileges by creating policies that are confusing." (p.4)(emphasis added)

"Yelling and condescending tones: The majority of the CRNAs describe her yelling as "a lot", "it's not uncommon" and "multiple times".  (p. 4)

"It is important to note that dissatisfaction among one, two or five employees many times would not be considered significant, depending on the concerns. But, there are fifteen CRNAs who have concerns with the common theme of **experiencing fear of retaliation,** policies that seem to be implemented as a punishment for the entire group and contrary to the Master Agreement, constant reminders of how much money they make and constant reminders that they can find another job if they are dissatisfied. " (p. 13) (emphasis added)

There are specific examples of Dr. Raphaely's retaliatory abuse of an injured

employee who needed to be off work for valid medical reasons. (Jessica Foster, CRNA,

Report, No 5, pp. 6-7, Exh. 27) (Doc. 37, Foster, 31-36). Although Ms. Foster denied

being "angry" at being forced to work as a phone secretary, outside of her job

6

description, contrary to her physician's order because the metal wedged into her right thumb and post-surgery condition precluded anesthetist activities, Dr. Moss testified she was beyond angry; she was "livid". (Moss, 45-46)

According to the Report the harsh characterizations ("vindictive, retaliatory, hostile, discriminatory and divisive") represented the views of the vast majority of CRNAs. In addition, a number of CRNAs agreed with the Report's characterization of Dr. Raphaely's retaliatory pattern whenever someone criticized or questioned her. They all testified to fears of retaliation against them from Dr. Raphaely if she learned of their testimony in this case which was critical of her.  (Doc. 35, Myers, pp. 34-36; Doc. 33, Constanzo, 30-32 and 79; Doc. 36, Frankito, 42-46;  Doc. 39, Bearss, 31-32,54, l.25-57; Doc. 41,Moss, 41-43; Doc. 31, Bonfili, 45-46; Doc. 40, Reese 118, and Doc. 32, Verb, 31-32);

Mr. Robert Bearss, a CRNA, was and is the Chief Nurse Anesthetist with supervisory responsibilities over the CRNAs. He reports to Dr. Raphaely. (Doc. 39, Bearss, 16-17). Mr. Bearss' testimony supported his view that Dr. Raphaely was both vindictive and retaliatory toward employees with several specific examples. (His testimony applicable to Dr. Lisan will be separately set forth hereafter). When Laurie Frankito, a CRNA, attended a VA conference for CRNAs for four days which included a weekend, Dr. Raphaely refused to authorize her to be compensated for the time at the conference. Mr. Bearss told Dr. Raphaely that Ms. Frankito was entitled to be compensated per VA policy. Dr. Raphaely was notified officially that Ms. Frankito was entitled to compensation, forcing Dr. Raphaely to authorize the pay to Ms. Frankito. Thereafter, Dr. Raphaely, to avoid paying compensation, precluded all CRNAs from

ever travelling to any VA conferences. Mr. Bearss thought this was vindictive and retaliatory on Dr. Raphaely's part. (id., 32-36) (Spicer Report, Exh. 27, p. 5,).

Another example was Dr. Raphaely's attempt to remove a Physician-CRNA office lounge area where during downtime, anesthesiologists and CRNAs chatted together and relaxed. It appeared to Mr. Bearss that Dr. Raphely didn't want her employees to be "united" and that removing a location where they would gather and chat was a way to "separate" them. (Doc. 39, Bearss, 36-38) (Spicer Report, Exh. 27, pp. 8-9)

Another example was the Friday before Labor Day 2017 when the operating rooms were "extremely busy". Dr. Raphaely instructed Mr. Bearss to mandate Rhonda Verb, a CRNA, to stay beyond the end of her shift. Dr. Raphaely asked Mr. Bearss if instead of Rhonda Verb staying beyond her shift, Dr. Raphaely should stay and fill in the extra support. Mr. Bearss told Dr. Raphaely to stay and fill in because Dr. Raphaely is a salaried employee and the Chief of the Anesthesiology Department. Rhonda Verb is an hourly employee. Upon hearing Mr. Bearss' view, which Dr. Raphaely herself solicited, Dr. Raphaely yelled at Mr. Bearss in front of other physicians as loud as "at a football game". Dr. Raphely said that the CRNAs '"were the most unprofessional group of CRNAs she ever worked with". (Doc. 39, Bearss, 38-40) (Spicer Report, Exh. 27, pp. 9-10)

Another example of Dr. Raphaely's retaliatory retribution, for believing she was slighted, involved Rhonda Verb. Dr. Raphely took umbrage because she thought Ms. Verb was rude and disrespectful to her because Ms. Verb, on some occasions, did not say "hi" to her in the morning when Ms. Verb walked past Dr. Raphaely in the facility.

(Doc. 32, Verb, 54-55). Dr. Raphaely also through Ms. Verb acted in a "cavalier" manner. (id., 46-48) Dr. Raphaely never discussed any of this with Rhonda Verb prior to calling her in for a serious meeting about potential discipline. (id., 57-58) The meeting took place in November 2018. (id., 36) But the meeting was not only about Ms. Verb's supposed rudeness in not saying "hi". There were two issues: rudeness and **falsification of medical records on the part of Ms. Verb.** These were both taken up by Dr. Raphaely at the same meeting at the same time with Ms. Verb. Of course, for a CRNA to be disciplined for falsification of a patient's medical record is a professionally lethal consequence with a risk of serious license sanctions, including possible revocation. (id., 38 and 42). The claim of falsification was so patently bogus that a simple review of the times and records would have ended the whole matter (and ultimately did end it). It was just a matter of two separate monitors at two separate times, one in the OR and the other in the PACU. (id., 39-50). Ms. Verb told Mr. Bearss that Dr. Raphaely fabricated a bogus falsification charge against her because Dr. Raphaely thought Ms. Verb was rude to her. (Doc. 39, Bearss, 16).

