

## AFFIDAVIT

STATE of: Ohio

I, **Karin Bonfili** make the following statement freely and voluntarily to **Burton Greenspan**, who has identified himself to me as a Contract EEO Investigator, investigating a complaint of discrimination filed by **Ronald Lisan** under agency Case No. **200H-0541-2017101627**, against the **Department of Veterans Affairs** knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know).

I have been advised that the accepted issues for investigation is:

**Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:**

1) When on December 7, 2016, Susan Raphaely (SR), Chief of Anesthesiology, gave complainant an unusually heavy workload after he returned to work from a medical leave of absence related to his disability.
2) When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from 'On-Call' duties.
3) When since January 6, 2017, Susan Fuehrer (SF), Facility Director, and Murray Altose (MA), Chief of Staff, have not taken appropriate corrective action after complainant's attorney sent a letter of complaint regarding SR's harassment.
4) When on January 11, 2017, SR emailed complainant to say that his scheduled meeting the next day with Bruce Kafer (BK), Reasonable Accommodation Coordinator, was canceled and that his request for reasonable accommodation would be decided without allowing complainant to discuss his circumstances with BK.
5) When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).
6) When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.
7) When in March and April 2017 SR attempted to force complainant to work in the same operating room with the CRNA's who accused him of sexual harassment, even though there were other CRNA's available.
8) When on March 9, 2017, SR issued complainant a Written Warning.
9) When on March 13 and 14, 2017, SR assigned complainant to serve as the anesthesiologist during operations without a CRNA to assist him, which is contrary to VA standard operating procedure, and put the patients at risk.
10) When on March 28, 2017, SR issued complainant's Proposed 10-Day Suspension.
11) When on July 10, 2017, complainant was suspended for 10 days.

Page 1 of 6

 **KMB** Initials

**Events 2, 6, and 8** above constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. **They also represent 3 of the 10 actions or harassing behaviors taken against or directed toward your client. These events are sufficiently related to the overall pattern of harassment and will be included for consideration in the analysis of the harassment claim.**

In a letter dated July 14, 2017 the complaint was amended:
**Events 2, 6, 8**, remain Accepted for investigation as independent claims; **event 11** is Accepted for investigation as an independently actionable claim; and Complainant's harassment claim, consisting of events **1 through 11** is Accepted for investigation.

> **2. When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from 'On-Call' duties.**
> **6. When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.**
> **8. When on March 9, 2017, SR issued complainant a Written Warning.**
> **11. When on July 10, 2017, complainant was suspended for 10 days.**

I hereby solemnly swear or affirm that:

**1. For the record, please state your name.**

Karin Bonfili

**2. What is your current position title, grade and agency unit/division?**

Certified Registered Nurse Anesthetist (CRNA),  Nurse 3

**3. How long have you been in this position? How long with this agency?**

I've been in the position for 20 years, 3 years with the Louis Stokes Cleveland VA Medical Center.

**4. Who are your first and second level supervisors at the time of the Complaint, by name and position title?**

1st Level supervisor – Dr. Susan Raphaely,  2nd Level Supervisor = Robert Bearss, Chief CRNA

**5. What is your working relationship with the Complainant?**

Complainant is one of the Attending Anesthesiologists at the Louis Stokes Cleveland VA Medical Center.

*KMB* Initials

6. **What is your working relationship with Dr. Susan Raphaely?**

Dr. Susan Raphaely is an Attending Anesthesiologist at the Louis Stokes Cleveland VA Medical Center.

7. **Please state for the record your sex?**

Female

8. **Please state for the record your disability?**

None

9. **Have you been involved in any prior EEO activity or protected activity? Please explain what the activity consisted of and when it took place.**

Yes, I had a complaint against Dr. Ronald Lisan for "Sexual Harassment" in the work place. I reported my situation to Dr. Susan Raphaely (my immediate supervisor), who then encouraged me to file a report with the EEO, it took place in January 2017. I filed a formal complaint with the EEO.

**Issue 1: Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:**

1. **When on December 7, 2016, Susan Raphaely (SR), Chief of Anesthesiology, gave complainant an unusually heavy workload after he returned to work from a medical leave of absence related to his disability.**
2. **When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from 'On-Call' duties.**
3. **When since January 6, 2017, Susan Fuehrer (SF), Facility Director, and Murray Altose (MA), Chief of Staff, have not taken appropriate corrective action after complainant's attorney sent a letter of complaint regarding SR's harassment.**
4. **When on January 11, 2017, SR emailed complainant to say that his scheduled meeting the next day with Bruce Kafer (BK), Reasonable Accommodation Coordinator, was canceled and that his request for reasonable accommodation would be decided without allowing complainant to discuss his circumstances with BK.**
5. **When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).**

Page 3 of 6

*KMB* Initials

**000443**

6. When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.

7. When in March and April 2017 RS attempted to force complainant to work in the same operating room with the CRNA's who accused him of sexual harassment, even though there were other CRNA's available.

8. When on March 9, 2017, SR issued complainant a Written Warning.

9. When on March 13 and 14, 2017, RS assigned complainant to serve as the anesthesiologist during operations without a CRNA to assist him, which is contrary to VA standard operating procedure, and put the patients at risk.

10. When on March 28, 2017, RS issued complainant's Proposed 10-Day Suspension.

11. When on July 10, 2017, complainant was suspended for 10 days.

**Issue 1: Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:**

When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).

10. **Please explain in detail any direct knowledge you may have regarding this allegation.**

I reported my claim of "Sexual Harassment" by Dr. Ronald Lisan to SR when it occurred. I was instructed then by SR to file a report with the EEO. The sexual harassment actually involved me personally. I had experienced more than one occurrence of Sexual Harassment by Dr. Ronald Lisan and reported each encounter to SR.

**Issue 1: Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:**

When in March and April 2017 SR attempted to force complainant to work in the same operating room with the CRNA's who accused him of sexual harassment, even though there were other CRNA's available.

11. **Please explain in detail any direct knowledge you may have regarding this allegation.**

I was never assigned to work with Dr. Lisan in March and April 2017.

*KMB* Initials

12. **Is there an Agency policy pertaining to harassment (non-sexual) in the work place? What is that policy? When and how were you made aware of this policy?**

Yes. We have mandatory computer training in our TMS training/education requirements – "Prevention of Workplace Harassment/No FEAR". I did the training on the following dates: 2/1/17 and 2/9/15.

13. **How are employees made aware of the policy?**

Found on the VA intranet homepage and required TMS training for VA Employees.

14. **Does the agency provide any training regarding harassment and or a hostile environment in the work place? If so what form does the training take? Have you received the training and when did you receive the training?**

Yes, I completed the training twice.

15. **To the best of your knowledge, did Complainant raise the issue of being harassed or subjected to a hostile work environment with any member of management? If yes, with whom did Complainant raise the issue?**

I was not made aware of this.

16. **Were any actions taken by you with regard to Complainant based in any way on Complainant's sex, disability and or prior EEO activity?**

No

17. **Can you suggest any witnesses who may be able to provide relevant knowledge regarding the accepted issues of this complaint? If so please provide there name, position, contact information and what information they might provide.**

No

18. **Is there anything you would like to add that is relevant to this claim, which has not already been addressed?**

No

Page 5 of 6

*KMB* Initials

_____END OF STATEMENT_____

I have read this statement, consisting of _____, and it is true, complete, and correct to the best of my knowledge and belief.

_____*Karen M. Boyle*_____
Signature

_____10·26·2017_____
Date

Signed and sworn to before me
on this _26th_ day of _October_, _2017_, at _____.

_Burton Greenspan_
Neutral witness, notary, or Investigator

Page 6 of 6                                         *KMB* Initials

**000446**

Jan. 12. 2017 11:53AM                  No. 0143   P. 13



PLAINTIFF'S
EXHIBIT
2

| **VA** Department of Veterans Affairs | **REPORT OF CONTACT** |
|---|---|

NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.

| VA OFFICE | IDENTIFICATION NOS. (C.XC, SS, XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|
| Bonfili, Karin | |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT (check one) |
|---|---|
| Susan Raphaely | ☐ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT (check one) |
|---|---|
| | ☐ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (Include area code) |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN (Continue on page 2 if needed)

On Friday January 6, 2017 I was assigned to work with Dr. Lisan for the day. Throughout the day Dr. Lisan continued to make sexually oriented comments. For example, in the morning I stated that I was tired and wanted to go home and get back in my bed. His response was something about "sounds good to me, we can go now and get in your bed".    Second example, on Thursday January 5th, 2017 I was trying to discuss the case that I was going to do with him on Friday January 6th, 2017.  I reviewed everything I knew about the patient with him and said, "so are you leaving now", his response "unless you can make me a better offer".  A few weeks prior I had asked, "do you have someone coming to relieve me to go home"?  His response, "If I get you out, what are you going to do for me"?  When I was reviewing the case with Dr. Lisan on Thrusday January 5th, 2017, another O.R. staff member happened to be present. After Dr. Lisan spoke with sexual undertones to me, and though in sexual comments  he walked away when we were done discussing the case.  The other O.R. staff member that was present asked me if I felt uncomfortable because he felt uncomfortable for me hearing how he spoke to me.  Although, I cannot write this "verbatim", because I am trying to account for what has been occurring the last several weeks, I can tell you that I am not comfortable with this type of "sexual" talk at work.

Although Dr. Lisan has always made "sexually oriented" jokes, recently I feel that the level of the sexual talk has escalated and I feel extremely uncomfortable.  I have not said anything in response, because  I am so uncomfortable and uneasy when it is happening.  I don't know how to respond & frequently I am caught off guard when he says it. I do not want to come to work feeling uncomfortable in the work place because we work together in a "team" care setting.  I just want to work in a respectable and professional environment and not feel uneasy while being at work.

Karin Bonfili, MSN, CRNA
January 11, 2017

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|

VA FORM
SEP 1997 (R)  **119**

ROC —

PLAINTIFF'S
EXHIBIT
3 K.B
3/7/19 BG

**Department of Veterans Affairs**

## VOLUNTARY WITNESS STATEMENT

Location: WADE PARK                                    Date: 3-8-2017

I, KARIN Bonfili ___, residing at or employed at The Department of Anesthesia—
make the following statement freely and voluntary:                          (Loved)                    Edward
Today I was working in the opposite Operating room— Dr. Lisan WAS NOT
my staff Anesthesiologist. He is Not allowed to work with me— due to a
previous sexual harassment issue filed January 2017 with EEO. Today he
entered my room. He tried talking to me. He put his hand on my
back & asked me if it was okay to touch me. He continued to
tell me that if I talked to his lawyer, he would promise not " to
Sue me" if I would explain that he was "joking about the sexual
talk & never meant to hurt me. He went to tell me how he valued
our "relationship" and that there are only 6 Nurse Anestretists he
trusts to work with, & I was one of them. He discussed that if
I talked to DR. Raphaely there would be retaliation. DR.
Marin Mannix came into my room to tell Dr. Ross Lisan that
he other another assignment & need to attend to. He refused to
leave. She came back in a few minutes later & said you need
to go to room 7 & he said "I'll go when I'm ready". He continued
to stay in my room — talking to me how he values our relationship
and then DR. Schlesinger came in to my room. She told me to
leave & she would stay with the patient. I left the room. I
told Dr. Raphaely & Schlesinger & met Bruce Kaczer in EEO @
1:00 pm. Yesterday 3/7/2017 — the exact same thing occurred.
I was in O.R. # A — he came into my room, again startled with
"I didn't mean to make a joke with sexual overtones".
as you were pushing the stretcher / I said, "I didn't hear →

Karin Bonfili
*Declarant Initial*

issued on 3/10/17
① 1300 —
Talism refused to sign

3.8.2017

| | |
|---|---|
| **VA** Department of Veterans Affairs | **VOLUNTARY WITNESS STATEMENT** (Continuation Sheet) |

Statement of __WADE PARK__

you" & he said "well forget what I said then"! He started telling me how he always liked me & valued our relationship. I told him — he needed to leave & we can't talk about this Now.' He did leave my O.R. Room yesterday, but approached me again today. I cannot concentrate on my work, I can't focus on caring for my patient & I am cornered in my operating room by Dr. Lisan with No where No go! I cannot do my job. with him coming into my room. He has been told by EEO to stay away from the 4 femal CRNA's that filed a complaint of sexual harrasment.

Twice in the last few weeks — I was talking to John Fancella an O.R. staff personal. Dr. Lisan stood there staring at us — and wouldn't leave. John Fancella said it felt extremely awkward to have Dr. Lisane staring at us & just standing there while we talked || Dr. Lisan said " I want to talk to you" I told him "No" & "I'm not talking to you" & I walked away! I felt intimidated & extremely uncomfortable by Dr. Lisans behavior!

I have read/have had read to me the above statement consisting of _____ page(s), and certify that it is true and correct to the best of my knowledge

No threats or promises have been made to me and no pressure or coercion of any kind has been used against me.

| _(signature)_ | 3.8.2017 |
|---|---|
| (Declarant) Signature | Date |
| | |
| (Witness) Signature | Date |

Page _____ of _____

VA FORM
JAN 1993(R) **0024** Automated form in lieu of VA Form 0024

**PLAINTIFF'S EXHIBIT** R.V.
3/7/19 PSG

## Department of Veterans Affairs          REPORT OF CONTACT

*NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C,XC, SS, XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT *(check one)* |
|---|---|
| | ☐ PERSONAL    ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED *(Include Area Code)* |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT *(check one)* |
|---|---|
| Dr Susan Raphaely Chief Department of Anesthesia | ☐ PERSONAL    ☐ TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU *(Include area code)* |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

Dr Lisan has said in the past many inappropriate things to me while we were working together almost the whole time I have worked in the Department of Anesthesia. The most recent thing I remember is when I was leaving for the day I said to him, "I'm going home" and his response was, "what time should I be over?". My response has always been to just look at him and not respond. I feel I have had a good working relationship with him but feel as though he has been struggling recently, he has seemed very distracted and not present while working. I have worried about his mental well being.
I am coming forward in light of recent events involving my peers whom I have a great amount of respect for. This type of behavior is not to be tolerated at any time in our professional work environment. This is particularly concerning as we are in a subordinate role in the operating room.

| DIVISION OR SECTION | EXECUTED BY *(Signature and title)* | CRNA |
|---|---|---|
| | *[signature]* Rhonda L. Verb CRNA | |

VA FORM
SEP 1997 (R)  **119**

**AFFIDAVIT**



STATE of: Ohio

I, **Rhonda Verb** make the following statement freely and voluntarily to **Burton Greenspan**, who has identified himself to me as a Contract EEO Investigator, investigating a complaint of discrimination filed by **Ronald Lisan** under agency Case No. **200H-0541-2017101627**, against the **Department of Veterans Affairs** knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know).

I have been advised that the accepted issues for investigation is:

**Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:**

1) **When on December 7, 2016, Susan Raphaely (SR), Chief of Anesthesiology, gave complainant an unusually heavy workload after he returned to work from a medical leave of absence related to his disability.**
2) **When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from 'On-Call' duties.**
3) **When since January 6, 2017, Susan Fuehrer (SF), Facility Director, and Murray Altose (MA), Chief of Staff, have not taken appropriate corrective action after complainant's attorney sent a letter of complaint regarding SR's harassment.**
4) **When on January 11, 2017, SR emailed complainant to say that his scheduled meeting the next day with Bruce Kafer (BK), Reasonable Accommodation Coordinator, was canceled and that his request for reasonable accommodation would be decided without allowing complainant to discuss his circumstances with BK.**
5) **When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).**
6) **When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.**
7) **When in March and April 2017 SR attempted to force complainant to work in the same operating room with the CRNA's who accused him of sexual harassment, even though there were other CRNA's available.**
8) **When on March 9, 2017, SR issued complainant a Written Warning.**
9) **When on March 13 and 14, 2017, SR assigned complainant to serve as the anesthesiologist during operations without a CRNA to assist him, which is contrary to VA standard operating procedure, and put the patients at risk.**
10) **When on March 28, 2017, SR issued complainant's Proposed 10-Day Suspension.**
11) **When on July 10, 2017, complainant was suspended for 10 days.**

Page 1 of 5

_____ Initials

Events **2, 6, and 8** above constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. **They also represent 3 of the 10 actions or harassing behaviors taken against or directed toward your client. These events are sufficiently related to the overall pattern of harassment and will be included for consideration in the analysis of the harassment claim.**

In a letter dated July 14, 2017 the complaint was amended:
Events **2, 6, 8,** remain Accepted for investigation as independent claims; event **11** is Accepted for investigation as an independently actionable claim; and Complainant's harassment claim, consisting of events **1 through 11** is Accepted for investigation.

2. **When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from 'On-Call' duties.**
6. **When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.**
8. **When on March 9, 2017, SR issued complainant a Written Warning.**
11. **When on July 10, 2017, complainant was suspended for 10 days.**

I hereby solemnly swear or affirm that:

1. **For the record, please state your name.**
   Rhonda L Verb

2. **What is your current position title, grade and agency unit/division?**
   CRNA Dept of Anesthesia
3. **How long have you been in this position? How long with this agency?**
   March 2013   March 2015
4. **Who are your first and second level supervisors at the time of the Complaint, by name and position title?**
   Robert Bearass CRNA     Dr Susan Raphaely
5. **What is your working relationship with the Complainant?**
   He is a staff Anesthesiologist and supervises directly in the Operating Room

6. **What is your working relationship with Dr. Susan Raphaely?**
   Chief of our Anesthesia Department and direct supervision in OR when assigned

7. **Please state for the record your sex?** Female

8. **Please state for the record your disability?**None

9. **Have you been involved in any prior EEO activity or protected activity? Please explain what the activity consisted of and when it took place.**
   Filed a formal complaint against Dr Ronald Lisan because of his inappropriate behavior in the operating room. Jan 2017

Page 2 of 5                                            _Initials_

**000463**

Issue 1: Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:

1. When on December 7, 2016, Susan Raphaely (SR), Chief of Anesthesiology, gave complainant an unusually heavy workload after he returned to work from a medical leave of absence related to his disability.

2. When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from 'On-Call' duties.

3. When since January 6, 2017, Susan Fuehrer (SF), Facility Director, and Murray Altose (MA), Chief of Staff, have not taken appropriate corrective action after complainant's attorney sent a letter of complaint regarding SR's harassment.

4. When on January 11, 2017, SR emailed complainant to say that his scheduled meeting the next day with Bruce Kafer (BK), Reasonable Accommodation Coordinator, was canceled and that his request for reasonable accommodation would be decided without allowing complainant to discuss his circumstances with BK.

5. When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).

6. When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.

7. When in March and April 2017 RS attempted to force complainant to work in the same operating room with the CRNA's who accused him of sexual harassment, even though there were other CRNA's available.

8. When on March 9, 2017, SR issued complainant a Written Warning.

9. When on March 13 and 14, 2017, RS assigned complainant to serve as the anesthesiologist during operations without a CRNA to assist him, which is contrary to VA standard operating procedure, and put the patients at risk.

10. When on March 28, 2017, RS issued complainant's Proposed 10-Day Suspension.

11. When on July 10, 2017, complainant was suspended for 10 days.

Issue 1: Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:

When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).

Page 3 of 5

Initials

10. **Please explain in detail any direct knowledge you may have regarding this allegation.**
SR did not foster allegations rather she did her job by helping us report to the appropriate authorities which is actually her reasonality as our Dept Lead.

**Issue 1: Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:**

When in March and April 2017 RS attempted to force complainant to work in the same operating room with the CRNA's who accused him of sexual harassment, even though there were other CRNA's available.

11. **Please explain in detail any direct knowledge you may have regarding this allegation.**
Every anesthesia provider who is either a CRNA or physician is capable of providing direct patient care. Many of our physicians as asked to practice solo as needed.

12. **Is there an Agency policy pertaining to harassment (non-sexual) in the work place? What is that policy? When and how were you made aware of this policy?**
Yes there are defined policies in the VA handbook, on the VA intranet and we do TMS training.

13. **How are employees made aware of the policy?**
We do TMS training and in-service is also given by our EEO department.

14. **Does the agency provide any training regarding harassment and or a hostile environment in the work place? If so what form does the training take? Have you received the training and when did you receive the training?**
As above and and both are done yearly.

15. **To the best of your knowledge, did Complainant raise the issue of being harassed or subjected to a hostile work environment with any member of management? If yes, with whom did Complainant raise the issue?**
I am not aware.

16. **Were any actions taken by you with regard to Complainant based in any way on Complainant's sex, disability and or prior EEO activity?**
Just the formal complaint filed in Jan 2017 against Dr Lisan.

_____ Initials

17. Can you suggest any witnesses who may be able to provide relevant knowledge regarding the accepted issues of this complaint? If so please provide there name, position, contact information and what information they might provide.

No

18. Is there anything you would like to add that is relevant to this claim, which has not already been addressed?

In my opinion Dr Lisan is not a safe practitioner because of his obvious mental illness. I feel he is not capable of providing safe care to our veterans. By no means has he been treated unjustly, rather he has caused disruption and discord with the practitioners in our Anesthesia department.

_____ END OF STATEMENT _____

I have read this statement, consisting of 5 pages and it is true, complete, and correct to the best of my knowledge and belief.

_____
Signature

19 Oct 2017
_____
Date

Signed and sworn to before me
on this 19 day of October, 2017, at Cleveland, Oh.

_____
Neutral witness, notary, or Investigator

CARLA R. HODGE
Notary Public, State of Ohio
My Commission Expires April 8, 2018

Page 5 of 5

Initials

**000466**

**From:** Bruce Kafer, RN, MSN / Leshelle Reese, EEO Specialist

**Subject:** Report of Investigation into Allegations of Sexual Harassment:

CRNAs complaints against Ronald Lisan, MD

**Thru:** EEO Affirmative Employment Manager

Associate Medical Center Director

**Cc:** Susan Raphaely, MD, Chief, Anesthesiology

**To:** Medical Center Director



## INTRODUCTION

This report presents the findings of a sexual harassment investigation of allegations made by Certified Registered Nurse Anesthetists who alleged sexual harassment perpetrated by Ronald Lisan, MD. Following a review of written reports of contact and interviews of appropriate staff it was evident that sexually inappropriate behavior may had occurred by Dr. Lisan. However, the evidence in this case did not rise to the level of "sexual harassment" as defined in the VA policy. Despite the finding in this case corrective actions are being implemented to ensure all staff are trained in the Prevention of Sexual Harassment as well as the VA requirements for professional conduct.

## POLICY

It is the policy of the Louis Stokes Cleveland Veterans Affairs Medical Center (LSCVAMC) that sexual harassment is unacceptable conduct in the workplace and will not be tolerated. The policy applies to all employees and covers employees outside the workplace while conducting official business. This facility aims to provide a work environment free from sexual harassment, and in cases that so warrant, corrective action will be taken by appropriate management officials (MCP 003-003).

Furthermore, no employee will be subjected to harassment, a form of employment discrimination that violates Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, (ADEA), and the Americans with Disabilities Act of 1990, (ADA). All employees are entitled to a work environment in which they feel

free to raise concerns and are confident that those concerns will be addressed. Unwelcome harassing conduct will not be tolerated and immediate, appropriate action will be taken when management becomes aware of allegations per MCP 003-008.

### a. Factors

In determining a hostile work environment, the central inquiry is whether the conduct "unreasonably interfered with an individual's work performance" or created "an intimidating, hostile, or offensive working environment."

Determining unwelcome conduct when confronted with conflicting evidence as to whether conduct was welcome, the record as a whole will be reviewed and the totality of the circumstances, evaluating each situation on a case by case basis. The investigation should determine whether the complainant's conduct was consistent, or inconsistent, with his/her assertion that the sexual conduct, was unwelcome.

### b. Responsibilities

As required per Medical Center Policy 003-003, all parties involved have been advised of their responsibility regarding the prevention of sexual harassment in the workplace. When conduct perceived as sexual harassment occurs, it is incumbent on the recipient to verbally direct the perpetrator of the unwanted conduct to cease and desist the unwanted actions and then report the occurrence to the appropriate management official and also provide written documentation regarding the incident. Employees have annual training on the Prevention of Sexual Harassment.

### BACKGROUND

Ronald Lisan, MD, is an Anesthesiologist within Anesthesiology Service. His direct supervisor is Susan Raphaely, MD, Chief, Anesthesiology Service. Four Certified Registered Nurse Anesthetists (CRNA) alleged sexual harassment by Dr. Ronald Lisan, which occurred over an extended period of time. The CRNA's alleging sexual harassment complaints are as follows:

1.  Karin Bonfili, CRNA
2.  Jessica Foster, CRNA
3.  Elaine Costanzo, CRNA
4.  Rhonda Verb, CRNA

Reports of Contact were obtained from each complainant and direct interviews were conducted by Bruce Kafer, RN, and Leshelle Reese, EEO Specialist. Copies of the Reports of Contact were provided to Dr. Ronald Lisan by his direct supervisor. Dr. Lisan's attorney provided a response to the Reports of Contact denying the allegations of sexual harassment. Findings from the interviews will follow.

## INTERVIEW: Karen Bonfili, CRNA

Karen Bonfili, CRNA, was interviewed by Bruce Kafer and Leshelle Reese. Notable was her admission that she had refrained from verbally responding to Dr. Lisan's inappropriate sexual jokes which initially began as just him telling her sexual jokes. Karen Bonfili verbalized that she felt uncomfortable saying anything to Dr. Lisan because he was an attending anesthesiologist. Karen Bonfili wrote a report of contact on January 11, 2017, and expounded on what had been occurring. She also reported that Dr. Lisan had been observed licking the bottom of his shoe in an effort to demonstrate to others he was cured of any sickness.

Karen Bonfili stated the reason she was coming forward now was because it seemed Dr. Lisan had changed from general sexual jokes to comments that are more directed at her. Karen Bonfili's Report of Contact has examples of what Dr. Lisan had said to her. Following Karen Bonfili informing her supervisor and making her aware of what has been occurring, her supervisor subsequently provided the Reports of Contact to Dr. Lisan and also ordered Dr. Lisan to refrain from interacting with Karen Bonfili unless there was a relevant patient care issue to discuss with her. In addition, Dr. Raphaely began scheduling them separately so they would not be working together during the course of this review.

*Violation of Supervisory Order*

On March 8, 2017, Karen Bonfili reported an unwanted incident of touching to Bruce Kafer and Leshelle Reese. In addition, she informed her supervisor and completed a VA Police Report. Subsequently, a "cease and desist" letter was drafted and issued to Dr. Ronald Lisan. Dr. Lisan had been ordered to refrain from interacting with Karin Bonfili on any non-patient care issues. In addition to violating this order, Karin Bonfili alleges he touched her despite her verbal instructions to him to refrain from touching her. In addition, he refused to leave her assigned patient room and despite prompting from another physician he refused to leave and continued to attempt to interact with Karen Bonfili in an intimidating and threatening manner.

## INTERVIEW: Jessica Foster, CRNA

Jessica Foster, CRNA, informed Bruce Kafer and Leshelle Reese that on January 4, 2017, Dr. Lisan had made sexual references and also observed her marriage may be like his which resulted in divorce. Jessica Foster indicated she refrained from instructing Dr. Lisan to discontinue sexual topics as she felt uncomfortable in doing so.

## INTERVIEW: Elaine Constanzo, CRNA

Elaine Constanzo cited incidents that occurred in 2015 that she did not report at the time. She stated because she was a new employee she felt uncomfortable talking to others about these two incidents that occurred. In particular, she recalled one of the incidents from 2015 where Dr. Lisan began talking about his own male genitalia. Upon hearing this she put her hands over her ears and informed Dr. Lisan she wanted him to stop telling her. It is notable that he stopped interacting with her on the sexual subject matter and no further incidents were experienced by Elaine Constanzo.

## INTERVIEW: Rhonda Verb, CRNA

Ms. Rhonda Verb cites that Dr. Lisan has said many inappropriate things to her while working. She cited an example of her leaving for the day and informing Dr. Lisan. She stated Dr. Lisan responded by inquiring what time should he come over. She reported she said nothing in response to this sexual innuendo remark. She added this has

always been how she responds to his inappropriate remarks, which is to say nothing and just look at him.

## INTERVIEW: Ronald Lisan, MD

While Dr. Lisan's attorney had denied all allegations of sexual harassment on his client's behalf. It is appropriate to interview Dr. Lisan regarding the recent infraction of the supervisory order. Dr. Lisan stated that he did touch Karin Bonfili, with her permission. Dr. Lisan is adamant that Karin Bonfili gave him permission to touch her shoulder and states that during this same period, he became noticely upset and that Ms. Bonfili then placed her hands on his shoulder. It is obvious that both parties have two different perceptions of the incident. However, it is also obvious that Dr. Lisan did not follow the direct order to have no contact with the CRNA's.

## CONCLUSION

The Policy on the Prevention of Sexual Harassment underscores VA employees have the responsibility of bringing any instance or allegation of sexual harassment to the attention of their supervisor or appropriate management official. When the January 2017 reports were received there was an immediate fact finding process as well as instructions to Dr. Lisan to refrain from contacting the complainants, which he violated. As a result, a cease and desist letter was issued to him. Any further violations will result in appropriate disciplinary actions.

While the complainants have cited that Dr Lisan has engaged in sexually inappropriate jokes and commentary throughout the course of their employment, there is no indication that anyone informed him to stop with the exception of Elaine Constanzo after which he stopped.

In reviewing the totality of the case it fails to rise to the level of sexual harassment as defined in policy which was promulgated pursuant to Equal Opportunity Employment

law. However, it is clear sexually inappropriate behavior was occurring. Moreover, Dr. Lisan had violated the supervisory order. Ms. Bonfili reported the infraction appropriately and action was taken.

# Bruce Kafer, RN, MSN, BSN, AAS
**"PhD Student"**
**Case Western Reserve University ~ Louis Stokes Cleveland VA Medical Center**
**38056 Edge Meadow Court**
**North Ridgeville, OH 44039**
**(440) 453-8938**
Bruce.Kafer@va.gov
Bruce.Kafer@case.edu



PLAINTIFF'S
EXHIBIT 8K.
7
3/8/19    PSG

## EDUCATION

- **Case Western Reserve University**, Cleveland, Ohio
  "PhD in Nursing Student," attending the Frances Payne Bolton School of Nursing, Case Western Reserve University, Cleveland, Ohio.

  Currently writing a dissertation on Native American national utilization of Substance Abuse and Mental Health Services. This dissertation research study will utilize a multiple regression and a structural equation model to identify direct and indirect predictors of service utilization. The implications are federal strategic planning will be informed to allocate funding to guide engagement pursuant to equitable healthcare practice consistent with the Federal Indian Trust. Research interests also include leadership as it relates to team dynamics, conflict resolution, professional and cultural milieu, and organizational health.

  **"Jonas Veteran Healthcare Scholar"** - Scholarship recipient. Scholars are by invitation only and are funded by the "Jonas Center for Nursing and Veterans Healthcare." Recipients are selected among universities that have a formal relationship with the Veterans Health Administration, U.S. Department of Veterans Affairs, and whose students exemplify nursing excellence.

  **"American Nurse Association / Substance Abuse Mental Health Services Administration Minority Fellow"** - Competitive fellowship program recipient which provides tuition and stipend support for outstanding scholars. Fellowship provides 16 national fellowship slots for minority scholars across the nation.

- **Cleveland State University**, Cleveland, Ohio
  Master of Science in Nursing (MSN) in Population Health Nursing. May 2005.

  **Member, Sigma Theta Tau International** – Nursing Honor Society: Membership is by invitation to baccalaureate and graduate nursing students, who demonstrate excellence in scholarship, and to nurse leaders exhibiting exceptional achievements in nursing.

  **Key Note Graduate Speaker** for the 2005 graduation ceremony for the School of Nursing which hosted baccalaureate and graduate students as well as faculty, staff, student families, and community supporters.

- **Cleveland State University**, Bachelor of Science in Nursing (BSN), May 1999.

- **Cuyahoga Community College**, Associate of Applied Science (AAS) in Community Mental Health Technology with a concentration in Chemical Dependency, May 1992.

## Bruce Kafer, RN, MSN, BSN, AAS

# EMPLOYMENT
## UNITED STATES DEPARTMENT OF VETERANS AFFAIRS (VA)

September 12, 1999 to present

### Louis Stokes Cleveland Department of Veterans Affairs Medical Center (LSCDVAMC)
- OFFICE OF THE DIRECTOR, January 2009 to present

  *Population Health Nurse* – coordinate the LSCVAMC Minority Affairs Program as the Minority Veterans Program Coordinator pursuant to the Department of Veterans Affairs Center for Minority Veterans program. Also, support the LSCVAMC Equal Employment Opportunity and Affirmative Employee Program. Function in various workforce development capacities pursuant to medical center, VISN, and national VHA workforce strategic initiatives / programs. Collaborate with service lines pursuant to shared interest related to applicable directives, policies, and programming.

  *Local Reasonable Accommodation Coordinator* – process all medical documentation for the Medical Center for employees with disabilities and applicants with disabilities pursuant to the Americans with Disabilities Act Amendments Act.

  Consult with other facilities for clinical review of VA Reasonable Accommodation cases.

  Assisted the Dayton VA Medical Center with  conflict resolution regarding an American Indian Initiative at the request of the Dayton VAMC Director. Provided a key recommendation based on cultural knowledge which facilitated resolution.

  Provided specialized training on American Indians and Alaska Natives for a VISN 18: VA Southwest Health Care Network Diabetes Collaborative. Continue to provide consultation on Native America for various internal and external stakeholders who seek cultural direction and input.

- MENTAL HEALTH CARE LINE, January 2001 to December 2008
  *American Indian and Latino Veteran Outreach Coordinator* - coordinated a special growth initiative for American Indian and Latino veterans. Duties included the identification of organizational access barriers and the implementation of an outreach program for these two racial / ethnic cohorts to facilitate engagement, treatment, and retention. Chaired an inter-departmental work group within the LSCDVAMC Mental Health Care Line to establish programmatic and strategic direction and support for this ongoing growth initiative.

  Appointed by the Mental Health Care Line by the Chief in January of 2001, specifically to this Mental Health Care Line Initiative. Initially, for the first 12 months worked collaboratively with CAPT Robert Carson (Ojibwe), PhD, who was detailed to Veterans Integrated Systems Network (VISN) 10 from the United States Public Health Service, Office of the Surgeon General. Thereafter, Mr. Kafer continued as coordinator to maintain this ongoing initiative within VISN 10 and locally.

  Utilized quantitative data to measure increase in user enrollment. Determined insufficiency of initial data sets due to systemic collection protocol inadequacies. Connected problematic data rigor to non-existent internal VHA policy. Subsequently, interfaced with the Center for

## Bruce Kafer, RN, MSN, BSN, AAS

Minority Veterans Director and provided an Executive Summary at his request. The Center for Minority Veterans was able to then facilitate a national VA policy on the collection of racial and ethnic data.

Also worked collaboratively with Native American community organizations as well as Hispanic and Latino community organizations to establish and maintain a positive community network to serve American Indian veterans and Hispanic / Latino veterans in a proactive response to the under utilization of VA services.

Participated in numerous community education venues providing presentations on the cultural circumstances and needs of Native Americans and Native American veterans.

- EQUAL EMPLOYMENT OPPORTUNITY, December 1999 to present
  (Cleveland VA Medical Center Co-lateral Duty)

  *Native American EEO Special Emphasis Program Manager* – current co-lateral duty begun in December 1999. Past chairperson of the Louis Stokes Cleveland VAMC EEO Advisory Committee. Developed a landmark community outreach partnership model to facilitate the establishment of minority community partnerships to assist minorities in applying for VA employment. Function to maintain special emphasis on Native Americans and serve as a point of contact for the community at large as well as VHA.

  Duties included authoring a Memorandum-Of-Understanding (MOU) between the LSCDVAMC and the Cleveland Sight Center to establish a partnership to facilitate their constituents in being able to identify appropriate assistance for their application for federal employment. This is an ongoing EEO project that is addressing the viability of developing Braille material to supplement an informational package to further orient blind patrons to the federal employment process.

  "Key Note Speaker" for a four facility speaking tour during November 2005 in VISN 3 to educate staff on the special circumstances of Native Americans and American Indian veterans for their annual Native American Heritage Month Celebrations.

- COMPREHENSIVE HOMELESS CENTER January 2001 – December 2008
  (Mental Health Homelessness Duties)

  Joined this operating division within the Mental Health Care Line when formally established as a Mental Health Care Line Registered Nurse. Professionally served as a psychiatric nursing case collaborator to assist homeless veterans afflicted with serious mental illnesses. Facilitated the acquisition and utilization of VA services. Collaborated with the Volunteers of America (VOA) Veterans Resource Center pursuant to the VA Homeless Providers Grant and Per Diem Program to establish a therapeutic and collaborative milieu.

  Utilized veteran data to assist Comprehensive Homeless Center in strategizing on billing and meeting key primary care measures related to veteran medical status, vesting, and clinical indicators.

## Bruce Kafer, RN, MSN, BSN, AAS

- ADDITIONAL MENTAL HEALTH CARE DUTIES April 2004 to September 2008

  *PMDB Trainer* – trainer for the VA Prevention and Management of Disruptive Behavior (PMDB) Program for LSCDVAMC since April 2004. Train medical center staff in VA

  approved de-escalation and self-defense techniques. All persons working within mental health in any capacity are required to attend as well as other key medical center employees typically working in front line customer service areas.

  Presented various data to attendees related to safety and evidenced based approaches for the prevention and management of disruptive behavior. Certified by the VHA PMDB program.

- MENTAL HEALTH CARE LINE REGISTERED NURSE April 2000 to 2005

  *Intensive Psychiatric Community Care Team (IPCC)* – Formally joined the Louis Stokes Cleveland Department of Veterans Affairs Mental Health Care Line in April 2000 to function as a psychiatric RN to intensively case manage severely mentally ill veterans with multiple medical problems who lived within the medical center service area. Functioned out of a VA community based outpatient clinic and interfaced with medical center services where needed and worked effectively with a multidisciplinary staff to promote veterans' health and psychiatric stability.

- HIGH INTENSITY PSYCHIATRY NURSING DUTIES October 2001 to September 2002

  *High Intensity General Psychiatry* – 2001 – 2002 served in a temporary duty assignment due to an emergency staffing shortage and performed as a staff psychiatric nurse on the locked, high intensity general psychiatry wards at both Brecksville and Wade Park campuses. Also, provided detoxification nursing to veterans addicted to heroin, benzodiazepines, alcohol, and other addictive substances. Implemented detoxification program protocols pursuant to VA best practices in substance abuse and mental health.

- GERIATRIC EXTENDED CARE LINE, September 1999 to April 2000

  *Geriatric nursing duties* –  functioned as a staff nurse to serve geriatric veterans in an extended care setting providing nursing care for complicated co-morbid conditions including dementia, various psychiatric presentations, Alzheimer's and long term gero-psychiatric veterans, as well as Vancomycin Resistant Enterococcus (VRE) patients. Performed Charge Nurse duties on a rotating basis.

## Veterans Health Administration Native American Advisory Council

- January 2003 to September 2005

  COUNCIL MEMBER - Competitively selected to serve on the national VHA Native American Advisory Council. Provided advisement to the Under Secretary for Health on the VA relationship with Native America related to veterans' health and also VA employment.

  PLANNER / COORDINATOR - for annual national VHA training conferences to educate on socio-cultural aspects of Native Americans and Native American veterans. Secured key

## Bruce Kafer, RN, MSN, BSN, AAS

national American Indian Experts including the former Assistant Secretary for the Interior (Bureau of Indian Affairs Director), former Indian Health Service Director (Michael Trujillo) the Deputy Under Secretary for Health for Health Policy Coordination, and the Chief Medical Officer of the Indian Health Service (IHS), among others.

Introduced a strategic planning initiative to facilitate increased organizational structure and to establish measurability both quantitatively and qualitatively consistent with the mission and purpose established in the national VHA charter.

Assisted with budgetary management and the initial contracting of external presenters. Operated in compliance with budgetary restrictions and contracting guidelines.

Initiated a collaboration pilot with a Tribal College on the Pine Ridge Indian Reservation and partnered with the Oglala Lakota College (OLC) Nursing Program to bring two OLC students to the national VHA Native American Conference in Bedford, MA. Coordinated and worked with a regional consortium and the OLC Nursing Director. Hosted students in Bedford, MA, and served as their "cultural attaché'" during the conference.

## Under Secretary for Health Diversity Advisory Council
* January 2006 to present

NATIVE AMERICAN WORKGROUP MEMBER
*The Under Secretary for Health's Diversity Advisory Council*

Functioned to assist the workgroup in the facilitation of national Native American diversity programmatic efforts.

FILM PRODUCER: *"NATIVE AMERICA: DIVERSITY WTIHIN DIVERSITY"*
Provided leadership, creative and strategic cultural direction, as well as coordination, and was featured in a national film project to highlight and educate on diversity within Native America as part of the Under Secretary for Health's national Veterans Health Administration *Reach for Diversity* campaign. Utilized various quantitative and qualitative measures to determine the education requirements of VA staff regarding Native America. Also, employed appropriate cultural engagement strategies based primarily on qualitative evidence regarding the role of traditional healing in Native America and the challenges and barriers for integration into the western health service delivery structures.

This film was recipient of an "Aurora Award," an independent film award, and has been distributed to all VA Medical Centers in the nation as well as other key colleges, universities, organizations and among Native American stakeholders.

Contracted with local film company and directed local filming in Cleveland, Ohio. Remained within budget and contract protocols. Also, secured key local personnel and veterans for filming pursuant to media release guidelines.

Previewed this film in a workshop during the Society of American Indian Government Employees Annual Conference in Anchorage, Alaska, in 2006.

## Bruce Kafer, RN, MSN, BSN, AAS

- KEY NOTE ADDRESS, November 2007

Provided a key note address to the U.S. Department of Agriculture for Native American Heritage Month celebration in Washington, DC. Utilized a traditional Native American storytelling format. Educated attendees based on evidence explicated from Native American research.

**Southern Arizona VA Health Care System (SAVAHCS)**
- LEAD FACILITATOR: "GATHERING OF HEALERS"
  March 2004 to Present (Faculty position)

Serve as Lead Facilitator for the SAVAHCS "Gathering of Healers" Training Program. Assisted with the development and ongoing maintenance and strategic direction of this Native American cultural immersion program designed to assist SAVAHCS staff in gaining cultural competency with Native American veterans and becoming more effective in a high volume health care environment. Also, to facilitate reconnection with the holistic principles of health and the VA mission.

Provided leadership for the submission to compete for the 2005 VHA Diversity Advisory Award. Serve as the lead facilitator of this program which is based on a traditional Native American paradigm of spirit, mind, and body. Provide proposal writing and outcome reports for this initiative as well as ongoing collaboration and program development. Also, provide justification for total program costs: Approximately $20,000.

Provided Native American education presentations to SAVAHCS staff as part of their internal diversity and minority health initiatives. Cultural competency presentations based on quantitative and qualitative data from multiple sources related to Native America, minority health, and diversity.

- SECRETARY OF VETERANS AFFAIRS DIVERSITY AND INCLUSION EXCELLENCE AWARD 2016 – NATIONAL TEAM AWARD

Lead author for the submission of this team award for Diversity and Inclusion Excellence presented by the Secretary of the U.S. Department of Veterans Affairs.

**New Mexico VA Health Care System (NMVAHCS)**
- LEAD FACILITATOR: "GATHERING OF HEALERS"
  October 2007 (Faculty position)

Implemented the first two sessions of NMVAHCS Gathering of Healers program. Assisted with proposal development, strategic direction, and outcome reporting. Worked with national and local team to implement the Gathering of Healers model utilized with SAVAHCS. Approximate program cost: $20,000.

**Cleveland Federal Executive Board (FEB)**
CLEVELAND FEDERAL COMMUNITY LEADERSHIP INSTITUTE (CFCLI)
- September 2003 to 2008 (Faculty Leadership position)

## Bruce Kafer, RN, MSN, BSN, AAS

Served five years as faculty with the CFCLI Development Team. Responsible for the implementation and supervision of the "Group Project" aspect of the leadership program which is the capstone aspect of the curriculum. Introduced an adapted nursing science framework to guide participants with the implementation of community based projects commensurate with broad based standards of practice in government initiatives.

Team member recipient of the 2006 Federal Executive Board "Wings of Excellence" Team Award for the CFCLI Development Team.

Cognizant of the role of leadership in establishing a vision pursuant to the organizational mission and the impact of leadership in facilitating the voluntary donation of creative energy for working towards the vision by team members.

- CFCLI (LEADERSHIP GRADUATE) September 2002 to May 2003

Graduate of this federal leadership program in 2003, which is sponsored by the Cleveland Federal Executive Board. Approached by the CFCLI Director to join the Development Team due to exemplary performance and outstanding contributions.

### Center for Minority Veterans (CMV) U.S. Department of Veterans Affairs
- LECTURER March 2003

Lectured on "Best Practices" at the national CMV training conference in Washington, DC, in 2003. Outlined for participants the various facets of a strategic outreach plan which includes goals and objectives and the role of quantitative data in strategizing with unique user populations as well as key aspects of a culturally specific mental health initiative.

- POLICY SUBMISSION November 2002

Pursuant to a national VHA data review submitted a policy proposal to the CMV Director following consultation on the need for a national VA policy on the collection of racial and ethnic data. Policy eventually adopted two years later, final work completed by the CMV.

- TRAINING CURRICULUM May 2005 to present

Submitted a proposal in collaboration with the Center for Minority Veterans to establish an online curriculum on American Indian cultural competency for all VA staff. Also, implemented an online pilot with a cohort within VISN 18 to secure data for curriculum development and to establish course efficacy.

The final curriculum was adopted by the Under Secretary for Health Diversity Advisory Board and is posted on the VA Web site (http://vaww1.va.gov/diversity/) as a companion booklet to the film, *Native America: Diversity Within Diversity.* This booklet contains a comprehensive overview of Native America and is written to increase the cultural competency of VA staff so they may better serve American Indian and Alaska Native veterans as well as gain increased knowledge about the role of culture and its impact on worldview and health.

## Bruce Kafer, RN, MSN, BSN, AAS

## RELEVANT PRIVATE SECTOR AND NON PROFIT EMPLOYMENT EXPERIENCE

Southwest General Health Center
- September 1998 to August 1999

  *Emergency Room Nursing Assistant* – 1998 – 1999, assisted in all facets of emergency and trauma care within the emergency room department including the use of restraints for out of control patients.

West Side Community Mental Health Center
- January 1994 – August 1998

  *Assistant Rehabilitation Technician* – supervised severely mentally ill clients in an 18-month residential facility providing structure, ADL assistance, and crisis intervention.

Parmadale Children's Village
- August 1990 to May 1992

  *Childcare worker* – worked with both chemically dependent adolescents and behaviorally challenged youth with various psychiatric presentations in a structured residential setting. Provided crisis intervention, ADL supervision, and guidance within the programmatic structure.

Glenbeigh Hospital
- September 1985 – October 1986

  *Counselor* - functioned as chemical dependency counselor working with adolescents residing in a 38 day residential chemical dependency treatment program. Worked in a variety of settings including assessment, primary treatment, group and family therapy, aftercare, education, and crisis intervention.

## COMMUNITY

- GENERAL SYNOD 2015 SPEAKER – presented on the cultural significance and relevance of the "UCC Repudiation of the Doctrine of Discovery" to an audience of 3500 who were attending the United Church of Christ National General Synod, held at the Cleveland Convention Center in June of 2015.

- ADVISOR - September 2011 to 2013
  Served as a member of the American Indian Education Center's Professional Advisory Committee to provide guidance in the implementation of a community health assessment grant from the Administration for Native Americans, an agency of the Department of Health and Human Services (HHS).

- PRESENTER - Presented a plenary session on Native America at the 2008 Federal Bureau of Investigation Hates Crimes Conference in Cleveland, Ohio.

- Champion Personnel System, Inc., Board of Directors member since 2006.

- BOARD MEMBER - September 2002 to August 2003

**Bruce Kafer, RN, MSN, BSN, AAS**

Served as a population health advisor and board member to the Native American Indian and Veterans Center (501(c) 3) of Barberton, Ohio.

**State of Ohio**
- PRODUCER / DOCUMENTARY - 2005
  Produced a documentary on Native American Traumatic Brain Injury for the State of Ohio Rehabilitation Services Commission (RSC) entitled, *"Native American Traumatic Brain Injury: A Journey of Healing."* Subsequently, RSC circulated 1000 copies across the national TBI network.

  As an outcome of this effort, provided an educational workshop based on evidence at the 2006 North American Brain Injury Society (NABIS) annual international conference in Miami, Florida, in September 2006.

- NURSING REWARDS CAMPAIGN – 2003

  One of 40 nurses selected out of 400 applicants to participate in the State of Ohio Board of Nursing "Nursing Rewards" campaign to attract Ohio residents into the field of nursing. Featured on the State campaign's Web page.

## TRIBAL MEMBERSHIP
- Oglala Sioux Tribe – The Pine Ridge Indian Reservation, South Dakota

  Enrolled member of the Oglala Sioux Tribe, which is the federally recognized tribe that resides on the Pine Ridge Indian Reservation in South Dakota.

## CERTIFICATION
- Basic Life Support (BLS) – The American Heart Association (current)
- Advanced Cardiac Life Support (ACLS) – The American Heart Association (2003 – 2005)
- Prevention and Management of Disruptive Behavior Trainer – LSCDVAMC
- Certified PPD Nurse for Tuberculosis Screening – LSCDVAMC
- Suicide Prevention Trainer

## AWARDS AND RECOGNITIONS
- U.S. Department of Veterans Affairs
  **2016 Secretary of Veterans Affairs Diversity & Inclusion Excellence Award**
  Southern Arizona VA Health Care System "Gathering of Healers" Program
  Faculty Member

- State of Ohio
  Ohio Commission on Minority Health
  **2014 Minority Health Community Action Leadership Award**.
  Minority Health Month Awards Program Recipient, Columbus, Ohio.

- **Recognition**, Featured on the cover of Minority Nurse Magazine a national publication in Spring 2008 with a group of local American Indian veterans. Also, featured in the cover story related to minority nursing with American Indian veterans. Congratulated by the Chief Nursing Officer of the VHA as well as multiple stakeholders within VHA nationally and locally.

## Bruce Kafer, RN, MSN, BSN, AAS

- **Martin Luther King Drum Major Award**, January 2008, Louis Stokes Cleveland Department of Veterans Affairs.

- **SAIGE Award**, October 2007, Society of American Indian Government Employees. Award noted in nationally distributed U.S. Department of Veterans Affairs quarterly periodical entitled, *U.S. Department of Veterans Affairs: VAnguard*. September/October 2007, page 34.

- **Wings of Excellence Award**, June 2006, Cleveland Federal Executive Board. Team member of award winning leadership development team implementing the Cleveland Federal Community Leadership Institute program.

- **Mental Health Care Line Champion**, 2004. Louis Stokes Cleveland Department of Veterans Affairs Medical Center. For going "above and beyond" on the behalf of a WWII Shoshone veteran which resulted in 100% service connection.

- **National Nursing Initiative Education Scholarship** 2001. Awarded to qualified nurses seeking ongoing nursing education for service obligation – MSN and service repayment obligation completed.

- **Recognition**, Numerous certificates of recognition for various speaking engagements on Native America.

**Bruce Kafer, RN, MSN, BSN, AAS**

Case Western Reserve University ~ Louis Stokes Cleveland VA Medical Center

38056 Edge Meadow Court

North Ridgeville, OH 44039

(440) 453-8938

Bruce.Kafer@va.gov

Bruce.Kafer@case.edu

**From:** Raphaely, Susan (VHACLE)
**Sent:** Thursday, December 08, 2016 1:43 PM
**To:** Lisan, Ronald M. (VHACLE)
**Subject:** Questions



Ron

Hope your return is going smoothly. I spoke with Dr Altose about making no call accommodations for you. Is this something you can have your doctors request on a more formal basis? What are your thoughts about covering late duty? Lastly, are you able to cover the Christmas holiday as originally planned?
I look forward to hearing from you,
Susan

# Behavioral Health Associates
*Partners in Quality Mental Health Services*

(216) 831-2500 • FAX (216) 831-4035

24400 Highpoint Road • Suite 9 • Beachwood, Ohio 44122
26777 Lorain Road • Suite 414 • North Olmsted, Ohio 44070

**Cleveland Center for Cognitive Therapy**

James Pretzer, Ph.D., Director

*Specializing in cognitive therapy as well as consultation and training for mental health professionals*

**Anxiety Treatment Center**

Barbara Fleming, Ph.D., Director

*Specializing in the treatment of anxiety disorders, phobias and stress*

**PsychSource**

Warren D. Salkin, Ph.D., Director

*Specializing in clinical consulting to private and public organizations, employee assistance, and debriefing services*

**Visit Us On The Web**

www.BehavioralHealthAssoc.com

---

December 16, 2016

**PLAINTIFF'S EXHIBIT 9**

Re: Ronald LISA
BD: 4-7-59

To Karen Roach;

This will verify this patient's need to not be on call as he is recovering from a recent hospital stay.

Sincerely,

Carole Marciano

**Behavioral Health Associates**
Partners in Quality Mental Health Services

Cleveland Center for Cognitive Therapy
Anxiety Treatment Center
PsychSource

**CAROLE M. MARCIANO, L.I.S.W.**

(216) 831-2500 • FAX (216) 831-4035
24400 Highpoint Road • Suite 9 • Beachwood, Ohio 44122
26777 Lorain Road • Suite 414 • North Olmsted, Ohio 44070
www.BehavioralHealthAssoc.com



**Info**

PLAINTIFF'S EXHIBIT
70
PENGAD-Bayonne, N. J.

**From:** Raphaely, Susan (VHACLE) <Susan.Raphaely@va.gov>
**Sent:** Monday, December 19, 2016 10:50 AM
**To:** Kafer, Bruce L. (VHACLE); Lisan, Ronald M. (VHACLE)
**Cc:** Zekanovic, Jelena (VHACLE); Roach, Kevin D. (VHACLE); Beham, Shawn T. (VHACLE)
**Subject:** Reasonable accommodations

Bruce,

I am reaching out to you for your assistance with a request I have received for accommodations by Dr. Ronald Lisan. Dr. Lisan is a long standing member of the anesthesia department and due to changes in his health status he is stating he is unable to participate in call. After much consideration, I feel that as a department we are unable to meet his request. Taking call is an essential function of his position. All the anesthesiologists within the Service who work primarily at Wade Park need to be able to participate in the call schedule. We do have one position for a full time, no call anesthesiologist that works exclusively at the ASC, but that position is currently filled.
Therefore, I am would request that if Dr. Lisan is indeed unable to perform the essential functions of his position, you could assist him in alternative reasonable accommodations.

I did receive a signed note by one of Dr. Lisan's care providers if you need that for your documentation. Let me know and I will forward that to you.

Sincerely,

Susan Raphaely, MD
Chief, Department of Anesthesiology
Louis Stokes VA Medical Center
Cleveland, OH 44106
216-791-3800, ext 6334

1


PLAINTIFF'S
EXHIBIT
11

**VA HANDBOOK 5975.1**                                                   **November 27, 2013**

**d. Essential Functions:** The essential functions of a job are the occupational duties that are fundamental to the position to the extent that the individual cannot do the job without being able to perform them. A function can be "essential" if, among other things, the position exists specifically to perform that function, a limited number of other employees can perform the function if given the assignment, or the function is specialized and the incumbent is hired based on his or her ability to perform it. If a function is listed in the position description as an essential function, but is not performed by the incumbent or takes only a few hours per week, it is not usually considered "essential" for purposes of accommodation. The following factors are considered in determining whether a job function is essential:

- Whether the reason the position exists is to perform that function;

- The number of other employees available to perform the function or among whom the performance of the function can be distributed;

- The degree of expertise or skill required to perform the function;

- Written job descriptions prepared before advertising or interviewing applicants for the job;

- The amount of time actually spent on the job performing the function;

- The consequences of not requiring the incumbent to perform the function;

- The terms of any collective bargaining agreement;

- The work experience of past incumbents in the job; and/or

- The current work experience of incumbents in similar jobs.

An example of an essential function for a social worker would be the ability to understand what the Veteran is saying. Speaking and hearing would not be essential functions, as the social worker could use an interpreter or other methods for communication. An essential function for a management analyst would be the ability to obtain information, synthesize it, and prepare reports.

**e. Extenuating Circumstances:** Factors beyond the Department's control which make it impossible for a reasonable accommodation to be provided within the time frame are considered to be extenuating circumstances. Examples of extenuating circumstances include, but are not limited to, delays encountered when ordering equipment that must be back-ordered, the vendor normally used has gone out of business, or there are unexpected delays by the vendor or CAP. Therefore, the office/facility is encouraged to use charge cards when possible to avoid contracts, ratification, etc. Review of medical documentation, the absence of the DMO or LRAC, and other situations within VA's control are <u>not</u> considered to be extenuating circumstances and should not delay the processing of a request.



f. To request reimbursement from the Centralized Fund, follow the instructions on the website: <http://www.diversity.va.gov/programs/pwd.aspx#fund>

## 21. DENIAL OF REASONABLE ACCOMMODATION REQUESTS.

a. After consultation with the NRAC or Regional OGC, the DMO may deny the request for accommodation for the following reasons:

(1) **Undue Hardship**. A determination of undue hardship means that VA finds that a specific accommodation would be significantly difficult to provide, or would fundamentally alter the nature of the operations of the affected VA organization, as defined earlier. Before reaching this determination, the DMO, in consultation with the LRAC, must explore whether other effective accommodations are available and can be provided.
(Note: In determining whether an accommodation poses an undue hardship, the financial resources of the organization or the Department as a whole should be considered, not just the resources of the individual facility or staff office. Thus, only the Secretary, VA, can deny a request based on cost, and facilities can invoke undue hardship only for impact on operations.)

(2) **Insufficient Medical Documentation**. The employee or applicant, when requested, did not provide sufficient medical documentation to establish a covered disability or a need for reasonable accommodation. <u>Medical documentation should not be requested when the disability is obvious or the employee has already submitted documentation to VA in the past for the same functional limitation.</u>

If medical documentation is received from an appropriate health care provider individual or entity, states the disability and nature of the impairment (the expected/likely duration, its severity, and one or more activities it limits including the extent/degree to which they are limited) and either the reason the individual requires accommodation or how the accommodation will assist the individual, it is VA's policy to not request additional medical documentation. Instead, the facility or office must move to the decision process. Additional documentation can be requested only if the medical provider did not answer the questions on VA Form 0857e, and/or the employee is unwilling to ask the medical provider to answer the questions.

(3) **Removes Essential Function(s)**. The requested accommodation would require the removal of an essential function from the position occupied by the employee or from the position for which the applicant applied. See section 2 (d) for the definition of essential functions.

(4) **Lowers Standards**. The requested accommodation would require lowering a performance or production standard that is required of all employees in similar positions (job series/grade level). To invoke this as the reason for denial, the performance or production standard must exist prior to the time of the request.

**November 27, 2013**



**VA HANDBOOK 5975.1**

c. All requests for and provisions of reasonable accommodation must be confidential and documented via RACS.

## 9. INTERACTIVE PROCESS.

a. When the individual makes an oral or written request for reasonable accommodation, managers should ordinarily begin to engage in the interactive process with the individual after receiving notice of the request. The interactive process is the communication between the DMO and the employee, in consultation with the LRAC, to determine how best to respond to the employee's request. During this process, an individualized assessment will be conducted to review essential and marginal job functions, the employee's limitations, and possible accommodations. The interactive process may require more than one discussion. The DMO or LRAC will also explain the reasonable accommodation process to the employee at this time.

b. Ongoing communication and cooperation are important, especially when a specific limitation, problem, or barrier is unclear or when the disability or an effective accommodation is not obvious. Thus, interactive discussions should be documented, with at least the date, time, participants, and key points noted.

c. In the case of an applicant for employment, the local HRMO (or his or her designee) will engage in the interactive process with the applicant.

d. Once a job offer has been made, if an accommodation is requested, the interactive process with the new employee with a known disability (post offer but pre-on boarding) should be conducted by the supervisor and the LRAC, in consultation with the GC, RC or NRAC, if necessary, to discuss and identify possible accommodations, and ensure that the requested accommodation is in place when the new employee starts.

**e. Failing to engage in the interactive process is a violation of the Rehabilitation Act of 1973, as amended, and may create liability for VA.**

## 10. INTERIM WORKPLACE ADJUSTMENTS.

Where feasible, interim workplace adjustments or accommodations will be provided for an employee with an obvious or documented disability until a final decision has been made on the request for accommodation (and, if approved, implemented). The interim workplace adjustment should enable the individual to perform the essential functions of the job or enjoy the benefits and privileges of employment without posing a direct threat to anyone's health and safety. Interim workplace adjustments are not required or guaranteed, but are highly recommended when they can be offered without adverse impact on the operation of the unit.

The office or facility should strive to provide an interim accommodation if there will be a delay in acquiring the approved accommodation. This is sometimes the case when the accommodation is ordered from the Department of Defense's CAP. VA Form 0857c, Approval of Interim Accommodation, can be used to document the agreement to make a workplace adjustment until the requested accommodation can be arranged.

**Info**



| | |
|---|---|
| **From:** | Kafer, Bruce L. (VHACLE) <Bruce.Kafer@va.gov> |
| **Sent:** | Monday, December 19, 2016 1:50 PM |
| **To:** | Lisan, Ronald M. (VHACLE) |
| **Subject:** | VA Reasonable Accommodation Request: Dr. Ronald Lisan |
| **Attachments:** | A Medical Documentation Form to be completed by Provider REASONABLE ACCOMMODATION.pdf; REASONABLE ACCOMMODATION VA HANDBOOK 5975 (1).pdf |

**Importance:**   High

Dr. Ronald Lisan,

I have attached instructions for your health provider and also the form that is needed. I understand at this juncture you are requesting to taken off the "on call" schedule. However, the duration for this is unknown by me.

Have you used any FMLA (Family Medical Leave Act) time?

Please advise me, feel free to call me if you have questions.
-Bruce

Bruce Kafer, RN, MSN
Local Reasonable Accommodation Coordinator (LRAC)
Minority Veterans Program Coordinator
Office of the Director
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Mail Stop: EEO
Cleveland, Ohio 44106
(216) 791-2300 ext. 6601
Bruce.Kafer@va.gov

*FAX: (216) 707-7627*

**_Equal Employment Opportunity, Diversity and Inclusion, Statement of the Month:_**
*"The true measure of the value of any business leader and manager is performance" ~Brian Tracy*



1

PENGAD-Bayonne, N. J.
PLAINTIFF'S EXHIBIT
15

## Info

**From:** Kafer, Bruce L. (VHACLE) <Bruce.Kafer@va.gov>
**Sent:** Tuesday, December 20, 2016 4:21 PM
**To:** Lisan, Ronald M. (VHACLE)
**Subject:** RE: VA Reasonable Accommodation Request: Dr. Ronald Lisan

Dr Lisan, do you have time to meet tomorrow morning individually in person with me? I can appreciate the sincerity of your assertions and thank you for making them. However, I do think it is important you understand the VA Reasonable Accommodation process and what is involved and this concept of essential functions. I am also available on Thursday and Friday so please advise if you have time to meet.

Thanks,
-Bruce

Bruce Kafer, RN, MSN
Local Reasonable Accommodation Coordinator (LRAC)
Minority Veterans Program Coordinator
Office of the Director
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Mail Stop: EEO
Cleveland, Ohio 44106
(216) 791-2300 ext. 6601
Bruce.Kafer@va.gov

*FAX: (216) 707-7627*

***Equal Employment Opportunity, Diversity and Inclusion, Statement of the Month:***
*"The true measure of the value of any business leader and manager is performance" ~Brian Tracy*

---

**From:** Lisan, Ronald M. (VHACLE)
**Sent:** Tuesday, December 20, 2016 4:06 PM
**To:** Kafer, Bruce L. (VHACLE)
**Subject:** RE: VA Reasonable Accommodation Request: Dr. Ronald Lisan

Bruce,

Sorry, one more question.



**From:** Kafer, Bruce L. (VHACLE)
**Sent:** Friday, December 23, 2016 5:23 PM
**To:** Lisan, Ronald M. (VHACLE)
**Cc:** Zekanovic, Jelena (VHACLE); Freeman, Andrea M. (VHACLE)
**Subject:** Medical Documentation Received
**Importance:** High

Dr. Ronald Lisan, I received your medical documentation and I will be meeting with HR about your case. However, you should know your medical documentation is private and I will not share the contents. Only that you have a disability and what the functional limitations are as the doctor has documented.

Respectfully,

-Bruce

Bruce Kafer, RN, MSN

Local Reasonable Accommodation Coordinator (LRAC)

Minority Veterans Program Coordinator

Office of the Director

Louis Stokes Cleveland VA Medical Center

10701 East Boulevard

Mail Stop: EEO

Cleveland, Ohio 44106

(216) 791-2300 ext. 6601

Bruce.Kafer@va.gov

*FAX: (216) 707-7627*

Dec. 23. 2016  2:44PM                                                    No. 0105  P. 5

**VA** Department of Veterans Affairs

PLAINTIFF'S EXHIBIT 17

## REQUEST FOR MEDICAL DOCUMENTATION

1. DATE  12/27/16

2. Dear Health Care Provider:

Your patient  Ronald Lisan, MD                has requested an accommodation *(describe the requested accommodation here)*

because of functional limitations caused by his/her disability. Since the disability is not visible, and we do not have documentation on file, I would appreciate information that would allow me to determine whether this individual has a disability covered by the Rehabilitation Act of 1973. The information that you provide will also help me determine whether the requested accommodation will be effective in eliminating or minimizing the limitations caused by the disability.

3. The key duties that your patient has advised that he/she is unable to perform, or benefits and privileges of employment that he/she is unable to enjoy are:
To be excused from "on call" duties, for nights, weekdays, weekends, and holidays, etc. It is unclear if this is a time limited request.

4. I have been given the responsibility for determining if your patient is covered by the Rehabilitation Act. I cannot proceed until I receive the requested information. If you have any questions, please contact me at the telephone number below.

| 5. MY NAME IS | 6. MY PHONE NO. IS | 7. MY TITLE IS |
|---|---|---|
| Bruce Kafer, RN, MSN | (216) 791-2300  Ext. 6601 | L: Reasonable Accommodation Coordinator |

8. Please return this form and the requested information to me at:
*(Enter complete mailing address and fax number.)*
Bruce Kafer, RN, MSN
Cleveland VA Medical Center
10701 East Boulevard
Cleveland, OH 44106-1702
FAX: 216-707-7627

9. Please do NOT provide a copy of the patient's complete medical history.
The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.
At present, we only need the following information:

(a) the nature, severity, and duration of the impairment;
Ron has contamination based OCD [obsessive Compulsive Disorder] + co-morbid depression.

(b) one or more of the activities the impairment limits (walking, reaching, breathing, etc.);
Ron needs to be allowed to slowly acclimate to his work schedule so as to avoid flooding him with work stressors/responsibilities. If allowed to slowly

reacclimate, his prognosis for returning to full functioning is good! However if Ron is overwhelmed with duty hours (especially call) he could

Dec. 29. 2016  2:44PM                                              No. 0703  P. 4

Ronald Lisan, MD

(c) the extent or degree to which the impairment limits an activity;

likely deteriorate rapidly, necessitating readmission
for further treatment. Prior to treatment his
symptoms were so severe as to interfere not only

(d) the reason the individual requires accommodation or the particular accommodation requested, and/or

with work but also basic ADL's. His mood
symptoms included passive thoughts of suicide, severe
anhedonia & poor appetite with considerable weight loss.

(e) how the accommodation will assist the individual in applying for a job, performing the essential functions of the job, or to enjoy a benefits of employment.

Again, this no-call request would be temporary.
However the stresses of call including lack of
sleep & increased anxiety could likely have delirious

| 10. NAME OF HEALTH CARE PROVIDER | 11. SIGNATURE OF HEALTH CARE PROVIDER | 12. DATE OF SIGNATURE |
|---|---|---|
| M. J. Kramer | | 12/27/16 |

effects
on
his
health.

13. MEDICAL/PROFESSIONAL LICENSE CATEGORY AND NUMBER

Medical licenses:
WI: 64665520
GA: 66450

IL:

I have attached his discharge
summary as well.
     Please call my work cell
at 262-370-0614 with questions

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM 0857e, SEP 2013, back                     Page 2 of 2

**Steven Sindell**



| | |
|---|---|
| **From:** | Raphaely, Susan (VHACLE) <Susan.Raphaely@va.gov> |
| **Sent:** | Wednesday, January 11, 2017 10:55 AM |
| **To:** | Lisan, Ronald M. (VHACLE) |
| **Subject:** | meeting CX |

Ron,

Our meeting scheduled for 10am Thursday has been cancelled. Bruce Kafer, the Reasonable Accommodation Coordinator, stated he will reach out to you directly with what has been decided based on your medical documentation.

Susan Raphaely, MD
Chief, Department of Anesthesiology
Louis Stokes VA Medical Center
Cleveland, OH 44106
216-791-3800, ext 6334

## *Equal Employment Opportunity, Diversity and Inclusion, Statement of the Month:*

*"The true measure of the value of any business leader and manager is performance" ~Brian Tracy*





---------- Forwarded message ----------
From: "Lisan, Ronald M. (VHACLE)" <Ronald.Lisan@va.gov>
To: "ronald.lisan@case.edu" <ronald.lisan@case.edu>, "ronald.lisan@gmail.com" <ronald.lisan@gmail.com>
Cc:
Date: Thu, 12 Jan 2017 16:46:34 +0000
Subject: FW: February call schedule

---

**From:** Raphaely, Susan (VHACLE)
**Sent:** Thursday, January 12, 2017 11:39 AM
**To:** Lisan, Ronald M. (VHACLE)
**Cc:** Roach, Kevin D. (VHACLE)
**Subject:** February call schedule
**Importance:** High

Ron,

As you are aware the responsibility of taking call remains an essential duty as a physician on the Anesthesia Service. As such, if you plan to continue to work fulltime in the Anesthesia Service you will be placed on the February call schedule. Kevin will be making the schedule today and tomorrow, so if you would like to submit any requests I would do so now.

Susan Raphaely, MD

"ronald.lisan@case.edu" <ronald.lisan@case.edu>, "ronald.lisan@gmail.com" <ronald.lisan@gmail.com>
Cc:
Date: Thu, 12 Jan 2017 18:44:15 +0000
Subject: RE: Meeting on Reasonable Accomodation

Mr. Kafer,



I was notified yesterday that the planned meeting today for my reasonable accommodation request was cancelled – I was not given the reason why.

That is currently a significant issue, since I have received communication from Dr. Raphaely requesting me to submit my call request for February ASAP, as well as to discuss the holiday call coverage I will take.

Obviously, I cannot put in my call requests until I have the parameters for the reasonable accommodation defined. As you know from my medical documentation, working gradually back into the regular call schedule has been recommended by my providers.

Also, I want to let you know (if you are not already available) that I have retained employment attorneys Steven & Rachel Sindell to help me through the various FMLA, accommodation, etc. processes. I think I have an ROI form already filled out but..

I hereby give you permission to speak with my attorneys Steven and/or Rachel Sindell about my health & accommodation issues. Their office phone number is 216-292-3393. Email is info@sindellattorneys.com or Rachel@sindellattorneys.com

Thank you for your assistance in this matter.

Ronald Lisan, MD

**Rachel Sindell**

PENGAD-Bayonne, N. J.

PLAINTIFF'S
EXHIBIT
27

| | |
|---|---|
| **From:** | Lisan, Ronald M. (VHACLE) <Ronald.Lisan@va.gov> |
| **Sent:** | Friday, January 13, 2017 11:11 AM |
| **To:** | Kafer, Bruce L. (VHACLE) |
| **Cc:** | rachel@sindellattorneys.com; info@sindellattorneys.com; ronald.lisan@case.edu; ronald.lisan@gmail.com |
| **Subject:** | Personal & Confidential -- Information on Reasonable Accomodation Request & Meeting |
| **Importance:** | High |

Dear Mr. Kafer,

I apologize for following up so soon on my last email, but I am being pushed by the Anesthesiology department administration to get my February call requests (and 2017 holiday call requests) submitted ASAP. Obviously, I cannot do this without knowing what the reasonable accommodations will be -- especially since night-time call is one of the major issues at this time.

I still do not know why the meeting was cancelled for yesterday – this was most inconvenient not only for the reason stated above, but also because my employment-law attorneys were supposed to come for the meeting. They would also like to know why it was cancelled on relatively short notice, given the problems it will now cause me.

In addition, I am also scheduled to meet with my attorneys this afternoon, and therefore need to have some more information about the reasonable accommodation issues so we can decide how to proceed.

I appreciate your cooperation in these matters. And even though I understand it may be a bit inconvenient for you, I would greatly appreciate you getting back to me ASAP.

Thank you,

Ronald Lisan MD

1

Dear Dr. Lisan,



In order to receive a reasonable accommodation from the Department of Veterans Affairs your medical documentation must provide evidence of how your disability impairs the performance of essential functions of your position. Documented medical evidence is different than discussions or recommendations or even verbal explanations.

Please remember, the VA Reasonable Accommodation process is a vehicle to provide an accommodation regarded as reasonable so an employee with a disability can perform the essential functions of their position.

In your case, being "on call" is an essential function of your position as an anesthesiologist. You are requesting the VA to take away an essential function. This is why you're unable to use the VA Reasonable Accommodation to accomplish this.

Typically, an employee would use the Family Medical Leave Act (FMLA) if their condition necessitated recovery time of a shorter duration.

It is important to remember the VA Reasonable Accommodation process is a very specific process whereby a requestor with a disability asks for an accommodation so they may perform the essential functions of their position. As an example, if an employee had to document progress notes but had significantly impaired vision and could not see the computer screen, we could provide them a large computer monitor or special software so the employee could perform the essential function of documentation. We would be prohibited from taking away an essential function of the position, because that's why we hired the employee. Rather, we look to see if there is something we can provide to accommodate the employee in the performance of essential functions. Moreover, we would be providing an accommodation based on the medical documentation of how the employee's disability impairs the performance of an essential function of their position.

I hope this clarifies the VA Reasonable Accommodation process. To facilitate easy reference, i have attached the VA policy on Reasonable Accommodation.

Please let me know if you have questions.

2

Respectfully,

-Bruce

Bruce Kafer, RN, MSN

Local Reasonable Accommodation Coordinator (LRAC)

Minority Veterans Program Coordinator

Office of the Director

Louis Stokes Cleveland VA Medical Center

10701 East Boulevard

Mail Stop: EEO

Cleveland, Ohio 44106

(216) 791-2300 ext. 6601

Bruce.Kafer@va.gov


FAX: *(216) 707-7627*

**_Equal Employment Opportunity, Diversity and Inclusion, Statement of the Month:_**

*"The true measure of the value of any business leader and manager is performance" ~Brian Tracy*



---

**From:** Lisan, Ronald M. (VHACLE)
**Sent:** Thursday, January 19, 2017 9:23 AM

Sincerely,

Ronald Lisan, MD



---

**From:** Kafer, Bruce L. (VHACLE)
**Sent:** Wednesday, January 18, 2017 2:28 PM
**To:** Lisan, Ronald M. (VHACLE)
**Subject:** Follow Up "On Call"
**Importance:** High

Dr. Lisan,

I want to make you aware that you are free to make a transfer request to another position which has no "on call" duties. You can always submit a request to Dr. Altose to see if anything is available. While your medical documentation is insufficient for the VA Reasonable Accommodation process as that is a very specific process pursuant to policy, I want to advise you there is another process you may use which is simply a transfer request.

As you may know, you are a Title 38 employee and there is a Title 38 representative in the AFGE Local Chapter 31 who can also assist you if you have questions about submitting a transfer request. His name is Mr. Carlton Daniel, RN, and he is at Carlton.Daniel@va.gov .

Please let me know if you have questions.

Respectfully,

-Bruce

14

Bruce Kafer, RN, MSN

Local Reasonable Accommodation Coordinator (LRAC)

Minority Veterans Program Coordinator

Office of the Director

Louis Stokes Cleveland VA Medical Center

10701 East Boulevard

Mail Stop: EEO

Cleveland, Ohio 44106

(216) 791-2300 ext. 6601

Bruce.Kafer@va.gov


FAX: (216) 707-7627


**_Equal Employment Opportunity, Diversity and Inclusion, Statement of the Month:_**

_"The true measure of the value of any business leader and manager is performance" ~Brian Tracy_



---------- Forwarded message ----------
From: "Lisan, Ronald M. (VHACLE)" <Ronald.Lisan@va.gov>
To: "Kafer, Bruce L. (VHACLE)" <Bruce.Kafer@va.gov>, "rachel@sindellattorneys.com"
<rachel@sindellattorneys.com>, "info@sindellattorneys.com" <info@sindellattorneys.com>,

PLAINTIFF'S
EXHIBIT
24

**Department of Veterans Affairs**

# REPORT OF CONTACT

NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.

| VA OFFICE | IDENTIFICATION NOS. (C,XC, SS, XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|
| | Early 2015 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT (check one) |
|---|---|
| Susan Raphaely | ☒ PERSONAL    ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT (check one) |
|---|---|
| | ☐ PERSONAL    ☐ TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (Include area code) |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN (Continue on page 2 if needed)

In light of recent events involving my female colleagues, I have decided to report the following incidents as they pertain to Dr. Ron Lisan and his inappropriate comments of a sexual nature while caring for patients in the operating room. These two incidents occured roughly one week apart about two years ago when I first began my CRNA position at the Cleveland VA. Although I cannot specifically recall the exact wording of the comments, I remember very clearly feeling extremely uncomfortable and embarrassed by his comments at the time. During one of the incidents I vividly recall him speaking to me about his own male genitalia. As a brand new employee, I did not feel comfortable speaking to my colleagues or even reporting the incident to my chief at the time as I was not yet familiar with my environment or the people I was working with. I quickly put the incidents aside in the interest of providing excellent patient care while working alongside him. I now realize that the comments were seriously inappropriate and unwarranted and that they have caused some amount of distress in addition to making me feel awkward and uncomfortable while working with Dr. Lisan in a position of authority in the operating room.

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|
| Anesthesiology | |

VA FORM
SEP 1997 (R)  **119**

| **Department of Veterans Affairs** | **REPORT OF CONTACT** |
|---|---|

NOTE: *As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C.XC, SS, XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)*<br>Foster, Jessica E | DATE OF CONTACT<br>01/04/2017 |
|---|---|

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
|---|---|

PLAINTIFF'S EXHIBIT 25

| PERSON CONTACTED<br>Susan Raphaely | TYPE OF CONTACT *(check one)*<br>☒ PERSONAL    ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON CONTACTED<br>Cleveland VA Medical Center | TELEPHONE NO. OF PERSON CONTACTED<br>*(Include Area Code)* |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT *(check one)*<br>☐ PERSONAL    ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU *(Include area code)* |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

On 1-4-2017 I was on call with Dr.Lisan and I stopped by his office to sign out to him at the end of my shift. Dr.Lisan stated that he had two things to tell me and asked me to close the door to office. The first thing was that another physician was going to be covering his call overnight. The second part of the conversation started with "I am not trying to hit on you, ask you out or have sex with you, but I would." Dr.Lisan then proceeded to tell me that he saw similarities between my marriage and his, that I don't necessarily talk about my husband the same way as other people do, and that he wasted far to many years in his own unhappy marriage. I was completely appalled at the context of the conversation and it made me extremely uncomfortable. At this point, I responded by defending my husband and marriage trying to end the conversation as rapidly as possible. Then as I was leaving he stated again that another physician would be taking his call shift. I joking said if he didn't pass along that I was the CRNA on call then the following doctor would not be able to call me in. Dr. Lisan's response was "how much is it worth to you." I basically walked away at this point and let his office door close behind me. This is not the first time unsolicited, inappropriate sexual comments/jokes have been made to me by Dr.Lisan. I just feel I need to come forward at this time because the current situation has made me feel extremely uncomfortable to be at work.

| DIVISION OR SECTION | EXECUTED BY *(Signature and title)* |
|---|---|

VA FORM
SEP 1987 (R)   **119**

**ATTACHMENT B**

Ron Lisan

**MEDICAL CENTER POLICY 003-003**
**March 1, 2016**



PLAINTIFF'S
EXHIBIT
26

### Sexual Harassment Allegation Checklist
### (Alleged Harasser)

**A copy of this checklist will be attached to the written report and submitted to the**
**Director, LSCVAMC through the EEO/Affirmative Employment Program Manager.**

1.    The employee occupies a position that is covered by the bargaining unit; he/she
was advised that he/she may request representation during the fact-finding process.

Not applicable_____ Initials _RML_ Date 1/10/17

2.    The alleged harasser has been interviewed and the information gathered is
included in the attached report.

    Initials_____ Date_____

3.    I have explained to the alleged harasser that counseling is available through the
Employee Assistance Program (EAP) to enable him/her to deal with the trauma caused
by the circumstances. I provided the telephone number to EAP. (1-216-791-3800 ext.
6818)

    Initials _RML_ Date 1/12/2012 .

4.    I have ordered the alleged harasser to cease any contact with the alleged victim
except that which is absolutely required for official business.

    Initials _RML_ Date 1/10/17       Dr. Lisan refused to initial
    initials_____       1/20/17 - He was Made Aware that he was
                                           Not to Attend or Elaine or
5.    I have included my written report, along with the statements made by both parties,    reside in the CRNA Lounge
witnesses, and if applicable, a VA Police report.

Initials_____ Date_____       Initials_____ date 1/25/17
                                          Rhonda Verba Roc-
6.    For EEO Manager:                      +refused to initial 1600

    .    I have made a recommendation as to the Medical Center Director as to whether
an Administrative Investigation Board should be appointed.

Initials_____ Date_____



PLAINTIFF'S
EXHIBIT
27 E.C.
3·19·19  PSG

### Northeast Ohio VA Healthcare System
Anesthesiology Department

The following document contains the findings of a professional Climate Assessment of the Anesthesiology Service. It provides information from multiple perspectives and explicates relevant issues concerning the workplace milieu and offers recommendations.

## BACKGROUND

On March 9, 2018, Ms. Laurie Frankito, Certified Registered Anesthetist (CRNA), Anesthesiology Service, contacted Ms. Leshelle Reese, EEO Specialist, expressed concerns via an email communication with attachments that described the anesthesiology workplace environment as being hostile. Also, she underscored it was a difficult decision for her and her peers to submit Reports of Contact which documented each of their concerns.

Subsequently, Ms. Reese convened a meeting with management to discuss the allegations and to formulate an appropriate plan of action to determine the facts related to multiple concerns and possible actions.  It was decided a workplace climate assessment was appropriate to obtain the widest vantage on the workplace milieu, perceptions of CRNA staff, anesthesiologists, as well as the Chief of Anesthesiology. Further, to identify the levels of satisfaction and dissatisfaction, and to identify the facts surrounding allegations of retaliation, discrimination, and unequal treatment, by ▓▓▓▓ (b)(6) ▓▓▓▓

## ACTION

Brenda J. Spicer, a Subject Matter Expert on EEO issues and related processes was contracted to conduct a climate assessment of the Anesthesiology Service. Ms. Spicer held series of separate in-person group meetings with three separate groups of Anesthesiology Service employees: The CRNA's, Anesthesiologists, and the Chief of Anesthesiology. In addition, she provided opportunity for individual interview sessions with those who felt more comfortable speaking one on one. Finally, she held a response meeting with ▓ (b)(6) ▓ ▓▓▓▓ on May 30, 2018, to obtain her response and perspective on the allegations, concerns, and perspectives, of the Anesthesiology Service employees who participated in the Climate Assessment process.

Following a review of the findings and recommendations contained within the detailed assessment on the following pages, the appropriate leadership team will determine follow up actions and their schedule of implementation.

*Climate Assessment Report: Anesthesiology*

## CLIMATE ASSESSMENT FINDINGS: ANESTHESIOLOGY SERVICE
Submitted by Brenda Spicer
June 18, 2018

## I. Workplace Structure Overview:

Mission of Anesthesiology Service, as expressed
by the groups:  Each group was asked to briefly describe their mission.

The CRNAs expressed:  To provide a full range of anesthesia services to the Veterans during surgery beginning with pre-op assessments to post-op visits that occurs once the patient awakens from the anesthesia.

The Anesthesiologist expressed: The Anesthesiologist in the Operating Room take care of the patients during the surgical procedures locally and at remote locations.  They prepare for surgery by supervising the care of the patient.  Not to simplify, but they keep the patient alive during the surgery.  They provide care for the patients in the beginning, during and after surgery (the take off and the landing). There is a Care Team consisting of the Anesthesiologists, Anesthesiologist Residence, CRNAs and a Student Anesthetist.  They also supervise two-three rooms at a time.  They do not perform administrative-type duties in the traditional sense; they are actually hands-on.

They develop the plan of care which includes determining any specialized lines for the medication and options according to the patient history.  The patient will usually see both the Anesthesiologist and the CRNAs before and after the surgery.  They explain to the patient about the type of care that will be administered during the surgery.

███ (b)(6) ███ expressed: To meet the medical needs of the patient. They provide a service in many areas (i.e. GI, cardiac, radiology, psychiatry, etc.).  They recently became part of the Pre-admission Testing team and it has brought in more work.  They are included at that stage of patient care.  She also indicated that she is responsible for staffing numbers and skill set.  She also participates in patient care as an Anesthesiologist along with dividing her time performing administrative and managerial duties.

According to the list of employees in the Anesthesiology Department, provided for this purpose, there is 1 Chief of Anesthesiology, ███ (b)(6) ███, 12 Anesthesiologist (Physicians), 1 Lead Certified Registered Nurse Anesthetist and 16 Certified Registered Nurse Anesthetist.  Not listed, 4 Anesthetist Technicians, 1 Office Administrator, 2.5 Nurse Practitioners in the Pre-Admission Test (PAT) area, and 1 Certified Nurse Specialist in the PAT area.  There is a team of physicians, nurses, technicians, CRNAs in the operating room. They meet to discuss the plan of care from the beginning of the surgery until the end when the patient is awake. The function of getting involved with the Pre-Admission department is a newly added function which has proven to increase the workload. ███ (b)(6) ███ is proud to have her team involved as they bring value to that part of the surgery process.

*Climate Assessment Report: Anesthesiology*

The ▮▮▮(b)(6)▮▮▮, is the only one in charge of the On-Call schedule. He also prepares the performance evaluations and ▮▮(b)(6)▮▮ signs off on them, he deals with personnel issues and he shares information as directed by ▮▮▮(b)(6)▮▮▮ would like to get him more involved with managing the CRNAs. She indicated that she does not get involved with the scheduling. The CRNAs don't feel ▮(b)(6)▮ has the level of authority to be able to resolve their concerns. The would like him to have more authority.

Everyone is very confident in knowing what is expected of them in the function of their duties. They are well aware of the regulations and requirements set forth by their medical boards and governmental requirements related their field of practice. Everyone agrees that they have the best equipment. They are well aware of the type of training and frequency of the training required to maintain their certifications and continuous learning requirements. Training is obtained in various ways, online, in person locally or travel to a conference/training class. Employees are normally placed on official authorized absence to attend training locally or out of town. They are also allowed to request up to $1,000 for tuition to attend training. Many Anesthesiologists attend training seminars on their own time, even on weekends.

The Anesthesiologists are salaried employees and the CRNAs are hourly employees and are covered under the DVA/AFGE Master Agreement.  There has been a change in staffing due to attrition and ▮▮(b)(6)▮▮ has been able to hire new staff.  She indicated that there is now a mixture of employees, some have only worked for the government, some employees had independent practices and some are in between.  The Anesthesiologists indicated that they love working for VA. ▮▮(b)(6)▮▮ is very professional, doesn't take things personally, she holds everyone to a high standard, she's very approachable and available. However, they expressed that there is an obvious undertone that the CRNAs believe they are treated differently. They also indicated that there are some CRNAs who believe they should be treated like an Anesthesiologist and be able to work independently.  But there are distinct differences in the training levels and background between a nurse and physician. There was a national legislation that addressed Scope of Practices. It was proposed to allow CRNAs to practice independently, but it was not passed.  VA's regulation requires that there will be an Anesthesiologist and a CRNA as part of the care team.

The methods used to communicate include emails, text, person to person interaction and meetings.  There are regular staff meetings, some are with all employees together and some are conducted with the groups separately (i.e. only Anesthesiologist and only CRNAs) depending on the subject matter. There are certain peer review sessions which are used for educational purposes. During this session, everyone is invited to attend.  There are also peer review sessions held separately depending on the subject matter.

It is unanimous that all of the staff members believe in putting the patient first, to provide the best care possible for our veterans and attend to their needs in an efficient way. Many staff members expressed that they enjoy what they do.

*Climate Assessment Report: Anesthesiology*

## II. Change in Work Environment and Perceptions

It is unanimous that ███(b)(6)███ knowledge of the anesthesiology function is excellent. The employees had positive compliments on the new ideas and methods that she brought with her three years ago.  Those ideas improved the efficiencies in the workplace. Employees expressed that before ███(b)(6)███ arrived, the work environment was divisive, the CRNAs were disrespected by the physicians and there was hardly to no accountability. One CRNA employee in particular could not express enough how he appreciated ██(b)(6)██ ████ changes that have resulted in structure and enhanced efficiencies.

Many CRNAs indicated that about a year or a year and a half ago, ███(b)(6)███ actions began to change.  Their initial impression of her changes to the operation changed from being one who cared for them as employees and wanting to make sure they were treated with respect by others to becoming someone who is vindictive, retaliatory, hostile, discriminatory and divisive.  They noticed that whenever someone questions her, she gets upset.  If she is proven wrong, she retaliates and penalizes the entire CRNA group and she takes away privileges by creating policies that are confusing. The CRNAs offered the following situations that they believe contributed to the low morale:

| A.  Yelling and Condescending Tones toward the staff. |
| --- |

     1. Yelling and condescending tones: The majority of the CRNAs describe her yelling as "a lot", "it's not uncommon" and "multiple times". ███(b)(6)███ yelled at one employee, but called her at home to apologize. The other CRNAs described her yelling at them in staff meetings. Many of them indicated that she constantly tells them that they make a lot of money and if they don't agree with the decision, you can go elsewhere.  The CRNAs acknowledge that they are grateful for their pay, but it didn't mean they should be subjected to disrespectful treatment. ███(b)(6)███ refers to the CRNAs as adults acting like children, and the most unprofessional group of employees.  There were three CRNAs who indicated that depending on how upset ███(b)(6)███ gets with you, she will stop speaking to you as you pass her in the hallways, but she remains professional in the OR.  A couple of them said, now they just don't say much when they are around her in the OR.  In the staff meetings, many do not feel comfortable speaking up after being yelled at, they are told, this is the way it's going to be. They believe she makes decisions that seemed vindictive after a staff member had upset her and the decisions seem out of the ordinary and many times contrary to the regulations.  Whenever they are called as a group to meet with ███(b)(6)███ separately from the other staff, they brace themselves.  They indicated they hardly hear positive comments or compliments.  One of the physicians indicated that he gets yelled at in front of others. They have witnessed ███(b)(6)███ yelling at ███(b)(6)███ in front of an Anesthesiologist. He asked her if she would like to step outside to discuss the matter.  They have also witnessed her embarrassing him during a staff meeting by inferring that he was the reason for the low Employee Survey score.  **It is recommended that this behavior be addressed.**

*Climate Assessment Report: Anesthesiology*

B. Administering personnel regulations:

1. New Travel Policy:  On June 2, 2017, [(b)(6)] sent out a new travel policy. The policy stated in part, "due to the large volume of travel requests and out of town conferences ...moving forward I will limit time off for conferences to one conference every other fiscal year, effective October 1, 2016.  Therefore, if you have attended a conference this fiscal year you are not eligible to attend another conference until October 1, 2018". [(b)(6)] response to this policy is because she was advised to decrease her spending of travel funds.

After reviewing the policy, it was discovered that this policy focused on limiting time off and if anyone attended a conference in FY 2017 would be eligible in FY-19.  This policy can be confusing because it's not clear how "time off" is related to travel funds.  Also, it appears that if you attend any conference (locally or out of town) it is subject to the every other fiscal year rule.  Once again, this is not clear as to how a local conference reduces the use of travel funds. The CRNAs believe this new policy was in retaliation because on May 16, 2017, Human Resources advised [(b)(6)] to reverse her decision to move a co-worker's off-day to be used while attending an approved out of town conference; it's the timing of the new policy. The employee indicated that [(b)(6)] was "pissed" when she found out she had contacted HR and because she had to reverse her decision and credit her 20 hours Comp time because her schedule was moved around.

**Master Agreement, Article 37-Training and Career Development, Section 5 states:**
- Scheduling Training
Paragraph A. When training required by the Department is conducted during an employee's regularly scheduled work hours, he/she will be granted excused absence to attend.

Paragraph B. When training is approved under Section 3(B) of this article (3 B. Depending upon the availability of funds and training priorities, the Department will also pay appropriate expenses for work-related training), the Department will make a good faith effort to grant excused absences from work or make schedule adjustments to accommodate an employee's training or educational program.

**It is recommended that the travel policy be re-evaluated and clarified.  (A copy of the travel policy is attached.)**

2. Administering Time and Leave Policies:  The CRNAs expressed their concern that when you call in sick, you can expect a text or a phone call later that day asking if you plan to come to work the next day. [(b)(6)] response is, it's for planning purposes. **Master Agreement, Article 35, Section 4 – Sick Leave, paragraph B** states in part, "an employee who expects to be absent more than one day will inform the supervisor or designee of the expected date of return to duty and notify of any change". The employees indicated that if they are going to be out another day, they usually call in each day to

*Climate Assessment Report: Anesthesiology*

request additional sick leave. The practice of calling employees at home on the first day of absence can be viewed as inappropriate.

**It is recommended that the practice of contacting the employee on the day of sick leave be re-evaluated.**

3. <u>Leave Restriction Letter:</u> There was an attempt to place an employee on leave restrictions for being absent three days (partial and full days) within a six month period (September, 2017 (partial day) January 12 and 19, 2018).  The letter indicated those three days took place the day before his scheduled day off.  The memo indicated that "This is to inform you that you are being counseled...."  The memo also indicated "the three days has had an adverse impact upon the operational efficiency of this service... and is considered sick leave abuse".  He was therefore "required to provide medical documentation to support future absences for personnel illness".  **Master Agreement, Article 35, Section 5-Documentation for Sick Leave, paragraph E.** states in part, "Where there is substantial reason to believe that an employee is abusing sick leave entitlement, medical certificates may be required... Paragraph E. 3. further states in part, "Frequency or amount of leave used will not be the sole factor for determining sick leave abuse..."

It is unusual to issue a leave restriction letter for counseling purposes.  While it is recognized that determining what is substantial is subjective, there was no information in the letter that showed his reasons for the absences were reviewed and taken into consideration.  Also, the letter does not refer to any prior counseling session that was held before being placed on leave restriction. When the employee was made aware of this pending letter, he shared the reasons for his absence with HR and he was told his reasons for the absences seemed reasonable.  He was advised to apply for FMLA.  He applied and was approved but has not used it since then.

**It should be noted that the letter was not issued.**

4. There is a concern with the schedule that is posted and available for everyone to see.  It shows when someone calls in and the type of leave they are using. The employee was uncomfortable with that information being available to all to see.

**(A copy is attached to this report.) During my conversation with** ▮▮ **(b)(6)** ▮▮ **agreed to make adjustments to accommodate this request.**

5. <u>Worker's Compensation-On-The-Job-Injury:</u> A CRNA employee experienced an on-the-job injury when it seemed a splinter went into her finger.  It became inflamed and she went to the doctor and discovered it was infected.  The doctor recommended that she be placed on light duty based on the type of duties she performs. ▮▮ **(b)(6)** ▮▮, under the advisement of ▮▮ **(b)(6)** ▮▮, placed her on light duty.  Time went on and the employee went on vacation and her finger became inflamed, but it seemed worse that time.  Upon her return from vacation, she went back to the doctor on September 11, 2017, and the doctor

*Climate Assessment Report: Anesthesiology*

determined that the infection was worse than previously. On September 13 or 14, 2017, he performed a procedure to find out the cause. She was given a sedative during the procedure and it was discovered that there were metal pieces and in her finger. She was placed on full restrictions from work and prescribed "narcotics" to take within the first 24 hours and subsequently as needed. She was instructed not to drive for at least 24 hours and whenever she takes it. Her follow up doctor visit was scheduled Thursday, September 21st. (b)(6) texted the employee on September 18th and 19th in an attempt to have her return to work. On Monday, September 18th, (b)(6) texts indicated that she needed her to come to work to answer the phones and she expected her to come to work on that Wednesday (September 20th) and if not, she would need written notice to address her specific limitation making her not qualified for duty. On Tuesday, September 19th, the employee replied to the text and informed (b)(6) that currently she was not cleared to return to work, her doctor's appointment was scheduled for that Thursday and she would not be able to work Tuesday, Wednesday or Thursday. She anticipated her release to be Friday, September 22nd and she has the required paperwork and will submit it when she returned to work. (b)(6) text response was "are you cleared to return to work with initial restrictions?" She described that the VA will expect her to do alternative duties. She further text, "If you're not in bed rest but just hand restrictions the expectation is that we provide you alternative duties".

The employee contacted the (b)(6) , regarding (b)(6) (b)(6) texts. She discovered that (b)(6) had emailed (b)(6) to explain the situation and (b)(6) told (b)(6) the employee is to follow her doctor's orders, not the doctor at work. The Specialist advised the employee to "follow the Worker's Comp rules to a T". The employee stated, after that situation, their relationship changed. (b)(6) does not speak to her in the hallway and there's no interaction as it was before the incident.

**Master Agreement, Article 29-Safety, Health & Environment, Section 10-Work Related Injuries and Illnesses** states in part, "B. An employee who has sustained a work-related injury or illness will be required to perform duties only to the extent and limits as prescribed by the treating physician or the Employee Health Physician as appropriate. No employee will be assigned duties when, in the physician's opinion, this would aggravate the employee's injury or illness".

**(A copy of the text screen is provided.) It is recommended that training be provided on how to administer Federal Sector leave policies and procedures.**

The following issues are strong contentions for the CRNAs. Even though the reasons provided by (b)(6) are within her full authority, these issues appear to weigh heavily on the CRNAs and contributed towards low morale and distrust as a group.

1. (b)(6) changed the CRNAs tour of duty, arrival time is 6:50 am instead of 6:30 am. The first case begins at 7:30 am. The reason for the change as they understand it to be is because (b)(6) wanted coverage at the end of their shift and that people were leaving at the end of their shift (i.e. 3:00 pm and 5:00 pm). Many CRNAs

*Climate Assessment Report: Anesthesiology*

expressed that for "big cases", they need the full hour to prepare for the patient. Some of them still come in at 6:30 am when needed and even though they are aware that they could request overtime, they usually don't request it. One employee asked in advance if he could come in at 6:30 and get overtime, but he was denied. **(b)(6)** May 2018 response was that she changed the time because (1) she needs coverage at the end of their shift; (2) she came to work a couple of times at 6:45 am and the bulk of the CRNAs came in at the same time, and; (3) they don't need an hour to set up for any cases. She was asked if she had ever talked with them about their need to start at 6:30. She said no.

**It is suggested that management explore the CRNA's point of view as to the effects of the change in start times. Also, coming in at 6:30 am instead of 6:50 am without requesting overtime could violate the Master Agreement. Further, this could be an educational opportunity.**

There is another concern regarding the change in tour of duty. The CRNAs are under the impression that the change in the start time is on a trial basis. They remembered the change was implemented without consulting the union. When the union became aware of this change, they considered it to be a change in working conditions and needed to be discussed before it could be implemented. The union met with **(b)(6)** and an agreement was made to proceed with the change, but with a follow up after three – six months. It has been close to two years and according to their recollection, the follow up never took place. **(b)(6)** May 2018 response to that the agreement was this change is permanent. The new duties with the Pre-admission Testing is on a trial basis.

**Master Agreement, Article 49, Section 4 - Notification of Changes in Conditions of Employment states as follows:**

"A. The Department shall provide reasonable advance notice to the appropriate Union official(s) prior to changing conditions of employment of bargaining unit employees. The Department agrees to forward, along with the notice, a copy of any and all information and/or material relied upon to propose the change(s) in conditions of employment. All notifications shall be in writing by U.S. mail, personal service, or electronically to the appropriate Union official with sufficient information to the Union for the UNION RIGHTS AND PRIVILEGES | ARTICLE 49 - RIGHTS AND RESPONSIBILITIES Department of Veterans Affairs Labor Management Relations | DVA /AFGE Master Agreement 251 purpose of exercising its full rights to bargain. The Department will work with the Union to identify and provide specific training and equipment to address concerns related to the use of technology, to include the sending and receiving of electronic communications."

**It is recommended that this issue be confirmed and communicated with the CRNAs. If there's nothing in writing, it could possibly mean that this change in work schedule is invalid.**

2. The CRNAs alleged that **(b)(6)** is going to move them out of their current location and use it to store equipment. They alleged that she is moving them

*Climate Assessment Report: Anesthesiology*

because she thinks they are talking about her. They alleged that she had threatened to take the door off the hinges. The (b)(6) indicated that many times people are on break or lunch. The employees close the door while on break or lunch break because if they don't, their breaks would be interrupted. It's also a high traffic area. The employees indicated that they were in a meeting and Director Susan Fuehrer came in and said she was sorry they didn't have enough space and that they were looking into finding more space for them. The employees said they were shocked because (b)(6) never mentioned this to them. The Union Official, indicated that (b)(6) mentioned the reason for the move was to store equipment to avoid a JCAHO violation. The Union Official indicated that it has not been declared a violation by JCAHO since they have visited the facility many times. The Union Official toured the area and there were alternate spaces available to store the equipment. (b)(6) May 2018 response was not only about her need to store the equipment from its current location, but there are some staff members who feel uncomfortable being in the room because of the conversations that take place. She also noticed that people were on their phones, on Facebook and had their feet propped on the desk.  Another reason for moving them out of the room is because (b)(6) believes she would be cited by JCAHO. Additionally, she indicated that the space, where the Anesthesiologists are located, has bad ventilation, it gets too warm. She has developed plans to restructure the work space, but the construction staff is not available to make that happen right now, so she's on hold.

**This is a major CRNA concern because they indicated that (b)(6) had not informed them about being moved before Director Fuehrer mentioned it. They had no opportunity to discuss any the concerns and to hear their side as to why the space is important to them. They alleged that (b)(6) previously offered the space to the physicians and they voted not to be placed there.  The CRNAs believe the move is retaliation for filing a complaint against her.**

3. A new policy began on August 30, 2017, requiring mandatory overtime in cases where there was not a volunteer to work past regular tour of duty. They alleged that (b)(6) does not administer the mandatory O/T list equally and based on her mood. The majority of the CRNAs stated that there is usually someone who volunteers. One employee indicated that she thought it was a shame that it has come to this. One employee researched available data and found that for a period of seven months the data shows there was five days that required a request for volunteers because there were four rooms active after 5:00 pm.  There were only two incidents where someone worked mandatory overtime.  The CRNAs were told (b)(6) was tired of having the same volunteers.  The majority of the CRNAs indicated that there are enough volunteers who get compensated for staying.  An incident occurred when (b)(6) became upset with an employee, she took her name from the middle of the Mandatory List, moved her up and made her stay.  Also, there was an incident when an employee volunteered and (b)(6) moved her name to the bottom of the list.  The CRNAs believe (b)(6) utilizes the mandation schedule in a subjective way. A CRNA's opinion is that before the morale changed, people were helping each other by volunteering to take their place. Now that the morale is low, he's observed that people don't want to support (b)(6) as

*Climate Assessment Report: Anesthesiology*

much. They don't feel she deserves their full support because of poor leadership. They will stay to finish their case, but not to go beyond what is expected. He has observed that it's the same people volunteering now. He recently experienced his name being up for mandatory overtime and another employee volunteered to take his place.

(b)(6) indicated that there are the same people volunteering to stay when needed. She indicated that she has had to use the mandatory twice when she has had a fourth active room. She also indicated that if a CRNA volunteers to stay, their name goes to the bottom of the list. She thought everyone knew this. In addition, a couple of CRNAs suggested that the physicians should be included in the mandatory list. She also indicated that she sought the advice from the Union. They discussed how the mandatory list would be administered. She also sought the advice from (b)(6) and was given approval to implement.

**I recommend that this matter be addressed.**



*Climate Assessment Report: Anesthesiology*





*Climate Assessment Report: Anesthesiology*

*Climate Assessment Report: Anesthesiology*

# (b)(5)&(b)(6)

**Conclusion:**

It became evident that all of the staff members in the Anesthesiology Department are sincerely focused on the patient care. It is evident that they love what they do, they feel they are making a difference, they are proud to work for the VA, they are proud that VA Cleveland has a great reputation for best practices and they have the latest equipment and everything to be successful in their field.  They have a strong desire is work together in a cohesive manner in all aspects of their job.  There is a mixture of opinions based on their experiences with (b)(6) .  There is a mixture of opinions of what happened during the attrition and mixed opinions of the new staff members.  With the various changes, it can cause a change in the work environment. While it is commendable that (b)(6) brought new ideas and procedures that improved the efficiencies of the operation, it is obvious that something happened along the way.

It is important to note that dissatisfaction among one, two or five employees many times would not be considered significant, depending on the concerns.  But, there are fifteen CRNAs who have concerns with the common theme of experiencing fear of retaliation, policies that seem to be implemented as a punishment for the entire group and contrary to the Master Agreement, constant reminders of how much money they make and constant reminders that they can find another job if they are dissatisfied.

(b)(6) experience in managing employees has been primarily in a private sector environment.  According to her staff, there's no doubt that she has demonstrated excellent knowledge, skills and abilities to perform the technical and scientific portion of job.  About three years ago, she became responsible for managing Federal Sector employees along with administering the Master Agreement.  This has proven to be a challenge for her and the CRNAs on the receiving end.  I offer the following recommendations for improving the work environment:

- Based on her decisions regarding the travel policy, the leave restriction letter and the worker's compensation situation and (b)(5) , it is recommended that



- In addition, considering the common theme regarding (b)(6) demeanor towards the staff (physicians and CRNAs) as witnessed by many staff members (physicians and CRNAs), it is recommended that (b)(6) in developing a strategy and gain tools on how to approach her staff when there is a critical change in policies and practices. (b)(6) might be one avenue.

*Climate Assessment Report: Anesthesiology*

██ (b)(6) ██ provides a structured method of exploring the best way to address a hot issue. It also assists the party in exploring and considering the true feelings, frustrations along with the facts surrounding the conflict or issue before making critical decisions. It assists the party in sorting out what is most important and it develops a strategy to present the situation and to consider the opposing point of view before coming to a final conclusion.

- It is also recommended that a strategic plan be developed on how to improve the morale of her department. One option would be to form a focus group consisting of two CRNAs, ██ (b)(6) ██ and perhaps a staff member from outside the department for an objective point of view. According to the CRNAs, once the employee survey was released, she had everyone in a room form groups to address how to raise the rating. There were mixed review from this meeting. Some were happy it took place and some felt intimidated and were confused as to how this was their responsibility. In that same meeting, the CRNAs indicated, she made an embarrassing remark about ██ (b)(6) ██, suggesting that he was the cause for the low rating. If this recommended is adopted, I recommend that someone else introduce this initiative in a manner that welcomes their buy-in to help make positive changes. Perhaps re-review the outcome of the previous meeting as a foundation.

I would be remiss if I didn't address the CRNAs contribution to the low morale. It takes two to tangle. Even though the CRNAs feel intimidated, retaliated against and not given opportunities to be heard, it is probable that their feelings were openly discussed based on many accounts many of them are aware of some of the conflicts that occurred. Spending a lot of time expressing their discontentment in a workplace setting can cause a hostile work environment for those who are not involved in the conflict, thus some approached ██ (b)(6) ██ that they were uncomfortable being in the room while certain conversations were occurring. With that in mind, I recommend the following:

- Explore ██ (b)(6) ██ in managing the CRNAs since he ██ (b)(6) ██ and he is at a higher classification level. If deemed appropriate, to adopt her idea as soon as possible, but ensure clear roles and responsibilities are established including, but not limited to detailed level of authority. Once approved, to communicate this expanded role to the staff.

- Develop a strategic plan on how issues of concern will be presented by sides. It is understood that they cannot control every outcome and every decision, but assure them that they will be provided with appropriate opportunities to present their side.

This concludes my assessment. If you have any further questions, please don't hesitate to contact me.

Humbly submitted,
Brenda J. Spicer
June 18, 2018



PLAINTIFF'S
EXHIBIT
28 E.C.
PENGAD-Bayonne, N. J.
3·19·19 PSG

## AFFIDAVIT

STATE of: Ohio

I, **Elaine Costanzo** make the following statement freely and voluntarily to **Burton Greenspan**, who has identified himself to me as a Contract EEO Investigator, investigating a complaint of discrimination filed by **Ronald Lisan** under agency Case No. **200H-0541-2017101627,** against the **Department of Veterans Affairs** knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know).

I have been advised that the accepted issues for investigation is:

**Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:**

1) **When on December 7, 2016, Susan Raphaely (SR), Chief of Anesthesiology, gave complainant an unusually heavy workload after he returned to work from a medical leave of absence related to his disability.**
2) **When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from 'On-Call' duties.**
3) **When since January 6, 2017, Susan Fuehrer (SF), Facility Director, and Murray Altose (MA), Chief of Staff, have not taken appropriate corrective action after complainant's attorney sent a letter of complaint regarding SR's harassment.**
4) **When on January 11, 2017, SR emailed complainant to say that his scheduled meeting the next day with Bruce Kafer (BK), Reasonable Accommodation Coordinator, was canceled and that his request for reasonable accommodation would be decided without allowing complainant to discuss his circumstances with BK.**
5) **When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).**
6) **When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.**
7) **When in March and April 2017 SR attempted to force complainant to work in the same operating room with the CRNA's who accused him of sexual harassment, even though there were other CRNA's available.**
8) **When on March 9, 2017, SR issued complainant a Written Warning.**
9) **When on March 13 and 14, 2017, SR assigned complainant to serve as the anesthesiologist during operations without a CRNA to assist him, which is contrary to VA standard operating procedure, and put the patients at risk.**
10) **When on March 28, 2017, SR issued complainant's Proposed 10-Day Suspension.**
11) **When on July 10, 2017, complainant was suspended for 10 days.**

Page 1 of 6.

*EMC* Initials

Events **2, 6, and 8** above constitute timely raised discrete acts that are hereby **ACCEPTED** for investigation as independently actionable claims. **They also represent 3 of the 10 actions or harassing behaviors taken against or directed toward your client. These events are sufficiently related to the overall pattern of harassment and will be included for consideration in the analysis of the harassment claim.**

In a letter dated July 14, 2017 the complaint was amended:
Events **2, 6, 8,** remain Accepted for investigation as independent claims; event **11** is Accepted for investigation as an independently actionable claim; and Complainant's harassment claim, consisting of events **1 through 11** is Accepted for investigation.

> **2. When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from 'On-Call' duties.**
> **6. When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.**
> **8. When on March 9, 2017, SR issued complainant a Written Warning.**
> **11. When on July 10, 2017, complainant was suspended for 10 days.**

I hereby solemnly swear or affirm that:

1. **For the record, please state your name.**

   Elaine Costanzo

2. **What is your current position title, grade and agency unit/division?**

   Certified Registered Nurse Anesthetist, Grade 3, Cleveland VAMC, Anesthesiology

3. **How long have you been in this position? How long with this agency?**

   2 years, 10 months/2 years, 10 months

4. **Who are your first and second level supervisors at the time of the Complaint, by name and position title?**

   Susan Raphaely, Service Chief, First level supervisor/Robert Bearss, Chief CRNA, Second level supervisor

5. **What is your working relationship with the Complainant?**

   Complainant is one of the Attending anesthesiologists at Cleveland VAMC

6. **What is your working relationship with Dr. Susan Raphaely?**

*EMC* Initials

Attending anesthesiologist at Cleveland VAMC

7. **Please state for the record your sex?**

   Female

8. **Please state for the record your disability?**

   None

9. **Have you been involved in any prior EEO activity or protected activity? Please explain what the activity consisted of and when it took place.**

   I was asked by SR to complete a Report of Contact in January 2017 as a witness to a local EEO complaint.

**Issue 1: Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:**

1. When on December 7, 2016, Susan Raphaely (SR), Chief of Anesthesiology, gave complainant an unusually heavy workload after he returned to work from a medical leave of absence related to his disability.
2. When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from 'On-Call' duties.
3. When since January 6, 2017, Susan Fuehrer (SF), Facility Director, and Murray Altose (MA), Chief of Staff, have not taken appropriate corrective action after complainant's attorney sent a letter of complaint regarding SR's harassment.
4. When on January 11, 2017, SR emailed complainant to say that his scheduled meeting the next day with Bruce Kafer (BK), Reasonable Accommodation Coordinator, was canceled and that his request for reasonable accommodation would be decided without allowing complainant to discuss his circumstances with BK.
5. When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).
6. When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.
7. When in March and April 2017 RS attempted to force complainant to work in the same operating room with the CRNA's who accused him

 Initials

of sexual harassment, even though there were other CRNA's available.

8. When on March 9, 2017, SR issued complainant a Written Warning.
9. When on March 13 and 14, 2017, RS assigned complainant to serve as the anesthesiologist during operations without a CRNA to assist him, which is contrary to VA standard operating procedure, and put the patients at risk.
10. When on March 28, 2017, RS issued complainant's Proposed 10-Day Suspension.
11. When on July 10, 2017, complainant was suspended for 10 days.

**Issue 1: Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:**

**When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).**

10. **Please explain in detail any direct knowledge you may have regarding this allegation.**

   Claims were brought to SR's attention by my colleagues. I was asked by SR to complete a Report of Contact during her investigation of the claims. My Report of Contact is factual.

   **Issue 1: Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal as evidenced by the following events:**

   **When in March and April 2017 RS attempted to force complainant to work in the same operating room with the CRNA's who accused him of sexual harassment, even though there were other CRNA's available.**

11. **Please explain in detail any direct knowledge you may have regarding this allegation.**

   I do not recall a time when I worked in the OR with Complainant in March and April 2017.

12. **Is there an Agency policy pertaining to harassment (non-sexual) in the work place? What is that policy? When and how were you made aware of this policy?**

   Yes. The policy is presented in the mandatory computer training in TMS titled "Prevention of Workplace Harassment/NO FEAR". I completed the training on

Page 4 of 6

2/23/2015, 1/19/2017, and then again on 4/19/2017. The policy can also be found on the VA intranet homepage at http://vaww.cleveland.med.va.gov/home/docs/eeo_policy_statement.doc.

**13. How are employees made aware of the policy?**

Required TMS training and VA intranet homepage

**14. Does the agency provide any training regarding harassment and or a hostile environment in the work place? If so what form does the training take? Have you received the training and when did you receive the training?**

Yes, I completed the training as stated above.

**15. To the best of your knowledge, did Complainant raise the issue of being harassed or subjected to a hostile work environment with any member of management? If yes, with whom did Complainant raise the issue?**

I cannot recall being made aware of this.

**16. Were any actions taken by you with regard to Complainant based in any way on Complainant's sex, disability and or prior EEO activity?**

No

**17. Can you suggest any witnesses who may be able to provide relevant knowledge regarding the accepted issues of this complaint? If so please provide there name, position, contact information and what information they might provide.**

No

**18. Is there anything you would like to add that is relevant to this claim, which has not already been addressed?**

No

_____ END OF STATEMENT _____

EMC Initials

I have read this statement, consisting of ____, and it is true, complete, and correct to the best of my knowledge and belief.

_____
Signature

10/26/17
_____
Date

Signed and sworn to before me
on this 26th day of October , 2017 , at _____ :

_Burton Greenspan_____
Neutral witness, notary, or Investigator

Page 6 of 6

_____Initials



PLAINTIFF'S
EXHIBIT
29 E.c.
3-19-19 PS6

| **Department of Veterans Affairs** | **REPORT OF CONTACT** |
|---|---|

NOTE: *As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C.XC. SS, XSS, V. K. etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT<br>Early 2015 |
|---|---|

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
|---|---|

| PERSON CONTACTED<br>Susan Raphaely | TYPE OF CONTACT *(check one)*<br>☒ PERSONAL  ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED *(Include Area Code)* |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT *(check one)*<br>☐ PERSONAL  ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU *(Include area code)* |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

In light of recent events involving my female colleagues, I have decided to report the following incidents as they pertain to Dr. Ron Lisan and his inappropriate comments of a sexual nature while caring for patients in the operating room. These two incidents occured roughly one week apart about two years ago when I first began my CRNA position at the Cleveland VA. Although I cannot specifically recall the exact wording of the comments, I remember very clearly feeling extremely uncomfortable and embarrassed by his comments at the time. During one of the incidents I vividly recall him speaking to me about his own male genitalia. As a brand new employee, I did not feel comfortable speaking to my colleagues or even reporting the incident to my chief at the time as I was not yet familiar with my environment or the people I was working with. I quickly put the incidents aside in the interest of providing excellent patient care while working alongside him. I now realize that the comments were seriously inappropriate and unwarranted and that they have caused some amount of distress in addition to making me feel awkward and uncomfortable while working with Dr. Lisan in a position of authority in the operating room.

| DIVISION OR SECTION<br>Anesthesiology | EXECUTED BY *(Signature and title)* |
|---|---|

VA FORM
SEP 1997 (R)  **119**



PLAINTIFF'S
EXHIBIT
30 E.C.
3.19.19   PSG

| **VA** Department of Veterans Affairs | **REPORT OF CONTACT** |

*NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C,XC, SS, XSS, V. K., etc.) |
|---|---|
| | |

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|
| | 03/08/2017 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
|---|---|
| | |

| PERSON CONTACTED | TYPE OF CONTACT *(check one)* |
|---|---|
| | [X] PERSONAL    [ ] TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED *(Include Area Code)* |
|---|---|
| | (440) 867-6740 |

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT *(check one)* |
|---|---|
| | [ ] PERSONAL    [ ] TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU *(Include area code)* |
|---|---|
| | |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

Yesterday after leaving work I received a phone call from a number I did not recognize and I answered the call. It was Dr. Lisan calling to tell me that he did not feel we could provide safe patient care together during our call shift scheduled on 3/9/2017. His reason was because he didn't say hello to him when we pass in the hallway. Myself, along with several other colleagues have recently reported Dr. Lisan for inappropriate behavior and sexual comments in the operating room, so for obvious reasons I have chosen to limit my contact with Dr. Lisan outside of our professional relationship while the allegations are investigated. I responded to Dr. Lisan that I have no problem working with him on a professional level and that no patient care would be compromised based on personal feelings. He proceeded to tell me that I needed to find someone to swap my call with because "it would be easier for me to do so than him." I expressed to him that because of my child care situation, it was in fact very difficult for me to change plans last minute. I asked him to please contact our boss, Dr. Raphaely if he needed any additional help solving the problem. He told me that he didn't want to talk to her for "obvious reasons" and that "by the way" he had raised far more serious allegations against her than I had against him, proceeded to list all of the allegations, and that he still says hello to her when they pass in the hallway. I asked him to tell me about an incident when he said hello to me in the hallway and I did not acknowledge him in some way and he said "several times in the last six weeks." I apologized if he interpreted my responses as inadequate or if he felt I was ignoring him because that was not my intention and assured him again I had no problem working with him on a professional level. He said he understood but there are underlying feelings of resentment in our relationship coming from me that may not manifest obviously but that could affect the quality of patient care. I expressed to him that I have no personal feelings of resentment towards him but of course now working together may be slightly awkward knowing that he doesn't want to work with me. We then agreed to keep the schedule as it is was and try to work on a better solution the next day. I called Dr. Raphaely immediately after the incident to report the contact. I felt Dr. Lisan was trying to intimidate me by telling me the responsibility fell on me to change the shift and by calling me on my personal phone after work hours when no one else could observe the interaction even though we passed in the hallway immediately before I left for the day. He had every opportunity to approach me then or even in the weeks prior to the shift as our call schedule comes out several weeks prior to the day of duty. His contact with me felt threatening and I have a real feeling that my work environment is unsafe at this time. For this reason I have requested not to have any contact with him both professionally and personally.

| DIVISION OR SECTION | EXECUTED BY *(Signature and title)* |
|---|---|
| | Elaine Costanzo 1004153 |

VA FORM
SEP 1997 (R)  **119**



*Sindell and Sindell, LLP*

Attorneys and Counselors at Law

Steven A. Sindell*
Board Certified in Labor and Employment Law by OSBA

Rachel Sindell



Chagrin Plaza West
23611 Chagrin Boulevard, Suite 227
Cleveland, Ohio 44122
Telephone: (216) 292-3393
Facsimile: (216) 292-3577
Website: www.sindellattorneys.com
E-mail: info@sindellattorneys.com

January 6, 2017

*By E-mail to Susan.Fuehrer@va.gov*
*and Murray.Altose@va.gov*
*and By Priority Mail with Tracking*

*Ms. Susan Fuehrer, Medical Center Director*
*Louis Stokes Cleveland VA Medical Center*
*10701 East Boulevard*
*Cleveland, Ohio 44106*

EL557629168US

*Dr. Murray D. Altose, Chief of Staff*
*Louis Stokes Cleveland VA Medical Center*
*10701 East Boulevard*
*Cleveland, Ohio 44106*

EL557629145US

Re:     Ronald Lisan, M.D.

Dear Ms. Fuehrer and Dr. Altose:

Please be advised that this office has been retained to represent your employee, Dr. Ronald Lisan, in connection with his employment issues at the VA. We have previously notified the VA of our representation of him.

Dr. Lisan has been employed at the VA as an anesthesiologist for many years. Although he may have previously exhibited indications of OCD traits, he was neither impaired nor deficient in his professional performance. His difficulties began after Dr. Susan Raphaely was hired by to replace Dr. David Kazdan as Chairperson of the Department of Anesthesiology.

In less than two years after Dr. Raphaely became Chairperson, eight of twelve anesthesiologists separated from employment at the VA. Our investigation reveals that Dr. Raphaely was instrumental in pressuring and targeting them in a number of ways. Seven out of eight of them were males. All were approximately 40 years old or older. Two of the seven were over 50 (one of those two in the late fifties); one was approximately 65 and another over 70. Dr. Raphaely replaced the largely male

Ms. Susan Fueher, Medical Center Director
Murray D. Altose, MD, Chief of Staff
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, Ohio 44106
Page 2

anesthesiologists with 6 new anesthesiologists, including herself. Five of the six anesthesiologists she newly hired were females. None of them were in their upper fifties, their sixties or seventies. We suspect that in some instances the anesthesiologists she managed to get rid of were more qualified than the ones she hired to replace them. Moreover, Dr. Raphaely apparently excluded her entire staff of experienced anesthesiologists from any background information or contact with her intended new hires. Their views were unsolicited, yet they were the ones having to work with the new hires. Since Dr. Raphaely has become Chairperson, eight out of twelve staff anesthesiologists have left primarily because of the treatment of Dr. Raphaely. Dr. Omar will be shortly replaced by a new female hire of Dr. Raphaely.

There are specific instances of extreme deceptive and unfair harshness directed by Dr. Raphaely toward other older male anesthesiologists in her Department, particularly Dr. Moss however, at this time, we will concentrate on her treatment of our client, Dr. Lisan. We believe that Dr. Raphaely was aware of Ron's emotional vulnerability and exploited it. In doing so, she contributed to his deterioration which caused his breakdown, hospitalization and need for recovery to full capacity, including "on-call" time.

Dr. Raphaely has accorded herself highly preferential treatment regarding her own "on-call" time. She has almost never taken "3rd call", the most onerous one. Other anesthesiologists have noticed that she excuses herself from it. She has been nitpickingly hypercritical of Dr. Lisan's performance, along with other older male anesthesiologists. There are clear specific examples of her disparate behavior.

In Ron's case, knowing that he was just returning from a lengthy in-patient hospitalization, she browbeat him to do "on-call" service immediately upon his return to work, loading him up with particularly heavy "on-call" duty. She let him know how displeased she would be if she herself had to do any "on-call" services over the Holidays. (The predecessor as Chair, Dr. David Kazdan, regularly assumed his proportionate share of "on-call" service, commensurate with other anesthesiologists).

We have attached a recent email authored by Dr. Raphaely, dated December 19, 2016. Apparently, Dr. Raphaely knows that Dr. Lisan, with an OCD problem, is having typical difficulty with what is known in the OCD world as "flooding", which means overwhelming the OCD patient shortly after lengthy (successful) treatment with an immediately heavy and stressful load. This causes a vulnerable newly recovered OCD person to deteriorate. Although Ron's initial medical documentation form does not

*Ms. Susan Fueher, Medical Center Director*
*Murray D. Altose, MD, Chief of Staff*
*Louis Stokes Cleveland VA Medical Center*
*10701 East Boulevard*
*Cleveland, Ohio 44106*
*Page 3*

specify a time-limit for the "on-call" limitation, you will shortly receive that medical detail, if you have not already received it from his treating psychiatrist, Dr. Kramer. Ron needs a relatively brief reasonable but gradual adjustment period for "on-call" duty. The decision of Dr. Raphaely was to quickly heap a heavy load of it on him, to mischaracterize his need for a brief period of a temporary light "on-call" load as a requirement for an indefinite period of no "on-call" whatsoever, and finally making it clear that this mischaracterized circumstance requires to his being separated from his current position in the Department of Anesthesiology because at full tilt "on-call" is "an essential function" of the position (and a no "on -call" position is not currently available).

We will not sit by idly while this kind abuse is visited upon Ron. With a reasonable adjustment leading up to Ron's assumption of his full share of "on-call "duty and the cessation of the continual discriminatory harassments and hostile work environment, there will be no reason or basis to bring about his separation from his current position. He has rendered long and good service to the VA and, but for his mistreatment, has and will continue to do so.

We request that his allegations be investigated. We request that no adverse action against him be taken at this time. We request a short period of time for his physician to more specifically verify the accommodation for which he is actually asking. And we request remediation for the continual misconduct that is being visited upon Ron and apparently upon others: Sex discrimination, age discrimination and (in Ron's case, in addition), disability discrimination. And, of course, it is unlawful to retaliate against him because of his communication of complaints and requests in this letter.

Please feel free to contact me as may be helpful to resolve these matters.

Sincerely

Steven A. Sindell



PBMGAD-Bayonne, N. J.

**PLAINTIFF'S
EXHIBIT
32** S.E.
4-2-19 PSG

In The Matter of:

Ronald M. Lisan, M.D.

vs

Robert Wilke, etc.

Elaine Costanzo, CRNA

March 19, 2019

Deposition



MEHLER HAGESTROM
Court Reporters

1660 West 2nd Street, Suite 780 | 50 South Main Street, Suite 720
Cleveland, Ohio 44113 | Akron, Ohio 44308
216.241.9000 | 330.535.7300
216.621.0050 Fax

www.MandH.com          Schedule@MandH.com

original filename: 190319_Costanzo_Elaine_psg

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

**Page 1**

```
 1         IN THE UNITED STATES DISTRICT COURT
 2     NORTHERN DISTRICT OF OHIO - EASTERN DIVISION
 3  RONALD M. LISAN, M.D.,
 4         Plaintiff,
                       JUDGE PATRICIA A. GAUGHAN
 5    -vs-          CASE NO. 1:18-CV-00969
 6  ROBERT WILKE, ACTING SECRETARY
    OF THE UNITED STATES DEPARTMENT
 7  OF VETERANS AFFAIRS,
 8         Defendant.
 9           -   -   -   -
10      Deposition of ELAINE COSTANZO, CRNA, taken as
11  if upon cross-examination before Pamela S.
12  Greenfield, a Certified Realtime Reporter,
13  Registered Diplomate Reporter and Notary Public
14  within and for the State of Ohio, at the offices
15  of Sindell & Sindell, LLP, 23611 Chagrin
16  Boulevard, Suite 227, Beachwood, Ohio, at 10:03
17  a.m. on Tuesday, March 19, 2019, pursuant to
18  notice and/or stipulations of counsel, on behalf
19  of the Plaintiff in this cause.
20           -   -   -   -
21           MEHLER & HAGESTROM
              Court Reporters
22
       CLEVELAND          AKRON
23  780 Skylight Office Tower  720 Akron Centre Plaza
     1660 West 2nd Street     50 South Main Street
24  Cleveland, Ohio 44113    Akron, Ohio 44308
        216.241.9000          330.535.7300
25            FAX 216.621.0050
```

**Page 2**

```
 1  APPEARANCES:
 2      Steven A. Sindell, Esq.
        Rachel Sindell, Esq.
 3      Sindell & Sindell, LLP
        23611 Chagrin Boulevard
 4      Suite 227
        Beachwood, Ohio  44122
 5      (216) 292-3393
        Info@SindellAttorneys.com,
 6
          On behalf of the Plaintiff;
 7
        Lisa Hammond Johnson, Esq.
 8      Ruchi Asher, Esq.
        Assistant United States Attorney
 9      U.S. Department of Justice
        United States Attorney's Office
10      Northern District of Ohio
        United States Court House
11      801 West Superior Avenue
        Suite 400
12      Cleveland, Ohio  44113
        (216) 622-3679
13      Lisa.hammond.johnson@usdoj.gov
        Ruchi.Asher@usdoj.gov
14
          -and-
15
        Amber Groghan, Esq.
16      United States Government
        Department of Veterans Affairs
17      441 Wolf Ledges Parkway
        Suite 403
18      Akron, Ohio 44311
        (330) 258-8105
19      Amber.Groghan@VA.gov,
20        On behalf of the Defendant.
21  ALSO PRESENT:
22      Ronald Lisan, M.D.
23
24
25
```

**Page 3**

```
 1        W I T N E S S   I N D E X
 2                            PAGE
 3  CROSS-EXAMINATION
    ELAINE COSTANZO, CRNA
 4  BY MR. SINDELL             4
 5
          E X H I B I T   I N D E X
 6
    EXHIBIT                    PAGE
 7
    Plaintiff's Exhibit 27, 6/18/18
 8  Spicer "Climate Assessment Report"    36
    Plaintiff's Exhibit 28, 10/27/17
 9  Costanzo affidavit          87
10
    Plaintiff's Exhibit 29, Costanzo
11  report of contact for "Early 2015"    92
12  Plaintiff's Exhibit 30, Costanzo
    report of contract for "3/08/17"     107
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1      ELAINE COSTANZO, CRNA, of lawful age, called
 2  by the Plaintiff for the purpose of
 3  cross-examination, as provided by the Rules of
 4  Civil Procedure, being by me first duly sworn, as
 5  hereinafter certified, deposed and said as
 6  follows:
 7      CROSS-EXAMINATION OF ELAINE COSTANZO, CRNA
 8  BY MR. SINDELL:
 9        MR. SINDELL:  All right.  Let the
10      record show this deposition is being taken
11      in the case of Lisan versus Wilkie in the
12      United States District Court, Northern
13      District of Ohio, Eastern Division, Judge
14      Gaughan presiding.
15          And here today in addition to
16      myself and the court reporter for the
17      deposition of the witness, Elaine Costanzo?
18  A.  Correct.
19        MR. SINDELL:  And present today in
20      addition to myself, the court reporter and
21      obviously the witness is my client,
22      Dr. Ronald Lisan, and also Attorney Lisa
23      Hammond Johnson, Ruchi Asher and Amber --
24        MS. GROGHAN:  Groghan.
25        MR. SINDELL:  -- Groghan.
```

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 5

1      MS. GROGHAN:  Groghan, yes.
2      MR. SINDELL:  Sorry about that.
3      MS. GROGHAN:  No worries.
4      MR. SINDELL:  Who are all from the
5  U.S. Attorney's Office.
6      MS. JOHNSON:  She's from the VA.
7      MR. SINDELL:  Okay.  Ms. Groghan
8  from the VA and the other two from the U.S.
9  Attorney's Office.
10  BY MR. SINDELL:
11  Q. Ms. Costanzo, my name is Steve Sindell and as you
12     probably figured out, I represent Ron Lisan.  I'm
13     going to ask you some questions today.  I know
14     that you're aware that you're under oath and what
15     that means; is that correct?
16  A. Yes.
17  Q. And I also want to tell you that there's certain
18     things in general about a deposition which your
19     attorney might have shared with you but I will
20     probably be repeating this.
21       If I ask you a question you don't understand,
22     rather than answer it, will you please let me
23     know that there's something about it you don't
24     understand and I'll try to clarify it.  Fair
25     enough?

Page 6

1  A. Yes.
2  Q. If there is a question that you answer, I'm going
3     to assume that you understood it.  Fair enough?
4  A. Yes.
5  Q. In addition to that, it is helpful, because the
6     court reporter can't take down two people talking
7     at the same time, and it's tempting for both the
8     witness and the lawyer, myself, to assume you
9     know what the question's going to be and start
10     answering it before it's over, thereby
11     interrupting me or I may think you're done with
12     an answer and start speaking the next question or
13     something and interrupt you.
14       It's not my intention to interrupt you and I
15     would appreciate it, of course, if you don't, if
16     you'd wait until the question is over before you
17     start answering another one.  Okay?
18  A. Yes.
19  Q. And I guess that's it.
20       Have you ever had your deposition taken
21     before?
22  A. Yes.
23  Q. Were you hostile during that deposition?
24  A. No.
25  Q. Are you hostile today?

Page 7

1  A. No.
2      MS. JOHNSON:  Objection.
3  Q. Are you angry about anything?
4      MS. JOHNSON:  Objection.  You can
5      answer.
6  A. No.
7  Q. Good.  Now, would you state your full name for
8     the record, please.
9  A. Elaine M. Costanzo.
10  Q. Could you spell it?
11  A. E-L-A-I-N-E.  C-O-S-T-A-N-Z-O.
12  Q. And what is your current address, Ms., shall I
13     call you Ms. Costanzo or Elaine?  What would you
14     had prefer?
15  A. Ms. Costanzo is fine.
16  Q. Ms. Costanzo, please state your address.
17  A. Do I need to answer that?
18      MS. JOHNSON:  Yes.
19  A. 7990 Newell Creek Drive.
20  Q. I'm sorry, how do you spell that?
21  A. N-E-W-E-L-L.
22  Q. Newell Creek Drive.  Yes?
23  A. Mentor, M-E-N-T-O-R, Ohio.
24  Q. Yes.
25  A. 44060.

Page 8

1  Q. 44060.
2       And Ms. Costanzo, I know you understand I
3     represent Dr. Lisan here; is that correct?
4  A. Yes.
5  Q. But I want you to, I want to share with you my
6     understanding that the attorneys here today other
7     than myself, they represent the Veterans
8     Administration, Dr. Raphaely, Dr. Altose and
9     Ms. Fuehrer.
10      MS. JOHNSON:  Objection.
11  Q. Do you understand that?
12      MS. JOHNSON:  Objection.  Can we
13      go off the record a second.
14      - - - -
15      (Thereupon, a discussion was had off the
16      record.)
17      - - - -
18  Q. Back on the record.
19      Let me clarify this.  We clarified this off
20     the record.
21      Other counsel today, which would be
22     Ms. Johnson, Ms. Asher and Ms. Groghan, represent
23     the Veterans Administration as such and because
24     Ms. Fuehrer is the, I believe the executive
25     director of the VA, and Dr. Altose, the former

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1    chief of medical service or something.
2        MS. JOHNSON: Chief of staff.
3  Q. Chief of staff, thank you. And what would I do
4    without Lisa here?
5      And also Dr. Raphaely, chief of the
6    anesthesiology department, that all three of them
7    are managers so they are, for my purposes at
8    least, considered her clients meaning that I have
9    to respect the fact that I wouldn't directly
10    communicate with them and so forth and they have
11    a direct attorney/client relationship. Okay?
12  A. Okay.
13  Q. And you understand, or at least I understand
14    you're not represented by a personal attorney
15    representing only you; is that correct?
16  A. Yes.
17  Q. Okay. Very good.
18    Now, can I have your birth date, please?
19        MS. JOHNSON: Objection.
20        MS. ASHER: That's PII.
21        MR. SINDELL: That's not private.
22        MS. JOHNSON: That's private
23    information. She could tell you --
24  Q. How old are you?
25        MS. JOHNSON: You can say how old

1    you are. That's fine.
2  A. 34.
3  Q. Are you single, are you married?
4        MS. JOHNSON: You may answer.
5  A. I'm married.
6  Q. All right. Can I have the name of your husband?
7  A. Frank.
8  Q. Last name Costanzo?
9  A. Correct.
10  Q. What was your maiden name?
11  A. LaFrance, L-A capital F-R-A-N-C-E.
12  Q. And approximately how long have you been married
13    to Frank Costanzo?
14  A. 11 years.
15  Q. Do you have children, Ms. Costanzo?
16  A. Do I have to answer that?
17        MS. JOHNSON: Yes.
18  A. Yes.
19  Q. These are just general background questions.
20  A. Uh-huh.
21  Q. I'm not trying to be, invade your personal
22    privacy and I promise I won't ask your blood
23    type, okay?
24    Now, what is, how many children do you have?
25    Excuse me.

1  A. Four.
2  Q. And what's the range of ages?
3  A. Nine to two.
4  Q. All right. Now I'd like just a bit of
5    information about your general background.
6    Did you grow up in the Cleveland area?
7  A. I spent some of my time growing up in the
8    Cleveland area.
9  Q. Okay. Where did you grow up?
10  A. I grew up on the east side of Cleveland.
11  Q. Were you born somewhere else?
12  A. Yes.
13  Q. Where is that?
14  A. Fort Smith, Virginia.
15  Q. When did you come, if you know, to the Cleveland
16    area?
17  A. When I was in third grade.
18  Q. And have you essentially lived in the Cleveland
19    area since you came here in the third grade?
20  A. Yes.
21  Q. And I take it you graduated from high school?
22  A. Yes.
23  Q. And where was that?
24  A. Notre Dame Cathedral Latin.
25  Q. That's a private school, right?

1  A. Yes.
2  Q. What year did you graduate?
3  A. 2002.
4  Q. Did you attend post high school formal education?
5  A. Yes.
6  Q. Could you tell me briefly about that.
7  A. I went to Ohio State University for my undergrad.
8  Q. And when did you graduate -- did you graduate?
9  A. Yes.
10  Q. And when was that?
11  A. 2006.
12  Q. What kind of a degree did you receive?
13  A. A Bachelor's in Nursing.
14  Q. So it's a B.S.N.?
15  A. Uh-huh, yes.
16  Q. This is a very small point. There's a tendency
17    understandably to say um-hmm, hm-hmm, something
18    like that and I'll prompt you, but try to use
19    either a yes or a no or a word to answer so she
20    gets it down.
21    Okay. B.S.N. and that would be an R.N.
22    degree, correct?
23  A. I --
24  Q. I mean you got a license, R.N.?
25  A. I took a test and I was a registered nurse.

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 13

1   Q.  Yes.  You took the NCLEX, right?
2   A.  Yes.
3   Q.  Okay.  And so you became a nurse in 2006
4       approximately?
5   A.  Yes.
6   Q.  Have you received any higher or other nursing
7       degree?
8   A.  Yes.
9   Q.  What was that?
10  A.  I have a Master's in Nursing.
11  Q.  When did you get that?
12  A.  I graduated in 2011.
13  Q.  Where from?
14  A.  Case Western Reserve University.
15  Q.  And that's when you got your CRNA?
16  A.  I took a certification exam for my CRNA.
17  Q.  In 2011?
18  A.  Yes.
19  Q.  And that's when you got your certification?
20  A.  Yes.
21  Q.  I think they changed that actually somehow
22      recently, didn't they?  They were called
23      something else and then they changed it or am
24      I --
25  A.  I don't know the answer to that question.

Page 14

1   Q.  You don't know, okay.  All right.
2       Now I'd like to go into, very briefly, your
3       work history.
4       Where did you -- by the way, I forgot to ask:
5       Is your husband employed outside the home?
6   A.  Yes.
7   Q.  And where is that?
8   A.  The Cleveland Clinic.
9   Q.  Is he a medical person?
10  A.  No.
11  Q.  What does he do at the Cleveland Clinic?
12  A.  He is a compensation analyst.
13  Q.  Is that part of HR there?
14  A.  Yes.
15  Q.  How long has he been employed at the Cleveland
16      Clinic?
17  A.  For as long as I've known him.  I can't tell you
18      exactly when he started.
19  Q.  It's over a decade?
20  A.  Yes.
21  Q.  That's fine then.
22      Now, when did you first become gainfully
23      employed as an R.N. or if it wasn't until you
24      were a CRNA, you tell me.
25  A.  I was an R.N. starting in July of 2006.

Page 15

1   Q.  And did you, where did you work?
2   A.  Cleveland Clinic.
3   Q.  And how long did you work at the Cleveland
4       Clinic?
5   A.  I worked at the Clinic until the year 2015 when I
6       started at the VA.
7   Q.  Until 2015?
8   A.  Correct.
9   Q.  So you started at the VA in 2015?
10  A.  Yes.
11  Q.  Do you remember by any chance, if you do, what
12      month you began at the VA in 2015?
13  A.  January.
14          MR. SINDELL:  Off the record.
15          - - - -
16      (Thereupon, a discussion was had off the
17      record.)
18          - - - -
19  Q.  Now, did you know Dr. Susan Raphaely prior to
20      your working at the Veterans Administration?
21  A.  No.
22  Q.  When was the very first time that you met
23      Dr. Raphaely?
24  A.  Orientation.
25  Q.  At the VA?

Page 16

1   A.  The VA.
2   Q.  How long was the orientation?
3   A.  Roughly a week-and-a-half maybe?  I can't
4       remember exactly.
5   Q.  That's okay.  I'm not holding you to that kind of
6       memory.  If you can, that's fine.  An
7       approximation is pretty good but if you started
8       in -- let me share with you what I know and see
9       if this focuses a little for you.
10      In March of 2015 Dr. Raphaely became head or
11      chair I guess of the department of anesthesiology
12      at the VA.  Okay?
13      I don't know that she was there prior to that
14      time so...
15          MS. JOHNSON:  Objection.
16  Q.  I'm just seeing if that --
17          MS. JOHNSON:  I'm sorry.
18  Q.  Well, I'm just trying to figure out if that
19      focuses you a little bit on when the orientation
20      might have been --
21          MS. JOHNSON:  Objection.  You may
22          answer.
23  Q.  -- for you, you know.
24  A.  I attended orientation with Dr. Raphaely.  We
25      started at the VA at the same time.

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 17

1  Q.  So you started, so she started to your knowledge
2      in January when you did?
3  A.  She was in my orientation class.
4  Q.  Which would have been January of 2015?
5  A.  Yes.
6  Q.  All right.  Did you know that she would be or was
7      head of the department of anesthesiology at that
8      time?
9  A.  I did, yes.
10  Q.  During the orientation period, you say it lasted
11      about a week-and-a-half give or take, correct?
12  A.  Correct.
13  Q.  Were you given any training, instruction,
14      material related to issues or policies of the VA
15      involving sexual harassment?
16  A.  I don't recall specifically.
17  Q.  How about generally?
18  A.  I know that there is a computer module that we
19      need to take in regards to sexual harassment.
20  Q.  I guess my -- let me maybe be more specific.
21          Do you recall any such exposure to that kind
22      of material during your orientation period if you
23      do?
24  A.  I don't recall.
25  Q.  One way or the other; is that correct?

Page 18

1  A.  I don't recall.
2  Q.  Well, let me be a little more specific about "I
3      don't recall."
4          What I want to be clear about is this:  You
5      can either not recall one way or the other like I
6      don't know or you cannot recall that occurring as
7      if I have no recollection of that occurring.
8          Do you understand the difference?
9  A.  I have no recollection of that occurring.
10  Q.  Okay.  That's what I wanted to know.
11          And that includes any material that you might
12      have even been given to read; is that correct?
13  A.  That's correct.
14  Q.  When is it that you have first recollection of
15      any information being imparted to you about VA
16      policy on sexual harassment?
17  A.  There's a training, a computer training module
18      that we are all required to take within the first
19      few months of employment that addresses sexual
20      harassment.
21  Q.  And did you do that I assume?
22  A.  Yes.
23  Q.  And then there were repeats of it or variations
24      of that subject matter throughout your continued
25      employment at --

Page 19

1  A.  Yes.
2  Q.  -- the VA?
3  A.  Yes.
4  Q.  Now, did you leave the Cleveland Clinic in
5      December or January of -- December 2014/January
6      of 2015, something like that?  Let me --
7      withdrawn.
8          When did you leave the Cleveland Clinic?
9  A.  My last days of employment at the Cleveland
10      Clinic were immediately prior to my employment at
11      the VA.
12  Q.  So sometime December/January 2015?
13  A.  Beginning of January 2015.
14  Q.  Beginning of January, okay.  Thank you.
15          Your job at the Cleveland Clinic, let me just
16      make sure I understand something here.
17          You were at the Cleveland clinic from I think
18      you said, did you tell me when you started, 2006
19      or '7, something like that?
20  A.  I started at the Cleveland Clinic in 2006.
21  Q.  '6, okay.
22          So 2006 to 2014, right?
23  A.  Yes.
24  Q.  So some of those years were as simply an R.N.?
25  A.  Yes.

Page 20

1  Q.  And as an R.N. were you a floor nurse?
2  A.  I was an ICU nurse.
3  Q.  Was that main campus?
4  A.  Yes.
5  Q.  Did you know Sara Clark?
6  A.  No.
7  Q.  Did you know Michael Okolish?
8  A.  No.
9  Q.  Did you know Sue Wilson?
10  A.  Yes.
11  Q.  She was your manager?
12  A.  No.
13  Q.  Okay.  She was a coworker in the ICU with you or
14      what?
15  A.  I knew of her.  She was a nurse manager in the
16      surgical intensive care unit.
17  Q.  Did you work there?
18  A.  No.
19  Q.  Which ICU did you work in?
20  A.  I worked in the neurointensive care unit and the
21      cardiothoracic intensive care unit.
22          MR. SINDELL:  Off the record.
23              - - - -
24      (Thereupon, a discussion was had off the
25      record.)

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 21

1           - - - -
2  Q. So in 2011, of course, you were still working at
3     the Clinic; is that correct?
4  A. Yes.
5  Q. And you became, however, a certified CRNA at that
6     point in 2011?
7  A. In 2011 -- I graduated in 2011, December.  In
8     February of 2012 I was certified.
9  Q. Okay.  Did you -- withdrawn.
10     I assume that you continued to work at the
11     Cleveland Clinic as a CRNA after February 2012;
12     is that correct?
13 A. Yes.
14 Q. Did you actually change positions?
15 A. I don't know -- can you rephrase that question?
16    I don't know what you're asking me.
17 Q. Sure.  Did you do something other than what you
18    had been doing before as an R.N. in the ICU, the
19    neuro ICU and cardiothoracic ICU?  Did you change
20    your job duties?
21 A. In 2009 I was admitted into anesthesia school.  I
22    maintained my employment because I was a student,
23    I trained at the Cleveland Clinic.
24     I did not work in the ICU during that time
25    that I went to school.

Page 22

1  Q. Okay.  So can you tell me when that was?
2  A. In 2009, August.
3  Q. Until?
4  A. 2011 December.
5  Q. Okay.  Where did you work?
6  A. I did not work.  I went to school full time.
7  Q. Okay.  Now, when you say anesthesia school, is
8     that part of Case Western Reserve University?
9  A. Yes.
10 Q. Is that different than the Frances Bolton Nursing
11    School?
12 A. No.
13 Q. Part of it?
14 A. Yes.
15 Q. And you were training -- I'm sorry.  And you were
16    in school to obtain the CRNA certificate?
17 A. Yes.
18 Q. Then you returned -- withdrawn.
19     Did you return in 2011 or '12 to the
20    Cleveland Clinic after you completed and obtained
21    your certificate for CRNA?
22 A. I never left.  I was always an employee of the
23    Cleveland Clinic.  Because my clinical rotation
24    was at the Cleveland Clinic, I was still
25    considered an employee of the Cleveland Clinic.

Page 23

1  Q. I see.  Were you paid by the Cleveland Clinic?
2  A. Yes.  I received a stipend.
3  Q. All right.  But not a salary?
4  A. Correct.
5  Q. But you're still considered an employee.  That's
6     interesting.
7  A. Correct.
8  Q. So you had employee benefits and that type of
9     thing?
10 A. Correct.
11 Q. I got it.  But a lot of your time was related to
12    school and not full-time employment as such as
13    previously as an R.N.; is that correct?
14 A. I don't know.
15 Q. Okay.
16 A. Can you rephrase that question?
17 Q. Yeah.  All I'm trying to understand is did you go
18    to work 40 hours a week or more at the Cleveland
19    Clinic on your stipend as part of school?
20 A. During some parts of my clinical, yes.
21 Q. But your clinical did not take up all of the time
22    because you attended classes as well?
23 A. The didactic was front loaded.
24 Q. What do you mean "didactic"?
25 A. The classroom work was front loaded.

Page 24

1  Q. Please explain that.  I don't understand.
2  A. Much of the beginning of our program was spent in
3     the classroom.
4  Q. Right.
5  A. And the remaining months of our program were
6     spent in the clinical area full time.
7  Q. Okay.  So it was a combination that would be
8     ordinarily the case with an anesthesiology
9     school?
10 A. Yes.
11 Q. Anesthesia school, excuse me.  Correct?
12 A. Yes.
13 Q. Okay.  Now I understand better.
14     So at some point you went back to full-time
15    employment as an employee, a regular employee,
16    non student employee at the Cleveland Clinic as a
17    CRNA; is that correct?
18 A. Yes.
19 Q. And is it correct that it was somewhere around
20    February or March of 2012?
21 A. Yes.
22 Q. Now, tell me what your job was at the Cleveland
23    Clinic starting in March 2012 after you had
24    obtained your CRNA or certificate.
25 A. I was responsible for the perioperative

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1    management of anesthesia for patients undergoing
2    surgery.
3    Q. Were you connected with the ICU at that time?
4    A. No.
5    Q. So your actual hands-on work time at the
6       Cleveland Clinic after, on and after March 2012
7       was in the operating room basically or around the
8       work in the operating room?
9    A. Yes.
10   Q. Now you obviously worked with anesthesiologists;
11      is that correct?
12   A. Yes.
13   Q. Who was your supervisor at the Cleveland Clinic
14      when you were working in perioperative
15      anesthesia?
16   A. Jason Beedlow.
17   Q. What's his last name?  How do you spell that?
18   A. B-E-E-D-L-O-W.
19   Q. Is he a physician?
20   A. No.
21   Q. What is his position?
22   A. He's a CRNA.
23   Q. So he was your supervisor?
24   A. Yes.
25   Q. Would he be comparable to Robert Bearss at the VA

1       or is it different at the Clinic?
2    A. Yes.
3    Q. Yes, it's different?
4    A. You asked two questions.
5    Q. Sorry.  I just want to understand in position,
6       authority, any difference or similarity between
7       Robert Bearss at the VA and Jason Beedlow at the
8       Clinic.
9          Can you explain that to me?
10   A. They would be in similar positions of authority
11      over me.
12   Q. It's my understanding -- but if you have a
13      different one let me know -- that Mr. Bearss was
14      your lead person at the Cleveland -- excuse me,
15      at the VA?
16   A. He is called our chief nurse anesthetist.
17   Q. Do you report to him?
18   A. Yes.
19   Q. Do you report to anybody else directly?
20   A. Prior to Bob being there, I would report directly
21      in to Dr. Raphaely.
22   Q. After -- when did Bob Bearss, you meant Bob
23      Bearss, correct?
24   A. Yes.
25   Q. When did Bob Bearss arrive, if you can recall, at

1    the VA?
2    A. I don't recall.
3    Q. About how long had he been there -- withdrawn.
4       About how long had you been at the VA before
5       he arrived?  I mean are we talking months?  Are
6       we talking years?  That's all I'm asking.
7    A. Roughly a year?
8    Q. Okay.  That's fine.
9    A. I don't recall exactly.
10   Q. Well, that's your best recollection, right?
11   A. Yes.
12   Q. And once again, just to hopefully relax you, I'm
13      not trying to pinpoint you to an exact time.  A
14      rough approximation is fine for my question.
15      Okay?
16   A. Okay.
17   Q. Now, you indicated at the Cleveland Clinic, you
18      worked with anesthesiologists; is that correct?
19   A. Yes.
20   Q. Did you report to anesthesiologists as
21      supervisors?
22   A. We work as a team in the operating room.  They, I
23      require their supervision to provide anesthesia.
24   Q. In the operating room?
25   A. In the operating room.

1    Q. Right.  But let me make this distinction for you:
2       I understand the operating room and the hands-on
3       work during surgery and so forth and that the
4       anesthesiologist has responsibilities over you of
5       a supervisory nature in that regard, right?
6    A. What are you asking?
7    Q. Just what I asked.
8       I'll repeat it.
9       In the operating room, the anesthesiologist
10      has some supervisory responsibilities over the
11      work in there?
12   A. Yes.
13   Q. With respect to you?
14   A. Yes.
15   Q. But then there's the employment relationship.
16      Somebody who gives input on the work
17      appraisal and performance appraisal, correct?
18      You get work appraisals and performance
19      appraisals at the Cleveland Clinic and at the VA,
20      right?
21   A. There are work appraisals at the Cleveland Clinic
22      and the VA.
23   Q. Yeah.  Well, that's not something an
24      anesthesiologist does.  It's something that you
25      would expect Mr. Bearss or Mr. Beedlow to have

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 29

1    some part in, correct?
2  A. Yes.
3  Q. But the anesthesiologist doesn't rate your
4    performance on your performance appraisal or
5    anything like that; is that correct?
6  A. No. Yes, that is correct.
7  Q. Yes, that is correct?
8  A. Yes, that is correct.
9  Q. I just wanted to be sure.
10    All right. And as far as disciplinary action
11    or concerns of that nature, I'm not saying you
12    had any, okay? I'm just asking this in a general
13    way just to be clear about it.
14    Do you understand my context here?
15  A. Yes.
16  Q. Good.
17    For purposes of possible disciplinary action
18    or criticism or something of that nature
19    involving your employment and the rules and
20    regulations of employment both at the VA and at
21    the Cleveland Clinic, the supervisor, CRNA
22    supervisor is the person involved in that kind of
23    issue, not the anesthesiologist; is that correct?
24  A. Yes.
25  Q. So an anesthesiologist at the Cleveland Clinic is

Page 30

1    not in any sense other than just right in the
2    operating room your supervisor; is that correct?
3  A. Yes.
4  Q. And that would be exactly the same situation at
5    the VA:
6    Mr. Bearss as the lead CRNA or supervisor of
7    you would be in that same role as Mr. Beedlow,
8    correct?
9  A. Yes, when he was there. He wasn't there for the
10    whole time.
11  Q. Yes. Of course if he wasn't there, he wouldn't
12    be but I'm talking about when he was there. Yes?
13  A. Yes.
14  Q. Okay. Now, do you dislike my client, Dr. Ron
15    Lisan, as an individual?
16    MS. JOHNSON: Objection. You may
17    answer.
18  A. No.
19  Q. Do you hope he loses this case?
20  A. No.
21  Q. Do you have any feeling about what the outcome of
22    this case should be?
23  A. No.
24  Q. As you sit here now, Ms. Costanzo, do you have
25    any fear that if you say things in this

Page 31

1    deposition which are upsetting or disturbing or
2    critical with respect to Dr. Raphaely, that you
3    might be retaliated against by her?
4    MS. JOHNSON: Objection. You may
5    answer.
6  A. Yes.
7  Q. Is that, and I understand that, by the way.
8    Do you feel -- well, let me just say this: I
9    think I can speak for both sets of attorneys
10    here, but I'll speak for myself first, that our
11    goal as attorneys and professionals in our field
12    is to obtain the truth and that means the whole
13    truth.
14    You understand that, don't you?
15  A. Yes.
16  Q. And you wouldn't hold it against me or your VA
17    counsel for having that goal, would you?
18  A. No.
19  Q. And when a witness is afraid of retaliation, my
20    concern, and I would think possibly the concern
21    of the other attorneys, but they can speak for
22    themselves, is that they might not get the whole
23    truth because of that fear.
24    Do you understand my concern?
25    MS. JOHNSON: Objection. You may

Page 32

1    answer.
2  A. I understand you could have that concern.
3  Q. Right. Well, I mean it's logical, isn't it?
4  A. Yes.
5  Q. Do I have to be concerned or worried here that
6    because of your fear of retaliation from
7    Dr. Raphaely that you might hesitate to tell the
8    whole truth in answer to questions that might
9    require you to say things very critical or
10    negative about Dr. Raphaely?
11    MS. JOHNSON: Objection. You may
12    answer.
13  A. I will answer your questions truthfully.
14  Q. And that means the whole truth, doesn't it?
15  A. Yes.
16  Q. I appreciate that very, very much and I empathize
17    with your position.
18    If there comes a point in my questions where,
19    for whatever reason, you feel you simply can't
20    tell the whole truth out of fear, if that
21    happens, and I'm not saying it will, okay?
22    But if it does, will you let us know?
23    Because I certainly don't want to sit here and
24    just browbeat you about it but I'd like to know
25    if you're afraid to say something.

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 33

1    MS. JOHNSON: Objection.
2  **Q. Would you let us know if that occurs?**
3    MS. JOHNSON: Objection. She has
4  sworn to tell the truth under oath.
5    MR. SINDELL: I understand.
6    MS. JOHNSON: And she said that
7  she understands what that means.
8    MR. SINDELL: She can answer my
9  question.
10    MS. JOHNSON: Right. You're
11  interrupting my objection.
12    MR. SINDELL: Oh, I'm sorry.
13    MS. JOHNSON: Well, you do that
14  and you don't think --
15    MR. SINDELL: Well, we both do it.
16    MS. JOHNSON: I was trying to
17  object. Okay?
18    MR. SINDELL: Sure.
19    MS. JOHNSON: She is sworn under
20  oath. She has told you that she
21  understands what an oath means. This line
22  of questioning is really not appropriate.
23    MR. SINDELL: Lisa, if somebody is
24  so fearful -- is it, did I interrupt you?
25    MS. JOHNSON: I was not done.

Page 34

1    MR. SINDELL: I'm sorry. Go right
2  ahead.
3    MS. JOHNSON: This line of
4  questioning is inappropriate and it's also
5  been asked and answered and I think it
6  would be best if we moved on a bit.
7    MR. SINDELL: Okay. Are you done?
8    MS. JOHNSON: I am done.
9    MR. SINDELL: Okay. I do
10  appreciate that you'd like to move on. I
11  do not think that this kind of question is
12  inappropriate at all and the reason I don't
13  think it's inappropriate is because it is,
14  it goes to the fundamental integrity of the
15  entire process, and if somebody is so
16  concerned about their job or some other
17  kind of retaliation from their supervisor
18  that they feel they're constrained from
19  telling the whole truth, I think we're
20  entitled to know that from the witness.
21  And all I'm asking her is will she let me
22  know if that occurs.
23    Why is that improper? Can I ask
24  her to please tell me that?
25    MS. JOHNSON: Well, can I respond

Page 35

1  to you first?
2    MR. SINDELL: Yes, of course.
3    MS. JOHNSON: Okay. So I believe
4  it's improper because it has been asked and
5  answered. You may ask her.
6    MR. SINDELL: I didn't get the
7  answer.
8    MS. JOHNSON: You got the answer
9  several times.
10    MR. SINDELL: What did she say?
11    MS. JOHNSON: She said she's going
12  to tell you the truth. You know, you've
13  asked this question in different ways.
14    MR. SINDELL: She did not tell me
15  that she would let me know if she was
16  afraid to say anything more that's the
17  truth in answer to a question. Now that's
18  the question.
19    MS. JOHNSON: I wasn't done
20  either. Okay? So let's go ahead and ask
21  that question. Let's read it back and then
22  she may answer.
23    MR. SINDELL: Okay. Let me just
24  ask it. Okay?
25    MS. JOHNSON: Okay.

Page 36

1  Q. Okay. Once again, I really don't think you had a
2    chance to answer this.
3      If there comes a point in this deposition,
4    which may not occur, that you are afraid to give
5    a complete, truthful answer to a question, all
6    I'm asking you is will you let us know?
7  A. Yes.
8  Q. Thank you. That's all.
9      MS. JOHNSON: Okay.
10  Q. Now --
11      MS. JOHNSON: Steve, would this be
12    an okay time to take a break? We've been
13    going for an hour or so almost. Would that
14    be okay?
15      MR. SINDELL: Yes, sure.
16      - - - -
17    (Thereupon, a recess was had.)
18      - - - -
19  (Thereupon, Plaintiff's Exhibit 27, 6/18/18
20  Spicer "Climate Assessment Report" was marked
21  for purposes of identification.)
22      - - - -
23  Q. Does the name Brenda Spicer mean anything to you?
24  A. Yes.
25  Q. And who do you understand Brenda Spicer to be?

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1  A.  She was someone in charge of doing a workplace
2  assessment.
3  Q.  Did that workplace assessment focus on anything
4  in particular?
5  A.  I think the overall kind of feeling of the
6  department, the negative kind of atmosphere that
7  was kind of present in the department at the
8  time.
9  Q.  This would have been approximately when, if you
10  can recall?
11  A.  Well, just looking at this, I can see it was
12  early 2018.
13  Q.  Yeah.  The last page, if you want to just take a
14  quick check, is dated June 18th, 2018 which
15  relates to the date of this report; so it would
16  have been before then in 2018.
17      Does that help focus it a little bit?
18  A.  Yes.
19  Q.  Okay.  Good.
20      Now, it's my understanding, correct me if you
21  understand differently, that there were a series
22  of complaints that the group of CRNAs in the VA
23  department of anesthesiology made; is that
24  correct?
25  A.  There were a series of complaints?

1  Q.  Yes.  Complaints from the CRNAs that brought
2  about this investigation?
3  A.  There, yes.
4  Q.  Okay.  This was in written form, correct, a
5  series of points?
6  A.  Yes.
7  Q.  Were you part of the drafting of that?
8  A.  We did it together as a group, yes.
9  Q.  Of which you were a member?
10  A.  Yes.
11  Q.  And when you say "a group," you're talking about
12  CRNAs?
13  A.  Yes.
14  Q.  When you say "a group," did it constitute an
15  entire group or who's in the group?
16  A.  It was the majority of the group of CRNAs.
17  Q.  Did that include, if you know, Karin Bonfili?
18  A.  Yes.
19  Q.  Did it include, if you know, Rhonda Verb?
20  A.  Yes.
21  Q.  Did it include, if you know, Jessica Foster?
22  A.  Yes.
23  Q.  Did it include Laurie Frankito?
24  A.  Yes.
25  Q.  How about Mark Myers?

1      If you're not sure, it's okay.
2  A.  I don't recall.
3  Q.  Can you recall any others that you would like to
4  be able to add just from your recollection off
5  the top of your head?
6  A.  No.  I don't recall.
7  Q.  Now, did individual -- withdrawn.
8      Was this focused on at least in part --
9  withdrawn.
10      Was it focused at least in part on the
11  conduct and management of Dr. Susan Raphaely?
12  A.  Yes.
13      MR. SINDELL:  Off the record.
14      - - - -
15      (Thereupon, a discussion was had off the
16  record.)
17      - - - -
18  Q.  I'm going to direct you to certain parts of it
19  because I don't want to take up the time to have
20  her read the whole thing.
21      MS. JOHNSON:  Yes, but she
22  deserves a chance to read it.
23  Q.  Have you seen this before by the way?
24  A.  Yes.
25  Q.  So do you want to read the whole thing?

1  A.  Yes.
2      MS. JOHNSON:  She's entitled to.
3  Give her a break.
4      MR. SINDELL:  I am.
5      MS. JOHNSON:  She's entitled to
6  read it.
7      - - - -
8      (Thereupon, a discussion was had off the
9  record.)
10      - - - -
11  Q.  Ready to go back?
12  A.  Yes.
13  Q.  Back on the record.
14      Well, we've taken a break and the witness has
15  had an opportunity to read Exhibit 27 which is a
16  14-page partially redacted document.
17      So referring to the exhibit in front of you,
18  Exhibit 27, Ms. Costanzo, can you identify this
19  document?
20  A.  It is a document assessing our workplace from
21  Brenda Spicer.
22  Q.  Okay.  This is the document that Ms. Spicer
23  produced as the assessor or investigator
24  appointed by the VA to investigate the original
25  complaints that you participated in making

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 41

1    regarding the department of anesthesiology, the
2    CRNAs and to some extent Dr. Raphaely; is that
3    correct?
4  A.  Yes.
5  Q.  Now I'd like to direct your attention to the
6    first, to the very first page and it says, one of
7    the purposes appears to be, and I'll just read
8    it.
9         MS. JOHNSON:  Excuse me, where are
10        you, Steve?
11  Q.  First paragraph under background -- not first
12    paragraph.  Sorry.
13        First page, second paragraph, last
14    sentence --
15        MS. JOHNSON:  Okay.
16  Q.  -- of the document.  And I'm just going to read
17    the last sentence out loud.
18        "Further, to identify the levels of
19    satisfaction/dissatisfaction, and to identify
20    facts surrounding allegations of retaliation,
21    discrimination and unequal treatment by," and
22    then it's redacted, the name, apparently.
23        Did I read that correctly?
24  A.  Yes.
25  Q.  Okay.  Is that your understanding of at least

Page 42

1    what a portion of this document is intended to
2    cover?
3  A.  Yes.
4  Q.  Do you recall when the original list of
5    complaints was made, what your personal input may
6    have been to that list?
7  A.  I don't recall personally having like a personal
8    experience that I was reporting or a experience
9    that was only related to me.
10      I was only involved in the complaints that
11    were as a group made.
12  Q.  Okay.  Were among the complaints any issues about
13    forcing CRNAs to make statements regarding sexual
14    harassment and Dr. Lisan?
15  A.  You're asking me were any of these complaints
16    related to us being forced to make?
17  Q.  Well, let me rephrase it then.
18        Maybe that's a badly phrased question.
19        MS. JOHNSON:  Off the record.
20              - - - -
21    (Thereupon, a discussion was had off the
22    record.)
23              - - - -
24  Q.  I'm talking about, for the record, and I'll ask
25    the witness, a series of written complaints with

Page 43

1    names after it of a number of the CRNAs.  I
2    assume your name was on there, Ms. Costanzo,
3    indicating certain kinds of objections,
4    criticisms, concerns by the CRNAs, many of which
5    were directed, if not all of them, to
6    Dr. Raphaely.
7        Is that about right?
8  A.  There was a list of concerns, yes.
9  Q.  Did I say it right pretty much?
10  A.  Yes.
11  Q.  Okay.  Is that it?
12        MS. JOHNSON:  Yeah.  No, I just
13        wanted to make sure the record was clear so
14        when we look at it later, that it will be
15        clear to us.
16        MR. SINDELL:  Yes.
17              - - - -
18    (Thereupon, a discussion was had off the
19    record.)
20              - - - -
21  Q.  Okay.  Now, among the complaints or concerns that
22    were on this list that generated the
23    investigation and assessment, Exhibit 27, did it
24    include a concern that CRNAs were in some way
25    coached by Dr. Raphaely regarding complaints

Page 44

1    about Dr. Lisan or possibly just an
2    anesthesiologist?
3  A.  Not to my knowledge.
4  Q.  Okay.  Now I'd like you to take a look at the, it
5    would be Page 4 of this document.  It says "Many
6    CRNAs indicated" -- I'm in the second paragraph
7    under Number 2, change in work environment and
8    perceptions.
9        Are you with me?
10  A.  Yes.
11  Q.  And it begins with the sentence:  "Many CRNAs
12    indicated that about a year or a year-and-a-half
13    ago, blank actions began to change."
14        Did I read that correctly?
15  A.  Yes.
16  Q.  The blank is Dr. Raphaely to the best of your
17    knowledge, isn't it?
18  A.  To the best of my knowledge, yes.
19  Q.  Okay.  Now, it says here:  "Their initial
20    impression of her changes," so we know it's a
21    female, "her changes to the operation changed
22    from being one who cared for them as employees
23    and wanting to make sure they were treated with
24    respect by others to becoming someone who is
25    vindictive, retaliatory, hostile, discriminatory

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1    and divisive."
2        Did I read that correctly?
3  A.  Yes.
4  Q.  It says here:  "Changes to the operation."
5        Do you see that phrase there in the beginning
6    of the sentence I read?
7  A.  Yes.
8  Q.  Dr. Raphaely as chief or head of the department
9    of anesthesiology would be involved and
10   responsible for changes in the operation; is that
11   correct?
12       Of the anesthesiology department?  That is a
13   part of her job?
14 A.  Yes.
15 Q.  So it's pretty clear who you're talking about
16   here, correct?
17 A.  Yes.
18          MS. JOHNSON:  Objection.  I just
19        want to clarify that you said that that's
20        who you're talking about.
21 Q.  I mean who the document is referring to.
22          MS. JOHNSON:  Right.  Thank you.
23 Q.  That's who the document is referring to, isn't
24   it?
25 A.  Yes.

1  Q.  Now, I'd like to ask you about that question
2    there or that sentence there.
3        It says, "someone becoming vindictive,
4    retaliatory, hostile, discriminatory and
5    divisive," correct?  It says that, right?
6  A.  That's what it says, yes.
7  Q.  Well, do you disagree with that?
8  A.  In some ways, I agree with it, yes.
9  Q.  You agree with it, okay.
10       So let's go on and then I'll ask you some
11   specific questions.
12       It says, "They noticed."
13       "They" being the CRNAs.  Is that what you
14   understand there?
15 A.  Yes.
16 Q.  Okay.  "They noticed that whenever someone
17   questions her," you understand Dr. Raphaely is
18   the "her" here?
19 A.  Yes.
20 Q.  "She gets upset."
21       Do you agree with that?
22 A.  I have not had a personal experience.
23 Q.  I didn't ask you that.
24          MS. JOHNSON:  Let her finish her
25        answer.

1  A.  Yes.  I agree with that statement.
2  Q.  Yes, I understand that you may or may not have
3    personally had an experience like that but the
4    question is directed, it's a general kind of
5    observation that others have made and that's all
6    I want to know, if you agree with that
7    observation.  That's all.
8  A.  I agree with that observation.
9  Q.  Okay.  Then it goes on to say:  "If she," meaning
10   Dr. Raphaely, "is proven wrong, she,"
11   Dr. Raphaely, "retaliates and penalizes the
12   entire CRNA group and she takes away privileges
13   by creating policies that are confusing."
14       Is that something that you agree or disagree
15   with?
16 A.  I agree with it.
17 Q.  Then it says, then it just goes on to say that
18   there were some specific situations which I'm not
19   going I'm not going to go into right this second,
20   okay?
21 A.  Yes.
22 Q.  All right.  Now -- actually, let me take that
23   back.  I'll go back.
24       It says under "Yelling," it's part A.
25   "Yelling and Condescending Tones Toward the

1    Staff."
2        Did I read that correctly?
3  A.  Yes.
4  Q.  Number 1, "Yelling and condescending tones:  The
5    majority of the CRNAs describe her yelling as,"
6    quote, "a lot," quote, "it's not uncommon" and,
7    quote, "multiple times."
8        Did I read that correctly?
9  A.  Yes.
10 Q.  Do you agree with that?
11 A.  I think that it's a little bit excessive, the
12   statement is a little bit excessive.
13 Q.  A little bit?
14 A.  In my opinion.
15 Q.  That's all I'm asking, your opinion.
16       A little bit excessive but somewhat true?
17 A.  Yes.
18 Q.  Okay.  It says "Dr. Raphaely yelled at one
19   employee but called her at home to apologize."
20       Do you know anything about that?
21 A.  Yes.
22 Q.  What is that about?  Is that about you?
23 A.  No.
24 Q.  Okay.  What's it about?
25 A.  An employee who requested time off to go to a

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

---

Page 49

1   doctor's -- a specialist doctor's appointment
2   with her son who was having a hearing problem and
3   she felt that it was inappropriate that the CRNA
4   asked for the specific day off and she yelled at
5   her over the phone.
6   Q.  Did you hear that or just hear about it?
7   A.  I heard it.
8   Q.  Actually heard it yourself?
9   A.  Yes.
10  Q.  What was she yelling, if you can recall?  "She"
11     being Dr. Raphaely.
12  A.  That it was disrespectful for that CRNA to ask
13     for that day off due to the fact that it was a
14     holiday week, the week of the holiday.
15  Q.  Do you have any reason to believe it was
16     disrespectful for that CRNA to make that request?
17  A.  No.
18  Q.  Do you have any idea why Dr. Raphaely yelled at
19     her and said that?
20        MS. JOHNSON:  Objection.  You may
21     answer.
22  A.  No.
23  Q.  The next sentence, it says:  "Many of them
24     indicated that Dr. Raphaely constantly tells them
25     that they make a lot of money."

---

Page 50

1       "They" being the CRNAs, correct?
2   A.  Yes.
3   Q.  "And if they," the CRNAs, "don't agree with the
4      decision, you can go elsewhere."
5          Did I read that correctly?
6   A.  Yes.
7   Q.  Have you ever heard Dr. Raphaely tell those
8      things to the CRNAs?
9   A.  Yes.
10  Q.  More than once?
11  A.  Not that I can recall.
12  Q.  Did you have any concerns or feelings about the
13     appropriateness of that kind of remark from
14     Dr. Raphaely?
15  A.  I don't agree with it.
16  Q.  Do you think it's appropriate conduct for the
17     chief of anesthesiology to speak that way?
18  A.  I think it's a little unconventional as far as
19     the management technique.
20  Q.  Do you think it's inappropriate?
21  A.  I don't, I don't know that I can speak to that.
22     I don't think I've ever been treated like that
23     from a manager before.
24  Q.  Okay.  If you were treated like that by a
25     manager, would you consider that inappropriate?

---

Page 51

1   A.  If I was treated?
2   Q.  Yes.
3   A.  If someone said that to me --
4   Q.  Well, I'm not talking about someone.
5          If your immediate supervisor in the
6      anesthesiology department as chief of the
7      anesthesiology department told you that you make
8      a lot of money and if you don't agree with the
9      decision, you can go elsewhere?
10  A.  I think that's her decision to make that remark.
11  Q.  Okay.  You have no problem with it, then?
12         Or are you afraid to tell me the answer to
13     that question?
14        MS. JOHNSON:  Objection.
15  A.  I'm not afraid.
16  Q.  Okay.  Good.
17         So that's her, that's her prerogative but
18     what do you think of it?
19  A.  I think that she's not going to retain a lot of
20     employees.
21  Q.  Do you think that's pretty shabby treatment?
22        MS. JOHNSON:  Objection.  You may
23     answer.
24  A.  She has the choice to treat --
25  Q.  She has the choice.  I'm asking your reaction to

---

Page 52

1   it.
2       Do you think that's shabby treatment?
3        MS. JOHNSON:  Objection, Steve.
4   You interrupted her when she was trying
5   to --
6        MR. SINDELL:  I didn't do a thing.
7        MS. JOHNSON:  Yes, you did.
8        MR. SINDELL:  You're interrupting.
9   Go ahead.
10       MS. JOHNSON:  I waited until you
11  finished.
12       MR. SINDELL:  Read back the
13  question.
14       MS. JOHNSON:  Steve, you're
15  talking over me when I'm trying to object
16  and you do this a lot.
17       MR. SINDELL:  Oh my goodness.
18       MS. JOHNSON:  Now you need to
19  listen to me.  She was in the middle of
20  answering your question when you cut her
21  off and asked a different question.  Let's
22  please go back and have the question, you
23  can reask it or have her go back and read
24  it, but you interrupted her and then you
25  interrupted me and I don't appreciate it.

---

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

---

Page 53

1       You need to let her answer, please.
2   Q. If I interrupt you, please let me know.  I don't
3       mean to.  Okay?
4   A. Okay.
5   Q. Don't hesitate.  It will be fine.  I didn't hear
6       you say that.  I heard opposing counsel say it.
7           Read back my question, if you can.
8           THE NOTARY:  "Do you think that's
9           shabby treatment?"
10  A. "Shabby" meaning?  Be more specific when you say
11      "shabby."
12  Q. Okay.
13  A. Use a different word.
14  Q. Okay.  Appropriate?  Do you think it's
15      appropriate?
16  A. I think that there are always different
17      personalities in the workplace and sometimes you
18      can't avoid it; but there are other reasons why
19      you do things or you don't do them in the
20      workplace so it's her decision to make that
21      statement.
22      I'm not in her position so I can't, I can't
23      say whether or not that I think that that is
24      inappropriate.
25  Q. Does it contribute to low morale?

---

Page 54

1   A. I certainly think that it could contribute to low
2       morale, yes.
3   Q. Well, to your knowledge, did it contribute to low
4       morale, that kind of statement in the department
5       of anesthesiology among CRNAs?
6   A. I think it probably did.
7   Q. Thank you.
8       Okay.  Now, the next sentence refers to the
9       reference to pay as being disrespectful
10      treatment.
11      Do you see that?
12          MS. JOHNSON:  Okay.  I see it.
13          Sorry.  I was just looking.
14  A. Yes, I see it.
15  Q. Do you disagree with that?
16  A. I agree that because of my pay, I shouldn't
17      be subject -- just because of my pay, I should
18      not be subjected to disrespectful treatment.
19  Q. Okay.  It says here:  There were three CRNAs who
20      indicated that depending on how upset
21      Dr. Raphaely gets with you, she will stop
22      speaking to you as you pass in the hallways but
23      she remains professional in the OR.  I added
24      "Dr. Raphaely" over the blank.
25      You understood that as Dr. Raphaely, correct?

---

Page 55

1   A. Yes.
2   Q. So let me ask you about that:  Are you aware of
3       any CRNAs to whom she stopped speaking as they
4       passed her in the hallways?
5   A. I am not aware.
6   Q. It says, next sentence, if you'll follow me:  "In
7       the staff meetings."
8       Do you see that?
9   A. Yes.
10  Q. Okay.  "In the staff meetings many do not feel
11      comfortable speaking up after being yelled at.
12      They are told this is the way it's going to be."
13          The question is:  Are you aware of any
14      people, including possibly yourself, who don't
15      feel comfortable speaking up after being yelled
16      at?
17  A. Yes.
18  Q. Okay.  Has that happened to you?
19  A. Yes.
20  Q. Has she yelled at you?
21  A. Yes.
22  Q. Why has she yelled at you?
23  A. I requested during the time that she was
24      mandating us that we be notified further in
25      advance that we would have to be staying after

---

Page 56

1       our tour of duty so that I could make
2       arrangements for my family.
3   Q. Okay.  That was a little jumbled because you said
4       "we" be notified.
5   A. The CRNAs as a group were being mandated to stay
6       past our tour of duty to care for patients
7       despite being hourly employees and having
8       salaried counterparts in physicians and I asked
9       if she was going to make this mandate list that
10      we have a little bit more notice during the day
11      that we were going to be mandated to stay.
12  Q. And what happened?
13  A. She told me that just because I have children
14      doesn't mean that I'm special.
15  Q. Did you think that you were special because you
16      had children?
17  A. No.
18  Q. Did you ever say that to her?
19  A. No.
20  Q. You said that she told you.
21      My question was:  Did you yell at you about
22      anything?
23  A. She raised her voice.
24  Q. Raised her voice, okay.
25      How did you feel?

---

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 57

1  A.  Upset.
2  Q.  Did you feel her remark was appropriate or
3     inappropriate?
4  A.  I didn't appreciate it.
5  Q.  Did you answer her back?
6  A.  No.
7  Q.  Reading further, the next sentence, are you with
8     me?  "They believe."  Do you see that?
9  A.  Yes.
10  Q.  Okay.  "They believe she makes decisions."
11     "She" being Dr. Raphaely?
12  A.  Yes.
13  Q.  "They believe that Dr. Raphaely makes decisions
14     that seem vindictive after a staff member had
15     upset her and the decisions seem out of the
16     ordinary and many times contrary to the
17     regulations."
18     Did I read that correctly?
19  A.  Yes.
20  Q.  Is that something that you became aware of?
21  A.  I don't think that some of the decisions that
22     Dr. Raphaely makes seem like they make sense at
23     the time but I don't, I can't make the judgment
24     of why she makes those decisions or what she
25     does, how she does it.

Page 58

1     Her management style is sometimes
2     unconventional but, like I said, there are
3     different personalities you have to work with in
4     the workplace.  Some people don't always follow
5     the rules and...
6  Q.  Okay.  Let me focus on this.
7     Are you aware that other CRNAs other than
8     yourself expressed the belief that she makes
9     decisions that seem vindictive to them?
10  A.  Yes.
11  Q.  Did they describe why they felt that her
12     decisions, Dr. Raphaely's decisions seemed
13     vindictive to them?
14     MS. JOHNSON:  Objection.  You may
15     answer.
16  A.  I can't say anything specific.
17  Q.  I didn't ask you for that.  Maybe I'm not clear.
18     Did they give reasons, whether you can
19     remember what the reasons were, as to why they
20     believed that Dr. Raphaely's decisions seemed to
21     them to be vindictive?
22  A.  Well, there are facts of things that have
23     happened; and looking at the facts and looking at
24     the timeline of events, some things seem a little
25     bit vindictive.

Page 59

1  Q.  So you, in part, agree with that?
2  A.  I agree with what?
3  Q.  The statement that the decisions seem vindictive?
4  A.  At times.
5  Q.  Yes.  That's my question.  Okay.  Thank you.
6     I'd like you to look at Page 13.  Are you
7     there?
8  A.  Yes.
9  Q.  If you'll look at the second paragraph under
10     conclusions starting with "it is important"?
11  A.  Yes.
12  Q.  It says:  "It is important to note that
13     dissatisfaction among one, two or five employees
14     many times would not be considered significant
15     depending on the concerns.
16     Did I read that correctly?
17  A.  Yes.
18  Q.  And it goes on, doesn't it?
19  A.  Yes.
20  Q.  "But there are 15 CRNAs who have concerns with
21     the common theme of experiencing fear of
22     retaliation, policies that seem to be implemented
23     as a punishment for the entire group and contrary
24     to the master agreement, constant reminders of
25     how much money they make and constant reminders

Page 60

1     that they can find another job if they are
2     dissatisfied."
3     Did I read that correctly?
4  A.  Yes.
5  Q.  How many CRNAs, if you know, in total are there
6     in the VA department of anesthesiology in
7     Cleveland?
8  A.  16, including Bob.
9  Q.  He's a CRNA, too, isn't he?
10  A.  Yes.
11  Q.  Perhaps you may have forgotten a couple but even
12     if there were 17, 18, 19, you know, I'm not
13     holding you to an exact number.  15 CRNAs out of
14     that group is the vast majority.
15     Would you agree with that?
16  A.  Agree.
17  Q.  You being one of them?
18  A.  Yes.
19  Q.  Do you agree that you had these concerns that I
20     just read to you in this sentence?
21  A.  I agree that I had these concerns.
22  Q.  Are you aware that the vast majority of CRNAs had
23     the same concerns as you?
24  A.  Yes.
25  Q.  Okay.  Now, did you have any conversations about

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1   Dr. Lisan with Karin Bonfili prior to coming here
2   today at any time?  I mean going back from the
3   beginning when you were working there at the VA?
4   A. Did I ever have any conversations about Dr. Lisan
5      with Karin Bonfili?
6   Q. It's a very broad question.
7   A. Yes.
8         MS. JOHNSON:  At least you admit
9      that one.
10        MR. SINDELL:  I thought I'd start
11     out with a big umbrella.
12        Off the record.
13           - - - -
14     (Thereupon, a discussion was had off the
15     record.)
16           - - - -
17  Q. All right.  Now, are you aware that Dr. Lisan was
18     on medical leave in the year 2016?
19  A. Yes.
20  Q. Are you aware that he had a condition called OCD
21     that was being treated while he was on leave?
22  A. Yes.
23  Q. Obsessive-compulsive disorder?
24  A. Yes.
25  Q. Do you have any knowledge at all about what that

1      is?
2   A. Yes.
3   Q. What do you understand it to mean just in
4      general?
5   A. It's a person acting on compulsions to the point
6      where it restricts their function of daily living
7      activities.
8   Q. And it would affect their work activities as
9      well?
10  A. Yes.
11  Q. Impair their activities?
12  A. Yes.
13  Q. Do you recall that it was approximately December
14     7th, 2016 that Dr. Lisan returned to work at the
15     VA?
16  A. I was on maternity leave from the end of
17     September 2016 until January 2017.
18  Q. Did you ever split your maternity leave or try to
19     do that?
20  A. No.  Try to split my maternity leave?
21  Q. Yeah.
22  A. I took my full 12 weeks' maternity leave.
23  Q. When did you return from maternity leave?
24  A. January 2017.
25  Q. When you say January, you mean the beginning of

1      January?
2   A. Yes.
3   Q. Like right after the new year?
4   A. The 2nd of the year.
5   Q. That's right after the new year.
6         And that would be 2017?
7   A. Correct.
8   Q. At any time after you returned from maternity
9      leave, have you had any discussions or overheard
10     any conversations with Karin Bonfili about Ronald
11     Lisan's issues involving sexual harassment?
12  A. I overheard a story about Karin's experience with
13     him.
14  Q. Did you ever hear Karin Bonfili -- withdrawn.
15           - - - -
16     (Thereupon, a discussion was had off the
17     record.)
18           - - - -
19  Q. Did you ever hear Karin Bonfili say that she was
20     coached by Dr. Raphaely --
21  A. No.
22  Q. -- in any way about Dr. Lisan?
23  A. Not that I can recall.
24  Q. Okay.
25  A. Can you be more specific about that as far as

1      like "coached"?
2   Q. Sure.
3   A. In regards to what?
4   Q. I'll be very specific.
5         This would be within the last couple months.
6         Do you remember Karin Bonfili ever indicating
7      that Dr. Raphaely said to her privately, "I
8      didn't coach you about what to write down in your
9      statements or affidavits or ROCs."
10        And she said, "Yes, you did," to Dr. Raphaely
11     or words to that effect?
12  A. I know that there was some talk about Karin being
13     coached what to say for -- but it wasn't related
14     to what she had complained about.
15  Q. Okay.  Was it about her deposition testimony?
16  A. I'm not sure.
17        There was some talk about her being called
18     into the office.
19  Q. What office?
20  A. Dr. Raphaely's office.
21  Q. By Dr. Raphaely?
22  A. Yes.
23  Q. And being coached?
24  A. And being told that whatever she says, she should
25     say as she remembers it and not according to --

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 65

1  that she was not being coached by Dr. Raphaely,
2  that she wanted to make sure that Dr. -- that
3  Karin understood she was not being coached or she
4  wasn't being told what to say.
5  Q. Okay. In other words, let me see if I got this
6  right.
7      Karin reported that Dr. Raphaely wanted to be
8  sure that Karin testified that she was not being
9  coached by Dr. Raphaely?
10          MS. JOHNSON: Objection.
11  Q. Is that correct?
12          MS. JOHNSON: You may answer.
13  A. No.
14  Q. Okay.
15  A. That she would, she had the opportunity to say
16  exactly what she felt happened and it wasn't --
17  she didn't have, she wasn't operating under any
18  duress from Dr. Raphaely. She didn't have to say
19  something just because Dr. Raphaely wanted her to
20  say something.
21  Q. And this was something that Karin said?
22  A. Karin had said, I heard her say that she had been
23  called into Dr. Raphaely's office and that
24  Dr. Raphaely wanted Karin to be sure that she
25  knew she needed to tell her story and not

Page 66

1  anything else, because apparently she was hearing
2  rumors that she was coaching Karin.
3  Q. And you don't remember -- withdrawn.
4      When you heard Karin Bonfili say that, you
5  were present?
6  A. I was present, yes.
7  Q. And others were present, too, weren't they?
8  A. I don't recall.
9  Q. Do you think Laurie Frankito was present?
10  A. I don't know.
11  Q. Let me broaden my question a little bit.
12      At any time, whether in the last few months
13  or not, did Karin Bonfili ever say that
14  Dr. Raphaely told her specifically not to testify
15  that she was coached by Dr. Raphaely and that
16  Karin responded to Dr. Raphaely, "But, yes, you
17  did coach me" or words to that effect? At any
18  time?
19          MS. JOHNSON: Steve, I didn't
20      quite catch the beginning of the question.
21      Could we reread that, please.
22          THE NOTARY: "Let me broaden my
23      question a little bit.
24          "At any time, whether in the last
25      few months or not, did Karin Bonfili ever

Page 67

1      say that Dr. Raphaely told her specifically
2      not to testify that she was coached by
3      Dr. Raphaely and that Karin responded to
4      Dr. Raphaely, 'But, yes, you did coach me'
5      or words to that effect? At any time?"
6  A. So there's a lot of questions in that question.
7      So I can answer the first question.
8      Can you repeat the first question again?
9          THE NOTARY: "At any time, whether
10      in the last few months or not, did Karin
11      Bonfili ever say that Dr. Raphaely told her
12      specifically not to testify that she was
13      coached by Dr. Raphaely?"
14  A. No.
15  Q. Okay. What was the other question you thought
16  was in there?
17  A. I don't -- well, you can read it again.
18          MR. SINDELL: Read it again.
19          THE NOTARY: "And that Karin
20      responded to Dr. Raphaely, 'But, yes, you
21      did coach me' or words to that effect? At
22      any time?"
23  A. I don't -- I can't comment on that. I don't
24      recall her saying that exact phrase --
25  Q. Oh, well --

Page 68

1  A. -- that she was "coached."
2  Q. Okay. I'm not, we're not going to limit, I'm not
3  going to limit it to a semantic restriction like
4  that, "the exact phrase." Okay? I'm not asking
5  you for the exact phrase.
6      Let me repeat it in a general way so that you
7  can answer it more broadly if necessary.
8      I want to know if there was any discussion
9  that you are aware of based on anything that
10  Karin Bonfili said that you heard that
11  Dr. Raphaely had any specific discussions with
12  her about anything she wrote in her ROC -- "she"
13  being Karin Bonfili -- anything she wrote in any
14  statement concerning Ron Lisan and sexual
15  harassment, anything she wrote in her affidavit
16  to any investigator about it or anything she may
17  have testified to in her deposition.
18      Do you understand that question?
19  A. I understand.
20          MS. JOHNSON: I'm going to object
21      to that question. It's quite compound.
22      You may answer.
23  A. I don't know what happened with Karin.
24  Q. I didn't ask you that. I didn't ask you what
25  happened.

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

---

Page 69

1  A. Everything is hearsay then.  I don't know --
2      there's no truth to --
3  Q. Okay.  Let me --
4          MS. JOHNSON:  Maybe rephrase the
5      question.
6  Q. Let me have the question reread.  I'm going to
7      reread it and if it needs to be broken down into
8      itty bitty little pieces, then we'll break it
9      down into itty bitty little pieces so that it's
10     not too compound for you.
11 A. Sounds great.
12         MS. JOHNSON:  Steve, let's go off
13     the record a second.
14              - - - -
15     (Thereupon, a discussion was had off the
16     record.)
17              - - - -
18         MS. JOHNSON:  Let's go back on the
19     record.
20         MR. SINDELL:  Where are we at?
21     Okay.  Read me slowly the question that I
22     asked so I can write down every word that I
23     asked and then you'll get it down.  Go
24     ahead.
25         THE NOTARY:  "Okay.  I'm not,

---

Page 70

1      we're not going to limit, I'm not going to
2      limit it to a semantic restriction like
3      that, 'the exact phrase.'  Okay?  I'm not
4      asking you for the exact phrase.
5          "Let me repeat it in a general way
6      so that you can answer it more broadly if
7      necessary.
8          "I want to know if there was any
9      discussion that you are aware of based on
10     anything that Karin Bonfili said that you
11     heard that Dr. Raphaely had any specific
12     discussions with her about anything she
13     wrote in her ROC -- 'she' being Karin
14     Bonfili -- anything she wrote in any
15     statement concerning Ron Lisan and sexual
16     harassment, anything she wrote in her
17     affidavit to any investigator about it or
18     anything she may have testified to in her
19     deposition.
20         "Do you understand that question?"
21 Q. Okay.  I'm going to reask the question.  Are you
22     ready?
23 A. Yes.
24 Q. Please tell me if there was any statements or
25     discussion you heard that Karin Bonfili said that

---

Page 71

1      Dr. Raphaely had any discussions with Karin
2      Bonfili about anything Karin Bonfili wrote in a
3      report of contact concerning Ron Lisan and
4      complaints about him.
5  A. So nothing in regards to the report of contact.
6  Q. Okay.
7  A. The only thing that I heard was in regards to the
8      EEO complaint.
9  Q. And what did you hear in regards to the EEO
10     complaint?
11 A. I heard that Karin felt she was told what to
12     write on the EEO complaint.
13 Q. And was that by Dr. Raphaely?
14 A. I don't know for sure but I can only assume that
15     that was the case.
16 Q. Is that your best recollection?
17 A. Best recollection.  Whether or not that actually
18     happened, I don't know.
19 Q. I didn't ask you that.
20 A. Okay.
21 Q. Do you recall when you heard that?
22 A. No, I do not recall.
23 Q. So I take it you don't recall when you heard
24     Karin Bonfili say that then; is that correct?
25 A. It would have been around the time that we were

---

Page 72

1      filling out our affidavits for the EEO.
2  Q. All right.  Let's deal with that next.
3          By the way, did you hear that same thing
4      regarding Jessica Foster?
5  A. No.
6  Q. Did you hear that same thing regarding Rhonda
7      Verb?
8  A. No.
9  Q. Now, in connection with Dr. Lisan's EEO
10     complaint --
11         MS. JOHNSON:  I'm sorry,
12     Dr. Lisan's EEO complaint?
13 Q. Let me withdraw that.
14         MS. JOHNSON:  I just wanted to
15     make sure.
16         MR. SINDELL:  Off the record.
17              - - - -
18     (Thereupon, a discussion was had off the
19     record.)
20              - - - -
21 Q. Regarding the EEO investigation, you are aware of
22     a man by the name of Mr. Greenspan?
23 A. Yes.
24 Q. Who do you understand Mr. Greenspan to be or to
25     have been?

---

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 73

1   A. An investigator for Dr. Lisan's EEO complaint.
2   Q. Now, did you ever speak with Mr. Greenspan?
3   A. Yes.
4   Q. Did he solicit information from you regarding
5       Dr. Lisan and the EEO complaint?
6   A. Yes.
7   Q. Do you recall approximately when it was?  I have
8       your affidavit, by the way.
9          Have you reviewed it recently?
10  A. Yes.
11  Q. When did you last review it?
12  A. This morning.
13  Q. And it was done according to this -- and I'm
14      going to show it to you in a minute -- October
15      26th, 2017?
16  A. Yes.
17  Q. Does that sound about right?
18  A. Yes.
19  Q. And that's your understanding of Dr. Lisan's EEO
20      complaint; is that correct?
21  A. What I read in that affidavit, yes.
22  Q. Yes.  Now, did you say anything to Dr. --
23      withdrawn.  Did you say anything to Mr. Greenspan
24      -- withdrawn.
25         Did you call him or did he call you or --

Page 74

1   A. I don't recall --
2   Q. -- did he write to you?
3         What?
4   A. -- exactly how the communication started.
5   Q. Okay.  Did you have a conversation with him?
6   A. I had a conversation with him, yes.
7   Q. And it was over the phone?
8   A. Yes.
9   Q. What did he tell you he wanted?
10  A. He told me that he was going to send me a list of
11      questions that I needed to answer.
12  Q. Okay.  Did you do that?
13  A. Yes.
14  Q. Did you talk to him again?
15  A. Via -- I'm sure I talked to him at some point
16      again, yes.
17  Q. Okay.  Was that before you answered the
18      questions?
19  A. I don't recall.
20  Q. Did you ever tell Mr. Greenspan that you were
21      fearful of telling the whole truth in answer to
22      his questions because of retaliation from
23      Dr. Raphaely?
24  A. I told him that I wanted to make sure that I
25      absolutely had to participate in it before I

Page 75

1       actually participated in it because I didn't want
2       to get myself involved with this situation.
3   Q. Did you tell him why you didn't want to get
4       involved with it?
5   A. I feared my boss.  I feared Dr. Raphaely.
6   Q. Feared retaliation against you from her?
7   A. Yes.
8   Q. Is it a fact that you told Mr. Bearss the same
9       thing?
10  A. I don't recall that I ever had that conversation
11      with Bob Bearss.
12  Q. Did you ever tell anybody else that you had that
13      conversation?
14  A. With?
15  Q. With anybody.
16  A. With Greenspan?
17  Q. Yeah -- no, I'm sorry.  Let me withdraw that.
18         Did you ever tell anybody else besides
19      Greenspan that you feared telling the whole truth
20      to anybody about Dr. Lisan's complaints, EEO
21      claim or sexual harassment because of retaliation
22      from Dr. Raphaely?
23  A. I never feared telling the truth.  I will always
24      tell the truth.
25  Q. You just testified about fear of retaliation that

Page 76

1       you expressed to Mr. Greenspan?
2   A. It doesn't mean it would limit me from telling
3       the truth.
4   Q. And I didn't ask you that and I didn't imply
5       that, or I didn't mean to.  I'm not trying to
6       imply that.
7          I'm just talking about what you said, not
8       whether you would tell the truth or not, and I
9       understand your testimony that you're going to
10      tell the truth.  I understand that.  Okay?
11         I'm not challenging that.
12  A. Great.
13  Q. I just want to clear it up so you're not worried
14      about it because you seem to say that a lot and
15      that's not what I'm really asking you.
16         What I'm asking you is:  Did you ever tell
17      anybody besides Mr. Greenspan about your fear of
18      retaliation from Dr. Raphaely if you told the
19      whole truth regarding Dr. Lisan's complaints and
20      sexual harassment?
21  A. My mom.
22  Q. Anybody else?
23  A. My husband maybe.
24  Q. Anybody else?
25  A. I, there's probably other people that I told,

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 77

1 yes. I can't tell you exactly who I told.
2 Q. Okay. Let me see if I can refresh your
3 recollection.
4 I asked you about Bob Bearss so I won't
5 repeat that.
6 How about Laurie Frankito?
7 A. I can't recall that I ever had a discussion with
8 her about this.
9 Q. How about saying something like that in her
10 presence if you can recall?
11 A. I don't recall.
12 Q. How about Mark Myers?
13 A. I don't recall.
14 Q. How about any other CRNA?
15 A. I don't recall.
16 Q. How about Karin Bonfili?
17 A. I don't recall.
18 Q. Okay. Don't recall anybody else?
19 A. No.
20 Q. Now, how about -- same question: How about
21 Brenda Spicer? Did you tell her that you feared
22 retaliation from Dr. Raphaely for any reason?
23 A. I did.
24 Q. Tell me what you told Ms. Brenda Spicer on that
25 subject, retaliation from Dr. Raphaely.

Page 78

1 A. I chose not to participate in the workplace
2 assessment sessions that she held because I
3 didn't want to be involved with it.
4 Q. Because of the fear of retaliation from
5 Dr. Raphaely? Did you tell her that?
6 A. I just didn't want to be involved with this.
7 Q. Was the fear of retaliation the reason --
8 A. There was probably a component of that, but I
9 also just didn't want to be involved anymore.
10 Q. And the component that had to do with fear of
11 retaliation, Ms. Costanzo, did you share that
12 fear of yours with Brenda Spicer?
13 A. I can't recall exactly what I told her. I
14 probably just said I didn't want to be involved
15 with the situation.
16 Q. Okay. So your recollection is that you didn't
17 share with her your fear of retaliation from
18 Dr. Raphaely? Is that what you're --
19 A. I didn't need to. There were plenty of other
20 people that were expressing that feeling.
21 Q. Did you tell -- excuse me.
22 - - - -
23 (Thereupon, a discussion was had off the
24 record.)
25 - - - -

Page 79

1 Q. I'll ask you this: Did you tell Brenda Spicer
2 about your fear of retaliation from Dr. Raphaely
3 that you expressed to Mr. Greenspan? I thought I
4 asked you that, but maybe I didn't.
5 A. Did I tell?
6 MR. SINDELL: Read it back.
7 THE NOTARY: "Did you tell Brenda
8 Spicer about your fear of retaliation from
9 Dr. Raphaely that you expressed to
10 Mr. Greenspan?"
11 A. Isn't that the same question you asked me?
12 You asked me that question, yes.
13 Q. Okay. Your answer is yes as I --
14 A. My answer is that I told Brenda Spicer I didn't
15 want to be involved with this situation anymore.
16 Q. All right.
17 A. I don't know that I specifically said to her it
18 was because of retaliation or my fear of
19 retaliation.
20 MR. SINDELL: Let's take a short
21 break.
22 - - - -
23 (Thereupon, a recess was had.)
24 - - - -
25 Q. Now I want to ask you about how it was that you

Page 80

1 came to write these ROCs. I see two of them that
2 you wrote about Ron.
3 A. Okay.
4 Q. And so I want to go into the etiology. Is that a
5 good word?
6 MS. JOHNSON: No.
7 A. All right. I want to go into how that came
8 about, okay?
9 A. Okay.
10 Q. Did you ever tell Mr. Bearss that Dr. Raphaely
11 called you at home to discuss with you filing a
12 complaint against Dr. Lisan?
13 A. Yes.
14 Q. Do you remember whether you were on maternity
15 leave at that time?
16 A. I was not on maternity leave at that time.
17 Q. Would that have been sometime in early January of
18 2017?
19 A. Yes.
20 Q. So you had just returned from maternity leave?
21 A. Yes.
22 MR. SINDELL: Off the record.
23 - - - -
24 (Thereupon, a discussion was had off the
25 record.)

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 81

1                    - - - -
2  Q.  So Dr. Raphaely did call you at home; is that
3      correct?
4  A.  From what I can remember, yes.
5  Q.  Of course what you can remember.  That's all I'm
6      asking for.
7          Did she ever call you at home before with any
8      frequency?
9  A.  I don't recall.
10  Q.  That was kind of unusual then that she would call
11      you at home?  I mean that's not normal, is it?
12  A.  This whole situation isn't normal.
13  Q.  Okay.
14              MS. JOHNSON:  Answer of the day.
15  Q.  My question, however, does not deal with this
16      whole situation.
17          My question deals very specifically with
18      Dr. Raphaely calling you at home.  That's what
19      I'm talking about, not the whole situation.
20          So my question is:  Her calling you at home
21      about something is unusual, isn't it?
22  A.  If it was important to her, maybe that's --
23  Q.  I don't want to psychoanalyze her or guess what
24      she was thinking or how it was important to her.
25          You know whether it was usual or unusual for

Page 82

1      Dr. Raphaely to call you at home.
2          So tell me was that unusual, out of the
3      ordinary or is it something she did regularly?
4  A.  I can't say that she did it regularly, no.
5  Q.  It was unusual, wasn't it, to be called at home?
6  A.  Yes.  It would not be something I would expect or
7      sit by the phone waiting for.
8  Q.  Right.  And had she ever called you at home about
9      something other than scheduling or coming in or
10      some such thing dealing with your specific CRNA
11      duties at the VA?  Ever done that before?
12  A.  No.
13  Q.  So it was unusual, the topic of the conversation
14      was unusual, wasn't it?
15  A.  Yes.
16  Q.  So tell me what Dr. Raphaely said to you when she
17      called you at home?
18  A.  I don't recall exactly but it was something to
19      the effect of she was encouraging me to draft a
20      report of contact in regards to my experience
21      with Dr. Lisan.
22  Q.  Okay.  Did she just say:  "Tell me your
23      experience with Dr. Lisan and write a report of
24      contact?"  Is that the way it was posed to you?
25      And you had no idea what she was talking about?

Page 83

1  A.  No.  That's --
2  Q.  Then she was more specific than that, wasn't she?
3  A.  That wasn't -- I don't know what you're asking
4      me.  Sorry.  Ask me again.
5  Q.  What was she asking you to write about or to do a
6      report of contact about?
7  A.  She asked me to report the facts of what my
8      experience -- my, my specific experience with
9      Dr. Lisan was.
10  Q.  Did you know what she was talking about?
11  A.  Yes.
12  Q.  How did you know that?
13                    - - - -
14          (Telephone interruption.)
15                    - - - -
16              MR. SINDELL:  I apologize.  Read
17      back my last question, please.
18              THE NOTARY:  "How did you know
19      that?"
20  Q.  How did you know what she was asking you to write
21      about?
22  A.  Because there was rumors of things that had
23      happened, that had transpired of inappropriate
24      conversations that Dr. Lisan had had.
25  Q.  So you knew right away when she said "I want you

Page 84

1      to write about your experiences with Dr. Lisan"
2      exactly what kind of experiences she was talking
3      about?
4  A.  At that moment, yes.
5  Q.  Okay.  Not because she told you but because
6      there'd been so much talk about it that you
7      overheard?  Is that what you're telling me?
8  A.  No.
9  Q.  Well, then what I'm trying to understand is this:
10      Isn't it a fact that she wanted to know if you
11      had any complaints about your experiences with
12      Dr. Lisan that you could put down in writing in a
13      report of contact?  Isn't that what she was
14      asking you specifically?
15  A.  She wanted to know -- she knew about a situation
16      that I had had that I had discussed with someone
17      else.
18  Q.  Okay.  Not that you had told her?
19  A.  Correct.
20  Q.  So she had overheard from someone else about a
21      situation that you had discussed with someone
22      else?
23              MS. JOHNSON:  I'm going to object
24      to the word "overheard."  I don't think
25      that was what she said.  I think she said

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 85

1  something else, but you can read it back.
2       MR. SINDELL:  I think --
3       MS. JOHNSON:  I think "overheard"
4  is not exactly what she said.
5       MR. SINDELL:  I think we're
6  getting into coaching here.
7       MS. JOHNSON:  No.  I said please
8  read it back because I think you misstated
9  her testimony with the word "overheard."
10      Please --
11 Q.  Okay.  Let me ask it again.
12      I'll rephrase the question.
13          MS. JOHNSON:  Okay.
14 Q.  Is it correct that Dr. Raphaely shared with you
15      in her phone call to you at home in early January
16      of 2017 that she had heard about something you
17      told somebody else about an experience that was
18      uncomfortable to you with Dr. Lisan; is that
19      correct?
20 A.  She had heard an experience that I had with
21      Dr. Lisan that she was encouraging me to write
22      up.
23 Q.  Did she tell you what experience she heard from
24      somebody else?
25 A.  Yes.  We --

Page 86

1 Q.  What did she tell you she heard from somebody
2      else?
3 A.  She heard that I had had, when I first started
4      working there, I had an uncomfortable -- two
5      uncomfortable encounters with Dr. Lisan that I
6      kind of just brushed off as inappropriate and
7      went on with my life.
8 Q.  Who was it that she heard this from?
9 A.  Jessica Foster.
10 Q.  Did she share with you why she was talking to
11      Jessica Foster about Ron Lisan?
12 A.  No.
13 Q.  Did she tell you she was investigating complaints
14      about Ron Lisan?
15 A.  Yes.
16 Q.  Did she tell you why she was investigating
17      complaints about Ron Lisan?
18 A.  No, I don't think she had to.  I think --
19 Q.  I didn't ask you if she had to.
20      I asked you if she told you.
21 A.  No.
22 Q.  Okay.  The fact is that by the time you got a
23      phone call at home from Dr. Raphaely, there was a
24      lot of chitchat in the department of
25      anesthesiology and among CRNAs about Ron Lisan,

Page 87

1  inappropriate conduct, sexual issues, that kind
2      of thing, correct?
3 A.  Yes.
4 Q.  And do you know who generated that kind of
5      conversation?
6 A.  I thought it was -- I don't know for sure.
7 Q.  What's your best recollection?
8 A.  It was either Jessica Foster or Karin Bonfili.
9 Q.  And do you know what inspired them to begin
10      talking about Ron Lisan and concerns of that
11      nature?
12 A.  Jessica I know had an unpleasant conversation or
13      what she thought was unpleasant conversation with
14      Dr. Lisan.
15          - - - -
16      (Thereupon, Plaintiff's Exhibit 28, 10/27/17
17      Costanzo affidavit, was marked for purposes
18      of identification.)
19          - - - -
20 Q.  Now I'm going to give you Exhibit 28, which is
21      your affidavit, and I'm going to ask you first of
22      all to turn to the last page, and that's Page
23      453.
24      Do you see it at the bottom there?
25 A.  Yes.

Page 88

1 Q.  And is that your signature on top, Ms. Costanzo?
2 A.  Yes.
3 Q.  And did you write out that date, October 26,
4      2017?
5 A.  Yes.
6 Q.  And is that the date you signed it?
7 A.  Yes.
8 Q.  This is the affidavit solicited from you by
9      Mr. Greenspan; is that correct?
10 A.  Yes.
11 Q.  Okay.  I would like you to turn to Page 450.
12      It's also Page 3 of 5.
13      Are you with me?
14 A.  Yes.
15 Q.  And I'd like you to look at Number 9.  And it
16      says, "Have you been involved in any prior EEO
17      activity or protected activity?"
18      And it says, "Please explain what the
19      activity consisted of and when it took place."
20      Did I read that correctly?
21 A.  Yes.
22 Q.  Now, who typed in this answer?  You?
23 A.  Yes.
24 Q.  So this is your answer, then, to it?
25 A.  Yes.

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1  Q.  It says, "I was asked by S.R."
2      Susan Raphaely?
3  A.  Yes.
4  Q.  "To complete a report of contact in January 2017
5      as a witness to a local EEO complaint."
6      Did I read that correctly?
7  A.  Yes.
8  Q.  Why were you, why did you think you were a
9      witness?  Who told you you were a witness?
10 A.  I was -- I don't, I don't, just as like
11     supporting evidence is what I took it as, is what
12     my complaint was.
13 Q.  Okay.  Can you tell me -- withdrawn.
14     Did you type that out in the presence of
15     anybody else?
16 A.  No.
17 Q.  All by yourself?
18 A.  Yes.
19 Q.  Did you discuss prior to typing your answer out
20     what your answer could or should be with anybody
21     else?
22 A.  No.
23 Q.  Are you sure?
24 A.  Yes.
25 Q.  I'd like you to turn to Page 451.  And if you'll

1      look at Number 10.  Okay?
2      Are you with me?
3  A.  Yes.
4  Q.  "Please explain in detail any direct knowledge
5      you may have regarding this allegation."
6      And the allegation is stated above; is that
7      correct?
8  A.  Yes.
9  Q.  And this is your answer, and I'm going to read
10     it -- you typed this answer, right?
11 A.  Yes.
12 Q.  And I assume your answer would be the same about
13     being, discussing it in advance with anyone else
14     and so forth?
15 A.  Correct.
16 Q.  Okay.
17     "Claims were brought to Susan Raphaely's
18     attention by my colleagues.  I was asked by Susan
19     Raphaely to complete a report of contact during
20     her investigation of the claims.  My report of
21     contact is factual."
22     Did I read that correctly?
23 A.  Yes.
24 Q.  How do you know what claims were brought to Susan
25     Raphaely's attention by your colleagues?

1  A.  How do I know what claims --
2  Q.  Yes.
3  A.  -- my own claims?  Because she came to me to
4      discuss them.
5  Q.  No.  Excuse me.  It says here:  "Claims were
6      brought to Susan Raphaely's attention by my
7      colleagues."
8      "Colleagues" is your CRNAs in the department
9      of anesthesiology in Cleveland at the VA, right?
10 A.  Right.
11 Q.  Okay.  So we're talking about claims --
12 A.  Their claims.  Their EEO complaints, yes.
13 Q.  Their claims.  Okay.  Are we clear now?
14 A.  Yes.
15 Q.  All right.  How did you know about claims being
16     brought to Dr. Raphaely's attention by other
17     CRNAs?
18 A.  They specifically told me, Jessica.
19 Q.  "They" is Jessica or others?
20 A.  Jessica and Karin both told me that there was,
21     that they were making claims based on their
22     experience.
23 Q.  And did they specify for you what the claims
24     were?
25 A.  Yes.

1  Q.  Okay.  Did they tell you whether they were
2      solicited by Dr. Raphaely in the manner that you
3      were?
4  A.  They were not.
5  Q.  They were not solicited?
6  A.  That is correct.
7  Q.  You mean they told you they were not?
8  A.  They told me that they went to Dr. Raphaely.
9  Q.  That's what they told you.  You don't know
10     whether they were solicited or not, do you?
11 A.  Correct.
12 Q.  Now, this may have been marked before but I'm
13     going to mark it again if I can as Number 29.
14         MS. JOHNSON:  Whose is that?
15         Elaine's?
16         MR. SINDELL:  Yes.
17         - - - -
18     (Thereupon, Plaintiff's Exhibit 29, Costanzo
19     report of contact for "Early 2015" was marked
20     for purposes of identification.)
21         - - - -
22 Q.  Why don't you take a minute and take a look at
23     that.
24     When was the last time you looked at this
25     document?

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 93

1  A. I read it this morning.

2  Q. Do you want to read it again here?

3  A. Yes.

4  Q. Oh, I'm sorry, you're finished. Okay. Thank

5     you.

6       All right. I'd like to go over this with you

7     if I can.

8       First of all, in the lower right-hand corner,

9     is that your signature?

10  A. Yes.

11  Q. Who typed this out?

12  A. I did.

13  Q. Is this the ROC that you typed out in response to

14     your phone call at home in early January 2017

15     from Dr. Raphaely?

16  A. Yes.

17  Q. So let's take a look at it.

18       Did anybody go over this with you before you

19     wrote it?

20  A. Anybody? No.

21  Q. Anybody is anybody.

22  A. No. Not that I can recall.

23  Q. Did you discuss what you were going to write with

24     anybody before you wrote it or typed it in here?

25  A. Maybe my husband.

Page 94

1  Q. No. I'm talking about at the --

2  A. Not anybody at work, no. I did it while I was at

3     home.

4  Q. Okay. But did you discuss what you were going to

5     write with Dr. Raphaely --

6  A. No.

7  Q. I didn't finish my question, but that's okay.

8       All right. At any time before you typed it?

9       The answer is no; is that correct?

10  A. No.

11  Q. Okay. It says, "In light of recent events

12     involving my female colleagues."

13       Did I read that correctly?

14  A. Yes.

15  Q. "I have decided to report the following incidents

16     as they pertain to Dr. Lisan and his

17     inappropriate comments of a sexual nature while

18     caring for patients in the operating room."

19       Did I read that correctly?

20  A. Yes.

21  Q. Okay. Now, you say, "In light of recent events

22     involving my female colleagues."

23       You don't mention in light of a request by

24     Dr. Raphaely as part of her investigation or

25     anything like that; is that correct?

Page 95

1  A. Yes.

2  Q. But in fact it was in light of her request that

3     you did this ROC because she's the one who

4     requested you to do it; is that right?

5  A. I did the ROC because I was interested in helping

6     my female colleagues that had, were obviously

7     distressed by what had happened to them.

8  Q. So you were helping your female colleagues?

9  A. That's what I was led to believe was my purpose.

10  Q. Led to believe by who?

11  A. By probably Dr. Raphaely. She told me that

12     there more of a -- or there, in any situation,

13     more of a paper trail could help.

14  Q. Help what?

15  A. Their situation to show that they were, had, you

16     know, these events happened to them and that they

17     were complaining about them, that they were real,

18     true events that they were complaining about.

19  Q. Okay. So you were encouraged by Dr. Raphaely to

20     join in with the other female CRNAs who had made

21     complaints; is that correct?

22  A. She was doing her investigation so...

23  Q. You were --

24  A. I was encouraged by her, yes.

25  Q. Okay. Before you were encouraged by her, you did

Page 96

1     not report this to anybody else at the VA?

2  A. Other than a common -- or an off-the-cuff

3     conversation with another CRNA at the time that

4     it happened, no.

5  Q. And the time that it happened was not in 2017

6     when you typed this?

7  A. Correct.

8  Q. Or in the entire preceding year of 2016, correct?

9  A. Correct.

10  Q. Or in a good part of the year of 2015; is that

11     correct?

12  A. Correct.

13  Q. So we're talking about something, as you stated

14     here, two years previously?

15  A. Yes.

16  Q. And you never, prior to January 2017, reported

17     this in any written form to anybody?

18  A. Correct.

19  Q. You never reported it officially to anybody?

20  A. Correct.

21  Q. You never reported it to anybody in management or

22     leadership at the VA; is that correct.

23  A. Correct.

24  Q. You never reported it to the EEO complaint

25     department anywhere; is that correct?

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 97

1  A. Correct.
2  Q. You never reported it to your CRNA leader,
3     whether it was Mr. Bearss or somebody who
4     preceded him; is that correct?
5  A. Correct.
6  Q. You never reported it to Ron Lisan himself; is
7     that correct?
8  A. I never reported what?
9  Q. That you were offended in any way.
10 A. I told him to stop when he did it.
11 Q. Did he stop?
12 A. Yes.
13 Q. Okay.  Other than that?
14 A. No.
15 Q. Now, you say further, if you follow with me, I
16    think it's the second sentence, maybe the third
17    sentence.
18    Second sentence, "These two incidents
19    occurred roughly one week apart about two years
20    ago."
21    Did I read that correctly?
22 A. Yes.
23 Q. All right.  We've covered that already.
24    "When I first began my CRNA position at the
25    Cleveland VA."

Page 98

1     Is that correct?
2  A. Yes.
3  Q. So that would put us back in January?
4  A. Yes.
5  Q. Of 2015; is that correct?
6  A. Yes.
7  Q. "Although I cannot specifically" -- okay.
8     Let's talk about the two-year interval
9     between January 2015 and January 2017 when you
10    reported this.
11 A. Uh-huh.
12 Q. Correct?
13 A. Uh-huh, yes.
14 Q. You have to say yes.  Okay.
15    In those two years, you worked with Ron on a
16    regular basis, didn't you?
17 A. Yes.
18 Q. I mean, you got along with him?  I mean in work,
19    correct?
20 A. Professionally, yes.
21 Q. Yes, that's what I mean, professionally; is that
22    correct?
23 A. Correct.
24 Q. He never assaulted you, did he?
25 A. No.

Page 99

1  Q. He never threatened you in any way, did he?
2  A. He was -- no.
3  Q. During those two years?
4  A. No.
5  Q. Okay.  You never had any cause to report him for
6     anything at all during that entire two-year
7     period to --
8        MS. JOHNSON: Objection.  I'm --
9        go ahead.  I'm sorry.  I didn't realize you
10       weren't finished.  Go ahead.
11 Q. I'll start again.
12    You didn't have any reason to go to anybody
13    to report him about anything that he did that
14    upset you in authority at the VA during that
15    two-year period; is that correct?
16       MS. JOHNSON: Objection.  You may
17       answer.
18 A. I, in general, like to fly under the radar.
19    Don't like to participate in things like this.
20 Q. Could you answer --
21 A. Don't like to get involved.
22       MS. JOHNSON: Let her finish.
23       MR. SINDELL: Yeah, but she's not
24       answering my question.
25       MS. JOHNSON: Let her finish.

Page 100

1  A. So if there was something that I had to report
2     about Dr. Lisan, I probably -- it would have had
3     to be something very serious for me to report it.
4  Q. Now I would like you to answer my question.
5     Would you please read it back and answer my
6     question.
7        THE NOTARY: "You didn't have any
8        reason to go to anybody to report him about
9        anything that he did that upset you in
10       authority at the VA during that two-year
11       period; is that correct?"
12 A. Nothing that I felt important enough to do so.
13 Q. Okay.  I'd like to diverge just a moment and ask
14    you, and then maybe -- as you look at your watch,
15    caught you -- ask you to please just answer my
16    question like you just did.
17    That's an answer to my question.
18    The previous thing was something else.  You
19    didn't really answer the question.
20       MS. JOHNSON: She --
21       MR. SINDELL: I'm sorry, she
22       didn't answer.  And I asked --
23       MS. JOHNSON: And, Steve, you got
24       an answer and she --
25       MR. SINDELL: I know but it will

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1   go much faster if --
2        MS. JOHNSON:  She's permitted to
3   explain what she thinks is necessary to
4   explain.
5        MR. SINDELL:  First she has to
6   answer the question.
7        MS. JOHNSON:  Well, she did answer
8   it.
9        MR. SINDELL:  After she explained,
10  she answered.
11       MS. JOHNSON:  I think that you
12  don't need to instruct her when she just
13  answered your question.
14       MR. SINDELL:  Yes, I do.
15       MS. JOHNSON:  Let's move on,
16  please.
17  Q. All right.  But in the future try to just answer
18      the question and we'll move along.  I'm not
19      trying to prolong this.  Okay.
20      Off the record.
21            - - - -
22      (Thereupon, a discussion was had off the
23      record.)
24            - - - -
25  Q. Back on the record.

1       It says, "Although I cannot specifically
2   recall the exact wording of the comments, I,"
3   you're talking about two years earlier in this
4   one?
5   A. Correct.
6   Q. Okay.  "I remember very clearly feeling extremely
7      uncomfortable and embarrassed by his comments at
8      the time."
9      Did I read that right?
10  A. Yes.
11  Q. And I assume that's true?
12  A. Yes.
13  Q. "During one of the incidents I vividly recall him
14     speaking to me about his own male genitalia."
15  A. Yes.
16  Q. Was anybody else there when he explained this?
17  A. We were in the OR and the surgeons were working
18     and we were at the head of the bed behind a
19     drape.
20  Q. You were behind a drape?
21  A. Yes.
22  Q. Okay.  Was anybody else within hearing distance?
23  A. I don't know that anybody else heard it.
24  Q. And you don't know if they didn't?
25  A. I don't.

1   Q. Nobody told you they heard it?
2   A. Correct.
3   Q. "As a brand new employee, I did not feel
4      comfortable speaking to my colleagues or even
5      reporting the incident to my chief at the time as
6      I was not yet familiar with my environment or the
7      people I was working with."
8      Did I read that correctly?
9   A. Yes.
10  Q. And that's true?
11  A. Yes.
12  Q. "I quickly put the incidents aside in the
13     interest of providing excellent patient care
14     while working alongside him."
15     Is that correctly read?
16  A. Yes.
17  Q. And that's true, right?
18  A. Uh-huh, yes.
19  Q. Okay.  "I now realize that the comments were
20     seriously inappropriate and unwarranted."
21     Okay.  Let me stop right there.  You didn't
22     realize that at the time?
23  A. I did realize it at the time because I told him
24     to stop.
25  Q. Okay.  So you, when you write "I now realize,"

1   you realize it again two years later in January
2   of 2017?
3   A. Yeah.
4   Q. Well it says, "I now realize" at least implied to
5      me that you didn't really realize it before.
6   A. I should have said I realize it's important for
7      me to speak up about the events that happened.
8   Q. So you miswrote?
9   A. Yes.
10  Q. Okay.  You didn't write what you really intended.
11     Is that what you're saying?
12  A. I could have said that better.
13  Q. Okay.  "And they have caused some amount of
14     distress in addition to making me feel awkward
15     and uncomfortable while working with Dr. Lisan in
16     a position of authority in the operating room."
17     Okay.  Now, this is written in January 2017.
18     Did I read that correctly?
19  A. Yes.
20  Q. This is 2017, January, that you're writing that
21     it caused you some distress, "in addition to
22     making me feel awkward and uncomfortable while
23     working with Dr. Lisan in a position of authority
24     in the operating room."
25     Okay.  Are you telling me that for two years

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 105

1   you felt awkward and uncomfortable working with
2   Ron in the operating room because he made a
3   remark in January of 2015?
4   A. Yes.
5   Q. Okay. Did it cause you to think about it every
6   day you worked with him?
7   A. No, because I didn't work with him every day.
8   Q. I said that you worked with him.
9   A. Yes.
10  Q. Every --
11  A. Maybe not that specific moment but, yes, it was
12  always very awkward to work with Dr. Lisan.
13  Q. Just because of one remark he made and stopped
14  when you said stop?
15  A. His overall social behavior is uncomfortable,
16  yes.
17  Q. To you?
18  A. Yes.
19  Q. Do you have the impression that anybody liked
20  him?
21  A. I don't think that anyone felt threatened by him.
22  Q. Except you? You felt threatened?
23  A. I didn't feel threatened by him. I never said
24  that.
25  Q. Okay. I'm sorry. I misunderstood. Good. All

Page 106

1   right.
2   You said hello to him walking down the hall
3   during this two-year period before you made your
4   complaint?
5   A. Yes.
6   Q. I mean you said hi, you were civil, social,
7   cordial?
8   A. And professional.
9   Q. Professional. All those words, right?
10  A. Yes.
11  Q. He would have no reason to believe that you
12  harbored any dislike or hatred of him based on
13  your conduct, correct?
14  A. Correct.
15  Q. You would have no reason to believe that he was
16  trying to upset you or disturb you based on
17  anything he said or did; is that correct?
18  A. I think he should know that the things that he
19  said were inappropriate.
20  Q. Okay. If you think that, that's fine, but are
21  you suggesting that he was maliciously and
22  purposely trying to upset you personally by
23  whatever he said?
24  A. I never suggested that, no.
25  Q. Okay. Thank you.

Page 107

1   Now, did you think you were sexually
2   harassed?
3   A. No.
4   Q. So you had no intention of making a sexual
5   harassment complaint against Ron Lisan for two
6   years?
7   A. I never accused him of any sexual harassment and
8   I won't.
9   Q. Even today?
10  A. Correct.
11  Q. Why don't you --
12  A. Towards myself.
13  Q. Yes. Towards you.
14  And why don't you think that -- withdrawn.
15  Why don't you accuse him of sexual harassment
16  towards yourself?
17  A. Because when I asked him to stop saying the
18  sexual things in nature, he didn't say, that I
19  can recall, anything other -- any other sexual
20  comments to me in nature after that point.
21  Q. I understand. Okay. I'm going to go to the next
22  exhibit.
23  - - - -
24  (Thereupon, Plaintiff's Exhibit 30, Costanzo
25  report of contract for "3/08/17" was marked

Page 108

1   for purposes of identification.)
2   - - - -
3   Q. And I'm going to mark it as Exhibit 30 and give
4   it to you and you.
5   You read this before you came here today?
6   A. Yes.
7   Q. Did you read anything else before you came here
8   today?
9   A. The affidavit and my two report of contacts.
10  Q. Okay. So that we've covered it?
11  A. Yes.
12  Q. All right. Go ahead. Do you want to look at it
13  again right now?
14  A. Yes.
15  Q. Go ahead. Let me know when you're done.
16  - - - -
17  (Off the record.)
18  - - - -
19  Q. Have you had a chance to read it?
20  A. Yes.
21  Q. Thank you.
22  First of all, you indicate that you received
23  a phone call from Dr. Lisan calling you to tell
24  you he did not feel we can provide safe patient
25  care together during our call shift scheduled on

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1    March 9th, 2017; is that correct?
2  A. Yes.
3  Q. Did Dr. Raphaely ever tell you not to speak to
4    Ron Lisan about anything but strictly business
5    matters?
6  A. I don't recall specifically, no, that she told me
7    that.
8  Q. Do you have any recollection of her telling you
9    that?
10 A. No.
11 Q. Now, so Dr. Lisan was concerned about safe
12    patient care for a schedule on March 9, 2017; is
13    that correct?
14 A. We were scheduled to be on call with each other.
15    There was not any specific scheduled cases at the
16    time but we were, there's the chance that we
17    would have to work together in an OR, yes.
18 Q. Did you agree with him?
19 A. About what?
20 Q. That.
21 A. That?
22 Q. Okay.  I'll be more specific.  Sorry.
23    "His reason was because I don't say hello to
24    him when we pass in the hallway."
25    Did I read that right?

1  A. Yes.
2  Q. So skipping a line, and then you say, "I
3    responded to Dr. Lisan that I have no problem
4    working with him on a professional level and that
5    no patient care would be compromised based on
6    personal feelings."
7    Is that correct?
8  A. Yes.
9  Q. And did you tell him that?
10 A. Yes.
11 Q. And did you believe that?
12 A. Yes.
13 Q. So you didn't agree with him that you could not
14    together provide safe patient care on March 9th,
15    2017; is that correct?
16 A. That's correct.
17 Q. Okay.  You're smiling?  Why?
18 A. Because I'm going to be there with the patient.
19 Q. Oh, okay.  Then I want you to jump down toward
20    the bottom and it says, about seven lines from
21    the bottom over to the right, "I felt Dr. Lisan."
22    Do you see that?
23 A. Yes.
24 Q. Okay.  You write there, "I felt Dr. Lisan was
25    trying to intimidate me by telling me the

1    responsibility fell on me to change the shift and
2    by calling me on my personal phone after work
3    when no one else left for the day."
4    Did I read that correctly?
5      MS. JOHNSON:  You skipped a line.
6  Q. I'm sorry.  And I didn't mean to read that line,
7    okay?
8    Let me skip below further.
9    The very last sentence here, it says, "His
10    contact with me felt threatening and I have a
11    real feeling that my work environment is unsafe
12    at this time.  For this reason I requested not to
13    have any contact with him both professionally and
14    personally."
15    Did I read that correctly?
16 A. Yes.
17 Q. Well, explain to me why you felt threatened by
18    him.
19 A. Because of the way he approached the situation,
20    the way that he told me that I needed to change
21    my call shift on the phone because it would be
22    easier for me to do so than him.
23 Q. And that threatened you?
24 A. It, when I had time to think about it, it felt
25    very intimidating, the phone call.

1    I wrote this the next day.
2  Q. So you didn't feel threatened at the time that he
3    called you, but you felt threatened the next day
4    when you thought about it?
5  A. Yes.  I was kind of taken aback by the whole
6    situation because I was not expecting it to
7    happen because the call schedule had been out for
8    weeks prior and I literally saw him in the hall
9    before I left for the day and he said nothing to
10    me but then waited for me to leave and called me
11    on my cellphone.
12 Q. What's wrong with that?
13 A. Why would you not have a conversation with me
14    prior to the situation or a face-to-face
15    conversation with me in front of other people or
16    in our workplace?  Why would you wait for me to
17    be off duty?
18 Q. Why would Dr. Raphaely wait for you to be off
19    duty and call you at home about making a
20    complaint about Ron Lisan?
21      MS. JOHNSON:  Objection.  You can
22      answer.
23 A. Maybe that was just the time she was following up
24    with me.
25 Q. Maybe that was the time that Ron Lisan was

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1  following up with you?
2  A.  It didn't seem like that was the case at the time
3  to me.
4  Q.  Okay.  All right.
5      Well, did you work together with him or not?
6  A.  We did not end up having to do any cases
7  together.
8  Q.  Since that time have you worked together with
9  him?
10  A.  Yes.
11  Q.  How has it gone?
12  A.  Same as always.
13  Q.  Good.  Good professionally, right?
14  A.  Professional, yes.
15  Q.  The patient was safe?
16  A.  Yes.
17  Q.  He did his job the way he should do it.  You did
18  yours the way you should do it?
19  A.  I can't make any comments on him doing his job.
20  I don't -- I don't practice medicine, so...
21  Q.  Well, he didn't do anything that looked wrong or
22  untoward to you, did he?
23  A.  Not wrong, no.
24  Q.  I'm talking about his medical practice here.
25  A.  He doesn't do much.

1  Q.  Is that true of all the anesthesiologists or just
2  Dr. Lisan?  He doesn't do much even though all
3  the other anesthesiologists do more?  Is that
4  what you're trying to say?
5  A.  He's not very present during the process in my
6  opinion.
7  Q.  Okay.  Has he ever injured a patient to your
8  knowledge?
9  A.  Not to my knowledge.
10  Q.  Has he ever been brought up on any charges or
11  accusations for poor practice in risking the
12  health of a patient?
13  A.  Not to my knowledge.
14  Q.  Did you see anything that indicated that he was
15  doing anything that would result in any danger or
16  harm to a patient?
17  A.  In our job, it requires extreme vigilance and
18  sometimes I don't think that, you know, the
19  conversations that Dr. Lisan is having during
20  moments of, times that we should really be paying
21  attention, he's not always very present.
22  Q.  Have you ever said anything to him?
23  A.  No.
24  Q.  Has any physician in the room, operating room
25  said anything to him?

1  A.  There's not always physicians in the operating
2  room.
3  Q.  And would you answer my question, please?
4  A.  Not that -- not to my knowledge.
5  Q.  Has any other CRNA in your presence ever said
6  anything to him?
7  A.  In my presence?
8  Q.  Yes.
9  A.  About him not paying attention?
10  Q.  Yes.
11  A.  No.
12  Q.  You always pay attention?
13  A.  Always.
14  Q.  So you're perfect?
15  A.  No, not everybody's perfect, but I pay attention
16  to my patient when I'm taking care of them.
17  Q.  Did you ever have a lapse of attention ever?
18  A.  Probably.
19  Q.  Isn't it a fact that during operations from time
20  to time other CRNAs make off-color remarks or
21  comments?
22  A.  Yeah.  The operating room is kind of a what
23  happens there stays there kind of place.
24  Q.  Kind of like Las Vegas?
25  A.  Yeah.

1  Q.  Isn't that what they say?
2  A.  Yeah.
3  Q.  What happens in Las Vegas stays in Las Vegas?
4  A.  Yeah.  You got to have a tough skin.
5  Q.  I understand.  And have you ever objected or
6  complained about off-color remarks by other
7  CRNAs?
8  A.  By other CRNAs?  No.
9  Q.  Even though they occur?
10  A.  They occur in different situations than what
11  happened with Dr. Lisan.
12  Q.  I'm not talking about comparing Dr. Lisan to
13  anybody.
14  A.  Okay.
15  Q.  And I'm not talking about two years ago when he
16  made one remark that you found highly offensive.
17  A.  Two.
18  Q.  Two remarks highly offensive two years ago and
19  stopped when you told him you were uncomfortable
20  with it.  Okay?
21      So I'm not talking about that.
22      I want to know if you have expressed any
23  objections or made any complaints about any of
24  the off-color remarks over the years in the
25  operating room that other CRNAs have made?

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1  A.  No.
2  Q.  Have any other anesthesiologists ever made any
3     off-color remarks in all the time you've been
4     working at the VA as a CRNA?
5  A.  I can't recall specifically a moment where an
6     anesthesiologist made me feel as uncomfortable as
7     I did when Dr. Lisan made his comments.
8  Q.  So you're going to compare yourself again to what
9     comments Dr. Lisan --
10 A.  Yeah.
11        MS. JOHNSON:  Objection.  Steve,
12     she answered your question.
13 Q.  Well, my question is not compared to Dr. Lisan.
14     I didn't ask you that.
15     I asked you, and I'll ask you again, so just
16     answer my question, please.
17        Did you make any complaints or objections to
18     any management or other people at the VA about
19     any off-color remarks made by anybody in the OR
20     during your work as a CRNA at the VA?
21 A.  No.
22 Q.  Did you speak with Mr. Kafer, Bruce Kafer?  He's
23     an EEO representative.
24 A.  Yes.  I remember his name.  I don't know exactly
25     what I spoke to him about, but...

1  Q.  Well, if I try to refresh your memory by saying
2     to you that he was what they call the EEO, equal
3     employment opportunity, coordinator, was an
4     internal investigator at the VA for complaints
5     made by CRNAs about Dr. Lisan and was
6     investigating and inquiring into that, would that
7     refresh your recollection as to who he is?
8        MS. JOHNSON:  Objection.  You can
9     answer.
10 A.  I know of the name.  I don't know exactly what I,
11     what conversations I had with him.
12 Q.  I didn't ask you --
13 A.  I can't remember.  I can't remember.
14 Q.  Okay.  Do you remember talking to somebody
15     investigating the complaints made by Dr. Lisan at
16     the VA?  Not Mr. Greenspan?
17 A.  There's two different situations here.
18        MS. JOHNSON:  Let's go off the
19     record a second.
20          - - - -
21     (Thereupon, a discussion was had off the
22     record.)
23          - - - -
24 Q.  Back on the record.
25        Do you have any recollection, Ms. Costanzo,

1     of discussing your written complaint or
2     complaints, ROCs, with any person at the VA who
3     was investigating these other than Dr. Raphaely?
4  A.  No.
5        MR. SINDELL:  Off the record.
6          - - - -
7     (Thereupon, a discussion was had off the
8     record.)
9          - - - -
10 Q.  Did you ever tell Laurie Frankito that you felt
11     you were being used by Dr. Raphaely, words to
12     that effect?
13 A.  There was a feeling that I had.  I don't know
14     that I told Laurie Frankito.  I might have.
15 Q.  Okay.  Well, let's talk about your feeling that
16     you were being used by Dr. Raphaely.
17        Tell me what the feeling was.
18 A.  Amidst all this, Dr. Lisan was walking around to
19     the OR and telling everybody his side of the
20     story, which is fine but, you know, it was kind
21     of threatening to us and our, you know,
22     reputations and it was hurtful to me that he
23     would go around and talk to these people behind
24     my back and say the things that he was saying
25     because I wasn't lying, and what I expressed in

1     my ROCs really happened to me, and so I didn't
2     think it was appropriate for him to be going
3     around and discussing it with other CRNAs, with
4     other nurses in the OR, and it was something I
5     was concerned about, so I addressed it with
6     Dr. Raphaely and I asked her what she was going
7     to do about it.  And she said to me that I needed
8     to remember that my ROC was two years ago and
9     that it was not sexual harassment.
10        And at that point I felt like what was I even
11     involved with this for.  That's why I felt like,
12     I had that feeling.
13 Q.  So let me try and unpack all of that.
14        Do I understand you correctly that the reason
15     you felt used by Dr. Raphaely is because she told
16     you, and you agree, that you were not making a
17     complaint about Ron Lisan sexually harassing you.
18        Is that a fair statement?
19 A.  She basically told me that the complaint that I
20     had that seemed important at the time to her was
21     not important anymore is what I felt.
22 Q.  Okay.  Did she say to you that it had nothing to
23     do with sexual harassment?
24 A.  No.
25 Q.  Did you say to her that it had nothing to do with

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 121

1  sexual harassment?
2  A. No.  She -- I'm sorry.  She said to me that it
3    wasn't sexual harassment, that my complaint was
4    not sexual harassment.
5  Q. That's what I thought you said.
6  A. Yes.
7  Q. Oh, okay.
8  A. Sorry.
9  Q. And you agreed with that?
10 A. Yes.
11 Q. So you wondered why was I asked in the first
12   place to make a complaint like that if it
13   wasn't --
14 A. Important.
15 Q. -- important or sexual harassment, correct?
16 A. Yes.
17 Q. Okay.  Did you explain to Dr. Raphaely before you
18   made your complaint in writing in the ROC we
19   talked about, which is the first one you made in
20   January of 2017, what the nature of your
21   complaint was against Dr. Lisan two years
22   earlier?
23 A. Did I explain to her?
24 Q. Yes.
25 A. What the nature of my complaint was?

Page 122

1  Q. Yes.
2  A. We had already had a discussion about it.  She
3    knew exactly what my complaint was and --
4  Q. Okay.  Just for the record, could you tell us
5    exactly what you understood and she told you she
6    knew your complaint was about Dr. Lisan?
7  A. She knew that I had two uncomfortable situations
8    with him when I first started working there that
9    were sexual in nature and that I told him to
10   stop.
11 Q. Did she know that it was some comment about --
12 A. Yes.
13 Q. I haven't finished.
14 A. Sorry.
15 Q. Did you know --
16 A. I'm getting good at this.
17 Q. Did you know that it was some kind -- withdrawn.
18   Did she hear from you or express that she
19   knew that he made some kind of comment about
20   genitalia, male genitalia?
21 A. Yes.
22 Q. So she knew what the comments were?
23 A. Yes.
24 Q. So is it your understanding that she should have
25   known that those comments were not sexual

Page 123

1  harassment; is that correct?
2        MS. JOHNSON:  Objection.  You may
3    answer.
4  A. I don't know what she knows.  All I know is what
5    I know.  And I know that I didn't consider it
6    threatening or sexual harassment.
7  Q. Well, according to your testimony neither did she
8    when she talked to you later?  Is that true?
9  A. That's what she said to me.
10 Q. Okay.  Secondly -- withdrawn.
11   So to summarize, that's why you felt you were
12   being sued by her and why you may have said that
13   to Laurie Frankito?
14 A. Yes.
15 Q. I do have a question.
16   If you'll take a look at exhibit, the last
17   one, 30 I think it is.  Do you have it in front
18   of you?
19 A. Yes.
20 Q. Okay.  I see some typing at the bottom, "Executed
21   By."  That's not handwriting, correct?
22 A. Yes.
23 Q. It says "Elaine Costanzo."  Did you type that in?
24 A. Yes.  And there's a little, next to it, you can't
25   really see it --

Page 124

1  Q. There's a number?
2  A. -- but it's a digitally signed document.
3  Q. Well, it says 1004153.  What does that mean?
4  A. Right.  This is a bad copy of it but this writing
5    right here is all, it's a digitally signed thing
6    in the PDF.
7  Q. Right, I understand, but what is the number?
8  A. I don't know.  It's just a number that was
9    assigned to it.  I didn't type that, no.
10 Q. Oh, you did not type that?
11 A. No.
12 Q. You don't know what that number means?
13 A. I don't.
14 Q. Did you go to the VA police?
15 A. Yes.
16 Q. Who told you to do that?
17 A. Dr. Raphaely.
18 Q. And when did she tell you to do that?  It was
19   when you made this second complaint?
20 A. When Dr. Lisan called me that night after I had
21   left work.
22 Q. Yes.
23 A. I called Dr. Raphaely afterwards and she told
24   me -- I don't know if it was then or the next
25   day, she told me that I needed to go make a

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

1    police report for whatever reason.
2  Q. And did you do that?
3  A. Yes.
4  Q. Did you understand why she wanted you to make a
5     police report against Dr. Lisan?
6  A. I can't say I understood that, no.
7  Q. In fact, did it seem somewhat strange to you?
8  A. It seemed a little excessive to me.
9  Q. Okay. Did you tell her that it felt that way?
10  A. No, but I think after I had time to think about
11     all of this, I was feeling more uncomfortable
12     with the situation and so going to make a police
13     report was important at the time to me.
14  Q. Well, when you told her about you were upset
15     about the call with Dr. Lisan when he called you
16     and the discussion about working together and so
17     forth, were you hysterical?
18  A. No.
19  Q. Did you tell her you were terrified or threatened
20     or fearful of being anywhere near Dr. Lisan?
21  A. Not at the time.
22  Q. Did you tell him that you feared -- withdrawn.
23        Did you tell her that you feared being
24     assaulted by him in some way?
25  A. Not at that time.

1  Q. Did you know that the police at the VA actually
2     came to Dr. Lisan while he was at work to
3     investigate him about your complaint?
4  A. Not about my complaint, no.
5  Q. Okay. Is it your understanding that Karin
6     Bonfili went to the police, too?
7  A. I know that she went to the police and filed a
8     police report as well, yes.
9  Q. And are you aware that it was at Dr. Raphaely's
10     suggestion?
11  A. No, I was not aware of that.
12  Q. Okay. Did you ever talk to her about going to
13     the police?
14  Q. Talk to Dr. Raphaely?
15  Q. No. To Bonfili.
16  A. No.
17  Q. So how do you know she went to the police?
18  A. She told me afterwards.
19  Q. Did she tell you why she went to the police?
20  A. There was some physical contact.
21  Q. Do you know what the physical contact was?
22  A. I don't know exactly what it was and I wasn't
23     there.
24  Q. Do you know anything about what it was?
25  A. I know that -- the only thing I know is that it

1    was in the OR while a patient was under
2    anesthesia and it was physical contact and he was
3    not the provider in the room, and that's all I
4    know, and that there were other doctors that also
5    witnessed it.
6  Q. Was it an assault? Is that how you understood
7     it?
8  A. I don't -- I don't know that I --
9  Q. Did you know that --
10  A. Any time you're touched without wanting to be
11     touched it's assault.
12  Q. Any time?
13  A. Yes.
14  Q. If somebody shakes your hand, are you assaulted?
15  A. You put your hand out to shake that other
16     person's hand.
17  Q. Oh. So if somebody taps you on the shoulder,
18     that's an assault?
19  A. If you say I don't want to be touched.
20  Q. Oh, beforehand?
21  A. It was unwarranted touching.
22  Q. That's what Karin Bonfili told you, correct? Is
23     that correct?
24  A. That's correct, that's what she told me.
25  Q. Okay. Do you know who typed in the number here

1    on Exhibit 30 at the bottom by your signature?
2  A. If you look -- if you have ever signed something
3     digitally in PDF form, this number -- this whole
4     thing comes up next to it. It's very clear. It
5     says what date you sign it. It's like a serial
6     number attached to your signature is basically
7     what it is.
8  Q. Okay. Will you accept my admission that I'm a
9     technological dinosaur?
10  A. That's okay.
11  Q. That's off the record, please.
12        MS. JOHNSON: Oh, come on. Keep
13     it.
14  Q. All right.
15        Would it offend you if I extended my hand and
16     shook it and thanked you for coming in today?
17  A. Not at all. It's a pleasure.
18  Q. I'm sure it wasn't, but thank you very much.
19        MS. JOHNSON: I'm going to explain
20     to you when the deposition is transcribed,
21     the court reporter sends it to us and you
22     have a right to read it and review it for
23     errors in spelling or something like that.
24        THE WITNESS: Okay.
25        MS. JOHNSON: You don't have to do

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

Page 129

1 that but you can and I would recommend, I
2 would recommend reading it in this
3 instance, and if you want to do that, you
4 need to tell the court reporter --
5          THE WITNESS:  Okay.
6          MS. JOHNSON:  -- whether you would
7 like to read it or not.
8          THE WITNESS:  I would like to read
9 it, please.
10          - - - -
11       (Deposition concluded.)
12          - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 131

1
2
3          C E R T I F I C A T E
4
   The State of Ohio, )  SS:
5   County of Cuyahoga.)
6
      I, Pamela S. Greenfield, a Notary Public
7   within and for the State of Ohio, authorized to
    administer oaths and to take and certify
8   depositions, do hereby certify that the
    above-named witness was by me, before the giving
9   of their deposition, first duly sworn to testify
    the truth, the whole truth, and nothing but the
10   truth; that the deposition as above-set forth was
    reduced to writing by me by means of stenotypy,
11   and was later transcribed into typewriting under
    my direction; that this is a true record of the
12   testimony given by the witness; that the deponent
    or a party requested that the deposition be
13   reviewed by the deponent; that said deposition
    was taken at the aforementioned time, date and
14   place, pursuant to notice or stipulations of
    counsel; that I am not a relative or employee or
15   attorney of any of the parties, or a relative or
    employee of such attorney or financially
16   interested in this action.
17      IN WITNESS WHEREOF, I have hereunto set my
    hand and seal of office, at Cleveland, Ohio, this
18   29th day of March, 2019.
19
20
21
   _____
   Pamela S. Greenfield, CRR, RDR
22   Notary Public, State of Ohio
   My commission expires July 2, 2023
23
24
25

Page 130

1
2
3          SIGNATURE PAGE
4
5
6       I, ELAINE COSTANZO, CRNA, having
7   read the foregoing deposition, do hereby certify
8   said testimony is a true and accurate transcript;
9
10   _____ I submit no changes.
11
12   _____ I submit the following changes on
        the _____ errata sheet(s) attached hereto
13     and made a part hereof.
14
15   _____
       ELAINE COSTANZO, CRNA
16
17   _____
       DATE SIGNED
18
19
20
21
22
23
24
25

Page 132

1 DO NOT WRITE IN TRANSCRIPT EXCEPT TO SIGN.
   Please note any word changes/corrections on this
2 sheet only.  Thank you.
3 Page/Line  Correction
4 _____  _____
5 _____  _____
6 _____  _____
7 _____  _____
8 _____  _____
9 _____  _____
10 _____  _____
11 _____  _____
12 _____  _____
13 _____  _____
14 _____  _____
15 _____  _____
16 _____  _____
17 _____  _____
18 _____  _____
19 _____  _____
20 _____  _____
21 _____  _____
22 _____  _____
23 _____  _____
24 _____  _____
25 _____  _____

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

### Exhibits

Costanzo_
Exhibits_27_thru_
30

---

### 1

**1** 48:4
**10** 90:1
**10/27/17** 87:16
**1004153** 124:3
**11** 10:14
**12** 22:19 62:22
**13** 59:6
**14-page** 40:16
**15** 59:20 60:13
**16** 60:8
**17** 60:12
**18** 60:12
**18th** 37:14
**19** 60:12

---

### 2

**2** 44:7 131:22
**2002** 12:3
**2006** 12:11 13:3
  14:25 19:18,20,22
**2009** 21:21 22:2
**2011** 13:12,17 21:2,
  6,7 22:4,19
**2012** 21:8,11 24:20,
  23 25:6
**2014** 19:22
**2014/january** 19:5
**2015** 15:5,7,9,12
  16:10 17:4 19:6,12,13
  92:19 96:10 98:5,9
  105:3
**2016** 61:18 62:14,17
  96:8
**2017** 62:17,24 63:6
  73:15 80:18 85:16
  88:4 89:4 93:14 96:5,
  16 98:9 104:2,17,20
  109:1,12 110:15
  121:20
**2018** 37:12,14,16
**2019** 131:18
**2023** 131:22
**26** 88:3
**26th** 73:15
**27** 36:19 40:15,18
  43:23
**28** 87:16,20
**29** 92:13,18
**29th** 131:18
**2nd** 63:4

---

### 3

**3** 88:12
**3/08/17** 107:25
**30** 107:24 108:3
  123:17 128:1
**34** 10:2

---

### 4

**4** 44:5
**40** 23:18
**44060** 7:25 8:1
**450** 88:11
**451** 89:25
**453** 87:23

---

### 5

**5** 88:12

---

### 6

**6** 19:21
**6/18/18** 36:19

---

### 7

**7** 19:19
**7990** 7:19
**7th** 62:14

---

### 9

**9** 88:15 109:12
**9th** 109:1 110:14

---

### A

**aback** 112:5
**above-named**
  131:8
**above-set** 131:10
**absolutely** 74:25
**accept** 128:8
**accurate** 130:8
**accusations** 114:11
**accuse** 107:15
**accused** 107:7
**acting** 62:5
**action** 29:10,17
  131:16
**actions** 44:13
**activities** 62:7,8,11
**activity** 88:17,19
**actual** 25:5
**add** 39:4
**added** 54:23
**addition** 4:15,20 6:5
  104:14,21
**address** 7:12,16
**addressed** 120:5
**addresses** 18:19

**administer** 131:7
**Administration** 8:8,
  23 15:20
**admission** 128:8
**admit** 61:8
**admitted** 21:21
**advance** 55:25
  90:13
**affect** 62:8
**affidavit** 68:15 70:17
  73:8,21 87:17,21 88:8
  108:9
**affidavits** 64:9 72:1
**aforementioned**
  131:13
**afraid** 31:19 32:25
  35:16 36:4 51:12,15
**age** 4:1
**ages** 11:2
**agree** 46:8,9,21
  47:1,6,8,14,16 48:10
  50:3,15 51:8 54:16
  59:1,2 60:15,16,19,21
  109:18 110:13 120:16
**agreed** 121:9
**agreement** 59:24
**ahead** 34:2 35:20
  52:9 69:24 99:9,10
  108:12,15
**allegation** 90:5,6
**allegations** 41:20
**alongside** 103:14
**Altose** 8:8,25
**Amber** 4:23
**Amidst** 119:18
**amount** 104:13
**analyst** 14:12
**anesthesia** 21:21
  22:7 24:11 25:1,15
  27:23 127:2
**anesthesiologist**
  28:4,9,24 29:3,23,25
  44:2 117:6
**anesthesiologists**
  25:10 27:18,20 114:1,
  3 117:2
**anesthesiology** 9:6
  16:11 17:7 24:8 37:23
  41:1 45:9,12 50:17
  51:6,7 54:5 60:6
  86:25 91:9
**anesthetist** 26:16
**angry** 41:4
**answering** 6:10,17
  52:20 99:24
**anymore** 78:9 79:15
  120:21
**apologize** 48:19
  83:16
**apparently** 41:22
  66:1

**appears** 41:7
**appointed** 40:24
**appointment** 49:1
**appraisal** 28:17 29:4
**appraisals** 28:18,
  19,21
**approached** 111:19
**appropriateness**
  50:13
**approximately**
  10:12 13:4 37:9 62:13
  73:7
**approximation**
  16:7 27:14
**area** 11:6,8,16,19
  24:6
**arrangements** 56:2
**arrive** 26:25
**arrived** 27:5
**Asher** 4:23 8:22 9:20
**assault** 127:6,11,18
**assaulted** 98:24
  125:24 127:14
**assessing** 40:20
**assessment** 36:20
  37:2,3 43:23 78:2
**assessor** 40:23
**assigned** 124:9
**assume** 6:3,8 18:21
  21:10 43:2 71:14
  90:12 102:11
**atmosphere** 37:6
**attached** 128:6
  130:12
**attend** 12:4
**attended** 16:24
  23:22
**attention** 41:5
  90:18,25 91:6,16
  114:21 115:9,12,15,
  17
**attorney** 4:22 5:19
  9:14 131:15
**Attorney's** 5:5,9
**attorney/client** 9:11
**attorneys** 8:6 31:9,
  11,21
**August** 22:2
**authority** 26:6,10
  99:14 100:10 104:16,
  23
**authorized** 131:7
**avoid** 53:18
**aware** 5:14 55:2,5,13
  57:20 58:7 60:22
  61:17,20 68:9 70:9
  72:21 126:9,11
**awkward** 104:14,22
  105:1,12

**B**

**B-E-E-D-L-O-W**
  25:18
**B.S.N.** 12:14,21
**Bachelor's** 12:13
**back** 8:18 24:14
  35:21 40:11,13 47:23
  52:12,22,23 53:7 57:5
  61:2 69:18 79:6 83:17
  85:1,8 98:3 100:5
  101:25 118:24 119:24
**background** 10:19
  11:5 41:11
**bad** 124:4
**badly** 42:18
**based** 68:9 70:9
  91:21 106:12,16
  110:5
**basically** 25:7
  120:19 128:6
**basis** 98:16
**Bearss** 25:25 26:7,
  13,22,23,25 28:25
  30:6 75:8,11 77:4
  80:10 97:3
**bed** 102:18
**Beedlow** 25:16 26:7
  28:25 30:7
**began** 15:12 44:13
  97:24
**begin** 87:9
**beginning** 19:13,14
  24:2 45:5 61:3 62:25
  66:20
**begins** 44:11
**behavior** 105:15
**belief** 58:8
**believed** 58:20
**benefits** 23:8
**big** 61:11
**birth** 9:18
**bit** 11:4 16:19 34:6
  37:17 48:11,12,13,16
  56:10 58:25 66:11,23
**bitty** 69:8,9
**blank** 44:13,16 54:24
**blood** 10:22
**Bob** 26:20,22,25
  60:8 75:11 77:4
**Bolton** 22:10
**Bonfili** 38:17 61:1,5
  63:10,14,19 64:6
  66:4,13,25 67:11
  68:10,13 70:10,14,25
  71:2,24 77:16 87:8
  126:6,15 127:22
**born** 11:11
**boss** 75:5
**bottom** 87:24
  110:20,21 123:20
  128:1

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

**brand** 103:3
**break** 36:12 40:3,14 69:8 79:21
**Brenda** 36:23,25 40:21 77:21,24 78:12 79:1,7,14
**briefly** 12:6 14:2
**broad** 61:6
**broaden** 66:11,22
**broadly** 68:7 70:6
**broken** 69:7
**brought** 38:1 90:17, 24 91:6,16 114:10
**browbeat** 32:24
**Bruce** 117:22
**brushed** 86:6
**business** 109:4

**C**

**C-O-S-T-A-N-Z-O** 7:11
**call** 7:13 73:25 81:2, 7,10 82:1 85:15 86:23 93:14 108:23,25 109:14 111:21,25 112:7,19 118:2 125:15
**called** 4:1 13:22 26:16 48:19 61:20 64:17 65:23 80:11 82:5,8,17 112:3,10 124:20,23 125:15
**calling** 81:18,20 108:23 111:2
**campus** 20:3
**capital** 10:11
**cardiothoracic** 20:21 21:19
**care** 20:16,20,21 56:6 103:13 108:25 109:12 110:5,14 115:16
**cared** 44:22
**caring** 94:18
**case** 4:11 13:14 22:8 24:8 30:19,22 71:15 113:2
**cases** 109:15 113:6
**catch** 66:20
**Cathedral** 11:24
**caught** 100:15
**caused** 104:13,21
**cellphone** 112:11
**certificate** 22:16,21 24:24
**certification** 13:16, 19
**certified** 4:5 21:5,8
**certify** 130:7 131:7,8
**chair** 16:11
**challenging** 76:11

**chance** 15:11 36:2 39:22 108:19 109:16
**change** 21:14,19 44:7,13 111:1,20
**changed** 13:21,23 44:21
**changes/corrections** 132:1
**charge** 37:1
**charges** 114:10
**check** 37:14
**chief** 9:1,2,3,5 26:16 45:8 50:17 51:6 103:5
**children** 10:15,24 56:13,16
**chitchat** 86:24
**choice** 51:24,25
**chose** 78:1
**civil** 4:4 106:6
**claim** 75:21
**claims** 90:17,20,24 91:1,3,5,11,12,13,15, 21,23
**clarified** 8:19
**clarify** 5:24 8:19 45:19
**Clark** 20:5
**class** 17:3
**classes** 23:22
**classroom** 23:25 24:3
**clear** 18:4 29:13 43:13,15 45:15 58:17 76:13 91:13 128:4
**Cleveland** 11:6,8, 10,15,18 14:8,11,15 15:2,3 19:4,8,9,15,17, 20 21:11,23 22:20,23, 24,25 23:1,18 24:16, 22 25:6,13 26:14 27:17 28:19,21 29:21, 25 60:7 91:9 97:25 131:17
**client** 4:21 30:14
**clients** 9:8
**Climate** 36:20
**clinic** 14:8,11,16 15:2,4,5 19:4,8,10,15, 17,20 21:3,11,23 22:20,23,24,25 23:1, 19 24:16,23 25:6,13 26:1,8 27:17 28:19,21 29:21,25
**clinical** 22:23 23:20, 21 24:6
**coach** 64:8 66:17 67:4,21
**coached** 43:25 63:20 64:1,13,23 65:1,3,9 66:15 67:2, 13 68:1

**coaching** 66:2 85:6
**colleagues** 90:18, 25 91:7,8 94:12,22 95:6,8 103:4
**combination** 24:7
**comfortable** 55:11, 15 103:4
**comment** 67:23 122:11,19
**comments** 94:17 102:2,7 103:19 107:20 113:19 115:21 117:7,9 122:22,25
**commission** 131:22
**common** 59:21 96:2
**communicate** 9:10
**communication** 74:4
**comparable** 25:25
**compare** 117:8
**compared** 117:13
**comparing** 116:12
**compensation** 14:12
**complained** 64:14 116:6
**complaining** 95:17, 18
**complaint** 71:8,10, 12 72:10,12 73:1,5,20 80:12 89:5,12 96:24 106:4 107:5 112:20 119:1 120:17,19 121:3,12,18,21,25 122:3,6 124:19 126:3, 4
**complaints** 37:22, 25 38:1 40:25 42:5, 10,12,15,25 43:21,25 71:4 75:20 76:19 84:11 86:13,17 91:12 95:21 116:23 117:17 118:4,15 119:2
**complete** 36:5 89:4 90:19
**completed** 22:20
**component** 78:8,10
**compound** 68:21 69:10
**compromised** 110:5
**compulsions** 62:5
**computer** 17:18 18:17
**concern** 31:20,24 32:2 43:24
**concerned** 5:2 34:16 109:11 120:5
**concerns** 29:11 43:4,8,21 50:12 59:15,20 60:19,21,23 87:10

**concluded** 129:11
**conclusions** 59:10
**condescending** 47:25 48:4
**condition** 61:24
**conduct** 39:11 50:16 87:1 106:13
**confusing** 47:13
**connected** 25:3
**connection** 72:9
**considered** 9:8 22:25 23:5 59:14
**consisted** 88:19
**constant** 59:24,25
**constantly** 94:24
**constitute** 38:14
**constrained** 34:18
**contact** 71:3,5 82:20,24 83:6 84:13 89:4 90:19,21 92:19 111:10,13 126:20,21 127:2
**contacts** 108:9
**context** 29:14
**continued** 18:24 21:10
**contract** 107:25
**contrary** 57:16 59:23
**contribute** 53:25 54:1,3
**conversation** 74:5, 6 75:10,13 82:13 87:5,12,13 96:3 112:13,15
**conversations** 60:25 61:4 63:10 83:24 114:19 118:11
**coordinator** 118:3
**copy** 124:4
**cordial** 106:7
**corner** 93:8
**correct** 4:18 5:15 8:3 9:15 10:9 12:22 15:8 17:11,12,25 18:12,13 21:3,12 23:4,7,10,13 24:11,17,19 25:11 26:23 27:18 28:17 29:1,5,6,7,8,23 30:2,8 37:20,24 38:4 41:3 45:11,16 46:5 50:1 54:25 63:7 65:11 71:24 73:20 81:3 84:19 85:14,19 87:2 88:9 90:7,15 92:6,11 94:9,25 95:21 96:7,8, 9,11,12,18,20,22,23, 25 97:1,4,5,7 98:1,5, 12,19,22,23 99:15 100:11 102:5 103:2 106:13,14,17 107:10 109:1,13 110:7,15,16

121:15 123:1,21 127:22,23,24
**Correction** 132:3
**correctly** 41:23 44:14 45:2 48:2,8 50:5 57:18 59:16 60:3 88:20 89:6 90:22 94:13,19 97:21 103:8, 15 104:18 111:4,15 120:14
**Costanzo** 4:1,7,17 5:11 7:9,13,15,16 8:2 10:8,13,15 30:24 40:18 43:2 78:11 87:17 88:1 92:18 107:24 118:25 123:23 130:6,15
**counsel** 8:21 31:17 53:6 131:14
**counterparts** 56:8
**County** 131:5
**couple** 60:11 64:5
**court** 4:12,16,20 6:6 128:21 129:4
**cover** 42:2
**covered** 97:23 108:10
**coworker** 20:13
**creating** 47:13
**Creek** 7:19,22
**critical** 31:2 32:9
**criticism** 29:18
**criticisms** 43:4
**CRNA** 4:1,7 13:15,16 14:24 21:5,11 22:16, 21 24:17,24 25:22 29:21 30:6 47:12 49:3,12,16 60:9 77:14 82:10 96:3 97:2,24 115:5 117:4,20 130:6, 15
**CRNAS** 37:22 38:1, 12,16 41:2 42:13 43:1,4,24 44:6,11 46:13 48:5 50:1,3,8 54:5,19 55:3 56:5 58:7 59:20 60:5,13,22 86:25 91:8,17 95:20 115:20 116:7,8,25 118:5 120:3
**cross-examination** 4:3,7
**CRR** 131:21
**current** 7:12
**cut** 52:20
**Cuyahoga** 131:5

**D**

**daily** 62:6
**Dame** 11:24
**danger** 114:15

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

**date** 9:18 37:15 88:3, 6 128:5 130:17 131:13
**dated** 37:14
**day** 49:4,13 56:10 81:14 105:6,7 111:3 112:1,3,9 124:25 131:18
**days** 19:9
**deal** 72:2 81:15
**dealing** 82:10
**deals** 81:17
**decade** 14:19
**December** 19:5 21:7 22:4 62:13
**December/january** 19:12
**decided** 94:15
**decision** 50:4 51:9, 10 53:20
**decisions** 57:10,13, 15,21,24 58:9,12,20 59:3
**degree** 12:12,22 13:7
**department** 9:6 16:11 17:7 37:6,7,23 41:1 45:8,12 51:6,7 54:4 60:6 86:24 91:8 96:25
**depending** 54:20 59:15
**deponent** 131:12,13
**deposed** 4:5
**deposition** 4:10,17 5:18 6:20,23 31:1 36:3 64:15 68:17 70:19 128:20 129:11 130:7 131:9,10,12,13
**depositions** 131:8
**describe** 48:5 58:11
**deserves** 39:22
**detail** 90:4
**didactic** 23:23,24
**difference** 18:8 26:6
**differently** 37:21
**digitally** 124:2,5 128:3
**dinosaur** 128:9
**direct** 9:11 39:18 41:5 90:4
**directed** 43:5 47:4
**direction** 131:11
**directly** 9:9 26:19,20
**director** 8:25
**disagree** 46:7 47:14 54:15
**disciplinary** 29:10, 17
**discrimination** 41:21

**discriminatory** 44:25 46:4
**discuss** 80:11 89:19 91:4 93:23 94:4
**discussed** 84:16,21
**discussing** 90:13 119:1 120:3
**discussion** 8:15 15:16 20:24 39:15 40:8 42:21 43:18 61:14 63:16 68:8 69:15 70:9,25 72:18 77:7 78:23 80:24 101:22 118:21 119:7 122:2 125:16
**discussions** 63:9 68:11 70:12 71:1
**dislike** 30:14 106:12
**disorder** 61:23
**disrespectful** 49:12,16 54:9,18
**dissatisfaction** 59:13
**dissatisfied** 60:2
**distance** 102:22
**distinction** 28:1
**distress** 104:14,21
**distressed** 95:7
**District** 4:12,13
**disturb** 106:16
**disturbing** 31:1
**diverge** 100:13
**Division** 4:13
**divisive** 45:1 46:5
**doctor's** 49:1
**doctors** 127:4
**document** 40:16,19, 20,22 41:16 42:1 44:5 45:21,23 92:25 124:2
**draft** 82:19
**drafting** 38:7
**drape** 102:19,20
**Drive** 7:19,22
**due** 49:13
**duly** 4:4 131:9
**duress** 65:18
**duties** 21:20 82:11
**duty** 56:1,6 112:17, 19

**E**

**E-L-A-I-N-E** 7:11
**earlier** 102:3 121:22
**early** 37:12 80:17 85:15 92:19 93:14
**easier** 111:22
**east** 11:10
**Eastern** 4:13
**education** 12:4
**EEO** 71:8,9,12 72:1, 9,12,21 73:1,5,19 75:20 88:16 89:5

91:12 96:24 117:23 118:2
**effect** 64:11 66:17 67:5,21 82:19 119:12
**Elaine** 4:1,7,17 7:9, 13 123:23 130:6,15
**Elaine's** 92:15
**embarrassed** 102:7
**empathize** 32:16
**employed** 14:5,15, 23
**employee** 22:22,25 23:5,8 24:15,16 48:19,25 103:3 131:14,15
**employees** 44:22 51:20 56:7 59:13
**employment** 18:19, 25 19:9,10 21:22 23:12 24:15 28:15 29:19,20 118:3
**encounters** 86:5
**encouraged** 95:19, 24,25
**encouraging** 82:19 85:21
**end** 62:16 113:6
**entire** 34:15 38:15 47:12 59:23 96:8 99:6
**entitled** 34:20 40:2,5
**environment** 44:7 103:6 111:11
**equal** 118:2
**errata** 130:12
**errors** 128:23
**essentially** 11:18
**etiology** 80:4
**events** 58:24 94:11, 21 95:16,18 104:7
**everybody's** 115:15
**evidence** 89:11
**exact** 27:13 60:13 67:24 68:4,5 70:3,4 102:2
**exam** 13:16
**excellent** 103:13
**excessive** 48:11,12, 16 125:8
**excuse** 10:25 24:11 26:14 41:9 78:21 91:5
**Executed** 123:20
**executive** 8:24
**exhibit** 36:19 40:15, 17,18 43:23 87:16,20 92:18 107:22,24 108:3 123:16 128:1
**expect** 28:25 82:6
**expecting** 112:6
**experience** 42:8 46:22 47:3 63:12 82:20,23 83:8 85:17, 20,23 91:22

**experiences** 84:1,2, 11
**experiencing** 59:21
**expires** 131:22
**explain** 24:1 26:9 88:18 90:4 101:3,4 111:17 121:17,23 128:19
**explained** 101:9 102:16
**exposure** 17:21
**express** 122:18
**expressed** 58:8 76:1 79:3,9 116:22 119:25
**expressing** 78:20
**extended** 128:15
**extent** 41:2
**extreme** 114:17
**extremely** 102:6

**F**

**F-R-A-N-C-E** 10:11
**face-to-face** 112:14
**fact** 9:9 49:13 75:8 84:10 86:22 95:2 115:19 125:7
**facts** 41:20 58:22,23 83:7
**factual** 90:21
**fair** 5:24 6:3 120:18
**familiar** 103:6
**family** 56:2
**faster** 101:1
**fear** 30:25 31:23 32:6,20 59:21 75:25 76:17 78:4,7,10,12,17 79:2,8,18
**feared** 75:5,6,19,23 77:21 125:22,23
**fearful** 33:24 74:21 125:20
**February** 21:8,11 24:20
**feel** 31:8 32:19 34:18 55:10,15 56:25 57:2 103:3 104:14,22 105:23 108:24 112:2 117:6
**feeling** 30:21 37:5 78:20 102:6 111:11 119:13,15,17 120:12 125:11
**feelings** 50:12 110:6
**fell** 111:1
**felt** 49:3 58:11 65:16 71:11 100:12 105:1, 21,22 110:21,24 111:10,17,24 112:3 119:10 120:10,11,15, 21 123:11 125:9

**female** 44:21 94:12, 22 95:6,8,20
**field** 31:11
**figure** 16:18
**figured** 5:12
**filed** 126:7
**filing** 80:11
**filling** 72:1
**financially** 131:15
**find** 60:1
**fine** 7:15 10:1 14:21 16:6 27:8,14 53:5 106:20 119:20
**finish** 46:24 94:7 99:22,25
**finished** 52:11 93:4 99:10 122:13
**floor** 20:1
**fly** 99:18
**focus** 37:3,17 58:6
**focused** 39:8,10
**focuses** 16:6,19 97:15
**follow** 55:6 58:4
**forced** 42:16
**forcing** 42:13
**foregoing** 130:7
**forgot** 14:4
**forgotten** 60:11
**form** 38:4 96:17 128:3
**formal** 12:4
**Fort** 11:14
**Foster** 38:21 72:4 86:9,11 87:8
**found** 116:16
**Frances** 22:10
**Frank** 10:7,13
**Frankito** 38:23 66:9 77:6 119:10,14 123:13
**frequency** 81:8
**front** 23:23,25 40:17 112:15 123:17
**Fuehrer** 89:24
**full** 7:7 22:6 24:6 62:22
**full-time** 23:12 24:14
**function** 62:6
**fundamental** 34:14
**future** 101:17

**G**

**gainfully** 14:22
**Gaughan** 4:14
**general** 5:18 10:19 11:5 29:12 47:4 62:4 68:6 70:5 99:18
**generally** 17:17
**generated** 43:22 87:4

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

genitalia 102:14
122:20
give 17:11 36:4 40:3
58:18 87:20 108:3
giving 131:8
goal 31:11,17
good 7:7 9:17 16:7
29:16 37:19 51:16
80:5 96:10 105:25
113:13 122:16
goodness 52:17
grade 11:17,19
graduate 12:2,8
graduated 11:21
13:12 21:7
great 69:11 76:12
Greenfield 131:6,21
Greenspan 72:22,
24 73:2,23 74:20
75:16,19 76:1,17
79:3,10 88:9 118:16
grew 11:10
Groghan 4:24,25
5:1,3,7 8:22
group 37:22 38:8,11,
14,15,16 42:11 47:12
56:5 59:23 60:14
grow 11:6,9
growing 11:7
guess 6:19 16:11
17:20 81:23

**H**

hall 106:2 112:8
hallway 109:24
hallways 54:22 55:4
Hammond 4:23
hand 127:14,15,16
128:15 131:17
hands-on 25:5 28:2
handwriting 123:21
happen 112:7
happened 55:18
56:12 58:23 65:16
68:23,25 71:18 83:23
95:7,16 96:4,5 104:7
116:11 120:1
harassed 107:2
harassing 102:17
harassment 17:15,
19 18:16,20 42:14
63:11 68:15 70:16
75:21 76:20 107:5,7,
15 120:9,23 121:1,3,
4,15 123:1,6
harbored 106:12
harm 114:16
hatred 106:12
head 16:10 17:7 39:5
45:8 102:18
health 114:12

hear 49:6 53:5 63:14,
19 71:9 72:3,6 122:18
heard 49:7,8 50:7
53:6 65:22 66:4 68:10
70:11,25 71:7,11,21,
23 85:16,20,23 86:1,
3,8 102:23 103:1
hearing 49:2 66:1
102:22
hearsay 49:1
held 78:2
helpful 6:5
helping 95:5,8
hereinafter 4:5
hereof 130:13
hereto 130:12
hereunto 131:17
hesitate 32:7 53:5
high 11:21 12:4
higher 13:6
highly 116:16,18
history 14:3
hm-hmm 12:17
hold 31:16
holding 16:5 60:13
holiday 49:14
home 14:5 48:19
80:11 81:2,7,11,18,20
82:1,5,8,17 85:15
86:23 93:14 94:3
112:19
hope 30:19
hostile 6:23,25
44:25 46:4
hour 36:13
hourly 56:7
hours 23:18
HR 14:13
hurtful 119:22
husband 10:6 14:5
76:23 93:25
hysterical 125:17

**I**

ICU 20:2,13,19
21:18,19,24 25:3
idea 49:18 82:25
identification 36:21
87:18 92:20 108:1
identify 40:18 41:18,
19
immediately 19:10
Impair 59:10,12
imparted 18:15
implemented 59:22
implied 104:4
imply 76:4,6
important 59:10,12
81:22,24 100:12
104:6 120:20,21
121:14,15 125:13

impression 44:20
105:19
improper 34:23 35:4
inappropriate 34:4,
12,13 49:3 50:20,25
53:24 57:3 83:23 86:6
87:1 94:17 103:20
106:19
incident 103:5
incidents 94:15
97:18 102:13 103:12
include 38:17,19,21,
23 43:24
includes 18:11
including 55:14
60:8
indicating 43:3 64:6
individual 30:15
39:7
information 9:23
11:5 18:15 73:4
initial 44:19
injured 114:7
input 28:16 42:5
inquiring 118:6
inspired 87:9
instance 129:3
instruct 101:12
instruction 17:13
integrity 34:14
intended 42:1
104:10
intensive 20:16,21
intention 6:14 107:4
interest 103:13
interested 95:5
131:16
interesting 23:6
internal 118:4
interrupt 6:13,14
33:24 53:2
interrupted 52:4,24,
25
interrupting 6:11
33:11 52:8
interruption 83:14
interval 98:8
intimidate 110:25
intimidating 111:25
invade 10:21
investigate 40:24
126:3
investigating
86:13,16 118:6,15
119:3
investigation 38:2
43:23 72:21 90:20
94:24 95:22
investigator 40:23
68:16 70:17 73:1
118:4

involved 29:22
42:10 45:9 75:2,4
78:3,6,9,14 79:15
88:16 99:21 120:11
involving 17:15
29:19 63:11 94:12,22
issue 29:23
issues 17:14 42:12
63:11 87:1
itty 69:8,9

**J**

January 15:13 17:2,
4 19:5,13,14 62:17,
24,25 63:1 80:17
85:15 89:4 93:14
96:16 98:3,9 104:1,
17,20 105:3 121:20
Jason 25:16 26:7
Jessica 38:21 72:4
86:9,11 87:8,12
91:18,19,20
job 19:15 21:20
24:22 34:16 45:13
60:1 113:17,19
114:17
Johnson 4:23 5:6
7:2,4,18 8:10,12,22
9:2,19,22,25 10:4,17
16:15,17,21 30:16
31:4,25 32:11 33:1,3,
6,10,13,16,19,25
34:3,8,25 35:3,8,11,
19,25 36:9,11 39:21
40:2,5 41:9,15 42:19
43:12 45:18,22 46:24
49:20 51:14,22 52:3,
7,10,14,18 54:12
62:11,14 63:6 65:10,12
66:19 68:20 69:4,12,
18 72:11,14 80:6
81:14 84:23 85:3,7,13
92:14 99:8,16,22,25
100:20,23 101:2,7,11,
15 111:5 112:21
117:11 118:8,18
123:2 128:12,19,25
129:6
join 95:20
Judge 4:13
judgment 57:23
July 14:25 131:22
jumbled 56:3
jump 110:19
June 37:14

**K**

Kafer 117:22
Karin 38:17 61:1,5
63:10,14,19 64:6,12
65:3,7,8,21,22,24

66:2,4,13,16,25 67:3,
10,19 68:10,13,23
70:10,13,25 71:1,2,
11,24 77:16 87:8
91:20 126:5 127:22
Karin's 63:12
kind 12:12 16:5
17:21 29:22 34:11,17
37:5,6,7 47:4 50:13
54:4 81:10 84:2 86:6
87:1,4 112:5 115:22,
23,24 119:20 122:17,
19
kinds 43:3
knew 20:15 65:25
83:25 84:15 122:3,6,
7,19,22
knowledge 17:1
44:3,17,18 54:3 61:25
90:4 114:8,9,13 115:4

**L**

L-A 10:11
Lafrance 10:11
lapse 115:17
Las 115:24 116:3
lasted 17:10
Latin 11:24
Laurie 38:23 66:9
77:6 119:10,14
123:13
lawful 4:1
lawyer 6:8
lead 26:14 30:6
leader 97:2
leadership 96:22
leave 19:4,8 61:18,
21 62:16,18,20,22,23
63:9 80:15,16,20
112:10
led 95:9,10
left 22:22 111:3
112:9 124:21
level 110:4
levels 41:18
license 12:24
life 86:7
light 94:11,21,23
95:2
limit 68:2,3 70:1,2
76:2
lines 110:20
Lisa 4:22 9:4 33:23
Lisan 4:11,22 5:12
8:3 30:15 42:14 44:1
61:1,4,17 62:14 63:22
68:14 70:15 71:3 73:5
80:12 82:21,23 83:9,
24 84:1,12 85:18,21
86:5,11,14,17,25
87:10,14 94:16 97:6
100:2 104:15,23

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

105:12 107:5 108:23
109:4,11 110:3,21,24
112:20,25 114:2,19
116:11,12 117:7,9,13
118:5,15 119:18
120:17 121:21 122:6
124:20 125:5,15,20
126:2
**Lisan's** 63:11 72:9,
12 73:1,19 75:20
76:19
**list** 42:4,6 43:8,22
56:9 74:10
**listen** 52:19
**literally** 112:8
**lived** 11:18
**living** 62:6
**loaded** 23:23,25
**local** 89:5
**logical** 32:3
**long** 10:12 14:15,17
15:3 16:2 27:3,4
**looked** 92:24 113:21
**loses** 30:19
**lot** 23:11 48:6 49:25
51:8,19 52:16 67:6
76:14 86:24
**loud** 41:17
**low** 53:25 54:1,3
**lower** 93:8
**lying** 119:25

**M**

**M-E-N-T-O-R** 7:23
**made** 37:23 42:5,11
47:5 95:20 105:2,13
106:3 116:16,23,25
117:2,6,7,19 118:5,15
121:18,19 122:19
124:19 130:13
**maiden** 10:10
**main** 20:3
**maintained** 21:22
**majority** 38:16 48:5
60:14,22
**make** 19:16 28:1
42:13,16 43:13 44:23
49:16,25 51:7,10
53:20 56:1,9 57:22,23
59:25 65:2 72:15
74:24 113:19 115:20
117:17 121:12 124:25
125:4,12
**makes** 57:10,13,22,
24 58:8
**making** 40:25 91:21
104:14,22 107:4
112:19 120:16
**male** 102:14 122:20
**maliciously** 106:21
**man** 72:22

**management** 25:1
39:11 50:19 58:1
96:21 117:18
**manager** 20:11,15
50:23,25
**managers** 9:7
**mandate** 56:9
**mandated** 56:5,11
**mandating** 55:24
**manner** 92:2
**March** 16:10 20,20,
23 25:6 109:1,12
110:14 131:18
**mark** 38:25 77:12
92:13 108:3
**marked** 36:20 87:17
92:12,19 107:25
**married** 10:3,5,12
**master** 59:24
**Master's** 13:10
**material** 17:14,22
18:11
**maternity** 62:16,18,
20,22,23 63:8 80:14,
16,20
**matter** 18:24
**matters** 109:5
**me'** 67:21
**meaning** 9:8 47:9
53:10
**means** 5:15 31:12
32:14 33:7,21 124:12
131:10
**meant** 26:22
**medical** 9:1 14:9
61:18 113:24
**medicine** 113:20
**meetings** 55:7,10
**member** 38:9 57:14
**memory** 16:6 118:1
**mention** 94:23
**Mentor** 7:23
**met** 15:22
**Michael** 20:7
**middle** 52:19
**minute** 73:14 92:22
**misstated** 85:8
**misunderstood** 105:25
**miswrote** 104:8
**module** 17:18 18:17
**mom** 76:21
**moment** 84:4 100:13
105:11 117:5
**moments** 114:20
**money** 49:25 51:8
59:25
**month** 15:12
**months** 18:19 24:5
27:5 64:5 66:12,25
67:10

**morale** 53:25 54:2,4
**morning** 73:12 93:1
**move** 34:10 101:15,
18
**moved** 34:6
**multiple** 48:7
**Myers** 38:25 77:12

**N**

**N-E-W-E-L-L** 7:21
**names** 43:1
**nature** 28:5 29:11,18
87:11 94:17 107:18,
20 121:20,25 122:9
**NCLEX** 13:1
**needed** 65:25 74:11
111:20 120:7 124:25
**negative** 32:10 37:6
**neuro** 21:19
**neurointensive**
20:20
**Newell** 7:19,22
**night** 124:20
**normal** 81:11,12
**Northern** 4:12
**Notary** 53:8 66:22
67:9,19 69:25 79:7
83:18 100:7 131:6,22
**note** 59:12 132:1
**notice** 56:10 131:14
**noticed** 46:12,16
**notified** 55:24 56:4
**Notre** 11:24
**number** 43:1 44:7
48:4 60:13 88:15 90:1
92:13 124:1,7,8,12
127:25 128:3,6
**nurse** 12:25 13:3
20:1,2,15 26:16
**nurses** 120:4
**nursing** 12:13 13:6,
10 22:10

**O**

**oath** 5:14 33:4,20,21
**oaths** 131:7
**object** 33:17 52:15
68:20 84:23
**objected** 116:5
**objection** 7:2,4
8:10,12 9:19 16:15,21
30:16 31:4,25 32:11
33:1,3,11 45:18 49:20
51:14,22 52:3 58:14
65:10 99:8,16 112:21
117:11 118:8 123:2
**objections** 43:3
116:23 117:17
**observation** 47:5,7,
8

**Obsessive-**
**compulsive** 61:23
**obtain** 22:16 31:12
**obtained** 22:20
24:24
**occur** 36:4 116:9,10
**occurred** 97:19
**occurring** 18:6,7,9
**occurs** 33:2 34:22
**OCD** 61:20
**October** 73:14 88:3
**off-color** 115:20
116:6,24 117:3,19
**off-the-cuff** 96:2
**offend** 128:15
**offended** 97:9
**offensive** 116:16,18
**office** 5:5,9 64:18,
19,20 65:23 131:17
**officially** 96:19
**Ohio** 4:13 7:23 12:7
131:4,7,17,22
**Okolish** 20:7
**operating** 25:7,8
27:22,24,25 28:2,9
30:2 65:17 94:18
104:16,24 105:2
114:24 115:1,22
116:25
**operation** 44:21
45:4,10
**operations** 115:19
**opinion** 48:14,15
114:6
**opportunity** 40:15
65:15 118:3
**opposing** 53:6
**ordinarily** 24:8
**ordinary** 57:16 82:3
**orientation** 15:24
16:2,19,24 17:3,10,22
**original** 40:24 42:4
**outcome** 30:21
**overheard** 63:9,12
84:7,20,24 85:3,9

**P**

**Page/line** 132:3
**paid** 23:1
**Pamela** 131:6,21
**paper** 95:13
**paragraph** 41:11,
12,13 44:6 59:9
**part** 14:13 22:8,13
23:19 29:1 38:7 39:8,
10 45:13 47:24 59:1
94:24 96:10 130:13
**partially** 40:16
**participate** 74:25
78:1 99:19
**participated** 40:25
75:1

**parties** 131:15
**parts** 23:20 39:18
**party** 131:12
**pass** 54:22 109:24
**passed** 55:4
**past** 56:6
**patient** 103:13
108:24 109:12 110:5,
14,18 113:15 114:7,
12,16 115:16 127:1
**patients** 25:1 56:6
94:18
**pay** 54:9,16,17
115:12,15
**paying** 114:20 115:9
**PDF** 124:6 128:3
**penalizes** 47:11
**people** 6:6 55:14
58:4 76:25 78:20
103:7 112:15 117:18
119:23
**perceptions** 44:8
**perfect** 115:14,15
**performance** 28:17,
18 29:4
**period** 17:10,22
99:7,15 100:11 106:3
**perioperative** 24:25
25:14
**permitted** 101:2
**person** 14:9 26:14
29:22 62:5 119:2
**person's** 127:16
**personal** 9:14 10:21
42:5,7 46:22 110:6
111:2
**personalities** 53:17
58:3
**personally** 42:7
47:3 106:22 111:14
**pertain** 94:16
**phone** 49:5 74:7
82:7 85:15 86:23
93:14 108:23 111:2,
21,25
**phrase** 45:5 67:24
68:4,5 70:3,4
**phrased** 42:18
**physical** 126:20,21
127:2
**physician** 25:19
114:24
**physicians** 56:8
115:1
**pieces** 69:8,9
**PII** 9:20
**pinpoint** 27:13
**place** 88:19 115:23
121:12 131:14
**Plaintiff** 4:2
**Plaintiff's** 36:19
87:16 92:18 107:24

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

pleasure 128:17
plenty 78:19
point 12:16 21:6 24:14 32:18 36:3 62:5 74:15 107:20 120:10
points 38:5
police 124:14 125:1, 5,12 126:1,6,7,8,13, 17,19
policies 17:14 47:13 59:22
policy 18:16
poor 114:11
portion 42:1
posed 82:24
position 25:21 26:5 32:17 53:22 97:24 104:16,23
positions 21:14 26:10
possibly 31:20 44:1 55:14
post 12:4
practice 113:20,24 114:11
preceded 97:4
preceding 96:8
prefer 7:14
prerogative 51:17
presence 77:10 89:14 115:5,7
present 4:19 37:7 66:5,6,7,9 114:5,21
presiding 4:14
pretty 16:7 43:9 45:15 51:21
previous 100:18
previously 23:13 96:14
prior 15:19 16:13 19:10 26:20 61:1 88:16 89:19 96:16 112:8,14
privacy 10:22
private 9:21,22 11:25
privately 64:7
privileges 47:12
problem 49:2 51:11 110:3
Procedure 4:4
process 34:15 114:5
produced 40:23
professional 54:23 106:8,9 110:4 113:14
professionally 98:20,21 111:13 113:13
professionals 31:11
program 24:2,5

prolong 101:19
promise 10:22
prompt 12:18
protected 88:17
proven 47:10
provide 27:23 108:24 110:14
provided 4:3
provider 127:3
providing 103:13
psychoanalyze 81:23
Public 131:6,22
punishment 59:23
purpose 4:2 95:9
purposely 106:22
purposes 9:7 29:17 36:21 41:7 87:17 92:20 108:1
pursuant 131:14
put 84:12 98:3 103:12 127:15

---

**Q**

question 5:21 6:2, 12,16 13:25 21:15 23:16 27:14 33:9 34:11 35:13,17,18,21 36:5 42:18 46:1 47:4 51:13 52:13,20,21,22 53:7 55:13 56:21 59:5 61:6 66:11,20,23 67:6,7,8,15 68:18,21 69:5,6,21 70:20,21 77:20 79:11,12 81:15, 17,20 83:17 85:12 94:7 99:24 100:4,6, 16,17,19 101:6,13,18 115:3 117:12,13,16 123:15
question's 6:9
questioning 33:22 34:4
questions 5:13 10:19 26:4 32:8,13,18 46:11,17 67:6 74:11, 18,22
quick 37:14
quickly 103:12
quote 48:6,7

---

**R**

R.N. 12:21,24 14:23, 25 19:24 20:1 21:18 23:13
radar 99:18
raised 56:23,24
range 11:2
Raphaely 8:8 9:5 15:19,23 16:10,24 26:21 31:2 32:7,10

39:11 41:2 43:6,25 44:16 45:8 46:17 47:10,11 48:18 49:11, 18,24 50:7,14 54:21, 24,25 57:11,13,22 63:20 64:7,10,21 65:1,7,9,18,19,24 66:14,15,16 67:1,3,4, 11,13,20 68:11 70:11 71:1,13 74:23 75:5,22 76:18 77:22,25 78:5, 18 79:2,9 80:10 81:2, 18 82:1,16 85:14 86:23 89:2 90:19 92:2,8 93:15 94:5,24 95:11,19 109:3 112:18 119:3,11,16 120:6,15 121:17 124:17,23 126:14
Raphaely's 58:12, 20 64:20 65:23 90:17, 25 91:6,16 126:9
rate 29:3
RDR 131:21
reaction 51:25
read 18:12 35:21 39:20,22,25 40:6,15 41:7,16,23 44:14 45:2,6 48:2,8 50:5 52:12,23 53:7 57:18 59:16 60:3,20 67:17, 18 69:21 73:21 79:6 83:16 85:1,8 88:20 89:6 90:9,22 93:1,2 94:13,19 97:21 100:5 102:9 103:8,15 104:18 108:5,7,19 109:25 111:4,6,15 128:22 129:7,8 130:7
reading 57:7 129:2
ready 40:11 70:22
real 95:17 111:11
realize 99:9 103:19, 22,23,25 104:1,4,5,6
reask 52:23 70:21
reason 32:19 34:12 49:15 77:22 78:7 99:12 100:8 106:11, 15 109:23 111:12 120:14 125:1
reasons 53:18 58:18,19
recall 17:16,21,24 18:1,3,5,6 26:25 27:2, 9 37:10 39:2,3,6 42:4, 7 49:10 50:11 62:13 63:23 66:8 67:24 71:21,22,23 73:7 74:1,19 75:10 77:7, 10,11,13,15,17,18 78:13 81:9 82:18 93:22 102:2,13

107:19 109:6 117:5
receive 12:12
received 13:6 23:2 108:22
recent 94:11,21
recently 13:22 73:9
recess 36:17 79:23
recollection 18:7,9, 14 27:10 39:4 71:16, 17 77:3 78:16 87:7 109:8 118:7,25
recommend 129:1, 2
record 4:10 7:8 8:13, 16,18,20 15:14,17 20:22,25 39:13,16 40:9,13 42:19,22,24 43:13,19 61:12,15 63:17 69:13,16,19 72:16,19 78:24 80:22, 25 101:20,23,25 108:17 118:19,22,24 119:5,8 122:4 128:11 131:11
redacted 40:16 41:22
reduced 131:10
reference 54:9
referring 40:17 45:21,23
refers 54:8
refresh 77:2 118:1,7
regard 28:5
registered 12:25
regular 24:15 98:16
regularly 82:3,4
regulations 29:20 57:17
related 17:14 23:11 42:9,16 64:13
relates 37:15
relationship 9:11 28:15
relative 131:14,15
relax 27:12
remaining 24:5
remains 54:23
remark 50:13 51:10 57:2 105:3,13 116:16
remarks 115:20 116:6,18,24 117:3,19
remember 15:11 16:4 58:19 64:6 66:3 80:14 81:4,5 102:6 117:24 118:13,14 120:8
remembers 64:25
reminders 59:24,25
repeat 28:8 67:8 68:6 70:5 77:5
repeating 5:20

repeats 18:23
rephrase 21:15 23:16 42:17 69:4 85:12
report 26:17,19,20 27:20 36:20 37:15 71:3,5 82:20,23 83:6, 7 84:13 89:4 90:19,20 92:19 94:15 96:1 99:5,13 100:1,3,8 107:25 108:9 125:1,5, 13 126:8
reported 65:7 96:16, 19,21,24 97:2,6,8 98:10
reporter 4:16,20 6:6 128:21 129:4
reporting 42:8 103:5
represent 5:12 8:3, 7,22
representative 117:23
represented 9:14
representing 9:15
reputations 119:22
request 49:16 94:23 95:2
requested 48:25 55:23 95:4 111:12 131:12
require 27:23 32:9
required 18:18
requires 14:17
reread 66:21 69:6,7
Reserve 13:14 22:8
respect 9:9 28:13 31:2 44:24
respond 34:25
responded 66:16 67:3,20 110:3
response 93:13
responsibilities 28:4,10
responsibility 111:1
responsible 24:25 45:10
restriction 68:3 70:2
restricts 62:6
result 114:15
retain 51:19
retaliated 31:3
retaliates 47:11
retaliation 31:19 32:6 34:17 41:20 59:22 74:22 75:6,21, 25 76:18 77:22,25 78:4,7,11,17 79:2,8, 18,19
retaliatory 44:25 46:4

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

return 22:19 62:23
returned 22:18
 62:14 63:8 80:20
review 73:11 128:22
reviewed 73:9
 131:13
Rhonda 38:19 72:6
right-hand 93:8
risking 114:11
Robert 25:25 26:7
ROC 68:12 70:13
 93:13 95:3,5 120:8
 121:18
ROCS 64:9 80:1
 119:2 120:1
role 30:7
Ron 5:12 30:14
 68:14 70:15 71:3 80:2
 86:11,14,17,25 87:10
 97:6 98:15 105:2
 107:5 109:4 112:20,
 25 120:17
Ronald 4:22 63:10
room 25:7,8 27:22,
 24,25 28:2,9 30:2
 94:18 104:16,24
 105:2 114:24 115:2,
 22 116:25 127:3
rotation 22:23
rough 27:14
roughly 16:3 27:7
 97:19
Ruchi 4:23
rules 4:3 29:19 58:5
rumors 66:2 83:22

---

**S**

S.R. 89:1
safe 108:24 109:11
 110:14 113:15
salaried 56:8
salary 23:3
Sara 20:5
satisfaction/
dissatisfaction
 41:19
schedule 109:12
 112:7
scheduled 108:25
 109:14,15
scheduling 82:9
school 11:21,25
 12:4 21:21,25 22:6,7,
 11,16 23:12,19 24:9,
 11
seal 131:17
semantic 68:3 70:2
send 74:10
sends 128:21
sense 30:1 57:22
sentence 41:14,17
 44:11 45:6 46:2 49:23

54:8 55:6 57:7 60:20
 97:16,17,18 111:9
September 62:17
serial 128:5
series 37:21,25 38:5
 42:25
service 9:1
sessions 78:2
set 131:17
sets 31:9
sexual 17:15,19
 18:16,19 42:13 63:11
 68:14 70:15 75:21
 76:20 87:1 94:17
 107:4,7,15,18,19
 120:9,23 121:1,3,4,15
 122:9,25 123:6
sexually 107:1
 120:17
shabby 51:21 52:2
 53:9,10,11
shake 127:15
shakes 127:14
share 8:5 16:8
 78:11,17 86:10
shared 5:19 85:14
sheet 132:2
sheet(s) 130:12
shift 108:25 111:1,21
shook 128:16
short 79:20
shoulder 127:17
show 4:10 73:14
 95:15
side 11:10 119:19
sign 128:5 132:1
signature 88:1 93:9
 128:1,6 130:3
signed 88:6 124:2,5
 128:2 130:17
significant 59:14
similar 26:10
similarity 26:6
simply 19:24 32:19
Sindell 4:8,9,19,25
 5:2,4,7,10,11 9:21
 15:14 20:22 33:5,8,
 12,15,18,23 34:1,7,9
 35:2,6,10,14,23 36:15
 39:13 40:4 43:16
 52:6,8,12,17 61:10
 67:18 69:20 72:16
 79:6,20 80:22 83:16
 85:2,5 92:16 99:23
 100:21,25 101:5,9,14
 119:5
single 10:3
sit 30:24 32:23 82:7
situation 30:4 75:2
 78:15 79:15 81:12,16,
 19 84:15,21 95:12,15
 111:19 112:6,14

125:12
situations 47:18
 116:10 118:17 122:7
skin 116:4
skip 111:8
skipped 111:5
skipping 110:2
slowly 69:21
small 12:16
smiling 110:17
Smith 11:14
social 105:15 106:6
solicit 73:4
solicited 88:8 92:2,
 5,10
son 49:2
sound 73:17
Sounds 69:11
speak 31:9,10,21
 50:17,21 73:2 104:7
 109:3 117:22
speaking 6:12 54:22
 55:3,11,15 102:14
 103:4
special 56:14,15
specialist 49:1
specific 17:20 18:2
 46:11 47:18 49:4
 53:10 58:16 63:25
 64:4 68:11 70:11
 82:10 83:2,8 105:11
 109:15,22
specifically 17:16
 66:14 67:1,12 79:17
 81:17 84:14 91:18
 98:7 102:1 109:6
 117:5
spell 7:10,20 25:17
spelling 128:23
spent 11:7 24:2,6
Spicer 36:20,23,25
 40:21,22 77:21,24
 78:12 79:1,8,14
split 62:18,20
spoke 117:25
SS 131:4
staff 9:2,3 48:1 55:7,
 10 57:14
start 6:9,12,17 61:10
 99:11
started 14:18 15:6,9
 16:7,25 17:1 19:18,20
 74:4 86:3 122:8
starting 14:25 24:23
 59:10
state 7:7,16 12:7
 131:4,7,22
stated 90:6 96:13
statement 47:1
 48:12 53:21 54:4 59:3
 68:14 70:15 120:18

statements 42:13
 64:9 70:24
States 4:12
stay 56:5,11
staying 55:25
stays 115:23 116:3
stenotypy 131:10
Steve 5:11 36:11
 41:10 52:3,14 66:19
 69:12 100:23 117:11
stipend 23:2,19
stipulations 131:14
stop 54:21 97:10,11
 103:21,24 105:14
 107:17 122:10
stopped 55:3 105:13
 116:19
story 63:12 65:25
 119:20
strange 125:7
strictly 109:4
student 21:22 24:16
style 58:1
subject 18:24 54:17
 77:25
subjected 54:18
submit 130:10,12
Sue 20:9
suggested 106:24
suggesting 106:21
suggestion 126:10
summarize 123:11
supervision 27:23
supervisor 25:13,23
 29:21,22 30:2,6 34:17
 51:5
supervisors 27:21
supervisory 28:5,
 10
supporting 89:11
surgeons 102:17
surgery 25:2 28:3
surgical 20:16
surrounding 41:20
Susan 15:19 39:11
 89:2 90:17,18,24 91:6
sworn 4:4 33:4,19
 131:9

---

**T**

takes 47:12
taking 115:16
talk 64:12,17 74:14
 84:6 98:8 119:15,23
 126:12,14
talked 74:15 121:19
 123:8
talking 6:6 27:5,6
 30:12 38:11 42:24
 45:15,20 51:4 52:15
 76:7 81:19 82:25
 83:10 84:2 86:10

87:10 91:11 94:1
 96:13 102:3 113:24
 116:12,15,21 118:14
taps 127:17
team 27:22
technique 50:19
technological
 128:9
telephone 83:14
telling 34:19 74:21
 75:19,23 76:2 84:7
 104:25 109:8 110:25
 119:19
tells 49:24
tempting 6:7
tendency 12:16
terrified 125:19
test 12:25
testified 65:8 68:17
 70:18 75:25
testify 66:14 67:2,12
 131:9
testimony 64:15
 76:9 85:9 123:7 130:8
 131:12
thanked 128:16
theme 59:21
there'd 84:6
thing 3:9 39:20,25
 52:6 71:7 72:3,6 75:9
 82:10 87:2 100:18
 124:5 126:25 128:4
things 5:18 30:25
 32:9 50:8 53:19
 58:22,24 83:22 99:19
 106:18 107:18 119:24
thinking 81:24
thinks 101:3
thought 61:10 67:15
 79:3 87:6,13 112:4
 121:5
threatened 99:1
 105:21,22,23 111:17,
 23 112:2,3 125:19
threatening 111:10
 119:21 123:6
time 6:7 11:7 15:22
 16:14,25 17:8 21:24
 22:6 23:11,21 24:6
 25:3,5 27:13 30:10
 36:12 37:8 39:19
 48:25 55:23 57:23
 61:2 63:8 66:12,18,24
 67:5,9,22 71:25
 80:15,16 86:22 92:24
 94:8 96:3,5 102:8
 103:5,22,23 109:16
 111:12,24 112:2,23,
 25 113:2,8 115:19,20
 117:3 120:20 125:10,
 13,21,25 127:10,12
 131:13

---

**Elaine Costanzo, CRNA - March 19, 2019**
**Deposition**

timeline 58:24
times 35:9 48:7
57:16 59:4,14 114:20
today 4:15,19 5:13
6:25 8:6,21 61:2
107:9 108:5,8 128:16
told 33:20 51:7 55:12
56:13,20 64:24 65:4
66:14 67:1,11 71:11
74:10,24 75:8 76:18,
25 77:1,24 78:13
79:14 84:5,18 85:17
86:20 89:9 91:18,20
92:7,8,9 95:11 97:10
103:1,23 109:6
111:20 116:19 119:14
120:15,19 122:5,9
124:16,23,25 125:14
126:18 127:22,24
tones 47:25 48:4
top 39:5 88:1
topic 82:13
total 60:5
touched 127:10,11,
19
touching 127:21
tough 116:4
tour 56:1,6
trail 95:13
trained 21:23
training 17:13 18:17
22:15
transcribed 128:20
131:11
transcript 130:8
132:1
transpired 83:23
treat 51:24
treated 44:23 50:22,
24 51:1 61:21
treatment 41:21
51:21 52:2 53:9
54:10,18
true 48:16 95:18
102:11 103:10,17
114:1 123:8 130:8
131:11
truth 31:12,13,23
32:8,14,20 33:4 34:19
35:12,17 69:2 74:21
75:19,23,24 76:3,8,
10,19 131:9,10
truthful 36:5
truthfully 32:13
turn 87:22 88:11
89:25
two-year 98:8 99:6,
15 100:10 106:3
type 10:23 23:8
89:14 123:23 124:9,
10

typed 88:22 90:10
93:11,13,24 94:8 96:6
127:25
typewriting 131:11
typing 89:19 123:20

### U

U.S. 5:5,8
Uh-huh 10:20 12:15
98:11,13 103:18
um-hmm 12:17
umbrella 61:11
uncomfortable
85:18 86:4,5 102:7
104:15,22 105:1,15
116:19 117:6 122:7
125:11
uncommon 48:6
unconventional
50:18 58:2
undergoing 25:1
undergrad 12:7
understand 5:21,24
8:2,11 9:13 18:8
19:16 23:17 24:1,13
26:5 28:2 29:14 31:7,
14,24 32:2 33:5 36:25
37:21 46:14,17 47:2
62:3 68:18,19 70:20
72:24 76:9,10 84:9
107:21 116:5 120:14
124:7 125:4
understandably
12:17
understanding 8:6
26:12 37:20 41:25
73:19 122:24 126:5
understands 33:7,
21
understood 6:3
54:25 65:3 122:5
125:6 127:6
unequal 41:21
unit 20:16,20,21
United 4:12
University 12:7
13:14 22:8
unpack 120:13
unpleasant 87:12,
13
unsafe 111:11
untoward 113:22
unusual 81:10,21,25
82:2,5,13,14
unwarranted
103:20 127:21
upset 46:20 54:20
57:1,15 99:14 100:9
106:16,22 125:14
upsetting 31:1
usual 81:25

### V

VA 5:6,8 8:25 15:6,9,
12,25 16:1,12,25
17:14 18:15 19:2,11
25:25 26:7,15 27:1,4
28:19,22 29:20 30:5
31:16 37:22 40:24
60:6 61:3 62:15 82:11
91:9 96:1,22 97:25
99:14 100:10 117:4,
18,20 118:4,16 119:2
124:14 126:1
variations 18:23
vast 60:14,22
Vegas 115:24 116:3
Verb 38:19 72:7
versus 4:11
Veterans 8:7,23
15:20
vigilance 114:17
vindictive 44:25
46:3 57:14 58:9,13,
21,25 59:3
Virginia 11:14
vividly 102:13
voice 56:23,24

### W

wait 6:16 112:16,18
waited 52:10 112:10
waiting 82:7
walking 106:2
119:18
wanted 18:10 29:9
43:13 65:2,7,19,24
72:14 74:9,24 84:10,
15 125:4
wanting 44:23
127:10
watch 100:14
ways 35:13 46:8
week 23:18 49:14
97:19
week-and-a-half
16:3 17:11
weeks 112:8
weeks' 62:22
Western 13:14 22:8
WHEREOF 131:17
Wilkie 4:11
Wilson 20:9
withdraw 72:13
75:17
withdrawn 19:7
21:9 22:18 27:3 39:7,
9 63:14 66:3 73:23,24
89:13 107:14 122:17
123:10 125:22
witnessed 127:5

wondered 121:11
word 12:19 53:13
69:22 80:5 84:24 85:9
132:1
wording 102:2
words 64:11 65:5
66:17 67:5,21 106:9
119:11
work 14:3 15:1,3
20:17,19 21:10,24
22:5,6 23:18,25 25:5,
8 27:22 28:3,11,16,
18,21 44:7 58:3 62:8,
14 94:2 98:18 105:7,
12 109:17 111:2,11
113:5 117:20 124:21
126:2
worked 15:5 20:20
25:10 27:18 98:15
105:6,8 113:8
working 15:20 21:2
25:14 61:3 86:4
102:17 103:7,14
105:4,23 105:1
110:4 117:4 122:8
125:16
workplace 37:1,3
40:20 53:17,20 58:4
78:1 112:16
worried 32:5 76:13
worries 5:3
write 64:8 69:22
71:12 74:2 80:1 82:23
83:5,20 84:1 85:21
88:3 93:23 94:5
103:25 104:10 110:24
132:1
writing 84:12 104:20
121:18 124:4 131:10
written 38:4 42:25
96:17 104:17 119:1
wrong 47:10 112:12
113:21,23
wrote 68:12,13,15
70:13,14,16 71:2 80:2
93:19,24 112:1

### Y

year 12:2 15:5 27:7
44:12 61:18 63:3,4,5
96:8,10
year-and-a-half
44:12
years 10:14 19:24
27:6 96:14 97:19
98:15 99:3 102:3
104:1,25 107:6
116:15,18,24 120:8
121:21
yell 56:21
yelled 48:18 49:4,18
55:11,15,20,22

yelling 47:24,25
48:4,5 49:10

**ATTACHMENT B**

Ron Lisan

MEDICAL CENTER POLICY 003-003
March 1, 2016



**PLAINTIFF'S EXHIBIT**
**33** 5.F.
4.2.19 PSb

**Sexual Harassment Allegation Checklist**
(Alleged Harasser)

A copy of this checklist will be attached to the written report and submitted to the
Director, LSCVAMC through the EEO/Affirmative Employment Program Manager.

1. The employee occupies a position that is covered by the bargaining unit; he/she
was advised that he/she may request representation during the fact-finding process.

Not applicable_____ Initials _fdML____ Date 1/10/17

2. The alleged harasser has been interviewed and the information gathered is
included in the attached report.

Initials_____ Date_____

3. I have explained to the alleged harasser that counseling is available through the
Employee Assistance Program (EAP) to enable him/her to deal with the trauma caused
by the circumstances. I provided the telephone number to EAP. (1-216-791-3800 ext.
6818)

Initials _RM____ Date 1/12/2017

4. I have ordered the alleged harasser to cease any contact with the alleged victim
except that which is absolutely required for official business.

Initials _AM____ Date 1/10/17        Dr Lisan refused to initial
initials _____        1/20/17 - he was Made Aware that he was
                                    not to Aldr/or Elaine or
5. I have included my written report, along with the statements made by both parties,
witnesses, and if applicable, a VA Police report.        reside in the CRNA Lounge

Initials_____ Date_____        Initials ____ date 1/25/17
                                               Rhonda Vista Roc,
                                               + refused to initial 1600

6. For EEO Manager:

I have made a recommendation as to the Medical Center Director as to whether
an Administrative Investigation Board should be appointed.

Initials_____ Date_____



Jan. 12. 2017 11:33AM

EXHIBIT
**34** 5.F.
4.2-19 PSG

No. 0143 P. 13

| Department of Veterans Affairs | REPORT OF CONTACT |
|---|---|

NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.

| VA OFFICE | IDENTIFICATION NOS. (C,XC, SS, XSS, V, K, etc.) |
|---|---|
| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) Bonfili Karin | DATE OF CONTACT |
| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |
| PERSON CONTACTED Susan Raphaely | TYPE OF CONTACT (check one) ☐ PERSONAL ☐ TELEPHONE |
| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |
| PERSON WHO CONTACTED YOU | TYPE OF CONTACT (check one) ☐ PERSONAL ☐ TELEPHONE |
| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (include area code) |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN (Continue on page 2 if needed)

On Friday January 6, 2017 I was assigned to work with Dr. Lisan for the day. Throughout the day Dr. Lisan continued to make sexually oriented comments. For example, in the morning I stated that I was tired and wanted to go home and get back in my bed. His response was something about "sounds good to me, we can go now and get in your bed". Second example, on Thursday January 5th, 2017 I was trying to discuss the case that I was going to do with him on Friday January 6th, 2017. I reviewed everything I knew about the patient with him and said, "so are you leaving now", his response "unless you can make me a better offer". A few weeks prior I had asked, "do you have someone coming to relieve me to go home"? His response, "If I get you out, what are you going to do for me"? When I was reviewing the case with Dr. Lisan on Thrusday January 5th, 2017, another O.R. staff member happened to be present. After Dr. Lisan spoke with sexual undertones to me, and though in sexual comments he walked away when we were done discussing the case. The other O.R. staff member that was present asked me if I felt uncomfortable because he felt uncomfortable for me hearing how he spoke to me. Although, I cannot write this "verbatim", because I am trying to account for what has been occurring the last several weeks, I can tell you that I am not comfortable with this type of "sexual" talk at work.

Although Dr. Lisan has always made "sexually oriented" jokes, recently I feel that the level of the sexual talk has escalated and I feel extremely uncomfortable. I have not said anything in response, because I am so uncomfortable and uneasy when it is happening. I don't know how to respond & frequently I am caught off guard when he says it. I do not want to come to work feeling uncomfortable in the work place because we work together in a "team" care setting. I just want to work in a respectable and professional environment and not feel uneasy while being at work.

Karin Bonfili, MSN, CRNA
January 11, 2017

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|

VA FORM
SEP 1997 (R) **119**

Jan. 12. 2017 11:33AM                                          No. 0143   P. 15

| **Department of Veterans Affairs** | **REPORT OF CONTACT** |
|---|---|

*NOTE: As appropriate, ance this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C.XC, SS. XSS. V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|
| Foster, Jessica E | 01/04/2017 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT *(check one)* |
|---|---|
| Susan Raphaely | ☒ PERSONAL  ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED *(Include Area Code)* |
|---|---|
| Cleveland VA Medical Center | |

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT *(check one)* |
|---|---|
| | ☐ PERSONAL  ☐ TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU *(Include area code)* |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

On 1-4-2017 I was on call with Dr.Lisan and I stopped by his office to sign out to him at the end of my shift Dr.Lisan stated that he had two things to tell me and asked me to close the door to office. The first thing was that another physician was going to be covering his call overnight. The second part of the conversation started with "I am not trying to hit on you, ask you out or have sex with you, but I would." Dr.Lisan then proceeded to tell me that he saw similarities between my marriage and his, that I don't necessarily talk about my husband the same way as other people do, and that he wasted far to many years in his own unhappy marriage. I was completely appalled at the context of the conversation and it made me extremely uncomfortable. At this point, I responded by defending my husband and marriage trying to end the conversation as rapidly as possible. Then as I was leaving he stated again that another physician would be taking his call shift. I joking said if he didn't pass along that I was the CRNA on call then the following doctor would not be able to call me in. Dr. Lisan's response was "how much is it worth to you." I basically walked away at this point and let his office door close behind me. This is not the first time unsolicitated, inappropriate sexual comments/jokes have been made to me by Dr.Lisan. I just feel I need to come forward at this time because the current situation has made me feel extremely uncomfortable to be at work.

| DIVISION OR SECTION | EXECUTED BY *(Signature and title)* |
|---|---|

VA FORM
SEP 1907 (R)  **119**

| VA Department of Veterans Affairs | REPORT OF CONTACT |
|---|---|

*NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C,XC, 8S, XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT (check one) |
|---|---|
| | ☐ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT (check one) |
|---|---|
| Dr Susan Raphaely Chief Department of Anesthesia | ☐ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (Include area code) |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

Dr Lisan has said in the past many inappropriate things to me while we were working together almost the whole time I have worked in the Department of Anesthesia. The most recent thing I remember is when I was leaving for the day I said to him, "I'm going home" and his response was, "what time should I be over?". My response has always been to just look at him and not respond. I feel I have had a good working relationship with him but feel as though he has been struggling recently, he has seemed very distracted and not present while working. I have worried about his mental well being.

I am coming forward in light of recent events involving my peers whom I have a great amount of respect for. This type of behavior is not to be tolerated at any time in our professional work environment. This is particularly concerning as we are in a subordinate role in the operating room.

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|
| | Rhanda L. Verb CRNA |

VA FORM
SEP 1987 (R)   **119**

| **Department of Veterans Affairs** | **REPORT OF CONTACT** |
|---|---|

NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.

| VA OFFICE | IDENTIFICATION NOS. (C.XC. SS, XSS, V. K. etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|
| | Early 2015 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT (check one) |
|---|---|
| Susan Raphaely | ☒ PERSONAL    ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT (check one) |
|---|---|
| | ☐ PERSONAL    ☐ TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (Include area code) |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN (Continue on page 2 if needed)

In light of recent events involving my female colleagues, I have decided to report the following incidents as they pertain to Dr. Ron Lisan and his inappropriate comments of a sexual nature while caring for patients in the operating room. These two incidents occured roughly one week apart about two years ago when I first began my CRNA position at the Cleveland VA. Although I cannot specifically recall the exact wording of the comments, I remember very clearly feeling extremely uncomfortable and embarrassed by his comments at the time. During one of the incidents I vividly recall him speaking to me about his own male genitalia. As a brand new employee, I did not feel comfortable speaking to my colleagues or even reporting the incident to my chief at the time as I was not yet familiar with my environment or the people I was working with. I quickly put the incidents aside in the interest of providing excellent patient care while working alongside him. I now realize that the comments were seriously inappropriate and unwarranted and that they have caused some amount of distress in addition to making me feel awkward and uncomfortable while working with Dr. Lisan in a position of authority in the operating room.

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|
| Anesthesiology | SM Castenger |

VA FORM
SEP 1997 (R)  119

ATTACHMENT A

MEDICAL CENTER POLICY 003-003
March 1, 2016



PLAINTIFF'S
EXHIBIT
35 s.F
4-2-19 PSG

## Sexual Harassment Allegation Checklist
### (Alleged Victim)

A copy of this checklist will be attached to the written report and submitted to the Director, LSCVAMC through the EEO/Affirmative Employment Program Manager.

1.   The employee occupies a position that is covered by the bargaining unit; he/she was advised that he/she may request representation during the fact-finding process.

Not applicable_____ Initials_____ Date_____

2.   The alleged victim has been interviewed and the information gathered is included in the attached report.

Initials_____ Date_____

3.   During the interview, I notified the alleged victim of his/her right to utilize the EEO complaint process. I provided the telephone number to the Office of Resolution Management.  (1-888-737-3361)

Initials_____ Date_____

4.   I have explained to the alleged victim that counseling is available through the Employee Assistance Program (EAP) to enable him/her to deal with the trauma caused by the circumstances. I provided the telephone number to EAP. (1-216-791-3800 ext. 6818)

Initials_____ Date_____

5.   I have included my written report, along with the statements made by both parties, witnesses, and if applicable, a VA Police report.

Initials_____ Date_____

6.   For EEO Manager:

I have made a recommendation as to the Medical Center Director as to whether an Administrative Investigation Board should be appointed.

Initials_____ Date_____

PLAINTIFF'S
EXHIBIT
36  L. R.
4-3-19  AMF
PENGAD 800-631-6989

**Info**

| | |
|---|---|
| **From:** | Ronald Lisan <rxl7@case.edu> |
| **Sent:** | Sunday, October 1, 2017 11:08 PM |
| **To:** | Info; Rachel Sindell |
| **Subject:** | Fwd: FW: Oral Reply |

Contains LaShelle Reese telling me new EEO panel was being constituted (without Kafer) to review my case --- I have highlighted that paragraph below in red.

---------- Forwarded message ----------
From: **Lisan, Ronald M. (VHACLE)** <Ronald.Lisan@va.gov>
Date: Tue, May 2, 2017 at 9:01 AM
Subject: FW: Oral Reply
To: "ronald.lisan@case.edu" <ronald.lisan@case.edu>, "ronald.lisan@gmail.com" <ronald.lisan@gmail.com>

**From:** Reese, Leshelle L. (VHACLE)
**Sent:** Friday, April 28, 2017 12:36 PM
**To:** Lisan, Ronald M. (VHACLE)
**Subject:** RE: Oral Reply

Okay, I'll contact the union, see what works for them and we'll go from there.

**From:** Lisan, Ronald M. (VHACLE)
**Sent:** Friday, April 28, 2017 12:36 PM
**To:** Reese, Leshelle L. (VHACLE)
**Subject:** RE: Oral Reply

I am on-call this Sunday, so Monday would not be good. The rest of the week should be fine as far as I know.

1

**From:** Reese, Leshelle L. (VHACLE)
**Sent:** Friday, April 28, 2017 12:33 PM
**To:** Lisan, Ronald M. (VHACLE)
**Cc:** info@sindellattorneys.com; rachel@sindellattorneys.com
**Subject:** RE: Oral Reply

Okay, are there any days/times next week where you will not be available?

**From:** Lisan, Ronald M. (VHACLE)
**Sent:** Friday, April 28, 2017 12:30 PM
**To:** Reese, Leshelle L. (VHACLE)
**Cc:** info@sindellattorneys.com; rachel@sindellattorneys.com
**Subject:** RE: Oral Reply

Yes. I would like them present.

**From:** Reese, Leshelle L. (VHACLE)
**Sent:** Friday, April 28, 2017 11:57 AM
**To:** Lisan, Ronald M. (VHACLE)
**Subject:** RE: Oral Reply

Okay. I was just checking because I was told by HRMS that you were being represented by the union and not your attorney. Additionally, they denied your request to extend your oral reply with Dr. Altose any further. I do not have any bearing on that process. However, Ms. Freeman has agreed to reopen the sexual harassment case and pull together a new panel of investigators to review this case. I will remain a member of the panel, but Bruce Kafer will not. I will be contacting you next week to set up a time for your interview. Would you like your AFGE representative present? If so just let me know and I will work with them to schedule it.

**From:** Lisan, Ronald M. (VHACLE)
**Sent:** Friday, April 28, 2017 11:45 AM
**To:** Reese, Leshelle L. (VHACLE)
**Subject:** RE: Oral Reply

Dear Ms. Reese:

For the moment I switched to Union representation, because it seemed to be quicker that way to get ahold of my personnel file (which I only obtained last Friday in the afternoon).

I am planning to switch back to Mr. Sindell before the actual hearing date (whenever that is), but would like to have the Union Rep./steward available as well.

**From:** Reese, Leshelle L. (VHACLE)
**Sent:** Friday, April 28, 2017 10:19 AM
**To:** Lisan, Ronald M. (VHACLE)
**Subject:** Oral Reply

Hey Dr. Lisan,

I'm just checking are you still being represented by an attorney or are you now represented by the union.

Equal Employment Opportunity is more than complaints-it is the best way to a productive workplace.

# LeShelle Reese

Louis Stokes Cleveland VA Medical Center

Equal Employment Opportunity Specialist

EEO/Affirmative Employment Office (003)

3

**From:** Bruce Kafer, RN, MSN / Leshelle Reese, EEO Specialist

**Subject:** Report of Investigation into Allegations of Sexual Harassment:

CRNAs complaints against Ronald Lisan, MD

**Thru:** EEO Affirmative Employment Manager

Associate Medical Center Director

**Cc:** Susan Raphaely, MD, Chief, Anesthesiology

**To:** Medical Center Director



## INTRODUCTION

This report presents the findings of a sexual harassment investigation of allegations made by Certified Registered Nurse Anesthetists who alleged sexual harassment perpetrated by Ronald Lisan, MD. Following a review of written reports of contact and interviews of appropriate staff it was evident that sexually inappropriate behavior may had occurred by Dr. Lisan. However, the evidence in this case did not rise to the level of "sexual harassment" as defined in the VA policy. Despite the finding in this case corrective actions are being implemented to ensure all staff are trained in the Prevention of Sexual Harassment as well as the VA requirements for professional conduct.

## POLICY

It is the policy of the Louis Stokes Cleveland Veterans Affairs Medical Center (LSCVAMC) that sexual harassment is unacceptable conduct in the workplace and will not be tolerated. The policy applies to all employees and covers employees outside the workplace while conducting official business. This facility aims to provide a work environment free from sexual harassment, and in cases that so warrant, corrective action will be taken by appropriate management officials (MCP 003-003).

Furthermore, no employee will be subjected to harassment, a form of employment discrimination that violates Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, (ADEA), and the Americans with Disabilities Act of 1990, (ADA). All employees are entitled to a work environment in which they feel

free to raise concerns and are confident that those concerns will be addressed. Unwelcome harassing conduct will not be tolerated and immediate, appropriate action will be taken when management becomes aware of allegations per MCP 003-008.

### a. Factors

In determining a hostile work environment, the central inquiry is whether the conduct "unreasonably interfered with an individual's work performance" or created "an intimidating, hostile, or offensive working environment."

Determining unwelcome conduct when confronted with conflicting evidence as to whether conduct was welcome, the record as a whole will be reviewed and the totality of the circumstances, evaluating each situation on a case by case basis. The investigation should determine whether the complainant's conduct was consistent, or inconsistent, with his/her assertion that the sexual conduct, was unwelcome.

### b. Responsibilities

As required per Medical Center Policy 003-003, all parties involved have been advised of their responsibility regarding the prevention of sexual harassment in the workplace. When conduct perceived as sexual harassment occurs, it is incumbent on the recipient to verbally direct the perpetrator of the unwanted conduct to cease and desist the unwanted actions and then report the occurrence to the appropriate management official and also provide written documentation regarding the incident. Employees have annual training on the Prevention of Sexual Harassment.

### BACKGROUND

Ronald Lisan, MD, is an Anesthesiologist within Anesthesiology Service. His direct supervisor is Susan Raphaely, MD, Chief, Anesthesiology Service. Four Certified Registered Nurse Anesthetists (CRNA) alleged sexual harassment by Dr. Ronald Lisan, which occurred over an extended period of time. The CRNA's alleging sexual harassment complaints are as follows:

1. Karin Bonfili, CRNA
2. Jessica Foster, CRNA
3. Elaine Costanzo, CRNA
4. Rhonda Verb, CRNA

Reports of Contact were obtained from each complainant and direct interviews were conducted by Bruce Kafer, RN, and Leshelle Reese, EEO Specialist. Copies of the Reports of Contact were provided to Dr. Ronald Lisan by his direct supervisor. Dr. Lisan's attorney provided a response to the Reports of Contact denying the allegations of sexual harassment. Findings from the interviews will follow.

### INTERVIEW: Karen Bonfili, CRNA

Karen Bonfili, CRNA, was interviewed by Bruce Kafer and Leshelle Reese. Notable was her admission that she had refrained from verbally responding to Dr. Lisan's inappropriate sexual jokes which initially began as just him telling her sexual jokes. Karen Bonfili verbalized that she felt uncomfortable saying anything to Dr. Lisan because he was an attending anesthesiologist. Karen Bonfili wrote a report of contact on January 11, 2017, and expounded on what had been occurring. She also reported that Dr. Lisan had been observed licking the bottom of his shoe in an effort to demonstrate to others he was cured of any sickness.

Karen Bonfili stated the reason she was coming forward now was because it seemed Dr. Lisan had changed from general sexual jokes to comments that are more directed at her. Karen Bonfili's Report of Contact has examples of what Dr. Lisan had said to her. Following Karen Bonfili informing her supervisor and making her aware of what has been occurring, her supervisor subsequently provided the Reports of Contact to Dr. Lisan and also ordered Dr. Lisan to refrain from interacting with Karen Bonfili unless there was a relevant patient care issue to discuss with her. In addition, Dr. Raphaely began scheduling them separately so they would not be working together during the course of this review.

Violation of Supervisory Order

On March 8, 2017, Karen Bonfili reported an unwanted incident of touching to Bruce Kafer and Leshelle Reese. In addition, she informed her supervisor and completed a VA Police Report. Subsequently, a "cease and desist" letter was drafted and issued to Dr. Ronald Lisan. Dr. Lisan had been ordered to refrain from interacting with Karin Bonfili on any non-patient care issues. In addition to violating this order, Karin Bonfili alleges he touched her despite her verbal instructions to him to refrain from touching her. In addition, he refused to leave her assigned patient room and despite prompting from another physician he refused to leave and continued to attempt to interact with Karen Bonfili in an intimidating and threatening manner.

## INTERVIEW: Jessica Foster, CRNA

Jessica Foster, CRNA, informed Bruce Kafer and Leshelle Reese that on January 4, 2017, Dr. Lisan had made sexual references and also observed her marriage may be like his which resulted in divorce. Jessica Foster indicated she refrained from instructing Dr. Lisan to discontinue sexual topics as she felt uncomfortable in doing so.

## INTERVIEW: Elaine Constanzo, CRNA

Elaine Constanzo cited incidents that occurred in 2015 that she did not report at the time. She stated because she was a new employee she felt uncomfortable talking to others about these two incidents that occurred. In particular, she recalled one of the incidents from 2015 where Dr. Lisan began talking about his own male genitalia. Upon hearing this she put her hands over her ears and informed Dr. Lisan she wanted him to stop telling her. It is notable that he stopped interacting with her on the sexual subject matter and no further incidents were experienced by Elaine Constanzo.

## INTERVIEW: Rhonda Verb, CRNA

Ms. Rhonda Verb cites that Dr. Lisan has said many inappropriate things to her while working. She cited an example of her leaving for the day and informing Dr. Lisan. She stated Dr. Lisan responded by inquiring what time should he come over. She reported she said nothing in response to this sexual innuendo remark. She added this has

always been how she responds to his inappropriate remarks, which is to say nothing and just look at him.

## INTERVIEW: Ronald Lisan, MD

While Dr. Lisan's attorney had denied all allegations of sexual harassment on his client's behalf. It is appropriate to interview Dr. Lisan regarding the recent infraction of the supervisory order. Dr. Lisan stated that he did touch Karin Bonfili, with her permission. Dr. Lisan is adamant that Karin Bonfili gave him permission to touch her shoulder and states that during this same period, he became noticely upset and that Ms. Bonfili then placed her hands on his shoulder. It is obvious that both parties have two different perceptions of the incident. However, it is also obvious that Dr. Lisan did not follow the direct order to have no contact with the CRNA's.

## CONCLUSION

The Policy on the Prevention of Sexual Harassment underscores VA employees have the responsibility of bringing any instance or allegation of sexual harassment to the attention of their supervisor or appropriate management official. When the January 2017 reports were received there was an immediate fact finding process as well as instructions to Dr. Lisan to refrain from contacting the complainants, which he violated. As a result, a cease and desist letter was issued to him. Any further violations will result in appropriate disciplinary actions.

While the complainants have cited that Dr Lisan has engaged in sexually inappropriate jokes and commentary throughout the course of their employment, there is no indication that anyone informed him to stop with the exception of Elaine Constanzo after which he stopped.

In reviewing the totality of the case it fails to rise to the level of sexual harassment as defined in policy which was promulgated pursuant to Equal Opportunity Employment

law. However, it is clear sexually inappropriate behavior was occurring. Moreover, Dr. Lisan had violated the supervisory order. Ms. Bonfili reported the infraction appropriately and action was taken.

Feb. 7. 2017 6:31PM                                          No. 0253   P. 3



PLAINTIFF'S
EXHIBIT
**38** L. R.
4·3·19  DMF

| Department of Veterans Affairs | REPORT OF CONTACT |
|---|---|

*NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C,XC,SS. XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT *(check one)* ☐ PERSONAL  ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED *(Include Area Code)* |
|---|---|

| PERSON WHO CONTACTED YOU<br>Dr Susan Raphaely Chief Department of Anesthesia | TYPE OF CONTACT *(check one)* ☐ PERSONAL  ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU *(Include area code)* |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

Dr Lisan has said in the past many inappropriate things to me while we were working together almost the whole time I have worked in the Department of Anesthesia. The most recent thing I remember is when I was leaving for the day I said to him, "I'm going home" and his response was, "what time should I be over?". My response has always been to just look at him and not respond. I feel I have had a good working relationship with him but feel as though he has been struggling recently,he has seemed very distracted and not present while working. I have worried about his mental well being.
I am coming forward in light of recent events involving my peers whom I have a great amount of respect for. This type of behavior is not to be tolerated at any time in our professional work environment. This is particularly concerning as we are in a subordinate role in the operating room.

| DIVISION OR SECTION | EXECUTED BY *(Signature and title)*    CRNA |
|---|---|

VA FORM
SEP 1997 (R)  **119**

Rhonda L. Verb  CRNA

## Department of Veterans Affairs — REPORT OF CONTACT

NOTE: As appropriate, ance this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.

| VA OFFICE | IDENTIFICATION NOS. (C.XC. SS. XSS. V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type ar print) | DATE OF CONTACT |
|---|---|
| Foster, Jessica E | 01/04/2017 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT (check one) |
|---|---|
| Susan Raphaely | ☒ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |
|---|---|
| Cleveland VA Medical Center | |

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT (check une) |
|---|---|
| | ☐ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (Include area code) |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN (Continue on page 2 if needed)

On 1-4-2017 I was on call with Dr.Lisan and I stopped by his office to sign out to him at the end of my shift   Dr.Lisan stated that he had two things to tell me and asked me to close the door to office. The first thing was that another physician was going to be covering his call overnight. The second part of the conversation started with "I am not trying to hit on you, ask you out or have sex with you, but I would." Dr.Lisan then proceeded to tell me that he saw similarities between my marriage and his, that I don't necessarily talk about my husband the same way as other people do, and that he wasted far to many years in his own unhappy marriage. I was completely appalled at the context of the conversation and it made me extremely uncomfortable. At this point, I responded by defending my husband and marriage trying to end the conversation as rapidly as possible. Then as I was leaving he stated again that another physician would be taking his call shift. I joking said if he didn't pass along that I was tha CRNA on call then the following doctor would not be able to call me in. Dr. Lisan's response was "how much is it worth to you." I basically walked away at this point and let his office door close behind me. This is not the first time unsolicitated, inappropriate sexual comments/jokes have been made to me by Dr.Lisan. I just feel I need to come forward at this time because the current situation has made me feel extremely uncomfortable to be at work.

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|

VA FORM
SEP 1007 (R)   119

Jan. 12. 2017 11:33AM                                                                    No. 0143   P. 13

| **Department of Veterans Affairs** | **REPORT OF CONTACT** |
|---|---|

NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.

| VA OFFICE | IDENTIFICATION NOS. (C.XC, SS, XSS, V. K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|
| Bonfili Karin | |
| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |

| PERSON CONTACTED | TYPE OF CONTACT (check one) |
|---|---|
| Susan Raphaely | ☐ PERSONAL ☐ TELEPHONE |
| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT (check one) |
|---|---|
| | ☐ PERSONAL ☐ TELEPHONE |
| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (Include area code) |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN (Continue on page 2 if needed)

On Friday January 6, 2017 I was assigned to work with Dr. Lisan for the day. Throughout the day Dr. Lisan continued to make sexually oriented comments. For example, in the morning I stated that I was tired and wanted to go home and get back in my bed. His response was something about "sounds good to me, we can go now and get in your bed". Second example, on Thursday January 5th, 2017 I was trying to discuss the case that I was going to do with him on Friday January 6th, 2017. I reviewed everything I knew about the patient with him and said, "so are you leaving now", his response "unless you can make me a better offer". A few weeks prior I had asked, "do you have someone coming to relieve me to go home"? His response, "If I get you out, what are you going to do for me"? When I was reviewing the case with Dr. Lisan on Thrusday January 5th, 2017, another O.R. staff member happened to be present. After Dr. Lisan spoke with sexual undertones to me, and though in sexual comments he walked away when we were done discussing the case. The other O.R. staff member that was present asked me if I felt uncomfortable because he felt uncomfortable for me hearing how he spoke to me. Although, I cannot write this "verbatim", because I am trying to account for what has been occurring the last several weeks, I can tell you that I am not comfortable with this type of "sexual" talk at work.

Although Dr. Lisan has always made "sexually oriented" jokes, recently I feel that the level of the sexual talk has escalated and I feel extremely uncomfortable. I have not said anything in response, because I am so uncomfortable and uneasy when it is happening. I don't know how to respond & frequently I am caught off guard when he says it. I do not want to come to work feeling uncomfortable in the work place because we work together in a "team" care setting. I just want to work in a respectable and professional environment and not feel uneasy while being at work.

Karin Bonfili, MSN, CRNA
January 11, 2017

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|

VA FORM
SEP 1997 (R)  **119**

## Department of Veterans Affairs

# REPORT OF CONTACT

NOTE: *As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C,XC, SS, XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|
| | Early 2015 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
|---|---|

| PERSON CONTACTED<br>Susan Raphaely | TYPE OF CONTACT *(check one)*<br>[X] PERSONAL   [ ] TELEPHONE |
|---|---|

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED *(Include Area Code)* |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT *(check one)*<br>[ ] PERSONAL   [ ] TELEPHONE |
|---|---|

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU *(Include area code)* |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

In light of recent events involving my female colleagues, I have decided to report the following incidents as they pertain to Dr. Ron Lisan and his inappropriate comments of a sexual nature while caring for patients in the operating room. These two incidents occured roughly one week apart about two years ago when I first began my CRNA position at the Cleveland VA. Although I cannot specifically recall the exact wording of the comments, I remember very clearly feeling extremely uncomfortable and embarrassed by his comments at the time. During one of the incidents I vividly recall him speaking to me about his own male genitalia. As a brand new employee, I did not feel comfortable speaking to my colleagues or even reporting the incident to my chief at the time as I was not yet familiar with my environment or the people I was working with. I quickly put the incidents aside in the interest of providing excellent patient care while working alongside him. I now realize that the comments were seriously inappropriate and unwarranted and that they have caused some amount of distress in addition to making me feel awkward and uncomfortable while working with Dr. Lisan in a position of authority in the operating room.

| DIVISION OR SECTION | EXECUTED BY *(Signature and title)* |
|---|---|
| Anesthesiology | |

VA FORM
SEP 1997 (R)   119

**ATTACHMENT B**

Ron Lisan

**MEDICAL CENTER POLICY 003-003**
**March 1, 2016**



PLAINTIFF'S EXHIBIT 39 L.R. 4.3.19 OMF

**Sexual Harassment Allegation Checklist**
**(Alleged Harasser)**

A copy of this checklist will be attached to the written report and submitted to the
Director, LSCVAMC through the EEO/Affirmative Employment Program Manager.

1. The employee occupies a position that is covered by the bargaining unit; he/she
was advised that he/she may request representation during the fact-finding process.

Not applicable _____ Initials _PdL_ Date 1/10/17

2. The alleged harasser has been interviewed and the information gathered is
included in the attached report.

Initials_____ Date_____

3. I have explained to the alleged harasser that counseling is available through the
Employee Assistance Program (EAP) to enable him/her to deal with the trauma caused
by the circumstances. I provided the telephone number to EAP. (1-216-791-3800 ext.
6818)

Initials _RM_ Date _1/12/2017_

4. I have ordered the alleged harasser to cease any contact with the alleged victim
except that which is absolutely required for official business.

Initials _AM_ Date 1/10/17

initials _____  1/20/17 — Dr. Lisan refused to initial
Hr was Made Aware that he was
Not to Address Elaine or
reside in the CRNA Lounge

5. I have included my written report, along with the statements made by both parties,
witnesses, and if applicable, a VA Police report.

Initials_____ Date_____

Initials _____ date 1/25/17
Rhonda Verla Roc~
+refused to initial 1600

6. For EEO Manager:

I have made a recommendation as to the Medical Center Director as to whether
an Administrative Investigation Board should be appointed.

Initials_____ Date_____

MEDICAL CENTER POLICY 003-003

March 1, 2016

PLAINTIFF'S
EXHIBIT
40 L.R.
PENGAD 800-631-6989
4·3·19 DMF

## Sexual Harassment Allegation Checklist
### (Alleged Victim)

**A copy of this checklist will be attached to the written report and submitted to the Director, LSCVAMC through the EEO/Affirmative Employment Program Manager.**

1.   The employee occupies a position that is covered by the bargaining unit; he/she was advised that he/she may request representation during the fact-finding process.

Not applicable_____ Initials_____ Date_____

2.   The alleged victim has been interviewed and the information gathered is included in the attached report.

Initials_____ Date_____

3.   During the interview, I notified the alleged victim of his/her right to utilize the EEO complaint process. I provided the telephone number to the Office of Resolution Management. (1-888-737-3361)

Initials_____ Date_____

4.   I have explained to the alleged victim that counseling is available through the Employee Assistance Program (EAP) to enable him/her to deal with the trauma caused by the circumstances. I provided the telephone number to EAP. (1-216-791-3800 ext. 6818)

Initials_____ Date_____

5.   I have included my written report, along with the statements made by both parties, witnesses, and if applicable, a VA Police report.

Initials_____ Date_____

6.   For EEO Manager:

I have made a recommendation as to the Medical Center Director as to whether an Administrative Investigation Board should be appointed.

Initials_____ Date_____

PLAINTIFF'S
EXHIBIT
41   L.R.
4.3.19   DMF
PENGAD 800-631-6989

**Info**

| | |
|---|---|
| **From:** | Reese, Leshelle L. (VHACLE) <Leshelle.Reese@va.gov> |
| **Sent:** | Thursday, April 27, 2017 4:30 PM |
| **To:** | Lisan, Ronald M. (VHACLE) |
| **Cc:** | info@sindellattorneys.com; rachel@sindellattorneys.com; ronald.lisan@case.edu |
| **Subject:** | RE: Folow-Up on Yesterday's Conversation about EEO Interview & Correction/Amendment of EEO Report, and Proprosal of Suspension Against Me |

Thank you Dr. Lisan for your feedback. I will speak with my manager when she returns on Monday about your request below. Also, if you could provide me with your rebuttal to the allegations in writing so that I have it to include in our file it would really help. I will speak with HR about your request to postpone your oral reply with Dr. Altose. Due to the fact that you have an attorney, they may want a formal request in writing. I will let you know where we are with this by no later than cob May 1, 2017.

---

**From:** Lisan, Ronald M. (VHACLE)
**Sent:** Thursday, April 27, 2017 3:09 PM
**To:** Reese, Leshelle L. (VHACLE)
**Cc:** info@sindellattorneys.com; rachel@sindellattorneys.com; ronald.lisan@case.edu
**Subject:** Folow-Up on Yesterday's Conversation about EEO Interview & Correction/Amendment of EEO Report, and Proprosal of Suspension Against Me

Dear Ms. Reese,

Thank you once again for taking the time to speak with me yesterday. At the risk of repeating myself, I greatly appreciate talking to someone who is truly neutral and unbiased, evaluates both sides of the story, and tries to work things out amicably among parties. I also appreciate your confirming that all no-contact orders, no-CRNA office orders, etc. are null and void. Needless to say I am extremely disappointed (among other things) that none of the complainants will meet with me for a mediated resolution, despite the finding of no sexual harassment, etc.. As I mentioned, I am not surprised; I just view it a rather clear statement of fairness and moral character among the various parties involved.

I will, of course, follow your advice as to how to help protect myself by limiting interactions with the individuals involved until such time as they indicate a willingness to work things out, and taking the measures you advised as well.

**The main point I am writing about today is to ask you to directly request that HR and/or other responsible parties delay the date of my oral response with Dr. Altose to the suspension proposal levelled against me by Dr. Raphaely.**

I have written below a more detailed explanation of the rationale, but it basically comes down to this: **The EEO report in question (including the allegations made against me by the**

1

complainants in both their original and subsequent complaints) is being used by Dr. Raphaely as evidence of "inappropriate behavior" on my part – even though I was denied my right to be interviewed by the EEO and have my explanation of events and counter-claims included, let alone seriously considered, in the EEO report that was submitted.  (And, btw, Dr. Raphaely has never even bothered to hear, let alone consider, my counter-claims herself, either – not that it would matter much).

As I gather from your reaction yesterday, you were also rather surprised that I was never interviewed by Mr. Kafer about any of the complaints against me, except for the false VA Police report.  As I expressed to you as well, I am extremely troubled by the fact the Mr. Kafer was involved in any way at all, since he himself is a defendant in my EEO complaints.  My attorney and I requested that he recuse himself, but he adamantly refused, and Ms. Freeman declined to remove him as well.  Mr. Kafer did, however, become very hostile and inappropriate towards my attorney and me because we had asked him to be recused – and I think that in and of itself shows that he is not, and cannot be a neutral party in my case.

Further, I cannot possibly imagine how Mr. Kafer could have been considered an impartial 3rd party in these events in the first place, and why he was allowed to issue an official report against me that contains such incredibly biased and damaging comments against me, along the lines of (not necessarily an exact quote)  "nevertheless Dr. Lisan may have engaged in inappropriate behavior".  **Mr. Kafer has a very serious conflict-of-interest here**, as was clearly demonstrated by his behaviors and failure to interview me about all the relevant allegations – and yet "completed" a report nonetheless.

I therefore greatly appreciate the fact that you have agreed to take my statement on the allegations (and my counter-claims as well), and impartially and fairly assess them, and make changes/amendments/redo  the EEO report as indicated.  I seems you agree with me that doing anything less would unconscionable, and a failure of EEO officials to do their duty.

And, for the various reasons noted above, I would much prefer that you conduct the interviews yourself – in part because I have already discussed with you some of my responses (which will help save time), but also because I believe you are indeed a fair and impartial third party who will act appropriately at all times in these matters.

Since I obviously cannot be expected to "defend" conclusions from an EEO report that was incomplete and biased against me in the first place, and because said report is now subject to amendment, etc.,  it seems to me that having my suspension proposal hearing delayed until the process is actually appropriately completed is the only correct course to follow.
(To anticipate possible objections, having Dr. Raphaely – the primary defendant in my PPP / retaliation claims –be the person to determine my "inappropriate behavior" is simply ludicrous.  She should never have been allowed to judge any complaints against me. )

Not to mention that in any circumstance vague phrases such as "may have occurred" can be used as a meaningless basket phrase to made outrageous allegations about an issue for which there is no factual basis, e.g. (to deliberately be outrageous myself, in order to stress the point) "although we do not have any evidence that Dr. Jones' behavior meets any legal definition of armed robbery, assault or attempted murder, and even though we never obtained Dr. Jones' statements or reviewed his evidence, nevertheless Dr. Jones may still have engaged in inappropriate behavior."

Would any sane and rational person ever take that sort of statement seriously?
And yet, that is exactly what is being perpetrated against me.


Btw, if you want character references to support my claims that I would never have made the comments alleged – and that far worse comments are made in the OR every single day -- I can produce dozens of them.  To be quite blunt, pretty much nobody here believes the CRNAs' stories about what I said – except for Dr. Raphaely and the CRNAs themselves.  As I told you, almost everyone actually laughs – literally -- with incredulity when I tell them I had sexual harassment charges levelled against me.  I would hope that means something– and I invite you to come down here anytime and speak to the other CRNAs, PACU nurses, OR nurses, etc., so that my point will be clearly proven.


**So once again, I would greatly appreciate your contacting the appropriate individuals to have this matter taken care of ASAP.**
**Asking for such a clearly and legally justified delay in my hearing won't mean much coming from me – but  it will have a lot of weight and credence coming directly from you.  And if they ignore it anyway then, as you said about a certain individual yesterday, "it becomes his/her problem for not taking the appropriate action".**

Thank you again so much for your assistance, and your very insightful discussions and advice – it really does help, in many ways.

Sincerely,

Ron Lisan

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

On a secondary topic, not nearly as urgent right now:

As we also discussed, I am very troubled by the fact that even though I was cleared of all sexual harassment charges, and that you made clear to some of the CRNAs that their claims should never have been filed in the first place – and you made clear to ALL of the CRNAs that it was unreasonable for them to assume I knew something they had never told me, and that they should have spoken to me first before filing any complaints – **not a single one of them will agree to speak with me in mediation**.

As I noted, these are people who up until just a day or two before my complaints were filed against Dr. Raphaely were all pleasant, friendly (one even routinely touched my back/shoulder in an "intimate friends" style), and gave me – as you well know – absolutely **no indication whatsoever, at any time whatsoever**, that anything I said/did made them uncomfortable in any way.  And then, suddenly, they were inexplicably very inappropriate and uncivil towards me, frequently making rude and dismissive gestures when I said "hello" and/or passed them in the hallway, etc., etc..

It is clear to me that to have such behavior occur in all four cases, especially after what should have been easily de-escalated incidents, **very strongly suggests that these individuals were "fed" false, negative, and defamatory statements about me**.  I understand that all people respond to incidents differently, but to have **four separate CRNAs all change so drastically and suddenly would, I think, seem highly suspicious to any reasonable person**.

As one other separate issue to be addressed later as well:  I would suggest that the CRNAs who filed false or old complaints against me when they knew or should have known that their actions were grossly inappropriate and inconsistent with official policy  -- that they are the ones who are guilty of "inappropriate behavior, since all these issues could have – and should have – been handled quite differently from the get-go.  And yet they deliberately failed to do so, indicating obvious intent to cause possibly serious and permanent harm to me.

Once some of these other more urgent matters are resolved, I would like to find out from you if there is some way to have the CRNAs deliberately divisive and  destructive behaviors looked into and dealt with fairly, but seriously.

4

May 10, 2017 12:47PM

No 0372   P. 2



**PLAINTIFF'S
EXHIBIT
42** L. R.
4·3·19 DMF

## Department of
## Veterans Affairs

# Memorandum

Date:    March 9, 2017

From:    Chief, Anesthesiology Service

Subj:    Written Warning

To:    Ronald M. Lisan, MD, Anesthesiology Service

1.    I have learned of additional serious allegations that were made against you. I was advised that you may have engaged in additional conversations regarding allegations of inappropriate behavior of sexual nature involving female coworkers.

2.    The above-mentioned allegations are potentially serious. If true, they may likely constitute sexual harassment on your part. For this reason, you are hereby warned that such conduct will not be tolerated. While I am bringing these allegations to your attention at the present, be advised that they will be fully investigated.. In the meantime, I am placing you on notice that if these allegations are true, you must cease this offending behavior immediately. You were previously instructed to refrain from discussing this allegation with your coworkers. Specifically, you received those instructions on January 10, 2017, January 20, 2017, and January 23, 2017. Additionally, you are to refrain from discussing these allegations with your coworkers. Furthermore, you are not to have any personal contact at or outside of work with Nurse Anesthetists: Ms. Jessica Foster, Ms. Elaine Costanzo, Ms. Rhonda Verb and Ms. Karin Bonfili. You are still required to maintain interactions of professional nature, relating to patient care, with the above named individuals.

3.    If these allegations are not true, and an investigation exonerates you of these charges, you must still be aware of how your interactions with your coworkers are interpreted. Accordingly, you are strongly advised to make no statement, or take no action, which even suggests the remotest possibility of impropriety on your part.

4.    At this time, disciplinary action will not be imposed. As more is learned about the nature of these allegations, you will be advised as to your rights and responsibilities in this matter. Until then, if a personal, medical, or other situation is affecting your conduct on the job, this medical center has an employee assistance program that offers short-term counseling and referral. You may contact EAP Counselors, Dr. Erica Sharkansky or Dr. Diane Johnson, at (216) 791-3600, extension 6922. One of them will be happy to meet with you on a confidential basis.

4.    Should you have any questions regarding my expectations, please see me immediately.

Susan D. Raphaely, MD

Ronald M. Lisan, MD

VA FORM    2105
MAR 1989



**Info**

| | |
|---|---|
| **From:** | Ronald Lisan <ronald.lisan@gmail.com> |
| **Sent:** | Sunday, October 1, 2017 3:39 PM |
| **To:** | info@sindellattorneys.com |
| **Subject:** | Fwd: [EXTERNAL] Fwd: Written Response to EEO version 3.8 |

This is apparently the "official" response letter I sent to LaShelle Reese about the EEO complaints against me, and my claims of harassment, retaliation, etc. by Raphaely

---------- Forwarded message ----------
From: **Ronald Lisan** <ronald.lisan@gmail.com>
Date: Thu, May 11, 2017 at 1:13 PM
Subject: Re: [EXTERNAL] Fwd: Written Response to EEO version 3.8
To: "Reese, Leshelle L. (VHACLE)" <Leshelle.Reese@va.gov>, info@sindellattorneys.com,
rachel@sindellattorneys.com

As I recall, my attorney's letter was not particularly specific, and that is why I wanted to go through all the allegations point-by-point.

I believe my specific rebuttals will provide a convincing, logical, reasoned response to the complaints against me -- which should help the reviewers to understand the validity and strength of my case.

Also, as I recall, the initial letter was intended primarily as a basic statement, with the idea that more details were to be provided later on as requested.

Therefore, I appreciate your adding my letter to the file.

Sincerely,

Ronald Lisan

On Thu, May 11, 2017 at 10:46 AM, Reese, Leshelle L. (VHACLE) <Leshelle.Reese@va.gov> wrote:

Thank you Dr. Lisan,

1

I was not aware that your attorney had already provided a response on your behalf in a letter dated January 26, 2017 to our attorney Lisa Clark. I will attach your reply, along with the initial letter (from your attorney) to our administrative file.  Thank you.

**From:** Ronald Lisan [mailto:ronald.lisan@gmail.com]
**Sent:** Wednesday, May 10, 2017 6:22 PM
**To:** Reese, Leshelle L. (VHACLE); Ronald Lisan
**Subject:** [EXTERNAL] Fwd: Written Response to EEO version 3.8

Sorry, not quite done with the "polished" written response yet, but since I promised something by late this afternoon, I've sent what I have so far.

It needs a lot of editing (among other things to remove some of the repetition, since I wrote each section separately) -- and I will try to get that done tomorrow if I can.

Perhaps more importantly, I want to add a disclaimer here that I will need to re-read and edit carefully some of the clear fact vs. strong evidence vs. opinion statements.

For example, I will probably add "in my/our opinion" or the like in various places to indicate things are not factually proven statements (unless indicated otherwise) -- so please take that into account when reading this

I do not wish to be in the category of those who state as indisputable fact things that are only strong suspicions or opinions.  So, I will try to refine this over the next few days...

I also forgot to point out that I've heard from various sources that JF's main complaint was actually about the marriage discussion, and that apparently the other issues were not really what she was objecting to -- so I will add that in the appropriate place later.

Thank you again,

Ron Lisan

2

---------- Forwarded message ----------
From: **Ronald Lisan** <ronald.lisan@gmail.com>
Date: Wed, May 10, 2017 at 4:46 PM
Subject: Written Response to EEO version 3.8
To: Ronald Lisan <ronald.lisan@gmail.com>, ronald.lisan@case.edu

Dear Ms. Reese:


Thank you very much once again for your assistance, and I greatly appreciate your taking the time and effort to conduct the interview with me about all of the complaints lodged against me, about which I had not been previously interviewed by the EEO.


I have included below, as requested, my written responses to the various allegations against me.

I apologize for the length of this message, but as you know there are many allegations to which it seems I need to respond; if I happen to have omitted any issues that you feel might be of significance, please let me know and I will respond to those in detail as well


Before getting into each of the CRNA complaints individually, I would like to add a few general statements here:


First, I strongly deny that I have, at any time, harassed or otherwise engaged in inappropriate behavior with any of the complainants (or anyone else).  As you know, each of the complainants has essentially admitted in her own written report that she failed to ever make me aware of any concerns she had, contrary to VA policy / EEO law, etc..  **Therefore each of them was self-evidently and by definition NOT harassment, and should never have been treated as such.**



Yet all of these complaints appeared "out of nowhere" -- and all within a short span of time after I filed formal complaints against my chairperson, Dr. Raphaely, who knew she was a defendant -- but nevertheless refused to recuse herself, which is in and of itself actual impropriety, let alone "even the appearance of impropriety", which is prohibited.

In fact, I have never before in my entire life ever been accused of sexual (or any other) harassment of any kind -- and essentially every single person whom I have told about being charged with sexual harassment literally laughs out loud, and responds that they know the very idea of that is preposterous.

Which leads me  to the extremely important piece of background information in whose light all of these events need to be examined:

Namely, we assert these harassment complaints, etc., and the inappropriate fashion in which they were handled etc.,  are a direct part of Dr. Raphaely's reprisals against me for having  previously filed formal complaints against her for sex-discrimination, disability discrimination, and what amounts to creation of a hostile work environment, etc..  Furthermore, among other events, my reasonable accommodation meeting was cancelled abruptly, without explanation, during that period as well.

I have several other instances that clearly demonstrate Dr. Raphaely's discrimination, disparate behavior & reprisal against me, and I will provide more written details if you request.

But suffice it to say, it is clear to any reasonable person that the evidence, occurrences, etc., point to the CRNA reports as being part of Dr. Raphaely's reprisal against me.

I am not sure how to state this delicately, but after the four CRNAs filed complaints against me, I was informed by multiple CRNAs and others that  all four complainants are considered by many of their colleagues to be  "close associates" of Dr. Raphaely; I explained this more in my oral response, and as I said then, I had no personal knowledge of this beforehand, but it was told to me by multiple sources.

**My point here is that the ONLY complainants against me (ever) are all closely associated with Dr. Raphaely and her agendas, and only spoke out AFTER I had filed complaints against Dr. Raphaely -- and therefore the nature and timing of their complaints are highly suggestive of reprisal and need to be examined very carefully with that consideration.**

Also please keep in mind that **every single complaint against me was processed through and/or initiated by Dr. Raphaely**, who despite being a defendant in my EEO complaints, has refused to recuse herself.

4

Please further note that it appears in multiple instances Dr. Raphaely failed to follow policy and/or perform her legal duty with regard to the handling of these complaints.

As just one glaring example, **Dr. Raphaely has never included my side of the story in any of her reports**, and in fact failed to even ask for my input in most of the cases!

That is clearly a serious breach of Dr. Raphaely's duty as my supervisor and supposed "neutral referee" (as she claims) of the allegations filed against me.

In other words, this alone is evidence of her intentional malfeasance.

Such behavior -- and others I can get into if you wish -- clearly make my case that all the reports are being used by Dr. Raphaley as part and parcel of her retaliation against me, and her attempts to force me out of the department.

I will also note that, do to their failure to stop Dr. Raphaely's reprisals against me, we have named Dr. Altose and Ms. Fuehrer in my EEO complaints -- as well as Mr. Bruce Kafer for being part of the inappropriate handling of my reasonable accommodation complaint, including the abrupt cancelling of my reasonable accommodation meeting without explanation, not allowing me to explain what our specific requests were (especially since the no-call was denied -- we believe unlawfully), etc., etc..

Therefore I want to emphasize that I strongly object to Mr. Kafer's involvement in my case, including using in his EEO report the phrases, "it is clear that sexually inappropriate behavior was occurring", that "it was evident that sexually inappropriate behavior may had [sic] occurred by Dr. Lisan, and "Dr. Lisan had violated the supervisory order".

Mr. Kafer's comments were completely unacceptable and inappropriate, since:

1) When my attorney and I asked him to recuse himself because he is a defendant in my EEO complaint, he refused and became very inappropriate & belligerent with Mr. Sindell and with me;

he refused to allow me to record the interview, which I said I wanted to do "for my own protection".

2) Mr. Kafer unlawfully told my lawyer (who was on speakerphone due to the very short notice I was afforded of this interview) to "shut up" and that he had no right to speak -- even though Mr. Sindell and I both identified him to Mr. Kafer as the attorney representing me.

3) Mr. Kafer interviewed me about what I consider the false VA Police report filed against me by Ms. Bonfili -- even though it is implied in Ms. Bonfili's report that Mr. Kafer is the person who directed her to VA Police in the first place.

Furthermore, his reporting of my responses to the police report was incomplete, and left out some very significant (and exculpatory) evidence, which I intend to include below (and which I explained during my interview with Ms. Reese).

4) Mr. Kafer failed, as was his duty, to interview me about any of the other complaints filed against me --and yet completed his report anyway.

5) **Despite the finding of no sexual harassment**, Dr. Raphaely then proceeded to use Mr. Kafer's "inappropriate behavior" comments as a weapon against me in her (retaliatory) suspension proposal.

My attorneys and I contend that this was inexcusable behavior on Mr. Kafer's part, and makes it quite clear that his conclusions were highly biased against me -- which in our opinion also reflects badly on the way that EEO complaints are handled here at the Cleveland VA.

(And once again, I appreciate the fact that Ms. Reese & Ms. Freeman are giving me the opportunity to respond; nonetheless, I hope you will understand that the "bitter taste" still remains for now, until all of this is resolved).

Once all the sexual harassment charges were dropped, and all the CRNAs notified of the results and the reasons why their complaints were invalid, I offered through Ms. Reese to speak with each of them -- with a neutral mediator -- to try and resolve our differences, and get back to a normal working environment.

Every single one of the CRNAs has refused my offer -- and every single one of them continues to behave in a grossly inappropriate, unprofessional and uncivil manner towards me, just as they were doing before they were told their allegations were dismissed. Specifically, except on rare occasions they will not acknowledge my presence in the hallway or even the OR, despite my attempts to be polite.  When I have thanked them for giving a break in my room, etc., I am met with either turning away & silence, or a "grunt" or a sarcastic smile as a response -- or in one case even throwing a blood pressure cuff at me, over a patient lying in his cart, without any other word spoken.

THAT is the sort of behavior to which I refer when I speak of the CRNAs acting in unprofessional and uncivil fashion (not just that they "don't say hello" to me in the hallway, as falsely alleged).

I submit to you that these behaviors by themselves reveal most of what one needs to know about the allegations involved, especially since every single one of the complainants and I were previously on very friendly terms --.UNTIL I filed my complaints against Dr. Raphaely.

I will note here that I have many, many colleagues who say they will gladly testify that I would never say such things as I was accused of saying -- and I will be happy to provide names if you wish.

Finally, I have multiple witnesses who say they will testify to the fact that not only are much "worse" comments than what I am accused of made all the time in the OR, and that all of the CRNAs are exposed daily to such comments and worse -- yet to the best of our knowledge they have never complained about anyone else's behavior.

Furthermore, I have multiple witnesses who say they will testify to the fact that at least three of the four CRNAs routinely engage in such banter themselves -- putting a lie to their statements that they are "uncomfortable" with such comments-- contrary to their claims of being uncomfortable with such remarks.

I will now address the CRNA reports of contact (ROCs) in more detail below.

For clarity, I will add here that, throughout this document (and other similar/related communications), when I put quotation marks around a person's statement, it is intended to denote a very close approximation of that person's words, but not necessary an exact, verbatim quote (unless I have indicated that it is verbatim).

One last comment:  As I will explain below, **though I have never engaged in inappropriate conduct, I contend that several of the CRNAs are the ones who have in fact engaged in inappropriate behavior themselves  -- behavior that was directed against me.**

**For example, since all four CRNAs had supposedly completed TMS training on sexual harassment, they knew or should have known that they had a responsibility to speak with me first before filing any complaints, and that their complaints -- even if true (which they are not) -- did not constitute sexual harassment in the first place, and therefore should never have been filed.**

**Therefore I contend that the four complainants have themselves engaged in clearly inappropriate behavior, and have essentially made false sexual harassment allegations against me.**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\* \* \* \* \* \* \*

Rhonda Verb:

First some important background information relevant to Rhonda Verb's (RV) ROC:

First, please be aware that RV has often been grossly inappropriate to me and others by threatening violence against us with comments such as:  "I can hurt you.  With my military background I know how to do that.  I can punch you in the larynx"!

8

Perhaps she thinks that threatening to use lethal force is a "joke", but many others would disagree.

I have actually had to talk at least two people out of filing ROCs against her for those comments, and on several other occasions I simply suggested people "not take her seriously"  and let it go.

So Rhonda's definition of what is appropriate or not to say to others appears to be widely divergent from what most other people believe.

More importantly, I was told by Dr. Shah that not long before RV filed her complaint against me, she had approached him asking about my mental health, and telling him I was having OCD symptoms, wore gloves all the time, and was afraid to touch things, etc.

That statement (and similar statements in the ROC itself) was grossly false, as will be testified to by many people in the OR, and by the fact that RV herself saw me lick my shoe as proof contrary.  Furthermore, it seems to me those comments may actually be defamatory, since they were clearly intended to raise questions about my mental health in the minds of my colleagues.

One must ask oneself -- especially in light of what occurred afterward, and what I have noted above -- why would RV say such things?  Where would she get those notions, when she had seen with her own eyes that it was not true?

Regarding Ms. Verb's ROC, I will note the following:

First, **nowhere in the ROC is there any reference whatsoever to any time frame**.  That is because the "most recent thing" RV referred to occurred approximately one year before the ROC was filed!

She complains of "many inappropriate things" -- but gives no examples whatsoever.  The only example she provides is the "what time should I be over" remark.

**RV conveniently leaves out the entire context of the conversation** (why?), which actually ran along these lines:

RV:  OK Dr. Lisan, I'll be going home shortly.

RL:  Anything good planned for the weekend?

RV:  Well, I have to set up tonight for the party I'm having; I've invited [so-and-so and so-and-so, etc] over to my house.

RL: Sounds like fun -- when can I come over?

RV: Sorry, it's a girls-only party

RL:  Oh well.

That was the entire extent of the conversation. How is that in any way, even remotely, a sexual comment, let alone a sexually harassing comment?

Then why did she report this as such?

RV also makes clear that she never made me aware that anything I said or did made her uncomfortable in any way.  Just giving a "blank stare" is clearly not an adequate response by any reasonable person's definition.

Furthermore, why was RV commenting about my mental health -- when everyone else in the OR has noted how amazingly better I have been seen I came back from therapy.

Furthermore, Dr. Sunil Shah told me that RV had come to him to question my mental health and claim that I was wearing gloves all the time and would not touch anything -- which is demonstrably false! (and why I had to occasionally lick my shoe in front of others to put aside any doubts that were being cast by the defamatory statements of some of my colleagues.

Not many days afterward, Dr. Shah came to me in the afternoon to inform me that RV had accused me of "not adequately supervising" a 2nd-year CRNA student with whom I was working.  To be very brief, Dr. Shah & I together went into the OR to discuss the matter with RV.  Then, not long afterward, I stopped by in the room to wish the student a good afternoon -- and found that RV had left him completely alone -- which is the exact thing she considered "inappropriate" for me to do!

I believe all of this was done deliberately, as part of a campaign to question my mental health  & smear my reputation among the OR staff.

**I therefore submit to you that Rhonda Verb was the one who engaged in inappropriate behavior by filing this ROC against me, knowing full well that her allegations were not even remotely close to being harassment of any kind, and that she was engaging in disability discrimination against me.**

Further note that the ROC was not even remotely close to being filled out properly. It is important then, to be aware of the events that preceded Dr. Raphaely giving me that ROC on Jan. 23rd, 2017:

Dr. Raphaely called me about 15:40 on January 23rd to ask when I was leaving.  I told her in a few minutes, and wanted to know why she asked.  She replied that she had yet another ROC to present to me (from RV), but Dr. Raphaely said she would do it the next day.  I told her I would stay to receive it, but she still wanted to give it to me the next morning, or just put it in my mailbox.

After some back and forth, I insisted that I was going to stay to receive the ROC, because I wanted to send a copy to my lawyers ASAP.

Dr. Raphaely responded "OK, I'll make a quick copy and be over to your office in five minutes".

Ten minutes later I called her back, and she said "I'll be right over".

**Not until after 16:05 (a full 25 minutes later!) did Dr. Raphaely come to my office and hand me the grossly incomplete form that you have as evidence.**

Clearly, any reasonable person would conclude that there was something highly unusual occurring if it took 25 minutes to "make a quick copy" of what was supposed to be a fully-completed ROC.

Finally, I want to state unequivocally that RV's behavior toward me after she filed her ROC has been rude, unprofessional, "conduct unbecoming", and in at least one case put patient safety at risk (she is the one who threw the blood pressure cuff at me).  I will provide details and examples if you request -- **but again, she is the one engaging in inappropriate behavior.**

*****************************************************************************************
**************************************

Elaine Costanzo (EC):

I think it is self-evident from  what is written in EC's ROC itself that this report should NEVER have been brought in the first place, and that EC knew or should have known that there was no harassment of any kind that had occurred.

The comments, which she admits she doesn't even remember, occurred two years ago, but somehow she "vividly recalls" that I described my genitalia (all I can say is I never have nor ever would describe my own genitalia, especially not in the OR!). The she "quickly put the incidents aside".   I have no recollection whatsoever of EC ever "putting her hands on her ears" and telling me to stop doing/saying anything -- that would be a rather dramatic gesture that I wouldn't forget.  Apparently she had no recollection of doing that that either when she filed the ROC, but suddenly recalled it at the time of her interview...

**Yet somehow, EC didn't realize how inappropriate the comments were at the time** -- and even though **there were no incidents between us for two years --**  she suddenly realizes two years later "how inappropriate the comment were", and decided to file an ROC & EEO complaint (which cannot be done > 45 days after the occurrence = it was invalid from the start) -- **after consulting with Dr. Raphaely and Jessica Foster** (and ? other of her  "female colleagues" who apparently egged her on)!

And all this just shortly after Dr. Raphaely's was aware of my formal complaints against her.

Any reasonable person would have to concluded that EC decided to file (an invalid) complaint 2 years after the fact only **because she was solicited to do so by Dr. Raphaely** -- who failed in her duty as chairperson and neutral party to reject a complaint not even remotely close to the allowed time limits = more evidence of reprisal.

12

I to be specific, on the day of ECs complaint against me, Dr. Raphaely paged Jessica Foster (JF) overhead (she was in an OR); just a few minutes later, Dr. Raphaely paged EC overhead. EC was then unavailable to do a case with Dr. Moss because she was "meeting with Dr. Raphaely". Not long afterward, as I was walking to the locker rooms, I saw JF and EC in the CRNA office. Even though they were the only two people in the office, they were leaning close together, glancing around, and speaking in "conspiratorial" tones (for lack of a better word).

Perhaps one hour after that, Dr. Raphaely called me to tell me about an ROC just filed by EC.

Needless to say that in light of all the other events, it is clear that EC was intentionally solicited into **filing a harassment complaint against me which she knew or should have known was false** -- and which indicates that, apart from criteria already noted, **EC is the one who engaged in inappropriate behavior by filing such a report.**

As to ECs ROC of March 8, 2017 -- this is even more outrageous.

Despite the fact that EC's original ROC was self-evidently NOT harassment, Dr. Raphaely nevertheless instructed me to have no contact with EC except for official business and patient care, etc.

**EC states clearly -- more than once -- in her March 8 ROC that I contacted her because of my concerns about patient safety!  How is patient safety NOT "patient care"?**

In fact I specifically told EC that our chief CRNA Bob Bearss, had said to me that since she and I were not on speaking terms (due to ECs unprofessional behavior), he strongly felt that we could not provide safe patient care, and should not work together (and other CRNAs agreed with his assessment). Bob therefore told me he would make sure I was not scheduled to be on-call with any of them, and so I didn't check the schedule until the night before to see with whom I would be working. Unfortunately, I found out Bob had overlooked that particular day, and I was supposed to be on-call with EC.

I never noticed her "passing me in the hallway" as she claims -- and I have multiple CRNAs (including as I recall Mark Myers, Andrea Huff, Tom McMaster and Adam Wilson), who were present, who heard me ask where EC was, who themselves told me that she had already left -- and

from whom I obtained EC's number so I could call her and try to work things out in a professional manner.

When I expressed my patient safety concerns to EC, she became very offended, and took them as a personal affront (even though I explained carefully to her that it was not an affront, merely a concern for patient welfare).

ECs statement that I demanded she switch her call is completely false. I asked her if she could, and she replied she could not due to child care responsibilities. I told her that as a parent I completely understood, and that I would try to switch my call. At this she became even more offended, and insisted we could work together just fine (as it is clear from previous and subsequent actions by EC, clearly we could not), and that I didn't need to switch my call. I finally told her that I would take her word, and I agreed to be on-call with her and see how things worked out.

You may ask Laurie Frankito CRNA as to what EC (and others) were saying about me in the CRNA lounge on the night of that call -- but eventually Laurie told me she would take the call instead 1) for my protection and 2) because "I just want to get EC out of here!"

**I am also almost at a loss of words for how to reply to EC's comments that my talking to her about patient safety concerns caused her to feel that: "his contact with me felt threatening and I have a real feeling that my work environment is unsafe..."!**

**She felt unsafe?  She was the one who filed a false harassment complaint against me!   And then filed an ROC against me for discussing patient safety!**

Is there any further proof needed of the fact that we could not possibly have provided safe patient care together, and that her responses/behaviors to me show that she was the one engaging in inappropriate behavior...

**Except that EC filed a VA Police complaint against me, again claiming to feel unsafe because I talked to her about patient care; and she again repeated her lies about my demanding she change her call.** To repeat -- I immediately volunteered to change my call instead, at which point EC became even more offended.

I do not know what else to say except:  It is outrageous and grossly inappropriate for a CRNA to file a police report because a physician suggested that they could not provide safe patient care due to interpersonal issues.

And, I hope needless to say, EC's actions proved my point 100% -- and showed again that she is the one engaging in grossly inappropriate behavior.

**********************************************************************************
******************************

Karin Bonfili (KB):

As to Karin Bonfili's complaint(s), there is significant background information of which you need to be aware, in order to put her comments and actions into proper perspective.

First, please note that Karin's behavior towards me had always been extremely friendly.

For example, Karin give me a hug when I returned from my FMLA.  She also frequently put her hand on my shoulder in a "close-friends" manner, including several times in the few days before the alleged incident occurred.  **It is impossible to imagine that someone who was being sexually harassed or made uncomfortable would repeatedly engage in the sorts of gestures and actions with the alleged harasser as Karin did with me.**

Furthermore, Karin admits she **never** made me aware of any issues or concerns before she filed her ROC.

As another example, when I came back to work after my father's death (and was still within the official Jewish mourning period), Karin immediately came up to me and gave me a big hug.  Then Erica O'Mallley RN came over, and joined the hug.

Karin said "Dr. Lisan, I bet you didn't expect a 'threesome' when you got back!"

**First, this clearly indicates Karin's level of acceptance -- and engagement in -- sexually oriented and/or double-entendre jokes, which, according to a number of individuals besides me, is fairly common for her.**  Therefore her claim of being uncomfortable with such talk is clearly at odds with her behavior.

Second, I thought that under the circumstances her comment was a grossly inappropriate thing to say; but since I thought she was my "friend" and meant well, I didn't bring it up at the time.

I did, however, notice at least two occurrences this past January that struck me as very odd.

Just a day or so before the alleged incident, I was in the PACU, and couldn't find my pen.  Karin reached out her pen and said "here, use mine".

Then, she abruptly pulled back the pen, and with a bit of a snarky smile said "wait, can you touch my pen?"

Given the fact that Karin knew full well that I had suffered from severe OCD and depression, and that she had seen me "lick my shoe" as proof of my recovery, her remark was extremely inappropriate, demeaning, belittling, humiliating and in fact defamatory, since others in the PACU could hear it.

I said nothing as I assumed (wrongly, as it turns out) that she was my "friend" and wouldn't deliberately try to hurt me.

**Nevertheless, I was stunned that Karin would have said that, and started to wonder who had put such an idea in her head -- i.e. I began to think that perhaps someone was trying to defame me, and spread false rumors about my mental health.**

On Jan. 6th, as we were about to start the anesthetic induction, I noticed that the anesthesia machine check-out had not been completed; this is an essential safety feature for which the CRNA is responsible during his/her morning set-up and safety check.

This was the third consecutive time I had worked with Karin and found the machine check to be incomplete.  I could have filed an ROC about, but I felt that first I should make her aware of the issue, so I politely pointed out that she had recently not been completing her machine checks in the morning -- and it was clear she was irked by my comment.

16

A short time later, as we were starting the case, Karin said to me "Dr. Lisan, why don't you trust me doing Anesthesia anymore?"

Once again, I was completely taken aback, since she is one of the very best CRNAs with whom I have ever worked, and I trusted her completely (at least back then) to do any case with me at any time -- which for me is saying quite a lot.

I expressed my surprise at her question, and she replied "we've worked together for almost 3 years, and it seems you don't trust me as much as you used to."

Again, I was nearly speechless, and tried to explain to her that her assumption was completely the opposite of the way I felt about her abilities.

I was so surprised by her comments, that I mentioned Karin's questions to Dr. Moss -- who immediately replied that he thought Dr. Raphaely was trying to turn people against me in her attempt to force me out of the anesthesia department, as she has done to others.

As to the specifics of Karin Bonfili's ROC:

I have never asked any CRNA, etc. to go to bed with me.  That is outrageous and defamatory.  In fact, the conversation between me (RL) and KB went like this (almost verbatim):

KB: Dr. Lisan, I'm having a bad day today.  Can I just go home, go to bed, and start over again?

RL: Sure -- if you take me with you.  I want to go to home, go to bed, and start over again too.

She was apparently so "offended" by my remark, that several hours later she asked the same thing:

KB: Dr. Lisan, I'm still having a bad day, and I'm tired.  I still want to just go home, go to bed, and start over again; can I?

RL:  Same offer applies -- if you take me with you.  I'm really tired now too, and I need to go home and take a nap.

As to the comment when I was signing out at the end of my workday:

KB:  Dr. Lisan, are you leaving now?

RL:  I am really tired and want to go home.  So unless I get a much better offer -- yes, I am going home and taking a nap.

As to KB's reference to her asking about someone coming to relieve her at 15:00, the conversation went approximately like this:

KB: Is someone going to relieve me at 3 o'clock?

RL:  It depends -- how much is it worth to you?

That is clearly a joke, and I use that line frequently in or out of the OR, at work or socially, with males and females.  If anyone asks "what do you mean?" I have one stock reply:

"I don't know what you're thinking about, but I'm talking about food or money...especially food!"  (It is rather well-known that I have a large appetite.)

In other words, that is in no way a sexually-oriented comment, nor were the others -- unless the other individual was intent on interpreting them as such (consciously or unconsciously) for their own purposes, .

To summarize: **None of the comments above are sexually oriented or harassing conversation by any reasonable or rational definition of that term.**

Which brings me to KBs other allegation:  That when she was discussing the next day's cases with me on Jan. 5th, I made sexually oriented remarks to her.  I have no recollection or even idea as to what comments she is referring, and based on her ROC written statement, apparently neither does she.

But, given what KB defines as "sexually oriented" or harassing in her other examples, I presume it could refer to almost anything at all that I said or did.

Importantly, note that KB's initial ROC dated Jan. 11, 2017 is not correctly filled out -- **and is not even signed**, making it legally null and void (and therefore the "no-contact" order as well) from the very beginning.  Furthermore, as will be made clear above, the accusations could NEVER have met the definition of harassment, since KB made it clear that she (like all the other CRNAs) **never** told me that anything I ever said or did bothered her in any way.

If she and Dr. Raphaely have done their TMS training on harassment as claimed, **then they knew or should have known that KB's complaints, by definition, were not harassment,** and therefore KB was required to first tell me about the unwelcome behavior before she filed any formal complaints -- and she should have been so instructed by Dr. Raphaely.

Therefore Dr. Raphaely's directing KB to fill out an ROC and EEO complaint was grossly inappropriate, a violation of official policy -- and further evidence of her reprisals against me.

**Needless to say, the statements above apply to ALL of the CRNA complaints that were filed, especially the initial ones by each complainant -- therefore there should never have been any no-contact orders issued in the first place.**

As for the VA Police report filed by KB on March 8th, I will not waste time going through each and every allegation in detail, but will address most of them -- if you desire more written information and detail I will be happy to do so.

But first I will point out the following:

My conversation with KB was going very well until, near the end, Dr. Mannix (another "close associate" of Dr. Raphaely) came into the OR.  Immediately I saw KB get a terrified look on

her face, and she literally turned very pale -- since she knew that Dr. Mannix would immediately report this meeting to Dr. Raphaely.

Then, as indicated in KB's police statement itself, KB went to speak with Dr. Raphaely (the prime defendant in my claims),  who referred her to Bruce Kafer (another defendant in my claims against the hospital/agency), who apparently in turn sent her (most inappropriately) to VA Police.

And, as noted above, the "neutral" party who took my statement on this interaction was Bruce Kafer himself, **who "neglected" to mention in his report that KB had actually told me that she wanted to speak with me, but was being prevented from doing so by Dr. Raphaely.**

**I categorically state here that each and every accusation/allegation made against me by KB is a falsehood, and/or such a grossly distorted version of the events that it bears no semblance to the truth.**

First, it is important to note that KB was the only one of the four CRNAs who initially maintained civil and professional relations with me.  In fact, she would not only say hello in the hallway, but also thanked me profusely for having helped her & Dr. Nasr out with a difficult case.

When I thanked her for being polite and appropriate, KB basically told me she didn't see any reason why the others were behaving as they were; in fact, she told me on several occasions that she felt that we should just "talk things over like adults" and be done with it.

On March 7, as KB was pushing a patient in cart from PACU, people moved quickly out of the way.  KB said "don't' worry, I've never hit anyone with a cart."

As a joke I said "that's what you said to me, but I've got the bruises to prove otherwise!"

Given the situation in our department, I realized she might use that as a weapon against me if she misunderstood the intent.  So a little while later, I entered OR A, and asked KB if I could speak with her for a moment.

Let me state categorically:  Everything I said or did on both the days cited by KB were said/done with her repeated, express and explicit verbal consent.  Both times I entered the OR she was in, I clearly asked if it was OK for me to speak with her for a few minutes, and she stated yes, it was.  I told her she could ask me to stop speaking and/or leave at any time, and I would immediately stop/leave; she gave her verbal agreement to that.  I then proceeded to explicitly asked her permission before broaching **any** topic, and each time she gave her express verbal assent (and, I also made clear we were not going to address her ROC against me – which we did not).   I also repeated to KB many times during the conversation (at least a dozen times in total, and probably much more than that) that if anything I said or did at any time made her uncomfortable I would immediately stop and/or leave the room as she requested.  She expressed her consent verbally every time, and told me explicitly each time it was OK for me to proceed with the next topic – **and she never once** requested I leave her room, her false statements to the contrary.

On the first day, I explained to her that no offense was meant, and she replied that she hadn't even heard the joke -- so where she came up with a "sexual" content to my comment (as she claims) I cannot even begin to imagine.  She told me "I never get offended at things like that anyway".

KB then once again expressed how she thought all of us should just talk things over like adults and put it behind us.

I then asked her:  So, what you are saying is that you want to talk this over with me, work it out, and move on?

KB: Yes

RL:  But you are being prevented from doing so?

KB:  Yes.

RL:  By Dr. Raphaely?

KB:  Yes.

At that point, I told her that legally Dr. Raphaely could not prevent her from speaking to me, and I offered to speak with her anywhere, anytime.

21

She replied "later, not now" -- and gestured to Nick Naugle, and OR nurse who is also known to be a "close associate" of Dr. Raphaely.

I then nodded assent and immediately left the room.


I spoke with my attorneys that evening (as well as with Dr. Moss who is on very friendly terms with KB).  My attorneys told me that I could now legally approach KB, since she had  expressly told me that Dr. Raphaely  was (unlawfully) preventing her from speaking to me.

My attorneys also suggested KB could speak to them in strict confidence, and that they would protect her from any of Dr. Raphaely's reprisals.


Therefore, I approached KB the next day in OR-6 to discuss those matters.  And again, I state categorically that everything I said or did was with KB's explicit -- and repeated -- verbal permission.


Let me categorically state up front that KB's claims about my refusing to leave the OR and trapping her there are defamatory and ludicrous.

First of all, what possible rational motive would I have for harassing KB, when I was trying to gain her cooperation in my claims against Dr. Raphaely?

Secondly why would **anyone even think about trying to harass somebody in front of an OR full of witnesses** -- who included surgeons, nurses, and the circulating nurse Erica O'Malley -- **whom KB considered one of her very best friends here at work?**

And finally, if patient care truly was an issue as she claimed, it was her responsibility to speak up and do something -- but again she did nothing, because her allegations are false.


All KB had to do was call Erica over, and the matter would be finished...but she didn't -- **because the events as described by KB are false, and did not occur!**

KB's allegation that I put my hand on her back without permission and made sexual comments, is a complete lie.

The context was as follows:

About half-way through our conversation, and again with KB's explicit permission, I told her how much I had appreciated her support during my very difficult times last year ( I needed to take 4 months leave for treatment of my major depression and severe OCD – and, btw, KB gave me a big hug when I came back). I explained to her that her supportive words and gestures were very much appreciated. She asked me what I meant by gestures, and I said "you know, when you'd put your hand on my shoulder and ask 'how are you doing, Dr. Lisan?'" **This is something KB did many, many times over the years, including at least two times in the days shortly before her alleged complaint occurred.**

KB then said "I'm not sure what you mean." So, to demonstrate, I put one of my hands on the back of my own opposite shoulder. KB said "I'm still not sure what you mean." So I reached over and put my hand near --- **but not on** – her shoulder. She replied "I'm still not sure", so I explicitly asked her at least twice (and I believe 3 times) if it were OK to demonstrate, and each time she clearly answered yes. So I very briefly & lightly touched the upper back of her shoulder as is often done by people who are on friendly terms, to demonstrate what she had done so many times to me -- without ever having asked my permission first.


**That was the complete extent of any physical contact.**

**Furthermore, I did not, on either day in question, make ANY sexually oriented (or even double-entendre) jokes or comments of any kind.**


I now realize – but was far too trusting and naïve at the time – that KB was deliberately setting me up by baiting/entrapping me into touching her so that she could file a complaint. I cannot express how reprehensible I find it that someone who pretended to be friendly with me would do such a thing.


Even more galling is that several minutes later I was talking about a topic that made me somewhat emotional. KB then reached out her hand – and **touched me on my left shoulder in exactly the same manner as I had touched her** – and said "Oh, don't cry Dr. Lisan, it's OK.!"

Also, you will note that **KB did not ask my permission for her to touch me**. So, if we have sunk to the level where touching someone's shoulder after twice receiving verbal permission is somehow harassment, how is KB's not only harassment, but also battery?

As to other allegations: It is ludicrous to suggest that I ever threatened KB with retaliation or lawsuit. As I clearly indicated above, **I specifically told her that my attorneys would protect her from retaliation** by Dr. Raphaely for speaking the truth to me; I also assured her that my attorneys, Dr. Moss & I would do everything we could to help her avoid repercussions from speaking up.

Furthermore, please carefully note that KB's official police report indicates that she first went to Dr. Raphaely – even though KB is fully aware that Dr. Raphaely is the prime defendant in my legal/EEO complaint..

Dr. Raphaely, once again refusing to recuse herself as would be appropriate, then sent KB to Mr. Bruce Kafer -- who is, of course, also a defendant in my legal/EEO complaints.

Then **these two blatantly biased & self-interested parties** steered KB to the VA Police to make a complaint against me -- a complaint which I once again state was false in every important aspect of its allegations.

**As proof of my point, the VA Police closed the complaint without ever even getting my side of the story** -- obviously because it was crystal-clear that KB's allegations (like ECs) had no merit.

**However, steering KB to the Police constitutes not only grossly inappropriate, but possibly even illegal, behavior by Dr. Raphaely & Mr. Kafer.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*

Jessica Foster (JF):

Once again, there is important background of which you must be aware, in order to understand the nature of the interactions that occurred on Jan. 4, 2017.

As an aside, also please note that JF did make any complaint, and neither called nor approached Dr. Raphaely until Jan. 10, 2017 -- a day when she and I had been scheduled to work together in the OR, and did so without any comment or complaint from JF.

Furthermore, JF first approached our chief CRNA **Bob Bearss, who will testify that JF did not appear to have any intention of filing a complaint at that time, but just wanted to talk.**

**JF only filed her complaint after meeting with Dr. Raphaely -- who by then knew full well of my legal/EEO complaints against her.**

On many, many occasions in the past, when I was being relieved for the day, I would tell JF that Dr. so-and-so would be taking over.  Depending upon whom the attending was who was taking over, JF would almost literally beg me not to do so, because she did not want to work with that attending.  At other times she would, even during regular work hours, ask me to PLEASE somehow step in and do a case with her rather than the assigned attending.  Those attending Anesthesiologists included Dr. Adusumilli, Dr. Abdallah, Dr. Omar **and Dr. Raslan** -- the attending on-call the night in question.

Many times I would in fact stay late or take over a case, to help JF out, and make her work day better.

Almost every single time when JF asked (probably more than a hundred times), I would say to her "It depends -- how much is it worth to you."  JF would laugh.  Occasionally she would jokingly ask "Dr. Lisan, what do you mean?"  And every time I would reply "I don't know what you're thinking about, but I want either food or money --  in your case , preferably the food!"

Invariably JF would laugh -- because she also is a vegan as I am, cooks for herself, and knows I would actually love to have the food.

That was clearly a running joke, and JF knows that very well -- which is what makes her allegations so incredulous.

**Furthermore, if I had truly been harassing her all these years -- why would she keep asking me to stay and be her attending Anesthesiologist?**

On the night in question, JF was actually smiling/"laughing" when she left my office and asked me not to tell Dr. Raslan that she was on-call.  Obviously, it would be unethical for me not to tell him (or even for her to ask me to do that) -- and we all know that.  So to claim that constituted harassment also strains credulity.

It is clear that JF was trying to lighten the mood at the end of our serious conversation -- so I played along with it.  To claim anything else is a clear distortion of the truth.

Furthermore, I always ask J.F.'s permission before I tell any sort of off-color joke.  In fact, not long before the ROC was filed, I had asked her permission to tell such a joke, and she agreed.  I told her that I needed to use someone's name, and asked if I should use hers, or someone else's.  She told me to use someone else's name -- and specified who that person was.  After I told her the joke, she immediately laughed and said "that is *really* good!  Where did you hear it?"  When I told her I had made it up myself, she was very impressed, and said she wanted to tell it to others; I of course agreed.

**Can any reasonable or rational person believe that is the behavior of someone who is being sexually (or otherwise) harassed?**

When I returned to work Dec. 7, 2016 after my 4 months off for treatment of my OCD/depression/anxiety, I offered J.F. my hand when I saw her.  Instead, she opened her arms and gave me a big hug.

**Is that the behavior of someone who was being chronically harassed?**

 I would submit that **none** of the above in any way would support the idea that I have ever subjected J.F. to harassment – in fact it strongly suggests just the opposite.

As to the specifics of JF's ROC (and once again note it is neither signed nor even dated):

Several times in the past, I have asked JF to speak privately with me, so that I could ask her a question about department issues that she might not want to say in public.  Each time she would smile, cock her head, flutter her eyelids, laugh, and say "Uh-oh!" ---- **exactly as she did on the night in question!**

I would always respond "no, it's not that, I have something serious to talk about" or even "no, I am not going to ask you out or anything like that -- I have something serious to discuss with you."  And we did discuss serious issues without any other overtones.

**So this was a recurring pattern of joking of which JF was fully aware, and in which she willingly took part -- and that is exactly what happened on Jan. 4, 2017.**

When JF said "uh-oh" and smile/laughed & rolled her eyes I said "No, this is NOT where I am going to tell you that you are a very attractive woman and I want to seduce you (even if that might be true).  That is NOT where this is going.  No, I actually have something serious I want to discuss with you."  That comment of mine was intended to lighten the mood before going on to a very serious topic, just as we had done many times before.

Unfortunately, it seems that this time the joking was taken in a different way by JF, which was never my intent.

Despite JF's comments that she was "appalled at the context" of our discussion, **she completely left out of her ROC the actual context of that discussion:  That I wanted to speak to her because I felt she was showing signs of serious depression.**

As I noted previously, just a few months before this incident, I had been in a literal state of hopelessness, and was ready to kill myself in exactly 30 days if I didn't get better.

Thank G-d I did get better, and I realized how depression could so disastrously distort one's thinking as to lead someone into a true hell-on-earth.

I resolved that I would never voluntarily let anyone, especially my friends/family/co-workers, take that road to hell, if I could possibly help prevent it.

I explicitly told this to everyone when I returned to work after my treatment, because I know from personal experience that people are ashamed of talking about their depression (or serious marital issues that cause severe psychological damage) -- and so I determined to let everyone know it could be discussed without shame, and that I was available to help.

Therefore, when I noticed that JF seemed very depressed, and that she answered questions about her well-being and her marriage in the exact way that I (and other depressed people I've known) had answered them, I felt it was my moral obligation to speak to her and try to assist her if she truly were depressed.

I was further convinced of this when, just the day before, an OR nurse had asked JF "Is everything alright?  Is everything OK at home?"

JF : "No, I'm fine; why?"

Nurse:  "Because you've seemed very depressed lately."

JF:  No, I'm fine.

I realized JF was using almost exactly the same words, tone of voice, etc., that I and others used to cover up our depression and/or toxic relationships.

And that is why I decided I was morally obligated to speak with JF about this, in order to help her -- **and I made that clear to her AT LEAST 5-6 times during the discussion, if not more.**

So JF was never put into a position of "defending her marriage" or anything of the kind -- and it is unfortunate she felt that way, since I made very clear my intention of trying to help her avoid the road to hell I had so recently been on (and I even used that exact phrase multiple times).

Furthermore, when JF assured me she was OK, and that her marriage was OK & her husband was her best friend, I reflexively smiled, put my hand on my heart and said "Thank G-d!  I am so happy for you.  You are very lucky."

Then I told her the aphorism that "if after the wedding, the person with whom you are walking down the aisle is not your best friend -- you married the wrong person!"

She again stated her husband was her best friend, and I again told her I was very happy for her (which I was, and still am).

...

[Message clipped]

1620 East 105th Street, Cleveland, Ohio 44106

(216) 791-2300 ext. 6602

(216) 338-7111 bb

(216) 707-7627/fax

Leshelle.reese@va.gov



**U.S. Department of Veterans Affairs**
Northeast Ohio VA Healthcare System



NORTHEAST OHIO VA HEALTHCARE SYSTEM
10701 EAST BOULEVARD
CLEVELAND, OH 44106

March 28, 2019

In Reply Refer to: 541/136D(W)
19-05398-F

Ronald Lisan
5071 Hidden Creek Circle
Solon, OH 44139

Dear Ronald Lisan:

This letter is the initial agency decision on your March 10, 2019 request under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, VHA FOIA Central Office and subsequently referred to the to the VA Northeast Ohio HealthCare System of Ohio on March 20, 2019 for *"full and complete copy of the June 2018 report by Brenda Spicer of her Professional Climate Assessment of the Department of Anesthesiology, Cleveland VA Medical Center, as well as any other associated notes or related documents including, but not limited to, those pertaining to what actions were taken in response to Ms. Spicer's recommendations. I hereby give my permission for my identity – Dr. Ronald Lisan MD -- to be revealed wherever it appears in, or is otherwise referred to in any form, in the relevant documents. I also hereby give permission to reveal all the material in the requested documents that is, in any form, relevant to the events related to me."*

Your request was received in my office on March 20, 2019. The tracking number for this request is **19-05398-F.** You may use this number when inquiring about the status of this request. The cut-off date for this request was March 10, 2019. No records created after this date was considered responsive. No fee is associated with this request. Your request was processed under the simple track.

The FOIA places all FOIA requesters in one of three categories for fee purposes 5 U.S.C. 552(A)(4)(a)(II), The statute establishes the fees that may be charged each category of requester, as well as stating the limitations, if any, on the fees that may be charged each category of FOIA requester. The three statutory categories of FOIA requesters, the reasonable, standard fees that they may be charged, and the limitations on those fees are:

(I)     Commercial Use Requester - document search, duplication, and review.

(II)    A Representative of the News Media or an educational or noncommercial scientific institution seeking records for a non-commercial purpose - document duplication with the first 100 pages provided without charge

(III)   Any other FOIA requester - document search and duplication with no charge for the first two hours of search time and first 100 pages of duplication.

The VA regulation implementing the fee provisions of FOIA is at 38 C.F.R. § 1.555. Based upon information in your FOIA request, I have determined that you are an "all other" requestor. Because VA has determined that you fall under "all other" FOIA requester, VA may charge you for duplication after the first 100 pages and search time after the first 2 hours.

The EEO Office conducted the search for documents responsive to your request. The search was conducted by utilizing the search criteria of Anesthesia. At the conclusion of the search one documents, totaling 14 pages were determined to be responsive to your request. Also, per the EEO Office, there are no associated notes or related documents.

   Please note that your personal knowledge does not impact the processing of your FOIA request. (see: Schiffer v. FBI, 78 F.3d 1405, 1411 (9th Cir. 1996) (treating requester's personal knowledge as irrelevant in assessing privacy interests).

   My review of the documents revealed that they contained information that falls within the disclosure protections of FOIA Exemption FOIA Exemption 6, 5 U.S.C. § 552(b)(6). The coverage of FOIA Exemption 6 is absolute unless the FOIA requester can demonstrate a countervailing public interest in the requested information by demonstrating that the individual is in a position to provide the requested information to members of the general public and that the information requested contributes significantly to the public's understanding of the activities of the Federal government.

   Additionally, the requester must demonstrate how the public's need to understand the information significantly outweighs the privacy interest of the person to whom the information pertains. Upon consideration of the materials provided, I have not been able to identify a countervailing public interest of sufficient magnitude to outweigh the privacy interest in this case.

   Specifically, the information covered by exemption (b)(6) of individual names, titles, and direct recommendations that if disclosed, would be an unwarranted invasion of privacy. The individuals associated with this information have a personal privacy interest in information that outweighs any public interest served by disclosure of their identities under FOIA. Consequently, I am denying your request for this information under FOIA Exemption 6, 5 U.S.C. § 552 (b)(6).

   Upon review of the responsive records, I have determined they contain information which is protected under FOIA Exemption 5, 5 U.S.C. § 552(b)(5). Therefore, I am withholding potions of pages 10-13 (as indicated) under FOIA Exemption 5.

   FOIA Exemption 5 permits VA to withhold a document or information contained within a document as "pre-decisional" if two requirements are met. First, if there is an identifiable deliberative process. Second, the agency generated the information or document as part of the agency decision process. Stated another way, VA may withhold information under Exemption 5 where the document or its content makes recommendations or expresses opinions about legal or policy matters during a decision-making process and the document is not the decision document or incorporated into the decision document. Additionally, as a matter of Federal policy, the agency must state an articulable, foreseeable harm to the agency or its activities that could occur as a result of release of the document or information.

   Therefore, this document's status is pre-decisional as VHA's decision regarding the redactions of the Climate Assessment Report: Anesthesiology has not yet been made and release of this information would cause injury to the deliberative process. The deliberative process privilege of Exemption 5 is invoked as it is determined that the release of the pre-decisional document to the public would negatively impact frank discussion on matters of policy between subordinates and supervisors. Additionally, it is my conclusion that the release would cause premature disclosure of proposed polices based on the recommendations before they are actually adopted thus creating public confusion from disclosure of reasons and rationales that were not in fact ultimately the grounds for an Agency action.

   Until a decision is made regarding the Climate Assessment Report: Anesthesiology, premature release of this portion may confuse the public, as the information contained within the report may not be consistent with the final actions of VHA VA Northeast Ohio HealthCare System of Ohio seeks a full, unbiased review of these records. Protection of the decision-making process will help to ensure this result. Consequently, VA denies your request for this information under FOIA Exemption 5, 5 U.S.C. § 552(b)(5).

*Furthermore, as a result of the Climate Assessment Report, staff was required to complete multiple training courses in TMS, professional counseling was given, assistance was provided by the Chief of Education to improve the All Employee Survey (AES) results and there have been a couple of focus groups held to brainstorm wats to make additional departmental improvements; many of which have been implemented.*

If you disagree with my determination to withhold the information under FOIA Exemption 6 and Exemption 5 please be advised you may appeal to:

> Office of the General Counsel (024)
> Department of Veterans Affairs
> 810 Vermont Avenue, N.W.
> Washington, D.C. 20420

If you should choose to file an appeal, your appeal must be postmarked no later than ninety (90) calendar days from the date of this letter. Please include a copy of this letter with your written appeal and clearly state why you disagree with the determinations set forth in this response.

In addition to filing an appeal with the Office of General Counsel regarding my determination, you may also seek assistance and/or dispute resolution services regarding your FOIA request from VHA's FOIA Public Liaison and or Office of Government Information Services (OGIS) as provided below:

> VHA FOIA Public Liaison:
> Email Address:      vhafoia2@va.gov
> Phone Number:      (877) 461-5038

> Office of Government Information Services (OGIS)
> Email: ogis@nara.gov
> Fax: (202) 741-5769
> Mailing address: Office of Government Information Services
> National Archives and Records Administration
> 8601 Adelphi Road
> College Park, MD 20740-6001

*Please note the appeal rights only apply to what is redacted and not the content or the decisions made in the report.*

Thank you for your cooperation in this matter. If you have any questions, please contact me at (216) 791-2300 Extension 2342 or by email at Tomica.Jefferson@va.gov or Joseph Picklo at (216) 791-2300 Extension 2341 or by email at Joseph.Picklo@va.gov.

Sincerely,

Tomica Jefferson

Enclosure

## Northeast Ohio VA Healthcare System
Anesthesiology Department

The following document contains the findings of a professional Climate Assessment of the Anesthesiology Service. It provides information from multiple perspectives and explicates relevant issues concerning the workplace milieu and offers recommendations.

### BACKGROUND

On March 9, 2018, **(b) (6)**
, contacted Ms. Leshelle Reese, EEO Specialist, expressed concerns via an email communication with attachments that described the anesthesiology workplace environment as being hostile. Also, she underscored it was a difficult decision for her and her peers to submit Reports of Contact which documented each of their concerns.

Subsequently, Ms. Reese convened a meeting with management to discuss the allegations and to formulate an appropriate plan of action to determine the facts related to multiple concerns and possible actions. It was decided a workplace climate assessment was appropriate to obtain the widest vantage on the workplace milieu, perceptions of CRNA staff, anesthesiologists, as well as the Chief of Anesthesiology. Further, to identify the levels of satisfaction and dissatisfaction, and to identify the facts surrounding allegations of retaliation, discrimination, and unequal treatment, by **(b) (6)**

### ACTION

Brenda J. Spicer, a Subject Matter Expert on EEO issues and related processes was contracted to conduct a climate assessment of the Anesthesiology Service. Ms. Spicer held series of separate in-person group meetings with three separate groups of Anesthesiology Service employees: The CRNA's, Anesthesiologists, and the Chief of Anesthesiology. In addition, she provided opportunity for individual interview sessions with those who felt more comfortable speaking one on one. Finally, she held a response meeting with **(b) (6)**
on May 30, 2018, to obtain her response and perspective on the allegations, concerns, and perspectives, of the Anesthesiology Service employees who participated in the Climate Assessment process.

Following a review of the findings and recommendations contained within the detailed assessment on the following pages, the appropriate leadership team will determine follow up actions and their schedule of implementation.

**CLIMATE ASSESSMENT FINDINGS: ANESTHESIOLOGY SERVICE**
Submitted by Brenda Spicer
June 18, 2018

## I. Workplace Structure Overview:

Mission of Anesthesiology Service, as expressed
by the groups: Each group was asked to briefly describe their mission.

The CRNAs expressed: To provide a full range of anesthesia services to the Veterans during surgery beginning with pre-op assessments to post-op visits that occurs once the patient awakens from the anesthesia.

The Anesthesiologist expressed: The Anesthesiologist in the Operating Room take care of the patients during the surgical procedures locally and at remote locations. They prepare for surgery by supervising the care of the patient. Not to simplify, but they keep the patient alive during the surgery. They provide care for the patients in the beginning, during and after surgery (the take off and the landing). There is a Care Team consisting of the Anesthesiologists, Anesthesiologist Residence, CRNAs and a Student Anesthetist. They also supervise two-three rooms at a time. They do not perform administrative-type duties in the traditional sense; they are actually hands-on.

They develop the plan of care which includes determining any specialized lines for the medication and options according to the patient history. The patient will usually see both the Anesthesiologist and the CRNAs before and after the surgery. They explain to the patient about the type of care that will be administered during the surgery.

(b) (6) expressed: To meet the medical needs of the patient. They provide a service in many areas (i.e. GI, cardiac, radiology, psychiatry, etc.). They recently became part of the Pre-admission Testing team and it has brought in more work. They are included at that stage of patient care. She also indicated that she is responsible for staffing numbers and skill set. She also participates in patient care as an Anesthesiologist along with dividing her time performing administrative and managerial duties.

According to the list of employees in the Anesthesiology Department, provided for this purpose, there is 1 Chief of Anesthesiology, (b) (6) , 12 Anesthesiologist (Physicians), 1 Lead Certified Registered Nurse Anesthetist and 16 Certified Registered Nurse Anesthetist. Not listed, 4 Anesthetist Technicians, 1 Office Administrator, 2.5 Nurse Practitioners in the Pre-Admission Test (PAT) area, and 1 Certified Nurse Specialist in the PAT area. There is a team of physicians, nurses, technicians, CRNAs in the operating room. They meet to discuss the plan of care from the beginning of the surgery until the end when the patient is awake. The function of getting involved with the Pre-Admission department is a newly added function which has proven to increase the workload. (b) (6) is proud to have her team involved as they bring value to that part of the surgery process.

The (b) (6)                        is the only one in charge of the On-Call schedule. He also prepares the performance evaluations and (b) (6)        signs off on them, he deals with personnel issues and he shares information as directed by (b) (6) would like to get him more involved with managing the CRNAs. She indicated that she does not get involved with the scheduling. The CRNAs don't feel (b)(6) has the level of authority to be able to resolve their concerns. The would like him to have more authority.

Everyone is very confident in knowing what is expected of them in the function of their duties. They are well aware of the regulations and requirements set forth by their medical boards and governmental requirements related their field of practice. Everyone agrees that they have the best equipment. They are well aware of the type of training and frequency of the training required to maintain their certifications and continuous learning requirements. Training is obtained in various ways, online, in person locally or travel to a conference/training class. Employees are normally placed on official authorized absence to attend training locally or out of town. They are also allowed to request up to $1,000 for tuition to attend training. Many Anesthesiologists attend training seminars on their own time, even on weekends.

The Anesthesiologists are salaried employees and the CRNAs are hourly employees and are covered under the DVA/AFGE Master Agreement. There has been a change in staffing due to attrition and (b) (6)        has been able to hire new staff. She indicated that there is now a mixture of employees, some have only worked for the government, some employees had independent practices and some are in between. The Anesthesiologists indicated that they love working for VA. (b) (6)        is very professional, doesn't take things personally, she holds everyone to a high standard, she's very approachable and available. However, they expressed that there is an obvious undertone that the CRNAs believe they are treated differently. They also indicated that there are some CRNAs who believe they should be treated like an Anesthesiologist and be able to work independently. But there are distinct differences in the training levels and background between a nurse and physician. There was a national legislation that addressed Scope of Practices. It was proposed to allow CRNAs to practice independently, but it was not passed. VA's regulation requires that there will be an Anesthesiologist and a CRNA as part of the care team.

The methods used to communicate include emails, text, person to person interaction and meetings. There are regular staff meetings, some are with all employees together and some are conducted with the groups separately (i.e. only Anesthesiologist and only CRNAs) depending on the subject matter. There are certain peer review sessions which are used for educational purposes. During this session, everyone is invited to attend. There are also peer review sessions held separately depending on the subject matter.

It is unanimous that all of the staff members believe in putting the patient first, to provide the best care possible for our veterans and attend to their needs in an efficient way. Many staff members expressed that they enjoy what they do.

## II. Change in Work Environment and Perceptions

It is unanimous that (b) (6)    knowledge of the anesthesiology function is excellent. The employees had positive compliments on the new ideas and methods that she brought with her three years ago. Those ideas improved the efficiencies in the workplace. Employees expressed that before (b) (6)   arrived, the work environment was divisive, the CRNAs were disrespected by the physicians and there was hardly to no accountability. One CRNA employee in particular could not express enough how he appreciated (b)(6) changes that have resulted in structure and enhanced efficiencies.

Many CRNAs indicated that about a year or a year and a half ago, (b) (6) aely's actions began to change. Their initial impression of her changes to the operation changed from being one who cared for them as employees and wanting to make sure they were treated with respect by others to becoming someone who is vindictive, retaliatory, hostile, discriminatory and divisive. They noticed that whenever someone questions her, she gets upset. If she is proven wrong, she retaliates and penalizes the entire CRNA group and she takes away privileges by creating policies that are confusing. The CRNAs offered the following situations that they believe contributed to the low morale:

| A. Yelling and Condescending Tones toward the staff. |
| --- |

      1. Yelling and condescending tones: The majority of the CRNAs describe her yelling as "a lot", "it's not uncommon" and "multiple times". (b) (6)  yelled at one employee, but called her at home to apologize. The other CRNAs described her yelling at them in staff meetings. Many of them indicated that she constantly tells them that they make a lot of money and if they don't agree with the decision, you can go elsewhere. The CRNAs acknowledge that they are grateful for their pay, but it didn't mean they should be subjected to disrespectful treatment. (b) (6)  refers to the CRNAs as adults acting like children, and the most unprofessional group of employees. There were three CRNAs who indicated that depending on how upset (b) (6)  gets with you, she will stop speaking to you as you pass her in the hallways, but she remains professional in the OR. A couple of them said, now they just don't say much when they are around her in the OR. In the staff meetings, many do not feel comfortable speaking up after being yelled at, they are told, this is the way it's going to be. They believe she makes decisions that seemed vindictive after a staff member had upset her and the decisions seem out of the ordinary and many times contrary to the regulations. Whenever they are called as a group to meet with (b) (6) separately from the other staff, they brace themselves. They indicated they hardly hear positive comments or compliments. One of the physicians indicated that he gets yelled at in front of others. They have witnessed (b) (6)  yelling at their (b) (6) RNA in front of an Anesthesiologist. He asked her if she would like to step outside to discuss the matter. They have also witnessed her embarrassing him during a staff meeting by inferring that he was the reason for the low Employee Survey score. **It is recommended that this behavior be addressed.**

B. Administering personnel regulations:

      1. New Travel Policy: On June 2, 2017, **(b) (6)** sent out a new travel policy. The policy stated in part, "due to the large volume of travel requests and out of town conferences ...moving forward I will limit time off for conferences to one conference every other fiscal year, effective October 1, 2016. Therefore, if you have attended a conference this fiscal year you are not eligible to attend another conference until October 1, 2018". **(b)(6)** response to this policy is because she was advised to decrease her spending of travel funds.

After reviewing the policy, it was discovered that this policy focused on limiting time off and if anyone attended a conference in FY 2017 would be eligible in FY-19. This policy can be confusing because it's not clear how "time off" is related to travel funds. Also, it appears that if you attend any conference (locally or out of town) it is subject to the every other fiscal year rule. Once again, this is not clear as to how a local conference reduces the use of travel funds. The CRNAs believe this new policy was in retaliation because on May 16, 2017, Human Resources advised **(b) (6)** to reverse her decision to move a co-worker's off-day to be used while attending an approved out of town conference; it's the timing of the new policy. The employee indicated that **(b) (6)** was "pissed" when she found out she had contacted HR and because she had to reverse her decision and credit her 20 hours Comp time because her schedule was moved around.

## Master Agreement, Article 37-Training and Career Development, Section 5 states:

- Scheduling Training

Paragraph A. When training required by the Department is conducted during an employee's regularly scheduled work hours, he/she will be granted excused absence to attend.

Paragraph B. When training is approved under Section 3(B) of this article (3 B. Depending upon the availability of funds and training priorities, the Department will also pay appropriate expenses for work-related training), the Department will make a good faith effort to grant excused absences from work or make schedule adjustments to accommodate an employee's training or educational program.

## It is recommended that the travel policy be re-evaluated and clarified. (A copy of the travel policy is attached.)

      2. Administering Time and Leave Policies: The CRNAs expressed their concern that when you call in sick, you can expect a text or a phone call later that day asking if you plan to come to work the next day. **(b) (6)** response is, it's for planning purposes. **Master Agreement, Article 35, Section 4 – Sick Leave, paragraph B** states in part, "an employee who expects to be absent more than one day will inform the supervisor or designee of the expected date of return to duty and notify of any change". The employees indicated that if they are going to be out another day, they usually call in each day to

request additional sick leave. The practice of calling employees at home on the first day of absence can be viewed as inappropriate.

**It is recommended that the practice of contacting the employee on the day of sick leave be re-evaluated.**

3. <u>Leave Restriction Letter:</u> There was an attempt to place an employee on leave restrictions for being absent three days (partial and full days) within a six month period (September, 2017 (partial day) January 12 and 19, 2018). The letter indicated those three days took place the day before his scheduled day off. The memo indicated that "This is to inform you that you are being counseled...." The memo also indicated "the three days has had an adverse impact upon the operational efficiency of this service... and is considered sick leave abuse". He was therefore "required to provide medical documentation to support future absences for personnel illness". **Master Agreement, Article 35, Section 5-Documentation for Sick Leave, paragraph E.** states in part, "Where there is substantial reason to believe that an employee is abusing sick leave entitlement, medical certificates may be required... Paragraph E. 3. further states in part, "Frequency or amount of leave used will not be the sole factor for determining sick leave abuse..."

It is unusual to issue a leave restriction letter for counseling purposes. While it is recognized that determining what is substantial is subjective, there was no information in the letter that showed his reasons for the absences were reviewed and taken into consideration. Also, the letter does not refer to any prior counseling session that was held before being placed on leave restriction. When the employee was made aware of this pending letter, he shared the reasons for his absence with HR and he was told his reasons for the absences seemed reasonable. He was advised to apply for FMLA. He applied and was approved but has not used it since then.

**It should be noted that the letter was not issued.**

4. There is a concern with the schedule that is posted and available for everyone to see. It shows when someone calls in and the type of leave they are using. The employee was uncomfortable with that information being available to all to see.

**(A copy is attached to this report.) During my conversation with (b) (6)          , she agreed to make adjustments to accommodate this request.**

5. <u>Worker's Compensation-On-The-Job-Injury:</u> A CRNA employee experienced an on-the-job injury when it seemed a splinter went into her finger. It became inflamed and she went to the doctor and discovered it was infected. The doctor recommended that she be placed on light duty based on the type of duties she performs. (b) (6)      , under the advisement of (b) (6)      , placed her on light duty. Time went on and the employee went on vacation and her finger became inflamed, but it seemed worse that time. Upon her return from vacation, she went back to the doctor on September 11, 2017, and the doctor

determined that the infection was worse than previously. On September 13 or 14, 2017, he performed a procedure to find out the cause. She was given a sedative during the procedure and it was discovered that there were metal pieces and in her finger. She was placed on full restrictions from work and prescribed "narcotics" to take within the first 24 hours and subsequently as needed. She was instructed not to drive for at least 24 hours and whenever she takes it. Her follow up doctor visit was scheduled Thursday, September 21st. (b) (6)    texted the employee on September 18th and 19th in an attempt to have her return to work. On Monday, September 18th, (b) (6)    texts indicated that she needed her to come to work to answer the phones and she expected her to come to work on that Wednesday (September 20th) and if not, she would need written notice to address her specific limitation making her not qualified for duty. On Tuesday, September 19th, the employee replied to the text and informed (b) (6)    that currently she was not cleared to return to work, her doctor's appointment was scheduled for that Thursday and she would not be able to work Tuesday, Wednesday or Thursday. She anticipated her release to be Friday, September 22nd and she has the required paperwork and will submit it when she returned to work. (b) (6)    text response was "are you cleared to return to work with initial restrictions?" She described that the VA will expect her to do alternative duties. She further text, "If you're not in bed rest but just hand restrictions the expectation is that we provide you alternative duties".

The employee contacted the (b) (6)                  regarding (b)(6)
          texts. She discovered that (b) (6)    had emailed Alisa to explain the situation and Alisa told (b) (6)   ely the employee is to follow her doctor's orders, not the doctor at work. The Specialist advised the employee to "follow the Worker's Comp rules to a T". The employee stated, after that situation, their relationship changed. (b) (6)    does not speak to her in the hallway and there's no interaction as it was before the incident.

**Master Agreement, Article 29-Safety, Health & Environment, Section 10-Work Related Injuries and Illnesses** states in part, "B. An employee who has sustained a work-related injury or illness will be required to perform duties only to the extent and limits as prescribed by the treating physician or the Employee Health Physician as appropriate. No employee will be assigned duties when, in the physician's opinion, this would aggravate the employee's injury or illness".

**(A copy of the text screen is provided.) It is recommended that training be provided on how to administer Federal Sector leave policies and procedures.**

The following issues are strong contentions for the CRNAs. Even though the reasons provided by (b) (6)    are within her full authority, these issues appear to weigh heavily on the CRNAs and contributed towards low morale and distrust as a group.

1. (b) (6)    changed the CRNAs tour of duty, arrival time is 6:50 am instead of 6:30 am. The first case begins at 7:30 am. The reason for the change as they understand it to be is because (b) (6)    wanted coverage at the end of their shift and that people were leaving at the end of their shift (i.e. 3:00 pm and 5:00 pm). Many CRNAs

expressed that for "big cases", they need the full hour to prepare for the patient.  Some of them still come in at 6:30 am when needed and even though they are aware that they could request overtime, they usually don't request it.  One employee asked in advance if he could come in at 6:30 and get overtime, but he was denied. (b) (6)  May 2018 response was that she changed the time because (1) she needs coverage at the end of their shift; (2) she came to work a couple of times at 6:45 am and the bulk of the CRNAs came in at the same time, and; (3) they don't need an hour to set up for any cases.  She was asked if she had ever talked with them about their need to start at 6:30. She said no.

**It is suggested that management explore the CRNA's point of view as to the effects of the change in start times.  Also, coming in at 6:30 am instead of 6:50 am without requesting overtime could violate the Master Agreement.  Further, this could be an educational opportunity.**

There is another concern regarding the change in tour of duty. The CRNAs are under the impression that the change in the start time is on a trial basis.  They remembered the change was implemented without consulting the union. When the union became aware of this change, they considered it to be a change in working conditions and needed to be discussed before it could be implemented. The union met with (b) (6) and an agreement was made to proceed with the change, but with a follow up after three – six months.  It has been close to two years and according to their recollection, the follow up never took place. (b) (6)  May 2018 response to that the agreement was this change is permanent.  The new duties with the Pre-admission Testing is on a trial basis.

**Master Agreement, Article 49, Section 4 - Notification of Changes in Conditions of Employment states as follows:**

"A. The Department shall provide reasonable advance notice to the appropriate Union official(s) prior to changing conditions of employment of bargaining unit employees. The Department agrees to forward, along with the notice, a copy of any and all information and/or material relied upon to propose the change(s) in conditions of employment. All notifications shall be in writing by U.S. mail, personal service, or electronically to the appropriate Union official with sufficient information to the Union for the UNION RIGHTS AND PRIVILEGES | ARTICLE 49 - RIGHTS AND RESPONSIBILITIES Department of Veterans Affairs Labor Management Relations | DVA /AFGE Master Agreement 251 purpose of exercising its full rights to bargain.  The Department will work with the Union to identify and provide specific training and equipment to address concerns related to the use of technology, to include the sending and receiving of electronic communications."

**It is recommended that this issue be confirmed and communicated with the CRNAs.  If there's nothing in writing, it could possibly mean that this change in work schedule is invalid.**

2. The CRNAs alleged that (b) (6)  is going to move them out of their current location and use it to store equipment.  They alleged that she is moving them

because she thinks they are talking about her. They alleged that she had threatened to take the door off the hinges. The (b) (6) indicated that many times people are on break or lunch. The employees close the door while on break or lunch break because if they don't, their breaks would be interrupted. It's also a high traffic area. The employees indicated that they were in a meeting and Director Susan Fuehrer came in and said she was sorry they didn't have enough space and that they were looking into finding more space for them. The employees said they were shocked because (b) (6) never mentioned this to them. The Union Official, indicated that (b) (6) mentioned the reason for the move was to store equipment to avoid a JCAHO violation. The Union Official indicated that it has not been declared a violation by JCAHO since they have visited the facility many times. The Union Official toured the area and there were alternate spaces available to store the equipment. (b) (6) May 2018 response was not only about her need to store the equipment from its current location, but there are some staff members who feel uncomfortable being in the room because of the conversations that take place. She also noticed that people were on their phones, on Facebook and had their feet propped on the desk. Another reason for moving them out of the room is because (b) (6) believes she would be cited by JCAHO. Additionally, she indicated that the space, where the Anesthesiologists are located, has bad ventilation, it gets too warm. She has developed plans to restructure the work space, but the construction staff is not available to make that happen right now, so she's on hold.

**This is a major CRNA concern because they indicated that (b) (6) had not informed them about being moved before Director Fuehrer mentioned it. They had no opportunity to discuss any the concerns and to hear their side as to why the space is important to them. They alleged that (b) (6) previously offered the space to the physicians and they voted not to be placed there. The CRNAs believe the move is retaliation for filing a complaint against her.**

3. A new policy began on August 30, 2017, requiring mandatory overtime in cases where there was not a volunteer to work past regular tour of duty. They alleged that (b) (6) does not administer the mandatory O/T list equally and based on her mood. The majority of the CRNAs stated that there is usually someone who volunteers. One employee indicated that she thought it was a shame that it has come to this. One employee researched available data and found that for a period of seven months the data shows there were five days that required a request for volunteers because there were four rooms active after 5:00 pm. There were only two incidents where someone worked mandatory overtime. The CRNAs were told (b) (6) was tired of having the same volunteers. The majority of the CRNAs indicated that there are enough volunteers who get compensated for staying. An incident occurred when (b) (6) became upset with an employee, she took her name from the middle of the Mandatory List, moved her up and made her stay. Also, there was an incident when an employee volunteered and (b) (6) moved her name to the bottom of the list. The CRNAs believe (b) (6) utilizes the mandation schedule in a subjective way. A CRNA's opinion is that before the morale changed, people were helping each other by volunteering to take their place. Now that the morale is low, he's observed that people don't want to support (b) (6) as

much. They don't feel she deserves their full support because of poor leadership. They will stay to finish their case, but not to go beyond what is expected. He has observed that it's the same people volunteering now. He recently experienced his name being up for mandatory overtime and another employee volunteered to take his place.

(b) (6) indicated that there are the same people volunteering to stay when needed. She indicated that she has had to use the mandatory twice when she has had a fourth active room. She also indicated that if a CRNA volunteers to stay, their name goes to the bottom of the list. She thought everyone knew this. In addition, a couple of CRNAs suggested that the physicians should be included in the mandatory list. She also indicated that she sought the advice from the Union. They discussed how the mandatory list would be administered. She also sought the advice from (b) (6) and was given approval to implement.



**(b) (6), (b) (5)**

(b) (6), (b) (5)                                            by Dr. Ronald Lisan, (b) (6), (b) (5)

(b) (6), (b) (5)
(b) (6), (b) (5)                                            by Dr. Ronald Lisan, (b) (6), (b) (5)

- (b) (6), (b) (5)    Dr. Lisan (b) (6), (b) (5)

- (b) (6), (b) (5)                              Dr. Lisan. (b) (6), (b) (5)

- Dr. Lisa (b) (6), (b) (5)

- (b) (6), (b) (5)

- (b) (6), (b) (5)

*Climate Assessment Report: Anesthesiology*



Dr. Lisan (b) (6), (b) (5)



*Climate Assessment Report: Anesthesiology*

(b) (6), (b) (5)

(b) (6), (b) (5)

(b) (6), (b) (5)

(b) (6), (b) (5)
(b) (6), (b) (5)
Dr. Lisan, (b) (6), (b) (5)

(b) (6), (b) (5)

(b) (6), (b) (5)

## Conclusion:

It became evident that all of the staff members in the Anesthesiology Department are sincerely focused on the patient care. It is evident that they love what they do, they feel they are making a difference, they are proud to work for the VA, they are proud that VA Cleveland has a great reputation for best practices and they have the latest equipment and everything to be successful in their field. They have a strong desire is work together in a cohesive manner in all aspects of their job. There is a mixture of opinions based on their experiences with (b) (6) . There is a mixture of opinions of what happened during the attrition and mixed opinions of the new staff members. With the various changes, it can cause a change in the work environment. While it is commendable that (b) (6) brought new ideas and procedures that improved the efficiencies of the operation, it is obvious that something happened along the way.

It is important to note that dissatisfaction among one, two or five employees many times would not be considered significant, depending on the concerns. But, there are fifteen CRNAs who have concerns with the common theme of experiencing fear of retaliation, policies that seem to be implemented as a punishment for the entire group and contrary to the Master Agreement, constant reminders of how much money they make and constant reminders that they can find another job if they are dissatisfied.

(b) (6) experience in managing employees has been primarily in a private sector environment. According to her staff, there's no doubt that she has demonstrated excellent knowledge, skills and abilities to perform the technical and scientific portion of job. About three years ago, she became responsible for managing Federal Sector employees along with administering the Master Agreement. This has proven to be a challenge for her and the CRNAs on the receiving end. I offer the following recommendations for improving the work environment:

- Based on her decisions regarding the travel policy, the leave restriction letter and the worker's compensation situation and (b) (6), (b) (5) , it is recommended that



- In addition, considering the common theme regarding (b) (6) demeanor towards the staff (physicians and CRNAs) as witnessed by many staff members (physicians and CRNAs), it is recommended that (b) (6) in developing a strategy and gain tools on how to approach her staff when there is a critical change in policies and practices. (b) (6) might be one avenue.

[redacted] provides a structured method of exploring the best way to address a hot issue. It also assists the party in exploring and considering the true feelings, frustrations along with the facts surrounding the conflict or issue before making critical decisions. It assists the party in sorting out what is most important and it develops a strategy to present the situation and to consider the opposing point of view before coming to a final conclusion.

- It is also recommended that a strategic plan be developed on how to improve the morale of her department. One option would be to form a focus group consisting of two CRNAs, [redacted] and perhaps a staff member from outside the department for an objective point of view. According to the CRNAs, once the employee survey was released, she had everyone in a room form groups to address how to raise the rating. There were mixed review from this meeting. Some were happy it took place and some felt intimidated and were confused as to how this was their responsibility. In that same meeting, the CRNAs indicated, she made an embarrassing remark about [redacted], suggesting that he was the cause for the low rating. If this recommended is adopted, I recommend that someone else introduce this initiative in a manner that welcomes their buy-in to help make positive changes. Perhaps re-review the outcome of the previous meeting as a foundation.

I would be remiss if I didn't address the CRNAs contribution to the low morale. It takes two to tangle. Even though the CRNAs feel intimidated, retaliated against and not given opportunities to be heard, it is probable that their feelings were openly discussed based on many accounts many of them are aware of some of the conflicts that occurred. Spending a lot of time expressing their discontentment in a workplace setting can cause a hostile work environment for those who are not involved in the conflict, thus some approached [redacted] that they were uncomfortable being in the room while certain conversations were occurring. With that in mind, I recommend the following:

- Explore [redacted] in managing the CRNAs since he [redacted] and he is at a higher classification level. If deemed appropriate, to adopt her idea as soon as possible, but ensure clear roles and responsibilities are established including, but not limited to detailed level of authority. Once approved, to communicate this expanded role to the staff.

- Develop a strategic plan on how issues of concern will be presented by sides. It is understood that they cannot control every outcome and every decision, but assure them that they will be provided with appropriate opportunities to present their side.

This concludes my assessment. If you have any further questions, please don't hesitate to contact me.

Humbly submitted,
Brenda J. Spicer
June 18, 2018

2 017



PENGAD 800-631-6989
PLAINTIFF'S
EXHIBIT
45  R.B.
4-5-19 DMF

1

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **JAN** | | | | | | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **FEB** | | | | | | |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | | | | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **MAR** | | | | | | |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **APR** | | | | | | |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | | | | | | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **MAY** | | | | | | |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **JUN** | | | | | | |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **JUL** | | | | | | |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **AUG** | | | | | | |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **SEP** | | | | | | |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **OCT** | | | | | | |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **NOV** | | | | | | |
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| **DEC** | | | | | | |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

May 10, 2017

PLAINTIFF'S
EXHIBIT
46  R.B.
4-5-19  DMF
PENGAD 800-631-6989

To whom It may concern;

I was asked by Dr. Ron Lisan to write a note in regards to the incident that occurred on January 4th 2017. Mrs. Foster was off duty on January 6th and January 9th. I was first aware of the incident on January 10th when Mrs. Foster returned to work, she informed me that an incident occurred, but didn't tell the nature of the incident. I asked her if she wanted to speak to me about it, and that I am always available on my cell phone even if I am not at work. I then asked her if she would feel more comfortable speaking to a female and she seemed agreeable to that idea. To my recollection, she hadn't spoken to anybody formally about the incident or her intentions to file a complaint. I referred her to Dr. Raphaely for assistance if she wanted to speak to someone in private. She agreed and went to speak to her. I haven't spoken with Mrs. Foster about this incident any further than to ensure she received the help that she needed.

I don't know if this will help or hurt Dr. Lisan's case, but theses the facts as I recall them.

Robert J. Bearss

Robert J. Bearss CRNA

*Sindell and Sindell, LLP*



Attorneys and Counselors at Law

Steven A. Sindell\*
  Board Certified in Labor and Employment Law by OSBA

Rachel Sindell

Chagrin Plaza West
23611 Chagrin Boulevard, Suite 227
Cleveland, Ohio 44122
Telephone: (216) 292-3393
Facsimile: (216) 292-3577
Website: www.sindellattorneys.com
E-mail: info@sindellattorneys.com

January 6, 2017

*By E-mail to Susan.Fuehrer@va.gov
and Murray.Altose@va.gov
and By Priority Mail with Tracking*

*Ms. Susan Fuehrer, Medical Center Director
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, Ohio 44106*

*Dr. Murray D. Altose, Chief of Staff
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, Ohio 44106*

Re:    Kenneth S. Moss, M.D.

Dear Ms. Fuehrer and Dr. Altose:

Please be advised that this office has been retained to represent Kenneth Moss, MD in connection with his employment at the VA. Dr. Kenneth S. Moss has been a staff anesthesiologist at the hospital for almost 17 years. On December 27, 2016, he received a Report of Contact from Dr. Susan Raphaely for alleged tardiness (see attached). This Report of Contact is the latest in a systematic harassment designed to force Dr. Moss to resign/retire. This simply isn't going to happen now or in the foreseeable future. Due to the severity of this Report of Contact, Dr. Moss requested that I contact you directly.

On 4/21/16 Dr. Moss did receive a Letter of Expectation regarding "tardiness" from Dr. Raphaely (see attached) which included future penalties of not being paid for any days he is late. The hospital union notified her that this was illegal and I am pursuing the question of whether a professional employee can be tardy no matter what time he comes if his work is completed appropriately and in a timely fashion. Dr. Moss cannot recall any time when the cases he was responsible for started after 0730 due to

Ms. Susan Fueher, Medical Center Director
Murray D. Altose, MD, Chief of Staff
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, Ohio 44106
Page 2

his actions. In fact Dr. Raphaely admitted that this was the first time she considered him late since receiving the Letter of Expectation dated March 17, 2016.

On November 7, 2016 Dr. Moss underwent L Foot reconstructive surgery for which an estimated six week recuperation ending December 18, 2016 was recommended by his surgeon and approved by Dr. Raphaely. At his four week follow-up appointment, it was apparent to the surgeon that Dr. Moss would be unable to return to work on December 19 without physical restrictions for at least two weeks. He wrote a letter to Dr. Raphaely (see attached) and Dr. Moss forwarded the letter to her in an email (see attached ) whereby he offered to extend his sick leave if Dr. Raphaely was unable to honor the restrictions. She called him and told him that due to the approaching holidays, she needed him to return and that she would honor the restrictions which included no more that 1-2 days of call until after January 3, 2017.

The complaint states that Dr. Moss arrived late on December 19, his first day back. This is blatantly false. Dr. Moss exited his car before 0700 and because the employee entrance near the loading dock was open, he saved himself considerable time and pain in having to walk to the main entrance of the hospital and then all the way to the OR. He was in scrubs and evaluating his patient, a vascular bypass at 0710. The patient was brought into the OR at 0725. This is documented in CPRS and can be verified by the CRNA assigned to the room with him.

On December 20, Dr. Moss arrived in the parking garage at the same time but wasn't so lucky. The employee entrance was locked forcing him to make the long and painful walk to the front entrance and all the way through the hospital to the OR, a walk that normally took him five minutes took him fifteen minutes and he did not arrive to his office to hang up his coat until 0715 at which time he ran into the CRNA who was assigned to one of his two rooms for that day. He went over the assessment for the patient, a mediport insertion under Monitored Anesthesia Care and told the CRNA that he would say hello to the patient in the PACU. Dr. Moss then changed into scrubs and went to evaluate his big case, a robotic prostatectomy for which a student nurse anesthetist was assigned to assist him. Dr. Moss reviewed the assessment, spoke to the patient for no more than four minutes before he realized that he hadn't seen the mediport patient. He asked that the prostatectomy patient remain in the PACU until he returned. Dr. Moss approached the mediport patient at 0725 and it was at that time that he noted Dr. Raphaely glaring at him. It took him less than a minute to say hello, verify that the patient had no questions and understood the anesthetic plan. The CRNA took the patient to the OR and arrived on time at 0730. Dr. Moss returned to the prostatectomy patient and continued talking to him for another couple minutes before

*Ms. Susan Fueher, Medical Center Director*
*Murray D. Altose, MD, Chief of Staff*
*Louis Stokes Cleveland VA Medical Center*
*10701 East Boulevard*
*Cleveland, Ohio 44106*
*Page 3*

accompanying him to the OR with the student anesthetist. That case also started at 0730.

Dr. Raphaely must have based her accusation of tardiness on December 20 on the fact that she first saw him at 0725. The fact that he had already medically assessed both patients, one of which while he was still in street clothes, could easily have been ascertained by asking him, or by talking to either of the CRNA's he worked with. She did not. Nor did she check the nursing OR report in CPRS for the three patients. Had she done that she would have seen that two of the cases started on time and one case started five minutes early.

The question that concerns Dr. Moss and myself is why a Report of Contact was issued in the first place and why it took her one week to do so. What were Dr. Raphaely's intentions? If she was fulfilling her administrative responsibilities, didn't she have an obligation to see if patient care was rendered in a timely fashion? Didn't she have the obligation to speak with the anesthetists to substantiate Dr. Moss's alleged tardiness? Dr. Moss did her a favor in coming in to work on December 19 rather than extending his sick time. Wouldn't it have been logical for her to ask him why he was late, especially two days in a row, in light of the fact that Dr. Moss had never been late since receiving the Letter of Expectation eight months before? Wouldn't a good leader want to welcome him back when she initially saw him and, if he appeared to be late, see if there was anything wrong?

And why did Dr. Raphaely wait one week to deliver a Report of Contact that couldn't have taken her more than five minutes to type up. A problem two days in a row serious enough to warrant a Report of Conduct should have been serious enough to be presented on December 20 or at the very latest, December 21st. Dr. Moss feels strongly that the Report of Contact was direct retaliation for the fact that she had to cover night call on Sunday, December 25 for Dr. Lisan's Christmas call, five consecutive days which violated the restrictions his surgeons placed for him to return. The call responsibility then fell to her and she promptly dumped it on Dr. Lisan but was forced to cover the night hours. She even demanded that Dr. Lisan take one of her Holiday calls next year to repay her. That is preposterous for a service chief.

To summarize, Dr. Moss has been victimized repeatedly in an attempt to force him to resign or be terminated, undoubtedly so she could hire a younger female anesthesiologist to replace him, which I understand she has already done to replace an earlier departure. Eight of the twelve anesthesiologists on staff when Dr. Raphaely started have been driven out. Of the eight, all were male except one and all were

Ms. Susan Fueher, Medical Center Director
Murray D. Altose, MD, Chief of Staff
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, Ohio 44106
Page 4

replaced by younger females except one. At no time did Dr. Raphaely share with the department the CV's of the applicants or permit any of the staff to interview and give opinions about a potential colleague. I find that odd.

Dr. Moss has been the victim of many incidents of harassment by Dr. Raphaely. He has been lied to and treated unfairly by virtue of his age and sex. Dr. Moss has told me that he feels that he wears a target on his back. He feels that he has no support from Dr. Raphaely and if he were to make an error and now with the Report of Contact, if he is involved in an accident on the way to work or encounters a traffic jam or adverse weather conditions making him late, that he would be suspended. Until Dr. Raphaely's harassment started, Dr. Moss greatly enjoyed working at the VA. He remains dedicated to caring for the veterans and in so doing, repays his country for the freedom and opportunities it provides him. He is not a quitter and will not back down in the face of harassment and discrimination like many of his former colleagues did. He fully intends to fight this Report of Contact and has formally retained me to represent him.

We are requesting that the VA remove the Report of Contact concerning the above-detailed matter and any other negative reference to it from his personnel record and file. We further request that the sex and age discriminatory adverse actions directed against Dr. Moss and others, including the unlawful actions creating a hostile work environment, be fully investigated and promptly remediated.

Finally, I want to caution the VA against engaging in any adverse retaliatory action against Dr. Moss because we have communicated this letter of complaint and our requests to the VA.

Please feel free to have your counsel communicate with me at my office. Thank you in advance for your anticipated expeditious attention and cooperation in this matter.

Sincerely,

Steven A. Sindell

**VA** Department of Veterans Affairs

# REPORT OF CONTACT

*NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder.  Please do not use a pencil to complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C, XC, SS, XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN *(Type or print)* | DATE OF CONTACT |
|---|---|
| Moss, Kenneth | 12/19/2016 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN *(Include Area Code)* |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT *(check one)*  ☐ PERSONAL  ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED *(Include Area Code)* |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT *(check one)*  ☐ PERSONAL  ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU *(Include area code)* |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN *(Continue on page 2 if needed)*

On 4/21/2016 Dr. Moss was issued and signed a "Letter of Expectations" to address the issue of Dr. Moss' tardiness to work.  In this letter the time to report to duty was clearly spelled out and that if not adhered to corrective action would be taken.

On the morning of 12/19/2016 and again on the morning of 12/20/2016 Dr. Moss arrived to preop past the expected time of arrival. His tardiness on 12/20 resulted in two ORs having delays in there first case on time starts.  My concern is not only for the start of our day but the inability to do an appropriate preoerative patient evaluation when a clinician arrives at the bedside only moments before a case starts. This morning I directly observed Dr. Moss' arrival to preop at 7:27 and first pt evaluation taking place in less than a minutes time.

| DIVISION OR SECTION | EXECUTED BY *(Signature and title)* |
|---|---|

VA FORM
SEP 1997 (R)  **119**

## Ontell-Silverman, Sheryl (VHACLE)

**From:** Ontell-Silverman, Sheryl (VHACLE)
**Sent:** Wednesday, February 22, 2017 3:34 PM
**To:** Raphaely, Susan (VHACLE)
**Subject:** incident in OR



On February 22, 2017, I was in OR 2 at the OSC providing MAC anesthesia for patient A. P. for and open right inguinal hernia repair. The patient had a large hernia and once Dr. Perez opened the hernia sac a large amount of bowel was found inside and it was decided that the patient would need to be changed to a general anesthetic with intubation and muscle relaxation in order for the procedure to be completed. Dr. Moss was at the surgery center to give lunch relief and I requested that he join me in OR 2 for induction of general anesthesia as this would be the first time that we had switched to GA here and I wanted another set of "intelligent hands" available in case there was any problem with anesthesia equipment or documentation in PICIS. Dr. Moss poked his head in the OR at 12:25pm when I asked the circulator to go next door to get him. He said he would come over when the cataract surgery in his room was done. I then asked the circulator to get Dr. Varma who I believed Dr. Moss was relieving for lunch break to come to the room, but was informed that Dr. Moss had relieved her. The patient was stable and comfortable under sedation, but surgery could not proceed further without induction of general anesthesia. At 12:40pm Dr. Moss was in PACU dropping off the cataract Patient. I again sent the circulator to PACU to tell him that I needed him to come to the OR. He replied that he would come when he was done in PACU. At that point I called Dr. Raphaely who was on her way in to the hospital for call and apprised her of the situation. She was 5 minutes away and said she would head to the OSC. Again I asked the circulator to tell Dr. Moss that I wanted him to come to OR because I needed to induce general anesthesia for the first time at the OSC and wanted back up in case there were equipment problems. Finally at 12:45pm, Dr. Moss came to OR 2 and assisted me with inducing general anesthesia. Dr. Raphaely walked in just after the patient was intubated.

Dr. Moss then came back into OR to tell me that he had cancelled the last case in his room. I told him that he should have come and assisted me in a more timely fashion. He told me that he could not "abandon his patient". I told him that his patient was done with surgery (cataract with minimal sedation) and that when he dropped him off in PACU, he should have come to OR 2 as requested. If he needed to finish charting postop, he could have done that after assisting me as I requested.

Sheryl Ontell-Silverman, MD, PhD
Anesthesiologist, Outpatient Surgery Center



DEPARTMENT OF VETERANS AFFAIRS
LOUIS STOKES CLEVELAND
DEPARTMENT OF VETERANS AFFAIRS MEDICAL CENTER
10701 EAST BOULEVARD
CLEVELAND, OH 44106



March 8, 2017

In Reply Refer To: 541/053

Dr. Kenneth S. Moss, MD
Anesthesiology Service
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, OH 44106

Subject: Proposed Suspension

1.      This letter is to inform you that it is proposed to suspend you from duty and pay for five (5) calendar days based on the following reasons:

You are employed as a Physician, VM-0602-15, Step 9, in Anesthesiology Service at the Louis Stokes Cleveland Medical Center. As an employee of this Medical Center you are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy and ethical behavior toward patients, visitors and coworkers. An employee who violates established conduct requirements may be subject to appropriate disciplinary, adverse, or major adverse action. Furthermore, as an anesthesiologist during surgery you are responsible for monitoring and controlling the patient's vital life functions, including heart rate and rhythm, breathing, blood pressure, body temperature and body fluid balance.

I.      Inappropriate Conduct

a.      On Tuesday, February 21, 2017, you were the anesthesiologist assigned to provide monitored anesthesia care during an Esophagogastroduodenoscopy (EGD) procedure that took place in the Room 8 of the Gastrointestinal (GI) Endoscopy Unit. The procedure was scheduled to end at 4:30 p.m. However, the patient had a lesion in the second portion of the duodenum that was actively bleeding. Thus, the procedure was not completed until approximately 4:53 p.m. Dr. Richard Wong, MD, Gastroenterology, Medical Service, reported that you entered the room at approximately 4:40 p.m. stating that the procedure should have been completed by 4:30 p.m. At that time Dr. Wong informed you of the unforeseen delay as the patient was actively bleeding. Dr. Wong further reported that you returned to the room at approximately 4:45 p.m. and instructed Mr. Kyle Veliz, Certified Registered Nurse Anesthetist (CRNA) to stop providing anesthesia care and to turn off anesthesia equipment in ten (10) minutes, and left the room. At that time the GI nurses started to prepare to provide moderate sedation in case anesthesia care was discontinued before the procedure was completed. This incident was witnessed by the GI team present in the room. Consequently, you are being charged with inappropriate conduct.

Page 2.
Proposed Suspension
Dr. Kenneth Moss

b.      On Wednesday, February 22, 2017, Dr. Sheryl Ontell-Silverman, MD, PhD, Anesthesiology Service, was providing Monitored Anesthesia Care (MAC) in the Operating Room (OR) 2, for a patient undergoing open right inguinal hernia repair. During the procedure it was discovered that patient had a large amount of bowel in the hernia sac and would need to be changed to a general anesthetic with intubation and muscle relaxation in order for the procedure to be completed. At approximately 12:21 p.m., Dr. Ontell-Silverman sent the circulator to request you join her in the OR 2 for induction of general anesthesia as that was the first time she had to switch to general anesthetic during the procedure, and wanted, as she stated, "another set of intelligent hands" available in case there was any problem with anesthesia equipment or documentation in the PI Client Information System (PICIS).  Dr. Ontell-Silverman reported that you poked your head in the OR 2 at approximately 12:25 p.m. informing her that you would join her when the cataract surgery in your room was completed. At approximately 12:40 p.m., Dr. Ontell-Silverman sent the circulator to remind you she needed your assistance, as the surgery could not continue without general anesthesia. At that time you were in the Post Anesthesia Care Unit (PACU) dropping off the patient that underwent the cataract surgery and responded that you would go assist Dr. Ontell-Silverman once you are done in PACU. You did not arrive to the OR 2 until approximately 12:45 p.m. Furthermore, the circulator, Ms. Sonya Clay, reported that when she approached you at the patient's bedside in PACU to inform you that your assistance was still needed you did not respond to her. Ms. Clay reported when she returned to PACU you were talking to the next patient in the OR 1. Additionally, you had been paged overhead several times with instructions to report to OR 2. Moreover, the surgery tracker for February 22, 2017, indicates that the cataract surgery in the OR 1 ended at approximately 12:26 p.m. Consequently, you are being charged with inappropriate conduct.

c.      On Friday, February 24, 2017, I met with you briefly to inform you I received several reports of contact (ROCs) regarding your recent actions and to give you the opportunity to arrange for union representation so I could issue them to you. At the meeting you snickered out loud and stated in a sarcastic and mocking manner, "As you know, I have an attorney who will represent me and deal with this", or words to that effect. You then proceeded to tell me in a tone I perceived threatening, "You better make sure you have all your facts straight on this one", or words to that effect. Consequently, you are charged with inappropriate conduct.

2.      As an employee of this Medical Center, it is your responsibility to adhere to the rules and procedures, as described in MCP 005-024, Employee Responsibility and Conduct, which states in part:

"Employees are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy and ethical behavior toward patients, visitors and coworkers."

"Employees shall put forth honest effort in the performance of their duties."

"As an employee of the Cleveland VA Medical Center you are expected to:

•   Treat your supervisor(s) with resect, following their directions and guidance in a cooperative, responsive manner and completing assignments on a timely basis.

Page 3.
Proposed Suspension
Dr. Kenneth Moss

- *Exhibit courteous, respectful and compassionate behavior toward patients and those, with whom you interact, both co-workers and visitors, as a requirement of your position, not as an option."*

Your actions, as described above, are in direct contradiction with these expectations, thereby serving as the basis for your proposed suspension.

3.    If you choose to do so, you have until close of business fourteen (14) calendar days from the day after you receive this notice to reply orally, or in writing, or both orally and in writing, and to submit affidavits and other documentary evidence in support of your reply, showing why the charge is unfounded and any other reasons why your suspension should not be effected. Your written reply should be submitted to me. I will receive your oral reply, or will designate an official to receive it. You may make arrangements for your oral reply by calling Ms. Jelena Zekanovic, Employee/Labor Relations Specialist, Human Resources Management Service, at 216-791-2300, extension 2163.

4.    The evidence upon which this notice of proposed suspension is based will be available for your review in the Employee/Labor Relations Section of Human Resources Management Service, Second Floor, Administrative Building, Wade Park Campus, between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday. You will be allowed up to eight (8) hours of official duty time for reviewing the evidence relied on to support the reason(s) in this notice, preparing a written reply, securing affidavits, and for making a personal reply. Arrangements for the use of official time or requests for additional time should be made with me.

5.    You may be represented by an attorney or other representative of your choice at all stages of this matter, up to and including the issuance of the decision. Please advise me in writing of any representative designated.

6.    The final decision to effect the proposed action has not been made. The Medical Center Director, who will make the final decision, will give full and impartial consideration to your reply (ies), if submitted. You will be informed in writing of the final decision as soon as possible after your reply has been considered or after the expiration of the time allowed for reply, if you do not reply. If an action is effected, the applicable grievance or appeal rights will be included in the decision letter.

7.    You will be given a written decision within 21 calendar days of the receipt of your reply (ies) or, the close of business 14 calendar days following the receipt of this notice, if you do not reply.

8.    If it is decided that you should be suspended, it will be effective not less than thirty (30) calendar days from the day after the date of receipt of this notice.

9.    You will be retained in an active duty status during the advance notice period.

10.    If a personal, medical, family, or other situation is affecting your conduct on the job, this Medical Center has an Employee Assistance Program (EAP) that offers short-term counseling

Page 4.
Proposed Suspension
Dr. Kenneth Moss

and referral. You may contact EAP Counselors, Dr. Erica Sharkansky or Dr. Diane Johnson, at (216) 791-3800, extension 6922. One of them will be happy to meet with you on a confidential basis.

11.    If you do not understand the above reason as to why your suspension is being proposed, please contact me, or Ms. Jelena Zekanovic, Employee and Labor Relations Specialist, Human Resources Management Service, at 216-791-2300, extension 2163.


Susan D. Raphaely, MD
Chief, Anesthesiology Service

written after
Peer Review 3/8
Delivered 3/10 to me



| REPORT OF CONTACT<br>NOTE: This form must be filled out in ink or on typewriter as it becomes a permanent record in veterans' folders. | VA OFFICE<br><br>LSCVAMC<br>Cleveland, OH<br>(541) | IDENTIFICATION NOS. (C,XC,SS,XSS,V,K, etc.) |
|---|---|---|
| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print)<br>Pocs,Alexander  1402 | | DATE OF CONTACT<br>2/24/2017 |
| ADDRESS OF VETERAN | | TELEPHONE NO. OF VETERAN |
| PERSON CONTACTED<br>Murray Altose, MD | | TYPE OF CONTACT  (Check)<br>PERSONAL |
| ADDRESS OF PERSON CONTACTED<br>Cleveland Va Medical Center | | TELEPHONE NUMBER OF PERSON CONTACTED<br>(216) 791-3800 Ext: |

**BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN**

On February 24 2017 Dr. Susan Raphaely delivered a series of emails to me pertaining to events which took place at the Ambulatory Care Center (ASC) on February 22 which implied wrong doing on my part. On that day Wade Park could not send 2 anesthetists to assist Dr. Ontell and sent Dr. Kalpana Varma to provide anesthesia services for the second room. I volunteered to go to the ASC to give lunch relief and to takeover for Dr. Varma who was post call and had an important doctor's appointment. I relieved Dr. Ontell first, A.P. (1402), a stable open hernia repair for Dr. Perez. Other than a slight alteration in the propofol infusion rate, the patient was stable. He was not a high risk patient and had a good airway.  10 minutes after I took over Dr. Varma's cataract room, Dr. Ontell sent me a message asking me not to leave and I notified her that I was replacing Dr. Varma and would be here.  A few minutes after that, she requested that I leave my case and come and talk to her. I refused but she persisted and I therefore did so for 1 minute while the circulating nurse monitored my patient. Dr. Ontell told me that she needed to induce general anesthesia and needed my help. I told her that I could not abandon my patient and would come after my case was completed.  The case was finished at 1226 but by the time the eye patch was applied and monitors removed, it was 1231 before I brought the patient over to PACU.  Unfortunately I forgot to transfer the patient to PACU on the computer and when I returned to the OR to do so, I quickly peaked in the other room to find things calm.  About 2 minutes later, I finished with the cataract patient and as I was about to go to assist Dr. Ontell, I was told that my next patient was having respiratory difficulties, could not lie flat and was coughing.  I looked over to his bed to see him sitting in bed slumped forward.  I felt that the patient might indeed be in respiratory distress and that my attention was needed more urgently at his bedside than to assist Dr. Ontell with a very routine anesthetic induction and intubation.  I needed to examine him to determine if he needed to go to the ER, cancelled the case, and requested that the surgeons order a pulmonary consult and to reschedule the patient for Wade Park when he was optimal.  I had to do this before going to the OR because I knew that I would be tied up for awhile and I needed to communicate this to the surgeons. This took 10 minutes and I then proceeded to assist Dr. Ontell.  I did not complete the paperwork on the cancelled patient until well after I finished helping Dr. Ontell.  I was told several times while attempting to evaluate the patient that Dr. Ontell was still waiting.  Other nurses also informed me that Dr. Ontell was very anxious. I assisted her in inducing the anesthetic, performing the tasks that any OR nurse is trained to do and does at Wade Park.  During the intubation, I noted Dr. Ontell to be trembling.  It was apparent to me and to Dr. Perez that Dr. Ontell was too afraid to induce anesthesia and intubate by herself. Dr. Raphaely was evidently called by Dr. Ontell during the 20 minutes before I was available and arrived at the OSC a few minutes after the patient was intubated and stabilized.  She was quite rude, totally ignoring me and didn't ask me anything.

While it has been many years since my 5 year tenure as an anesthesia service chief, I feel that Dr. Raphaely was grossly negligent in her duties. It is the ultimate responsibility of the service chief to ensure safe and proper patient care. The fact that an anesthesiologist was unable to induce and intubate a fairly healthy patient with an easy airway by herself didn't seem to be a problem.  Had she expressed any concern for the events to Dr. Ontell, there would be no way that Dr. Ontell would have sent her another email on February 24 in which she expressed the opinion that I could have left the cataract patient at 1226.  A nurse anesthetist refusing to intubate in an emergency would not be tolerated.

To ensure proper patient care, I believe a service chief would be interested in obtaining all the facts. This would have required Dr. Raphaely to talk to both me and Dr. Perez. She doesn't know what I was told about the next cataract patient prompting me to change plans, or what I saw, what I diagnosed etc.  She found me guilty of negligent behavior without attempting to understand what happened. Had she spoken to Dr. Perez, he would have told her that the patient was stable the entire time and that in his opinion Dr. Ontell waited 20 minutes for me to arrive because she was afraid to work alone. The only thing Dr. Raphaely asked Dr Perez was why he needed general anesthesia and relaxation in the first place.  Another question that Dr. Raphaely could have asked and didn't is why Dr. Ontell didn't simply give some propofol, place an LMA and paralyze the patient. While not ideal, LMA's can be used with paralysis, are easy to insert and would have allowed Dr. Perez to continue his surgery rather than waiting 20 minutes for me. Was Dr. Ontell afraid to do that also?.  Shouldn't this question be addressed?

| DIVISION OR SECTION  Anesthesiology Service | EXECUTED BY (Signature and Title)<br><br>Staff Anesthesiologist Kenneth S. Moss, MD | _Kenneth Moss_ |
|---|---|---|

Automated VA Form 119

_Christopher M Jones_  recieved
3-2-17 for M.D. Altose

| REPORT OF CONTACT | VA OFFICE | IDENTIFICATION NOS. (C,XC,SS,XSS,V,K. etc.) |
|---|---|---|
| **NOTE:** This form must be filled out in ink or on typewriter as it becomes a permanent record in veterans' folders. | LSCVAMC Cleveland, OH (541) | |

| LAST NAME–FIRST NAME–MIDDLE NAME OF VETERAN (Type or print) | | |
|---|---|---|
| Pozs, Alexander  1402 | **DATE OF CONTACT** 2/22/2017 | |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN |
|---|---|
| | |

| PERSON CONTACTED | TYPE OF CONTACT   (Check) |
|---|---|
| Kristen Guadalupe | PERSONAL |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NUMBER OF PERSON CONTACTED |
|---|---|
| Cleveland VA Medical Center | (216) 791-3800 Ext: |

**BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN**

On February 22,2017 the Outpatient Surgery Center (OSC) required anesthesia services in 2 rooms. Since there was an insufficient number of CRNA's, Dr. Kalpana Varma was assigned to provide anesthesia with Dr. Sheryl Ontell. Late morning I was asked to go to the OSC to provide lunch relief. I relieved Dr. Ontell first, A.P. (1402), a stable open hernia repair. The patient did move a couple times causing me to increase the sedation. I gave report to Dr. Ontell and proceeded to relieve Dr. Varma. As it turned out, Dr. Varma was due to be relieved for the day due to her call responsibilities the previous day so I agreed to assume her responsibilities. 10 minutes later Dr. Ontell sent me a message asking me not to leave and I notified her that I was replacing Dr. Varma and would be here. A few minutes after that, she requested that I leave my case and come and talk to her. I refused but she persisted and I therefore did so for 1 minute while the circulating nurse monitored my patient. Dr. Ontell told me that she needed to induce general anesthesia and needed my help. I told her that I could not abandon my patient and would come after my case was completed.

I took my patient to PACU at 1231 but forgot to transfer the patient to PACU on the computer and when I returned to the OR to do so, I quickly peaked in the other room to find things calm. I could not help Dr. Ontell because I was still responsible for the previous eye patient. Over the next few minutes I wrapped up the patient in PACU and just as I was about to go to assist Dr. Ontell, I was informed that my next cataract patient was unable to lie flat and was having difficulty breathing and was coughing. Since I knew the OR patient was stable, I proceeded to check the cataract patient and he indeed had significant pulmonary issues. I needed to examine him to determine if he needed to go to the ER, cancelled the case, and requested that the surgeons order a pulmonary consult and to reschedule the patient for Wade Park when he was optimal. I had to do this before going to the OR because I knew that I would be tied up for awhile and I needed to communicate to the surgeons. I also knew that the patient in the OR was stable. During this time the nurse came to me and kept telling me that Dr. Ontell was still waiting. Other nurses also informed me that Dr. Ontell was very anxious.

When I arrived in the OR, the patient was indeed stable and Dr. Ontell was upset. I assisted her in inducing the anesthetic, performing the tasks that any of the OR nurses could have easily done and commonly do at Wade Park. During the intubation, I noted Dr. Ontell to be trembling. My concern is the fact that Dr. Ontell, a board certified anesthesiologist should have been able to do induce the patient herself and couldn't. I suspect this is due to a lack of confidence in her own clinical skills. It should be noted that when she interviewed for her position, it was the unanimous opinion of Dr. David Kazdan, the chief of anesthesiology at that time, and everyone who interviewed her including myself, that she should not be offered a position. Dr. Altose, Chief of Staff, overruled Dr. Kazdan and hired her over his objections. This however is in the past and my concern now is the welfare of our present and future veterans at the OSC.

In my opinion, based on 36 years post residency experience in anesthesiology, 17 of which are at LSCVAMC, Dr. Ontell should not be placed in a position of being solely responsible for the anesthetic care of veterans. All of our CRNA's are capable of induction/intubation and care of anesthetized patients. In the event that there are insufficient CRNA's to do this, she should be forced to take a vacation day. She cannot work at Wade Park in my opinion.

I believe that Dr. Ontell was under the erroneous impression that I was seeing my next patient and deliberately not coming to assist her. She called Dr. Raphaely, chief of Anesthesiology, who arrived after the patient was anesthetized and intubated. Dr. Raphaely completely ignored me, was quite unprofessional, and never asked me what I was doing or why it took time for me to respond. The fact that she is issuing a report of contact to me tomorrow without getting my explanation reaks of harassment and retaliation for the EEO complaint I filed against her in January, 2017. Unfortunately, now I am forced to notify my attorney of this matter and cannot contain it as I had hoped when I met with Kristen Guadalupe this morning. Patient safety is something I take very seriously and must be addressed. The unprofessionalism, intimidation harrassent, and retaliation against me by Dr. Raphaely should also be addressed in my opinion.

| DIVISION OR SECTION   **Anesthesiology Service** | EXECUTED BY (Signature and Title) | |
|---|---|---|
| | Staff Anesthesiologist Kenneth S. Moss, MD | *Kenneth S Moss* |

Automated VA Form 119

Submitted 2/23/17   1625



DEPARTMENT OF VETERANS AFFAIRS
LOUIS STOKES CLEVELAND
DEPARTMENT OF VETERANS AFFAIRS MEDICAL CENTER
10701 EAST BOULEVARD
CLEVELAND, OH 44106



May 18, 2017

**In Reply Refer To: 541/053**

Dr. Kenneth S. Moss, MD
Anesthesiology Service
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, OH 44106

Subject: Rescission of Proposed Suspension

In connection with the letter presented to you on March 10, 2017, in which you were given advance notice of your proposed suspension, a decision has been made to rescind the proposed action.

Susan Raphaely, MD
Service Chief, anesthesiology

I certify receipt of the original and two (2) copies of this document.

Kenneth S. Moss, MD

$\frac{6/2/17}{\text{Date}}$

541/053/4-26-17/JZ _____ 053 _____ 053 SS _11A____



**DEPARTMENT OF VETERANS AFFAIRS**
**LOUIS STOKES CLEVELAND**
**DEPARTMENT OF VETERANS AFFAIRS MEDICAL CENTER**
**10701 EAST BOULEVARD**
**CLEVELAND, OH 44106**



May 18, 2017                                                **In Reply Refer To: 541/053**

Dr. Kenneth S. Moss, MD
Anesthesiology Service
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, OH 44106

Subject: Proposed Suspension

1.       This letter is to inform you that it is proposed to suspend you from duty and pay for five (5) calendar days based on the following reasons:

You are employed as a Physician, VM-0602-15, Step 9, in Anesthesiology Service at the Louis Stokes Cleveland Medical Center. As an employee of this Medical Center you are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy and ethical behavior toward patients, visitors and coworkers. An employee who violates established conduct requirements may be subject to appropriate disciplinary, adverse, or major adverse action.   Furthermore, as an anesthesiologist during surgery you are responsible for monitoring and controlling the patient's vital life functions, including heart rate and rhythm, breathing, blood pressure, body temperature and body fluid balance.

I.       Inappropriate Conduct

a.       On Tuesday, February 21, 2017, you were the anesthesiologist assigned to provide monitored anesthesia care during an Esophagogastroduodenoscopy (EGD) procedure that took place in the Room 8 of the Gastrointestinal (GI) Endoscopy Unit. The patient had a lesion in the second portion of the duodenum that was actively bleeding. Thus, the procedure was not completed until approximately 4:53 p.m. Dr. Richard Wong, MD, Gastroenterology, Medical Service, reported that you entered the room at approximately 4:40 p.m. stating that the procedure should have been completed by 4:30 p.m. At that time Dr. Wong informed you of the unforeseen delay as the patient was actively bleeding. Dr. Wong further reported that you returned to the room at approximately 4:45 p.m. and instructed Mr. Kyle Veliz, Certified Registered Nurse Anesthetist (CRNA) to stop providing anesthesia care and to turn off anesthesia equipment in ten (10) minutes, and left the room. At that time the GI nurses started to prepare to provide moderate sedation in case anesthesia care was discontinued before the procedure was completed. This incident was witnessed by the GI team present in the room. Consequently, you are being charged with inappropriate conduct.

Page 2.
Proposed Suspension
Dr. Kenneth Moss

b.      On Wednesday, February 22, 2017, Dr. Sheryl Ontell-Silverman, MD, PhD, Anesthesiology Service, was providing Monitored Anesthesia Care (MAC) at the Ambulatory Surgical Center (ASC), for a patient undergoing open right inguinal hernia repair. During the procedure it was discovered that patient had a large amount of bowel in the hernia sac and would need to be changed to a general anesthetic with intubation and muscle relaxation in order for the procedure to be completed. At approximately 12:21 p.m., Dr. Ontell-Silverman sent the circulator to request you join her in the OR 2 for induction of general anesthesia as that was the first time she had to switch to general anesthetic at the ASC, and wanted, as she stated, "another set of intelligent hands" available in case there was any problem with anesthesia equipment or documentation in the PI Client Information System (PICIS).    Dr. Ontell-Silverman reported that you poked your head in the OR 2 at approximately 12:25 p.m. informing her that you would join her when the cataract surgery in your room was completed. At approximately 12:40 p.m., Dr. Ontell-Silverman sent the circulator to remind you she needed your assistance, as the surgery could not continue without general anesthesia. At that time you were in the Post Anesthesia Care Unit (PACU) dropping off the patient that underwent the cataract surgery and responded that you would go assist Dr. Ontell-Silverman once you are done in PACU. You did not arrive to the OR 2 until approximately 12:45 p.m. Furthermore, the circulator, Ms. Sonya Clay, reported that when she approached you at the patient's bedside in PACU to inform you that your assistance was still needed you did not respond to her. Ms. Clay reported when she returned to PACU you were talking to the next patient in the OR 1. Additionally, you had been paged overhead several times with instructions to report to OR 2. Moreover, the surgery tracker for February 22, 2017, indicates that the cataract surgery in the OR 1 ended at approximately 12:26 p.m. Consequently, you are being charged with inappropriate conduct.

c.      On Friday, February 24, 2017, I met with you briefly to inform you I received several reports of contact (ROCs) regarding your recent actions and to give you the opportunity to arrange for union representation so I could issue them to you. At the meeting you snickered out loud and stated in a sarcastic and mocking manner, "As you know, I have an attorney who will represent me and deal with this", or words to that effect. You then proceeded to tell me in a tone I perceived threatening, "You better make sure you have all your facts straight on this one", or words to that effect. Consequently, you are charged with inappropriate conduct.

   II.      Failure to Timely Report for "Call"

   On Sunday, March 19, 2017, at approximately 10:00 p.m. you were contacted by the Emergency Department (ED) attending physician to report for "call". A Veteran patient was in the ED and the ED staff thought he was in need of intubation. You refused to report for "call", stating that was not an appropriate case for anesthesiology. Second time you were contacted about the same patient, you stated that you would come in if the Ear Nose and Throat (ENT) attending was there in case the patient required emergent trach. Third time you were contacted about the same patient you finally agreed to come in and arrived at approximately 11:40 p.m. You failed to timely report for "call" to assess the patient to determine if intubation was needed. Consequently, you are charged with failure to timely report for "call".

Page 3.
Proposed Suspension
Dr. Kenneth Moss

2.     As an employee of this Medical Center, it is your responsibility to adhere to the rules and procedures, as described in MCP 005-024, Employee Responsibility and Conduct, which states in part:

*"Employees are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy and ethical behavior toward patients, visitors and coworkers."*

*"Employees shall put forth honest effort in the performance of their duties."*

*"As an employee of the Cleveland VA Medical Center you are expected to:*

- *Treat your supervisor(s) with resect, following their directions and guidance in a cooperative, responsive manner and completing assignments on a timely basis.*

- *Exhibit courteous, respectful and compassionate behavior toward patients and those, with whom you interact, both co-workers and visitors, as a requirement of your position, not as an option."*

Your actions, as described above, are in direct contradiction with these expectations, thereby serving as the basis for your proposed suspension.

3.     If you choose to do so, you have until close of business fourteen (14) calendar days from the day after you receive this notice to reply orally, or in writing, or both orally and in writing, and to submit affidavits and other documentary evidence in support of your reply, showing why the charge is unfounded and any other reasons why your suspension should not be effected.  Your written reply should be submitted to me.  I will receive your oral reply, or will designate an official to receive it.  You may make arrangements for your oral reply by calling Ms. Jelena Zekanovic, Employee/Labor Relations Specialist, Human Resources Management Service, at 216-791-2300, extension 2163.

4.     The evidence upon which this notice of proposed suspension is based will be available for your review in the Employee/Labor Relations Section of Human Resources Management Service, Second Floor, Administrative Building, Wade Park Campus, between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday. You will be allowed up to eight (8) hours of official duty time for reviewing the evidence relied on to support the reason(s) in this notice, preparing a written reply, securing affidavits, and for making a personal reply.  Arrangements for the use of official time or requests for additional time should be made with me.

5.     You may be represented by an attorney or other representative of your choice at all stages of this matter, up to and including the issuance of the decision.  Please advise me in writing of any representative designated.

6.     The final decision to effect the proposed action has not been made. The Medical Center Director, who will make the final decision, will give full and impartial consideration to your reply (ies), if submitted.  You will be informed in writing of the final decision as soon as possible after your reply has been considered or after the expiration of the time allowed for reply, if you do

Page 4.
Proposed Suspension
Dr. Kenneth Moss

not reply.  If an action is effected, the applicable grievance or appeal rights will be included in the decision letter.

7.  You will be given a written decision within 21 calendar days of the receipt of your reply (ies) or, the close of business 14 calendar days following the receipt of this notice, if you do not reply.

8.  If it is decided that you should be suspended, it will be effective not less than thirty (30) calendar days from the day after the date of receipt of this notice.

9.  You will be retained in an active duty status during the advance notice period.

10.  If a personal, medical, family, or other situation is affecting your conduct on the job, this Medical Center has an Employee Assistance Program (EAP) that offers short-term counseling and referral. You may contact EAP Counselors, Dr. Erica Sharkansky or Dr. Diane Johnson, at (216) 791-3800, extension 6922.  One of them will be happy to meet with you on a confidential basis.

11.  If you do not understand the above reason as to why your suspension is being proposed, please contact me, or Ms. Jelena Zekanovic, Employee and Labor Relations Specialist, Human Resources Management Service, at 216-791-2300, extension 2163.

Susan Raphaely, MD
Service Chief, anesthesiology

I certify receipt of the original and two (2) copies of this document.

Kenneth S. Moss, MD

6/2/17
Date

541/053/JZ/04-28-17/ /JZ 053 SS 053_____ 053_____ 11A

PLAINTIFF'S EXHIBIT 50 PENGAD 800-631-6989

# Anesthesia On Call Schedule
## August, 2015

| | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| | **30** | **31** | September **1** | | | | **1** |
| First call | LISAN | RASLAN | SHAH | | | | |
| 2nd call | FRANKITO | COSTANZO | | | | | MOSS |
| Late Duty | | SHAH | | | | | KILBANE |
| Leave | | OO,SR,JO,RV,RS MK,AH | | | | | |
| | **2** | **3** | **4** | **5** | **6** | **7** | **8** |
| First call | MOSS | HOXHA | VENNA | TSUI | SHAH | VENNA | VENNA |
| 2nd call | KILBANE | COSTANZO | FOSTER | BONFILI | HUFF | McMASTER | WILSON |
| Late duty | | RASLAN | TSUI | SHAH | LISAN | MOSS | |
| Leave | | OO ,SR,JO,RV,RS TMJF | OO,JO,RV,RS LFKB | OO .RS  RVJO | OO,JO,RV,RS EC AW | OO,SR,JO,RV,RS, MK ah | |
| | **9** | **10** | **11** | **12** | **13** | **14** | **15** |
| First call | VENNA | OMAR | SCHLESINGER | SHAH | RASLAN | HOXHA | HOXHA |
| 2nd call | WILSON | FOSTER | KILBANE | BONFILI | McMASTER | RIEKE | WHITTIER |
| Late duty | | SCHLESINGER | SHAH | RASLAN | HOXHA | OMAR | |
| Leave | | SR,JO,RL,EC MK ah | SR,JO,RL,EC LFKB | SR,JO,RL,EC TM RV | SR,JO,RL,EC JF JO | SR,JO,RL,EC,KM EC AW | |
| | **16** | **17** | **18** | **19** | **20** | **21** | **22** |
| First call | HOXHA | OMAR | SCHLESINGER | VENNA | TSUI | MOSS | RAPHAELY |
| 2nd call | WHITTIER | COSTANZO | RIEKE | FRANKITO | McMASTER | VERB | HUFF |
| Late duty | | VENNA | SHAH | TSUI | MOSS | SCHLESINGER | |
| Leave | | JO,RL,KM,KB JF AW | JO,RL,KB LFKB | JO,RL,KB RV ah | JO,RL,KB EC MK | JO,RL,EC,KB JO, TM | |
| | **23** | **24** | **25** | **26** | **27** | **28** | **29** |
| First call | RAPHAELY | SCHLESINGER | LISAN | TSUI | MOSS | OMAR | RASLAN |
| 2nd call | HUFF | WILSON | VERB | RIEKE | FOSTER | BONFILI | FRANKITO |
| Late duty | | LISAN | TSUI | SCHLESINGER | OMAR | RASLAN | |
| Leave | | JO,EC,PV,TM  TM JF | JO,PV,TM,AH LFKB | JO,PV,TM,AH RV JO | JO,PV,TM,AH EC AW | JO,RV,PV,TM,AH MK ah | |

Completed August 1, 2015

# Kenneth S. Moss, MD

2428 Cedarwood Road
Pepper Pike, Ohio 44124-4239
e-mail: ksmoss@sbcglobal.net



PLAINTIFF'S EXHIBIT 53 4·11·19 DMF

440-823-9242

March 22, 2018

Dr. Murray D. Altose, Chief of Staff
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, Ohio 44106

Dear Dr. Altose:

Thank you for taking time to return my call Friday. I took you advice and completed what became a stressful, busy late call. I also apologized to Dr. Raphaely for my rudeness.

I believe you need to know what is going on within the Anesthesiology Service regarding Dr. Raphaely. Less than one hour after speaking to you, three PACU nurses came to me stating that while I was doing the ECT's in PACU, Dr. Raphaely came to the PACU asking what time I started. She later spoke with Dr. Punit Vaidya, the psychiatrist doing the ECT's in a voice loud enough for the PACU nurses to hear every word. She evidently asked if the ECT start was delayed and Dr. Vaidya told her that it was because his staff was delayed in getting to the PACU. He went on to say that it was no big deal and that when delays occur, sometimes they are his fault, sometimes they are anesthesia's fault. It wasn't a problem. She specifically asked if I was late and gave him a report of contact to fill out on me. To my knowledge, he did not do so because she did not include it in the report of contact that she presented to me on later that day. Bob Bearss was ready to go before 0930 and I arrived at 0930. The psych staff finished getting ready shortly thereafter. Bob Bearss informed me that she also asked him about me. He said nothing was wrong.

Going around and trying to find fault with staff to get them in trouble is unacceptable behavior in a service chief. She deliberately was looking for trouble. This unprofessional behavior intensifies an already stressful and hostile work environment.

I told you that ever since Dr. Raphaely marked me AWOL for arriving 8 minutes late for a 0900 Late call and without my knowledge, didn't pay me for the entire day, I have been very cautious when circumstances beyond my control result in my being a few minutes late. Every employee working at the VA expects to be paid. When that doesn't happen, morale suffers. I can't tell you how many surgeons, surgical nurses, techs, housekeepers, anesthetists and anesthesiologists who somehow found out that Dr. Raphaely intentionally did this to me came up to me to express how unprofessional, dishonest and harassing this was. Dr. Raphaely stated that she did this because of my "repeated tardiness" during last summer when Shaker Road and the Cedar-Fairmount intersection was under construction. I was no more than 5-10 minutes late for 0900 arrival despite always giving myself an extra 30 minutes travel time. At no time have I ever failed to get my work done in a timely fashion and I was by no means, the only person arriving late. I was however the only person that she was monitoring by standing in the hall to note my arrival time. This is clearly harassment. Then to compound things she used the day she marked me AWOL and a day I called off improperly and she docked me a days pay, to request a 10 day suspension which you overturned. You can't imagine the stress this double jeopardy created. So last Friday when I was delayed leaving the house because of an overflowing toilet that had to be cleaned up, resulting in my being 2 minutes late and seeing her standing in the hall outside her office, I lost it. That was why I was rude to her. I admit that was unprofessional but after 26 months of harassment, I believe that the most people would at the very least understand my mindset.

I would not have had to call you at all had Dr. Raphaely answered if she planned to mark me AWOL for the 2 minutes. She refused, left my office and returned 5-10 minutes later with Kevin Roach to ask me if I was planning

on staying or leaving. I again asked if she was going to mark me AWOL and once again she refused to answer. By that time I had already reviewed my schedule for the day, checked the ECT patients so that after she left and I placed a call to you, I went to PACU for the ECT's. Clearly Dr. Raphaely's refusal to answer a legitimate question tells me that she was baiting me, hoping that I would leave so she could mark me AWOL. This is clearly unprofessional behavior and should not be permitted by a service chief.

Dr. Raphaely assigned herself first call this past Monday. Everyone else assigned Monday first call is assigned late call on Friday. When I told her that last Friday's late call was technically hers, she became angry. In the 3 years she has been here, she has not taken a single late call. I did the call schedule for 13 years. Once her orientation period was up and I started assigning her calls, she began a subtle campaign of criticism and belittling my work on the call schedule. The criticism increased when I brought up the possibility of her taking late call. I finally got tired of it and turned the call schedule over to her which was exactly what she wanted me to do so she could gain control of it and reduce her call responsibilities further.

And why does she refuse to take late call? I don't believe it is because she is lazy or fears she can't handle it. Dr. Raphaely is not lazy and she is a competent clinical anesthesiologist. She doesn't take late call because I believe she feels a sense of entitlement and late call is simply beneath her. This attitude of looking down on people is simply unacceptable. Knowing that the CRNA's find the term, "frontliners", offensive, she continues to refer to them that way. Within a couple months of her arrival, I told her privately that the term was disrespectful and demeaning and to please stop using it. She ignored me.

For months now, the CRNA's unrest has been building. Dr. Raphaely's answer was to try to reassign their offices and scatter them around in an attempt to keep them from talking to each other. Threats to take down their office door, insulting them in public didn't help either. I do not know what finally precipitated the EEO complaint because I was on a two week vacation. I was surprised that 13 CRNA's (everyone asked to sign the complaint did so) filed but I was quite upset to learn that the only response was hiring an outside VA investigator to look into the complaint. This does not stop Dr. Raphaely from further retaliation and harassment as my situation illustrates.

To date 13 employed CRNA's, 1 former CRNA, 1 former anesthesia tech, Dr. Lisan and I have filed EEO complaints accusing Dr. Raphaely of harassment and creating a hostile work environment. Surely when over half of the present staff have filed an EEO complaint, when over half of the anesthesiologists on staff at the time Dr. Raphaely arrived have left (many of whom are willing to testify that they were also harassed), the probability that the accusations are credible should have been considered and definitive action taken by now.

In my opinion Dr. Raphaely should be immediately relieved of her administrative duties and an interim service chief be appointed until a satisfactory resolution of all complaints has occurred. I have had the privilege of working at the Louis Stokes Cleveland VA Medical Center for 18 years under 4 service chiefs. I have never seen morale as low as it is at present. I fear that if one person gets frustrated or angry enough to take these concerns public, the damage to the hospital could wipe out everything you have done to make this hospital the great institution that it is. No one wins if that were to happen, not the employees I am proud to work with, and surely not our veterans for whom I enjoyed serving. Political ideology aside, when I hear mutterings that perhaps President Trump needs to "drain the swamp" at the Cleveland VA, I am uncomfortable.

I am not holding out any hope that this letter will accomplish much or that I will even get a response back. I know that I have done what I feel is right for my anesthesia friends and colleagues in what is now the final days of my career. It was never my intention to retire. I would have liked to go part time but I cannot tolerate the harassment and hostile work environment any longer. The stress this has placed on my family and my health is unacceptable.

Respectfully submitted,


Kenneth S Moss, MD
Staff Anesthesiologist

CC: Ms. Susan Fuehrer, Medical Center Director

Received from Kenneth Moss, MD one letter to be delivered to

Dr. Murray D. Altose

PLAINTIFF'S
EXHIBIT
54
PENGAD 800-631-6989
4·11·19  DMF

_____     _____     _____     _____
Name of Recipient                    Title       Date        Time


Received from Kenneth Moss, MD one letter to be delivered to

MS. Susan Fuehrer

_____     _____     _____     _____
Name of Recipient                    Title       Date        Time

| REPORT OF CONTACT | VA OFFICE | IDENTIFICATION NO. (C,XC,SS,NSN,V,R, etc.) |
|---|---|---|
| NOTE: This form must be filled out in ink or on typewriter as it becomes a permanent record in veterans' folders. | LSCVAMC Cleveland, OH (541) | |

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|
| Pocs,Alexander 1402 | 2/22/2017 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN |
|---|---|
| | |

PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989
55 K.M
4-11-09 DMF

| PERSON CONTACTED | TYPE OF CONTACT (Check) |
|---|---|
| Kristen Guadalupe | PERSONAL |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NUMBER OF PERSON CONTACTED |
|---|---|
| Cleveland Va Medical Center | (216) 791-3800 Ext: |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

On February 22,2017 the Outpatient Surgery Center (OSC) required anesthesia services in 2 rooms. Since there was an insufficient number of CRNA's, Dr. Kalpana Varma was assigned to provide anesthesia with Dr. Sheryl Ontell. Late morning I was asked to go to the OSC to porvide lunch relief. I relieved Dr. Ontell first, A.P. (1402), a stable open hernia repair. The patient did move a couple times causing me to increase the sedation. I gave report to Dr. Ontell and proceded to relieve Dr. Varma. As it turned out, Dr. Varma was due to be relieved for the day due to her call responsibilities the previous day so I agreed to assume her responsibilities. 10 minutes later Dr. Ontell sent me a message asking me not to leave and I notified her that I was replacing Dr. Varma and would be here. A few minutes after that, she requested that I leave my case and come and talk to her. I refused but she persisted and I therefore did so for 1 minute while the circulating nurse monitored my patient. Dr. Ontell told me that she needed to induce general anesthesia and needed my help. I told her that I could not abandon my patient and would come after my case was completed.

I took my patient to PACU at 1231 but forgot to transfer the patient to PACU on the computer and when I returned to the OR to do so, I quickly peaked in the other room to find things calm. I could not help Dr. Ontell because I was still responsible for the previous eye patient. Over the next few minutes I wrapped up the patient in PACU and just as I was about to go to assist Dr. Ontell, I was informed that my next cataract patient was unable to lie flat and was having difficulty breathing and was coughing. Since I knew the OR patient was stable, I proceeded to check the cataract patient and he indeed had significant pulmonary issues. I needed to examine him to determine if he needed to go to the ER, cancelled the case, and requested that the surgeons order a pulmonary consult and to reschedule the patient for Wade Park when he was optimal. I had to do this before going to the OR because I knew that I would be tied up for awhile and I needed to communicate to the surgeons. I also knew that the patient in the OR was stable. During this time the nurse came to me and kept telling me that Dr. Ontell was still waiting. Other nurses also informed me that Dr. Ontell was very anxious.

When I arrived in the OR, the patient was indeed stable and Dr. Ontell was upset. I assisted her in inducing the anesthetic, performing the tasks that any of the OR nurses could have easily done and commonly do at Wade Park. During the intubation, I noted Dr. Ontell to be trembling. My concern is the fact that Dr. Ontell, a board certified anesthesiologist should have been able to do induce the patient herself and couldn't. I suspect that this is due to a lack of confidence in her own clinical skills. It should be noted that when she interviewed for the position, it was the unanimous opinion of Dr. David Kazdan, the chief of anesthesiology at that time, and everyone who interviewed her including myself, that she should not be offered a position. Dr. Altose, Chief of Staff, overruled Dr. Kazdan and hired her over his objections. This however is in the past and my concern now is the welfare of our present and future veterans at the OSC.

In my opinion, based on 36 years post residency experience in anesthesiology, 17 of which are at LSCVAMC, Dr. Ontell should not be placed in a position of being solely responsible for the anesthetic care of veterans. All of our CRNA's are capable of induction/intubation and care of anesthetized patients. In the event that there are insufficient CRNA's to do this, she should be forced to take a vacation day. She cannot work at Wade Park in my opinion.

I believe that Dr. Ontell was under the erroneous impression that I was seeing my next patient and deliberately not coming to assist her. She called Dr. Raphaely, chief of Anesthesiology, who arrived after the patient was anesthetized and intubated. Dr. Raphaely completely ignored me, was quite unprofessional, and never asked me what I was doing or why it took time for me to respond. The fact that she is issuing a report of contact to me tomorrow without getting my explanation reaks of harassment and retaliation for the EEO complaint I filed against her in January, 2017. Unfortunately, now I am forced to notify my attorney of this matter and cannot contain it as I had hoped when I met with Kristen Guadalupe this morning. Patient safety is something I take very seriously and must be addressed. The unprofessionalism, intimidation harrassent, and retaliation against me by Dr. Raphaely should also be addressed in my opinion.

| DIVISION OR SECTION **Anesthesiology Service** | EXECUTED BY (Signature and Title) |
|---|---|
| | Staff Anesthesiologist Kenneth S, Moss, MD |

Automated VA Form 119

Submitted 2/23/17 1625

| REPORT OF CONTACT<br>NOTE: This form must be filled out in ink<br>or on typewriter as it becomes a permanent<br>record in veterans' folders. | VA OFFICE<br><br>**LSCVAMC**<br>Cleveland, OH<br>(541) | IDENTIFICATION NOS. (C,XC,SS,XSS,V,K, etc.) |
|---|---|---|
| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print)<br>Pocs,Alexander 1402 | | DATE OF CONTACT<br>2/24/2017 |
| ADDRESS OF VETERAN | | TELEPHONE NO. OF VETERAN |
| PERSON CONTACTED<br>Murray Altose, MD | | TYPE OF CONTACT (Check)<br><br>PERSONAL |
| ADDRESS OF PERSON CONTACTED<br>Cleveland Va Medical Center | | TELEPHONE NUMBER OF PERSON CONTACTED<br>(216) 791-3800 Ext: |

PLAINTIFF'S EXHIBIT 56 K.M 4/.11.19 DMF PENGAD 800-631-6989

**BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN**

On February 24,2017 Dr. Susan Raphaely delivered a series of emails to me pertaining to events which took place at the Ambulatory Care Center (ASC) on February 22 which implied wrong doing on my part. On that day Wade Park could not send 2 anesthetists to assist Dr. Ontell and sent Dr. Kalpana Varma to provide anesthesia services for the second room. I volunteered to go to the ASC to give lunch relief and to takeover for Dr. Varma who was post call and had an important doctor's appointment. I relieved Dr. Ontell first, A.P. (1402), a stable open hernia repair for Dr. Perez. Other than a slight alteration in the propofol infusion rate, the patient was quite stable. He was not a high risk patient and had a good airway. 10 minutes after I took over Dr. Varma's cataract room, Dr. Ontell sent me a message asking me not to leave and I notified her that I was replacing Dr. Varma and wanted to assist here. A few minutes after that, she requested that I leave my case and come and talk to her. I refused but she persisted and I therefore did so for 1 minute while the circulating nurse monitored my patient. Dr. Ontell told me that she needed to induce general anesthesia and needed my help. I told her that I could not abandon my patient and would come after my case was completed. The case was finished at 1226 but by the time the eye patch was applied and monitors removed, it was 1231 before I brought the patient over to PACU. Unfortunately I forgot to transfer the patient to PACU on the computer and when I returned to the OR to do so, I quickly peaked in the other room to find things calm. About 2 minutes later, I finished with the cataract patient and as I was about to go to assist Dr. Ontell, I was told that my next patient was having respiratory difficulties, could not lie flat and was coughing. I looked over to his bed to see him sitting in bed slumped forward. I felt that the patient might indeed be in respiratory distress and that my attention was needed more urgently at his bedside than to assist Dr. Ontell with a very routine anesthetic induction and intubation. I needed to examine him to determine if he needed to go to the ER, cancelled the case, and requested that the surgeons order a pulmonary consult and to reschedule the patient for Wade Park when he was optimal. I had to do this before going to the OR because I knew that I would be tied up for awhile and I needed to communicate this to the surgeons.This took 10 minutes and I then proceeded to assit Dr. Ontell. I did not complete the paperwork on the cancelled patient until well after I finished helping Dr. Ontell. I was told several times while attempting to evaluate the patient that Dr. Ontell was still waiting. Other nurses also informed me that Dr. Ontell was very anxious. I assisted her in inducing the anesthetic, performing the tasks that any OR nurse is trained to do and does at Wade Park. During the intubation, I noted Dr. Ontell to be trembling. It was apparent to me and to Dr. Perez that Dr. Ontell was too afraid to induce anesthesia and intubate by herself. Dr. Raphaely was evidently called by Dr. Ontell during the 20 minutes before I was available and arrived at the OSC a few minutes after the patient was intubated and stabilized. She was quite rude, totally ignoring me and didn't ask me anything.

While it has been many years since my 5 year tenure as an anesthesia service chief, I feel that Dr. Raphaely was grossly negligent in her duties. It is the ultimate responsibility of the service chief to ensure safe and proper patient care. The fact that an anesthesiologist was unable to induce and intubate a fairly healthy patient with an easy airway by herself didn't seem to be a problem. Had she expressed any concern for the events to Dr. Ontell, there would be no way that Dr. Ontell would have sent her another email on February 24 in which she expressed the opinion that I could have left the cataract patient at 1226. A nurse anesthestist refusing to intubate in an emergency would not be tolerated.

To ensure proper patient care, I believe a service chief would be interested in obtaining all the facts. This would have required Dr. Raphaely to talk to both me and Dr. Perez She doesn't know what I was told about the next cataract patient prompting me to change plans, or what I saw, what I diagnosed etc. She found me guilty of negligent behavior without attempting to understand what happened. Had she spoken to Dr. Perez,, he would have told her that the patient was stable the entire time and that in his opiniont Dr. Ontell waited 20 minutes for me to arrive because she was afraid to work alone. The only thing Dr. Raphaely asked Dr Perez was why he needed general anesthesia and relaxation in the first place. Another question that Dr. Raphaely could have asked and didn't is why Dr. Ontell didn't simply give some propofol, place an LMA and paralyze the patient. While not ideal, LMA's can be used with paralysis, are easy to insert and would have allowed Dr. Perez to continue his surgery rather than waiting 20 minutes for me. Was Dr. Ontell afraid to do that also? Shouldn't this question be addressed?

| DIVISION OR SECTION  Anesthesiology Service | EXECUTED BY (Signature and Title)<br><br>Staff Anesthesiologist Kenneth S, Moss, MD |
|---|---|

Automated VA Form 119

recieved 3-3-17 Av M.D.A|+05

*A note from*

Dr. Kenneth Moss

ASA study.
Female 2012
30 % of doctors
but only 23 % of MDA
overall.

RAND STUDY

33 % anesthesiogists of < 36 yo.
38 %

still minority        VA policy

2017
   31 094 male
   10 624 female
by statista . com

   41 718        25.4 %
                .0002 655359
6 times random chance     .0269 %  1 in for min act.

# Kenneth Moss

25.42 to 1 = 3.9

factor 6

.0 002685

PLAINTIFF'S
EXHIBIT
50
4-11-19  K.W.  DMF
PENGAD 800-631-6989

Chance at random
is 1 out of ~~3724~~
3724.39

1 in 3724.395

10% veterans, female
so Statistics are
even worse

888 Printed on 100% Post Consumer Waste

Dictatorial
vengeful
punitive

| REPORT OF CONTACT<br>NOTE: This form must be filled out in ink<br>or on typewriter as it becomes a permanent<br>record in veterans' folders. | VA OFFICE<br><br>LSCVAMC<br>Cleveland, OH<br>(541) | IDENTIFICATION NOS. (C,XC,SS,XSS,V,K, etc.) |
|---|---|---|
| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print)<br>Poes,Alexander 1402 | | DATE OF CONTACT<br>2/24/2017 |
| ADDRESS OF VETERAN | | TELEPHONE NO. OF VETERAN |
| PERSON CONTACTED<br>Murray Altose, MD | | TYPE OF CONTACT (Check)<br><br>PERSONAL |
| ADDRESS OF PERSON CONTACTED<br>Cleveland Va Medical Center | | TELEPHONE NUMBER OF PERSON CONTACTED<br>(216) 791-3800 Ext: |

PLAINTIFF'S EXHIBIT 59 M.A 4-12-19 OMF PENGAD 800-631-6989

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

On February 24,2017 Dr. Susan Raphaely delivered a series of emails to me pertaining to events which took place at the Ambulatory Care Center (ASC) on February 22 which implied wrong doing on my part. On that day Wade Park could not send 2 anesthetists to assist Dr. Ontell and sent Dr. Kalpana Varma to provide anesthesia services for the second room. I volunteered to go to the ASC to give lunch relief and to takeover for Dr. Varma who was post call and had an important doctor's appointment. I relieved Dr. Ontell first, A.P. (1402), a stable open hernia repair for Dr. Perez. Other than a slight alteration in the propofol infusion rate, the patient was quite stable. He was not a high risk patient and had a good airway. 10 minutes after I took over Dr. Varma's cataract room, Dr. Ontell sent me a message asking me not to leave and I notified her that I was replacing Dr. Varma and would be here. A few minutes after that, she requested that I leave my case and come and talk to her. I refused but she persisted and I therefore did so for 1 minute while the circulating nurse monitored my patient. Dr. Ontell told me that she needed to induce general anesthesia and needed my help. I told her that I could not abandon my patient and would come after my case was completed. The case was finished at 1226 but by the time the eye patch was applied and monitors removed, it was 1231 before I brought the patient over to PACU. Unfortunately I forgot to transfer the patient to PACU on the computer and when I returned to the OR to do so, I quickly peeked in the other room to find things calm. About 2 minutes later, I finished with the cataract patient and as I was about to go to assist Dr. Ontell, I was told that my next patient was having respiratory difficulties, could not lie flat and was coughing. I looked over to his bed to see him sitting in bed slumped forward. I felt that the patient might indeed be in respiratory distress and that my attention was needed more urgently at his bedside than to assist Dr. Ontell with a very routine anesthetic induction and intubation. I needed to examine him to determine if he needed to go to the ER, cancelled the case, and requested that the surgeons order a pulmonary consult and to reschedule the patient for Wade Park when he was optimal. I had to do this before going to the OR because I knew that I would be tied up for awhile and I needed to communicate this to the surgeons.This took 10 minutes and I then proceeded to assit Dr. Ontell. I did not complete the paperwork on the cancelled patient until well after I finished helping Dr. Ontell. I was told several times while attempting to evaluate the patient that Dr. Ontell was still waiting. Other nurses also informed me that Dr. Ontell was very anxious. I assisted her in inducing the anesthetic, performing the tasks that any OR nurse is trained to do and does at Wade Park. During the intubation, I noted Dr. Ontell to be trembling. It was apparent to me and to Dr. Perez that Dr. Ontell was too afraid to induce anesthesia and intubate by herself. Dr. Raphaely was evidently called by Dr. Ontell during the 20 minutes before I was available and arrived at the OSC a few minutes after the patient was intubated and stabilized. She was quite rude, totally ignoring me and didn't ask me anything.

While it has been many years since my 5 year tenure as an anesthesia service chief, I feel that Dr. Raphaely was grossly negligent in her duties. It is the ultimate responsibility of the service chief to ensure safe and proper patient care. The fact that an anesthesiologist was unable to induce and intubate a fairly healthy patient with an easy airway by herself didn't seem to be a problem. Had she expressed any concern for the events to Dr. Ontell, there would be no way that Dr. Ontell would have sent her another email on February 24 in which she expressed the opinion that I could have left the cataract patient at 1226. A nurse anesthestist refusing to intubate in an emergency would not be tolerated.

To ensure proper patient care, I believe a service chief would be interested in obtaining all the facts. This would have required Dr. Raphaely to talk to both me and Dr. Perez She doesn't know what I was told about the next cataract patient prompting me to change plans, or what I saw, what I diagnosed etc. She found me guilty of negligent behavior without attempting to understand what happened. Had she spoken to Dr. Perez,, he would have told her that the patient was stable the entire time and that in his opinionn Dr. Ontell waited 20 minutes for me to arrive because she was afraid to work alone. The only thing Dr. Raphaely asked Dr Perez was why he needed general anesthesia and relaxation in the first place. Another question that Dr. Raphaely could have asked and didn't is why Dr. Ontell didn't simply give some propofol, place an LMA and paralyze the patient. While not ideal, LMA's can be used with paralysis, are easy to insert and would have allowed Dr. Perez to continue his surgery rather than waiting 20 minutes for me. Was Dr. Ontell afraid to do that also? .Shouldn't this question be addressed?

| DIVISION OR SECTION Anesthesiology Service | EXECUTED BY (Signature and Title) |
|---|---|
| | Staff Anesthesiologist Kenneth S, Moss, MD |

Automated VA Form 119

recieved 2-2-17 for M.D.A|+05

Received from Kenneth Moss, MD one letter to be delivered to

Dr. Murray D. Altose

PLAINTIFF'S
EXHIBIT
60 mA
4-12-19 OMF
PENGAD 800-631-6989

_____ _____ 3/23/18 _____ 2:05 _____

Name of Recipient          Title          Date          Time


Received from Kenneth Moss, MD one letter to be delivered to

MS. Susan Fuehrer

_____ _____ 3/23/18 _____ 2:05 _____

Name of Recipient          Title          Date          Time

**REPORT OF CONTACT**

NOTE: This form must be filled out in ink
or on typewriter as it becomes a permanent
record in veterans' folders.

LSCVAMC
Cleveland, OH
(541)

VA OFFICE, IDENTIFICATION NOS. (C,XC,SS,XSS,V,X, etc.)

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|
| Pocs, Alexander 1402 | 2/22/2017 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN |
|---|---|

PLAINTIFF'S EXHIBIT
61
4-12-19 DMF
PENGAD 800-631-6989

| PERSON CONTACTED | TYPE OF CONTACT (Check) |
|---|---|
| Kristen Guadalupe | PERSONAL |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NUMBER OF PERSON CONTACTED |
|---|---|
| Cleveland Va Medical Center | (216) 791-3800 Ext: |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

On February 22,2017 the Outpatient Surgery Center (OSC) required anesthesia services in 2 rooms. Since there was an insufficient number of CRNA's, Dr. Kalpana Varma was assigned to provide anesthesia with Dr. Sheryl Ontell. Late morning I was asked to go to the OSC to porvide lunch relief. I relieved Dr. Ontell first, A.P. (1402), a stable open hernia repair. The patient did move a couple times causing me to increase the sedation. I gave report to Dr. Ontell and proceeded to relieve Dr. Varma. As it turned out, Dr. Varma was due to be relieved for the day due to her call responsibilities the previous day so I agreed to assume her responsibilities. 10 minutes later Dr. Ontell sent me a message asking me not to leave and I notified her that I was replacing Dr. Varma and would be here. A few minutes after that, she requested that I leave my case and come and talk to her. I refused but she persisted and I therefore did so for 1 minute while the circulating nurse monitored my patient. Dr. Ontell told me that she needed to induce general anesthesia and needed my help. I told her that I could not abandon my patient and would come after my case was completed.

I took my patient to PACU at 1231 but forgot to transfer the patient to PACU on the computer and when I returned to the OR to do so, I quickly peaked in the other room to find things calm. I could not help Dr. Ontell because I was still responsible for the previous eye patient. Over the next few minutes I wrapped up the patient in PACU and just as I was about to go to assist Dr. Ontell, I was informed that my next cataract patient was unable to lie flat and was having difficulty breathing and was coughing. Since I knew the OR patient was stable, I proceeded to check the cataract patient and he indeed had significant pulmonary issues. I needed to examine him to determine if he needed to go to the ER, cancelled the case, and requested that the surgeons order a pulmonary consult and to reschedule the patient for Wade Park when he was optimal. I had to do this before going to the OR because I knew that I would be tied up for awhile and I needed to communicate to the surgeons. I also knew that the patient in the OR was stable. During this time the nurse came to me and kept telling me that Dr. Ontell was still waiting. Other nurses also informed me that Dr. Ontell was very anxious.

When I arrived in the OR, the patient was indeed stable and Dr. Ontell was upset. I assisted her in inducing the anesthetic, performing the tasks that any of the OR nurses could have easily done and commonly do at Wade Park. During the intubation, I noted Dr. Ontell to be trembling. My concern is the fact that Dr. Ontell, a board certified anesthesiologist should have been able to do induce the patient herself and couldn't. I suspect that this is due to a lack of confidence in her own clinical skills. It should be noted that when she interviewed for the position, it was the unanimous opinion of Dr. David Kazdan, the chief of anesthesiology at that time, and everyone who interviewed her including myself, that she should not be offered a position. Dr. Altose, Chief of Staff, overruled Dr. Kazdan and hired her over his objections. This however is in the past and my concern now is the welfare of our present and future veterans at the OSC.

In my opinion, based on 36 years post residency experience in anesthesiology, 17 of which are at LSCVAMC, Dr. Ontell should not be placed in a position of being solely responsible for the anesthetic care of veterans. All of our CRNA's are capable of induction/intubation and care of anesthetized patients. In the event that there are insufficient CRNA's to do this, she should be forced to take a vacation day. She cannot work at Wade Park in my opinion.

I believe that Dr. Ontell was under the erroneous impression that I was seeing my next patient and deliberately not coming to assist her. She called Dr. Raphaely, chief of Anesthesiology, who arrived after the patient was anesthetized and intubated. Dr. Raphaely completely ignored me, was quite unprofessional, and never asked me what I was doing or why it took time for me to respond. The fact that she is issuing a report of contact to me tomorrow without getting my explanation reaks of harassment and retaliation for the EEO complaint I filed against her in January, 2017. Unfortunately, now I am forced to notify my attorney of this matter and cannot contain it as I had hoped when I met with Kristen Guadalupe this morning. Patient safety is something I take very seriously and must be addressed. The unprofessionalism, intimidation harrassent, and retaliation against me by Dr. Raphaely should also be addressed in my opinion.

| DIVISION OR SECTION Anesthesiology Service | EXECUTED BY (Signature and Title) |
|---|---|
| | Staff Anesthesiologist Kenneth S, Moss, MD |

Automated VA Form 119

submitted 2/23/17  1625

## Ontell-Silverman, Sheryl (VHACLE)

**From:**     Ontell-Silverman, Sheryl (VHACLE)
**Sent:**     Wednesday, February 22, 2017 3:34 PM
**To:**       Raphaely, Susan (VHACLE)
**Subject:**  incident in OR



On February 22, 2017, I was in OR 2 at the OSC providing MAC anesthesia for patient A. P. for and open right inguinal hernia repair. The patient had a large hernia and once Dr. Perez opened the hernia sac a large amount of bowel was found inside and it was decided that the patient would need to be changed to a general anesthetic with intubation and muscle relaxation in order for the procedure to be completed. Dr. Moss was at the surgery center to give lunch relief and I requested that he join me in OR 2 for induction of general anesthesia as this would be the first time that we had switched to GA here and I wanted another set of "intelligent hands" available in case there was any problem with anesthesia equipment or documentation in PICIS. Dr. Moss poked his head in the OR at 12:25pm when I asked the circulator to go next door to get him. He said he would come over when the cataract surgery in his room was done. I then asked the circulator to get Dr. Varma who I believed Dr. Moss was relieving for lunch break to come to the room, but was informed that Dr. Moss had relieved her. The patient was stable and comfortable under sedation, but surgery could not proceed further without induction of general anesthesia. At 12:40pm Dr. Moss was in PACU dropping off the cataract Patient. I again sent the circulator to PACU to tell him that I needed him to come to the OR. He replied that he would come when he was done in PACU. At that point I called Dr. Raphaely who was on her way in to the hospital for call and apprised her of the situation. She was 5 minutes away and said she would head to the OSC. Again I asked the circulator to tell Dr. Moss that I wanted him to come to OR because I needed to induce general anesthesia for the first time at the OSC and wanted back up in case there were equipment problems. Finally at 12:45pm, Dr. Moss came to OR 2 and assisted me with inducing general anesthesia. Dr. Raphaely walked in just after the patient was intubated.

Dr. Moss then came back into OR to tell me that he had cancelled the last case in his room. I told him that he should have come and assisted me in a more timely fashion. He told me that he could not "abandon his patient". I told him that his patient was done with surgery (cataract with minimal sedation) and that when he dropped him off in PACU, he should have come to OR 2 as requested. If he needed to finish charting postop, he could have done that after assisting me as I requested.

Sheryl Ontell-Silverman, MD, PhD
Anesthesiologist, Outpatient Surgery Center

# Kenneth S. Moss, MD

2428 Cedarwood Road
Pepper Pike, Ohio 44124-4239
e-mail: ksmoss@sbcglobal.net



PLAINTIFF'S EXHIBIT
63
4-12-19

440-823-9242

March 22, 2018

Dr. Murray D. Altose, Chief of Staff
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, Ohio 44106

Dear Dr. Altose:

Thank you for taking time to return my call Friday. I took you advice and completed what became a stressful, busy late call. I also apologized to Dr. Raphaely for my rudeness.

I believe you need to know what is going on within the Anesthesiology Service regarding Dr. Raphaely. Less than one hour after speaking to you, three PACU nurses came to me stating that while I was doing the ECT's in PACU, Dr. Raphaely came to the PACU asking what time I started. She later spoke with Dr. Punit Vaidya, the psychiatrist doing the ECT's in a voice loud enough for the PACU nurses to hear every word. She evidently asked if the ECT start was delayed and Dr. Vaidya told her that it was because his staff was delayed in getting to the PACU. He went on to say that it was no big deal and that when delays occur, sometimes they are his fault, sometimes they are anesthesia's fault. It wasn't a problem. She specifically asked if I was late and gave him a report of contact to fill out on me. To my knowledge, he did not do so because she did not include it in the report of contact that she presented to me on later that day. Bob Bearss was ready to go before 0930 and I arrived at 0930. The psych staff finished getting ready shortly thereafter. Bob Bearss informed me that she also asked him about me. He said nothing was wrong.

Going around and trying to find fault with staff to get them in trouble is unacceptable behavior in a service chief. She deliberately was looking for trouble. This unprofessional behavior intensifies an already stressful and hostile work environment.

I told you that ever since Dr. Raphaely marked me AWOL for arriving 8 minutes late for a 0900 Late call and without my knowledge, didn't pay me for the entire day, I have been very cautious when circumstances beyond my control result in my being a few minutes late. Every employee working at the VA expects to be paid. When that doesn't happen, morale suffers. I can't tell you how many surgeons, surgical nurses, techs, housekeepers, anesthetists and anesthesiologists who somehow found out that Dr. Raphaely intentionally did this to me came up to me to express how unprofessional, dishonest and harassing this was. Dr. Raphaely stated that she did this because of my "repeated tardiness" during last summer when Shaker Road and the Cedar-Fairmount intersection was under construction. I was no more than 5-10 minutes late for 0900 arrival despite always giving myself an extra 30 minutes travel time. At no time have I ever failed to get my work done in a timely fashion and I was by no means, the only person arriving late. I was however the only person that she was monitoring by standing in the hall to note my arrival time. This is clearly harassment. Then to compound things she used the day she marked me AWOL and a day I called off improperly and she docked me a days pay, to request a 10 day suspension which you overturned. You can't imagine the stress this double jeopardy created. So last Friday when I was delayed leaving the house because of an overflowing toilet that had to be cleaned up, resulting in my being 2 minutes late and seeing her standing in the hall outside her office, I lost it. That was why I was rude to her. I admit that was unprofessional but after 26 months of harassment, I believe that the most people would at the very least understand my mindset.

I would not have had to call you at all had Dr. Raphaely answered if she planned to mark me AWOL for the 2 minutes. She refused, left my office and returned 5-10 minutes later with Kevin Roach to ask me if I was planning

on staying or leaving. I again asked if she was going to mark me AWOL and once again she refused to answer. By that time I had already reviewed my schedule for the day, checked the ECT patients so that after she left and I placed a call to you, I went to PACU for the ECT's. Clearly Dr. Raphaely's refusal to answer a legitimate question tells me that she was baiting me, hoping that I would leave so she could mark me AWOL. This is clearly unprofessional behavior and should not be permitted by a service chief.

Dr. Raphaely assigned herself first call this past Monday. Everyone else assigned Monday first call is assigned late call on Friday. When I told her that last Friday's late call was technically hers, she became angry. In the 3 years she has been here, she has not taken a single late call. I did the call schedule for 13 years. Once her orientation period was up and I started assigning her calls, she began a subtle campaign of criticism and belittling my work on the call schedule. The criticism increased when I brought up the possibility of her taking late call. I finally got tired of it and turned the call schedule over to her which was exactly what she wanted me to do so she could gain control of it and reduce her call responsibilities further.

And why does she refuse to take late call? I don't believe it is because she is lazy or fears she can't handle it. Dr. Raphaely is not lazy and she is a competent clinical anesthesiologist. She doesn't take late call because I believe she feels a sense of entitlement and late call is simply beneath her. This attitude of looking down on people is simply unacceptable. Knowing that the CRNA's find the term, "frontliners", offensive, she continues to refer to them that way. Within a couple months of her arrival, I told her privately that the term was disrespectful and demeaning and to please stop using it. She ignored me.

For months now, the CRNA's unrest has been building. Dr. Raphaely's answer was to try to reassign their offices and scatter them around in an attempt to keep them from talking to each other. Threats to take down their office door, insulting them in public didn't help either. I do not know what finally precipitated the EEO complaint because I was on a two week vacation. I was surprised that 13 CRNA's (everyone asked to sign the complaint did so) filed but I was quite upset to learn that the only response was hiring an outside VA investigator to look into the complaint. This does not stop Dr. Raphaely from further retaliation and harassment as my situation illustrates.

To date 13 employed CRNA's, 1 former CRNA, 1 former anesthesia tech, Dr. Lisan and I have filed EEO complaints accusing Dr. Raphaely of harassment and creating a hostile work environment. Surely when over half of the present staff have filed an EEO complaint, when over half of the anesthesiologists on staff at the time Dr. Raphaely arrived have left (many of whom are willing to testify that they were also harassed), the probability that the accusations are credible should have been considered and definitive action taken by now.

In my opinion Dr. Raphaely should be immediately relieved of her administrative duties and an interim service chief be appointed until a satisfactory resolution of all complaints has occurred. I have had the privilege of working at the Louis Stokes Cleveland VA Medical Center for 18 years under 4 service chiefs. I have never seen morale as low as it is at present. I fear that if one person gets frustrated or angry enough to take these concerns public, the damage to the hospital could wipe out everything you have done to make this hospital the great institution that it is. No one wins if that were to happen, not the employees I am proud to work with, and surely not our veterans for whom I enjoyed serving. Political ideology aside, when I hear mutterings that perhaps President Trump needs to "drain the swamp" at the Cleveland VA, I am uncomfortable.

I am not holding out any hope that this letter will accomplish much or that I will even get a response back. I know that I have done what I feel is right for my anesthesia friends and colleagues in what is now the final days of my career. It was never my intention to retire. I would have liked to go part time but I cannot tolerate the harassment and hostile work environment any longer. The stress this has placed on my family and my health is unacceptable.

Respectfully submitted,


Kenneth S Moss, MD
Staff Anesthesiologist

CC: Ms. Susan Fuehrer, Medical Center Director

Mar. 29. 2017 12:38PM                                                      No. 0441   P. 2



Defining
**VA** **EXCELLENCE**
**HEALTH**
**CARE** in the 21st Century

DEPARTMENT OF VETERANS AFFAIRS
LOUIS STOKES CLEVELAND
DEPARTMENT OF VETERANS AFFAIRS MEDICAL CENTER
10701 EAST BOULEVARD
CLEVELAND, OH 44106



PLAINTIFF'S
EXHIBIT
64 MA
4-12-19 DMF

March 20, 2017                                              **In Reply Refer To: 541/053**

Dr. Ronald Lisan, MD
Anesthesiology Service
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, OH 44106

Subject: Proposed Suspension

1.      This letter is to inform you that it is proposed to suspend you from duty and pay for ten (10) calendar days based on the following reasons:

You are employed as a Physician, VM-0602-15, Step 5, in Anesthesiology Service at the Louis Stokes Cleveland VA Medical Center. As an employee of this Medical Center, you are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy and ethical behavior toward patients, visitors and coworkers. An employee who violates established conduct requirements may be subject to appropriate disciplinary, adverse, or major adverse action.

On Friday, January 6, 2017, I was informed that you may have engaged in inappropriate behavior of sexual nature involving female coworkers. Specifically, I was approached by two (2) of your female coworkers who alleged sexual harassment perpetrated by you. Consequently, these allegations were referred to Equal Employment Opportunity (EEO) office for investigation.

On Thursday, March 16, 2017, VA EEO office concluded the investigation of allegations of Sexual Harassment made by Certified Registered Nurse Anesthetists (CRNA) who alleged sexual harassment perpetrated by you. Even though the case failed to rise to the level of sexual harassment, as defined in policy promulgated pursuant to Equal Employment Opportunity law, the EEO office did find evidence that inappropriate behavior might have occurred. Furthermore, the EEO office found evidence that you violated the supervisory order to cease any contact with the alleged victims except that which is absolutely required for official business.

I.      Failure to Follow Orders

On Tuesday, January 10, 2017, in consultation with the EEO Manager, I issued a Sexual Harassment Allegation Checklist to you, which stated in part:

"I have ordered the alleged harasser to cease any contact with the alleged victim except that which is absolutely required for official business."

a.      On Friday, January 20, 2017, I had to remind you of the order I gave you on Tuesday, January 10, 2017, as you were frequenting the CRNA lounge and were continuing to address one of the CRNAs that brought the above-mentioned allegations against you. Consequently, you are being charged with failure to follow orders.

1

Page 2.
Proposed Suspension
Dr. Ronald Lisan

b.    On Monday, January 23, 2017, I again had to remind you of the order I gave you on Tuesday, January 10, 2017, and Friday, January 20, 2017, as you were continuing to have contact with the CRNAs that brought the above-mentioned allegations against you. Consequently, you are being charged with failure to follow orders.

c.    On Thursday, March 9, 2017, I issued a written order to you, instructing you to immediately cease any contact with the alleged victims, except that which is absolutely required for official business.  I was advised that you were continuing to engage in conversations with the CRNAs that brought the allegations of inappropriate behavior against you. Despite my previous orders, you failed to follow my instructions to cease any contact with the alleged victims. Consequently, you are being charged with failure to follow orders.

        II.    Inappropriate Conduct

a.    On Wednesday January 4, 2017, Ms. Jessica Foster, CRNA, Anesthesiology Service, reported that she came to your office to sign out, as she was on a call assignment with you. Ms. Foster reported that you asked her to close the office door, as you had two (2) things to tell her. Ms. Foster stated that after you informed her that another physician would be covering your call assignment overnight, you said, "I am not trying to hit on you, ask you out or have sex with you, but I would", or words to that effect. Ms. Foster further reported that you told her how you saw similarities between your marriage and hers, and that you wasted far too many years in an unhappy marriage. Ms. Foster stated that she felt appalled at the context of the conversation and that the conversation made her extremely uncomfortable. Consequently, you are being charged with inappropriate conduct.

b.    On Thursday, January 5, 2017, Ms. Karen Bonfili, CRNA, Anesthesiology Service, reported that she was discussing a case with you that you were assigned to work the next day. She reported that when she asked you if you were leaving, you responded, "unless you can make me a better offer", or words to that effect. Ms. Bonfili stated that she felt extremely uncomfortable with your comment made to her. Consequently, you are being charged with inappropriate conduct.

c.    On Friday, January 6, 2017, Ms. Bonfili reported that she was assigned to work with you that day. Ms. Bonfili stated that you made sexually oriented comments throughout the day. Specifically, you stated, "sounds good to me, we can go now and get in your bed", or words to that effect, when she stated how tired she was and how she wanted to go home and go to bed. Consequently, you are being charged with inappropriate conduct.

d.    On Tuesday, March 7, 2017, Ms. Elaine Costanzo, CRNA, Anesthesiology Service, reported that you called her on her personal telephone after work hours. Ms. Costanzo stated that she received a phone call, from an unknown telephone number and answered the call. Ms. Costanzo stated that you were calling to tell her you did not feel you could provide safe patient care together as she does not greet you when she passes you in the hallway. You proceeded to tell Ms. Costanzo that she needed to find someone who would swap with her for the upcoming call assignment the two of you were scheduled to work, as it was easier for her to do so than you. Ms. Costanzo directed you to contact me regarding this matter and you responded that you did not want to talk to me for, "obvious reasons", or words to that effect. Furthermore, Ms. Costanzo reported that she felt intimidated and threatened by your phone call. You were previously instructed to cease any contact with the alleged victim except that which is absolutely required for official business. You should not have called Ms. Costanzo on her personal telephone. If you had concerns about being able to

Page 3.
Proposed Suspension
Dr. Ronald Lisan

provide safe patient care while working with Ms. Costanzo, you needed to address that with me. Consequently, you are being charged with inappropriate conduct.

e.      On Wednesday, March 8, 2017, Ms. Bonfili reported that you entered Operating Room (OR) 6, while she was working on a case, put your hands on her back and asked her if it was okay to touch her. Ms. Bonfill stated that you told her you would not press charges against her if she agreed to talk to your attorney and explain to him that you were just joking about the sexual talk. Furthermore, Ms. Bonfili stated that you told her if she talked to me there would be, "retaliation", or words to that effect. At some point during your interaction with Ms. Bonfili, Dr. Marin Mannix, MD, Staff Anesthesiologist, Anesthesiology Service, entered the room and informed you that you had an assignment in OR 7. As you did not leave OR 6 to attend your assignment, Dr. Mannix returned to remind you that you were needed in OR 7, at which time you responded, "I will go when I am ready", or words to that effect. Ms. Bonfili reported that you stayed in OR 6, continuing to talk to her about how you valued your relationship with her. Ms. Bonfili stated she left the room after Dr. Rachel Schlesinger, MD, Staff Anesthesiologist, Anesthesiology Service, came and instructed her to leave informing her she will stay with the patient. You were not assigned to work with Ms. Bonfili in OR 6, and did not have a need to be present in the room. Your presence and conversation in the room had no legitimate business or patient care purpose. Consequently, you are being charged with inappropriate conduct.

III.     Disruptive Behavior Putting Patient Safety at Risk

Over the last few months, you have engaged in inappropriate behavior involving female coworkers. Furthermore, four (4) of your female coworkers alleged sexual harassment perpetrated by you. The alleged victims reported that they felt their work environment was unsafe and they are not able to provide safe patient care as they are unable to concentrate on their work due to your intimidating and disruptive behavior. You were instructed, by me, to cease any contact with the alleged victims, except that which is required for direct patient care. Despite my orders, you continued to have contact with the alleged victims outside of your work assignments. Specifically, on March 8, 2017, you entered OR 6, approached Ms. Bonfili and put your hands on her back, while she was providing anesthetics care for a patient undergoing surgery. Ms. Bonfili stated that your intimidating behavior made it difficult for her to concentrate on the care she was providing. You were not assigned to the case and should not have entered the OR to approach Ms. Bonfili and disrupt the procedure. Consequently, you are being charged with disruptive behavior putting patient safety at risk.

2.      As an employee of this Medical Center, it is your responsibility to adhere to the rules and procedures, as described in Medical Center Policy (MCP) 005-024, Employee Responsibility and Conduct, which states in part:

"Employees are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy and ethical behavior toward patients, visitors and coworkers."

"As an employee of the Cleveland VA Medical Center you are expected to:

• Treat your supervisor(s) with respect, following their directions and guidance in a cooperative, responsive manner and completing assignments on a timely basis.

Page 4.
Proposed Suspension
Dr. Ronald Lisan

- *Exhibit courteous, respectful and compassionate behavior toward patients and those, with whom you interact, both co-workers and visitors, as a requirement of your position, not as an option."*

Furthermore, as an employee of this Medical Center, it is your responsibility to adhere to the rules and procedures, as described in MCP 003-003, Prevention of Sexual Harassment, which states in part:

*"Hostile-environment harassment is any lewd sexual conduct including, but not limited to: pictures, words, jokes, questions, remarks, teasing, and/or touching that unreasonably interferes with an individual's work performance or created an intimidating, hostile or offensive work environment."*

*"The key work in defining sexual harassment is unwelcome. When any unwelcome or unsolicited conduct is imposed on a person who regards it as offensive or undesirable, could be construed as sexual harassment."*

Your actions, as described above, are in direct contradiction with these expectations, thereby serving as the basis for your proposed suspension.

3.      I have considered the following to be the aggravating factors in determining the appropriate discipline to propose: the nature and seriousness of the offense and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties; consistency of the penalty with any applicable agency table of penalties; the notoriety of the offense or its impact upon the reputation of the agency; and the clarity with which the employee was on notice of any rules that were violated in committing the offense or had been warned about the conduct in question.

4.      If you choose to do so, you have until close of business fourteen (14) calendar days from the day after you receive this notice to reply orally, or in writing, or both orally and in writing, and to submit affidavits and other documentary evidence in support of your reply, showing why the charge is unfounded and any other reasons why your suspension should not be effected.  Your written reply should be submitted to me.  I will receive your oral reply, or will designate an official to receive it. You may make arrangements for your oral reply by calling Ms. Jelena Zekanovic, Employee/Labor Relations Specialist, Human Resources Management Service, at 216-791-2300, extension 2163.

5.      The evidence upon which this notice of proposed suspension is based will be available for your review in the Employee/Labor Relations Section of Human Resources Management Service, Second Floor, Administrative Building, Wade Park Campus, between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday. You will be allowed up to eight (8) hours of official duty time for reviewing the evidence relied on to support the reason(s) in this notice, preparing a written reply, securing affidavits, and for making a personal reply.  Arrangements for the use of official time or requests for additional time should be made with me.

6.      You may be represented by an attorney or other representative of your choice at all stages

Page 5.
Proposed Suspension
Dr. Ronald Lisan

of this matter, up to and including the issuance of the decision.  Please advise me in writing of any representative designated.

7.      The final decision to effect the proposed action has not been made. The Medical Center Director, who will make the final decision, will give full and impartial consideration to your reply (ies), if submitted.  You will be informed in writing of the final decision as soon as possible after your reply has been considered or after the expiration of the time allowed for reply, if you do not reply.  If an action is effected, the applicable grievance or appeal rights will be included in the decision letter.

8.      You will be given a written decision within 21 calendar days of the receipt of your reply (ies) or, the close of business 14 calendar days following the receipt of this notice, if you do not reply.

9.      If it is decided that you should be suspended, it will be effective not less than thirty (30) calendar days from the day after the date of receipt of this notice.

10.     You will be retained in an active duty status during the advance notice period.

11.     If a personal, medical, family, or other situation is affecting your conduct on the job, this Medical Center has an Employee Assistance Program (EAP) that offers short-term counseling and referral. You may contact EAP Counselors, Dr. Erica Sharkansky or Dr. Diane Johnson, at (216) 791-3800, extension 6922.  One of them will be happy to meet with you on a confidential basis.

12.     If you do not understand the above reason as to why your suspension is being proposed, please contact me, or Ms. Jelena Zekanovic, Employee and Labor Relations Specialist, Human Resources Management Service, at 216-791-2300, extension 2163.

Susan D. Raphaely, MD
Chief, Anesthesiology Service



PLAINTIFF'S
EXHIBIT
65 M/A
4-12-19 DM

## Response of Dr. Ron Lisan to Proposed Suspension at the Request of Dr. Raphaely (5-10-17)

### Recusal of Dr. Altose

Dr. Altose should recuse himself (or be removed) from any involvement in any decision regarding the proposed suspension. He has been named as a "Responding Party" from the outset of the VA EEO process. According to the allegations in Dr. Lisan's now pending formal Complaint (submitted initially to ORM and currently to the North Atlantic District 1 EEO Manager of the Department of Veterans'' Affairs in Lyons, New Jersey), Dr. Altose has fostered, permitted and failed to take appropriate action regarding Dr. Raphaely's unlawful discriminatory and retaliatory/reprisal misconduct of which he has been and continues to be fully aware. He has a manifest conflict of interest in this matter and should have no part in any disciplinary proceeding in this matter.

### Continuance of the Hearing

Dr. Altose is or should be aware that a new panel is being formed (per Leshelle Reese) to re-investigate the prior EEO report, a re-investigation currently underway. The proposed suspension is based upon the conclusions reached in the original EEO investigation. As Dr. Altose knows, that investigation is currently incomplete. Additionally, with the hearing currently scheduled for this Thursday, May 11, 2017 at 10:00 a.m., Dr. Raphaely initially placed Dr. Lisan on call on May 10-11, 2017. He is required to be on duty past midnight and perhaps until 7:30 a.m. on May 11, 2017, two and a half hours before the scheduled hearing. It is unfair to have a hearing for him to defend himself in an exhausted state for lack of sleep. After I objected to this circumstance, Dr. Lisan's on-call duty was cancelled. Dr. Lisan's attorney was not consulted on the choice of date or time for the hearing and has a previously scheduled court appearance earlier that morning. This hearing should be continued for a short period of time when Dr. Lisan's counsel can conveniently attend the hearing, when Dr. Lisan will not be sleep deprived and **when the re-investigation is completed with sufficient time for Dr. Lisan and his counsel to review and digest the report.**

### Failure to Follow Orders

The orders Dr. Lisan is accused of failing to follow were made and communicated to Dr. Lisan by Dr. Raphaely following a couple or so initial female CRNA complaints alleging that Dr. Lisan sexually harassed them. As Chair of the Department of Anesthesiology, Dr. Raphaely should know what Sexual Harassment is as defined by the VA or should have found out before utilizing VA Sexual Harassments protocols and checklists. In order for contact to constitue "Sexual Harassment", the alleged putative harasser must be told by the professed victim that his or her conduct is objectionable or unwelcome. Such was not the case for all but one of the accusing CRNA's. Thus, the current EEO report concluded that the CRNA complaints did not constitute "Sexual Harassment". And that is assuming that their characterization of Dr. Lisan's statements are true. Dr. Lisan disputes their accuracy.

Given the absence of any Sexual Harassment on the part of Dr. Lisan, the implementation of the Sexual Harassment Checklist applied by Dr. Raphaely to Dr. Lisan was inappropriate and void ab initio. (Attachment B to Dr. Raphaely's Report). This includes No. 4, ordering the alleged harasser to cease any contact with the alleged victim except that which is absolutely required to official business. Such an order under these circumstances was wrong. This matter should have been amicably resolved by Dr. Raphaely, not pursued in a formal punitive manner. But that approach was eschewed by Dr. Raphaely because the generation, and prosecution of these baseless accusations was to retaliate against Dr. Lisan, ginning up stress, tension, discord and fear in the entire Department. During this retaliatory/reprisal cause of misconduct, Dr. Altose, fully aware of what was going on, remained impervious to the circumstances and apparently supportive and condoning of Dr. Raphaely's actions.

Much of the proposed suspension is based upon Dr. Lisan's alleged violations of Dr. Raphaely's "no-contact" order which should never have been given in the first place.

Dr. Raphaely has included in her attachments as part of the evidentiary file a reference in July 2016 to tardiness on the part of Dr. Lisan. This was a period just before his medical leave for treatment of his OCD condition. On July 7, 2016 Dr. Raphaely apparently believed that Dr. Lisan was a few minutes late to work. Her punishment was to mark him AWOL for the entire day. She was informed by Carlton Daniel, the union representative, that this was an illegal entry of pay reduction. Nevertheless, this remains on Dr. Lisan's pay record. The statement in Apply Facet 4 that Dr. Lisan has been "counseled on several occasions" for tardiness is undocumented and denied by Dr. Lisan.

Mar 10 2017 12:47PM                                              No 0372   P. 2

## Department of
## Veterans Affairs

# Memorandum

Date:   March 9, 2017

From:   Chief, Anesthesiology Service

Subj:   Written Warning

To:     Ronald M. Lisan, MD, Anesthesiology Service



1.      I have learned of additional serious allegations that were made against you. I was advised that you may have engaged in additional conversations regarding allegations of inappropriate behavior of sexual nature involving female coworkers.

2.      The above-mentioned allegations are potentially serious. If true, they may likely constitute sexual harassment on your part. For this reason, you are hereby warned that such conduct will not be tolerated. While I am bringing these allegations to your attention at the present, be advised that they will be fully investigated. In the meantime, I am placing you on notice that if these allegations are true, you must cease this offending behavior immediately. You were previously instructed to refrain from discussing this allegation with your coworkers. Specifically, you received those instructions on January 10, 2017, January 20, 2017, and January 23, 2017. Additionally, you are to refrain from discussing these allegations with your coworkers. Furthermore, you are not to have any personal contact at or outside of work with Nurse Anesthetists: Ms. Jessica Foster, Ms. Elaine Costanzo, Ms. Rhonda Verb and Ms. Karin Bonfill. You are still required to maintain interactions of professional nature, relating to patient care, with the above named individuals.

3.      If these allegations are not true, and an investigation exonerates you of these charges, you must still be aware of how your interactions with your coworkers are interpreted. Accordingly, you are strongly advised to make no statement, or take no action, which even suggests the remotest possibility of impropriety on your part.

4.      At this time, disciplinary action will not be imposed. As more is learned about the nature of these allegations, you will be advised as to your rights and responsibilities in this matter. Until then, if a personal, medical, or other situation is affecting your conduct on the job, this medical center has an employee assistance program that offers short-term counseling and referral. You may contact EAP Counselors, Dr. Erica Sharkansky or Dr. Diane Johnson, at (216) 791-3800, extension 6922. One of them will be happy to meet with you on a confidential basis.

4.      Should you have any questions regarding my expectations, please see me immediately.

Susan D. Raphaely, MD

_____

Ronald M. Lisan, MD

VA FORM     2105
MAR 1989

## AFFIDAVIT

STATE OF: OHIO

I, **Susan Raphaely,** make the following statement freely and voluntarily to **Burton Greenspan,** who has identified himself to me as a Contract EEO Investigator, investigating a complaint of discrimination filed by **Ronald Lisan** under agency Case No. **200H-0541-2017101627** against the **Department of Veterans Affairs** knowing that this statement may be used in evidence. I understand that this statement is not confidential, may be shown to the interested parties (those with a legal right to know), and is under oath and affirmation.

I have been advised that the accepted issue for investigation is:



PENGAD 800-631-6989  PLAINTIFF'S EXHIBIT  67  4-15-19  DMF

**DESCRIPTION OF BASES AND ISSUES AND STANDARDS OF PROOF**
**Nature of Action, Decision, or Condition Giving Rise to Complaint:**

Whether complainant was subjected to a hostile work environment based on sex (male), disability, and reprisal[2] as evidenced by the following events:

1) When on December 7, 2016, Susan Raphaely (SR), Chief of Anesthesiology, gave complainant an unusually heavy workload after he returned to work from a medical leave of absence related to his disability.

2) When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from "On-Call" duties.

3) When since January 6, 2017, Susan Fuehrer (SF), Facility Director, and Murray Altose (MA), Chief of Staff, have not taken appropriate corrective action after complainant's attorney sent a letter of complaint regarding SR's harassment.

4) When on January 11, 2017, SR emailed complainant to say that his scheduled meeting the next day with Bruce Kafer (BK), Reasonable Accommodation Coordinator, was canceled and that his request for reasonable accommodation would be decided without allowing complainant to discuss his circumstances with BK.

5) When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).[3]

6) When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.

---

[1] While allegations of age discrimination were discussed during informal counseling, complainant's attorney stated on February 15, 2017, that complainant was not filing a claim for age discrimination. Therefore, age will not be considered as a basis for this complaint.

[2] Complainant claims he objected to being given an unusually heavy workload after returning from a medical leave of absence and made a request for a reasonable accommodation on December 7, 2016. As complainant participated in protected activity by complaining about his workload as it relates to his disability and requested a reasonable accommodation for his disability, reprisal will be considered for events occurring after December 7".

7) When in March and April 2017 RS attempted to force complainant to work in the same operating room with the CRNA's who accused him of sexual harassment, even though there were other CRNA's available

8) When on March 9, 2017, SR issued complainant a Written Warning.

9) When on March 13 and 14, 2017, RS assigned complainant to serve as the anesthesiologist during operations without a CRNA to assist him, which is contrary to VA standard operating procedure, and put the patients at risk.

10) When on March 28, 2017, SR issued complainant Proposed 10-Day Suspension.[4]

11) When on July 10, 2017, complainant was suspended for 10 days.

---

[3]Complainant claims SR solicited CRNA's Karen Bonfili, Jessica Foster, Ronda Verb, and Elaine Costanzo to file sexual harassment complaints against him; and that SR ordered him to limit his communications with these CRNA's, to not discuss the accusations with them, and to not enter the CRNA office/lounge.

[4]It is noted that the proposed suspension was dated March 20, 2017; but given to complainant on March 28, 2017. As of the writing of this letter, 1.10 final decision regarding the suspension has been made yet.

I hereby solemnly swear or affirm that:

**Responding Management Official(s):**

1. **What is your full name?**

   Susan Dea Raphaely

2. **What is your current position title, grade and agency unit/division?**

   Anesthesiology Service Chief, GS-15 Louis Stokes VAMC

3. **How long have you been in this position? How long with this agency?**

   I joined the agency on Jan. 15, 2015 in my current position.

4. **What was your position from December 19, 2016 to April, 2017?**

   Anesthesiology Service Chief

Page 2 of 20　　　　　　 **Initials**

5. **Please state your first-level supervisor, by name, position title, grade and series between the months of December 19, 2016 and April 2017.**

   Dr. Murray Altose, Chief of Staff, executive physician

6. **Please state your second-level supervisor by name, position, title, grade and series between the months of December 19, 2016 and April, 2017**

   Mrs. Susan Fuehrer, Medical Center Director, executive

7. **What is your working relationship with Complainant?**

   I met Dr. Lisan for the first time when I assumed my role as service chief in January 2015. I am his supervisor.

8. **Please state for the record whether you have a disability?**

   No

9. **Were you aware of Complainant's prior EEO activity?**

   I am unaware of any prior EEO activity.

10. **If yes, when and how did you become aware of this?**

    N/A

11. **Have you been involved in any prior EEO activity?**

    Yes

12. **Were you aware of whether or not the Complainant is a qualified individual with a disability?**

    I am not aware that Dr. Lisan is a qualified individual with a disability

13. **What are you aware of in terms of the Complainant's disability?**

    I am unaware of the fact that Dr. Lisan has a disability. I am aware that Dr. Lisan experienced an inpatient psychiatric hospitalization. I have never been provided any information or documentation that he is considered disabled. Any agencies determination of disability is not under my prevue nor have I ever been notified of a qualified disability.

14. **When and how did you become aware of the Complainant's disability?**

Page 3 of 20 _____ Initials

**000397**

I remain unaware that Dr. Lisan is considered disabled. I am only aware that Dr. Lisan took SL and FMLA for a hospitalization.

**15. Did the Complainant provide documentation? If yes, what documentation was provided and when was it provided?**

On December 16, 2016 my Administrative Officer, Kevin Roach, received a FAX addressed to him that read "This will verify this patient's need to not be on call as he is recovering from a recent hospitalization". The note was signed by a social worker. This documentation was forwarded to the Department of Reasonable Accommodations. To date I have never received disability documentation or notification.

**16. Were you aware of the Complainant's disability as of December 19, 2016?**

As stated above, I am unaware of a disability. Dr. Lisan was very public about the fact that he had a recent hospitalization. In addition, upon his return to work in December he was very verbose about the fact that he "had never felt better". He regularly shared this sentiment with members of our department as well as the operating room staff. In addition, he often provided demonstrations to the staff to verify his improvement and well being.

**17. Were you aware of the Complainant's sex as of December 19, 2016?**

I am aware the Dr. Lisan is a male. I met Dr. Lisan in person when I joined the group.

**18. Have you received training on harassment in the workplace? If yes, when and from whom?**

Yes, I received training during orientation in Jan. 2015, I have completed modules in TMS about EEO and work place harassment in March 2015 and again in April 2017. In addition, our staff underwent a live training seminar on April 19,2017 and again on July 12, 2017.

**Incident #1**

**1.) When on December 7, 2016, Susan Raphaely (SR), Chief of Anesthesiology, gave complainant an unusually heavy workload after he returned to work from a medical leave of absence related to his disability.**

**19. On December 7, 2016, Susan Raphaely (SR), Chief of Anesthesiology, gave Complainant an unusually heavy workload after he returned to work from a medical leave of absence related to his disability. Is this true?**

Page 4 of 20                                             Initials

This is not true and quite the contrary to the truth. When Dr. Lisan returned to work on December 7th after an extended leave he was given no clinical assignment or work load of any kind on that day as well as the following day December 8th. Some of our computer passwords expire after inactivity and Dr. Lisan was provided not

only Dec. 7th but Dec. 8th without clinical assignment before returning to his clinical activities. He received full pay for these two days and had no work load assigned. The purpose of this was to allow him time to catch up on email, reinstate passwords, etc. All work assignments and clinical duties performed can be easily verified if needed.

**20. Please explain what occurred in detail.**

On Dec. 7th and 8th Dr. Lisan was given no work assignments.

**21. What was your involvement, if any?**

It was my decision to have Dr. Lisan not have any clinical assignments on Dec.7th and 8th . This was out of kindness and empathy for one of my staff members who had been away from work.

**22. To the best of your knowledge, did the Complainant speak to any member of management regarding his workload?**

I am unaware of this. Again, the fact that he had no work assignment can be verified.

**23. What actions, if any, did you take to address the Complainant's concerns? If you responded that you took no action, why not?**

I have no knowledge that Dr. Lisan spoke to any member of management regarding his workload or that he had any complaints about his workload. Again, he had no workload on both the 7th and 8th. He resumed clinical duties on the 9th and that day he did a total of three cases (this would be considered a light assignment).

**24. Were any actions taken by you with regard to Complainant based on Complainant's sex?**

No actions taken by me with regard to Complainant were based in any way on Complainant's sex.

**25. Were any actions taken by you with regard to Complainant based in on**

Initials

000399

**Complainant's prior EEO activity?**

No actions taken by me with regard to Complainant were based in any way on Complainant's prior EEO activity.

**26. Were any actions taken by you with regard to Complainant based in on Complainant's disability?**

No actions taken by me with regard to Complainant were based in any way on Complainant's disability.

## Incident #2

**2.) When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from "On-Call" duties.**

**28. Are you aware of the Agency protocol for requesting a reasonable accommodation?**

Yes, the VA has a specialized department that handles all requests for reasonable accommodations (RAC), known as the Department of RAC.
   All requests made, supporting documentation, communications and decisions are handled directly by this department. I provided this information to Dr. Lisan.

**29. Who is responsible for processing reasonable accommodation requests?**

At our local VA Bruce Kafer, RN, MSN is the local RAC coordinator. I provided this information to Dr. Lisan.

**30. Were you aware of the Complainant's request for reasonable accommodation being to be exempt from "On-Call" duties? Please explain.**

Yes, Dr. Lisan did approach me upon his return and made a request to have a no call position. I let Dr. Lisan know that all documentation, communications and decisions are made directly from the Department of Reasonable Accommodations. I shared with him that I did not know how these determinations were made, but he should speak to them directly.

**31. When, how and to whom did the Complainant make his request?**

Initially, I believe the request came directly from Dr. Lisan to me. He made this request in person.

Page 6 of 20                     Initials

**000400**

**32. What was your direct involvement, if any? If you were not involved, who made the final decision not to relieve the Complainant from "On-Call" duties as a reasonable accommodation?**

My involvement was to refer Dr. Lisan to the department of RAC. I informed him that they are the ones who make all the determinations if someone qualifies for RAC and not myself. It would then be my responsibility to follow all recommendations that they make. I was contacted by the RAC department to" determine if call was considered an essential function of an anesthesiologists' duties". To which I said yes. Yes, call is an essential function of the staff anesthesiologists duties who are stationed at the Wade Park Cleveland VAMC

**33. Did you have the responsibility or authority to exempt the Complainant from "On-Call" duties as a reasonable accommodation?**

No, it is out of my prevue to make such determinations.

**34. What was the reason given to the Complainant for not receiving accommodations due to SR failing to exempt the Complainant from "On-Call" duties?**

As I shared with you, the department of RAC makes all of these determinations. I am not privy to any of the conversations, documentation, or reasons given as to why Dr. Lisan did not qualify for reasonable accomodations.

**35. Was an alternative option provided to the Complainant as a reasonable accommodation request?**

I am not privy to this information if an alternative was given by the RAC dept. However, I personally gave Dr. Lisan the option of a modified tour of duty which would then come with a reduced call schedule. I offered this as a temporary option, meaning he could revert to full time when he wanted or a permanent option. I shared both of these options with him but he declined.

I also informed Dr. Lisan that he had two more weeks of FMLA that he could use. These days could be used consecutively or intermittently. He declined this option as well.

**36. Were you aware of the Complainant's disability and/or prior EEO activity prior to the Complainant's request? If so, when and how did you become aware?**

I was and still am unaware of any prior EEO activity with Dr. Lisan.. Although, I understand complaints have been made against me based on a

**Page 7 of 20**                              Initials

disability. I remain unaware that Dr. Lisan is disabled.

**37. Did you propose any remedies?**

I offered Dr. Lisan a part time position. A part time position would come with a reduced call load. I let him know that he could work a modified tour of duty at any time and for as long as he desired. He declined this offer. In addition, I let Dr. Lisan know that he still had two more weeks of unused FMLA that were available to him if he did not feel that he was ready to return to work. He did not pursue that offer either.

**38. Can you provide any witnesses to the events of the accepted claim, who can provide relevant information? If so, please identify by name, title, telephone number and e-mail address. Please state the nature of the information to be provided by each witness.**

Bruce Kafer, RN, MSN is the Local Reasonable Accommodation Coordinator. As far as I am aware this is who handled Dr. Lisan's requests. He would be the one who could answer any questions as to why the request was denied. If there were other members of that department involved I would not know that information because I myself did not participate in making this determination. Bruce can be reached (216) 791-2300, ext. 6601 or Bruce.Kafer@va.gov.

## Incident #4

**4.) When on January 11, 2017, SR emailed complainant to say that his scheduled meeting the next day with Bruce Kafer (BK), Reasonable Accommodation Coordinator, was canceled and that his request for reasonable accommodation would be decided without allowing complainant to discuss his circumstances with BK.**

**39. The Complainant alleges on January 11, 2017, you emailed Complainant to say that his scheduled meeting the next day with Bruce Kafer, Reasonable Accommodation Coordinator, was canceled and that his request for a reasonable accommodation would be decided without allowing Complainant to discuss his circumstances with Mr Kafer. Is this true?**

This is not true. I did not schedule this meeting, nor did I cancel this meeting. The only reason I was aware that there was a meeting was that Dr. Lisan shared with me the previous day that he needed to be relieved from his clinical duties at a set time to be able to attend this meeting. I assured him that I would accommodate his schedule so that he could attend. From what I can recall, Bruce sent me the message because Dr. Lisan is in my service, that he cancelled the meeting. I simply passed the message along (I literally was just the

Page 8 of 20 ⎯⎯⎯⎯ Initials

**000402**

messenger). The only involvement I had was to relay the message to Dr. Lisan. I do not know why it was cancelled, or the agenda. Dr. Lisan did ask me why the meeting was cancelled and I was unable to answer this question. I did not schedule the meeting, I was not invited to the meeting and I did not cancel this meeting.

I shared with Dr. Lisan that he should contact Mr Kafer directly to reschedule and address any additional concerns he had.

## Incident #5

**5.) When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNAs (Certified Registered Nurse Anesthetists).[3]**

### 40. On January 11, 2017 did you begin promoting and fostering false accusations of Complainant sexually harassing CRNAs?

This is most untrue. The truth of this matter can be most easily verified by speaking directly with the four female CRNA's involved.

### 41. Please explain what occurred in detail.

On Friday January 6th Karin Bonfili, a CRNA in our service, approached me visibly upset and asked to speak with me. She then shared with me that on January 5th and then again that day of the 6th Dr. Lisan made her feel extremely uncomfortable by making unwelcome, unsolicited comments of a sexual nature. I shared with her that as her supervisor it was my duty and responsibility to report all sexual harassment allegations to EEO. I asked her to put her complaints in writing so we could follow the appropriate protocol. She agreed to do so. In addition, she shared with me that Jessica Foster, another CRNA, had confided in her yesterday that she was also very upset and had also received unwelcomed and unsolicited comments of a sexual nature by Dr. Lisan. Jessica was schedule off work both Friday and Monday and I did not see her until Tuesday, Jan. 10th. First thing Tuesday morning, she approached me with allegations of sexual harassment by Dr. Lisan. I immediately contacted the EEO office to receive advice to ensure that I followed the protocol and I conducted myself in accordance with the medical centers policy regarding allegations of sexual harassment. In accordance with the policy I asked both Jessica and Karin to put their allegations in writing and proceeded to complete the "sexual harassment allegation checklist" As per hospital policy Dr. Lisan was made aware that allegations were made against him and he was advised as to his rights in this situation.

Shortly thereafter, Elaine Costanzo and Rhonda Verb also CRNAs came to me to

Page **9** of **20**                                         ‍‍‍‍‍‍‍‍‍‍Initials

disclose prior incidents where Dr. Lisan had allegedly spoken to them in a sexual manner. I shared with them, as I did the two other women that we need to follow the rules set forth by the medical center and EEO and I requested that they put their concerns in writing.

**42. What was the basis for your involvement?**

My involvement was and continues to be as a supervisor doing what my position requires of me. This is to report allegations and follow the rules set forth by the medical center and EEO. The second bullet point in the allegation checklist states that I should "interview the alleged harasser and gather information" however, I was advised by the EEO department that they would fulfill that role and I should not participate in the fact finding with Dr. Lisan. Therefore, I did not engage in further conversations with Dr. Lisan regarding this situation other than what was required. As per the checklist (#4) I did instruct him that "I have ordered him to cease any contact with the alleged victim(s) except that which was absolutely required for official business". Dr. Lisan was aware and initialed the form for two of the four complaints. It was presented to him, I read the policy to him, he acknowledged it but refused to sign when presented for Rhonda and Elaine's allegations.

I provided Dr. Lisan with a copy of the policy on the prevention of sexual harassment. I provided him a copy of the checklist. I advised him that he was in a position covered by the bargaining unit and he had the right to request representation during the fact-find process. I explained that counseling was available to him through the EAP and provided him with the telephone number.

**43. Did Complainant inform you and/or any other higher-level official that this action was creating a creating a hostile work environment for him?**

Dr. Lisan was the one who was the alleged harasser and he was the one who talked about the situation in public places. Out of respect to Dr. Lisan I did not discuss the situation with anyone other than those immediately involved. There was certainly a disruption in the work environment but that was created by Dr. Lisan himself by talking to staff about the situation in the OR, in the hallways, in the lounge and in the offices.

**44. Did the Complainant inform you or any higher-level official of his contention that this was harassment based on reprisal (prior EEO), sex, and/or his disability which was creating a hostile work environment?**

I was made aware that he filed something with EEO and his attorney regarding "retaliation". I did not make any of the allegations, I did not foster allegations, I did my job as a supervisor and followed medical center policy and reported the allegations. The sexual harassment allegations and the application for RAC are

Initials

separate and unrelated incidents.

**45. Were your actions with regard to Complainant based on the Complainant's sex?**

No, they were not.

**46. Were your actions based on the Complainant's disability?**

No, they were not.

**47. Were your actions based on reprisal for the Complainant's prior EEO activity?**

No, they were not.

**48. Can you provide any witnesses to the events of this allegation, who would have relevant information? If so, please identify by name, title, telephone number and e-mail address. Please state the nature of the information to be provided by each witness.**

The witnesses are the four women involved. They are the ones who alleged sexual misconduct. I believe discussing this with them would clarify any accusations as to my involvement. I am not comfortable providing their personal phone numbers but can provide the number for our department and provide their email contact information. The department number is:  216-791-3800, ext. 3829.   Those involved are Elaine.Costanzo@va.gov,  Rhonda.verb@va.gov, Jessica.foster@va.gov, KarinMBonfili@va.gov.

**Incident #6**

**6.) When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.**

**49. The Complainant alleges that since January 17, 2017 you continued to not provide him with a reasonable accommodation by assigning him 'On Call' duties is that true?**

No this is not true I am not the one who has authority to provide RAC.  I am Dr. Lisan's supervisor. Taking call is an essential function of his position.  He requested RAC but was denied by that department for reasons I am not privy to. He was given a modified schedule upon return for Dec and Jan but with permission from ELR he was placed back fully on the call schedule in Feb.

Page **11** of **20**                    Initials

**50. Did the Complainant send a second request to be exempt from "On-Call" duty as a reasonable accommodation?**

All requests for reasonable accommodations would be handled by the Department of RAD. I did not receive a second request. If Dr. Lisan made a request, I am unaware.

**51. What actions, if any, did you take to address the Complainant's concerns? If you responded that you took no action, why not?**

I took a portion of his call. I also found others to assist with his call duties in January so he did not have to take them

**52. Were any actions taken by you with regard to Complainant based on the Complainant's sex?**

No they were not.

**53. Were any actions taken by you with regard to Complainant based on Complainant's disability?**

No, they were not.

**54. Were any actions taken by you with regard to Complainant based on reprisal for the Complainant's prior EEO activity?**

No they were not. I am unaware of Complainant's prior EEO activity

**55. Can you provide any witnesses to the events of the accepted claims, who would have can relevant information to this particular issue? If so, please identify them by name, title, telephone number and e-mail address. Please state the nature of the information to be provided by each witness.**

Absolutely. There are other staff members who took his calls for him.
I remember that Dr. Samanich (Anne.samanich@va.gov) took one of his calls.
Kevin Roach (kevin.roach2@va.gov) makes are call schedules

**56. Do you have any additional evidence or documentation you can provide?**

I can provide the information provided to the on-call operator which shows who took call in our department. It clearly spells out that I personally covered some of his call duties upon his return.

<u>Incident #7</u>

Page **12** of 20

Initials

**7.) When in March and April 2017 SR attempted to force complainant to work in the same operating room with the CRNAs who accused him of sexual harassment, even though there were other CRNA's available.**

**57. In March and April 2017 did you attempt to force Complainant to work in the same operating room with the CRNAs who accused him of sexual harassment?**

No, this is not true

**58. Please explain in detail what occurred.**

As an anesthesia group we designate one of the physicians as the "daily coordinator", it is the job of the coordinator to make the assignments for the next day. I do occasionally coordinate, but most of the time it is another member of the group. As I stated in a previous answer, I did not discuss the issue of the allegations of sexual harassment with the group and therefore not everyone was aware of the situation. Out of courtesy to the four CRNAs involved and Dr. Lisan we tried not to put them together when possible. However, the clinical needs of the department and patients will need to take priority. I am aware on a few occasions that assignments were made by staff doing their job and Dr. Lisan may have been assigned with one of these women. Once it was brought to the attention of the person making the schedule whenever possible (which is almost always) they would change the assignments.

**59. What, if any, was your direct involvement?**

As stated in the previous answer I was occasionally the "coordinator". I never forced Dr. Lisan to work with one of the CRNAs if there was an acceptable alternative. I am often not the one making the assignments.

**60. Were your actions with regard to Complainant based on the Complainant's sex?**

No, they were not.

**61. Were your actions based on the Complainant's disability?**

No, they were not.

**62. Were your actions based on reprisal for the Complainant's prior EEO activity?**

No, they were not.

Page **13** of **20**                              _____ Initials

63. **Were any witnesses present or can you provide any witnesses to the events of the accepted claims, who would have relevant information? If so, please identify by name, title, telephone number and e-mail address. Please state the nature of the information to be provided by each witness.**

Yes, I am certain that if one of the four CRNAs saw that assignment they would have also gone to the coordinator and asked for their assignments to be altered. Contact information was provided in an earlier response.

**Incident #8**

**8.) When on March 9, 2017, SR issued complainant a Written Warning.**

64. **Did you issue a Written Warning to Complainant on March 9, 2017 and if so please in detail why you did so?**

I did take action in the form of a written warning to Dr. Lisan but this was for no other reason than to protect our employee, Karin Bonfili and to ensure that patient care would be not compromised.

Dr. Lisan received verbal and written warnings when the sexual harassment allegations were made that he was required to "cease any contact with the alleged victim except that which is absolutely required for official business". On March 8, 2017 Dr. Lisan came into the OR where Karin Bonfili was working. She was providing anesthesia for a patient having surgery and Dr. Lisan was not the assigned anesthesiologist for this case so he had no business being in there. The full details of what transpired are in a police report and statement filed by Karin that afternoon. To briefly summarize, Dr. Lisan asked if he could touch her and she said no and he proceeded to put his hand on her back. He continued to tell her "that if you talk to my lawyer, I promise not to sue you" He also told her if "she talked to Dr. Raphaely that there would be retaliation". Karin asked him to leave and he did not. She was trapped in the room because she was providing patient care and could not leave. Dr. Mannix the anesthesiologist came into the room and asked Dr. Lisan to leave and according to Karin's police report he answered that he would leave when he was ready. Dr Mannix told Dr. Schlesinger who was the attending anesthesiologist for that case and she came into the room and relieved Karin from her clinical duties because Dr. Lisan was still in there trying to talk with her about the allegations and distracting her from the patient's care.

Karin shared with the police and then myself that afternoon that Dr. Lisan came into her OR on the previous day and again tried to speak with her about the situation.

Patient care needs to remain our primary focus and Karin felt that she was unable

Page **14** of 20        _____ Initials

to concentrate on the care of her patient both days because Dr. Lisan was in direct violation of the policy to cease contact. Karin did go speak to the EEO office on the afternoon of March 8th and they told her that it was in her right to file a police report, which is what she did. The VA police came to the department to speak to Dr. Lisan and tell him he was not allowed to touch anyone and could not speak to those involved in the investigation about anything other than professional matters. I was not present for this encounter, but the police officers did speak with me later to say that they gave Dr. Lisan a verbal warning and Dr. Lisan responded by saying he had rights and he could talk to anyone he wanted.

**65. What reason(s) was given to the Complainant for issuing him a Written Warning?**

That he engaged in additional conversations regarding the allegations of inappropriate behavior of a sexual nature involving female coworkers which he is not allowed to do.

**66. Have there been other employees under your supervision that you issued a Written Warning during the two years of 2016 -2017? Please give name, title, series, sex, whether or not they had a disability and whether or not they had prior EEO activity.**

Three other employees were also issued a written warning., Kenneth Moss, MD a male staff anesthesiologist, GS-15 Dr. Moss does not have a disability and I am unaware of any prior EEO activity. Dr. Moss received a written warning after I received multiple complaints from medical personnel throughout the medical center regarding Dr. Moss' unprofessional behavior.

Mr. Michel Caretti, anesthesia technician, male, GS-8. I am not aware of a disability of prior EEO activity for Mr. Caretti. Mr. Caretti received a written warning because several staff members witnessed that he was yelling profanities in the OR at a fellow anesthesia technician.

Mr. Charles Conor, anesthesia technician, male GS-9. I am not aware if Mr. Conor has a disability or prior EEO activity. Mr. Conor received a written warning because as lead tech he is required to complete certain tasks. Mr. Conor received informal verbal counseling to perform all the functions of his role. He received formal verbal counseling and then finally he received a written counseling for failing to fulfill the duties of his role.

**67. Were your actions with regard to Complainant based on the Complainant's sex?**

No, they were not.

Initials

**68. Were your actions based on the Complainant's disability?**

No, they were not.

**69. Were your actions based on reprisal for the Complainant's prior EEO activity?**

No, they were not.

**70. Can you provide any witnesses to the events of the accepted claims, who can relevant information? If so, please identify by name, title, telephone number and e-mail address. Please state the nature of the information to be provided by each witness.**

Yes, Karin Bonfili, CRNA, Karin.bonfili@va.gov
Rachel Schlesinger, MD  Rachel.Schlesinger@va.gov
Marin.Mannix, MD  Marin.Mannix@va.gov
I don't feel comfortable giving out personnel cell numbers but all of the above can be reached at 216-791-3800, ext 3829
There are also the police officers who took Karin's statement and spoke with Dr Lisan.  I do not have their names now but can certainly provide if you wish.
I can also submit the police report and Karin's write up.

**Incident #9**

**9.) When on March 13 and 14, 2017, SR assigned complainant to serve as the anesthesiologist during operations without a CRNA to assist him, which is contrary to VA standard operating procedure, and put the patients at risk.**

**71. On March 13 and 14, 2017, did you assign Complainant to serve as the anesthesiologist during operations without a CRNA to assist him, which is contrary to VA standard operating procedure? If so please explain in detail why and if it is contrary to VA operating procedure.**

Dr. Lisan was assigned to work in an operating room without a CRNA but it could not be farther from the truth to say this is against "VA standard procedure".

As I shared previously, I often to do not make out the assignments for the OR. However, there are times that staffing ratios do not afford for all physician anesthesiologists to work in supervisory capacity with a CRNA and rather are assigned solo to a procedure. Solo MD practice is absolutely the expectation of any anesthesiologist. This is an essential function of an anesthesiologist duty.  On these two occasions Dr. Lisan was placed in a room solo by the coordinator due to staffing. Below is a table that I created to show the number of times a physician

Page **16** of 20                                              Initials

has worked solo since Dr. Lisan returned from his hospitalization.

| 12/7/2016 through 6/21/2017 | |
|---|---|
| Anesthesiologist Name | Solo Room Cases |
| KELLEMS, MATTHEW | 0 |
| LISAN,RONALD M | 2 |
| MANNIX,MARIN K | 1 |
| MOSS,KENNETH S | 2 |
| NASR, VIVIAN | 0 |
| ONTELL-SILVERMAN,SHERYL | 23 |
| RAPHAELY,SUSAN D | 1 |
| RASLAN, FARES | 0 |
| SAMANICH,ANNE E | 9 |
| SCHLESINGER, RACHEL | 0 |
| SHAH,SUNIL K | 7 |
| VARMA,KALPANA | 11 |

I did not make the assignments, nor was I aware of the assignments when they were made. If I don't make the assignments I do not review them. However, it is reasonable to have an MD to work solo. No such, SOP exists in the contrary.

**72. Were your actions with regard to Complainant based on the Complainant's sex?**

No, they were not.

**73. Were your actions based on the Complainant's disability?**

No, they were not.

**74. Were your actions based on reprisal for the Complainant's prior EEO activity?**

No, they were not.

**Incident #10**

**10.) When on March 28, 2017, SR issued complainant Proposed 10-Day Suspension.**

Page **17** of **20**                    Initials

75. **Did you issue Complainant a Proposed 10-Day Suspension? If so please explain in detail why you did so**

Yes, I did. This suspension was directly related to the details listed in Incident # 8 (Written Warning).  Due to the severity of Dr. Lisan's actions in not following hospital policy and putting patient care in jeopardy as well as creating a hostile work environment for one of our employees. As his supervisor I proposed a suspension.

When Dr. Lisan was served his suspension, he was provided the contact number of ORM should he wish to appeal the action.  He was also given the number of the Employee/Labor Relations Specialist should he need further explanation of his appeal rights.

76. **Were your actions with regard to Complainant based on the Complainant's sex?**

No, they were not.

77. **Were your actions based on the Complainant's disability?**

No, they were not.

78. **Were your actions based on reprisal for the Complainant's prior EEO activity?**

No, they were not.

## OVERALL HOSTILE WORK ENVIRONMENT ISSUES 1-11

79. **Did the Complainant ever tell you that he believed that he was being harassed or subjected to a hostile work environment? If yes, please state when he made these statements to you.**

No, Dr. Lisan never told me he felt that he was being harassed all our interactions to date have been professional and polite

80. **To the best of your knowledge, did the Complainant speak to any member of management regarding the alleged harassment or hostile work environment?**

I am not aware of his speaking to management.  I do know he filed complaints with office of resolution management and the EEO.

Page 18 of 20                          _____Initials

81. **The Complainant alleges he was subjected to a hostile work environment as evidenced by these alleged incidents. Were you involved in the alleged incidents? If yes, what was your involvement?**

As the Service Chief of Anesthesia and the department supervisor it is my responsibility to uphold the policies of the VA Medical Center. I do so to the best of my ability and adherence to hospital policies regardless of sex, age, position, or with or without history of prior EEO activity.

82. **If you took the action that is claimed to have been harassing, did you take that action in order to subject the Complainant to a hostile work environment because of sex, disability and/or reprisal?**

I did not.

83. **Is there anything you would like to add, relevant to the accepted claims, which has not been addressed?**


_____END OF STATEMENT_____

I have read this statement, consisting of 19 pages, and it is true, complete, and correct to the best of my knowledge and belief.

_____
Signature

_____9/28/17_____
Date


Signed and sworn to before me
on this 28th day of September , 2017 , at _____.


_Burton Greenspan_____
Neutral witness, notary, or Investigator

**Page 19 of 20**                    _____Initials

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**



PLAINTIFF'S EXHIBIT 68 4-15-19 OMF

Page 61

1  (Thereupon, Plaintiff's Exhibit 9, 12/16/16
2  Marciano note to Roach, was marked for
3  purposes of identification.)
4        - - - -
5  Q. Let's take a look at Exhibit 9.
6     Okay. This is Exhibit 9.
7        MS. JOHNSON: This is 9, right?
8  Q. Yes.
9     Would you take a look at Exhibit 9 please?
10 A. Yes.
11 Q. Do you recall receiving this document as part of
12    submissions from Dr. Lisan to you in connection
13    with your processing of the reasonable
14    accommodation request?
15 A. Yes.
16 Q. And it's simply a letter from what appears to be
17    an LISW, social worker?
18 A. Yes.
19 Q. Who's Kevin Roach?
20 A. I think he is an administrative officer within
21    surgical service.
22 Q. Okay. Do you know --
23 A. At least that's what he is now because I had
24    recent -- I don't remember if he was at the time.
25 Q. I'm sorry. Go ahead. What did you just say?

Page 62

1  A. I am aware that Kevin Roach is an administrative
2     officer. He may have been the administrative
3     officer in anesthesiology service at the time.
4        MS. JOHNSON: And did you say now
5     he's in the surgery service?
6  A. It may be medicine service. It's one of those.
7  Q. Would it be helpful for you to assume that -- is
8     it Dr. or Mr.?
9        DR. LISAN: Mr. Roach.
10 Q. Mr. Roach was with anesthesiology at the time of
11    this communication of December 16, 2016 in
12    Exhibit 9?
13       MS. JOHNSON: I'm going to object.
14       You may answer.
15 A. I don't know if it would be helpful for me to
16    assume that; but I know that these administrative
17    officer persons like Mr. Roach all play a similar
18    role when it comes to reasonable accommodation
19    requests.
20 Q. And what's the role?
21 A. Typically they pass on information from a
22    requester to either a service chief or to me.
23 Q. And when you say a service chief, who would the
24    service chief be in this case?
25 A. Dr. Raphaely.

Page 63

1  Q. Does Dr. Raphaely play any role at all in the
2     reasonable accommodation request?
3  A. Yes.
4  Q. What would that be?
5  A. She would, in the face of a request, she would
6     pass information to me and then ultimately she
7     would have the final decision-making authority
8     about the provision of an accommodation as to
9     whether to provide it or to deny it.
10 Q. She decides whether or not there should be a
11    reasonable accommodation as requested or not?
12 A. Correct.
13 Q. Doesn't anybody else have anything to say about
14    that?
15 A. When you say "have anything to say about it,"
16    what does that mean?
17 Q. Well, I mean doesn't anybody else review it and
18    make a decision above Dr. Raphaely or separate
19    and apart from her?
20 A. No. Dr. Raphaely has the authority to make a
21    decision.
22 Q. Okay. Does she make the final decision?
23 A. Yes.
24 Q. Is there anyone else who participates in making
25    that final decision?

Page 64

1  A. No.
2  Q. So the chief of the department would be the
3     appropriate person in this case to decide whether
4     or not Ron Lisan's reasonable accommodation
5     request would be accepted or denied?
6  A. Correct.
7  Q. What about Dr. Altose? Does he have anything --
8     withdrawn.
9        Did Dr. Altose as the medical director have
10    any role in the decision to grant or deny
11    reasonable accommodation?
12 A. No.
13 Q. Is there any reason you can understand why
14    Dr. Raphaely wanted to check on that matter with
15    Dr. Altose?
16 A. I have no knowledge as to why she checked with
17    Dr. Altose.
18 Q. But she did not need to, did she?
19 A. I don't know. You're asking me about
20    Dr. Raphaely's needs?
21 Q. Yes. I'm asking you whether -- withdrawn.
22    She had no obligation to consult with him.
23    She could have made the decision all by herself
24    if she chose, right?
25 A. I don't know. She may have wanted to consult

**Bruce Kafer, RN, MSN - March 08, 2019**
**Deposition**

Page 65

1    Dr. Altose for some reason that I'm unaware of.
2  Q. Okay. Here's my question.
3    There's nothing of course that would prevent
4    a chief of a department of anesthesiology from
5    consulting with anyone about a reasonable
6    accommodation decision, correct? I mean within
7    the VA?
8  A. As long as it was a professional consultation.
9  Q. Yes. Yes.
10 A. Okay. Then yes.
11 Q. I mean she could consult with Dr. Altose, she can
12    consult with you. She can consult as I
13    understand you with anybody who might have
14    knowledge to give her about it. Right?
15 A. Perhaps.
16 Q. Well, she could if she chose?
17 A. If she chose to, yes.
18 Q. Okay. Now, when you're processing a reasonable
19    accommodation request, is it part of your job to
20    communicate with the, in this case, physician,
21    Dr. Lisan, making the request?
22 A. Yes.
23 Q. Okay. I think they call that the interactive
24    process, don't they?
25 A. Correct.

Page 66

1  Q. And you're familiar with that, aren't you?
2  A. Correct.
3  Q. And that's something that falls within your
4    responsibility; isn't it?
5  A. Correct.
6  Q. Let me be clear about something.
7    You've testified that the final decision on
8    reasonable accommodation rests exclusively with
9    Dr. Raphaely in this case?
10 A. Yes.
11 Q. On what do you base that? Where does that
12    statement you're making come from?
13 A. The VA policy that's in the handbook on
14    reasonable accommodation.
15 Q. Did you review those policies in preparation for
16    this deposition?
17 A. No.
18    - - - -
19    (Thereupon, Plaintiff's Exhibit 10, 12/19/16
20    Raphaely "Reasonable accommodations" email to
21    Kafer, et al., was marked for purposes of
22    identification.)
23    - - - -
24 Q. All right. This is Exhibit 10.
25    All right. I'd like you to take a look at

Page 67

1    Exhibit 10 if you would, please.
2  A. Okay.
3  Q. Oh, I'm sorry. Have you read it?
4  A. Yes.
5    MR. SINDELL: Off the record.
6    - - - -
7    (Thereupon, a discussion was had off the
8    record.)
9    - - - -
10 Q. Now, this, do you have any recollection of this
11    email?
12 A. Yes. Now that I'm reviewing it, I recall this
13    email.
14 Q. Good. Let's just identify Exhibit 10, this
15    email.
16    It's from Dr. Raphaely sent December 19,
17    Monday December 19, 2016 at 10:50 a.m. in the
18    morning to you, correct?
19 A. Correct.
20 Q. To Dr. Lisan, correct?
21 A. Correct.
22 Q. Who is Jelena Zekanovic?
23 A. She was the employee labor relations specialist
24    at the time. She is considered a subject matter
25    expert in human resources.

Page 68

1  Q. Any particular reason you can understand why she
2    would be copied on this?
3  A. Normal protocol.
4  Q. Kevin Roach is copied and we've talked about him,
5    right?
6  A. Correct.
7  Q. And who is Shawn Beham?
8  A. He was a assistant reasonable accommodation
9    coordinator at the time and an EEO specialist.
10 Q. Why would he get a copy of this?
11 A. Because he would assist me with cases.
12 Q. Was he assisting you on this case?
13 A. Not to my recollection.
14 Q. Okay. So it's a formality in this case for him?
15 A. Right. In the event I'm absent or...
16 Q. No, I understand.
17    And the subject of course as indicated is
18    reasonable accommodations, correct?
19 A. Correct.
20 Q. Now this is, as follows, the way it's written:
21    "Bruce: I am reaching out to you for your
22    assistance with a request I have received for
23    accommodations by Dr. Ronald Lisan."
24    Did I read that correctly?
25 A. Yes.



**VA HANDBOOK 5975.1**

**November 27, 2013**

**d. Essential Functions:** The essential functions of a job are the occupational duties that are fundamental to the position to the extent that the individual cannot do the job without being able to perform them. A function can be "essential" if, among other things, the position exists specifically to perform that function, a limited number of other employees can perform the function if given the assignment, or the function is specialized and the incumbent is hired based on his or her ability to perform it. If a function is listed in the position description as an essential function, but is not performed by the incumbent or takes only a few hours per week, it is not usually considered "essential" for purposes of accommodation. The following factors are considered in determining whether a job function is essential:

- Whether the reason the position exists is to perform that function;

- The number of other employees available to perform the function or among whom the performance of the function can be distributed;

- The degree of expertise or skill required to perform the function;

- Written job descriptions prepared before advertising or interviewing applicants for the job;

- The amount of time actually spent on the job performing the function;

- The consequences of not requiring the incumbent to perform the function;

- The terms of any collective bargaining agreement;

- The work experience of past incumbents in the job; and/or

- The current work experience of incumbents in similar jobs.

An example of an essential function for a social worker would be the ability to understand what the Veteran is saying. Speaking and hearing would not be essential functions, as the social worker could use an interpreter or other methods for communication. An essential function for a management analyst would be the ability to obtain information, synthesize it, and prepare reports.

**e. Extenuating Circumstances:** Factors beyond the Department's control which make it impossible for a reasonable accommodation to be provided within the time frame are considered to be extenuating circumstances. Examples of extenuating circumstances include, but are not limited to, delays encountered when ordering equipment that must be back-ordered, the vendor normally used has gone out of business, or there are unexpected delays by the vendor or CAP. Therefore, the office/facility is encouraged to use charge cards when possible to avoid contracts, ratification, etc. Review of medical documentation, the absence of the DMO or LRAC, and other situations within VA's control are not considered to be extenuating circumstances and should not delay the processing of a request.

6

December 23, 2016



Dear Dr. Kramer,

I have just finished speaking with Steve Sindell, who is the attorney whom I have retained to help deal with my employment issues at the VA (also, I hereby give permission for you to speak with him directly about my medical conditions and therapy requirements, etc.).

He feels very strongly that we need a letter from you ASAP (and the completed "VA reasonable accommodation" form) clearly stating that I am recovering from OCD/depression, and require a gradual re-entry to the on-call schedule, in order to avoid the "flooding" phenomenon – and to avoid the VA trying to terminate my employment.

The reasons are as follows (I apologize for the length of this message, but I think it will give you a better idea of what I may be up against):

Mr. Sindell believes that the department/administration here is trying to use my OCD & depression issues against me in order to terminate my employment. This is based on several observations and occurrences. First, they have already received a letter from my therapist (and I am assuming also from you) stating that due to my medical conditions it would be desirable for me to have a no-call position as I readjust to work – I also discussed this verbally with our chairperson Dr. Susan Raphaely before I returned to work on December 7th. At that time I was not on the December call schedule at all. However, I was asked if I might be able to help out by covering some of the Christmas weekend call, and I responded that I would have to see how things proceeded when I came back to work.

At the beginning of this week, I spoke to Dr. Raphaely and told her I would be OK covering about 10-12 hours of the daytime call on Dec. 25th; I was instructed to convey that information to the person who was already scheduled to be on call (who is recovering from foot surgery). He refused to cover the rest of the weekend call, but did not convey that to our chairperson. When I relayed the message to Dr. Raphaely, she told me that whatever I did not take of the call days, she would have to cover – and she made it very clear that she would be extremely unhappy about having to do so. Needless to say, since she is the chairperson and I am in a very vulnerable position, especially at this time, I felt compelled to acquiesce.

As a result of having offered to cover part of one day for about 10-12 hours, I was browbeaten into taken call from 9am-11pm on the 25th, and 8am-11pm on the 26th; my attempts to negotiate shorter hours were refused – even though Dr. Raphaely is very well aware that the on-call situation is still difficult for me in this early period of my recovery and return to work. In fact, we had previously discussed on several occasions my need to get back into work and taking calls gradually.

On top of that, I was told that no special on-call accommodation could be made for January, until the official "reasonable accommodation" process had been completed. I said I understood, and indicated I would be tentatively willing to be put on-call at the end of the month, in order to allow time for the accommodation request to go through. When the call schedule came out, I found I was assigned late call duty January 3rd - - the first day back from the weekend – and overnight call the next day. Clearly, no attempt was made to allow time for the reasonable accommodation request to be processed.

RONL1442

Finally, I was told by Dr. Raphaely that a fulltime no-call position could be created for me (at lesser pay, of course) if I could provide medical documentation of necessity. Much to my surprise, when I read her email to Bruce Kafer (the "reasonable accommodation coordinator" here at the Cleveland VA), I found that she had written that it was impossible to create such a position, and wanted to know what sort of temporary accommodations could be made.

Thus, as Mr. Sindell has suggested, it seems they may have been trying to get medical documentation stating that I should not take call – and then deliberately putting me on-call early in my return to work, so that if I refuse they can claim that I cannot fulfill the job requirements, and therefore terminate my employment.

What I would greatly appreciate from you is filling out the required VA medical necessity form (which I am faxing to you), and perhaps even sending a separate letter for further clarification if that cannot be adequately addressed on the form.

What we are looking for is a clear medical statement that I need only temporary no-call accommodation, and that I should be allowed to gradually work my way into more call duties, in order to avoid the "flooding" which might potentially be very detrimental to my health and recovery. If you need more information or specifics, please feel free to call Steve Sindell at 216-401-4912 (cell) or 216-292-3393 (office).

Thanks, and hope you have a great Christmas and New Year!

Ron Lisan

440-318-4678 (cell); 440-542-0550 (home)

RONL1443

# ᗺehavioral Health Associates

*Partners in Quality Mental Health Services*

(216) 831-2500 • FAX (216) 831-4035

24400 Highpoint Road • Suite 9 • Beachwood, Ohio 44122
26777 Lorain Road • Suite 414 • North Olmsted, Ohio 44070



**PLAINTIFF'S EXHIBIT**
71
4-15-19 DMF

**Cleveland Center for Cognitive Therapy**

mes Pretzer, Ph.D., Director

*Specializing in cognitive therapy as well as consultation and training for mental health professionals*

**Anxiety Treatment Center**

ırbara Fleming, Ph.D., Director

*Specializing in the reatment of anxiety disorders, phobias and stress*

**PsychSource**

arren D. Salkin, Ph.D., Director

*Specializing in clinical consulting to private and public organizations, employee assistance, and debriefing services*

**Visit Us On The Web**

ʍw.BehavioralHealthAssoc.com

December 16, 2016

Re: Ronald LeSA
ᗺD: 4-7-59

To Kevin Roach;

These will verify this patient's need to not be on call as he is recovering from a recent hospital stay.

Sincerely,

Rmarsean



**ᗺehavioral Health Associates**
Partners in Quality Mental Health Services

Cleveland Center for Cognitive Therapy
Anxiety Treatment Center
PsychSource

**CAROLE M. MARCIANO, L.I.S.W.**

(216) 831-2500 • FAX (216) 831-4035
24400 Highpoint Road • Suite 9 • Beachwood, Ohio 44122
26777 Lorain Road • Suite 414 • North Olmsted, Ohio 44070
www.BehavioralHealthAssoc.com



Dec. 23. 2016 2:44PM                                                    No. 0091   P. 5

PLAINTIFF'S
EXHIBIT
72
4-15-19 DMF



**Department of Veterans Affairs**

## REQUEST FOR MEDICAL DOCUMENTATION

1. DATE   12/27/16

2. Dear Health Care Provider;

Your patient    Ronald Lisan, MD                    has requested an accommodation *(describe the requested accommodation here)*

because of functional limitations caused by his/her disability. Since the disability is not visible, and we do not have documentation on file, I would appreciate information that would allow me to determine whether this individual has a disability covered by the Rehabilitation Act of 1973. The information that you provide will also help me determine whether the requested accommodation will be effective in eliminating or minimizing the limitations caused by the disability.

3. The key duties that your patient has advised that he/she is unable to perform, or benefits and privileges of employment that he/she is unable to enjoy are:

To be excused from "on call" duties, for nights, weekdays, weekends, and holidays, etc. It is unclear if this is a time limited request.

4. I have been given the responsibility for determining if your patient is covered by the Rehabilitation Act. I cannot proceed until I receive the requested information. If you have any questions, please contact me at the telephone number below.

| 5. MY NAME IS | 6. MY PHONE NO. IS | 7. MY TITLE IS |
|---|---|---|
| Bruce Kafer, RN, MSN   (216) 791-2300 | Ext.6601 | L. Reasonable Accommodation Coordinator |

8. Please return this form and the requested information to me at:
   *(Enter complete mailing address and fax number.)*
   Bruce Kafer, RN, MSN
   Cleveland VA Medical Center
   10701 East Boulevard
   Cleveland, OH 44106-1702
   FAX: 216-707-7627

9. Please do NOT provide a copy of the patient's complete medical history.
The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services. At present, we only need the following information:

(a) the nature, severity, and duration of the impairment;
Ron has contamination based OCD (obsessive Compulsive Disorder) + co-morbid depression.

(b) one or more of the activities the impairment limits (walking, reaching, breathing, etc.);
Ron needs to be allowed to slowly acclimate to his work schedule so as to avoid flooding him with work stressors/responsibilities. If allowed to slowly

VA FORM 0857e                                    Page 1 of 2
SEP 2013

reacclimate, his prognosis for returning to full functioning is good. However if Ron is overwhelmed, his duty hours (especially call) he could

Ronald Lisan, MD

(c) the extent or degree to which the impairment limits an activity:

likely deteriorate rapidly, necessitating readmission
for further treatments. Prior to treatment his
symptoms were so severe as to interfere not only

(d) the reason the individual requires accommodation or the particular accommodation requested, and/or

with work but also basic ADL's. His mood
symptoms included passive thoughts of suicide, severe
anhedonia & poor appetite with considerable weight loss.

(e) how the accommodation will assist the individual in applying for a job, performing the essential functions of the job, or to enjoy a benefits of employment.

Again, this no-call request would be temporary.
However the stresses of call including lack of
sleep & increased anxiety could likely have delirious
effects on his health.

| 10. NAME OF HEALTH CARE PROVIDER | 11. SIGNATURE OF HEALTH CARE PROVIDER | 12. DATE OF SIGNATURE |
|---|---|---|
| M. J. Kramer | | 12/27/16 |

13. MEDICAL/PROFESSIONAL LICENSE CATEGORY AND NUMBER

Medical licenses:
WI: 6466520          IL:
GA: 66450

I have attached his discharge
summary as well.
        Please call my work cell
at 262-370-0614 with questions

This form should be retained separately from the employee's Official Personnel Folder.



c. All requests for and provisions of reasonable accommodation must be confidential and documented via RACS.

## 9. INTERACTIVE PROCESS.

a. When the individual makes an oral or written request for reasonable accommodation, managers should ordinarily begin to engage in the interactive process with the individual after receiving notice of the request. The interactive process is the communication between the DMO and the employee, in consultation with the LRAC, to determine how best to respond to the employee's request. During this process, an individualized assessment will be conducted to review essential and marginal job functions, the employee's limitations, and possible accommodations. The interactive process may require more than one discussion. The DMO or LRAC will also explain the reasonable accommodation process to the employee at this time.

b. Ongoing communication and cooperation are important, especially when a specific limitation, problem, or barrier is unclear or when the disability or an effective accommodation is not obvious. Thus, interactive discussions should be documented, with at least the date, time, participants, and key points noted.

c. In the case of an applicant for employment, the local HRMO (or his or her designee) will engage in the interactive process with the applicant.

d. Once a job offer has been made, if an accommodation is requested, the interactive process with the new employee with a known disability (post offer but pre-on boarding) should be conducted by the supervisor and the LRAC, in consultation with the GC, RC or NRAC, if necessary, to discuss and identify possible accommodations, and ensure that the requested accommodation is in place when the new employee starts.

**e. Failing to engage in the interactive process is a violation of the Rehabilitation Act of 1973, as amended, and may create liability for VA.**

## 10. INTERIM WORKPLACE ADJUSTMENTS.

Where feasible, interim workplace adjustments or accommodations will be provided for an employee with an obvious or documented disability until a final decision has been made on the request for accommodation (and, if approved, implemented). The interim workplace adjustment should enable the individual to perform the essential functions of the job or enjoy the benefits and privileges of employment without posing a direct threat to anyone's health and safety. Interim workplace adjustments are not required or guaranteed, but are highly recommended when they can be offered without adverse impact on the operation of the unit.

The office or facility should strive to provide an interim accommodation if there will be a delay in acquiring the approved accommodation. This is sometimes the case when the accommodation is ordered from the Department of Defense's CAP. VA Form 0857c, Approval of Interim Accommodation, can be used to document the agreement to make a workplace adjustment until the requested accommodation can be arranged.

21

Mar. 29. 2017 12:38PM                                                    No 0441    P. 2



VA Defining
HEALTH **EXCELLENCE**
**CARE** in the 21st Century

DEPARTMENT OF VETERANS AFFAIRS
LOUIS STOKES CLEVELAND
DEPARTMENT OF VETERANS AFFAIRS MEDICAL CENTER
10701 EAST BOULEVARD
CLEVELAND, OH 44106



March 20, 2017                                                  **In Reply Refer To: 541/053**

Dr. Ronald Lisan, MD
Anesthesiology Service
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, OH 44106

Subject: Proposed Suspension

1.      This letter is to inform you that it is proposed to suspend you from duty and pay for ten (10) calendar days based on the following reasons:

You are employed as a Physician, VM-0602-15, Step 5, in Anesthesiology Service at the Louis Stokes Cleveland VA Medical Center. As an employee of this Medical Center, you are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy and ethical behavior toward patients, visitors and coworkers. An employee who violates established conduct requirements may be subject to appropriate disciplinary, adverse, or major adverse action.

On Friday, January 6, 2017, I was informed that you may have engaged in inappropriate behavior of sexual nature involving female coworkers. Specifically, I was approached by two (2) of your female coworkers who alleged sexual harassment perpetrated by you. Consequently, these allegations were referred to Equal Employment Opportunity (EEO) office for investigation.

On Thursday, March 16, 2017, VA EEO office concluded the investigation of allegations of Sexual Harassment made by Certified Registered Nurse Anesthetists (CRNA) who alleged sexual harassment perpetrated by you. Even though the case failed to rise to the level of sexual harassment, as defined in policy promulgated pursuant to Equal Employment Opportunity law, the EEO office did find evidence that inappropriate behavior might have occurred. Furthermore, the EEO office found evidence that you violated the supervisory order to cease any contact with the alleged victims except that which is absolutely required for official business.

      I.      Failure to Follow Orders

On Tuesday, January 10, 2017, in consultation with the EEO Manager, I issued a Sexual Harassment Allegation Checklist to you, which stated in part:

"I have ordered the alleged harasser to cease any contact with the alleged victim except that which is absolutely required for official business."

a.      On Friday, January 20, 2017, I had to remind you of the order I gave you on Tuesday, January 10, 2017, as you were frequenting the CRNA lounge and were continuing to address one of the CRNAs that brought the above-mentioned allegations against you. Consequently, you are being charged with failure to follow orders.

1

Page 2.
Proposed Suspension
Dr. Ronald Lisan

b.      On Monday, January 23, 2017, I again had to remind you of the order I gave you on Tuesday, January 10, 2017, and Friday, January 20, 2017, as you were continuing to have contact with the CRNAs that brought the above-mentioned allegations against you. Consequently, you are being charged with failure to follow orders.

c.      On Thursday, March 9, 2017, I issued a written order to you, instructing you to immediately cease any contact with the alleged victims, except that which is absolutely required for official business. I was advised that you were continuing to engage in conversations with the CRNAs that brought the allegations of inappropriate behavior against you. Despite my previous orders, you failed to follow my instructions to cease any contact with the alleged victims. Consequently, you are being charged with failure to follow orders.

## II.      Inappropriate Conduct

a.      On Wednesday January 4, 2017, Ms. Jessica Foster, CRNA, Anesthesiology Service, reported that she came to your office to sign out, as she was on a call assignment with you. Ms. Foster reported that you asked her to close the office door, as you had two (2) things to tell her. Ms. Foster stated that after you informed her that another physician would be covering your call assignment overnight, you said, "I am not trying to hit on you, ask you out or have sex with you, but I would", or words to that effect. Ms. Foster further reported that you told her how you saw similarities between your marriage and hers, and that you wasted far too many years in an unhappy marriage. Ms. Foster stated that she felt appalled at the context of the conversation and that the conversation made her extremely uncomfortable. Consequently, you are being charged with inappropriate conduct.

b.      On Thursday, January 5, 2017, Ms. Karen Bonfili, CRNA, Anesthesiology Service, reported that she was discussing a case with you that you were assigned to work the next day. She reported that when she asked you if you were leaving, you responded, "unless you can make me a better offer", or words to that effect. Ms. Bonfili stated that she felt extremely uncomfortable with your comment made to her. Consequently, you are being charged with inappropriate conduct.

c.      On Friday, January 6, 2017, Ms. Bonfili reported that she was assigned to work with you that day. Ms. Bonfili stated that you made sexually oriented comments throughout the day. Specifically, you stated, "sounds good to me, we can go now and get in your bed", or words to that effect, when she stated how tired she was and how she wanted to go home and go to bed. Consequently, you are being charged with inappropriate conduct.

d.      On Tuesday, March 7, 2017, Ms. Elaine Costanzo, CRNA, Anesthesiology Service, reported that you called her on her personal telephone after work hours. Ms. Costanzo stated that she received a phone call, from an unknown telephone number and answered the call. Ms. Costanzo stated that you were calling to tell her you did not feel you could provide safe patient care together as she does not greet you when she passes you in the hallway. You proceeded to tell Ms. Costanzo that she needed to find someone who would swap with her for the upcoming call assignment the two of you were scheduled to work, as it was easier for her to do so than you. Ms. Costanzo directed you to contact me regarding this matter and you responded that you did not want to talk to me for, "obvious reasons", or words to that effect. Furthermore, Ms. Costanzo reported that she felt intimidated and threatened by your phone call. You were previously instructed to cease any contact with the alleged victim except that which is absolutely required for official business. You should not have called Ms. Costanzo on her personal telephone. If you had concerns about being able to

Case: 1:18-cv-00969-PAB Doc #: 50-1 Filed: 06/21/19 268 of 304. PageID #: 3574

Page 3.
Proposed Suspension
Dr. Ronald Lisan

provide safe patient care while working with Ms. Costanzo, you needed to address that with me. Consequently, you are being charged with inappropriate conduct.

e.      On Wednesday, March 8, 2017, Ms. Bonfili reported that you entered Operating Room (OR) 6, while she was working on a case, put your hands on her back and asked her if it was okay to touch her. Ms. Bonfill stated that you told her you would not press charges against her if she agreed to talk to your attorney and explain to him that you were just joking about the sexual talk. Furthermore, Ms. Bonfili stated that you told her if she talked to me there would be, "retaliation", or words to that effect. At some point during your interaction with Ms. Bonfili, Dr. Marin Mannix, MD, Staff Anesthesiologist, Anesthesiology Service, entered the room and informed you that you had an assignment in OR 7. As you did not leave OR 6 to attend your assignment, Dr. Mannix returned to remind you that you were needed in OR 7, at which time you responded, "I will go when I am ready", or words to that effect. Ms. Bonfili reported that you stayed in OR 6, continuing to talk to her about how you valued your relationship with her. Ms. Bonfili stated she left the room after Dr. Rachel Schlesinger, MD, Staff Anesthesiologist, Anesthesiology Service, came and instructed her to leave informing her she will stay with the patient. You were not assigned to work with Ms. Bonfili in OR 6, and did not have a need to be present in the room. Your presence and conversation in the room had no legitimate business or patient care purpose. Consequently, you are being charged with inappropriate conduct.

          III.     Disruptive Behavior Putting Patient Safety at Risk

          Over the last few months, you have engaged in inappropriate behavior involving female coworkers. Furthermore, four (4) of your female coworkers alleged sexual harassment perpetrated by you. The alleged victims reported that they felt their work environment was unsafe and they are not able to provide safe patient care as they are unable to concentrate on their work due to your intimidating and disruptive behavior. You were instructed, by me, to cease any contact with the alleged victims, except that which is required for direct patient care. Despite my orders, you continued to have contact with the alleged victims outside of your work assignments. Specifically, on March 8, 2017, you entered OR 6, approached Ms. Bonfili and put your hands on her back, while she was providing anesthetics care for a patient undergoing surgery. Ms. Bonfill stated that your intimidating behavior made it difficult for her to concentrate on the care she was providing. You were not assigned to the case and should not have entered the OR to approach Ms. Bonfili and disrupt the procedure. Consequently, you are being charged with disruptive behavior putting patient safety at risk.

2.      As an employee of this Medical Center, it is your responsibility to adhere to the rules and procedures, as described in Medical Center Policy (MCP) 005-024, Employee Responsibility and Conduct, which states in part:

"Employees are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy and ethical behavior toward patients, visitors and coworkers."

"As an employee of the Cleveland VA Medical Center you are expected to:

   •   Treat your supervisor(s) with respect, following their directions and guidance in a cooperative, responsive manner and completing assignments on a timely basis.

Page 4.
Proposed Suspension
Dr. Ronald Lisan

> • *Exhibit courteous, respectful and compassionate behavior toward patients and those, with whom you interact, both co-workers and visitors, as a requirement of your position, not as an option."*

Furthermore, as an employee of this Medical Center, it is your responsibility to adhere to the rules and procedures, as described in MCP 003-003, Prevention of Sexual Harassment, which states in part:

*"Hostile-environment harassment is any lewd sexual conduct including, but not limited to: pictures, words, jokes, questions, remarks, teasing, and/or touching that unreasonably interferes with an individual's work performance or created an intimidating, hostile or offensive work environment."*

*"The key work in defining sexual harassment is unwelcome. When any unwelcome or unsolicited conduct is imposed on a person who regards it as offensive or undesirable, could be construed as sexual harassment."*

Your actions, as described above, are in direct contradiction with these expectations, thereby serving as the basis for your proposed suspension.

3.       I have considered the following to be the aggravating factors in determining the appropriate discipline to propose: the nature and seriousness of the offense and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties; consistency of the penalty with any applicable agency table of penalties; the notoriety of the offense or its impact upon the reputation of the agency; and the clarity with which the employee was on notice of any rules that were violated in committing the offense or had been warned about the conduct in question.

4.       If you choose to do so, you have until close of business fourteen (14) calendar days from the day after you receive this notice to reply orally, or in writing, or both orally and in writing, and to submit affidavits and other documentary evidence in support of your reply, showing why the charge is unfounded and any other reasons why your suspension should not be effected. Your written reply should be submitted to me. I will receive your oral reply, or will designate an official to receive it. You may make arrangements for your oral reply by calling Ms. Jelena Zekanovic, Employee/Labor Relations Specialist, Human Resources Management Service, at 216-791-2300, extension 2163.

5.       The evidence upon which this notice of proposed suspension is based will be available for your review in the Employee/Labor Relations Section of Human Resources Management Service, Second Floor, Administrative Building, Wade Park Campus, between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday. You will be allowed up to eight (8) hours of official duty time for reviewing the evidence relied on to support the reason(s) in this notice, preparing a written reply, securing affidavits, and for making a personal reply. Arrangements for the use of official time or requests for additional time should be made with me.

6.       You may be represented by an attorney or other representative of your choice at all stages

Page 5.
Proposed Suspension
Dr. Ronald Lisan

of this matter, up to and including the issuance of the decision. Please advise me in writing of any representative designated.

7.      The final decision to effect the proposed action has not been made. The Medical Center Director, who will make the final decision, will give full and impartial consideration to your reply (ies), if submitted. You will be informed in writing of the final decision as soon as possible after your reply has been considered or after the expiration of the time allowed for reply, if you do not reply. If an action is effected, the applicable grievance or appeal rights will be included in the decision letter.

8.      You will be given a written decision within 21 calendar days of the receipt of your reply (ies) or, the close of business 14 calendar days following the receipt of this notice, if you do not reply.

9.      If it is decided that you should be suspended, it will be effective not less than thirty (30) calendar days from the day after the date of receipt of this notice.

10.     You will be retained in an active duty status during the advance notice period.

11.     If a personal, medical, family, or other situation is affecting your conduct on the job, this Medical Center has an Employee Assistance Program (EAP) that offers short-term counseling and referral. You may contact EAP Counselors, Dr. Erica Sharkansky or Dr. Diane Johnson, at (216) 791-3800, extension 6922. One of them will be happy to meet with you on a confidential basis.

12.     If you do not understand the above reason as to why your suspension is being proposed, please contact me, or Ms. Jelena Zekanovic, Employee and Labor Relations Specialist, Human Resources Management Service, at 216-791-2300, extension 2163.

Susan D. Raphaely, MD
Chief, Anesthesiology Service

Mar 10. 2017 12:47PM



No 0372  P. 2

## Department of
## Veterans Affairs

# Memorandum

Date: March 9, 2017

From: Chief, Anesthesiology Service

Subj: Written Warning

To: Ronald M. Lisan, MD, Anesthesiology Service

1.    I have learned of additional serious allegations that were made against you.  I was advised that you may have engaged in additional conversations regarding allegations of inappropriate behavior of sexual nature involving female coworkers.

2.    The above-mentioned allegations are potentially serious.  If true, they may likely constitute sexual harassment on your part.  For this reason, you are hereby warned that such conduct will not be tolerated.  While I am bringing these allegations to your attention at the present, be advised that they will be fully investigated.  In the meantime, I am placing you on notice that if these allegations are true, you must cease this offending behavior immediately. You were previously instructed to refrain from discussing this allegation with your coworkers. Specifically, you received those instructions on January 10, 2017, January 20, 2017, and January 23, 2017. Additionally, you are to refrain from discussing these allegations with your coworkers. Furthermore, you are not to have any personal contact at or outside of work with Nurse Anesthetists: Ms. Jessica Foster, Ms. Elaine Costanzo, Ms. Rhonda Verb and Ms. Karin Bonfili. You are still required to maintain interactions of professional nature, relating to patient care, with the above named individuals.

3.    If these allegations are not true, and an investigation exonerates you of these charges, you must still be aware of how your interactions with your coworkers are interpreted. Accordingly, you are strongly advised to make no statement, or take no action, which even suggests the remotest possibility of impropriety on your part.

4.    At this time, disciplinary action will not be imposed. As more is learned about the nature of these allegations, you will be advised as to your rights and responsibilities in this matter. Until then, if a personal, medical, or other situation is affecting your conduct on the job, this medical center has an employee assistance program that offers short-term counseling and referral. You may contact EAP Counselors, Dr. Erica Sharkansky or Dr. Diane Johnson, at (216) 791-3800, extension 6922. One of them will be happy to meet with you on a confidential basis.

4.    Should you have any questions regarding my expectations, please see me immediately.

Susan D. Raphaely, MD

_____

Ronald M. Lisan, MD

VA FORM
MAR 1989    **2105**



Page 77

1  A. I have not -- yes. I have not seen any recent
2    complaints.
3  Q. Okay. Let's see if you consider this a
4    complaint.
5      If you'll take 31.
6  A. 32.
7  Q. 32. Thank you very much. Off the record.
8        - - - -
9      (Thereupon, a discussion was had off the
10     record.)
11       - - - -
12       MS. ASHER: Have you given us a
13     page number yet or not yet?
14 Q. Okay. I'd like you to turn to Page 30.
15     And at the bottom in Line 24, this is again
16   Ms. Costanzo's deposition, correct?
17 A. Yes.
18 Q. Question: "As you sit here now, Ms. Costanzo, do
19   you have any fear that if you say things in this
20   deposition which are upsetting or disturbing or
21   critical with respect to Dr. Raphaely, that you
22   might be retaliated against by her?"
23     Answer: "Yes."
24     Question: Skipping to the question: "I
25   think I can speak for both sets of attorneys

Page 78

1    here, but I'll speak for myself first, that our
2    goal as attorneys and professionals in our field
3    is to obtain the truth and that means the whole
4    truth.
5      "You understand that, don't you?"
6      Answer: "Yes."
7      Okay. Now this deposition was taken the
8    other day, March 19th, 2019?
9       MS. ASHER: Is there a question?
10 Q. Well, I just want to make sure she's with me.
11 A. Yes.
12 Q. I just want you to be able to assume that that's
13   true. Okay?
14     Doesn't that disturb you that somebody would
15   be afraid to testify truthfully under oath if it
16   meant saying something bad or negative about
17   Dr. Raphaely because of fear of retaliation?
18       MS. ASHER: Objection. The
19     testimony speaks for itself. You can
20     answer.
21 A. Yes.
22 Q. I'd like you to turn to Page 75. It's 74 but
23   it's the same page.
24 A. I'm there.
25 Q. You see it that's line -- are you with me?

Page 79

1  A. Page 74, yes.
2  Q. Okay. Good. I'm sorry. I just wanted to be
3    sure.
4      Line 20. Now Mr. Greenspan, just so you
5    understand the part I'm reading, he is, I think I
6    mentioned him before. He's an investigator
7    appointed by I guess it's the ORM investigation
8    arm to investigate Dr. Lisan's complaints and he
9    was doing his investigation talking to people, so
10   you know who that is, okay?
11 A. Yes.
12       MS. ASHER: Objection.
13 A. Oh.
14       MS. ASHER: That's okay.
15 Q. And you may assume that the approximate time was
16   in October of 2017. That's when this occurred.
17   Just so you have a time frame. I'm asking you to
18   assume that. Okay? The affidavits were sent in
19   about that time, October 2017. All right?
20     Now I'll read you the question so you know.
21   This is the testimony of Ms. Costanzo just
22   the other day. Line 20 on Page 74.
23     Question: "Did you ever tell Mr. Greenspan
24   that you were fearful of telling the whole truth
25   in answer to his questions because of retaliation

Page 80

1    from Dr. Raphaely?"
2      Answer: "I told him that I wanted to make
3    sure that I absolutely had to participate in it
4    before I actually participated in it because I
5    didn't want to get myself involved with this
6    situation."
7      Question: "Did you tell him why you didn't
8    want to get involved with it?"
9      Answer: "I feared my boss. I feared
10   Dr. Raphaely."
11     Question: "Feared retaliation against you
12   from her?"
13     Answer: "Yes."
14     Does that disturb you?
15       MS. ASHER: Objection. Go ahead.
16 A. Yes.
17 Q. Does that indicate to you that maybe the matters
18   raised in the Spicer report have not been
19   completely addressed?
20       MS. ASHER: Objection. Go ahead.
21 A. Yes.
22 Q. Do you intend to take any further action in that
23   regard or don't you know?
24       MS. ASHER: Objection. Go ahead.
25 A. I will have to consult attorneys because I

## Susan M. Fuehrer (Vol I) - April 02, 2019
## Deposition

**Page 81**

1   don't -- I have not had -- this is the first time
2   I've seen this. I don't know the context. I
3   don't know where we're at, so I would need to
4   talk to somebody.
5   Q. You'd need to investigate further?
6   A. Yes.
7   Q. Okay. That's fair. I understand.
8       You do understand there's a lot of other
9   sworn testimony and other testimony in this case
10  besides this?
11      MS. ASHER: Objection. And that
12  testimony speaks for itself.
13  Q. Did you know that?
14      MS. ASHER: Go ahead.
15  A. I don't know who you've spoken to and who you
16  haven't spoken to.
17  Q. Okay. I understand.
18      You got to leave at four and I understand
19  that. I understood that before, but I got a ways
20  to go.
21      I mean it will probably go faster but I am
22  not complete here. I'm nowhere near. This is
23  the first time I've had that problem actually
24  where I haven't -- off the record.
25      - - - -

**Page 82**

1       (Thereupon, a discussion was had off the
2   record.)
3       - - - -
4   Q. Now I'd like to show you what I'm going to mark
5   as Exhibit 33.
6       - - - -
7       (Thereupon, Plaintiff's Exhibit 33, 1/10/17
8   "Sexual Harassment Allegation Checklist
9   (Alleged Harasser)" was marked for purposes
10  of identification.)
11      - - - -
12  Q. I barely got it in there.
13      Okay. This is Exhibit 33. And that's for
14  you.
15      Do you recognize this sheet?
16  A. Yes.
17  Q. Okay. Do you recognize the sheet with the
18  writing on it or just the form?
19  A. Just the form. I'm sorry.
20  Q. Okay. It says, "Sexual Harassment Allegation
21  Checklist" and it's in parentheses below it,
22  "(Alleged Harasser)," correct?
23  A. Yes.
24  Q. You want to take a minute and look at it?
25  A. Okay.

**Page 83**

1   Q. I can tell you that the handwriting on there is
2       Dr. Raphaely's.
3           DR. LISAN: That's Raphaely's,
4       yeah.
5   Q. The part here where it says Dr. Lisan, et cetera?
6   A. Okay.
7           MS. JOHNSON: There's no
8       foundation for that.
9   Q. Yes. The initials, however, are my client's.
10          MS. ASHER: Objection.
11      Foundation. Go ahead.
12  A. Okay.
13  Q. Let me ask you this: How would you define sexual
14      harassment according to VA standards?
15  A. I would --
16          MS. ASHER: Objection. Which is
17      it? How would she define it or how is it
18      defined according to VA standards? Sorry,
19      it's just hard.
20  Q. All right. I'll rephrase the question.
21          MS. ASHER: Okay.
22  Q. What is your understanding of the VA's definition
23      of sexual harassment?
24  A. My understanding is any comments that are
25      provided to an employee that are unwelcomed and

**Page 84**

1   unwanted.
2   Q. Any comments?
3   A. That are sexual or could be construed as sexual
4       in nature.
5   Q. Right. Okay. But they have to be sexual?
6   A. Or perceived as...
7   Q. Reasonably perceived as sexual, correct?
8           MS. ASHER: Objection. You may
9       answer.
10  A. You can file a complaint whether it's reasonable
11      or not. If it's perceived, you can file a
12      complaint.
13  Q. Okay. I didn't ask you what the standard was to
14      file a complaint. I asked you what your
15      understanding is of the VA's definition of sexual
16      harassment and I think your answer was it has to
17      at least be reasonably perceived as having a
18      sexual connotation or is that wrong?
19  A. I did not say that it has to be reasonable.
20  Q. Oh. It could be unreasonable. It would still be
21      sexual harassment?
22  A. We work for the government, yes.
23  Q. So you can make an unreasonable claim of sexual
24      harassment that really isn't sexual harassment
25      but it is sexual harassment? Is that what you're

Robert J. Bearss, CRNA - April 05, 2019
Deposition

PLAINTIFF'S
EXHIBIT
77
4-26-19 PSG
PENGAD 800-631-6989

**Page 53**

1 A. In regards to anesthesiologists, CRNAs or --
2 Q. CRNAs.
3 A. Yes.
4 Q. You know who these favorites are and who the less
5 favorite are?
6 A. Yes.
7 Q. Jessica Foster, is she favored or unfavored,
8 disfavored?
9 A. It depends on the time of the day, I guess.
10 Q. Okay. But she has been one of the favorites from
11 time to time?
12 A. From time to time, yes.
13 Q. Elaine Costanzo?
14 A. Yes.
15 Q. Yes?
16 A. Yes, she has been a favorite and yes, she has not
17 been a favorite.
18 Q. Both ways?
19 A. Both ways, correct.
20 Q. Rhonda Verb?
21 A. I don't believe Rhonda has ever been a favorite.
22 Q. Okay.
23 A. So --
24 Q. And Bonfili, Karin Bonfili?
25 A. Yes.

**Page 54**

1 Q. Yes?
2 A. Both favorite and not favorite.
3 Q. Okay. Dr. Schlesinger?
4 A. Yes.
5 Q. Yes what?
6 A. Yes favorite.
7 Q. Not unfavored?
8 A. Not unfavored.
9 Q. Okay. Who would you characterize besides
10 Dr. Schlesinger that you would say generally
11 favored without being sometimes not favored?
12 A. Are you asking who is she friends with or who
13 does she treat more favorably?
14 Q. Treat more favorably.
15 A. Dr. Mannix.
16 Q. Anybody else?
17 A. Dr. Kellums.
18 Q. Anybody else?
19 A. I think that's it.
20 Q. Okay. Dr. Hahn?
21 A. I haven't really noticed one way or the other, to
22 be honest.
23 Q. Okay. How about Robert Bearss?
24 A. I would say favorable and unfavorable.
25 Q. Okay. Let me ask you this: As you sit here now

**Page 55**

1 testifying, do you have any fear that if she
2 becomes aware of something you testify to that
3 reflects badly on her that she may retaliate
4 against you?
5 A. I don't have fear of it, I'm pretty sure it would
6 happen.
7 Q. What would happen?
8 A. There would be, she would do something or try to
9 do something to me because she's upset about my
10 testimony.
11 Q. Well, you've said a number of things that might
12 upset her, wouldn't you agree?
13 A. Correct. But I'm --
14 Q. You're telling the truth?
15 A. I'm obligated to tell the truth.
16 Q. Right. I'm not criticizing you.
17 A. No, no. I'm just saying for the record that I'm
18 obligated to tell the truth.
19 Q. Right. So if I follow you correctly, you expect
20 that she will make efforts to retaliate against
21 you in some way?
22 A. Yes.
23 Q. Isn't that a disturbing thought to you?
24 A. It's, it's not a team atmosphere that I would
25 like to be a part of, yes.

**Page 56**

1 Q. I don't know if you're going to like this
2 question or not, but I have to ask questions that
3 I've -- do you believe that given her temperament
4 and conduct that she's fit to be in your view the
5 service chief or head of the department of
6 anesthesiology of the VA in Cleveland?
7 A. Not without some kind of anger management or some
8 other kind of counseling, no.
9 Q. That's based on your present perception of her,
10 is that correct?
11 A. That's correct.
12 Q. Okay. Do you believe that since this June 18,
13 2018 assessment by Brenda Spicer that there has
14 been any significant change in her conduct for
15 the better?
16 A. No.
17 Q. I'd like you to turn to page 13. Do you see the
18 paragraph under Conclusion: "It is important to
19 note"?
20 A. Yes, I do.
21 Q. Okay. Please, to yourself, read that paragraph.
22 A. Okay.
23 MS. JOHNSON: The Conclusion
24 paragraph?
25 MR. SINDELL: No.

Robert J. Bearss, CRNA - April 05, 2019
Deposition

**Page 73**

1        MS. JOHNSON: Objection.
2              You may answer.
3   A. That's correct.
4   Q. Okay. Do you find it curious that right after
5      this January 6th letter went to the head or the,
6      I guess you'd say the director of the VA and the
7      chief of staff, Dr. Altose, and the director was
8      Ms. Fuehrer, that all of these ROCs were
9      generated to the EEO through Dr. Raphaely?
10             MS. JOHNSON: Objection.
11             You may answer.
12  A. Yes, I find it curious.
13  Q. And what is curious about it to you?
14             MS. JOHNSON: Same objection.
15  Q. Let me withdraw it.
16  A. Well --
17  Q. Okay. Go ahead.
18  A. I'll just state something.
19  Q. Go ahead and answer.
20  A. I don't know what's in the ROCs because I have
21     never read them, nor have I discussed it with the
22     four people who filed the ROCs.
23  Q. Right.
24  A. I find it curious that some of the incidents
25     happened before this date but weren't reported

**Page 74**

1      until after the date.
2   Q. Would you agree with me that the filing of four
3      separate CRNA complaints through Dr. Raphaely
4      beginning with January 10, 2017 with Jessica
5      Foster, within four days after the letter of
6      January 6th, 2017, is consistent with the
7      statement in Brenda Spicer's report --
8             MS. JOHNSON: On which page,
9      Steve?
10            MR. SINDELL: Page 4 of 14.
11            MS. JOHNSON: Okay.
12  Q. -- that CRNAs noticed that whenever someone
13     questions her she gets upset and if she is proven
14     wrong she retaliates?
15            MS. JOHNSON: Objection.
16            You may answer.
17  Q. Take a look at it.
18  A. So I might agree with they noticed that whenever
19     someone questions her she gets upset. I don't
20     know that she was proven wrong. I don't see an
21     example of her being proven wrong so I can't say
22     that because she is proven wrong she retaliates.
23  Q. Okay. But does she retaliate sometimes in your
24     knowledge when she is simply upset with being
25     questioned?

**Page 75**

1        MS. JOHNSON: Objection.
2              You can answer.
3   A. Yes.
4   Q. Is the scenario of the CRNAs four days, beginning
5      four days after the letter of January 6th, 2017,
6      consistent with that?
7             MS. JOHNSON: Objection.
8      Foundation.
9             You may answer.
10  A. Yes.
11  Q. Thank you.
12            MR. SINDELL: I'd like you just to
13     read me back the last question and the last
14     answer, I just want to hear it.
15            THE NOTARY: "But does she
16     retaliate sometimes in your knowledge when
17     she was simply upset with being
18     questioned?"
19            Answer: "Yes."
20            Question: "Is the scenario of the
21     CRNAs four days, beginning four days after
22     the letter of January 6th, 2017, consistent
23     with that?"
24            Answer: "Yes."
25  Q. And what I meant was are the complaints of the

**Page 76**

1      CRNAs consistent with that, is your answer yes to
2      that?
3   A. Yes.
4   Q. Okay. Now, we've already identified the four
5      CRNAs in question, okay?
6   A. Correct.
7   Q. Okay. I'm going to take them one at a time for
8      this question. Did you ever hear Karin Bonfili
9      indicate that she or any other CRNA of the group
10     of four was coached or instructed by Dr. Raphaely
11     as to what to write on any documents connected
12     with the investigation of Dr. Lisan?
13            MS. JOHNSON: Objection.
14            You may answer.
15  A. Yes.
16  Q. Could you explain that?
17  A. I was told by Karin Bonfili that she was coached
18     on how to fill out the report and also that
19     Dr. Raphaely was looking over her shoulder while
20     she was filling out the report.
21  Q. "The report" meaning the ROC report?
22  A. The ROC.
23  Q. Report of Contact?
24  A. Correct.
25  Q. Okay. And that would have been around January

Mehler & Hagestrom
800.822.0650

Robert J. Bearss, CRNA - April 05, 2019
Deposition

**Page 77**

1 sometime of 2017, to the best of your knowledge?
2 You can answer.
3 A. It was on more than one occasion she told me she
4 was coached.
5 Q. More than one occasion?
6 A. More than one occasion.
7 Q. With respect to ROC?
8 A. Correct.
9 Q. How about affidavit?
10 A. Yes.
11 Q. How about testimony in her deposition?
12 A. No.
13 Q. Okay. Jessica Foster?
14 A. No.
15 Q. No?
16 A. No, I never talked about her being coached or
17 anything like that.
18 Q. I didn't ask you if you talked about it.
19 A. No, no, no. She never spoke to me about anything
20 she filed.
21 MS. JOHNSON: Just let him ask his
22 question. I think --
23 A. Okay. I'm sorry.
24 Q. I think that's what you meant, though.
25 A. Say it again so I can clarify it.

**Page 78**

1 Q. Right. I want to.
2 A. Okay.
3 Q. I want to clarify it.
4 A. All right.
5 Q. You never heard Jessica Foster say anything about
6 being coached by Dr. Raphaely in connection with
7 anything she wrote or reported, is that correct?
8 A. That is correct.
9 Q. Okay. That's what I thought you meant.
10 A. Yes.
11 Q. All right. How about same question with respect
12 to Elaine Costanzo?
13 A. Yes, I did hear that she was called at home to,
14 actually encouraged to file a complaint.
15 Q. By?
16 A. By Dr. Raphaely.
17 Q. Okay. Anything about her being coached as to
18 what to write?
19 A. Yes.
20 Q. And what, can you expand on that, please?
21 A. She said that she was instructed on how to fill
22 out the complaint.
23 Q. Okay. Did Karin Bonfili, going back to her --
24 A. Okay.
25 Q. -- did Karin Bonfili ever indicate that she was

**Page 79**

1 instructed on what to write even though it was
2 not what she, herself, believed occurred?
3 A. No.
4 Q. One way or the other?
5 A. One way or the other what?
6 Q. In other words, was she instructed -- withdrawn.
7 Did you have reason to believe that she was
8 coached one way or the other as to the truth or
9 falsity of the contents of what she wrote on the
10 ROC?
11 MS. JOHNSON: Sorry, Steve. Just
12 to clarify, to make sure, you're talking
13 about Karin?
14 MR. SINDELL: Yeah.
15 MS. JOHNSON: Okay.
16 A. Yes.
17 Q. Okay. Rhonda Verb?
18 A. No.
19 Q. Now --
20 A. Let's go back to the Rhonda Verb thing, though,
21 for a second, if we may.
22 Q. Yes.
23 A. Dr. Raphaely approached me to ask Rhonda if she
24 had any complaints about Dr. Lisan and, if so, to
25 talk to Dr. Raphaely, and initially when she

**Page 80**

1 asked me that I didn't think anything about it,
2 but after the fact it makes me wonder why she
3 asked me to ask Rhonda.
4 Q. Uh-huh. As you sit and wonder about that, does
5 it appear to you that she was soliciting negative
6 things to produce and write about Dr. Lisan?
7 MS. JOHNSON: Objection.
8 You may answer.
9 A. Yes.
10 Q. Okay. And do you see that as -- withdrawn.
11 Taking into account what you just read, dated
12 January 6th, 2017, Exhibit 31, does it appear
13 that these solicitations for improprieties
14 against Dr. Lisan were retaliatory in nature?
15 MS. JOHNSON: Objection.
16 Foundation and calls for speculation.
17 You may answer.
18 A. Yes.
19 Q. And why do you believe that?
20 MS. JOHNSON: Same objection.
21 You may answer.
22 A. Because she asked me to ask somebody who hadn't
23 complained if they had a complaint.
24 Q. Had that ever happened with Dr. Raphaely before
25 where she came to you soliciting complaints?

**Robert J. Bearss, CRNA - April 05, 2019**
**Deposition**

Page 81

1 A. Yes.
2 Q. Who did she do that with respect to?
3 A. She sent an email to all the physicians asking if
4    anybody had any problems with Rhonda Verb's
5    practice.
6 Q. Okay. Did you or do you believe that that was
7    retaliatory against Rhonda Verb?
8        MS. JOHNSON: Objection.
9        You may answer.
10 A. Yes.
11 Q. And why do you believe that?
12 A. Because the accusation of falsifying a medical
13    record wasn't substantiated by the documents that
14    she had so she was soliciting more evidence to
15    pursue that complaint.
16 Q. Is it your belief based on the evidence you
17    reviewed regarding Rhonda Verb's alleged
18    falsification of data of a patient that
19    Dr. Raphaely knew that the claim was untrue when
20    she made the accusation?
21        MS. JOHNSON: Objection.
22        You may answer.
23 A. Yes.
24 Q. So if I understand your testimony correctly,
25    Dr. Raphaely intentionally made a false

Page 82

1    accusation against Rhonda Verb knowing in advance
2    that it wasn't true, but rather that it was
3    false, is that what you're saying?
4        MS. JOHNSON: Objection.
5        You may answer.
6 A. Yes.
7 Q. Would that be a pretty good definition of your
8    understanding of the word "malicious"?
9 A. Yes.
10 Q. Are you aware of any action at all taken by the
11    VA of a disciplinary nature against Dr. Raphaely?
12        MS. JOHNSON: Objection.
13        You may answer.
14 A. No.
15        MS. JOHNSON: I'm sorry, can we
16    just take a quick break for a second. I
17    need to answer something urgent from the
18    office.
19        MR. SINDELL: Off the record.
20        - - - -
21        (Thereupon, a recess was had.)
22        - - - -
23 Q. All right. Do you recall Karin Bonfili ever
24    indicating, that you heard, that she felt that
25    she had been used in some way by Dr. Raphaely?

Page 83

1 A. Yes.
2 Q. Okay. Could you describe what year you heard
3    that?
4 A. It was after May 10th, I'm sure.
5 Q. Was it 2018 possibly, in the last couple months
6    or so?
7 A. No. I think it was in 2017.
8 Q. Okay. Can you tell me what you recall Karin
9    Bonfili saying on that subject of being used by
10    Dr. Raphaely?
11 A. She thought, Karin, Karin thought that
12    Dr. Raphaely was concerned about her complaint
13    and the fact that she was concerned about Karin
14    and in reality she was more concerned about
15    getting the complaint than she was about the
16    contents of the complaint.
17 Q. Okay. And that's what Karin Raphaely
18    communicated to you?
19 A. That's what Karin Bonfili communicated.
20 Q. Karin Bonfili. Let me repeat the question.
21    Thank you.
22        That's what Karin Bonfili stated to you, what
23    you've just said?
24 A. That is correct.
25 Q. Okay. Did Rhonda Verb ever indicate, that you

Page 84

1    heard her say, that she thought she, Rhonda Verb
2    had been used by Dr. Raphaely?
3 A. No.
4 Q. Same question with Elaine Costanzo?
5 A. Yes.
6 Q. Okay. Tell me what you recall Elaine Costanzo
7    saying about that.
8 A. She told me, Elaine Costanzo told me that if she
9    had known that this complaint was going to boil
10    into this big ordeal that it is that she would
11    not have filed a complaint.
12 Q. Do you recall approximately when that was, 2017?
13 A. 2017.
14 Q. Okay. And, again, same question Jessica Foster?
15 A. No.
16 Q. Do you recall Karin Bonfili expressing to you
17    that she was afraid to tell the whole truth to
18    Investigator Greenspan of the VA, investigating
19    Dr. Lisan's issues, out of fear of retaliation
20    against her by Dr. Raphaely?
21 A. Yes.
22 Q. Let me unpack that a little bit. Mr. Greenspan
23    was the investigator for the VA into
24    Dr. Raphaely's EEO complaint, are you aware of
25    that?

Robert J. Bearss, CRNA - April 05, 2019
Deposition

**Page 85**

1    MS. JOHNSON: Clarifying, you said
2 "Dr. Raphaely's EEO complaint."
3    MR. SINDELL: I mean Dr. Lisan.
4    MS. JOHNSON: You mean Dr. Lisan.
5    MR. SINDELL: Let me say it again.
6    MS. JOHNSON: Okay.
7    MR. SINDELL: Maybe I need a
8 longer break. Okay. Thank you.
9 Q. Mr. Greenspan, I assume you know, was the VA
10    investigator of Dr. Lisan's EEO complaint, is
11    that correct?
12 A. That is correct.
13 Q. And he was seeking information from various
14    witnesses including the CRNAs who complained,
15    correct?
16 A. Correct.
17 Q. That's something you understood?
18 A. Yes.
19 Q. Okay. So tell me what Karin Bonfili actually
20    told you or that you heard her say on the subject
21    of her fear of retaliation in connection with Dr.
22    -- in connection with Mr. Greenspan?
23 A. Karin Bonfili told me she didn't want to talk to
24    Mr. Greenspan for fear of retaliation from
25    Dr. Raphaely.

**Page 86**

1 Q. Okay. Did she share with you that she told
2    Mr. Greenspan that?
3 A. Yes, she did.
4 Q. Did she ever, did she, Karin Bonfili ever
5    indicate that Dr. Raphaely had called her into
6    Dr. Raphaely's office to tell her not to indicate
7    that she had been coached by Dr. Raphaely?
8 A. Yes.
9 Q. When do you recall that occurring?
10 A. I can't give you the specific time frame, but it
11    was within the last six months.
12 Q. Okay. And did she indicate anything about
13    Dr. Raphaely coaching her on the subject of Karin
14    Bonfili's deposition testimony?
15 A. No.
16 Q. What do you recall Karin Bonfili indicating about
17    Dr. Raphaely coaching her?
18 A. I recall her telling me that she offered,
19    Dr. Raphaely offered Karin Bonfili Dr. Raphaely's
20    office to use to file -- to fill out her
21    complaint, but Dr. Raphaely was in the room the
22    entire time that she filled out the complaint.
23 Q. So we're talking about the ROC again?
24 A. Correct.
25 Q. Okay. Report of Contact?

**Page 87**

1 A. Correct, Report of Contact.
2 Q. Right. Okay. Do you recall Karin Bonfili ever
3    indicating that she felt like a slave to
4    Dr. Raphaely because of some favor or benefit
5    Dr. Raphaely had previously extended to her?
6 A. No.
7 Q. You know that Karin Bonfili did leave the
8    Cleveland VA for a period of time and went to
9    Arizona?
10 A. Yes.
11 Q. And then she came back to the Cleveland VA?
12 A. Correct.
13 Q. Did she ever indicate that she felt she owed
14    Dr. Raphaely anything because Dr. Raphaely
15    facilitated her return to the Cleveland VA from
16    Arizona?
17 A. Yes.
18 Q. What did she say to you in that regard?
19 A. She said that she felt a duty to Dr. Raphaely
20    because she gave her her job back, which isn't
21    true, I'm the one that hires the CRNAs and I was
22    the one that gave Karin her job back and I told
23    her that when she told me that she thought
24    Dr. Raphaely was totally responsible for her
25    rehire.

**Page 88**

1 Q. Was she surprised when you told her that?
2 A. Yes.
3 Q. Did she say anything to you beyond expressing
4    surprise?
5 A. Just that Dr. Raphaely had told her that she was
6    the reason she was rehired.
7 Q. Is there any basis you can imagine why
8    Dr. Raphaely would be able to truthfully say that
9    she, Dr. Raphaely, was instrumental or helpful in
10    bringing Karin Bonfili back from Arizona to the
11    Cleveland VA?
12 A. We were both in discussion on whether or not to
13    hire her back, but ultimately it was my decision
14    to bring her back.
15 Q. Karin Bonfili did not know that until you told
16    her?
17 A. Correct.
18 Q. So if Dr. Raphaely was against Karin Bonfili's
19    returning to Cleveland and you were in favor of
20    it, your view would have predominated?
21    MS. JOHNSON: Objection.
22    You may answer.
23 A. No.
24 Q. Then I don't understand. Explain to me, you
25    say -- was it your call that Karin Bonfili came

Robert J. Bearss, CRNA - April 05, 2019
Deposition

Page 97

1    know?
2  A. Yes.
3  Q. Okay.  Broader context?
4  A. Broader context, yes.
5  Q. Okay.  Same with retaliatory?
6  A. Yes.
7  Q. Same with yelling a lot, not just at her, but
8    others?
9  A. Yes.
10  Q. Let me ask you this:  Have you had occasion to
11    work in the OR with Dr. Lisan?
12  A. Yes.
13  Q. Would that be on a number of occasions over the
14    years?
15  A. Yes.  Yesterday, in fact.
16  Q. Okay.  That's a recent occasion.
17  A. Yes.
18  Q. But with some degree of frequency you've worked
19    with him?
20  A. Yes.
21  Q. Is that correct?
22  A. That is correct.
23  Q. How do you assess his competence?
24  A. He's very competent.
25  Q. Okay.  Did you ever believe that he was

Page 98

1    endangering the health of any patient?
2  A. No.
3  Q. Did you ever believe that he made a lot of
4    inappropriate remarks during operations or any
5    inappropriate remarks?
6  A. Yes.
7  Q. Okay.  When did he do that?
8  A. I can't pinpoint any significant thing, but I,
9    myself, am guilty of doing that at times.  I'm
10    sure everybody is.  It's the atmosphere that we
11    work in.
12  Q. Was he worse than anybody else?
13  A. No.
14  Q. Was he less inappropriate than others?
15  A. Yes.
16  Q. He doesn't stand out as being an example of
17    someone that was conducting himself more
18    inappropriately than anybody else in the
19    operating room?
20  A. No.
21  Q. And that includes CRNAs?
22  A. Correct.
23  Q. And it includes physicians?
24  A. Correct.
25  Q. And it includes surgeons?

Page 99

1  A. Correct.
2  Q. One type or another as a general kind of thing
3    from time to time?
4  A. Correct.
5  Q. I don't mean all the time.  Okay.
6       Did Dr. Raphaely ever express an interest or
7    desire or intention to get Dr. Lisan out of the
8    department of anesthesiology at the Cleveland VA?
9  A. Yes.
10  Q. When was that?
11  A. I can't give you a specific date.
12  Q. Was it --
13  A. It was after, it was after this letter was sent.
14  Q. After January 6th?
15  A. Yes.
16  Q. 2017?
17  A. Yes.
18  Q. Okay.  You can't tell me about how long after it
19    was?
20  A. No.
21  Q. Well, let me ask you this:  Was it within that
22    same year?
23  A. Yes.
24  Q. Within a few months?
25  A. Yeah, probably.

Page 100

1  Q. Okay.  Best recollection?
2  A. Best recollection, yes.
3  Q. Okay.  What did she tell you about getting him
4    out of the department?
5  A. She just wanted him out of the department.
6  Q. What did she say?
7  A. She said, "I want him out of the department."
8  Q. Did she say why?
9  A. No.
10  Q. Did she explain that in any way?
11  A. No.
12  Q. Was anybody else present when she said that?
13  A. No.
14  Q. Did you know why she wanted him out of the
15    department?
16  A. No.
17  Q. Were you surprised?
18  A. Yes.
19  Q. Did you say anything?
20  A. No.
21  Q. Did you tell anybody that she had said that?
22  A. Yes.
23  Q. Who did you tell?
24  A. I can't recall right now who I told, but I'm sure
25    I told somebody.

Robert J. Bearss, CRNA - April 05, 2019
Deposition

Page 101

1  Q. Did she ever indicate that she wanted Ken Moss
2     out of the department?
3  A. Yes.
4  Q. When did you hear that?
5  A. Around the same time.
6  Q. Okay. Did she tell you why she wanted Ken Moss
7     out of the department?
8  A. No.
9  Q. Did she ever indicate that she preferred females
10     as anesthesiologists than males?
11  A. No.
12        MR. SINDELL: We're going to take
13     a short break, but I think we may be...
14        MS. JOHNSON: Getting there.
15        MR. SINDELL: Yeah.
16            - - - -
17        (Thereupon, a recess was had.)
18            - - - -
19  Q. There was a list of complaints made by a group of
20     CRNAs that preceded the investigation and report
21     of Brenda Spicer, do you remember that?
22  A. Yes, I do.
23  Q. One of those complaints indicated that a CRNA was
24     coached by Dr. Raphaely to further incriminate
25     Dr. Lisan, do you recall that?

Page 102

1  A. Yes.
2  Q. Do you know who that CRNA was?
3  A. Karin Bonfili.
4  Q. Okay. And did she make that complaint?
5  A. Yes.
6  Q. Did you hear her make that complaint?
7  A. Yes.
8  Q. In the group?
9  A. Yes.
10  Q. So the whole group heard her get up --
11  A. I don't know how many people were in the group.
12  Q. Some?
13  A. But there was more than one, yes.
14  Q. More than one?
15  A. Yes.
16  Q. And that would have been sometime perhaps in
17     2018, the first half of it?
18  A. Roughly, yes.
19  Q. All right. Did Dr. Raphaely ever indicate to you
20     anything about Dr. Lisan's medical problem that
21     caused him to take a medical leave for treatment?
22  A. During his time away?
23  Q. Yeah.
24  A. Or after he got back?
25  Q. After he got back. You weren't there during his

Page 103

1     time away so --
2  A. Yeah, I was.
3  Q. Oh, you were there?
4  A. Yeah.
5  Q. Wait a minute. He was away in the year 2016.
6        MS. JOHNSON: He was there in
7     2015.
8  A. It was '15, the end of '15, so I was there.
9  Q. Okay. All right. Well, I guess my question is
10     this: At any time did Dr. Raphaely indicate to
11     you that she was aware of Dr. Lisan's medical
12     issue?
13  A. Yes.
14  Q. And when did she indicate that to you?
15  A. Close to the time that he was coming back to
16     work.
17  Q. Before he came back?
18  A. Before he came back to work.
19  Q. Okay. And what did she indicate to you she was
20     aware of?
21  A. That he was seeking help for OCD.
22  Q. So if Dr. Raphaely indicated in writing that she
23     had no idea what his medical problem was, that
24     wouldn't be consistent with what your
25     recollection is?

Page 104

1  A. Correct.
2  Q. I want to give you a very general question. Is
3     there anything concerning these matters that
4     we've discussed today that I've asked you about
5     that you haven't mentioned either because I
6     haven't asked you or perhaps you hadn't thought
7     of it that you think should be related to any of
8     these matters?
9  A. You didn't ask me about Stacy Hollister and her
10     being yelled at for taking sick leave.
11  Q. Tell me about it.
12  A. She, she requested sick leave for Tuesday of the
13     week of Thanksgiving.
14  Q. This year?
15  A. No. This was --
16  Q. I mean last year.
17  A. Last year.
18  Q. Yeah.
19  A. I don't remember if it was last year or '16 or
20     '17. It might have been '17. I don't remember
21     the year.
22  Q. Okay. Go ahead.
23  A. But let's just say she asked for, she requested
24     sick leave on Tuesday of the week of Thanksgiving
25     and she requested it on the Friday before that





DEPARTMENT OF VETERANS AFFAIRS
LOUIS STOKES CLEVELAND
DEPARTMENT OF VETERANS AFFAIRS MEDICAL CENTER
10701 EAST BOULEVARD
CLEVELAND, OH 44106

June 20, 2017

**In Reply Refer To: 541/053**

Dr. Ronald Lisan, MD
Anesthesiology Service
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, OH 44106

Subject:  Decision - Suspension

1.    In connection with the letter you received on March 29, 2017, in which you were given advance notice of your proposed suspension for ten calendar days, a decision has been made to suspend you from duty and pay for a total of ten calendar days to be served during the following dates: July 10 - 11, 13 - 14, 17, 20 - 21, 24 - 26, 2017, based on the following reasons:

The reasons as stated in paragraph one, charge I (a through c), charge II (a through e), and charge III of the letter of proposed suspension are sustained.

2.    In reaching this decision, I considered the fact that you made an oral reply and provided a written reply, along with all the evidence developed in your case.  I also considered other factors in my decision making process, including the nature and seriousness of the offenses with which you have been charged, the relation of the offenses to your job duties, whether or not the offenses were intentional or inadvertent, or whether or not the offenses were committed for gain, with malice, or repeatedly; your job level and type of employment; your past disciplinary record; your work record, such as length of service, quality of performance, and dependability; the effect of the offenses upon both your ability to continue performing at a satisfactory level and your supervisor's confidence in you after the offenses were committed; the consistency of the penalty with those imposed upon other employees for the same or similar offenses and the Agency's Table of Penalties; the notoriety of the offense and the impact on the reputation of the Agency; the clarity with which you were notified of the rules violated in committing the offense, including warnings about the conduct; your potential for rehabilitation; the existence of any mitigating circumstances surrounding the commission of the offense; and the adequacy and effectiveness of alternative sanctions to deter such conduct in the future.  Based upon this information, it is my determination that mitigation of the proposed suspension is not warranted and that a ten calendar day suspension is both appropriate and within the range of reasonableness.  The suspension action will become a permanent part of your personnel record.

3.    This letter may be used in determining an appropriate penalty if further infractions occur.

4.    The sustained reasons do not involve a question of professional conduct or competence. Therefore, if you believe that this suspension is unjustified, you may appeal the action under the VA grievance procedure, as outlined in VA Handbook 5021, Part IV, Chapter 3, within 15 calendar days after you receive this decision, or the negotiated grievance procedure within 30 calendar days after you receive this decision, but not both. You shall be deemed to have exercised your option to appeal this action at such time as you timely file a grievance under either procedure. Your grievance must be

Page 2.
Decision – Suspension
Dr. Lisan

submitted to me.  If you elect to file a grievance through the VA grievance procedure in connection with this action, you have the right to request a hearing.  Any request for a hearing must be submitted in your grievance.

5.   If you believe that this action is based on discrimination because of your race, color, religion, sex, national origin, age or disabling condition, you may file a complaint of discrimination with Office of Resolution Management (ORM) discrimination complaint procedures.  Should you elect to do so, you may appeal this action by contacting ORM at 1-888-737-3361 within 45 calendar days of the effective date of this action.

6.   A further explanation of your appeal rights may be obtained by consulting Ms. Jelena Zekanovic, Employee/Labor Relations Specialist, at extension (216) 791-2300, extension 2163.

Susan M. Fuehrer
Medical Center Director

I certify receipt of the original and two (2) copies of this document.



PLAINTIFF'S
EXHIBIT
79
4-24-19  PSG

## Response of Dr. Ron Lisan to Proposed Suspension at the Request of Dr. Raphaely (5-10-17)

### Recusal of Dr. Altose

Dr. Altose should recuse himself (or be removed) from any involvement in any decision regarding the proposed suspension. He has been named as a "Responding Party" from the outset of the VA EEO process. According to the allegations in Dr. Lisan's now pending formal Complaint (submitted initially to ORM and currently to the North Atlantic District 1 EEO Manager of the Department of Veterans'' Affairs in Lyons, New Jersey), Dr. Altose has fostered, permitted and failed to take appropriate action regarding Dr. Raphaely's unlawful discriminatory and retaliatory/reprisal misconduct of which he has been and continues to be fully aware. He has a manifest conflict of interest in this matter and should have no part in any disciplinary proceeding in this matter.

### Continuance of the Hearing

Dr. Altose is or should be aware that a new panel is being formed (per Leshelle Reese) to re-investigate the prior EEO report, a re-investigation currently underway. The proposed suspension is based upon the conclusions reached in the original EEO investigation. As Dr. Altose knows, that investigation is currently incomplete. Additionally, with the hearing currently scheduled for this Thursday, May 11, 2017 at 10:00 a.m., Dr. Raphaely initially placed Dr. Lisan on call on May 10-11, 2017. He is required to be on duty past midnight and perhaps until 7:30 a.m. on May 11, 2017, two and a half hours before the scheduled hearing. It is unfair to have a hearing for him to defend himself in an exhausted state for lack of sleep. After I objected to this circumstance, Dr. Lisan's on-call duty was cancelled. Dr. Lisan's attorney was not consulted on the choice of date or time for the hearing and has a previously scheduled court appearance earlier that morning. This hearing should be continued for a short period of time when Dr. Lisan's counsel can conveniently attend the hearing, when Dr. Lisan will not be sleep deprived and **when the re-investigation is completed with sufficient time for Dr. Lisan and his counsel to review and digest the report.**

### Failure to Follow Orders

The orders Dr. Lisan is accused of failing to follow were made and communicated to Dr. Lisan by Dr. Raphaely following a couple or so initial female CRNA complaints alleging that Dr. Lisan sexually harassed them. As Chair of the Department of Anesthesiology, Dr. Raphaely should know what Sexual Harassment is as defined by the VA or should have found out before utilizing VA Sexual Harassments protocols and checklists. In order for contact to constitue "Sexual Harassment", the alleged putative harasser must be told by the professed victim that his or her conduct is objectionable or unwelcome. Such was not the case for all but one of the accusing CRNA's. Thus, the current EEO report concluded that the CRNA complaints did not constitute "Sexual Harassment". And that is assuming that their characterization of Dr. Lisan's statements are true. Dr. Lisan disputes their accuracy.

Given the absence of any Sexual Harassment on the part of Dr. Lisan, the implementation of the Sexual Harassment Checklist applied by Dr. Raphaely to Dr. Lisan was inappropriate and void ab initio. (Attachment B to Dr. Raphaely's Report). This includes No. 4, ordering the alleged harasser to cease any contact with the alleged victim except that which is absolutely required to official business. Such an order under these circumstances was wrong. This matter should have been amicably resolved by Dr. Raphaely, not pursued in a formal punitive manner. But that approach was eschewed by Dr. Raphaely because the generation, and prosecution of these baseless accusations was to retaliate against Dr. Lisan, ginning up stress, tension, discord and  fear in the entire Department. During this retaliatory/reprisal cause of misconduct, Dr. Altose, fully aware of what was going on, remained impervious to the circumstances and apparently supportive and condoning of Dr. Raphaely's actions.

Much of the proposed suspension is based upon Dr. Lisan's alleged violations of Dr. Raphaely's "no-contact" order which should never have been given in the first place.

Dr. Raphaely has included in her attachments as part of the evidentiary file a reference in July 2016 to tardiness on the part of Dr. Lisan. This was a period just before his medical leave for treatment of his OCD condition. On July 7, 2016 Dr. Raphaely apparently believed that Dr. Lisan was a few minutes late to work. Her punishment was to mark him AWOL for the entire day. She was informed by Carlton Daniel, the union representative, that this was an illegal entry of pay reduction. Nevertheless, this remains on Dr. Lisan's pay record. The statement in Apply Facet 4 that Dr. Lisan has been "counseled on several occasions" for tardiness is undocumented and denied by Dr. Lisan.

Mar. 29. 2017 12:38PM                                                        No. 0441   P. 2

 Defining **EXCELLENCE** in the 21st Century



DEPARTMENT OF VETERANS AFFAIRS
LOUIS STOKES CLEVELAND
DEPARTMENT OF VETERANS AFFAIRS MEDICAL CENTER
10701 EAST BOULEVARD
CLEVELAND, OH 44106

March 20, 2017                                          **In Reply Refer To: 541/053**

Dr. Ronald Lisan, MD
Anesthesiology Service
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, OH 44106

Subject: Proposed Suspension

1.      This letter is to inform you that it is proposed to suspend you from duty and pay for ten (10) calendar days based on the following reasons:

You are employed as a Physician, VM-0602-15, Step 5, in Anesthesiology Service at the Louis Stokes Cleveland VA Medical Center. As an employee of this Medical Center, you are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy and ethical behavior toward patients, visitors and coworkers. An employee who violates established conduct requirements may be subject to appropriate disciplinary, adverse, or major adverse action.

On Friday, January 6, 2017, I was informed that you may have engaged in inappropriate behavior of sexual nature involving female coworkers. Specifically, I was approached by two (2) of your female coworkers who alleged sexual harassment perpetrated by you. Consequently, these allegations were referred to Equal Employment Opportunity (EEO) office for investigation.

On Thursday, March 16, 2017, VA EEO office concluded the investigation of allegations of Sexual Harassment made by Certified Registered Nurse Anesthetists (CRNA) who alleged sexual harassment perpetrated by you. Even though the case failed to rise to the level of sexual harassment, as defined in policy promulgated pursuant to Equal Employment Opportunity law, the EEO office did find evidence that inappropriate behavior might have occurred. Furthermore, the EEO office found evidence that you violated the supervisory order to cease any contact with the alleged victims except that which is absolutely required for official business.

        I.      Failure to Follow Orders

On Tuesday, January 10, 2017, in consultation with the EEO Manager, I issued a Sexual Harassment Allegation Checklist to you, which stated in part:

"I have ordered the alleged harasser to cease any contact with the alleged victim except that which is absolutely required for official business."

a.      On Friday, January 20, 2017, I had to remind you of the order I gave you on Tuesday, January 10, 2017, as you were frequenting the CRNA lounge and were continuing to address one of the CRNAs that brought the above-mentioned allegations against you. Consequently, you are being charged with failure to follow orders.

Page 2.
Proposed Suspension
Dr. Ronald Lisan

b.    On Monday, January 23, 2017, I again had to remind you of the order I gave you on Tuesday, January 10, 2017, and Friday, January 20, 2017, as you were continuing to have contact with the CRNAs that brought the above-mentioned allegations against you. Consequently, you are being charged with failure to follow orders.

c.    On Thursday, March 9, 2017, I issued a written order to you, instructing you to immediately cease any contact with the alleged victims, except that which is absolutely required for official business.  I was advised that you were continuing to engage in conversations with the CRNAs that brought the allegations of inappropriate behavior against you. Despite my previous orders, you failed to follow my instructions to cease any contact with the alleged victims. Consequently, you are being charged with failure to follow orders.

    II.    Inappropriate Conduct

a.    On Wednesday January 4, 2017, Ms. Jessica Foster, CRNA, Anesthesiology Service, reported that she came to your office to sign out, as she was on a call assignment with you. Ms. Foster reported that you asked her to close the office door, as you had two (2) things to tell her. Ms. Foster stated that after you informed her that another physician would be covering your call assignment overnight, you said, "I am not trying to hit on you, ask you out or have sex with you, but I would", or words to that effect. Ms. Foster further reported that you told her how you saw similarities between your marriage and hers, and that you wasted far too many years in an unhappy marriage. Ms. Foster stated that she felt appalled at the context of the conversation and that the conversation made her extremely uncomfortable. Consequently, you are being charged with inappropriate conduct.

b.    On Thursday, January 5, 2017, Ms. Karen Bonfili, CRNA, Anesthesiology Service, reported that she was discussing a case with you that you were assigned to work the next day. She reported that when she asked you if you were leaving, you responded, "unless you can make me a better offer", or words to that effect. Ms. Bonfili stated that she felt extremely uncomfortable with your comment made to her. Consequently, you are being charged with inappropriate conduct.

c.    On Friday, January 6, 2017, Ms. Bonfili reported that she was assigned to work with you that day. Ms. Bonfili stated that you made sexually oriented comments throughout the day. Specifically, you stated, "sounds good to me, we can go now and get in your bed", or words to that effect, when she stated how tired she was and how she wanted to go home and go to bed. Consequently, you are being charged with inappropriate conduct.

d.    On Tuesday, March 7, 2017, Ms. Elaine Costanzo, CRNA, Anesthesiology Service, reported that you called her on her personal telephone after work hours. Ms. Costanzo stated that she received a phone call, from an unknown telephone number and answered the call. Ms. Costanzo stated that you were calling to tell her you did not feel you could provide safe patient care together as she does not greet you when she passes you in the hallway. You proceeded to tell Ms. Costanzo that she needed to find someone who would swap with her for the upcoming call assignment the two of you were scheduled to work, as it was easier for her to do so than you. Ms. Costanzo directed you to contact me regarding this matter and you responded that you did not want to talk to me for, "obvious reasons", or words to that effect. Furthermore, Ms. Costanzo reported that she felt intimidated and threatened by your phone call. You were previously instructed to cease any contact with the alleged victim except that which is absolutely required for official business.  You should not have called Ms. Costanzo on her personal telephone. If you had concerns about being able to

Mar. 29. 2017 12:38PM                                                        No. 0441  P. 4

Page 3.
Proposed Suspension
Dr. Ronald Lisan

provide safe patient care while working with Ms. Costanzo, you needed to address that with me. Consequently, you are being charged with inappropriate conduct.

e.      On Wednesday, March 8, 2017, Ms. Bonfili reported that you entered Operating Room (OR) 6, while she was working on a case, put your hands on her back and asked her if it was okay to touch her. Ms. Bonfili stated that you told her you would not press charges against her if she agreed to talk to your attorney and explain to him that you were just joking about the sexual talk. Furthermore, Ms. Bonfili stated that you told her if she talked to me there would be, "retaliation", or words to that effect. At some point during your interaction with Ms. Bonfili, Dr. Marin Mannix, MD, Staff Anesthesiologist, Anesthesiology Service, entered the room and informed you that you had an assignment in OR 7. As you did not leave OR 6 to attend your assignment, Dr. Mannix returned to remind you that you were needed in OR 7, at which time you responded, "I will go when I am ready", or words to that effect. Ms. Bonfili reported that you stayed in OR 6, continuing to talk to her about how you valued your relationship with her. Ms. Bonfili stated she left the room after Dr. Rachel Schlesinger, MD, Staff Anesthesiologist, Anesthesiology Service, came and instructed her to leave informing her she will stay with the patient. You were not assigned to work with Ms. Bonfili in OR 6, and did not have a need to be present in the room. Your presence and conversation in the room had no legitimate business or patient care purpose. Consequently, you are being charged with inappropriate conduct.

    III.     Disruptive Behavior Putting Patient Safety at Risk

        Over the last few months, you have engaged in inappropriate behavior involving female coworkers. Furthermore, four (4) of your female coworkers alleged sexual harassment perpetrated by you. The alleged victims reported that they felt their work environment was unsafe and they are not able to provide safe patient care as they are unable to concentrate on their work due to your intimidating and disruptive behavior. You were instructed, by me, to cease any contact with the alleged victims, except that which is required for direct patient care. Despite my orders, you continued to have contact with the alleged victims outside of your work assignments. Specifically, on March 8, 2017, you entered OR 6, approached Ms. Bonfili and put your hands on her back, while she was providing anesthetics care for a patient undergoing surgery. Ms. Bonfili stated that your intimidating behavior made it difficult for her to concentrate on the care she was providing. You were not assigned to the case and should not have entered the OR to approach Ms. Bonfili and disrupt the procedure. Consequently, you are being charged with disruptive behavior putting patient safety at risk.

2.      As an employee of this Medical Center, it is your responsibility to adhere to the rules and procedures, as described in Medical Center Policy (MCP) 005-024, Employee Responsibility and Conduct, which states in part:

*"Employees are expected to observe the highest possible standards of honesty, integrity, impartiality, compassion, courtesy and ethical behavior toward patients, visitors and coworkers."*

*"As an employee of the Cleveland VA Medical Center you are expected to:*

*   *Treat your supervisor(s) with respect, following their directions and guidance in a cooperative, responsive manner and completing assignments on a timely basis.*

Page 4.
Proposed Suspension
Dr. Ronald Lisan

- *Exhibit courteous, respectful and compassionate behavior toward patients and those, with whom you interact, both co-workers and visitors, as a requirement of your position, not as an option."*

Furthermore, as an employee of this Medical Center, it is your responsibility to adhere to the rules and procedures, as described in MCP 003-003, Prevention of Sexual Harassment, which states in part:

*"Hostile-environment harassment is any lewd sexual conduct including, but not limited to: pictures, words, jokes, questions, remarks, teasing, and/or touching that unreasonably interferes with an individual's work performance or created an intimidating, hostile or offensive work environment."*

*"The key work in defining sexual harassment is unwelcome. When any unwelcome or unsolicited conduct is imposed on a person who regards it as offensive or undesirable, could be construed as sexual harassment."*

Your actions, as described above, are in direct contradiction with these expectations, thereby serving as the basis for your proposed suspension.

3.     I have considered the following to be the aggravating factors in determining the appropriate discipline to propose: the nature and seriousness of the offense and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisor's confidence in the employee's ability to perform assigned duties; consistency of the penalty with any applicable agency table of penalties; the notoriety of the offense or its impact upon the reputation of the agency; and the clarity with which the employee was on notice of any rules that were violated in committing the offense or had been warned about the conduct in question.

4.     If you choose to do so, you have until close of business fourteen (14) calendar days from the day after you receive this notice to reply orally, or in writing, or both orally and in writing, and to submit affidavits and other documentary evidence in support of your reply, showing why the charge is unfounded and any other reasons why your suspension should not be effected. Your written reply should be submitted to me. I will receive your oral reply, or will designate an official to receive it. You may make arrangements for your oral reply by calling Ms. Jelena Zekanovic, Employee/Labor Relations Specialist, Human Resources Management Service, at 216-791-2300, extension 2163.

5.     The evidence upon which this notice of proposed suspension is based will be available for your review in the Employee/Labor Relations Section of Human Resources Management Service, Second Floor, Administrative Building, Wade Park Campus, between the hours of 8:00 a.m. and 4:30 p.m., Monday through Friday. You will be allowed up to eight (8) hours of official duty time for reviewing the evidence relied on to support the reason(s) in this notice, preparing a written reply, securing affidavits, and for making a personal reply. Arrangements for the use of official time or requests for additional time should be made with me.

6.     You may be represented by an attorney or other representative of your choice at all stages

Page 5.
Proposed Suspension
Dr. Ronald Lisan

of this matter, up to and including the issuance of the decision. Please advise me in writing of any representative designated.

7.       The final decision to effect the proposed action has not been made. The Medical Center Director, who will make the final decision, will give full and impartial consideration to your reply (ies), if submitted.  You will be informed in writing of the final decision as soon as possible after your reply has been considered or after the expiration of the time allowed for reply, if you do not reply.  If an action is effected, the applicable grievance or appeal rights will be included in the decision letter.

8.       You will be given a written decision within 21 calendar days of the receipt of your reply (ies) or, the close of business 14 calendar days following the receipt of this notice, if you do not reply.

9.       If it is decided that you should be suspended, it will be effective not less than thirty (30) calendar days from the day after the date of receipt of this notice.

10.      You will be retained in an active duty status during the advance notice period.

11.      If a personal, medical, family, or other situation is affecting your conduct on the job, this Medical Center has an Employee Assistance Program (EAP) that offers short-term counseling and referral. You may contact EAP Counselors, Dr. Erica Sharkansky or Dr. Diane Johnson, at (216) 791-3800, extension 6922.  One of them will be happy to meet with you on a confidential basis.

12.      If you do not understand the above reason as to why your suspension is being proposed, please contact me, or Ms. Jelena Zekanovic, Employee and Labor Relations Specialist, Human Resources Management Service, at 216-791-2300, extension 2163.

Susan D. Raphaely, MD
Chief, Anesthesiology Service



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
151 Knollcroft Road Building 16
Lyons, NJ 07939



In reply refer to: 08E

June 15, 2017

VIA: E-Mail [*info@sindellattorneys.com*]

Steven Sindell, Esq.
Sindell and Sindell, LLP
23611 Chagrin Boulevard
Suite 227
Cleveland, OH 44122

**SUBJECT: Notice of Acceptance of the EEO Complaint for Ronald Lisan, Case No. 200H-0541-2017101627, filed April 21, 2017, against officials of the Louis Stokes Cleveland VAMC in Cleveland, OH**

1. On January 19, 2017, your client initiated contact with an EEO counselor. Counseling concluded on April 10, 2017, when you and your client were emailed the *Notice of Right to File a Discrimination Complaint*, which you received on April 10, 2017, and your client received on April 20, 2017. On April 21, 2017, your client filed a formal complaint of discrimination, VA Form 4939.

2. Subsequent to informal counseling, your client provided additional information when filing the formal complaint. This information included more specific, clarifying details about the events your client discussed during informal counseling.

3. Your client's complaint of discrimination raises the following claim:

**Whether complainant was subjected to a hostile work environment based on[1] sex (male), disability, and reprisal[2] as evidenced by the following events:**

**1) When on December 7, 2016, Susan Raphaely (SR), Chief of Anesthesiology, gave complainant an unusually heavy workload after he returned to work from a medical leave of absence related to his disability.**

---

[1] While allegations of age discrimination were discussed during informal counseling, complainant's attorney stated on February 15, 2017, that complainant was not filing a claim for age discrimination. Therefore, age will not be considered as a basis for this complaint.

[2] Complainant claims he objected to being given an unusually heavy workload after returning from a medical leave of absence and made a request for a reasonable accommodation on December 7, 2016. As complainant participated in protected activity by complaining about his workload as it relates to his disability and requested a reasonable accommodation for his disability, reprisal will be considered for events occurring after December 7th.

Page 2
Notice of Acceptance
Ronald Lisan
200H-0541-2017101627

2) When since December 19, 2016, SR has failed to provide complainant with a reasonable accommodation by not exempting him from 'On-Call' duties.

3) When since January 6, 2017, Susan Fuehrer (SF), Facility Director, and Murray Altose (MA), Chief of Staff, have not taken appropriate corrective action after complainant's attorney sent a letter of complaint regarding SR's harassment.

4) When on January 11, 2017, SR emailed complainant to say that his scheduled meeting the next day with Bruce Kafer (BK), Reasonable Accommodation Coordinator, was canceled and that his request for reasonable accommodation would be decided without allowing complainant to discuss his circumstances with BK.

5) When on January 11, 2017, SR began promoting and fostering false accusations of complainant sexually harassing CRNA's (Certified Registered Nurse Anesthetists).[3]

6) When since January 17, 2017, SR continued to not provide complainant with a reasonable accommodation by assigning him 'On-Call' duties.

7) When in March and April 2017 RS attempted to force complainant to work in the same operating room with the CRNA's who accused him of sexual harassment, even though there were other CRNA's available.

8) When on March 9, 2017, RS issued complainant a Written Warning.

9) When on March 13 and 14, 2017, RS assigned complainant to serve as the anesthesiologist during operations without a CRNA to assist him, which is contrary to VA standard operating procedure, and put the patients at risk.

10) When on March 28, 2017, RS issued complainant a Proposed 10-Day Suspension.[4]

4. Events 2, 6, and 8 above constitute timely raised discrete acts that are hereby ACCEPTED for investigation as independently actionable claims. They also represent 3 of the 10 actions or harassing behaviors taken against or directed toward your client. These events are sufficiently related to the overall pattern of harassment and will be included for consideration in the analysis of the harassment claim.

---

[3] Complainant claims SR solicited CRNA's Karen Bonfili, Jessica Foster, Ronda Verb, and Elaine Costanzo to file sexual harassment complaints against him; and that SR ordered him to limit his communications with these CRNA's, to not discuss the accusations with them, and to not enter the CRNA office/lounge.

[4] It is noted that the proposed suspension was dated March 20, 2017; but given to complainant on March 28, 2017. As of the writing of this letter, no final decision regarding the suspension has been made yet.

Page 3
Notice of Acceptance
Ronald Lisan
200H-0541-2017101627

5.  In assessing a hostile environment claim, the totality of the circumstances must be examined, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.  A hostile environment claim generally requires a showing of a pattern of denigrating conduct that unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or offensive working environment.  In determining whether harassment is sufficiently severe or pervasive to create a claim of hostile environment, the harasser's conduct is evaluated from the objective standpoint of a reasonable person.  An objectively hostile or abusive work environment is created only when a reasonable person would find it hostile or abusive.

We have determined your client's claim of harassment passes the severe or pervasive requirement for further processing, and is therefore **ACCEPTED** for further investigation.  Your client has presented 10 events that occurred during a period of about 4 months, that illustrate actions by the alleged harassers and exhibit conduct that would unreasonably interfere with an individual's work performance and create an offensive work environment.

6.  As outlined above, <u>events 2, 6, and 8</u> have been <u>**ACCEPTED**</u> for investigation as independent claims, and your client's overall <u>**harassment claim consisting of events 1 – 10 is ACCEPTED**</u> for investigation.

7. If your client believes that the accepted claim is improperly formulated, incomplete, or incorrect, you must notify this office within **7 calendar days** of receipt of this letter, in writing, by mail or fax, stating your disagreement.  We will include your statement in the complaint file.  If you do not contact this office within **7 calendar days**, we will assume that the claim is correctly stated.

8.  We will assign the accepted claim to an impartial investigator under the supervision of the Office of Resolution Management (ORM).  The investigator will contact you and your client directly in order to obtain information or evidence you may wish to offer.  The investigator is only authorized to investigate the claim specified.

9. Your client has additional rights that are fully explained in the enclosure to this letter.

10. **Failure to keep this office advised of any change of address could lead to dismissal of this complaint.** All subsequent actions on the complaint will be mailed or delivered to you with copies to the complainant, unless the complainant advises us in writing that s/he is no longer represented by you.

Page 4
Notice of Acceptance
Ronald Lisan
200H-0541-2017101627

11. Our fax number is (908) 604-5261.  If you have any questions, please contact John
Oare, Case Manager at (615) 225-5320.

Sincerely,

*Christa T. Metzger*

for
James D. Jindra
District Manager

Enclosure:    Complainant Rights

cc:    Ronald Lisan [*Ronald.Lisan@va.gov*]
       Susan Fuehrer, Facility Director

Page 5
Notice of Acceptance
Ronald Lisan
200H-0541-2017101627

## Complainant Rights

The investigation must be completed within **180** calendar days of filing your complaint. You will receive a copy of the investigative file upon completion. You will be advised, in writing, of your right to request a **Final Agency Decision (FAD)** from the VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC, or a **hearing** by an administrative judge appointed by the Equal Employment Opportunity Commission (EEOC).

### Requesting a Hearing

In order to request a hearing, you must meet the following criteria:
- You have received your completed investigative file  -OR-
- 180 calendar or more days elapsed since you filed your formal complaint (and you have not received your complete investigative file)

| To request that EEOC appoint an administrative judge to hear your complaint, you must complete EEOC's "Hearing Request Form" and send it to: | You must send a **copy** of your EEOC hearing request to this office: |
|---|---|
| U.S. Equal Employment Opportunity Commission<br>Indianapolis District Office<br>101 West Ohio Street Suite 1900<br>Indianapolis IN 46204 | Department of Veterans Affairs<br>Office of Resolution Management<br>10701 East Blvd.<br>Admin Bldg., 5th Floor<br>Cleveland, OH 44106 |

You are required to certify to the EEOC administrative judge that you sent a copy of the request for a hearing to the Office of Resolution Management at the above address.

### Requesting a Final Agency Decision

To request a FAD, you must have received your completed investigative file.

| To request a FAD, submit the FAD request form which will be included in your investigation file to: |
|---|
| Department of Veterans Affairs<br>Office of Resolution Management<br>10701 East Blvd.<br>Admin Bldg., 5th Floor<br>Cleveland, OH 44106 |

If you request a FAD, it will be rendered by VA's Office of Employment Discrimination Complaint Adjudication (OEDCA) in Washington, DC. The FAD will address all claims, and a decision will be made on the merits of your complaint. You may appeal the FAD to EEOC if you are dissatisfied with the decision. OEDCA will provide you with specific information regarding your appeal rights following its final agency decision, including your right to file a civil action in an appropriate United States District Court.

### Requesting Civil Action

If you have not received a copy of the investigative file within 180 calendar days from date you filed your formal complaint, and you do not wish to have a hearing, you also have the right to file a civil action in an appropriate United States District Court. If you file a civil action, the court may, at its discretion and upon your request, appoint an attorney to represent you in the matter, if you do not have or cannot afford one. The court may also authorize the civil action to begin without payment of fees, costs, or other security. Finally, if you decide to file a civil action, you must name David J. Shulkin, M.D., Secretary of Veterans Affairs as the defendant.

### Requesting ADR

The EEOC encourages the use of Alternative Dispute Resolution (ADR) to resolve EEO complaints. Agencies and complainants can realize many advantages from using ADR. ADR offers parties the opportunity for an early, informal resolution of disputes in a mutually satisfactory fashion. If you are interested in using mediation to address the issues raised in your complaint, please contact the ORM case manager listed in the letter or the ADR program manager at workplaceadr@va.gov.



*Sindell and Sindell, LLP*                                           Attorneys and Counselors at Law

Steven A. Sindell*
  Board Certified in Labor and Employment Law by OSBA

Rachel Sindell



Chagrin Plaza West
23611 Chagrin Boulevard, Suite 227
Cleveland, Ohio 44122
Telephone: (216) 292-3393
Facsimile: (216) 292-3577
Website: www.sindellattorneys.com
E-mail: info@sindellattorneys.com

January 6, 2017

*By E-mail to Susan.Fuehrer@va.gov*
*and Murray.Altose@va.gov*
*and By Priority Mail with Tracking*

*Ms. Susan Fuehrer, Medical Center Director*
*Louis Stokes Cleveland VA Medical Center*
*10701 East Boulevard*
*Cleveland, Ohio 44106*

EL557629168US

*Dr. Murray D. Altose, Chief of Staff*
*Louis Stokes Cleveland VA Medical Center*
*10701 East Boulevard*
*Cleveland, Ohio 44106*

EL557629145US

Re:  Ronald Lisan, M.D.

Dear Ms. Fuehrer and Dr. Altose:

Please be advised that this office has been retained to represent your employee, Dr. Ronald Lisan, in connection with his employment issues at the VA. We have previously notified the VA of our representation of him.

Dr. Lisan has been employed at the VA as an anesthesiologist for many years. Although he may have previously exhibited indications of OCD traits, he was neither impaired nor deficient in his professional performance. His difficulties began after Dr. Susan Raphaely was hired by to replace Dr. David Kazdan as Chairperson of the Department of Anesthesiology.

In less than two years after Dr. Raphaely became Chairperson, eight of twelve anesthesiologists separated from employment at the VA. Our investigation reveals that Dr. Raphaely was instrumental in pressuring and targeting them in a number of ways. Seven out of eight of them were males. All were approximately 40 years old or older. Two of the seven were over 50 (one of those two in the late fifties); one was approximately 65 and another over 70. Dr. Raphaely replaced the largely male

Ms. Susan Fueher, Medical Center Director
Murray D. Altose, MD, Chief of Staff
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, Ohio 44106
Page 2

anesthesiologists with 6 new anesthesiologists, including herself. Five of the six anesthesiologists she newly hired were females. None of them were in their upper fifties, their sixties or seventies. We suspect that in some instances the anesthesiologists she managed to get rid of were more qualified than the ones she hired to replace them. Moreover, Dr. Raphaely apparently excluded her entire staff of experienced anesthesiologists from any background information or contact with her intended new hires. Their views were unsolicited, yet they were the ones having to work with the new hires. Since Dr. Raphaely has become Chairperson, eight out of twelve staff anesthesiologists have left primarily because of the treatment of Dr. Raphaely. Dr. Omar will be shortly replaced by a new female hire of Dr. Raphaely.

There are specific instances of extreme deceptive and unfair harshness directed by Dr. Raphaely toward other older male anesthesiologists in her Department, particularly Dr. Moss however, at this time, we will concentrate on her treatment of our client, Dr. Lisan. We believe that Dr. Raphaely was aware of Ron's emotional vulnerability and exploited it. In doing so, she contributed to his deterioration which caused his breakdown, hospitalization and need for recovery to full capacity, including "on-call" time.

Dr. Raphaely has accorded herself highly preferential treatment regarding her own "on-call" time. She has almost never taken "3rd call", the most onerous one. Other anesthesiologists have noticed that she excuses herself from it. She has been nitpickingly hypercritical of Dr. Lisan's performance, along with other older male anesthesiologists. There are clear specific examples of her disparate behavior.

In Ron's case, knowing that he was just returning from a lengthy in-patient hospitalization, she browbeat him to do "on-call" service immediately upon his return to work, loading him up with particularly heavy "on-call" duty. She let him know how displeased she would be if she herself had to do any "on-call" services over the Holidays. (The predecessor as Chair, Dr. David Kazdan, regularly assumed his proportionate share of "on-call" service, commensurate with other anesthesiologists).

We have attached a recent email authored by Dr. Raphaely, dated December 19, 2016. Apparently, Dr. Raphaely knows that Dr. Lisan, with an OCD problem, is having typical difficulty with what is known in the OCD world as "flooding", which means overwhelming the OCD patient shortly after lengthy (successful) treatment with an immediately heavy and stressful load. This causes a vulnerable newly recovered OCD person to deteriorate. Although Ron's initial medical documentation form does not

Ms. Susan Fueher, Medical Center Director
Murray D. Altose, MD, Chief of Staff
Louis Stokes Cleveland VA Medical Center
10701 East Boulevard
Cleveland, Ohio 44106
Page 3

specify a time-limit for the "on-call" limitation, you will shortly receive that medical detail, if you have not already received it from his treating psychiatrist, Dr. Kramer. Ron needs a relatively brief reasonable but gradual adjustment period for "on-call" duty. The decision of Dr. Raphaely was to quickly heap a heavy load of it on him, to mischaracterize his need for a brief period of a temporary light "on-call" load as a requirement for an indefinite period of no "on-call" whatsoever, and finally making it clear that this mischaracterized circumstance requires to his being separated from his current position in the Department of Anesthesiology because at full tilt "on-call" is "an essential function" of the position (and a no "on-call" position is not currently available).

We will not sit by idly while this kind abuse is visited upon Ron. With a reasonable adjustment leading up to Ron's assumption of his full share of "on-call "duty and the cessation of the continual discriminatory harassments and hostile work environment, there will be no reason or basis to bring about his separation from his current position. He has rendered long and good service to the VA and, but for his mistreatment, has and will continue to do so.

We request that his allegations be investigated. We request that no adverse action against him be taken at this time. We request a short period of time for his physician to more specifically verify the accommodation for which he is actually asking. And we request remediation for the continual misconduct that is being visited upon Ron and apparently upon others: Sex discrimination, age discrimination and (in Ron's case, in addition), disability discrimination. And, of course, it is unlawful to retaliate against him because of his communication of complaints and requests in this letter.

Please feel free to contact me as may be helpful to resolve these matters.

Sincerely

Steven A. Sindell



ATTACHMENT B

MEDICAL CENTER POLICY 003-003
March 1, 2016

*Ron Lisan*

PLAINTIFF'S
EXHIBIT
33 S.F.
4.2.19 PSG

### Sexual Harassment Allegation Checklist
### (Alleged Harasser)

**A copy of this checklist will be attached to the written report and submitted to the
Director, LSCVAMC through the EEO/Affirmative Employment Program Manager.**

1.     The employee occupies a position that is covered by the bargaining unit; he/she
was advised that he/she may request representation during the fact-finding process.

   Not applicable_____ Initials *RML* Date *1/10/17*

2.     The alleged harasser has been interviewed and the information gathered is
included in the attached report.

   Initials_____ Date_____

3.     I have explained to the alleged harasser that counseling is available through the
Employee Assistance Program (EAP) to enable him/her to deal with the trauma caused
by the circumstances.  I provided the telephone number to EAP.  (1-216-791-3800 ext.
6818)

   Initials *RML* Date *1/12/2017*

4.     I have ordered the alleged harasser to cease any contact with the alleged victim
except that which is absolutely required for official business.

   Initials *RML* Date *1/10/17*  Dr Lisan refused to initial
   initials _____ *1/20/17* - He was made aware that he was
   not to have Elaine or
5.     I have included my written report, along with the statements made by both parties,
witnesses, and if applicable, a VA Police report.  reside in the CRNA Lounge

   Initials_____ Date_____   Initials ____ date 1/25/17
                                            Rhonda Vista ROC
                                            refused to initial 1600

6.     For EEO Manager:

        I have made a recommendation as to the Medical Center Director as to whether
an Administrative Investigation Board should be appointed.

   Initials_____ Date_____

ATTACHMENT B

Ron Lison

MEDICAL CENTER POLICY 003-003
March 1, 2016

PLAINTIFF'S
EXHIBIT
33  5.F.
4.2.19  P56

**Sexual Harassment Allegation Checklist**
**(Alleged Harasser)**

**A copy of this checklist will be attached to the written report and submitted to the**
**Director, LSCVAMC through the EEO/Affirmative Employment Program Manager.**

1.  The employee occupies a position that is covered by the bargaining unit; he/she
was advised that he/she may request representation during the fact-finding process.

Not applicable_____  Initials _RML_  Date _1/10/17_

2.  The alleged harasser has been interviewed and the information gathered is
included in the attached report.

Initials_____  Date_____

3.  I have explained to the alleged harasser that counseling is available through the
Employee Assistance Program (EAP) to enable him/her to deal with the trauma caused
by the circumstances.  I provided the telephone number to EAP.  (1-216-791-3800 ext.
6818)

Initials _RML_  Date _1/12/2017_

4.  I have ordered the alleged harasser to cease any contact with the alleged victim
except that which is absolutely required for official business.

Initials _RML_  Date _1/10/17_   Dr Lison refused to initial

initials _____  1/20/17 - he was made aware that he was
                              NOT to Attend Elaine or

5.  I have included my written report, along with the statements made by both parties,
witnesses, and if applicable, a VA Police report.   reside in the CRNA Lounge

Initials_____  Date_____      Initials _____ date 1/23/17
                                             Rhonda Verba ROC -
                                             refused to initial 1600

6.  For EEO Manager:

       I have made a recommendation as to the Medical Center Director as to whether
an Administrative Investigation Board should be appointed.

Initials_____  Date_____

Jan. 12. 2017  11:55AM



PLAINTIFF'S
EXHIBIT
**34** S.F.
42-19  PSG

No. 0143   P. 13

---

| **VA** Department of Veterans Affairs | **REPORT OF CONTACT** |
|---|---|

*NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil in complete this form.*

| VA OFFICE | IDENTIFICATION NOS. (C, XC, SS, XSS, V, K, etc.) |
|---|---|

| LAST NAME–FIRST NAME–MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|
| Bonfili, Karin | |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT (check one) |
|---|---|
| Susan Raphaely | ☐ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT (check one) |
|---|---|
| | ☐ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (Include area code) |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN (Continue on page 2 if needed)

On Friday January 6, 2017 I was assigned to work with Dr. Lisan for the day. Throughout the day Dr. Lisan continued to make sexually oriented comments. For example, in the morning I stated that I was tired and wanted to go home and get back in my bed. His response was something about "sounds good to me, we can go now and get in your bed". Second example, on Thursday January 5th, 2017 I was trying to discuss the case that I was going to do with him on Friday January 6th, 2017. I reviewed everything I know about the patient with him and said, "so are you leaving now", his response "unless you can make me a better offer". A few weeks prior I had asked, "do you have someone coming to relieve me to go home"? His response, "If I get you out, what are you going to do for me"? When I was reviewing the case with Dr. Lisan on Thrusday January 5th, 2017, another O.R. staff member happened to be present. After Dr. Lisan spoke with sexual undertones to me, and though in sexual comments  he walked away when we were done discussing the case. The other O.R. staff member that was present asked me if I felt uncomfortable because he felt uncomfortable for me hearing how he spoke to me. Although, I cannot write this "verbatim", because I am trying to account for what has been occurring the last several weeks, I can tell you that I am not comfortable with this type of "sexual" talk at work.

Although Dr. Lisan has always made "sexually oriented" jokes, recently I feel that the level of the sexual talk has escalated and I feel extremely uncomfortable. I have not said anything in response, because I am so uncomfortable and uneasy when it is happening.  I don't know how to respond & frequently I am caught off guard when he says it. I do not want to come to work feeling uncomfortable in the work place because we work together in a "team" care setting. I just want to work in a respectable and professional environment and not feel uneasy while being at work.

Karin Bonfili, MSN, CRNA
January 11, 2017

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|

Jan. 12. 2017  11:55AM                                                        No. 0145   P. 15

| VA **Department of Veterans Affairs** | REPORT OF CONTACT |
|---|---|

NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder.  Please do not use a pencil to complete this form.

| VA OFFICE | IDENTIFICATION NOS. (C.XC, SS, XSS, V. K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|
| Foster, Jessica E | 01/04/2017 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT (check one) |
|---|---|
| Susan Raphaely | ☒ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |
|---|---|
| Cleveland VA Medical Center | |

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT (check one) |
|---|---|
| | ☐ PERSONAL   ☐ TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (Include area code) |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN (Continue on page 2 if needed)

On 1-4-2017 I was on call with Dr.Lisan and I stopped by his office to sign out to him at the end of my shift  Dr.Lisan stated that he had two things to tell me and asked me to close the door to office. The first thing was that another physician was going to be covering his call overnight. The second part of the conversation started with "I am not trying to hit on you, ask you out or have sex with you, but I would." Dr.Lisan then proceeded to tell me that he saw similarities between my marriage and his, that I don't necessarily talk about my husband the same way as other people do, and that he wasted far to many years in his own unhappy marriage. I was completely appalled at the context of the conversation and it made me extremely uncomfortable. At this point, I responded by defending my husband and marriage trying to end the conversation as rapidly as possible. Then as I was leaving he stated again that another physician would be taking his call shift. I joking said if he didn't pass along that I was the CRNA on call then the following doctor would not be able to call me in. Dr. Lisan's response was "how much is it worth to you." I basically walked away at this point and let his office door close behind me. This is not the first time unsolicitated, inappropriate sexual comments/jokes have been made to me by Dr.Lisan. I just feel I need to come forward at this time because the current situation has made me feel extremely uncomfortable to be at work.

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|

VA FORM
SEP 1007 (R)  **119**

Feb. 7. 2017  6:31PM                                                        No. 0253   P. 3

| **VA** Department of Veterans Affairs | **REPORT OF CONTACT** |
|---|---|

NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.

| VA OFFICE | IDENTIFICATION NOS. (C,XC,SS, XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT (check one) ☐ PERSONAL  ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |
|---|---|

| PERSON WHO CONTACTED YOU<br>Dr Susan Raphaely Chief Department of Anesthesia | TYPE OF CONTACT (check one) ☐ PERSONAL  ☐ TELEPHONE |
|---|---|

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (Include area code) |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN (Continue on page 2 if needed)

Dr Lisan has said in the past many inappropriate things to me while we were working together almost the whole time I have worked in the Department of Anesthesia. The most recent thing I remember is when I was leaving for the day I said to him, "I'm going home" and his response was, "what time should I be over?". My response has always been to just look at him and not respond. I feel I have had a good working relationship with him but feel as though he has been struggling recently, he has seemed very distracted and not present while working. I have worried about his mental well being.

I am coming forward in light of recent events involving my peers whom I have a great amount of respect for. This type of behavior is not to be tolerated at any time in our professional work environment. This is particularly concerning as we are in a subordinate role in the operating room.

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|
|  | _Rhonda L. Verb_ CRNA |

VA FORM
SEP 1997 (R)  **119**

Rhonda L. Verb   CRNA

Jan. 20. 2017  1:09PM                                      No. 0182  P. 2

| VA | Department of Veterans Affairs | REPORT OF CONTACT |
|---|---|---|

NOTE: As appropriate, once this form is completed it becomes a permanent record in the veteran's folder. Please do not use a pencil to complete this form.

| VA OFFICE | IDENTIFICATION NOS. (C, XC, SS, XSS, V, K, etc.) |
|---|---|

| LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print) | DATE OF CONTACT |
|---|---|
| | Early 2015 |

| ADDRESS OF VETERAN | TELEPHONE NO. OF VETERAN (Include Area Code) |
|---|---|

| PERSON CONTACTED | TYPE OF CONTACT (check one) |
|---|---|
| Susan Raphaely | [X] PERSONAL   [ ] TELEPHONE |

| ADDRESS OF PERSON CONTACTED | TELEPHONE NO. OF PERSON CONTACTED (Include Area Code) |
|---|---|

| PERSON WHO CONTACTED YOU | TYPE OF CONTACT (check one) |
|---|---|
| | [ ] PERSONAL   [ ] TELEPHONE |

| ADDRESS OF PERSON WHO CONTACTED YOU | TELEPHONE NO. OF PERSON WHO CONTACTED YOU (Include Area Code) |
|---|---|

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN (Continue on page 2 if needed)

In light of recent events involving my female colleagues, I have decided to report the following incidents as they pertain to Dr. Ron Lisan and his inappropriate comments of a sexual nature while caring for patients in the operating room. These two incidents occured roughly one week apart about two years ago when I first began my CRNA position at the Cleveland VA. Although I cannot specifically recall the exact wording of the comments, I remember very clearly feeling extremely uncomfortable and embarrassed by his comments at the time. During one of the incidents I vividly recall him speaking to me about his own male genitalia. As a brand new employee, I did not feel comfortable speaking to my colleagues or even reporting the incident to my chief at the time as I was not yet familiar with my environment or the people I was working with. I quickly put the incidents aside in the interest of providing excellent patient care while working alongside him. I now realize that the comments were seriously inappropriate and unwarranted and that they have caused some amount of distress in addition to making me feel awkward and uncomfortable while working with Dr. Lisan in a position of authority in the operating room.

| DIVISION OR SECTION | EXECUTED BY (Signature and title) |
|---|---|
| Anesthesiology | |

VA FORM
SEP 1997 (R)  119

ATTACHMENT A



PLAINTIFF'S
EXHIBIT
35 s.F
4.2.19 PSG
FERGED-Bayonne, N.J.

### Sexual Harassment Allegation Checklist
### (Alleged Victim)

**A copy of this checklist will be attached to the written report and submitted to the Director, LSCVAMC through the EEO/Affirmative Employment Program Manager.**

1.    The employee occupies a position that is covered by the bargaining unit; he/she was advised that he/she may request representation during the fact-finding process.

Not applicable_____ Initials_____ Date_____

2.    The alleged victim has been interviewed and the information gathered is included in the attached report.

Initials_____ Date_____

3.    During the interview, I notified the alleged victim of his/her right to utilize the EEO complaint process.  I provided the telephone number to the Office of Resolution Management.  (1-888-737-3361)

Initials_____ Date_____

4.    I have explained to the alleged victim that counseling is available through the Employee Assistance Program (EAP) to enable him/her to deal with the trauma caused by the circumstances.  I provided the telephone number to EAP.  (1-216-791-3800 ext. 6818)

Initials_____ Date_____

5.    I have included my written report, along with the statements made by both parties, witnesses, and if applicable, a VA Police report.

Initials_____ Date_____

6.    For EEO Manager:

I have made a recommendation as to the Medical Center Director as to whether an Administrative Investigation Board should be appointed.

Initials_____ Date_____