# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Ronald M. Lisan, M.D.,** | **Case No. 1:18cv969** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Robert Wilkie,** | |
| **Secretary of the United** | **MEMORANDUM OPINION AND** |
| **States Dep't of Veteran Affairs,** | **ORDER** |
| **Defendant** | |

Currently pending is the Motion for Summary Judgment (Doc. No. 29) filed by Defendant Robert Wilkie, Secretary of the United States Department of Veteran Affairs. For the following reasons, Defendant's Motion for Summary Judgment (Doc. No. 29) is GRANTED.

## I. Procedural Background

On April 27, 2018, Plaintiff Ronald M. Lisan, M.D. (hereinafter "Plaintiff" or "Lisan") filed a Complaint in this Court against Defendant Robert Wilkie, Secretary of the United States Department of Veteran Affairs (hereinafter "Defendant"), asserting claims for (1) sex discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, (2) disability discrimination, denial of reasonable accommodation, and hostile work environment under the Rehabilitation Act of 1973, as amended, 29 U.S.C. 706, 791, *et seq*.; and (3) "reprisal/retaliation and hostile work environment." (Doc. No. 1.) Plaintiff sought compensatory and punitive damages; an award of back pay, front pay, and benefits; pre and post judgment interest; and reasonable attorney fees and costs. (*Id*. at p. 25.) Plaintiff also sought an order permanently

removing any records from his employment file relating to suspensions, warnings, police reports, findings or other adverse employment actions. (*Id.*)

Defendant filed an Answer on July 16, 2018. (Doc. No. 9.) A Case Management Conference ("CMC") was conducted shortly thereafter, at which various case management deadlines were set. (Doc. No. 11.)

On May 21, 2019, Defendant filed a Motion for Summary Judgment with respect to each of Plaintiff's claims. (Doc. No. 29.) Plaintiff filed a Brief in Opposition (Doc. No. 50) on June 21, 2019, to which Defendant replied (Doc. No. 56) on July 12, 2019. Both parties obtained leave of Court to file Sur-Replies in August 2019. (Doc. Nos. 63, 65.)

This matter was re-assigned to the undersigned on June 26, 2019 pursuant to General Order 2019-13. Defendant's Motion is now ripe and ready for resolution.

## II.    Facts

Plaintiff is a board-certified anesthesiologist. He worked for many years at MetroHealth and, in 2006, joined the Anesthesiology Department at the Louis Stokes Veterans Administration ("VA") in Cleveland, Ohio as a staff anesthesiologist. (Lisan Depo. (Doc. No. 44) at Tr. 18-19, 27, 30.) In January 2015, Susan Raphaely, M.D., became the Service Chief of the VA Anesthesiology Department. (Raphaely Decl. (Doc. No. 29-2) at ¶ 1.) As such, Dr. Raphaely was Plaintiff's "first-line" supervisor. (*Id.* at ¶ 3.)

In the summer of 2016, Plaintiff was formally diagnosed with obsessive compulsive disorder ("OCD").[1] (Lisan Depo. at Tr. 35-36.) He took a medical leave of absence from September 7, 2016

---

[1] Although he was not formally diagnosed with this condition until 2016, Plaintiff testified that he had suffered from both OCD and depression for many years. (*Id.* at 36.)

until mid-November 2016, in order to undergo a course of specialized, in-patient treatment for this condition. (*Id.* at Tr. 46, 74, 123.)

At some point in November 2016, Plaintiff communicated with Dr. Raphaely in preparation for his return to work. Plaintiff testified that he agreed to return to work on December 7, 2016 but explained that he was not ready to immediately resume on-call duties and, instead, needed "some time to slowly get back into taking call." [2] (Lisan Depo. at Tr. 125-128.) Plaintiff testified that, at that time, he did not indicate a definite time frame to Dr. Raphaely for resumption of call duties, as he did not know how long it would take him to reacclimate to work. (*Id.* at Tr. 128-129.) Dr. Raphaely indicated that she thought Plaintiff's request would be doable but stated that she did not know what the rules were at the VA and needed to investigate and get back to him. (Raphaely Depo. at Tr. 120.) Dr. Raphaely testified that she then talked to her supervisor, VA Chief of Staff Murray Altose, M.D., who advised her that Plaintiff's request was not her decision. (*Id.* at Tr. 121-122.) Dr. Altose advised Dr. Raphaely to refer Plaintiff to the VA's Department of Reasonable Accommodation. (*Id.*)

Plaintiff returned to work on December 7, 2016. Shortly thereafter, on December 19, 2016, he submitted a reasonable accommodation request, along with a short letter from licensed social worker Carole Marciano, L.S.W. (Doc. No. 29-3 at PageID#s 247-249.) This letter provided, in its

---

[2] The anesthesiology department at the VA is a 24/7 operation. (Raphaely Decl. at ¶ 5.) Because an anesthesiologist may be needed at any time for emergency surgeries or consultations, most VA staff anesthesiologists participate in an on-call rotation. (*Id.*) When on-call, an anesthesiologist starts his/her shift at 2 p.m. (instead of 7 a.m.) and stays at the hospital until the last surgery is complete. (*Id.* at ¶ 5c.) At that point, the on-call physician may leave the hospital but must be available by pager or cell phone to answer calls or come back to the VA as needed. (*Id.*) Anesthesiologists are also asked to serve "late duty," during which the anesthesiologist starts his/her day at 9 a.m. and stays until the on-call physician allows him/her to leave. (*Id.* at ¶ 5b.) According to Defendant, anesthesiologists at the VA generally are either on-call or on late duty five or six times per month. (*Id.* at ¶ 5.)

entirely, as follows: "This will verify this patient's need to not be on call as he is recovering from a recent hospital stay." (Doc. No. 29-3 at PageID# 249.)

On that same date, Dr. Raphaely sent an email to Mr. Kafer forwarding Ms. Marciano's letter. (Doc. No. 29-3 at PageID# 243.) In this email, Dr. Raphaely indicated that "taking call is an essential function" of Plaintiff's position. (*Id.*) She concluded that "[a]fter much consideration, I feel that as a department we are unable to meet [Plaintiff's] request" for accommodation. (*Id.*)

Several hours later, Mr. Kafer sent an email to Plaintiff and Dr. Raphaely, in which he indicated that the medical documentation submitted by Plaintiff was insufficient for the granting of a VA Reasonable Accommodation. (Doc. No. 29-3 at PageID# 250.) Mr. Kafer provided Plaintiff with the specific medical documentation paperwork that was necessary to consider his request. (*Id.*) He asked Plaintiff to indicate the expected duration of his "no call" request and offered the possibility of reassignment in the event that the VA was unable to accommodate his request. (*Id.*)

Over the next two weeks, Plaintiff submitted additional documentation to Mr. Kafer. In particular, on December 22, 2016, Ms. Marciano completed a Request for Medical Documentation form which (1) requested that Plaintiff be excused from "on call" duties due to his need to have a regular sleep schedule, and (2) indicated that Plaintiff's ability to resume on call duties should be reviewed in six (6) months. (Doc. No. 29-3 at PageID# 256.) In addition, on December 26, 2016, Plaintiff provided a letter from psychiatrist M.J. Kramer, M.D., in which Dr. Kramer indicated, in relevant part, as follows:

> It is my strong recommendation that Dr. Lisan be allowed to reacclimatize slowly at work, so as to avoid a precipitous decompensation which, if severe, could require readmission. In doing so, it will not only improve his depression, but also increase his chance to successfully return to work full time, without a worsening of his OCD symptoms. I would strongly recommend that Dr. Lisan have a no-call position for the foreseeable future, as he readjusts to his work schedule. To that end, I have also

completed the Request for Medical Documentation form as well, outlining his functional limitations. Again, this request for no-call is temporary and time limited and if given this reasonable accommodation I believe he will be able to successfully return to a position in which he takes call in the near future.

(Doc. No. 29-3 at PageID# 258.)