Mr. Bearss offered stunning testimony regarding Dr. Raphaely, which is consistent with (and parallel to) her treatment of Dr. Moss and Dr Lisan:

" **Q. Had that ever happened with Dr. Raphaely before where she came to you soliciting complaints?**
A. Yes.
**Q. Who did she do that with respect to?**
A. She sent an email to all the physicians asking if anybody had any problems with Rhonda Verb's practice.
**Q. Okay. Did you or do you believe that that was retaliatory against Rhonda Verb?**
Ms. Johnson: Objection. You may answer.
A. Yes.
**Q. And why do you believe that?**
A. Because the accusation of falsifying a medical record wasn't substantiated by the documents that she had so she was soliciting more evidence to pursue that complaint.

9

**Q. Is it your belief based on the evidence you reviewed regarding Rhonda Verb's alleged falsification of data of a patient that Dr. Raphaely knew that the claim was untrue when she made the accusation?**
Ms. Johnson: Objection. You may answer.
A. Yes.
**Q. So if I understand your testimony correctly, Dr. Raphaely intentionally made a false accusation against Rhonda Verb knowing in advance that it wasn't true, but rather that it was false, is that what you're saying?**
Ms. Johnson: Objection. You may answer.
A. Yes.
**Q. Would that be a pretty good definition of your understanding of the word 'malicious"**
A. Yes.  (Bearss P.80, ll.24-25, P. 81, ll. 1-25, and P. 82, ll. 1-9)

" A.  Dr. Raphaely approached me to ask Ronda if she had any complaints about Dr. Lisan and, if so, to talk to Dr. Raphaely, and initially when she asked me that I didn't think anything about it, but after the fact it makes me wonder why she asked me to ask Rhonda.
**Q Uh-huh. As you sit and wonder about that, does it appear to you that she was soliciting negative things to produce and write about Lisan**?
Ms. Johson: objection. You may answer.
A. Yes.
**Q. Okay and do you see that as--withdrawn. Taking into account what you just read, dated January 6th, 2017, Exhibit 31, does it appear that these solicitations for improprieties against Dr. Lisan were retaliatory in nature?**
Ms. Johnson: Objection. Foundation and calls for speculation. You may answer.
A. Yes.
**Q. And why do you believe that?**
Ms. Johnson: Same objection. You may answer.
A. Because she asked me to ask somebody who hadn't complained if they had a complaint.  (Bears P. 79, ll. 23-25 and P. 80, ll.1-23)

See also Exh. 85 which we have chosen to electronically file as Sealed

Document B sent by Dr. Raphaely to every anesthesiologist in the VA. It is a direct

solicitation for "dirt" on Ms. Verb. According to Mr. Bearss, "because the accusation of

falsifying a medical record wasn't substantiated by the documents she [Dr. Raphaely]

had **so she was soliciting more evidence to pursue the Complaint"**. (id., 81, ll. 12-

15) (emphasis added)

10

## RETALIATION AGAINST DR. LISAN

We have chosen to describe in detail the background of Dr. Raphaely's pattern and practice with CRNAs, who are highly skilled professionals with certified expertise in anesthesiology. They put patients to sleep and monitor them in the OR, sometimes without the presence of a physician-anesthesiologist. It is not surprising that the same retaliatory pattern and practice of Dr. Raphaely occurred with respect to  Dr. Moss and Dr. Lisan, two experienced anesthesiologists who have each practiced for decades.

The kind of proof of retaliatory intent on the part of Dr. Raphaely against Drs. Lisan and Moss is extraordinary in this case. On January 6, 2017, this attorney (then representing both Drs. Lisan and Moss), wrote letters of complaints to Executive Director Ms.  Fuehrer and Chief of Staff Dr. Altose. (Lisan-Exh. 31 and Moss-Exh. 47), both claiming and objecting to statutorily prohibited discriminations by Dr. Raphaely. Both letters were sent by email and by U.S. Priority Mail.  (Exhs. 31 and 47)These letters were promptly provided to Dr. Raphaely. (Doc. 49, Altose, 77-78)

After the letters were sent out on January 6, 2017, **Dr. Raphely told Mr. Bearss that she wanted Drs. Lisan and Moss "out of the department".**  (Bearss, 99-101) Mr. Bearss has been characterized as a person of "the highest integrity." (Doc. 32, Verb, 32, I.5) The Court should consider the import of Mr. Bearss' testimony under oath. He is a current employee testifying against his immediate superior, his Department Head, who has demonstrated a widely recognized pattern of retaliation against any employee who crosses her. Mr. Bearss and several other **current** Anesthesiology Department employees have demonstrated manifest courage by their willingness to be candid and open in their testimony in the face of a threatening risk of retaliation. Their

11

testimony should not only be assumed as true and viewed in the light most favorable to Plaintiff who is opposing Summary Judgement; it should be fully credited by the Court.