Shortly thereafter, on January 6, 2017, Plaintiff sent a letter, through counsel, to Louis Stokes VA Medical Director Susan Fuehrer and Chief of Staff Dr. Altose. (Doc. No. 50-1 at Page ID#s 3601-3603.) Therein, Plaintiff's counsel accused Dr. Raphaely of gender, age, and disability discrimination, as follows:

In less than two years after Dr. Raphaely became Chairperson, eight of twelve anesthesiologists separated from employment at the VA. Our investigation reveals that Dr. Raphaely was instrumental in pressuring and targeting them in a number of ways. Seven out of eight of them were males. All were approximately 40 years old or older. Two of the seven were over 50 (one of those two in the late fifties); one was approximately 65 and another over 70. Dr. Raphaely replaced the largely male anesthesiologists with 6 new anesthesiologists, including herself. Five of the six anesthesiologists she newly hired were females. None of them were in their upper fifties, their sixties or seventies. We suspect that in some instances the anesthesiologists she managed to get rid of were more qualified than the ones she hired to replace them. Moreover, Dr. Raphaely apparently excluded her entire staff of experienced anesthesiologists from any background information or contact with her intended new hires. Their views were unsolicited, yet they were the ones having to work with the new hires. Since Dr. Raphaely has become Chairperson, eight out of twelve staff anesthesiologists have left primarily because of the treatment of Dr. Raphaely. Dr. Omar will be shortly replaced by a new female hire of Dr. Raphaely.

There are specific instances of extreme deceptive and unfair harshness directed by Dr. Raphaely toward other older male anesthesiologists in her Department, particularly Dr. Moss however, at this time, we will concentrate on her treatment of our client, Dr. Lisan. We believe that Dr. Raphaely was aware of Ron's emotional vulnerability and exploited it. In doing so, she contributed to his deterioration which caused his breakdown, hospitalization, and need for recovery to full capacity, including "on call" time.

***

In Ron's case, knowing that he was just returning from a lengthy in-patient hospitalization, she browbeat him to do "on-call" service immediately upon his return to work, loading him up with particularly heavy "on-call" duty. * * * We have

5

attached a recent email authored by Dr. Raphaely, dated December 19, 2016. Apparently, Dr. Raphaely knows that Dr. Lisan, with an OCD problem, is having typical difficulty with what is known in the OCD world as "flooding," which means overwhelming the OCD patient shortly after lengthy (successful) treatment with an immediately heavy and stressful load. This causes a vulnerable newly recovered OCD person to deteriorate. Although Ron's initial medical documentation form does not specify a time-limit for the "on-call" limitation, you will shortly receive that medical detail, if you have not already received it from his treating psychiatrist, Dr. Kramer. Ron needs a relatively brief reasonable but gradual adjustment period for "on-call" duty. The decision of Dr. Raphaely was to quickly heap a heavy load of it on him, to mischaracterize his need for a brief period of a temporary light "on-call" load as a requirement for an indefinite period of no "on-call" whatsoever, and finally making it clear that this mischaracterized circumstance requires to his being separated from his current position in the Department of Anesthesiology because at full tilt "on-call" is "an essential function" of the position (and a no "on-call" position is not currently available).

      \*\*\*

We request that his allegations be investigated. We request that no adverse action against him be taken at this time. We request a short period of time for his physician to more specifically verify the accommodation for which he is actually asking. And we request remediation for the continual misconduct that is being visited upon Ron and apparently upon others: Sex discrimination, age discrimination and (in Ron's case, in addition), disability discrimination. And, of course, it is unlawful to retaliate against him because of his communication of complaints and requests in this letter.

(*Id.*)

On January 10, 2017, Dr. Raphaely advised Plaintiff that she and Mr. Kafer wished to meet with him regarding his accommodation request on January 12, 2017. (Doc. No. 29-3 at PageID#270.) Plaintiff advised that he wanted his lawyer to be present at this meeting. (*Id.*) Mr. Kafer then advised Dr. Raphaely to tell Plaintiff that the meeting was cancelled, which she did. (Doc. No. 29-3 at PageID#269.) One week later, on January 17, 2017, Mr. Kafer denied Plaintiff's request for accommodation. (Doc. No. 29-3 at PageID# 277.)

Meanwhile, on January 9, 2017 (three days after Plaintiff's counsel's January 6, 2017 letter), Certified Registered Nurse Anesthetist ("CRNA") Karin Bonfili reported to Dr. Raphaely that, the

previous week, Plaintiff had "made unwelcome comments with sexual undertones" to her and that his comments made her feel "extremely uncomfortable." (Bonfili Decl. (Doc. No. 29-4) at ¶ 2-3.) Ms. Bonfili also advised Dr. Raphaely that she should talk to CRNA Jessica Foster, who allegedly recently had a similar experience with Plaintiff. (Raphaely Decl. at ¶ 8a.) Dr. Raphaely spoke to Ms. Foster, who reported that she also had an "uncomfortable, unsolicited, and upsetting encounter with Dr. Lisan" the previous week. (Foster Decl. (Doc. No. 29-5) at ¶ 2-3.) Dr. Raphaely reached out to the VA's Equal Employment Opportunity ("EEO") Office for guidance and was directed to Medical Center Policy ("MCP") 003-003, entitled "Policy on the Prevention of Sexual Harassment." (Raphaely Decl. at ¶8b; Kafer Decl. at ¶ 8.)

Among other things, MCP 003-003 provides that "Management Officials, Service Chiefs, and Supervisors must take immediate and appropriate action upon receipt of actual or constructive knowledge of sexual harassment affecting any of their employees." (Doc. No. 29-3 at PageID# 286.) Specifically, MCP 003-003 requires that, upon learning of sexual harassment affecting an employee, a supervisor must conduct an administrative inquiry, including conducting an interview of the alleged victim and recording "items pertinent to the incident, including dates, times, witnesses, and other information." (*Id*. at PageID# 288.) In addition, this Policy directs that "the alleged harasser will be ordered to cease any further contact with the alleged victim except that of which is absolutely required by official business." (*Id*.) MCP 003-003 also requires the investigating management official to administer "Sexual Harassment Allegation Checklists" to both the alleged victim and the alleged harasser. (*Id*. at PageID# 288.)

Pursuant to this Policy, Dr. Raphaely asked both Ms. Bonfili and Ms. Foster to document their complaints. Ms. Bonfili completed a Report of Contact form on January 11, 2017, which was

forwarded to the VA's EEO Office. (Bonfili Decl. at PageID# 309.) Ms. Foster also completed a Report of Contact form. (Foster Decl. at PageID# 320.) Dr. Raphaely administered "Sexual Harassment Allegation Checklist A" to both Ms. Bonfili and Foster. (Raphaely Decl. at ¶ 8c; Doc. No. 29-2 at PageID#s 192, 193.)

On January 10 and 12, 2017, Dr. Raphaely administered "Sexual Harassment Allegation Checklist B" to Plaintiff. (Raphaely Decl. at ¶ 8d; Doc. No. 29-2 at PageID# 196.) This Checklist documented that, in accordance with MCP 003-003, Dr. Raphaely ordered Plaintiff "to cease any contact with the alleged victim except that which is absolutely required for official business." (Doc. No. 29-2 at PageID# 196.)

In mid-January 2017, Dr. Raphaely learned that CRNAs Elaine Costanzo and Rhonda Verb had also reportedly had uncomfortable encounters with Plaintiff. (Raphaely Decl. at ¶ 8b; Costanzo Decl. (Doc. No. 29-6) at ¶¶ 3-4; Verb Decl. (Doc. No. 29-7) at ¶¶ 3-4.) Dr. Raphaely reached out to Ms. Costanzo and Ms. Verb and asked them to document their experiences. (*Id.*) Both Ms. Costanzo and Ms. Verb completed Report of Contact forms, and were administered Sexual Harassment Checklist A. (Costanzo Decl. at ¶ 4; Verb Decl. at ¶4; Doc. No. 29-6 at PageID#331; Doc. No. 29-7 at PageID# 344; Doc. No. 29-2 at PageID# 194, 195.) On January 20, 2017, Dr. Raphaely administered Sexual Harassment Checklist B to Plaintiff and expressly ordered him to cease any contact with Ms. Constanzo and Ms. Verb except that which is absolutely required for official business. (Raphaely Decl. at ¶ 8d; Doc. No. 29-2 at PageID# 196.)

Mr. Kafer and EEO Specialist Leshelle Reese investigated the sexual harassment allegations against Plaintiff throughout February and March 2017. (Kafer Decl. at ¶ 9.)