Within a few days after January 6, 2018, Karin Bonfili, CRNA, provided Dr. Raphaely with a story about how Dr. Lisan made her uncomfortable. Apparently, she spoke to Dr. Raphaely on January 9, 2017 about a verbal exchange which occurred 3 days earlier on January 6, 2017. (Doc. 31,Bonfili, 84) Ms. Bonfili was hired at the Cleveland VA in November 2014 (id., 12). She remained until May 2016, transferred to the Phoenix VA and stayed there only a few months, thereafter returning in August 2016 to the Cleveland VA. She has continued to work at the Cleveland VA, including to the present time. (id., 13) She was grateful to Dr. Raphaely for doing her the favor of facilitating her request to transfer back from the Phoenix VA to the Cleveland VA in August 2016. (id., 55-56)

Ms. Bonfili told Mr. Bearss that she felt a "duty" to Dr. Raphaely for giving Ms. Bonfili her job back in Cleveland. (Doc. 31, Bearss, 87-88)

Before Dr. Lisan's return from medical leave on December 7, 2016, Ms. Bonfili had worked with Dr. Lisan for well over a year in 2015-2016. (Doc. 31, Bonfili, 85) Although Ms. Bonfili claimed that Dr. Lisan would tell jokes with sexual innuendos (id.,86),  Ms. Bonfili did not feel sexually harassed by him. (id., 86) She never was offended. (id., 89) She never felt the need to report to management a complaint about anything Dr. Lisan said, and she never told Dr. Lisan to stop the jokes or that she found anything he said unwelcome. She could not recall any off-color remarks made by Dr. Lisan. (id. 88-90) In fact, Mark Myers, a CRNA who worked with Dr. Lisan in patient surgeries on many occasions, testified quite to the contrary of Ms. Bonfili regarding Dr.

12

Lisan's conduct in the OR, to wit:

**"Q. Through the time that you've been at the VA and obviously worked in the operating room, did you hear CRNAs from time to time make off-color remarks?**
A. Yes.
**Q. Even of a sexual nature?**
A. Yes.
**Q. Would that include anesthesiologists from time to time?**
A. Yes.
**Q. Would that include surgeons or physicians from time to time?**
A. Yes.
**Q. Does Dr. Ron Lisan stand out in your mind as somebody who was particularly frequent and vocal with off-color remarks in the operating room?**
A. Quite frankly, not at all.
**Q. Less than others?**
A. Less than others. (Doc. 35, Myers, P. 44, ll.7-25)

Ms. Bonfili never stated directly to Dr. Lisan -ever-that anything Dr. Lisan did or said to her was unwelcome or upsetting. (Doc. 31,Bonfili, 76)

Nevertheless, immediately after Dr. Lisan's letter of discrimination complaints and objections directed against Dr. Raphaely was sent (Exh. 31), Dr. Raphaely procured four Reports of Contact (ROCs from four female CRNAs); (Exh. 34; Doc. 31,Bonfili, January 11, 2017; Doc. 37 Foster, Exh. 46, January 10, 2017; Doc. 32, Verb, Exh. 4, undated but estimated by Verb as January, February or March 2017, depo P. 24: Costanzo, Exh. 29, early January, 2017; Doc. 33, Costanzo depo. 80; Doc. 32 Verb Depo, 80). These ROCs supposedly established Dr. Lisan's "sexual harassment" of each of these four CRNAs.

Why these particular CRNAs and why at this particular time? The timing is clear: it was an immediate response of Dr. Raphaely to the written criticism of her in the communication to her superiors by Dr. Lisan. Moreover, these CRNA's in early 2017 were a small clique of CRNAS, "the clique I like to call them, Jessica [Foster], Elaine [Costanzo], Rhonda [Verb] and Ms. Bonfili". (Doc. 35 Myers, 31). This "clique" of

13

CRNAs (out of a group of approximately 16) were the "favorites" of Dr. Raphaely at this time, which can be understood as being Dr. Raphaely's sycophants. (Doc. 39, Bearss, 52-53). Gathering ROCs against any employee who disagreed with or criticized Dr. Raphaely was part of her retaliatory modus operandi. Dr. Moss aptly described it in his testimony:

"if she heard any complaints about me she immediately would get on the phone or go in person to whatever she had to do and get report, **get them to fill out a Report** of Contact...And what she's trying to do is by **soliciting Reports of Contacts** from people whenever there was a disagreement is to stir up the problems and create more hostility, to create more distrust, and in my personal feelings more insecurity, more unrest. That's not the purpose of a service chief, but that was her purpose" (Moss, 63, ll. 24-25 -64, ll. 9-15); (See also Doc. 41, Moss, 159)(emphasis added)

The same pattern of gathering dirt was applied by Dr. Raphaely who was unable to find enough evidence of falsification to retaliate against CRNA Rhonda Verb. (See Exh. 85, Sealed Document B.)

Was the timing of these ROCs, **right after Dr. Lisan's complaint**, a mere unrelated coincidence or did Dr. Raphely solicit these reports? This is an obvious jury question of fact.

Of considerable importance is whether these CRNA reports were fabricated, grossly distorted and exaggerated or actually true. As will be shown hereafter, there are serious credibility issues about the veracity of these CRNA reports. Again, there these are jury issues, not summary judgment issues.

Dr. Lisan denies Ms. Bonfili's assertions. The so-called fact finding investigation by the EEO Coordinator, Mr. Kafer, did not include any discussion with Dr. Lisan about the ROC's accusing Dr. Lisan of verbal sexual harassment or even "inappropriate" remarks. Although he reviewed Ms. Bonfili's written ROCs of January 11 and March 8,

14

2017 (Doc. 34, Kafer, 190-192), Mr. Kafer recalled no conversation or interview with Dr. Lisan about the specific contents of those accusations. (id., 193-197 and 200-202). In concluding that Dr. Lisan made "inappropriate" remarks to any or all of the CRNAs, Mr. Kafer made the "assumption" (id., 200, l. 19) that every word and context stated by each CRNA was true, **without even obtaining Dr. Lisan's recollection of the same alleged events.** That is why Ms. Reese undertook a second investigation. (Doc. 40, Reese, 29-30) On March 13, 2017, Mr. Kafer's EEO Report finding "inappropriate remarks" was issued (although the official finding was that nothing said or done by Dr. Lisan rose to the level of sexual harassment.) (Exh. 86) (Exh. 6, p. 5)

On March 20, 2017, Dr. Raphaely issued a "Proposed Suspension" to Dr. Lisan for a whole series of events from early January through March 8, 2017, (Exh. 64) The basis was failure to follow orders by allegedly speaking to Ms. Bonfili and Ms. Costanzo about these events after being told not to do so, plus alleged inappropriate and disruptive conduct, which simply reiterated the various complaints of the CRNAs. At this point, nobody had ever asked Dr. Lisan about his side or response to any of these charges or accusations.