While the investigation was underway, several of the CRNAs that had accused Plaintiff of harassment reported ongoing concerns regarding Plaintiff's behavior. On January 26, 2017, Ms. Costanzo emailed Mr. Kafer to report that she was "starting to feel threatened and uncomfortable doing my job because Dr. Lisan has been making his rounds to ALL of my CRNA colleagues and some of the operating room nurses to 'tell his side of the story.'" (Doc. No. 29-6 at PageID#332.) Ms. Costanzo stated that she felt "terribly uncomfortable" and indicated "I'm at the point where I want to lock myself in the office and not come out or just not come to work." (*Id.*)

Subsequently, on March 7, 2017, Ms. Bonfili reported that Plaintiff came into an operating room where she was administering anesthesia to a patient undergoing surgery, and tried to talk to her about their relationship. (Bonfili Decl. at ¶ 4.) Plaintiff was not the anesthesiologist assigned to that surgery. (Lisan Depo. at Tr. 215-216.) Ms. Bonfili asked him to leave and he did. (Bonfili Decl. at ¶ 4.)

The next day, Plaintiff again came into an operating room where Ms. Bonfili was administering anesthesia to a patient undergoing surgery, despite the fact that he was not the anesthesiologist assigned to that surgery. (*Id.* at ¶5.) Plaintiff and Ms. Bonfili disagree regarding what happened during this encounter. According to Ms. Bonfili, she was at the anesthesia machine, behind drapes that separated her from the other operating room staff and the door. (*Id.*) Ms. Bonfili claims that Plaintiff entered the operating room and "tried to talk to me about my sexual harassment complaint against him, among other things, and asked if it was ok to touch me." (*Id.*) Ms. Bonfili states that she never said or communicated her consent, but "he put his hand on my back and shoulders anyway." (*Id.*) Ms. Bonfili further alleges that Plaintiff told her "that if I talked to his lawyer, he would promise not 'to sue me' if I would explain that he was joking about the sexual talk and never

meant to hurt me." (Doc. No. 29-4 at PageID# 310.) According to Ms. Bonfili, Plaintiff "discussed that if I talked to Dr. Raphaely there would be retaliation." (*Id*.)

At this point, another doctor, Dr. Marin Mannix, came into the room to tell Plaintiff that he needed to leave to attend another assignment. (*Id*.) Ms. Bonfili claims that Plaintiff refused to leave. (*Id*.) Dr. Mannix again asked Plaintiff to leave and he again refused. (*Id*.) Shortly thereafter, Dr. Schlesinger came into the room and told Ms. Bonfili to leave, stating that she (Dr. Schlesinger) would stay with the patient. (*Id*.) Ms. Bonfili quickly left and reported the incident to Dr. Raphaely. (*Id*.) Ms. Bonfili later filed a police report with the VA police. Among other things, she reported as follows:

> I cannot concentrate on my work, I can't focus on caring for my patient and I am cornered in my operating room by Dr. Lisan with nowhere to go! I cannot do my job with him coming into my room. He has been told by EEO to stay away from the 4 female CRNAs that filed a complaint of sexual harassment. * * * I felt intimidated and extremely uncomfortable by Dr. Lisan's behavior!

(Doc. No. 29-4 at PageID# 311.)

Plaintiff has a different recollection of the above incident. According to Plaintiff, Ms. Bonfili had previously told him that "we should talk this over and be done with it" but indicated that Dr. Raphaely had prohibited her from talking to Plaintiff about the allegations against him. (Lisan Depo. (Doc. No. 44) at Tr. 217.) Plaintiff testified he decided to talk to her alone, explaining as follows:

> Because it had to be a private conversation without other members of our staff who were part of Team Raphaely reporting things back. So again I said is it okay if I talk with you for a few minutes. Yes. Are you sure. Yes. Any time you feel uncomfortable, you want me to leave I will do so. Yes. I want to bring up what you told me yesterday, when you told me before, which is you still -- you feel you really didn't want to file any complaints against me, just want to talk this over. You didn't want to file any complaints against me. Yes. You just want to talk this over and be done with this. Yes. But Dr. Raphaely prevented you from doing so. Yes.

> So then I mentioned to her that it's obviously a significant legal issue, and contrary to her assertion I did not threaten in any way to sue her. That was in her report. Not even close. I simply said that if she's interested she can talk to my attorney and they'll try to help protect her from retaliation or talking about this kind of thing.

(*Id*. at Tr. 220-221.) Plaintiff further testified that he told Ms. Bonfili that he valued their professional relationship and appreciated the fact that she had supported him when he was depressed. (*Id*. at Tr. 223.) Plaintiff testified that Ms. Bonfili then gave him her express permission to touch her shoulder and he did, in fact, touch her shoulder. (*Id*. at Tr. 225-226.)

Plaintiff testified that Dr. Mannix or Dr. Schlesinger came in and told him he was needed in another operating room. (*Id*. at Tr. 227.) Plaintiff indicated that he said "okay, I'll be there, just give me a couple minutes." (*Id*.) At that point, however, Plaintiff claims Ms. Bonfili's demeanor changed and she looked "literally terrified." (*Id*. at Tr. 228.) Plaintiff testified that he believed Ms. Bonfili became afraid that Dr. Mannix would report to Dr. Raphaely that Ms. Bonfili had been speaking to Plaintiff. (*Id*.) Plaintiff testified that Dr. Schlesinger then entered the room and said "see you in the OR" to Plaintiff, after which Plaintiff left the operating room. (*Id.* at Tr. 229.)

On that same date, March 8, 2017, Ms. Costanzo received a call from Plaintiff "wanting to discuss his situation and wanting me to switch my on-call schedule so we would not have to work together." (Costanzo Decl. at ¶ 6.) Ms. Costanzo reported the incident to Dr. Raphaely and to the VA police, in relevant part, as follows:

> He said he understood but there are underlying feelings of resentment in our relationship coming from me that may not manifest obviously but that could affect the quality of patient care. I expressed to him that I have no personal feelings of resentment towards him but of course now working together may be slightly awkward knowing that he doesn't want to work with me. We then agreed to keep the schedule as it was and try to work on a better solution the next day. I called Dr. Raphaely immediately after the incident to report the contact. I felt Dr. Lisan was trying to intimidate me by telling me the responsibility fell on me to change the shift and by calling me on my personal phone after work hours when no one else could observe the

interaction even though we passed in the hallway immediately before I left for the day. He had every opportunity to approach me then or even in the weeks prior to the shift as our call schedule comes out several weeks prior to the day of duty. His contact with me felt threatening and I have a real feeling that my work environment is unsafe at this time. For this reason I have requested not to have any contact with him both professionally and personally.

(Doc. No. 29-6 at PageID# 333.)

On March 9, 2017, Ms. Foster emailed VA Medical Director Susan Fuehrer requesting that Plaintiff be placed on administrative leave because "it is unfair for us to have to work in an unhealthy, potentially unsafe work environment." (Doc. No. 29-5 at PageID# 321.) Ms. Foster asserted that "[n]ot only is Dr. Lisan's behavior a distraction to patient care, but it has also made several of my colleagues extremely uncomfortable." (*Id.*) The following day, Ms. Foster emailed Mr. Kafer, as follows:

I wanted to follow up with you from our meeting on Wednesday to tell you that I am concerned for my safety at work. I feel that little has been done to protect me from Dr. Lisan. I filed my sexual harassment complaint in January and since then, Dr. Lisan has and continues to make an effort to tell everyone that he is being accused of sexual harassment and that I am being used by management who want him out of the VA. Due to comments made to the group about the situation by other management, it is easily implied that I am one of the victims of his harassment. Despite requesting that Dr. Lisan have no contact with me, he has made an effort to say hello and hang around areas in the hospital that I am also present - like the CRNA office. This situation has made me very stressed, both mentally and physically, causing great anxiety, and has negatively impacted my life for over two months.

(Doc. No. 29-5 at PageID# 322.)

In response to the above incidents, Dr. Raphaely reached out to HR for guidance. (Raphaely Decl. at ¶ 9a.) Human Resources assisted Dr. Raphaely in drafting a Letter of Warning, which was issued to Plaintiff on March 10, 2017. (*Id.*) This Letter provides, in relevant part, as follows:

1.      I have learned of additional serious allegations that were made against you. I was advised that you may have engaged in additional conversations regarding allegations of inappropriate behavior of sexual nature involving female coworkers.