On May 11, 2017, Dr. Lisan was present at a meeting with Dr. Altose (Chief of Staff) to respond to the charges in the proposed suspension issued by Dr. Raphaely. There is no transcript of what Dr. Lisan stated. A VA representative took **incomplete** notes that were supposed to summarize Dr. Lisan's presentation. This is not a reliable transcript. (Exh. 87) Dr. Lisan submitted a short written statement given to Dr. Altose. (Exh. 79) It requested him to recuse himself as the reviewer of the Proposed Suspension. More importantly, it asked him to delay his meeting and review until the re-

15

investigation, to be done by the EEO office, was completed. Those requests were disregarded.

On June 20, 2017, (five days after the VA Office of Resolution Management, "ORM", notified on June 25, 2017 the VA and Ms. Fuehrer of its acceptance of Dr. Lisan's EEO Complaint, (Exh. 81), Ms. Fuehrer dated (and in July 2017 issued) her Decision confirming Dr. Lisan's suspension without pay for 10 days. (Exh. 78) He served that suspension and lost the pay. (Doc. 44, Lisan, 296-297)

The credibility of Karin Bonfili's accusations against Dr. Lisan is questionable. Regarding her January 11, 2017 ROC (Exh. 2) Dr. Lisan's sworn testimony is to the contrary. Dr. Lisan said:

"...this is gross misrepresentation of what I had said and implied nothing of the sort. Again, the closer quote I have written down, because I wrote it down around that time to clarify it. But Ms. Bonfili was--she said Dr. Lisan, I'm having a really bad day. Can I go home and start over again. And I said, yeah, sure take me with you because I want to go home and go to bed and start over too. That was it". (Doc. 44, Lisan, 268-269)

Dr. Lisan further testified:

"**Q. Do you recall what Ms. Bonfili is describing in this paragraph?**
A. Not the specific incidents, no. Her phrasing of my response is incorrect. It was similar to what I said before, are you going to relieve me. **I said what it worth is to you. I say it to males, females a lot of times the same kind of thing.** Everyone I ask, I say either food or money, preferably food. That's usually my answer.
    And as far as going on about unless you make me a better offer, she asked am I going home. I said, yeah, I'm tired. **I want to get the heck out of here unless you make me a better offer that was not meant as a sexual offer in any way. I was tired. That was it. That's all that's involved.**
    A specific date I don't know. I remember having that kind of back and forth.
Q. **So the context is different than what Ms. Bonfinili described here?**
A. Yes..."(Lisan P. 270 ll. 2-23) (emphasis added)(See also Reese, 70-72)

Karin Bonfili was herself, by no means, immune to initiating physical contact and making sexual innuendos. As Dr. Lisan testified:

"... I actually was coming back from my father's funeral, and this should have been a seven day mourning period. I came back to work and I was still in mourning. She

16

actually came up and gave me a **big hug**. And another nurse, Erica O'Malley, came up and gave me a **big hug** and the three of us were hugging. Karin said to me, **Dr. Lisan, I bet you didn't expect a threesome when you got back, did you.**
Mr. Sindell: Who said that?
The Witness: Karin said that."
(id. 271, ll. 6-17 )(emphasis added)

In her deposition, Ms. Bonfili had a major case of amnesia:

" Q….. **Do you recall having a consideration with Mr. Greenspan prior to doing an affidavit in which you told Mr. Greenspan that you were afraid or fearful of stating or telling him or writing in an affidavit the whole truth about you complaints and matters related to Dr. Lisan because of retaliation against you by Dr. Raphaely?**
A. I don't recall.
**Q. You might have said that?**
A. I don't recall.
**Q. If Mr. Greenspan says you said that, would you disagree with him?**
A. I don't know. I don't recall it.
**Q. Did you fear retaliation--withdrawn. Do you recall fearing retaliation from Dr. Raphaely if you wrote in an affidavit or told Mr. Greenspan the whole truth about your contacts with the complaint with Dr. Lisan and that whole matter of Dr. Lisan's harassment?**
A. I don't remember at that time. I don't remember that conversation.
**Q. I didn't ask you that. I asked you if you had any fear of telling Mr. Greenspan or writing in an affidavit for Mr. Greenspan the whole truth about your complaints involving Dr. Lisan?**
A. I don't remember having a fear at that point. (Doc. 31, Bonfili, 6,1 ll. 14-25 ;P.62, ll. 1-15)

Ms. Bonfili expressly denied the following:

""Q…**Did Dr. Raphaely ever talk to you about coaching you about what to write in your affidavit?**
A. NO" (Bonfili, 48, ll. 9-12)  [SEE Exh. 84,  SEALED DOCUMENT A, pp. 10-12, unredacted]

Contrary to Ms. Bonfili's testimony, Mr. Bearss testified that Ms. Bonfinli told him

"on more than one occasion" that Dr. Raphaely "coached [her] on how to fill out the

[ROC] report, and also that Dr. Raphely "was looking over her shoulder while she [Ms.

Bonfili} was filling out the report".