2.      The above-mentioned allegations are potentially serious.  If true, they may likely constitute sexual harassment on your part.  For this reason, you are hereby warned that such conduct will not be tolerated.   While I am bringing these allegations to your attention at the present, be advised that they will be fully investigated.   In the meantime, I am placing you on notice that if these allegations are true; you must cease this offending behavior immediately. You were previously instructed to refrain from discussing this allegation with your coworkers. Specifically, you received those instructions on January 10, 2017, January 20, 2017, and January 23, 2017. Additionally, you are to refrain from discussing these allegations with your coworkers. Furthermore, you are not to have any personal contact at or outside of work with Nurse Anesthetists: Ms. Jessica Foster, Ms. Elaine Costanzo, Ms. Rhonda Verb and Ms. Karin Bonfili. You are still required to maintain interactions of professional nature, relating to patient care, with the above-named individuals.

\*\*\*

4.      At this time, disciplinary action will not be imposed.  As more is learned about the nature of these allegations, you will be advised as to your rights and responsibilities in this matter.

(Doc. No. 29-2 at PageID# 197.)

Later that month, Mr. Kafer and Ms. Reese completed their sexual harassment investigation report regarding the CRNA's allegations against Plaintiff.  (Doc. No. 29-3 at PageID#s 292-297.)  In pertinent part, the Report concluded that: "Following a review of the written reports of contact and interviews of appropriate staff it was evident that sexually inappropriate behavior may had [sic] occurred by Dr. Lisan.  However, the evidence in this case does not rise to the level of 'sexual harassment' as defined in the VA policy."  (*Id*. at PageID# 292.)  In addition, the Report found that "[w]hen the January 2017 reports were received there was an immediate fact-finding process as well as instructions to Dr. Lisan to refrain from contacting the complainants, which he violated."  (*Id*. at PageID# 296.)

Dr. Raphaely felt that Plaintiff's failure to abide by the "no contact" orders with respect to CRNAs Bonfili, Foster, Costanzo and Verb was "egregious."  (Raphaely Decl. at ¶ 9d.)  Human

Resources assisted her in drafting a Proposed 10- day Suspension, which was issued to Plaintiff on March 25, 2017.  (*Id.* at ¶ 10.)  The bases for this Proposed Suspension were (1) failure to follow the no-contact orders;[3] (2) inappropriate conduct;[4] and (3) disruptive behavior putting patient safety at risk.  (Doc. No. 29-9 at PageID#s 363-367.)  With regard to the latter category, the Proposed Suspension states as follows:

> Over the last few months, you have engaged in inappropriate behavior involving female coworkers. Furthermore, four (4) of your female coworkers alleged sexual harassment perpetrated by you. The alleged victims reported that they felt their work environment was unsafe and they are not able to provide safe patient care as they are unable to concentrate on their work due to your intimidating and disruptive behavior. You were instructed, by me, to cease any contact with the alleged victims, except that which is required for direct patient care.  Despite my orders, you continued to have contact with the alleged victims outside of your work assignments. Specifically, on March 8, 2017, you entered OR 6, approached Ms. Bonfili and put your hands on her back, while she was providing anesthetics care for a patient undergoing surgery.  Ms. Bonfili stated that your intimidating behavior made it difficult for her to concentrate on the care she was providing.  You were not assigned to the case and should not have entered the OR to approach Ms.  Bonfili and disrupt the procedure. Consequently, you are being charged with disruptive behavior putting patient safety at risk.

(*Id.* at PageID# 365.)  Plaintiff was given the opportunity to reply.

On May 11, 2017, Plaintiff and his counsel met with Dr. Altose, who heard Plaintiff's oral reply.  (Altose Depo. (Doc. No. 49) at Tr. 89-90.)  *See also* Doc. No. 50-1 at PageID#s 3589-3590.

---

[3] Specifically, the Proposed Suspension stated that, although Plaintiff was advised on January 10, 2017 to cease contact with the alleged victims, Plaintiff had to be reminded of this no-contact order on January 20, 2017 because he was "frequenting the CRNA lounge and . . . continuing to address one of the CRNAs that brought the above-mentioned allegations against you."  (*Id.* at PageID#363.)  The Proposed Suspension also noted that Plaintiff again had to be reminded of the no contact order on January 23, 2017 because he was "continuing to have contact with the CRNAs that brought the above-mentioned allegations against you."  (*Id.* at PageID#s 363-364.)  Finally, the Proposed Suspension referenced the events underlying the March 9, 2017 Letter of Warning as further evidence that Plaintiff had failed to follow the no-contact orders relating to the CRNAs at issue.  (*Id.*)

[4] The bases for this portion of the Proposed Suspension were Plaintiff's allegedly inappropriate comments to (1) Ms. Foster on January 4, 2017; (2) Ms. Bonfili on January 5, 2017 and March 8, 2017; and (3) Ms. Costanzo on March 7, 2017.  (*Id.* at PageID#s 364-365.)

In a letter dated June 20, 2017, VA Director Susan Fuehrer upheld the suspension. (Doc. No. 50-1 at PageID# 3587-3588.) Plaintiff thereafter served his suspension in July 2017.[5] (*Id.*)

## III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary

---

[5] On April 21, 2017, Plaintiff filed a formal complaint of discrimination based on sex, disability, reasonable accommodation, hostile work environment, and reprisal/retaliation. (Doc. No. 1 at ¶ 3.) *See also* Doc. No. 50-1 at PageID# 3596.) An investigation was thereafter conducted, during which numerous witnesses provided affidavits. *See* e.g. Doc. Nos. 29-3 at PageID# 298-306; 29-4 at PageID#s 312-317; 29-5 at PageID#s 323-328; 29-6 at PageID#s 336-341; 29-7 at PageID#s 345-349; 50-1 at PageID#s 3543-3561.

judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV. Analysis

### A. Counts I and II—Sex Discrimination, Hostile Work Environment, Disability Discrimination, and Denial of Reasonable Accommodation

In the first and second Counts of his Complaint, Plaintiff asserts claims for (1) sex discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Count I); and (2) disability discrimination and denial of reasonable accommodation under the Rehabilitation Act of 1973, as amended, 29 U.S.C. 706, 791, *et seq.* (Count II). (Doc. No. 1.)

Defendant moves for summary judgment with respect to both of these claims. (Doc. No. 29.) In his Brief in Opposition, Plaintiff states that "the only claim of relief he is pursuing is his retaliation claims arising out of his protected activities related to Reasonable Accommodation, Sex and Disability Discrimination," as set forth in Count III. (Doc. No. 50 at p. 1.) At no point in his briefing does Plaintiff set forth any substantive argument regarding either his sex discrimination, hostile work environment, disability discrimination, or denial of reasonable accommodation claims.

In light of the above, the Court finds that Plaintiff has explicitly abandoned the claims set forth in Counts I and II of his Complaint. Accordingly, Defendant's Motion for Summary Judgment is GRANTED with respect to these claims.

### B.     Count III—Retaliation Claims

In Count III of his Complaint, Plaintiff alleges that Defendant "unlawfully and maliciously retaliated and took reprisals against Plaintiff Ronald M. Lisan, M.D.  for communicating, expressing and making complaints and objections, including pursuit of his EEO rights, to Defendant's sex discrimination, disability discrimination, Reasonable Accommodation Request denial and hostile work environment by taking multiple and continuous adverse employment actions against him." (Doc. No. 1 at ¶ 32.)  Specifically, Plaintiff argues that Defendant retaliated against him for (1) complaining about disability and sex discrimination in his January 6, 2017 letter; (2) pursuing an EEO complaint; and (3) seeking a reasonable accommodation request for his OCD.  (Doc. No. 50 at p. 5.)

Defendant argues that he is entitled to summary judgment in his favor with respect to Plaintiff's Title VII and Rehabilitation Act retaliation claims.  (Doc. No. 29 at pp. 23-29.)  Defendant first argues that Plaintiff is unable to set forth a *prima facie* case of retaliation under either of these statutes because he cannot demonstrate that he was suspended based on either his request for accommodation or his January 6, 2017 letter complaining of gender and disability discrimination and hostile work environment.  (*Id.*)  Rather, Defendant asserts that the basis for Plaintiff's suspension was his failure to follow Dr. Raphaely's explicit orders that he not contact CRNAs Bonfili and Costanzo, as well as Plaintiff's "disruptive behavior putting patient safety at risk" when he attempted to have a discussion with Ms. Bonfili in an operating room while she was monitoring a patient.  (*Id.*)

Defendant further asserts that, even if Plaintiff could establish a *prima facie* case, Defendant is nevertheless entitled to judgment in his favor because (1) Plaintiff's failure to follow Dr. Raphaely's explicit no contact orders constituted a legitimate non-discriminatory reason for his suspension; and (2) Plaintiff cannot show pretext.  (*Id*.)