This coaching also included Ms. Bonfili's Affidavit for Investigator Greenspan. (Doc. 39,

Bearss, 76-77) Ms. Bonfili was impeached again by the testimony of Mr. Bearss: she told him that she was afraid to "tell the whole truth" to Investigator Greenspan "out of fear of retaliation against her by Dr. Raphaely". (Doc. 39, Bearss, 84)

The remaining ROCs from Jessica Foster, Elaine Costanzo and Rhonda Verb are likewise distorted and exaggerated, almost on their face. (Exh. 34)

Dr. Lisan does not recall asking Ms. Foster to "close the door". Dr. Lisan denies that he ever said that he was not trying to hit on her, ask her out or have sex with her, but he would. He did tell her that she was a beautiful woman, that he doesn't want to seduce her, but that he was concerned that she seemed seriously depressed. He told her he had himself been through severe depression. He said he was talking to her as a "work friend". She never said anything about defending her marriage, even though Dr. Lisan had thought she may have previously openly spoken about her husband indicating otherwise. And that was it. (Doc. 44, Lisan, 252-260) Dr. Lisan characterized Ms. Foster's ROC as "a gross misrepresentation because off-color comments, remarks, jokes, et cetera do pass frequently between people including me and her. And there were never any times that she expressed discomfort." (Lisan, 264-265)

In order to conclude that Dr. Lisan sexually harassed Ms. Foster, one would have to make assumptions and inferences that might put normal verbal exchanges at unreasonable risk. If this conversation made Ms. Foster uncomfortable, she could have and should have simply said so to Dr. Lisan on the spot. The VA's sexual harassment policy 003-003 states under the heading "What to do if you are the victim of sexual Harassment "to tell the harasser that the behavior is unwanted, unwelcome and unsolicited". (Exh. 88, Sect. 5, Procedures, 5(b)(1), P. USA-001952). Bonfili, Foster and

18

Verb **NEVER** did this.  But there is also evidence that supports the conclusion that the **first time** Ms. Foster expressed a concern to anyone about an incident with Dr. Lisan which supposedly occurred on January 4, 2017 was on January 10, 2017, to Robert Bearss. (Doc. 39, Bearss, 71) January 4, 2017 was a Wednesday; January 5 was a Thursday. (Exh. 45) If this incident with Dr. Lisan was so disturbing to Ms. Foster, why didn't she report it to Mr. Bearss or anyone else until January 10, 2017, a Tuesday? She was not working (id., 66-67) on January 6,7,8, and 9 (Friday through Monday). Dr. Lisan's letter was emailed on Janaury 6, 2017. As Mr. Bearss testified: "I find it curious that some of the incidetns happened before this date [i.e. January 6] but weren't reported until after the date". (id., 73-74)

Ms. Constanzo reported her ROC against Dr. Lisan about his supposedly describing his genitalia in 2015, **two years previously.** (Exh. 34). Dr. Lisan has no recollection of describing his genitalia to Elaine Constanzo or to anybody else. (Doc. 44, Lisan, 277) When Ms. Constanzo told him to stop, she states that he did so. (Doc. 33, Constanzo, 97) How did Ms. Constnazo get involved with writing an accusatory ROC of Dr. Lisan about a remark he supposedly made 2 years earlier? Dr. Raphaely called Ms. Constanzo at home "encouraging me to draft a report of contact in regards to my experience with Dr. Lisan". (Doc. 33, Costanzo, P. 82) Jessica Foster had heard that Ms. Constanzo had an incident with Dr. Lisan two years earlier. Dr. Raphaely told Ms. Constanzo her writing an ROC would help her "female colleagues" and that "more of a paper trial could help". (id., 95) Ms. Costanzo told Mr. Bearss that if she knew this matter "was going to boil into this big ordeal…. she would not have filed a complaint". (Doc. 39,Bearss, 84)

Ms. Bonfili told Mr. Bearss that:

 "She thought, Karin, Karin thought that Dr. Raphaely was concerned about her complaint and **the fact that she was concerned about Karin and in reality she was more concerned about getting the complaint than she was about the contents of the complaint."** (Doc. 39, Bearss, 83, ll. 11-16)(emphasis added)

Dr. Lisan strongly disagreed with Ms. Verb's distorted misrepresentations. (Doc. 44, Lisan, 278-279) The more interesting inquiry is how Dr. Raphaely solicited Rhonda Verb's participation. Mr. Bearss testified as follows:

"A. Dr. Raphaely approached me to ask Rhonda if she had any complaints about Dr. Lisan and, if so, to talk to Dr. Raphaely, and initially when she asked me that I didn't think anything about it but after the fact it makes me wonder why she asked me to ask Rhonda.
**Q. Uh-huh. As you sit and wonder about that, does it appear to you that she was soliciting negative things to produce and write about Dr. Lisan?**
Ms. Johnson: Objection. You may answer.
A. Yes.
**Q. Okay. And do you see that as--withdrawn. Taking into account what you just read, dated January 6th, 2017, Exhibit 31, does it appear that these solicitations for improprieties against Dr. Lisan were retaliatory in nature?**
Ms. Johnson: Objection. Foundation and calls for speculation. You may answer.
A. Yes.
**Q. And why do you believe that?**
Ms. Johnson: Same objection. You may answer.
A. Because she asked me to ask somebody who hadn't complained if they had a complaint."
(Doc. 39, Bearss, 79, ll 23-25, 80, ll 1-23)

## THE 10-DAY SUSPENSION WITHOUT PAY WAS A RETALIATORY ADVERSE EMPLOYMENT ACTION

Dr. Raphaely abused and weaponized the disciplinary process. From the moment she became aware of Dr. Lisan's written Complaint of sex and disability discrimination against her (dated January 6, 2017, Exh. 31), she openly stated her intention to get Dr. Lisan "out of the department". (Doc. 39, Bearss, 99-101) Dr. Raphaely immediately thereafter started procuring, soliciting, cajoling, coaching and

pressuring four CRNAs to write out false and distorted ROCs accusing Dr. Lisan of sexually harassing them. Dr. Raphaely turned them into the Cleveland VA's Internal EEO Office for a formal investigation. Dr. Raphaely **NEVER** even sought to discuss the allegations of the complaining CRNAs with Dr. Lisan.