Plaintiff argues that Defendant's Motion must be denied because there is a genuine issue of material fact regarding both causation and pretext.  (Doc. No. 50.)  Specifically, with regard to the causation element of his *prima facie* case, Plaintiff maintains that "the best indication of causation is Dr. Raphaely's openly expressed intention (after receiving Plaintiff's protected written complaint) to target Plaintiff from separation from the Anesthesiology Department."  (*Id*. at p. 28.)  In this regard, Plaintiff points to testimony by Chief Nurse Anesthetist Bob Bearss that, at some point after January 6, 2017, Dr. Raphaely explicitly told him (i.e., Mr. Bearss) that she wanted Plaintiff out of the department.  (*Id*. at p. 27) (citing Bearss Depo. (Doc. No. 39) at 99-100.)

Plaintiff also emphasizes the temporal proximity between his January 6, 2017 letter and the CRNAs' allegations of sexual harassment.  (Doc. No. 50 at p. 28-29.)  He argues that it is not a coincidence that CRNAs Bonfili, Foster, Costanzo, and Verb came forward within days or weeks of his January 6, 2017 letter and asserts that Dr. Raphaely, in fact, solicited sexual harassment complaints against him in an effort to increase his anxiety, destroy his reputation, and run him out of the department.  (*Id*.)  Plaintiff further maintains that Dr. Raphaely improperly escalated the situation by requiring the CRNAs to submit written reports, rather than trying to informally mediate the parties' disputes.  He claims that Dr. Raphaely intentionally did so in order to "use the Checklist Form imposing the no-contact 'gag' order," which effectively prevented him from attempting to defuse the situation amicably.  (*Id*. at p. 25.)

Finally, Plaintiff argues that there is a genuine issue of material fact regarding whether Defendant's alleged legitimate, non-discriminatory reason is pretextual. (*Id.* at p. 29-30.) He asserts that "Dr. Raphaely's gag order was not used for its intended purpose of protecting victims of harassment," but rather "was used as a weapon to engender fear, hatred, tension, and volatility." (*Id.*) Plaintiff further maintains that Dr. Raphaely "made an exaggerated claim of disruption in her proposed suspension," asserting that "it is not uncommon for anesthesiologists . . . to enter operating rooms during operations in progress to which they were not assigned to discuss matters not necessarily related to that particular patient's medical care." (*Id.*) (citing Lisan Aff. (Doc. No. 50-7) at ¶ 2.)

Under Title VII, it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits retaliating against employees who oppose unlawful employment practices. *See* 42 U.S.C. § 2000e-3(a).

The Rehabilitation Act "constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (citation omitted). Retaliation claims under the Rehabilitation Act employ the same burden-shifting framework used in Title VII retaliation claims. *See Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). *See also Madden v. Brennan,* 2019 WL 4729777 at * 1 (6th Cir. Sept. 11, 2019).

To establish that a defendant engaged in retaliation in violation of Title VII or the Rehabilitation Act, a plaintiff may rely on either direct or circumstantial evidence. *See Daniels v.*

*Pike Cty. Comm'rs,* 706 Fed. Appx 281, 291 (6th Cir. 2017); *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003). Direct evidence is evidence which, if believed, requires the conclusion that unlawful retaliation was at least a motivating factor in the employer's actions. *See Johnson,* 319 F.3d at 865; *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543-44 (6th Cir. 2008).

In the absence of direct evidence, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *See Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007). Under this framework, the plaintiff faces the initial burden of presenting a *prima facie* case of unlawful retaliation. *Johnson*, 319 F.3d at 866. The establishment of a *prima facie* case creates a rebuttable presumption of retaliation and requires the defendant to 'articulate some legitimate, nondiscriminatory reason' for taking the challenged action. *Id. See also Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000)). Finally, "[i]f the defendant is able to satisfy this burden, the plaintiff must then 'prove that the proffered reason was actually a pretext to hide unlawful" retaliation. *Id. See also Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008).

### 1.     Direct Evidence

Here, Plaintiff first argues that Bob Bearss' testimony that Dr. Raphaely wanted Plaintiff "out of the department" constitutes direct evidence of Defendant's retaliatory intent. As noted above, "[d]irect evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Imwalle*, 515 F.3d at 543–44. If there is direct evidence of retaliation, then "the plaintiff's case-in-chief is met, and the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 346–47 (6th

Cir.2012) (internal quotation marks and citation omitted). *See also Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 648 (6th Cir. 2015).

The record reflects that Mr. Bearss testified regarding Dr. Raphaely's alleged statement as follows:

Q:   Did Dr. Raphaely ever express an interest or desire or intention to get Dr. Lisan out of the department of anesthesiology at the Cleveland VA?

A:   Yes.

Q:   When was that?

A:   I can't give you a specific date.

Q:   Was it –

A:   It was after, it was after this letter was sent.

Q:   After January 6th?

A:   Yes.

Q:   2017?

A:   Yes.

Q:   Okay. You can't tell me about how long after it was?

A:   No.

Q:   Well, let me ask you this: Was it within that same year?

A:   Yes.

Q:   Within a few months?

A:   Yeah, probably.

***

Q:   Okay. What did she tell you about getting him out of the department?

21

A:      She just wanted him out of the department.

Q:      What did she say?

A:      She said, "I want him out of the department."

Q:      Did she say why?

A:      No.

Q:      Did she explain that in any way?

A:      No.

Q:      Was anybody else present when she said that?

A:      No.

Q:      Did you know why she wanted him out of the department?

A:      No.

(Bearss Depo. at Tr. 99-100.)

In his Reply Brief, Defendant argues Mr. Bearss' testimony regarding Dr. Raphaely's alleged statement does not constitute direct evidence of retaliation because "[i]n order for the statement to constitute direct evidence, a factfinder would have to make at least one inference—that the reason Dr. Raphaely wanted Lisan out of the department was because he requested an accommodation or complained about discrimination." (Doc. No. 56 at p. 3.) Defendant maintains that, here, Mr. Bearss testified that did not know when Dr. Raphaely made this alleged statement or why. (*Id*. at pp. 2-3.) Defendant argues that, in light of this ambiguity and because Dr. Raphaely's statement does not refer to Lisan's protected activity, Mr. Bearss' testimony is insufficient to constitute direct evidence of discrimination as a matter of law. (*Id*.) Although granted leave to file a sur-reply, Plaintiff does not respond to this argument. (Doc. No. 63.)

For the following reasons, the Court agrees with Defendant that Mr. Bearss' testimony is insufficient to constitute direct evidence of retaliation. As discussed above, in order to constitute direct evidence of retaliation, Mr. Bearss' testimony must "not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by" retaliatory animus. *Johnson*, 319 F.3d at 865. Here, Mr. Bearss' testimony is vague with respect to both the timing of, and motivation behind, Dr. Raphaely's alleged statement. Even construing his testimony in a light most favorable to Plaintiff, the Court finds that Mr. Bearss' testimony does not sufficiently establish that Dr. Raphaely wanted Plaintiff out of the Anesthesiology Department *because of* Plaintiff's reasonable accommodation request and/or his January 6, 2017 letter accusing her of discrimination and creating a hostile work environment. To the contrary, Mr. Bearss' testimony is ambiguous and offers no insight into Dr. Raphaely's motivation for making the alleged statement at issue. *See Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 382 (6th Cir. 2002) (noting that "[i]t is well established that isolated and ambiguous comments are not sufficient to make out a direct-evidence case of employment discrimination") (citing *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir.1993)).

Accordingly, and because Mr. Bearss' testimony does not "compel the conclusion that retaliatory animus played a part in the challenged conclusion," the Court finds that it does not constitute direct evidence of retaliation. Plaintiff's argument to the contrary is without merit and rejected.