Contrary to the promulgated VA policy, she failed to bring the parties together to attempt to resolve or diffuse the matter without formal action. In 2017, an in-service presentation on VA sexual harassment policies was held at the VA for the entire Anesthesiology Department attended by anesthesiologists, supervisors, techs and CRNAs.

Dr. Kenneth Moss attended. Attendance for employees of the Anesthesiology Department was required. (Doc. 41,Moss, 203-205) Dr. Moss testified that the enunciated VA policy was for the Service Chief "to attempt to resolve the issue… by bringing the parties together in a safe environment", before launching formal action. (id., 206) This was not the way Dr. Raphaely handled it. (id., 207) This is hardly surprising, since her stated objective was to get Dr. Lisan "out of the department". (Doc. 39, Bearss, 99-101). It was not her goal to resolve or diffuse anything. It was to besmirch and set up Dr. Lisan for serious sanctions targeting him for termination and/or resignation, including the creation of a hostile work environment for him. Look at the allegations: to EEO specialist Leshelle Reese, (Doc. 40, Reese, 17) the Costanzo allegation that two years earlier Dr. Lisan described his genitalia (which he denied) and was allegedly told by Ms. Costanzo to desist, which she stated he did, was rated by Ms. Reese on a 10-point scale of egregiousness (10 being the most egregious) as a 1 or 2. (id., 44-46) The EEO Report and Ms. Reese's testimony (she did the re-investigation)

21

concluded, contrary to Dr. Raphaely's claim that Dr. Lisan did not engage in sexual harassment with any of the CRNAs. (Exh. 6 and Doc. 40, Reese, 66-68)

Immediately upon receiving the ROCs from the CRNAs, Dr. Raphaely presented Dr. Lisan with a Sexual Harassment Allegation Checklist (Exh. 26), which ordered Dr. Lisan "to cease any contact with the alleged victim except that which is absolutely required for official business". The CRNAs, however, were free to talk about anything they wished, including the allegations, to Dr. Lisan or to anyone else. (Doc. 31,Bonfili, 80 -81) However, Ms. Bonfili also told Dr. Lisan: "I think we should talk this over and be done with it". (id., 217) However, she feared Dr. Raphaely's wrath because she also claimed that Dr. Raphaely had prohibited her from talking about the "problem" to Dr. Lisan. (id., 217) So Dr. Lisan initiated a conversation with her while she was in an OR monitoring a sleeping patient. Ms. Bonfili welcomed the conversation with Dr. Lisan who touched her shoulder **with her express consent**. Dr. Lisan denies ever threatening to sue her. But Ms. Bonfili told him that she was afraid of retaliation from Dr. Raphaely if she tried in any way to work this out with Dr. Lisan instead of pursuing formal allegations against him. (Doc. 44, Lisan 221) When Dr. Mannix or Dr. Schlesinger came into the OR, Karin Bonfili became suddenly "terrified" that Dr. Mannix would report to Dr. Raphaley that Ms. Bonfili was chatting with Dr. Lisan. (id., 226-227; entire OR conversation, id., 219-229) Dr. Lisan never discussed with Ms. Bonfili any details related to the sexual harassment accusations made by her or by any of the other 3 CRNAs. (id., 330).

It must be understood that anesthesiology physicians not necessarily connected to a particular operation often enter an OR room to speak to a surgeon, a CRNA or

another anesthesiologist. (Lisan Affidaivt, Exh. 89) The attempt to paint Dr. Lisan's talk with Ms. Bonfili as if he were some kind of unauthorized officious intruder in the OR is trumped up nonsense.

The hostile work environment for Dr. Lisan created by Dr. Raphaely was brutal. He was falsely attacked as a sexual harasser, fearful of losing his job, humiliated, placed under tremendous stress, fear and upset, scared, angry, fearful and depressed. People were talking about him and behind his back. He was muzzled from defending himself by Dr. Raphaely and had just recovered from a long medical leave to overcome his OCD, anxiety and depression. It is not surprising that he welcomed Ms. Bonfili's desire to discuss and resolve any issues, something which Dr. Raphaely should have previously done herself in keeping with VA policy. (Doc. 44, Lisan, 307-311) (Doc. 41, Moss, 203-205 and 207)

The EEO VA Office issued its Report on March 13, 2017 (Exh. 86,    containing date on first page), (Exh. 6, containing concluding language on page 6) The Report found no sexual harassment was committed. (Exh. 6, Report P. 5) But it also concluded that "sexually inappropriate behavior" was occurring. Moreover, Dr. Lisan had supposedly violated Dr. Raphaely's gag order, by accepting Ms. Bonfili's invitation to speak with him. **Ms. Bonfili reported the interaction appropriately and action was taken."** (id., Report, 6) (Emphasis added)(Of course, Dr. Lisan never discussed the details of Ms. Bonfili's specific allegations against him with Ms. Bonfili).