### 2. Circumstantial Evidence

#### a. *Prima Facie* Case

In the absence of direct evidence, retaliation claims are governed by the *McDonnell Douglas* burden-shifting framework. *Weigel*, 302 F.3d at 381. *See also Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 877 (6th Cir. 1991). To establish a *prima facie* case of unlawful retaliation under Title VII and the Rehabilitation Act, a plaintiff must demonstrate by a preponderance of the evidence that: (1) he engaged in activity that Title VII and/or the Rehabilitation Act protects; (2) defendant knew that he engaged in this protected activity; (3) the defendant subsequently took an employment action adverse to the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action exists. *See Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000); *Kappen v. Ashley Medical Supply, Inc.*, 695 Fed. Appx. 94, 96 (6th Cir. 2017). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen*, 229 F.3d at 563; *see also EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997) (stating that establishing a *prima facie* case entails a lower burden of proof than that which is required to win a judgment on the merits.).

Here, Defendant concedes that Plaintiff has met the first and second prongs of his *prima facie* case; i.e., that Plaintiff engaged in protective activity and that Defendant knew of this activity. (Doc. No. 29-1 at p. 24.) With respect to the third prong, Plaintiff argues that his 10-day suspension without pay constitutes an "adverse employment action."[6] (Doc. No. 50 at p. 20, 27-28.) The Court agrees. *See Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004) (finding that a 24-hour suspension,

---

[6] In order to demonstrate an "adverse employment action," "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Garner v. Cuyahoga Cty. Juvenile Court*, 554 F.3d 624, 639 (6th Cir. 2009) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Here Plaintiff does not assert or present any legal argument that any other employment actions taken by Defendant constitute "adverse employment actions" for purposes of the third prong of the *prima facie* test. Thus, the Court deems waived any argument that any other alleged actions by the VA constituted an "adverse employment action."

the equivalent of three eight-hour work days, was an adverse employment action); *Gainor v. Worthington City Schools*, 2013 WL 6587869 at * 9 (S.D. Ohio Dec. 13, 2013) ("Though Gainor's suspensions were two separate, short suspensions, they were without pay, thereby meeting the standard of adverse action."); *Washington v. Marymount Hosp., Inc*., 2010 WL 447256 at * 7 (N.D. Ohio Feb. 3, 2010) (finding three day suspension without pay to be an adverse employment action).

The fourth, and final, element of the *prima facie* case requires Plaintiff to show that a causal connection between the protected activity and the adverse employment action exists. *See Mys v. Michigan Dept. of State Police,* 886 F.3d 591, 600 (6th Cir. 2018). This element requires proof of so-called "but-for" causation, meaning that the plaintiff must furnish evidence that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). *See also Mys*, 886 F.3d at 600. "Causation can be established by indicia of retaliatory conduct, such as evidence that the plaintiff was treated differently than similarly situated employees who did not engage in protected activity or evidence that the plaintiff was subjected to closer disciplinary scrutiny after engaging in protected activity." *Green v. Central Ohio Transit Authority*, 647 Fed. Appx. 555, 560 (6th Cir. 2016). *See also Evans v. Prospect Airport Servs., Inc*., 286 Fed. Appx. 889, 895 (6th Cir.2008) (citing *Little v. BP Exploration & Oil Co.,* 265 F.3d 357, 364–65 (6th Cir.2001); *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1080 (6th Cir.1999)).

Here, Plaintiff argues that the temporal proximity between his January 6, 2017 letter and his June 2017 Suspension permits the inference that retaliation was a motivating factor in Defendant's decision to suspend him. (Doc. No. 50 at p. 29.) Defendant argues that, even assuming the temporal proximity between these events is sufficient to create an inference of a causal connection, "Lisan's

admitted conduct of purposely disobeying the no-contact order was an intervening legitimate reason for discipline that 'dispel[led] an inference of retaliation based on temporal proximity.'" (Doc. No. 56 at p. 14.) Specifically, Defendant asserts that, "because Lisan engaged in the conduct that resulted in discipline, he cannot show that there is a material factual issue that his request for accommodation or complaint letter to the VA were the sole cause of the ten-day suspension against him." (*Id.*)

The Sixth Circuit has held that "temporal proximity between the employee's engagement in protected conduct and the adverse employment action also plays a role in the causation analysis, though the circuit's case law is inconsistent on whether temporal proximity standing alone is sufficient to establish causation." *Green*, 647 Fed. Appx. at 560 (citing *Evans*, 286 Fed. Appx. at 895; *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 525 (6th Cir.2008)). Nevertheless, it is well established that an "intervening legitimate reason" to take an adverse employment action will "dispel[ ] an inference of retaliation based on temporal proximity." *Kuhn v. Washtenaw Cty*., 709 F.3d 612, 628 (6th Cir.2013) (quoting *Wasek v. Arrow Energy Servs., Inc*., 682 F.3d 463, 472 (6th Cir.2012)). *See also McDonald v. UAW-GM Center for Human Resources,* 738 Fed. Appx. 848, 855 (6th Cir. 2018); *Green*, 647 Fed. Appx. at 560.

For example, in *Wasek*, plaintiff was sexually harassed by a co-worker and repeatedly complained to management. When his complaints remained unaddressed, plaintiff decided to leave his job site, which created difficulty for his employer because the plaintiff's crew was 600 miles away from the main office, making it difficult to bring in a replacement. *Wasek*, 682 F.3d at 465–66. Thereafter, defendant engaged in a materially adverse employment action by banning plaintiff from returning to work with the crew. *Id*. at 466–67, 470. The Sixth Circuit determined that the plaintiff's departure from the job site provided defendant with "an intervening legitimate reason to discipline

him," which allayed any inference of retaliation based on the temporal proximity between his protected activity and the adverse employment action. *Id.* at 472. *See also McDonald*, 738 Fed. Appx. at 855-856 (rejecting temporal proximity argument because "McDonald's insubordination and the follow-up meeting when she admitted to that insubordination were such intervening events providing [defendant] with a legitimate reason to suspend her for barely two days."); *Kuhn*, 709 F.3d at 628 (rejecting temporal proximity argument because "Kuhn's extended discretionary leave and his failure to return to work caused a shortage of available deputies in the Sheriff's Office and constituted an intervening reason for the County to terminate his employment.").

Here, the Court finds that the events that transpired in this case do not support an inference of retaliation based on temporal proximity between Plaintiff's reasonable accommodation request and/or January 2017 complaint letter, and his ten-day suspension. Plaintiff's suspension was based, in part, on his failure to follow the no-contact order relating to Ms. Bonfili in early March 2017. (Doc. No. 29-9 at PageID#s 363-367.) Even assuming the truth of Plaintiff's allegations that Ms. Bonfili gave him permission to speak with her about her sexual harassment allegations, it is undisputed that Plaintiff was expressly ordered, pursuant to VA Policy MCP 003-003, [7] to cease any contact with Ms. Bonfili except that which was absolutely required for official business. It is further undisputed that, despite this directive, Plaintiff entered an operating room on March 8, 2017 and spoke with Ms. Bonfili in an effort to resolve her sexual harassment complaint against him. (Lisan Depo. at Tr. 216, 219-232.) Plaintiff admits that a surgery was ongoing at that time; Ms. Bonfili was

---

[7] As noted *supra*, the VA's Sexual Harassment Policy MCP 003-003 expressly requires that "the alleged harasser will be ordered to cease any further contact with the alleged victim except that of which is absolutely required by official business." (Doc. No. 29-3 at PageID# 288.)

monitoring the patient, and Plaintiff was not the assigned anesthetist for that procedure or otherwise required to be in that particular operating room. (*Id*.) Plaintiff also admits that he touched Ms. Bonfili and that he failed to leave the operating room when first requested to do so by Dr. Mannix. (*Id*.) Lastly, Plaintiff himself testified that, at one point during this encounter, Ms. Bonfili looked "literally terrified." (*Id*. at Tr. 228.)