The phrase "action was taken" is a conclusory comment which correctly refers to the Written Admonishment pursuant to the VA Medical Center Policy 005-005 (Exh. 90, sect. 4(q)) This is the official disciplinary policy of the Medical Center. It states that

23

supervisors and managers will propose and implement the "least serious action" to correct current employee misconduct. (id., p. 1 section 2) It notes that progressive discipline means "a more severe penalty should not be proposed when a lesser penalty would be equally effective". (id., Sect. 4(f)) Various types (in increasing severity) of disciplinary actions are set forth starting with "Admonishment" "Reprimand", "Suspension", et cetera. (id., Sect. 4(q)(1-5))

On March 9, 2017, Dr. Raphaely issued a written Admonishment to Dr. Lisan which she called a "Written Warning". (Exh. 75) This is defined as a "disciplinary action" by Executive Director Fuehrer in aforementioned Policy 005-005. (Exh. 90, sect. 4(q)(1)) In fact, the word "admonish" means "warn". The fact that it states that "At this time, disciplinary action will not be imposed" is not capable of converting this so-called Memorandum into a nondisciplinary document when it is clearly a written Admonishment, specially defined as the first level of disciplinary actions by official VA policy. **The written Admonishment itself is the defined disciplinary action**. It certainly covers Dr. Lisan's alleged violation of Dr. Raphaely's gag order, even though Ms. Bonfili's specific accusations themselves against Dr. Lisan were never part of the discussion. The "forbidden" conversations all preceded the written Admonishment, constituting the supposed violation of the gag order on March 8, 2017.

In fact, Defendant attempts to make an end-run around the obvious retaliatory efforts of Dr. Raphaely. Once the VA EEO Report rejected the claims that Dr. Lisan committed "sexual harassment" of the CRNAs, the justification for the "Proposed Suspension" issued by Dr. Raphaely and imposed by Ms. Fuehrer no longer emphasized the sexual harassment allegations of the CRNAs. **Defendant switched its**

24

**justification for the suspension**, to wit: that although the newly recharacterized "inappropriate" comments were included as justifications, the Proposed Suspension "was based on his inappropriate and insubordinate conduct - **his blatant disregard of an order to have no non-business related contact with specific co-workers".** (Def's, SJ.Mot., p.25; Exh. 64, Proposed Suspension) The Disruptive Behavior and Failure to Follow Orders in the Proposed Suspension (Exh. 64, pp. 1-3) essentially involves the "incident" on March 8, 2017 involving Dr. Lisan's "contact" in the OR with Ms. Bonfili. (Doc. 44, Lisan, 219-229)

The gag or "no contact" order was on a checklist VA Form for "Sexual Harassment Allegations" (Exh. 26). The 2-year old allegation of Elaine Costanzo (denied by Dr. Lisan) was never intended to be reported to management. Ms. Costanzo regretted writing her ROC after being "encouraged" to do so by Dr. Raphaely who called her at home. The other 3 complaining CRNAs never told Dr. Lisan at the time that anything he said to any of them was unwelcome. (Exh. 6, p. 5) As a Service Chief, Dr. Raphaely should have known that characterizing those solicited allegations as "sexual harassment" was an obvious overreach. They could and, by VA policy, should have been informally resolved, not formally prosecuted. **But only the formal treatment and filing of these ROCs as "sexual harassment" allegations enabled Dr. Raphely to use the Checklist Form (Exh. 26) imposing the no-contact "gag" order**. His "contact" with Ms. Bonfili on March 8, 2019 led to the disciplinary "Written Admonishment" on March 9, 2017 (Exh. 66), Dr. Raphaely's "Proposed Suspension" on March 20, 2019 (Exh. 64) and Ms. Fuehrer's affirming "cat's paw" decision of it dated June 20, 2017, given to Dr. Lisan in July 2017. (Exh. 78)

25

The stated formal written VA Disciplinary Policy is for supervisors to propose the "least serious action" to "correct employee misconduct". (Exh. 90 p. 1, Sect. 2, Policy). The official finding of the VA EEO Investigation Report of March 13, 2017 was a rejection of the allegations of sexual harassment. According to the EEO Report finding no sexual harassment, the VA Sexual Harassment Allegations Checklist with the gag order no contact prohibition should never have been used in the first place.  But after the written disciplinary Admonishment on March 9, 2017, Dr. Lisan did not violate any "orders" of Dr.Raphaely, certainly did not engage in any "sexual harassment" and has not since then ever been accused of making any "inappropriate" remarks in any communications to any employee. It is highly dubious if so-called "inappropriate" remarks in conversations between employees is a justifiable basis for any discipline in this case. **But after a disciplinary written Admonishment, (which we urge was itself entirely bogus, retaliatory, however improperly imposed, and "corrected" the professed misconduct), the imposition one week later of a 10-day suspension without pay for the exact same professed misconduct - in light of all the other evidence in this case- certainly permits a jury to conclude that the suspension was retaliatory. How many disciplines can or should be imposed for the exact same incident? Dr. Lisan's supposed misconduct could not have gotten worse or more egregious one week after the first discipline, when the only thing which occurred between the first discipline and the second one within that week was an official finding of no sexual harassment.**

### LEGAL ARGUMENT

The resolution of Defendant's Summary Judgement Motion in this case is driven

by the facts. The applicable law is relatively straightforward and not in dispute.

For a prima facie case of retaliation, there can be direct evidence and/or the application of the McDonnell Douglas formula as the Sixth Circuit held in Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 707 (6th Cir., 2008).

Defendant omits mention of what we submit is "direct evidence" of retaliatory intent on the part of Dr. Raphaely. After receiving Plaintiff's protected letter of complaints about unlawful discrimination, she stated that she wanted Dr. Lisan out of the VA Anesthesiology Department. Applying the McDonnell-Douglas test, for a retaliation claim, the Sixth Circuit in Daugherty (at 707) identified 3 steps: (1) Engaging in a statutorily protected activity; (2) Suffering an adverse employment action; and (3) A causal connection between the protected activity and the adverse employment action.