In light of the above, the Court finds that Plaintiff's admitted failure to follow the no contact order constituted an intervening reason for his ten-day suspension. Therefore, the temporal proximity between his protected activity (i.e., his reasonable accommodation request and/or January 6, 2017 letter) and his suspension is not sufficient to create an inference of retaliation.[8]

Plaintiff also relies on other evidence of causation, including "Dr. Raphaely's openly expressed intention (after receiving Plaintiff's protected written complaint) to target Plaintiff for separation from the Anesthesiology Department." (Doc. No. 50 at p. 28.) The Court interprets this to be a reference to Mr. Bearss' testimony, discussed above, that Dr. Raphaely told him that she wanted Plaintiff "out of her department." (Bearss Depo. at Tr. 99-101.) As discussed *supra,* however, Mr. Bearss' testimony is vague with respect to both the timing of and motivation behind Dr. Raphaely's alleged statement. As such, the Court finds that it is insufficient to demonstrate that Dr. Raphaely wanted Plaintiff out of the Anesthesiology Department *because of* Plaintiff's reasonable accommodation request and/or his January 6, 2017 letter. Thus, the Court finds that Mr. Bearss'

---

[8] The cases cited by Plaintiff regarding temporal proximity are distinguishable. As the Sixth Circuit has noted, "[t]hroughout our case law on temporal proximity, we emphasize the importance of the particular facts surrounding an employer's action." *Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). Although the cases cited by Plaintiff found an inference of retaliation based on temporal proximity, the courts in those cases were not asked to consider, and did not address, whether the plaintiff's intervening conduct dispelled an inference of retaliation based on temporal proximity. *See Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006); *Goller v. Ohio Dept. of Rehabilitation & Correction*, 285 Fed. Appx. 250 (6th Cir. 2008); *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004).

testimony does not create a genuine issue of material fact regarding a causal connection between Plaintiff's protected activity and his suspension.

Finally, Plaintiff relies on the fact that "neither Dr. Raphaely nor the EEO fact finder Bruce Kafer ever discussed with Dr. Lisan his side of the [CRNAs sexual harassment] accusations." (Doc. No. 50 at p. 28.) He argues that "nobody at the VA considered questioning Dr. Raphaely about Dr. Lisan's protected discrimination complaints followed so quickly by the cascade of CRNA accusations of supposed sexual harassment." (*Id.*) Even assuming this to be the case, it does not change the fact that Plaintiff intentionally and deliberately violated the no contact order with respect to Ms. Bonfili, when he spoke to her and attempted to resolve her sexual harassment allegations against him in an operating room while she was monitoring a patient. Under these circumstances, the Court finds that the alleged failure to interview Plaintiff regarding the CRNAs' sexual harassment allegations does not create a genuine issue of material fact regarding this element of Plaintiff's *prima facie* case.

Accordingly, and for all the reasons set forth above, the Court finds that Plaintiff has failed to establish a *prima face* case because he has not demonstrated that there is a genuine issue of material fact that retaliation for engaging in protected activity was the sole, but-for cause of his ten-day suspension.

### b.        Legitimate, Non-Discriminatory Reason and Pretext

Even assuming *arguendo* that Plaintiff had established a *prima facie* case, the Court finds that Defendant has articulated a legitimate, non-discriminatory reason for suspending Plaintiff for ten days without pay. To meet this burden under the second step of the *McDonnell Douglas* burden-shifting framework, a defendant "need not prove a nondiscriminatory reason for [its actions], but need merely articulate a valid rationale." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996). In this case, Defendant

presented evidence that the VA suspended Plaintiff without pay because (among other things) he violated the no-contact order relating to CRNA Bonfili and engaged in "disruptive behavior putting patient safety at risk" when he entered an operating room and spoke to Ms. Bonfili regarding her sexual harassment claims while a patient was undergoing surgery. (Doc. No. 29-9 at PageID#s 363-367.) Thus, Defendant has clearly articulated a legitimate, nondiscriminatory, and nonretaliatory reason for its decision to suspend Plaintiff without pay.

As a result, to survive Defendant's Motion for Summary Judgment, Plaintiff must "demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Imwalle*, 515 F.3d at 544. The Sixth Circuit has identified three ways in which a plaintiff may rebut a defendant's legitimate, nondiscriminatory reason and demonstrate pretext. *See Imwalle*, 515 F.3d at 545 (citing *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994)). *See also Igwe v. Salvation Army,* 2019 WL 5424692 at * 5 (6th Cir. Oct.2 3, 2019). The plaintiff may show that (1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action. *See Imwalle,* 515 F.3d at 545; *Igwe*, 2019 WL 5424692 at * 5. Regardless of which rebuttal method is employed, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Johnson*, 319 F.3d at 866 (alteration in original). *See also Braithwaite v. Timken Co*., 258 F.3d 488, 493 (6th Cir. 2001).

Plaintiff argues that "[t]he proposed suspension issued by Dr. Raphaely for Dr. Lisan essentially disobeying a gag order for talking to Ms. Bonfili . . . was transparently pretextual." (Doc. No. 50 at p. 29.)  He asserts that "Dr. Raphaely's gag order was not used for its intended purpose of protecting victims of harassment" but was "used as a weapon to engender fear, hatred, tension, and hostility." (*Id*.)  Plaintiff further asserts that Defendant's shifting explanations for his suspension permit an inference of retaliation, arguing "Defendant changed its position to claim, after the EEO investigation found that there was no sexual harassment by Dr. Lisan, that its suspension without pay suddenly had little to do with sexual harassment; the new justification was because of Dr. Lisan's blatant disregard of" the no contact order.  (Doc. No. 63 at p. 5.)  Finally, Plaintiff argues that, even assuming he "technically" violated the no contact order, there is a genuine issue of material fact as to whether his attempt to resolve Ms. Bonfili's sexual harassment allegations against him was "absolutely required for official business" and, thus, in fact permitted under the terms of the no contact order.  (*Id*. at p. 4-5.)

For the following reasons, the Court finds Plaintiff has failed to demonstrate that Defendant's legitimate, non-discriminatory reason is pretextual.  As an initial matter, the Court finds that Plaintiff has not shown that Defendant's stated reason for terminating the employee has no basis in fact.  As discussed above, Plaintiff's suspension letter specifically stated that the basis for his suspension was his failure to follow the no-contact orders, inappropriate conduct, and disruptive behavior putting patient safety at risk.  (Doc. No. 29-9 at PageID#s 363-367.)  Each of these three categories of infractions expressly referenced and included the March 8, 2017 incident when he entered an operating room and spoke to Ms. Bonfili regarding the possibility of resolving her sexual harassment claims, while a patient was undergoing surgery.  (*Id.*)

During his deposition, Plaintiff expressly admitted that he engaged in the conduct underlying the March 8, 2017 incident with Ms. Bonfili that formed the basis of his suspension. Specifically, and as discussed *supra*, Plaintiff acknowledged and admitted the following:

- He was expressly ordered to cease any contact with Ms. Bonfili except that which was absolutely required for official business.

- Despite this directive, Plaintiff entered an operating room on March 8, 2017 and spoke with Ms. Bonfili in an effort to resolve her sexual harassment complaint against him.

- A surgery was ongoing at the time he entered the operating room and Ms. Bonfili was monitoring the patient.

- Plaintiff was not the assigned anesthetist for that procedure or otherwise required to be in that particular operating room.

- He touched Ms. Bonfili on her shoulder.

- He failed to leave the operating room when first requested to do so by Dr. Mannix.

- At one point during this encounter, Ms. Bonfili looked "literally terrified."

(Lisan Depo. at Tr. 219-230.) Although Plaintiff argues that Ms. Bonfili "invited" the contact and gave him permission both to speak to her and to touch her, the fact remains that Plaintiff was ordered, pursuant to VA Policy MCP 003-003, to refrain from any contact with Ms. Bonfili (except that required for official business)[9] pending the completion of the investigation. Plaintiff's deposition testimony reveals that he intentionally violated this order. Thus, the Court finds that

_____

[9] The Court flatly rejects Plaintiff's argument that his attempt to resolve Ms. Bonfili's sexual harassment allegations by talking to her privately in an operating room while she was monitoring a patient was "absolutely required for official business" and, thus, permitted under the terms of the no contact order. At the time of this encounter, the VA EEO office was in the process of investigating Ms. Bonfili's sexual harassment accusations (as well as the accusations of the other complaining CRNAs) in accordance with the procedures and policies set forth in MCP 003-033. Thus, it was not "absolutely required" that Plaintiff attempt to resolve her allegations privately and independently, as an official investigation was required by and being undertaken pursuant to VA Policy. Moreover, it cannot seriously be disputed that the entire point of the no contact order is to shield alleged victims of sexual harassment from exactly the type of behavior that Plaintiff engaged in when he confronted Ms. Bonfili on March 8, 2017.