Defendant concedes that Plaintiff met the requirements that Plaintiff made protected complaints known to Defendant. (Def's S.J. Motion, p. 24) The only remaining issues are adverse employment action and causation.

## ADVERSE EMPLOYMENT ACTION

Plaintiff was given a 10-day suspension without pay. Your Honor has held, citing White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789 (6th cir. 2004), (affirmed by the U.S.Sup. Ct., infra), "that only a three day period" of suspension without pay is an adverse employment action. Washington v. Marymount Hosp., Inc., 2010 U.S. Dist. LEXIS 9265, (U.S.D.C., N. Dist. of Ohio, Eastern Div., 2010 at *19-20) See also Rodgers v. Cty of Cleveland, 2006 U.S. Dist. LEXIS 60574 (U.S.D.C., N.Dist. of Ohio, Eastern Div., 2006) (Suspension without pay is an adverse employment action); Younger v. Ingersoll-Rand Co., 2013 U.S. Dist. LEXIS 170313 (U.S.D.C., So. Dist. of

Ohio, Western Division, 2013) (assessment of attendance points and zero-day suspension is an adverse employment action).

## CAUSATION

The first indication of causation is Dr. Raphaely's openly expressed intention (after receiving Plaintiff's protected written complaint) to target Plaintiff for separation from the Anesthesiology Department.

For the first time in his professional life, starting immediately, within days of his written discrimination complaint of January 6, 2017, a series of ROCs were solicited from 4 CRNAs making bogus claims that they were sexually harassed by Dr. Lisan. We state this as a fact for purposes of this Summary Judgment Opposition, viewing the facts in the light most favorable to Plaintiff.

A no-contact gag order was imposed only on Dr. Lisan, not on any complaining CRNA.

The so-called "sexual harassment" accusations, in addition to being solicited and false, were hardly egregious even if, arguendo, believed at face value. But neither Dr. Raphaely nor the EEO fact-finder Bruce Kafer ever discussed with Dr. Lisan his side of those accusations. A Report was made without the accused's input. Yet Mr. Kafer testified he believed every word of accusation stated by each CRNA. This is what passed for an "investigation" at the VA. Although LeShelle Reese did interview Dr. Lisan in the re-investigation, the review by Dr. Altose did not even include the input Dr. Lisan gave to Ms. Reese. And nobody at the VA considered questioning Dr. Raphaely about Dr. Lisan's protected discrimination complaints followed so quickly by the cascade of CRNA accusations of supposed sexual harassment.

28

The Sixth Circuit has held that close temporal proximity between the protected activity and the adverse employment actions targeted against the employee gives rise to an inference of retaliation. Goller v. Ohio Dept. of Rehab. & Corr., 285 Fed. Appx. 250, 257 (6th Cir., 2008) (3-month period between protected activity and adverse employment action "sufficient to create a causal connection to support a prima-facie case of retaliation); DiCarlo v. Potter, 398 F.3d 408, 421 (6th Cir. 2004) (close temporal proximity permits inference of retaliation); Asmo v. Keane, Inc., 471 F.3d 588,593(6th Cir., 2006) (temporal proximity can establish a causal connection); Younger, supra., citing Burlington, supra, (at Younger, * 21): Conduct prohibited by the antiretaliation provision is not limited to acts which "affect the employee's compensation, terms, conditions or privileges of employment", citing Burlington N. & Santa Fe Ry. Co. v White,, 548 U.S. 53, 60-61, 67 (2006). We ask: in this day and age, what could be more adverse to a male physician employee than being intentionally and falsely accused of sexually harassing female co-employees? In addition to the foregoing, there is abundant evidence with as many specific examples as space herein would permit of retaliatory propensities and actions of Dr. Raphaely.

### PRETEXT

The proposed suspension issued by Dr. Raphaely for Dr. Lisan essentially disobeying a gag order for talking to Ms. Bonfili (switched from earlier emphasis on "sexual harassment", which switching itself is proof of pretext) was transparently pretextual. It is certainly understandable that Dr. Lisan wished to accept Ms. Bonfili's invitation to resolve in discussion between them any misunderstandings without resort

to the formal process, Dr. Raphaely intentionally attempted to prevent such a nonconfrontational resolution. Both Dr. Lisan and Ms. Bonfili were terrified that their talking together to clear the air would trigger adverse consequences if Dr. Raphaely found out about it. **Dr. Raphaely's gag order was not used for its intended purpose of protecting victims of harassment. It was used as a weapon to engender fear, hatred, tension and hostility.** Moreover, the "contact" Plaintiff had with Ms. Bonfili was the subject of a disciplinary written Admonishment. Then, when the EEO office determined that Dr. Lisan did not commit sexual harassment, and had been already disciplined by Dr. Raphaely, she upped the ante with a proposed 10-day suspension without pay for the exact same thing for which she had previously given him a disciplinary Admonishment.  Dr. Raphaely also made an exaggerated claim of disruption in her proposed suspension because Dr. Lisan entered an OR in the course of an operation. (But see attached Affidavit of Dr. Lisan, (Exh.89)) Ms. Fuehrer's confirmation of the proposed suspension does not immunize Dr. Raphaely from our claim of retaliation, per the well-recognized "cat's paw" principle.

<u>CONCLUSION</u>

For all of the foregoing reasons, Defendant's Motion for Summary Judgment on the Claim of Retaliation should be denied.

Respectfully Submitted,

-------------------------------------------------

Steven A. Sindell, Esq. (0002508)
Rachel Sindell, Esq. (0078463)
23611 Chagrin Blvd., Suite 227
Beachwood, Ohio 44122
Tel: (216) 292-3393:
Fax: (216) 292-3577
Email: info@sindellattorneys.com

30