Plaintiff has not demonstrated that there is a genuine issue of material fact that Defendant's stated reason for terminating the employee has no basis in fact.

The Court also finds that Plaintiff has failed to demonstrate that there is a genuine issue of material fact that "the reason offered for terminating the employee was not the actual reason for the termination." *Imwalle*, 515 F.3d at 545. As Plaintiff correctly notes, the Sixth Circuit has held that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) *amended on other grounds*, 97 F.3d 833 (6th Cir. 1996). *See also Asmo*, 471 F.3d at 596; *Peck v. Elyria Foundry Co.*, 347 Fed. Appx. 139, 146 (6th Cir. 2009); *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). Here, however, Plaintiff has failed to demonstrate that Defendant's explanation for the ten-day suspension changed over time or was otherwise inconsistent or contradictory. To the contrary, the evidence shows that Defendant's consistent explanation for Plaintiff's suspension has been Plaintiff's failure to follow the no contact orders, including and most particularly as evidenced by the March 8, 2017 incident with Ms. Bonfili.

Specifically, the record reflects that, on March 10, 2017 (two days after the March 8th incident with Ms. Bonfili), Dr. Raphaely sent a Letter of Warning to Plaintiff in which she (1) reminded him that he had been previously ordered on three separate occasions to refrain from discussing the sexual harassment allegations with his coworkers; (2) advised him that he had been recently accused of violating these orders; and (3) ordered him to "cease this offending behavior immediately." (Doc. No. 29-2 at PageID# 197.) Dr. Raphaely also advised him that the allegations that he violated the no contact orders would be "fully investigated" and that "[a]s more is learned about the nature of these allegations, you will be advised as to your rights and responsibilities." (*Id.*)

Two weeks later, on March 25, 2017, Dr. Raphaely issued a Proposed 10-day Suspension. (Doc. No. 29-9 at PageID#s 363-367.) This Proposed Suspension expressly stated that the bases for his suspension included the failure to follow the no-contact orders, inappropriate conduct, and disruptive behavior putting patient safety at risk. (*Id.*) Each of these categories of infractions expressly referenced the March 8, 2017 incident with Ms. Bonfili. (*Id.*) When Ms. Fuehrer upheld the Supension in June 2017, she indicated that the bases listed in the Proposed Suspension were sustained. (Doc. No. 50-1 at PageID# 3587.) In addition, during her deposition, Ms. Fuehrer expressly testified that she sustained Plaintiff's suspension in large part because of the March 8, 2017 incident with Ms. Bonfili. (Fuehrer Depo. Vol. II (Doc. No. 43) at Tr. 211). She explained as follows:

> We have an anesthesiologist that is highly professional, that should be professional and should not be going into operating rooms that he had no business going into that he had been told not once, not twice but at least three times to not do and he went into an operating room active with a patient, spoke to someone, touched the CRNA, a physician came in, a separate physician came in, asked him to leave. He refused to leave. Another physician came in to excuse the CRNA. That alone is how I made this decision to suspend him.

(*Id.*) In light of the above, the Court finds that Defendant has consistently articulated the reason for Plaintiff's suspension as his failure to follow the no contact orders issued to him and that Plaintiff has failed to demonstrate that there is a genuine issue of material fact that this was not the actual reason for his suspension.[10]

---

[10] Plaintiff argues, summarily, that "Ms. Fuehrer's confirmation of the proposed suspension does not immunize Dr. Raphaely from our claim of retaliation, per the well-recognized 'cat's paw' principle." (Doc. No. 50 at p. 30.) This is the sum total of Plaintiff's argument with respect to this issue. Specifically, Plaintiff does not recite the law regarding the cat's paw principle, direct this Court's attention to any legal authority regarding this principle, or apply this principle to the facts of the instant case. Under these circumstances, the Court finds that Plaintiff waived any argument regarding this issue. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (quoting *Citizens Awareness*

Finally, the Court finds that Plaintiff has failed to demonstrate that there is a genuine issue of material fact that the reason offered by Defendant was insufficient to explain Plaintiff's suspension. *See Imwalle*, 515 F.3d at 545. As set forth above, Ms. Fuehrer testified that Plaintiff's decision to enter the operating room and talk to Ms. Bonfili violated the no contact order, was unprofessional, and put patient safety at risk. (*Id.* at Tr. 189, 211.) The Court finds Plaintiff has not sufficiently demonstrated that this is an insufficient basis for his ten-day suspension.

In closing, the Court acknowledges Plaintiffs' assertions that Dr. Raphaely solicited the CRNAs to submit false sexual harassment allegations, and that the CRNAs only did so because they feared retaliation from Dr. Raphaely if they did not comply.[11] The Court also recognizes Plaintiff's argument that Dr. Raphaely failed to try to mediate or de-escalate the situation and, instead, did everything in her power to encourage and pursue the allegations against him in order to "run him out of her department." Plaintiff also complains that everyone involved (Dr. Raphaely, Mr. Kafer, Ms. Reese, Dr. Altose, and Ms. Fuehrer) failed to conduct the investigation properly by refusing to recuse

---

*Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir.1995)). Moreover, even if the "cat's paw" principle had been properly raised, the Court would find it inapplicable in the present case. The "cat's paw" principle applies "[w]hen an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias." *Arendale v. City of Memphis*, 519 F.3d 587, n. 13 (6th Cir. 2008). Here, however, Plaintiff can show no such influence where he admits that he intentionally violated the no contact order when he entered the operating room and spoke to Ms. Bonfili in an attempt to resolve her sexual harassment allegations. Thus, even if properly raised, the Court would find this argument to be without merit.

[11] Plaintiff particularly emphasizes a report prepared by Brenda Spicer dated June 18, 2018 entitled "Climate Assessment Findings: Anesthesiology Service." (Doc. No. 51-1.) This report indicates that Ms. Spicer conducted a "Climate Assessment" regarding the VA Anesthesiology Department in response to concerns expressed by several CRNAs that the anesthesiology workplace environment was hostile. As part of this Assessment, Ms. Spicer interviewed Ms. Bonfili. According to Ms. Spicer, Ms. Bonfili told her the following: "Dr. Lisan filed a complaint against Dr. Raphaely and during the investigative stage, she was asked to complete a questionnaire. Dr. Raphaely called her into her office and proceeded to instruct her how to answer the questions. She specifically told her what to say on the questionnaire. She indicated the same thing happened to Elaine [Costanzo]." (*Id.* at p. 10.) Ms. Spicer also indicated that Ms. Bonfili stated she feared retaliation from Dr. Raphaely. (*Id.*) Even assuming the truth of these statements in Ms. Spicer's Assessment, this does not change the fact that Plaintiff intentionally violated the no contact order when he spoke to Ms. Bonfili on March 8, 2017 in an attempt to resolve her sexual harassment allegations. Thus, the Court finds that Ms. Spicer's Assessment does not create a genuine issue of material fact regarding pretext.

themselves and/or interview him directly about the allegations against him. Plaintiff maintains that all of this behavior reflects a conspiracy to retaliate against him for his January 6, 2017 letter.

Plaintiff's arguments, however, miss the mark. Even if the Court were to assume that all of the above allegations are true, it is nonetheless undisputed that Plaintiff intentionally violated the no contact order when he entered an operating room on March 8, 2017 and spoke to Ms. Bonfili regarding the possibility of resolving her sexual harassment claims, when he was not assigned to that operating room and a patient was undergoing surgery at the time. While Plaintiff disagrees with the VA Policy that prohibited him from contacting his accusers to attempt to resolve their allegations, Plaintiff cites no law that would support the argument that he was somehow immunized from intentionally violating that Policy.

For all the reasons set forth above, the Court finds that Plaintiff has failed to demonstrate that there is a genuine issue of material fact that Defendant's legitimate, non-discriminatory reason for suspending him was pretextual. Accordingly, Defendant is entitled to summary judgment in his favor with respect to the retaliation claims set forth in Count III of the Complaint.[12]

**V. Conclusion**

For all of the reasons set forth above, Defendant's Motion for Summary Judgment (Doc. No. 29) is GRANTED.

**IT IS SO ORDERED.**

        *s/Pamela A. Barker*
        PAMELA A. BARKER
Date: January 9, 2020        U. S. DISTRICT JUDGE

---

[12] This includes plaintiff's retaliation claims based on sex discrimination, disability discrimination and hostile work environment.

36